# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:21–cv–00586–APM</u>

SWALWELL v. TRUMP et al

Assigned to: Judge Amit P. Mehta

Cases:  1:21–cv–00400–APM

       1:21–cv–02265–APM

       1:21–cv–03267–APM

       1:22–cv–00010–APM

       1:21–cv–00858–APM

       1:22–cv–00011–APM

       1:22–cv–00034–APM

Cause: 48:1985 Conspiracy/Deprivation Civil Rights

Date Filed: 03/05/2021

Jury Demand: Defendant

Nature of Suit: 440 Civil Rights: Other

Jurisdiction: Federal Question

<u>**Non–Party Respondent**</u>

**OFFICE OF GENERAL COUNSEL FOR THE U.S. HOUSE OF REPRESENTATIVES**

represented by **Douglas N. Letter**
U.S. HOUSE OF REPRESENTATIVES
Office of General Counsel
5140 O'Neill House Office Building
Washington, DC 20515
202–225–9700
Email: douglas.letter@mail.house.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Non–Party Respondent**</u>

**UNITED STATES OF AMERICA**
*Attorneys for the United States*

represented by **Brian M. Boynton**
DOJ–CIV
950 Pennsylvania Avenue NW
Washington, DC 20530
202–514–4015
Email: brian.m.boynton@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Taheerah Kalimah El–Amin**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Torts Branch, FTCA
Section
P.O. Box 888
Benjamin Franklin Station
Washington, DC 20044
(202) 616–4270
Fax: (202) 616–5200
Email: taheerah.el–amin@usdoj.gov
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **ERIC SWALWELL** | represented by | **Matthew G. Kaiser** |
| *Representative* | | KAISERDILLON PLLC |

**ERIC SWALWELL**
*Representative*

represented by   **Matthew G. Kaiser**
KAISERDILLON PLLC
1401 K Street, NW
Suite 600
Washington, DC 20005
(202) 640–2850
Fax: (202) 280–1034
Email: mkaiser@kaiserdillon.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Philip C. Andonian**
CALEB ANDONIAN PLLC
1100 H Street, N.W.
Suite 315
Washington, DC 20005
202–953–9850
Email: phil@calebandonian.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah Fink**
KAISER DILLON, PLLC
1099 14th Street
Suite 800 West
Washington, DC 20005
(202) 640–2850
Email: SFink@kaiserdillon.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Bullock Pittard , IV**
KAISER DILLON, PLLC
1099 14th Street
Suite 800 West
Washington, DC 20005
(202) 640–2850
Email: wpittard@kaiserdillon.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Barry Coburn**
COBURN & GREENBAUM, PLLC
1710 Rhode Island Avenue, NW
2nd Floor
Washington, DC 20036
(202) 643–9472
Fax: (866) 561–9712
Email: barry@coburngreenbaum.com

*TERMINATED: 01/20/2022*
*ATTORNEY TO BE NOTICED*

**Joseph P. Caleb**
CALEB ANDONIAN, PLLC
1100 H Street NW
Suite 315
Washington, DC 20005
(202) 953–9850
Fax: (202) 217–4100
Email: joe@calebandonian.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DONALD J. TRUMP**                    represented by    **Jesse R Binnall**
*in his personal capacity*                                BINNALL LAW GROUP
                                                          717 King Street
                                                          Suite 200
                                                          Alexandria, VA 22314
                                                          703–888–1943
                                                          Email: jesse@binnall.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**DONALD TRUMP, JR.**                  represented by    **Jesse R Binnall**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**RUDOLPH GIULIANI**                   represented by    **Joseph D. Sibley , IV**
*TERMINATED: 02/18/2022*                                  CAMARA & SIBLEY LLP
                                                          1108 Lavaca St
                                                          Suite 110263
                                                          Austin, TX 78701
                                                          713–966–6789
                                                          Fax: 713–583–1131
                                                          Email: sibley@camarasibley.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**MO BROOKS**                          represented by    **MO BROOKS**
*Representative, in his personal capacity*                1000 New Jersey Avenue, S.E.
                                                          Unit 1208
                                                          Washington, DC 20003
                                                          PRO SE

**Movant**

| | |
|---|---|
| **FLOYD ABRAMS** | represented by **Nicholas D. Marais**<br>KEKER, VAN NEST & PETERS LLP<br>633 Battery Street<br>San Franisco, CA 94111<br>4153915400<br>Email: nmarais@keker.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Movant**

| | |
|---|---|
| **ERWIN CHEMERINSKY** | represented by **Nicholas D. Marais**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Movant**

| | |
|---|---|
| **MARTHA MINOW** | represented by **Nicholas D. Marais**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Movant**

| | |
|---|---|
| **LAURENCE H. TRIBE** | represented by **Nicholas D. Marais**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Movant**

| | |
|---|---|
| **CAMPAIGN LEGAL CENTER ACTION** | represented by **Adav Noti**<br>CAMPAIGN LEGAL CENTER<br>1101 14th Street, NW<br>Suite 400<br>Washington, DC 20005<br>(202) 736–2203<br>Fax: (202) 736–2222<br>Email: anoti@campaignlegalcenter.org<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Mark P. Gaber**<br>CAMPAIGN LEGAL CENTER<br>1101 14th Street, NW<br>Suite 400<br>Washington, DC 20005<br>(202) 736–2202<br>Fax: (202) 736–2222<br>Email: mgaber@campaignlegalcenter.org<br>*LEAD ATTORNEY* |

*ATTORNEY TO BE NOTICED*

**Paul March Smith**
CAMPAIGN LEGAL CENTER
1101 14th Street, NW
Suite 400
Washington, DC 20005
(202) 736–2200
Fax: (202) 736–2222
Email: psmith@campaignlegalcenter.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hayden Johnson**
CAMPAIGN LEGAL CENTER
1101 14th Street NW
Suite 400
Washington, DC 20005
202–736–2200
Email: hsj7@georgetown.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Movant**

**JARED HOLT**                    represented by **Jonathan Lentine Williams**
JONATHAN L. WILLIAMS, P.A.
113 South Monroe Street
First Floor
Tallahassee, FL 32301
850–706–0940
Email: jw@jonathanwilliamslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**EVAN H. CAMINKER**             represented by **Brianne Jenna Gorod**
CONSTITUTIONAL
ACCOUNTABILITY CENTER
1200 18th Street, NW
Suite 501
Washington, DC 20036
(202) 296–6889 ext. 304
Email: brianne@theusconstitution.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**ANDREW KENT**                  represented by **Brianne Jenna Gorod**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**SHELDON NAHMOD**                    represented by **Brianne Jenna Gorod**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*


**Amicus**

**DAPHNA RENAN**                      represented by **Brianne Jenna Gorod**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*


**Amicus**

**PETER M. SHANE**                    represented by **Brianne Jenna Gorod**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 03/05/2021 | 1 | | COMPLAINT against All Defendants with Jury Demand ( Filing fee $ 402 receipt number ADCDC–8280044) filed by ERIC SWALWELL. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons)(Caleb, Joseph) (Entered: 03/05/2021) |
| 03/05/2021 | 2 | | NOTICE OF RELATED CASE by ERIC SWALWELL. Case related to Case No. 21–cv–400. (Caleb, Joseph) (Entered: 03/05/2021) |
| 03/05/2021 | | | NOTICE OF ERROR re 1 Complaint; emailed to joe@calebandonian.com, cc'd 3 associated attorneys –– The PDF file you docketed contained errors: 1. Blank or missing coversheet. Please use the cover sheet at https://www.dcd.uscourts.gov/new–case–forms & file using the event Civil Cover Sheet., 2. Form filed as fillable PDF. Please file form in a non–fillable PDF format., 3. **COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied.** (zsb, ) (Entered: 03/05/2021) |
| 03/05/2021 | | | NOTICE OF ERROR re 2 Notice of Related Case; emailed to joe@calebandonian.com, cc'd 3 associated attorneys –– The PDF file you docketed contained errors: 1. Form filed as fillable PDF. Please file form in a non–fillable PDF format., 2. **COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied.** (zsb, ) (Entered: 03/05/2021) |
| 03/09/2021 | 3 | | CIVIL COVER SHEET by ERIC SWALWELL filed by ERIC SWALWELL.(Caleb, Joseph) (Entered: 03/09/2021) |
| 03/09/2021 | 4 | | NOTICE OF RELATED CASE by ERIC SWALWELL. Case related to Case No. 1:21–cv–00400. (Caleb, Joseph) (Entered: 03/09/2021) |
| 03/09/2021 | | | Case Assigned to Judge Amit P. Mehta. (adh, ) (Entered: 03/09/2021) |

| 03/10/2021 | 5 | | SUMMONS (4) Issued Electronically as to MO BROOKS, RUDOLPH W. GIULIANI, DONALD J. TRUMP, JR, DONALD J. TRUMP. (Attachment: # 1 Notice and Consent)(adh, ) (Entered: 03/10/2021) |
|---|---|---|---|
| 03/17/2021 | 6 | | NOTICE of Appearance by Sarah Renee Fink on behalf of ERIC SWALWELL (Fink, Sarah) (Entered: 03/17/2021) |
| 03/17/2021 | 7 | | NOTICE of Appearance by Matthew G. Kaiser on behalf of ERIC SWALWELL (Kaiser, Matthew) (Entered: 03/17/2021) |
| 03/24/2021 | 8 | | NOTICE of Appearance by Jesse R Binnall on behalf of DONALD J. TRUMP, JR, DONALD J. TRUMP (Binnall, Jesse) (Entered: 03/24/2021) |
| 03/25/2021 | 9 | | WAIVER OF SERVICE. DONALD J. TRUMP waiver sent on 3/24/2021, answer due 5/23/2021. (Fink, Sarah) (Entered: 03/25/2021) |
| 03/25/2021 | 10 | | WAIVER OF SERVICE. DONALD J. TRUMP, JR waiver sent on 3/24/2021, answer due 5/23/2021. (Fink, Sarah) (Entered: 03/25/2021) |
| 04/02/2021 | 11 | | WAIVER OF SERVICE. RUDOLPH W. GIULIANI waiver sent on 3/18/2021, answer due 5/17/2021. (Caleb, Joseph) (Entered: 04/02/2021) |
| 04/15/2021 | 12 | | NOTICE of Appearance by Philip C. Andonian on behalf of ERIC SWALWELL (Andonian, Philip) (Entered: 04/15/2021) |
| 05/17/2021 | 13 | | MOTION to Dismiss *pursuant to FED. R. CIV. P. 12(b)(6)* by RUDOLPH W. GIULIANI. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Sibley, Joseph) (Entered: 05/17/2021) |
| 05/24/2021 | 14 | | MOTION to Dismiss *for lack of jurisdiction and failure to state a claim* by DONALD J. TRUMP, JR, DONALD J. TRUMP. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Binnall, Jesse) (Entered: 05/24/2021) |
| 05/29/2021 | 15 | | Joint MOTION for Briefing Schedule by ERIC SWALWELL. (Attachments: # 1 Text of Proposed Order)(Fink, Sarah) (Entered: 05/29/2021) |
| 05/31/2021 | | | MINUTE ORDER granting 15 Motion for Briefing Schedule. Plaintiff's oppositions to motions to dismiss shall be filed on or before July 8, 2021. Defendants' replies to Plaintiff's oppositions shall be filed on or before July 22, 2021. Signed by Judge Amit P. Mehta on 5/31/2021. (lcapm3) (Entered: 05/31/2021) |
| 06/02/2021 | 16 | | MOTION for Extension of Time to *Serve the Complaint and Other Relief as to Defendant Mo Brooks* by ERIC SWALWELL. (Attachments: # 1 Exhibit Exhibit A, # 2 Text of Proposed Order Proposed Order)(Andonian, Philip) (Entered: 06/02/2021) |
| 06/02/2021 | | | MINUTE ORDER granting in part and denying in part 16 Plaintiff's Motion for Additional Time to Serve the Complaint on Defendant Mo Brooks. Plaintiff shall have an additional sixty (60) days to serve Defendant Brooks. Due to separation of powers concerns, however, the court declines Plaintiff's request to order the United States Marshals Service to assist Plaintiff in effecting service. Signed by Judge Amit P. Mehta on 6/2/2021. (lcapm3) (Entered: 06/02/2021) |
| 06/05/2021 | 17 | | NOTICE of Appearance by Barry Coburn on behalf of ERIC SWALWELL (Coburn, Barry) (Entered: 06/05/2021) |

| 06/08/2021 | 18 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MO BROOKS served on 6/6/2021, answer due 6/27/2021 (Andonian, Philip) (Entered: 06/08/2021) |
|---|---|---|
| 07/01/2021 | 19 | MOTION for Default Judgment as to *Defendant MO BROOKS* by ERIC SWALWELL. (Andonian, Philip) (Entered: 07/01/2021) |
| 07/02/2021 | 20 | MOTION to Certify Defendant Mo Brooks was Acting Within the Scope of his Office or Employment by MO BROOKS. "Let this be filed" Signed by Judge Amit P. Mehta on 7/2/2021. (eg) (Main Document 20 replaced on 7/7/2021) (zeg). (Entered: 07/02/2021) |
| 07/04/2021 | 21 | REPLY re 19 MOTION for Default Judgment as to *Defendant MO BROOKS* filed by MO BROOKS. (eg) (Entered: 07/07/2021) |
| 07/05/2021 | | MINUTE ORDER. The United States and Plaintiffs shall respond by July 27, 2021, to 20 Defendant Mo Brooks' Petition to Certify He Was Acting Within the Scope of his Office or Employment. Defendant Brooks may file a reply by August 10, 2021. The clerk of court shall serve a copy of this Minute Order and a copy of Defendant's Motion on the head of the Civil Division for the U.S. Attorney's Office for the District of Columbia. Signed by Judge Amit P. Mehta on 7/5/2021. (lcapm3) (Entered: 07/05/2021) |
| 07/05/2021 | | MINUTE ORDER denying 19 Plaintiff's Motion for Default Judgment Against Defendant Mo Brooks. By virtue of filing his Petition to Certify, Defendant Brooks cannot be considered "an essentially unresponsive party," and strong policy reasons favor resolution of disputes on their merits. See Jackson v. Beech, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting H. F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe, 432 F.2d 689, 691 (D.C. Cir. 1970) (per curiam)). Accordingly, Plaintiff's motion is denied without prejudice. Signed by Judge Amit P. Mehta on 7/5/2021. (lcapm3) (Entered: 07/05/2021) |
| 07/07/2021 | | MINUTE ORDER. The General Counsel for the U.S. House of Representatives shall respond by July 27, 2021, to 20 Defendant Mo Brooks' Petition to Certify He Was Acting Within the Scope of his Office or Employment. The clerk of court shall serve a copy of this Minute Order and a copy of Defendant's Motion on the House General Counsel. Signed by Judge Amit P. Mehta on 7/7/2021. (lcapm3) (Entered: 07/07/2021) |
| 07/08/2021 | 22 | MOTION for Leave to File *Brief of Amici Curiae In Support of Plaintiffs* by Floyd Abrams, ERWIN CHEMERINSKY, MARTHA MINOW, LAURENCE H. TRIBE. (Attachments: # 1 Brief of Amici Curiae, # 2 Text of Proposed Order [Proposed] Order Granting Motion For Leave To File Brief of Amici Curiae)(Marais, Nicholas) (Entered: 07/08/2021) |
| 07/08/2021 | 23 | Memorandum in opposition to re 14 MOTION to Dismiss *for lack of jurisdiction and failure to state a claim*, 13 MOTION to Dismiss *pursuant to FED. R. CIV. P. 12(b)(6)* filed by ERIC SWALWELL. (Andonian, Philip) (Entered: 07/08/2021) |
| 07/08/2021 | 24 | NOTICE of Appearance by Paul March Smith on behalf of Campaign Legal Center Action (Smith, Paul) (Entered: 07/08/2021) |
| 07/08/2021 | 25 | NOTICE of Appearance by Mark P. Gaber on behalf of Campaign Legal Center Action (Gaber, Mark) (Entered: 07/08/2021) |

| 07/08/2021 | 26 | NOTICE of Appearance by Adav Noti on behalf of Campaign Legal Center Action (Noti, Adav) (Entered: 07/08/2021) |
|---|---|---|
| 07/08/2021 | 27 | MOTION for Leave to File *Amicus Brief* by Campaign Legal Center Action. (Attachments: # 1 Proposed Order, # 2 Proposed Amicus Brief, # 3 Appendix A, # 4 Appendix B)(Smith, Paul) (Entered: 07/08/2021) |
| 07/12/2021 | 28 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Hayden S. Johnson, Filing fee $ 100, receipt number ADCDC–8593379. Fee Status: Fee Paid. by CAMPAIGN LEGAL CENTER ACTION. (Attachments: # 1 Declaration)(Smith, Paul) (Entered: 07/12/2021) |
| 07/13/2021 | | MINUTE ORDER granting 28 Motion for Leave to Appear Pro Hac Vice. Attorney Hayden S. Johnson is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions.** Signed by Judge Amit P. Mehta on 7/13/2021. (lcapm3) (Entered: 07/13/2021) |
| 07/15/2021 | 29 | MOTION for Leave to File *Amici Curiae Brief in Support of Plaintiff* by Evan H. Caminker, Andrew Kent, Sheldon Nahmod, Daphna Renan, PETER M. SHANE. (Attachments: # 1 Exhibit Brief of Law Professors as Amici Curiae in Support of Plaintiff, # 2 Text of Proposed Order)(Gorod, Brianne) (Entered: 07/15/2021) |
| 07/15/2021 | | MINUTE ORDER granting 29 Motion for Leave to File Amici Curiae Brief in Support of Plaintiff. Signed by Judge Amit P. Mehta on 7/15/2021. (lcapm3) (Entered: 07/15/2021) |
| 07/15/2021 | 30 | AMICUS BRIEF by EVAN H. CAMINKER, ANDREW KENT, SHELDON NAHMOD, DAPHNA RENAN, PETER M. SHANE. (eg) (Entered: 07/16/2021) |
| 07/17/2021 | 31 | Unopposed MOTION for Extension of Time to File Response/Reply as to 14 MOTION to Dismiss *for lack of jurisdiction and failure to state a claim*, 13 MOTION to Dismiss *pursuant to FED. R. CIV. P. 12(b)(6) (Joint Motion with Trump Defendants)* by RUDOLPH W. GIULIANI. (Attachments: # 1 Text of Proposed Order)(Sibley, Joseph) (Entered: 07/17/2021) |
| 07/18/2021 | | MINUTE ORDER granting in part and denying in part 31 Motion to Set Briefing Schedule. Defendants may file their reply briefs up to and until August 16, 2021. Those reply briefs may also incorporate replies to amicus briefs. However, the replies shall not to exceed 35 pages in length. Signed by Judge Amit P. Mehta on 7/18/2021. (lcapm3) (Entered: 07/18/2021) |
| 07/27/2021 | 32 | RESPONSE TO ORDER OF THE COURT re Order, filed by OFFICE OF GENERAL COUNSEL FOR THE U.S. HOUSE OF REPRESENTATIVES. (Attachments: # 1 Exhibit)(Letter, Douglas) (Entered: 07/27/2021) |
| 07/27/2021 | 33 | RESPONSE TO ORDER OF THE COURT re Order, filed by UNITED STATES. (Attachments: # 1 Text of Proposed Order)(El–Amin, Taheerah) (Entered: 07/27/2021) |
| 07/27/2021 | 34 | Memorandum in opposition to re 20 MOTION to Certify Defendant Mo Brooks was Acting Within the Scope of his Office or Employment filed by ERIC SWALWELL. (Fink, Sarah) Modified docket event/text on 7/29/2021 (eg). (Entered: 07/27/2021) |

| 07/28/2021 | 35 | MOTION for Leave to File *an Amicus Curiae Brief in Support of the Plaintiffs* by JARED HOLT. (Attachments: # 1 Proposed Amicus Curiae Brief, # 2 Text of Proposed Order)(Williams, Jonathan) (Entered: 07/28/2021) |
| 07/28/2021 | | MINUTE ORDER granting 22 Motion for Leave to File Brief of Amici Curiae In Support of Plaintiffs by Floyd Abrams, Erwin Chemerinsky, Martha Minow, and Laurence H. Tribe. Signed by Judge Amit P. Mehta on 7/28/2021. (lcapm3) (Entered: 07/28/2021) |
| 07/28/2021 | | MINUTE ORDER granting 27 Motion for Leave to File Amicus Brief by Campaign Legal Center Action. Signed by Judge Amit P. Mehta on 7/28/2021. (lcapm3) (Entered: 07/28/2021) |
| 07/30/2021 | 36 | NOTICE of Appearance by Hayden Johnson on behalf of CAMPAIGN LEGAL CENTER ACTION (Johnson, Hayden) (Entered: 07/30/2021) |
| 07/30/2021 | 37 | MOTION for CM/ECF Password by MO BROOKS. (eg) (Entered: 08/02/2021) |
| 08/02/2021 | | MINUTE ORDER granting 37 Motion for CM/ECF Password. Signed by Judge Amit P. Mehta on 8/2/2021. (lcapm3) (Entered: 08/02/2021) |
| 08/03/2021 | 38 | REPLY to opposition to motion re 20 MOTION to Certify Defendant Mo Brooks was Acting Within the Scope of his Office or Employment filed by MO BROOKS. (eg) (Entered: 08/04/2021) |
| 08/03/2021 | 39 | MOTION to Strike 34 Response to Document by MO BROOKS. (eg) (Entered: 08/04/2021) |
| 08/03/2021 | 40 | MOTION to Strike 33 Response to Order of the Court by MO BROOKS. (eg) (Entered: 08/04/2021) |
| 08/13/2021 | 41 | Memorandum in opposition to re 40 MOTION to Strike 33 Response to Order of the Court filed by UNITED STATES OF AMERICA. (El–Amin, Taheerah) (Entered: 08/13/2021) |
| 08/16/2021 | 42 | Memorandum in opposition to re 39 MOTION to Strike 34 Response to Document filed by ERIC SWALWELL. (Andonian, Philip) (Entered: 08/16/2021) |
| 08/16/2021 | 43 | REPLY to opposition to motion re 13 MOTION to Dismiss *pursuant to FED. R. CIV. P. 12(b)(6)* filed by RUDOLPH W. GIULIANI. (Sibley, Joseph) (Entered: 08/16/2021) |
| 08/16/2021 | 44 | REPLY to opposition to motion re 14 MOTION to Dismiss *for lack of jurisdiction and failure to state a claim* filed by DONALD J. TRUMP, DONALD J. TRUMP, JR. (Binnall, Jesse) (Entered: 08/16/2021) |
| 12/16/2021 | | NOTICE of Hearing: Oral Argument set for 1/10/2022 at 1:00 PM in Courtroom 10 before Judge Amit P. Mehta. Members of the public or media may also access this hearing by dialing the court's toll–free public access line: (877) 848–7030, access code 321–8747.(zjd) (Entered: 12/16/2021) |
| 12/27/2021 | 45 | NOTICE of Appearance by Brian M. Boynton on behalf of UNITED STATES OF AMERICA (Boynton, Brian) (Entered: 12/27/2021) |
| 01/03/2022 | 46 | NOTICE of Appearance by William Bullock Pittard, IV on behalf of ERIC SWALWELL (Pittard, William) (Main Document 46 replaced on 1/4/2022) |

| | | |
|---|---|---|
| | | (zeg). (Entered: 01/03/2022) |
| 01/03/2022 | | NOTICE TO PARTIES. I provide this Notice so that the parties are aware of my prior professional relationships with counsel for Plaintiff Representative Eric Swalwell. From 2002 to 2005, I was employed as a trial lawyer at the Public Defender Service for the District of Columbia ("PDS"). Counsel Philip Andonian and Joseph Caleb also were trial lawyers at PDS during that time period. Additionally, from 2007 to 2014, I was counsel and then partner at Zuckerman Spaeder LLP. Counsel Matthew Kaiser was an associate at the firm from 2007 to 2009, as I understand it. Since leaving these places of work, I have maintained no more than a social relationship with Messrs. Andonian, Caleb, and Kaiser, largely, if not exclusively, through periodic professional events. I do not believe that these relationships are grounds for recusal but nevertheless provide this Notice in the interest of full disclosure. Signed by Judge Amit P. Mehta on 01/03/2022. (lcapm3) (Entered: 01/03/2022) |
| 01/04/2022 | | NOTICE of Hearing: The Oral Argument set for 1/10/2022 at 1:00 PM before Judge Amit P. Mehta will proceed via videoconference. The courtroom deputy will circulate connection information to counsel. Members of the public or media may access this hearing by dialing the court's toll–free public access line: (877) 848–7030, access code 321–8747. (zjd) (Entered: 01/04/2022) |
| 01/05/2022 | 47 | ORDER establishing schedule for the oral argument for pending motions to dismiss on January 10, 2022. The time designations noted within are collective across all three cases (to the extent applicable), not per party per case. The court encourages each side, where appropriate, to designate a lead counsel on a particular topic. Please see attached Order for further details. Signed by Judge Amit P. Mehta on 01/05/2022. (lcapm3) (Main Document 52 replaced on 1/6/2022) (zjd). (Entered: 01/05/2022) |
| 01/10/2022 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Oral Argument held via videoconference on 1/10/2022. Arguments heard and taken under advisement. (Court Reporter: William Zaremba) (zjd) (Entered: 01/10/2022) |
| 01/11/2022 | 48 | Supplemental Pleading by MO BROOKS. "Let this be filed." Signed by Judge Amit P. Mehta on 1/11/2022. (zjd) (Entered: 01/11/2022) |
| 01/11/2022 | 49 | Supplemental Pleading by MO BROOKS. "Let this be filed." Signed by Judge Amit P. Mehta on 1/11/2022. (zjd) (Entered: 01/11/2022) |
| 01/12/2022 | 50 | NOTICE *of Response* by ERIC SWALWELL re 48 Letter, 49 Letter (Fink, Sarah) (Entered: 01/12/2022) |
| 01/14/2022 | 51 | NOTICE OF SUPPLEMENTAL AUTHORITY by ERIC SWALWELL (Andonian, Philip) (Entered: 01/14/2022) |
| 01/14/2022 | 52 | NOTICE OF SUPPLEMENTAL AUTHORITY by ERIC SWALWELL (Andonian, Philip) (Entered: 01/14/2022) |
| 01/20/2022 | 53 | NOTICE OF WITHDRAWAL OF APPEARANCE as to ERIC SWALWELL. Attorney Barry Coburn terminated. (Coburn, Barry) (Entered: 01/20/2022) |
| 01/24/2022 | 54 | LEAVE TO FILE DENIED– Request This document is unavailable as the Court denied its filing. "Leave to file is denied. The court does not have an "audio form" of the January 10th hearing. A written transcript may be ordered from the court reporter". Signed by Judge Amit P. Mehta on 1/24/2022. (zeg) (Entered: |

| | | | |
|---|---|---|---|
| | | | 01/24/2022) |
| 01/25/2022 | 55 | | TRANSCRIPT OF ORAL ARGUMENT VIA ZOOM PROCEEDINGS before Judge Amit P. Mehta held on January 10, 2022; Page Numbers: 1–236. Date of Issuance: January 25, 2022. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354–3249. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased f rom the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, PDF or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 2/15/2022. Redacted Transcript Deadline set for 2/25/2022. Release of Transcript Restriction set for 4/25/2022.(wz) (Entered: 01/25/2022) |
| 02/18/2022 | 56 | | MEMORANDUM OPINION AND ORDER (1) granting Defendant Giuliani's 13 Motion to Dismiss and (2) granting in part and denying in part Defendants President Trump & Trump Jr.'s 14 Motion to Dismiss. The court defers ruling on Defendant Rep. Mo Brooks's 20 Petition to Certify and invites him to file a motion to dismiss. Please see attached Memorandum Order and Opinion for further details. Signed by Judge Amit P. Mehta on 02/18/2022. (lcapm3) (Entered: 02/18/2022) |
| 02/18/2022 | | | MINUTE ORDER. Due to the court's prior ruling in its Memorandum Opinion & Order, ECF No. 56 , Def. Brooks's 39 and 40 Motions to Strike are denied as moot. Signed by Judge Amit P. Mehta on 02/18/2022. (lcapm3) (Entered: 02/18/2022) |
| 02/22/2022 | 57 | | MOTION to Dismiss by MO BROOKS. (zeg) (Entered: 02/22/2022) |
| 03/08/2022 | 58 | | Memorandum in opposition to re 57 MOTION to Dismiss filed by ERIC SWALWELL. (Andonian, Philip) (Entered: 03/08/2022) |
| 03/09/2022 | 59 | | ORDER granting Defendant Mo Brooks's 57 Motion to Dismiss. The court now also finds Defendant Brooks's 20 Petition to Certify as moot. Please see attached Order for further details. Signed by Judge Amit P. Mehta on 03/09/2022. (lcapm3) (Entered: 03/09/2022) |
| 03/18/2022 | 60 | | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 56 Order on Motion to Dismiss,,,, Order on Motion for Miscellaneous Relief, by DONALD J. TRUMP. Filing fee $ 505, receipt number ADCDC–9113372. Fee Status: Fee Paid. Parties have been notified. (Binnall, Jesse) (Entered: 03/18/2022) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ERIC SWALWELL,

     Plaintiff,

     v.

DONALD J. TRUMP,

     Defendant.

Civil Case No. 1:21-cv-00586 APM

## NOTICE OF APPEAL

Defendant Donald J. Trump hereby gives notice of his appeal to the United States Court of Appeals for the D.C. Circuit from this Court's Memorandum Opinion and Order entered on February 18, 2022, denying Defendant's Motion to Dismiss, particularly with respect to his defense of Absolute Immunity. (Dkt. No. 56).

Dated: March 18, 2022

Respectfully submitted,

/s/ Jesse R. Binnall
Jesse R. Binnall (VA022)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com

Counsel for President Donald J. Trump

13

## CERTIFICATE OF SERVICE

I certify that the foregoing was electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will cause a copy to be sent to all counsel of record.

Dated: March 18, 2022                    /s/ Jesse R. Binnall
                                         Jesse R. Binnall

                                         *Counsel for President Donald J. Trump*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **BENNIE G. THOMPSON et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 21-cv-00400 (APM)** |
| | ) | |
| **DONALD J. TRUMP et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

| | | |
|---|---|---|
| **ERIC SWALWELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 21-cv-00586 (APM)** |
| | ) | |
| **DONALD J. TRUMP et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

| | | |
|---|---|---|
| **JAMES BLASSINGAME &** | ) | |
| **SIDNEY HEMBY,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 21-cv-00858 (APM)** |
| | ) | |
| **DONALD J. TRUMP,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION AND ORDER

## I.     INTRODUCTION

January 6, 2021 was supposed to mark the peaceful transition of power.  It had been that way for over two centuries, one presidential administration handing off peacefully to the next. President Ronald Reagan in his first inaugural address described "the orderly transfer of authority" as "nothing less than a miracle."[1]  Violence and disruption happened in other countries, but not here.  This is the United States of America, and it could never happen to our democracy.

But it did that very afternoon.  At around 1:30 p.m., thousands of supporters of President Donald J. Trump descended on the U.S. Capitol building, where Congress had convened a Joint Session for the Certification of the Electoral College vote.  The crowd had just been at the Ellipse attending a "Save America" rally, where President Trump spoke.  At the end of his remarks, he told rally-goers, "we fight, we fight like hell, and if you don't fight like hell, you're not going to have a country anymore."  The President then directed the thousands gathered to march to the Capitol—an idea he had come up with himself.  About 45 minutes after they arrived, hundreds of the President's supporters forced their way into the Capitol building.  Many overcame resistance by violently assaulting United States Capitol Police ("Capitol Police") with their fists and with weapons.  Others simply walked in as if invited guests.  As Capitol Police valiantly fought back and diverted rioters, members of Congress adjourned the Joint Session and scrambled to safety.

---

[1] President Reagan said on that day:

> To a few of us here today, this is a solemn and most momentous occasion; and yet, in the history of our Nation, it is a commonplace occurrence.  The orderly transfer of authority as called for in the Constitution routinely takes place as it has for almost two centuries and few of us stop to think how unique we really are.  In the eyes of many in the world, this every-4-year ceremony we accept as normal is nothing less than a miracle.

President Ronald W. Reagan, First Inaugural Address (Jan. 20, 1981), https://www.reaganfoundation .org/media/128614/inaguration.pdf (last visited Feb. 17, 2022).

So, too, did the Vice President of the United States, who was there that day in his capacity as President of the Senate to preside over the Certification.  Five people would die, dozens of police officers suffered physical and emotional injuries and abuse, and considerable damage was done to the Capitol building.  But, in the end, after law enforcement succeeded in clearing rioters from the building, Congress convened again that evening and certified the next President and Vice President of the United States.  The first ever presidential transfer of power marred by violence was over.

These cases concern who, if anyone, should be held civilly liable for the events of January 6th.  The plaintiffs in these cases are eleven members of the House of Representatives in their personal capacities and two Capitol Police officers, James Blassingame and Sidney Hemby ("*Blassingame* Plaintiffs").  Taken together, they have named as defendants:  President Trump; the President's son, Donald J. Trump Jr.; the President's counsel, Rudolph W. Giuliani; Representative Mo Brooks; and various organized militia groups—the Proud Boys, Oath Keepers, and Warboys— as well as the leader of the Proud Boys, Enrique Tarrio.

Plaintiffs' common and primary claim is that Defendants violated 42 U.S.C. § 1985(1), a provision of a Reconstruction-Era statute known as the Ku Klux Klan Act of 1871.  The Act was aimed at eliminating extralegal violence committed by white supremacist and vigilante groups like the Ku Klux Klan and protecting the civil rights of freedmen and freedwomen secured by the Fourteenth Amendment.  Section 1985(1) is not, however, strictly speaking a civil rights provision; rather, it safeguards federal officials and employees against conspiratorial acts directed at preventing them from performing their duties.   It provides:

> If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or

> to injure him in his person or property on account of his lawful
> discharge of the duties of his office, or while engaged in the lawful
> discharge thereof, or to injure his property so as to molest, interrupt,
> hinder, or impede him in the discharge of his official duties.

42 U.S.C. § 1985(1).  The statute, in short, proscribes conspiracies that, by means of force, intimidation, or threats, prevent federal officers from discharging their duties or accepting or holding office.  A party injured by such a conspiracy can sue any coconspirator to recover damages. *Id.* § 1985(3).

Plaintiffs all contend that they are victims of a conspiracy prohibited by § 1985(1).  They claim that, before and on January 6th, Defendants conspired to prevent members of Congress, by force, intimidation, and threats, from discharging their duties in connection with the Certification of the Electoral College and to prevent President-elect Joseph R. Biden and Vice President–elect Kamala D. Harris from accepting or holding their offices.  More specifically, they allege that, before January 6th, President Trump and his allies purposely sowed seeds of doubt about the validity of the presidential election and promoted or condoned acts of violence by the President's followers, all as part of a scheme to overturn the November 2020 presidential election.  Those efforts culminated on January 6th, when the President's supporters, including organized militia groups and others, attacked the Capitol building while Congress was in a Joint Session to certify the Electoral College votes.  Notably, Plaintiffs allege that President Trump's January 6 Rally Speech incited his supporters to commit imminent acts of violence and lawlessness at the Capitol. Plaintiffs all claim that they were physically or emotionally injured, or both, by the acts of the conspirators.

Plaintiffs advance other claims, as well.  Swalwell alleges a violation of § 1986, a companion provision to § 1985.  42 U.S.C. § 1986.  That statute makes a person in a position of power who knows about a conspiracy prohibited by § 1985, and who neglects or refuses to take

4

steps to prevent such conspiracy, liable to a person injured by the conspiracy. Swalwell claims

that President Trump, Trump Jr., Giuliani, and Brooks violated § 1986 by refusing to act to prevent

the violence at the Capitol. Swalwell and the *Blassingame* Plaintiffs also advance numerous

common law torts and statutory violations under District of Columbia law.

All Defendants have appeared except the Proud Boys and Warboys. Defendants have

moved to dismiss all claims against them. They advance a host of arguments that, in the main,

seek dismissal for lack of subject matter jurisdiction or for failure to state a claim. The parties

have submitted extensive briefing on a range of constitutional, statutory, and common law issues.

The court held a five-hour-long oral argument to consider them.

After a full deliberation over the parties' positions and the record, the court rules as follows:

(1) President Trump's motion to dismiss is denied as to Plaintiffs' § 1985(1) claim and certain

District of Columbia–law claims and granted as to Swalwell's § 1986 claim and certain District of

Columbia–law claims; (2) Trump Jr.'s motion to dismiss is granted; (3) Giuliani's motion to

dismiss is granted; (4) the Oath Keepers' motion to dismiss is denied; and (5) Tarrio's motion to

dismiss is denied. Separately, Brooks has moved to substitute the United States as the proper party

under the Westfall Act. The court declines to rule on that motion and instead invites Brooks to

file a motion to dismiss, which the court will grant for the same reasons it has granted Trump Jr.'s

and Giuliani's motions.

## II.    BACKGROUND

### A.    Facts Alleged

This summary of the alleged facts is drawn from the complaints in all three cases. There

is substantial overlap, but there are some differences. The court has not referenced every fact

alleged across the three complaints; this factual recitation is meant to summarize the main

allegations.  Additionally, a citation to one complaint should not be understood to mean that the allegation is not present in the other complaints.  The court has limited the citations in the interest of efficiency.  Additional facts will be referenced as appropriate in the Discussion section.

As is required on a motion to dismiss, the court assumes these facts to be "true (even if doubtful in fact)."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  These are *not* the court's factual findings.

### 1.    *The Weeks Following the Election*

#### a.    <u>False claims of election fraud and theft</u>

President Trump began to sow seeds of doubt about the validity of the November 2020 presidential election in the weeks leading up to Election Day.  Am. Compl., *Blassingame v. Trump*, No. 21-cv-00858 (APM) (D.D.C.), ECF No. 3 [hereinafter *Blassingame* Compl.], ¶ 13.  He claimed, among other things, that there would be "fraud," the election was "rigged," and his adversaries were "trying to steal" victory from him.  *Id.* ¶¶ 13, 16; Compl., *Swalwell v. Trump*, No. 21-cv-00586 (APM) (D.D.C.), ECF No. 1 [hereinafter *Swalwell* Compl.]; Mot. for Leave to File Am. Compl., ECF No. 11, Am. Compl., ECF No. 11-1, [hereinafter, *Thompson* Compl.], ¶ 33.[2]

On election night, the President claimed victory before all the votes were counted.  He tweeted that "they are trying to STEAL the Election.  We will never let them do it."  *Blassingame* Compl. ¶ 17.  He also would say in a primetime television address the next day, "If you count the legal votes, I easily win.  If you count the illegal votes, they can try to steal the election from us." *Swalwell* Compl. ¶ 33.

---

[2] Subsequent citations to filings from these three dockets omit the case name and number.  Context and/or the title of the filing should make clear to which docket a particular filing belongs.

6

The President's allies joined him in making similar claims. For example, on November 5, 2020, Brooks tweeted that he "lack[ed] faith that this was an honest election." *Id.* ¶ 78. On November 6, 2021, Trump Jr. tweeted that his father's campaign was uncovering evidence of voter fraud and that the media was creating a false narrative that voter fraud was not real. *Id.* ¶ 69. On November 7, 2020, one of President Trump's lawyers, Rudolph Giuliani, held a press conference in suburban Philadelphia, during which he asserted that there was rampant voter fraud in Philadelphia and Pittsburgh, which accounted for the President's loss in Pennsylvania. *Thompson* Compl. ¶ 38.

b.    <u>Efforts to influence state and local election officials</u>

The President also took his case directly to state and local election officials. These meetings occurred by phone and in person, and centered mostly on Georgia, Michigan, and Pennsylvania. *Swalwell* Compl. ¶¶ 39, 45, 49, 52. In some instances, these efforts were followed by threatening words and conduct by some supporters.

In Georgia, for example, the President called Georgia's Secretary of State an "enemy of the people" and tweeted about him over a dozen times. *Swalwell* Compl. ¶ 49. The Secretary and his family were then targeted by some of the President's supporters with threats of violence and death. *Id.* ¶ 50. Another Georgia state official pleaded with the President to condemn death threats made to election workers in Georgia, but he refused to do so. *Blassingame* Compl. ¶ 29.

In another instance, in Michigan, on December 5, 2020, the President falsely declared that he had won almost every county in the state. *Swalwell* Compl. ¶ 40. The next day armed protesters went to the home of Michigan's Secretary of State, demanding she overturn the election results. *Thompson* Compl. ¶ 50. During these weeks, the President also tweeted criticism of Republican

7

governors in Arizona and Georgia, claiming that "[i]f they were with us, we would have already won both." *Swalwell* Compl. ¶ 36.

During these efforts, and aware of the threats directed against state election officials, the President tweeted, "People are upset, and they have a right to be." *Thompson* Compl. ¶ 52.

The President's allies, including Brooks and Giuliani, continued to support the President's campaign to undo the election results. Brooks, for example, tweeted false claims that President-elect Joe Biden had not won Georgia, and he also announced that he would object to certifying the Electoral College ballots from Georgia. *Swalwell* Compl. ¶ 82. Giuliani also continued his efforts, falsely suggesting in mid-November that irregularities in Detroit were the reason for the President's loss. *Thompson* Compl. ¶ 42. He asked then–Deputy Secretary of Homeland Security Ken Cuccinelli to seize voting machines. *Swalwell* Compl. ¶ 62. A Trump campaign attorney even suggested that an election official should be shot. *Thompson* Compl. ¶ 48.

c.     <u>"Stop the Steal" rallies</u>

Dozens of protests sprung up around the country. *Blassingame* Compl. ¶ 22. Two in Washington, D.C., turned violent. On the evening of November 14, 2020, multiple police officers were injured and nearly two dozen arrests were made. *Id.* ¶ 26. Then, on December 12, 2020, supporters of the President clashed with District of Columbia police, injuring eight of them, which led to over 30 arrests, many for acts of assault. *Id.* ¶ 28. The President was aware of these rallies, as he tweeted about them, and he would have known about the violence that accompanied them. *Id.* ¶¶ 25, 27.

Organized militia groups attended these events in Washington, D.C. One of them was the Proud Boys. During a pre-election debate, the moderator asked whether President Trump would denounce white supremacist groups. When the President asked, "[W]ho would you like me to

8

condemn?," Vice President Biden suggested the "Proud Boys," to which the President responded, "Proud Boys, stand back, and stand by." *Thompson* Compl. ¶ 30.  Tarrio, the head of the Proud Boys, tweeted in response, "Standing by sir." *Id.*

Another militia group that came to Washington, D.C., for these rallies was the Oath Keepers.  At the December rally, an Oath Keepers leader told the assembled crowd, the President "needs to know from you that you are with him, [and] that if he does not do it while he is commander in chief, we're going to have to do it ourselves later, in a much more desperate, much more bloody war." *Id.* ¶ 54.

### 2. *Preparations for the January 6 Rally*

On December 19, 2020, President Trump announced that there would be a rally in Washington, D.C., on January 6th, the day of the Certification of the Electoral College: "Big protest in D.C. on January 6th.  Be there, will be wild!" *Swalwell* Compl. ¶ 86.  The President and his campaign were involved in planning and funding the rally.  He participated in selecting the speaker lineup and music, and his campaign made direct payments of $3.5 million to rally organizers. *Thompson* Compl. ¶¶ 68–69.  Significantly, the rally was not permitted for a march from the Ellipse. *Id.* ¶ 90.  The President and his campaign came up with the idea for a march to the Capitol. *Id.* ¶ 69.

Pro-Trump message boards and social media lit up after the President's tweet announcing the January 6 Rally.  Some followers viewed the President's tweet as "marching orders."  One user posted, referring to the President's debate statement to the Proud Boys, "standing by no longer." *Swalwell* Compl. ¶ 88; *Thompson* Compl. ¶ 57.  Other supporters explicitly contemplated "[s]torm[ing] the [Capitol]," and some posted about "Operation Occupy the Capitol" or tweeted using the hashtag #OccupyCapitols. *Swalwell* Compl. ¶ 89; *Thompson* Compl. ¶ 62.

The President knew that his supporters had posted such messages. He and "his advisors actively monitored the websites where his followers made these posts." *Thompson* Compl. ¶ 66. News outlets, including Fox News, discussed them, as well. *Id.* On December 28, 2020, in widely publicized remarks, a former White House aide predicted, "there will be violence on January 6th because the president himself encourages it." *Id.*

Trump's allies also worked to promote the January 6 Rally. Trump Jr. posted a video on Instagram asking his followers to "Be Brave. Do Something." *Swalwell* Compl. ¶ 74. Giuliani tweeted a video purporting to explain how Vice President Mike Pence could block the certification of the election results. *Id.* ¶ 65. Brooks posted on social media on the eve of the rally that the President "asked [him] personally to speak & tell the American people about the election system weaknesses that the Socialist Democrats exploited to steal this election." *Id.* ¶ 84.

At the same time, members of the Proud Boys and the Oath Keepers began their preparations for the rally in earnest. On December 19 and 25, 2020, leaders of the Oath Keepers announced that they had "organized an alliance" and "orchestrated a plan" with the Proud Boys. *Thompson* Compl. ¶ 63. Tarrio said that the Proud Boys would turn out in "record numbers." *Id.* ¶ 64. The groups also secured tactical and communications equipment. *Id.* ¶ 65. The Oath Keepers recruited additional members and prepared them with military-style training. *Id.* ¶ 127.

### 3.    *January 6th—The Riot at the Capitol Building*

The "Save America" rally on the Ellipse began at about 7:00 a.m. *Blassingame* Compl. ¶ 58. Brooks took the stage around 8:50 a.m. *Swalwell* Compl. ¶ 84. The Congressman said, among other things, that "[w]e are great because our ancestors sacrificed their blood, their sweat, their tears, their fortunes, and sometimes their lives," and that "[t]oday is the day American patriots start taking down names and kicking ass!" *Id.* ¶¶ 106, 108. After Brooks finished, Giuliani spoke.

10

He repeated that the "election was stolen" and said that it "has to be vindicated to save our country." *Id.* ¶ 113. Then, in the context of discussing how disputes over election fraud might be resolved, he proclaimed, "Let's have trial by combat!" *Id.* ¶ 114. Trump Jr. gave the last speech before the President took to the podium. He spent much of his remarks claiming that the Republican Party belongs to Donald Trump. He also warned Republican members of Congress, "If you're gonna be the zero, and not the hero, we're coming for you, and we're gonna have a good time doing it." *Id.* ¶¶ 117–119.

At about noon, President Trump took the stage. *Id.* ¶ 121. The court will discuss the President's speech in much greater detail later in this opinion, so recites only portions here. The President spoke for 75 minutes, and during that time, he pressed the false narrative of a stolen election. He suggested that Vice President Pence could return Electoral College ballots to the states, allowing them to recertify Electors, which would bring about an election victory. He urged rally-goers to "fight like hell," and he told them that "you're allowed to go by very different rules" when fraud occurs. *Swalwell* Compl. ¶¶ 126, 128. Early in the speech he referenced a march to the Capitol and said he knew the crowd would be going there to "peacefully and patriotically" make their voices heard. An hour later, he punctuated his speech by saying that the election loss "can't have happened and we fight, we fight like hell, and if you don't fight like hell, you're not going to have a country anymore." *Thompson* Compl. ¶ 88. He then directed his supporters to the Capitol. The crowd at various points responded, "Fight Like Hell. Fight for Trump," and at other points, "Storm the Capitol," "Invade the Capitol Building," and "Take the Capitol right now." *Blassingame* Compl. ¶ 61; *Thompson* Compl. ¶ 88.[3] Responding to the President's call, thousands marched to the Capitol building after he finished his remarks.

---

[3] As discussed later, these Complaints make different allegations about the timing of these shouts and chants.

Meanwhile, Congress had convened a Joint Session at 1:00 p.m. to certify the Electoral College vote. *Thompson* Compl. ¶ 93. Outside the building, some supporters already had begun confrontations with Capitol Police. Even before the President's speech had concluded, the Proud Boys, operating in small groups, had begun to breach the outer perimeter of the Capitol. *Blassingame* Compl. ¶ 66; *Thompson* Compl. ¶¶ 98–100. The Ellipse crowd began to arrive by 1:30 p.m. *Blassingame* Compl. ¶ 69. As their numbers grew, the crowd overwhelmed police and exterior barriers and entered the Capitol by 2:12 p.m. *Swalwell* Compl. ¶ 134. The Oath Keepers were among the crowd. *Thompson* Compl. ¶ 126. The Joint Session was suspended, and the Vice President and members of Congress were evacuated. *Id.* ¶ 111; *Swalwell* Compl. ¶¶ 135–136. Police officers, including the *Blassingame* Plaintiffs, were injured as violent confrontations continued with the President's supporters.

### 4. The President's Response

After his speech, the President returned to the White House and watched the events at the Capitol unfold on television. *Thompson* Compl. ¶ 106. Despite pleas from advisors and Congressmen, the President did not immediately call on his supporters to leave the Capitol building. *Blassingame* Compl. ¶¶ 114, 116; *Thompson* Compl. ¶ 123. At about 2:24 p.m., after rioters had entered the Capitol, he sent a tweet critical of the Vice President for lacking "the courage to do what should have been done to protect our Country and our Constitution." *Blassingame* Compl. ¶ 116. Eventually, two hours later, the President would tell his supporters to stand down. He tweeted a video calling on them to "[g]o home. We love you. You're very special." *Id.* ¶ 125.

The President sent one more tweet that day. After police had cleared the Capitol, around 6:00 p.m., the President said: "These are the things and events that happen when a sacred landslide

12

election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long. . . .  Remember this day forever!" *Id.* ¶ 127.

The House of Representatives would later pass a single Article of Impeachment accusing President Trump of "Inciting an Insurrection," but the Senate would acquit him after he left office.

### B. Procedural History

#### *1.* Thompson v. Trump

The *Thompson* case was the first to come before the court on February 16, 2021. *See* Compl., ECF No. 1.  The plaintiffs in that case are ten members of the House of Representatives.[4] Although the case is captioned *Thompson v. Trump*, the court will refer to these plaintiffs as the "Bass Plaintiffs"—after the second named plaintiff, Representative Karen R. Bass—because the lead plaintiff, Representative Bennie G. Thompson, voluntarily dismissed his claims after his appointment to serve as the chair of the Select Committee to Investigate the January 6th Attack on the United States Capitol. *See* Notice of Voluntary Dismissal, ECF No. 39.  Although all are elected officials, the Bass Plaintiffs have filed suit in their personal capacities. *See Thompson* Compl.

The Bass Plaintiffs have named six defendants:  President Trump, Giuliani, the Oath Keepers, Proud Boys International, Warboys LLC, and Tarrio. *Id.*  They assert a single claim against all Defendants: a violation of 42 U.S.C. § 1985(1). *Id.* at 60.  All Defendants except the Proud Boys and Warboys have appeared and moved to dismiss the claim against them. *See* Def. Oath Keepers' Mot. to Dismiss, ECF No. 20 [hereinafter *Thompson* Oath Keepers' Mot.]; Def. Giuliani's Mot. to Dismiss, ECF No. 21, Mem. of P. & A. in Supp. of Def.'s Mot. to Dismiss, ECF No. 21-1 [hereinafter *Thompson* Giuliani Mot.]; Def. Trump's Mot. to Dismiss, ECF No. 22, Mem.

---

[4] The plaintiffs are Representatives Karen R. Bass, Stephen I. Cohen, Veronica Escobar, Pramila Jayapal, Henry C. Johnson, Jr., Marcia C. Kaptur, Barbara J. Lee, Jerrold Nadler, Maxine Waters, and Bonnie M. Watson Coleman.

13

in Supp. of Def. Trump's Mot. to Dismiss, ECF No. 22-1 [hereinafter *Thompson* Trump Mot.];

Def. Tarrio's Notice of Intention to Join Mots. to Dismiss, ECF No. 64.

    *2.*  Swalwell v. Trump

   Representative Eric Swalwell filed his action on March 5, 2021, also in his personal

capacity. *Swalwell* Compl. He named as defendants President Trump, Trump Jr., Brooks, and

Giuliani. His Complaint advances a host of federal and District of Columbia–law claims against

all Defendants: (1) violation of § 1985(1) (Count 1); (2) violation of 42 U.S.C. § 1986 (Count 2);

(3) two counts of negligence per se predicated on violations of District of Columbia anti-rioting

and disorderly conduct criminal statutes (Counts 3 and 4); (4) violation of the District of Columbia

anti-bias statute, D.C. Code § 22-3701 *et seq.* (Count 5); (5) intentional infliction of emotional

distress (Count 6); (6) negligent infliction of emotional distress (Count 7); (7) aiding and abetting

common law assault (Count 8); and (8) negligence (Count 9). *Id.* at 45–62.

   Each Defendant except Brooks has moved to dismiss all claims against him. *See* Def.

Giuliani's Mot. to Dismiss, ECF No. 13, Mem. of P. & A. in Supp. of Def.'s Mot. to Dismiss, ECF

No. 13-1 [hereinafter *Swalwell* Giuliani Mot.]; Defs. Trump & Trump Jr.'s Mot. to Dismiss, ECF

No. 14, Mem. in Supp. of Trump & Trump Jr.'s Mot. to Dismiss, ECF No. 14-1 [hereinafter

*Swalwell* Trump Mot.].

   Brooks has moved for a scope-of-office certification under the Westfall Act, 28 U.S.C.

§ 2679. *See* Pet. to Certify Def. Mo Brooks Was Acting Within Scope of His Office or

Employment, ECF No. 20. Under the Westfall Act, if the Attorney General certifies that a tort

claim against an employee of government—including a member of Congress—arises from conduct

performed while "acting within the scope of his office or employment," the United States is to be

substituted as the defendant. 28 U.S.C. § 2679(d)(1). Brooks asked the Attorney General for a

Westfall Act certification, but he declined the request. *See* U.S. Resp. to Def. Mo Brooks's Petition to Certify He Was Acting Within Scope of His Office or Employment, ECF No. 33 [hereinafter U.S. Resp. to Brooks]. Notwithstanding the Attorney General's denial, the Westfall Act authorizes a court to make the requisite certification. *See* 28 U.S.C. § 2679(d)(3) ("In the event that the Attorney General has refused to certify scope of office or employment under this section, the employee may at any time before trial petition the court to find and certify that the employee was acting within the scope of his office or employment."). Brooks seeks such relief from the court.

### *3.* Blassingame v. Trump

The third action is brought by James Blassingame and Sidney Hemby, two Capitol Police officers who were on duty and injured on January 6th. They name only President Trump as a defendant. *Blassingame* Compl. They advance numerous federal and District of Columbia–law claims: (1) directing assault and battery (Count 1); (2) aiding and abetting assault and battery (Count 2); (3) directing intentional infliction of emotional distress (Count 3); (4) two counts of negligence per se predicated on violations of District of Columbia anti-rioting and disorderly conduct criminal statutes (Counts 4 and 5); (5) punitive damages (Count 6); (6) violation of § 1985(1) (Count 7); and (7) civil conspiracy in violation of common law (Count 8). *See id.* at 36–48.

Defendant Trump has moved to dismiss all counts against him. Def. Trump's Mot. to Dismiss, ECF No. 10, Def.'s Mem. in Supp. of His Mot. to Dismiss, ECF No. 10-1 [hereinafter *Blassingame* Trump Mot.].

### *4.* *The Motions to Dismiss*

Defendants' arguments for dismissal are the same across all three cases. Generally, all Defendants contend the following: (1) Plaintiffs lack standing to sue under Article III of the

Constitution; (2) the First Amendment bars Plaintiffs' claims; and (3) Plaintiffs have failed to state claims under § 1985(1) and District of Columbia law.  President Trump advances a number of contentions that are specific to him: (1) he is absolutely immune from suit; (2) the political question doctrine renders these cases nonjusticiable; (3) the Impeachment Judgment Clause bars civil suits against a government official, like him, acquitted following impeachment; and (4) the doctrines of res judicata and collateral estoppel premised on his acquittal by the Senate preclude all of Plaintiffs' claims.

The court held oral argument on January 10, 2022, on Defendants' motions.  *See* Hr'g Tr., ECF No. 63.

## III.    DISCUSSION

This section consists of two subparts:  a discussion of (1) whether the court has subject matter jurisdiction to hear these actions, and if it does, (2) whether Plaintiffs have stated cognizable claims.  The court begins, where it must, with determining whether it has jurisdiction to hear these matters.

### A.    Subject Matter Jurisdiction

Defendants' challenge to the court's subject matter jurisdiction requires the court to make four inquiries:  (1) whether Plaintiffs have Article III standing to sue, (2) whether President Trump enjoys absolute immunity from suit, (3) whether the cases present a political question that is nonjusticiable as to President Trump, and (4) whether the claims against President Trump are barred by the Impeachment Judgment Clause.[5]  The court also addresses in this portion of the

---

[5] President Trump raises another contention under the rubric of Article III standing but misclassifies it.  He insists that Swalwell and the Bass Plaintiffs cannot bring suit under § 1985(1) because such a claim "is only available to specific federal officials," which does not include members of Congress.  *Thompson* Trump Mot. at 16.  Therefore, he says, "Plaintiffs are not of a class of individuals who have *standing* to bring a claim under § 1985(1)."  *Id.* at 18 (emphasis added).  This type of argument is commonly referred to as "statutory standing."  *See Lexmark Int'l, Inc. v. Static*

16

opinion President Trump's res judicata and collateral estoppel defenses, which, although not jurisdictional in nature, logically fit here because they are premised on his acquittal following impeachment.

The court holds that (1) all Plaintiffs have plausibly established Article III standing, (2) President Trump is not absolutely immune from suit, except as to Swalwell's § 1986 failure-to-act claim (Count 2), (3) the political question doctrine does not bar the court's review, (4) the Impeachment Judgment Clause does not foreclose the claims against President Trump, and (5) the doctrines of res judicata and collateral estoppel do not preclude litigation of the case or any claim or fact against President Trump. The court takes up these issues in the order listed.

### 1. *Article III Standing*

The Article III standing arguments made by Defendants are of two varieties. First, President Trump maintains that Swalwell and the Bass Plaintiffs "have not alleged a particularized injury causally connected to Mr. Trump." *Thompson* Trump Mot. at 15; *Swalwell* Trump Mot. at 16–17 (arguing that Swalwell "failed to allege any concrete injury caused by Defendants"). Second, the Oath Keepers contend that the Bass Plaintiffs lack standing to sue in their personal capacities to redress the alleged interference with their official duty to attend and participate in the Certification of the Electoral College vote. *Thompson* Oath Keepers' Mot. at 17. Neither contention has merit.

---

*Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014). The Supreme Court has made clear, however, that a question of statutory standing does not implicate the court's subject matter jurisdiction, that is, the court's power to hear a case. *See id.* Rather, a dispute as to statutory standing simply requires a court to determine whether a plaintiff "has a cause of action under the statute." *Id.* at 128. It is therefore an argument properly addressed pursuant to Federal Rule of Civil Procedure 12(b)(6), not Rule 12(b)(1). The court thus takes up President Trump's statutory standing argument below in the section addressing whether Swalwell and the Bass Plaintiffs have stated a claim under § 1985(1).

a.     The elements of standing

A plaintiff in federal court bears the burden of showing that she meets the "irreducible constitutional minimum" of Article III standing: (1) injury in fact, (2) causation, and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). To establish standing at the motion to dismiss stage, the plaintiff "must state a plausible claim that [she has] suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (internal quotation marks omitted). The court must accept the well-pleaded allegations of the complaint as true and draw all inferences in favor of the plaintiff. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

The primary question the court faces concerns "injury in fact, the first and foremost of standing's three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (internal quotation marks and alteration omitted). In one sense that inquiry here is easy; in another, it is a bit more complicated. The easy establishment of a concrete injury is in *Blassingame* and as to one Plaintiff in *Thompson*. "If a defendant has caused physical . . . injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). The *Blassingame* Plaintiffs claim to have suffered physical injury. *Blassingame* Compl. ¶ 83 ("Officer Hemby was crushed against the doors on the east side trying to hold the insurrectionists back."); *id.* ¶ 88 (alleging Officer Hemby suffered "cuts and abrasions" over his face and hands); *id.* ¶ 109 ("The insurrectionists struck Officer Blassingame in his face, head, chest, arms, and what felt like every part of his body."). [6] So, too, does Bass Plaintiff Jayapal. *See*

---

[6] Although President Trump does not contest the *Blassingame* Plaintiffs' standing except for a cursory mention in the one-page motion to which he attaches his memorandum, Def. Trump's Mot. to Dismiss, ECF No. 10; *see generally Blassingame* Trump Mot., the court nevertheless addresses it. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)

18

*Thompson* Compl. ¶¶ 197, 203, 208 (alleging that she had a recent knee-replacement surgery and the evacuation from the House Gallery caused her to suffer "throbbing pain in her greatly swollen knee," and that she "endured significant pain and experienced setbacks in her knee replacement surgery recovery"). Because only one plaintiff must establish standing in *Thompson*, the court need not inquire as to the other Bass Plaintiffs. *See In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012).

The more challenging question surrounding injury in fact relates to Swalwell in his individual case. He does not allege any physical injury, only emotional harm. *Swalwell* Compl. ¶¶ 149, 223 (claiming "severe emotional distress"). For his common law claims, such harm is sufficient to establish an injury in fact. *See, e.g.*, *TransUnion LLC*, 141 S. Ct. at 2211 n.7 (acknowledging that emotional or psychological injury suffices for the tort of intentional infliction of emotional distress). But not automatically so for his claims under § 1985(1) and § 1986 of the Ku Klux Klan Act. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (stating that "a plaintiff must demonstrate standing for each claim he seeks to press" (internal quotation marks omitted)). As to those claims, a question remains whether emotional harm is sufficiently "concrete" to establish Article III standing. *Spokeo*, 578 U.S. at 340. To determine "whether [such an] intangible harm" is sufficiently concrete, courts must consider "both history and the judgment of Congress." *Id.* As to history, "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* at 341. And, as to Congress's judgment, courts must ask "whether Congress has permissibly sought to 'elevate to the status of legally cognizable

---

(stating that federal courts have an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party").

injuries concrete *de facto* injuries that were previously inadequate in law[.]'" *Magruder v. Capital One, Nat'l Ass'n*, 540 F. Supp. 3d 1, 7 (D.D.C. 2021) (quoting *Spokeo*, 578 U.S. at 341).

The parties have devoted scant attention to these questions. The court has considered them, however, and concludes that emotional harm is sufficiently concrete to establish Article III standing for claims asserted under § 1985(1) and § 1986. Starting with history, the alleged intangible harm here—emotional distress—has long been accepted as a basis for certain types of suits in American courts. "Emotional harm has long-standing recognition as a compensable injury as a parasitic harm to personal injury or property damage claims, usually referred to as a claim for pain and suffering." Betsy J. Grey, *The Future of Emotional Harm*, 83 FORDHAM L. REV. 2605, 2610 (2015). Additionally, "[c]ommon law . . . traditionally recognized emotional harm claims as a component of trespassory torts like assault, false imprisonment, and defamation, allowing a presumption of damages without a showing of related physical injury." *Id.* This common law tradition dovetails with the plain text of § 1985(1) and Congress's reasons for enacting it. The statute creates a cause of action for a person "injured in his person or property" due to a proscribed conspiracy. 42 U.S.C. § 1985(3). The statute makes no distinction between physical and emotional injury, and in that sense it aligns with the common law tradition of permitting recovery for emotional distress for certain torts without a showing of physical injury. And, though the statute "was enacted by a Congress acutely aware of the massive and frequently violent resistance in the southern states to federal Reconstruction after the Civil War," *Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1334 (7th Cir. 1977), courts have broadly interpreted § 1985(1) consistent with its "terms and legislative intent . . . , which [are] directed against efforts to impede governmental operations by interfering with officials in the discharge of their duties." *Lawrence v. Acree*, 665 F.2d 1319, 1329 (D.C. Cir. 1981) (Wald, J., concurring) (citing *Stern*, 547 F.2d 1329). Permitting

20

recovery for emotional harm arising from such interference is consistent with that intent. The court thus concludes that "history and the judgment of Congress" support recognizing emotional harm as a concrete injury to establish standing to bring claims under § 1985(1) and § 1986.

This conclusion is buttressed, at least implicitly, by two D.C. Circuit decisions. In both *Barr v. Clinton*, 370 F.3d 1196 (D.C. Cir. 2004), and *Hall v. Clinton*, 285 F.3d 74 (D.C. Cir. 2002), the court faced claims brought under § 1985(1). In *Barr*, the court dismissed the claim based on the statute of limitations and the First Amendment, 370 F.3d at 1202–03, and in *Hall*, it dismissed based on the statute of limitations alone, 285 F.3d at 82. In both cases, the plaintiff alleged emotional distress as their injury, *Barr*, 370 F.3d at 1200; *Hall*, 285 F.3d at 77, yet in neither did the court address whether emotional harm was a concrete injury for purposes of Article III. Perhaps that is because the sufficiency of such injury was so obvious it did not need to be addressed. *Barr* and *Hall* therefore support the court's conclusion.

President Trump also contests whether Swalwell and the Bass Plaintiffs have plausibly demonstrated the second element of standing—causation. He contends that their claimed injuries were caused not by his challenged actions, but by "the independent and intervening acts of third-party rioters." *Swalwell* Trump Mot. at 16. He also contends that causation is lacking because "Plaintiffs did not properly allege a conspiracy." *Thompson* Trump Mot. at 15. But these arguments misconstrue the standing inquiry. In "reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003); *see also Weissman v. Nat'l R.R. Passenger Corp.*, 21 F.4th 854, 857 (D.C. Cir. 2021) (citing *City of Waukesha*, 320 F.3d 228). Thus, in assessing Plaintiffs' standing here, the court must assume that Plaintiffs have successfully pleaded an

21

actionable conspiracy under § 1985(1): that is, President Trump did conspire "to prevent, by force, intimidation, or threat," (1) President Biden and Vice President Harris "from accepting or holding any office, trust, or place of confidence under the United States" and (2) members of Congress from lawfully discharging their constitutional and statutory duties with respect to certifying the Electoral College vote. Viewed in this way, it is apparent that Plaintiffs' injuries are "fairly traceable" to President Trump's alleged actions as a coconspirator, and "not the result of the *independent* action of some third party not before the court." *Lujan*, 504 U.S. at 560 (cleaned up) (emphasis added).

Finally, Plaintiffs' injuries are redressable with money damages. The court therefore is satisfied that Plaintiffs have sufficiently alleged the requisite elements of standing.[7]

### b. Legislator standing

The Oath Keepers take a different tack on standing. They assert that the Bass Plaintiffs' injuries are *institutional* in nature—that is, they derive exclusively from their positions as members of the House. The Oath Keepers contend that if their injuries are so understood, the Bass Plaintiffs, as individual members, lack standing to vindicate an institutional injury. Oath Keepers Mot. at 17–26. The court might agree with this line of argument if the Bass Plaintiffs were claiming no more than that the riot interfered with their abilities to carry out their legislative duties. But that is not what they allege. They do not advance an institutional injury, such as the "dilut[ion] [of] their Article I voting power." *Raines v. Byrd*, 521 U.S. 811, 817 (1997) (internal quotation marks omitted). Their injuries are instead personal: emotional distress in the main, as well as physical

---

[7] Certain Plaintiffs seek injunctive relief in addition to damages. *See Swalwell* Compl. at 64; *Thompson* Compl. at 62. The standing inquiry for injunctive relief is different, as it requires a plaintiff to establish a likelihood of *future* harm. *In re Navy Chaplaincy,* 697 F.3d at 1178 ("It is sufficient that plaintiffs have demonstrated a 'likelihood of injury that rises above the level of unadorned speculation—that is, a realistic danger that [they] will suffer future harm." (internal quotation marks omitted)). Plaintiffs have not plausibly pleaded at this stage any likelihood of future injury.

22

injury to Jayapal. *Thompson* Compl. ¶ 265 ("During the time when the Capitol was under attack, each of the Plaintiffs named above suffered emotional harm."). Personal harm is the basis for their standing and, as discussed, it is sufficient for purposes of Article III.[8]

### 2. *Presidential Immunity*

The court turns next to the question of presidential immunity. President Trump contends that under the Supreme Court's decision in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), he is absolutely immune from damages liability in all three cases because his alleged conduct fell within the "outer perimeter" of his official presidential responsibilities. *See Swalwell* Trump Mot. at 8–11; *Thompson* Trump Mot. at 8–11; *Blassingame* Trump Mot. at 7–13. This is not an easy issue. It is one that implicates fundamental norms of separation of powers and calls on the court to assess the limits of a President's functions. And, historical examples to serve as guideposts are few. After careful consideration, the court concludes that, on the facts alleged, absolute immunity does not shield President Trump from suit, except as to Swalwell's § 1986 failure-to-act claim.

### a. The scope of a President's absolute immunity against damages liability

The court's discussion naturally begins with the Supreme Court's decision in *Nixon v. Fitzgerald*. In that case, a former federal employee sued President Richard Nixon and various Executive Branch officials for damages arising from his termination from employment. *Fitzgerald*, 457 U.S. at 733–39. The plaintiff claimed that President Nixon was directly involved in his firing and that the action was undertaken in retaliation for his having publicly revealed during

---

[8] It is understandable why the Oath Keepers interpreted the Bass Plaintiffs' claimed injury to include an impairment of their official duties. Their Complaint states that "each of the Plaintiffs named above was hindered and impeded in the discharge of his or her official duties and suffered the deprivation of the right to be free from intimidation and threats in the discharge of his or her official duties, as explicitly protected under the Ku Klux Klan Act." *Thompson* Compl. ¶ 265. That certainly sounds like an institutional injury. In any event, the Bass Plaintiffs have expressly disavowed such a theory of standing. Bass Pls.' Omnibus Mem. of Law in Opp'n to Defs.' Mots. to Dismiss, ECF No. 29, at 20 ("Plaintiffs, however, are *not* seeking damages for an impaired ability to certify the results of the election.").

congressional hearings cost overruns in the Department of the Air Force. *See id.* The plaintiff

asserted two statutory claims and one claim under the First Amendment against President Nixon,

who by that point no longer occupied the Office of the President. *See id.* After the D.C. Circuit

declined to dismiss the case on the ground of absolute presidential immunity, the Supreme Court

took up the question of the "scope of immunity available to a President of the United States." *Id.*

at 741.

The Court held that President Nixon enjoyed absolute immunity from the plaintiff's suit:

"[W]e hold that petitioner, as former President of the United States, is entitled to absolute

immunity from damages liability predicated on his official acts." *Id.* at 749. The Court continued:

"We consider this immunity a functionally mandated incident of the President's unique office,

rooted in the constitutional tradition of the separation of powers." *Id.* Central to the Court's

determination was the "unique position in the constitutional scheme" that the President occupies.

*Id.* The Court observed that, "as the chief constitutional officer of the Executive Branch," the

President is "entrusted with supervisory and policy responsibilities of the utmost discretion and

sensitivity." *Id.* at 750. Those responsibilities include taking care that the laws be faithfully

executed; conducting foreign affairs; and managing the Executive Branch. *Id.*; *see also Trump v.*

*Vance*, 140 S. Ct. 2412, 2425 (2020) (describing the President's "duties, which range from

faithfully executing the laws to commanding the Armed Forces," as "of unrivaled gravity and

breadth"). Though the Court had previously held that qualified immunity struck the proper

separation-of-powers balance for cabinet officers, the Court said that "[t]he President's unique

status under the Constitution distinguishes him from other executive officials." *Fitzgerald*, 457

U.S. at 750. For a President, "diversion of his energies by concern with private lawsuits would

raise unique risks to the effective functioning of government." *Id.* at 751. Indeed, because the

24

President must concern himself with "matters likely to 'arouse the most intense feelings,'" "there exists the greatest public interest in providing an official the maximum ability to deal fearlessly and impartially with the duties of his office." *Id.* at 752 (internal quotation marks omitted). The Court also weighed the "sheer prominence" of the President's office, which makes him "an easily identifiable target for suits for civil damages." *Id.* at 752–53. "Cognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Id.*

The Court then defined the scope of a President's absolute immunity. It observed that "the sphere of protected action must be related closely to the immunity's justifying purposes." *Id.* at 755. That principle militated in favor of expansive immunity: "In view of the special nature of the President's constitutional office and functions, we think it appropriate to recognize absolute Presidential immunity from damages liability for acts within the 'outer perimeter' of his official responsibility." *Id.* at 756. The Court recognized that given the "broad variety of areas, many of them highly sensitive," of presidential discretionary responsibility, in "many cases it would be difficult to determine which of the President's innumerable 'functions' encompassed a particular action." *Id.* Such function could not, however, be defined by probing the President's motive for the contested action or by simply claiming a violation of law. The plaintiff in *Fitzgerald*, for example, could not avoid the immunity bar by alleging that the President's motive for terminating him was retaliatory, and thus unlawful, and therefore fell outside the outer perimeter of his duties. *See id.* at 756. Such a "construction would subject the President to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose." *Id.* President Nixon thus enjoyed absolute immunity from suit because it was clearly within his constitutional and

25

statutory authority to prescribe reorganizations and reductions in force within a military branch—the stated reason for Plaintiff's termination. *Id.* at 757. Such action "lay well within the outer perimeter of [a President's] authority." *Id.*

*Fitzgerald* thus established a scope of presidential immunity for civil money damages that is unquestionably capacious, though not categorical. The Supreme Court contemplated that, at least, there might be *some* actions by a President that would fall outside the outer perimeter of his official responsibilities and expose him to a civil suit. What lay beyond the outer perimeter would come into some focus fifteen years later in *Clinton v. Jones*.

There, President Bill Clinton, while in office, faced a suit by Paula Jones that, in the main, alleged that he had engaged in sexually inappropriate conduct while he was the Governor of Arkansas and had retaliated against her for rebuffing his advances. *Clinton v. Jones*, 520 U.S. 681, 686 (1997).[9] Such acts, the Court said, were "unrelated to any of his official duties as President of the United States and, indeed, occurred before he was elected to that office." *Id.* at 686. President Clinton nevertheless urged the Court to hold that "the Constitution affords the President temporary immunity from civil damages litigation arising out of events that occurred before he took office." *Id.* at 692. The Court rejected the President's call for "temporary immunity." *Id.* It reasoned that the principal rationale for affording certain public servants absolute immunity was to enable "such officials to perform their designated functions effectively without fear that a particular decision may give rise to personal liability," and that such rationale did not apply to "unofficial conduct." *Id.* at 693–94. The Court emphasized that in defining the scope of immunity

---

[9] *Clinton v. Jones* also involved a claim of defamation that arose while President Clinton was in office. The claim was that "persons authorized to speak for the President publicly branded [the plaintiff] a liar by denying that the incident had occurred." 520 U.S. at 685. The question of immunity as to the defamation claim was not before the Court, though it did observe in passing that the defamation claim "may involve conduct within the outer perimeter of the President's official responsibilities." *Id.* at 686 & n.3.

26

it had taken a "functional approach," and that "immunities are grounded in the nature of the function performed, not the identity of the actor who performed it." *Id.* at 694–95 (internal quotation marks omitted). It concluded: "With respect to acts taken in his 'public character'—that is, official acts—the President may be disciplined principally by impeachment, not by private lawsuits for damages. But he is otherwise subject to the laws for his purely private acts." *Id.* at 696.[10]

### b.     The parties' positions on official-acts immunity

Guided by the foregoing principles, the court turns to the parties' arguments. President Trump bears the burden of establishing that he is immune from suit. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1140 (D.C. Cir. 2015).

The complained-of actions of the President in these matters can be generally framed as falling into three categories: his pre–January 6th tweets, the January 6 Rally Speech, and his failure to promptly act once the Capitol was breached by rioters. President Trump argues that these acts fall into two presidential "functions": (1) the constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const., art. II, § 3, and (2) speaking on matters of public concern. *Swalwell* Trump Mot. at 8–11; *Blassingame* Trump Mot. 12; Reply in Supp. of Def. President Trump's Mot. to Dismiss, ECF No. 43 [hereinafter *Thompson* Trump Reply], at 3–6. Across his various briefs, President Trump describes these functions in different ways. With respect to faithful execution of the laws, President Trump says that he "had an ever-present duty to ensure that the election laws were followed, including the certification process." *Thompson* Trump Reply

---

[10] The Court also made clear in *Clinton*, and later in *Vance v. Trump*, that the "dominant concern" for crafting broad immunity in *Fitzgerald* "was not mere distraction but the distortion of the Executive's 'decisionmaking process' with respect to official acts that would stem from 'worry as to the possibility of damages.'" *Vance*, 140 S. Ct. at 2426 (quoting *Clinton*, 520 U.S. at 694 n.19). President Trump alludes to a "distraction" rationale in his papers, *see Thompson* Trump Mot. at 9, but he does not seriously advocate for it, recognizing instead that the "distortion" rationale is the predominant reason for affording a President absolute immunity from civil suit for official acts.

27

at 3. Quoting from a law review student note, he says that enforcing election laws is "at the core of the executive branch's duty to faithfully execute the law." *Id.* (internal quotation marks and citation omitted). As to speaking on matters of public concern, the President argues that he "was engaged in discretionary action pursuant to his Constitutional duty to ensure that the laws were faithfully executed by petitioning Congress not to certify the electors from States with ongoing election challenges." *Blassingame* Trump Mot. at 10–11. Elsewhere he contends that the speech and social media posts complained of by Plaintiffs all addressed matters of public concern and thus are "within the outer perimeter of the Presidential office." *Thompson* Trump Reply at 5. "[A] political speech by the President is not at the 'outer perimeter' of his duties," he says; rather, "it is at dead center." *Swalwell* Trump Mot. at 9.

The court finds that President Trump's Take Care Clause argument is misleading and wrong as a matter of law, and that his contention with respect to speech of public concern is too simplistic.

### i. *The Take Care Clause*

Article II, Section 3 vests in the President the authority to "take Care that the Laws be faithfully executed." Those are "sweeping words," *Myers v. United States*, 272 U.S. 52, 122 (1926), but they do not confer limitless presidential authority or the authority to encroach on the powers vested in the co-equal branches, *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–88 (1952). Presidential authority remains constrained by the Constitution and the laws that Congress enacts. *See id.* at 587 ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker."); *id.* at 588 ("The President's order does not direct that a congressional policy be executed in a manner

28

prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President.").

President Trump cites no constitutional provision or federal statute that grants or vests in the President (or the Executive Branch) any power or duty with respect to the Certification of the Electoral College vote, at least in the manner in which he conceives it. That is because there is none. The Constitution spells out the respective responsibilities of various actors in the election of the President.[11] The Constitution provides that States are to select Electors who will cast votes for President and Vice President, and the Electors transmit a tally of those votes to the President of the Senate. U.S. Const. art. II, § 1, cl. 3; *id.* amend. XII. The President of the Senate "in the presence of the Senate and House of Representatives" shall "open all the certificates and the votes shall then be counted." *Id.* amend. XII. A sitting President is prescribed no role.

The Electoral Count Act, Pub. L. No. 49-90, 24 Stat. 373 (1887), fills in procedural details not addressed in the Constitution. It, too, prescribes no role for a sitting President. A Joint Session of the Senate and the House of Representatives must meet "at the hour of 1 o'clock in the afternoon" on "the sixth day of January succeeding every meeting of the electors." 3 U.S.C. § 15. The President of the Senate, as the presiding officer, opens the certificates of the electoral votes and hands them to tellers appointed by each House, who make a list of the votes. *Id.* When announcing each certificate, the President of the Senate calls for objections, which if made must be in writing and signed by one Senator and one member of the House of Representatives. *Id.* Thereafter, the Senate and the House withdraw to their respective chambers to consider each objection, and "each Senator and Representative may speak to such objection or question five minutes, and not more than once[.]" *Id.* § 17. The presiding officer must cut the debate off after

---

[11] The below summary is pulled, some of it verbatim, from Judge Friedrich's decision in *United States v. Sandlin*, No. 21-cr-88 (DLF), 2021 WL 5865006, at *4 (D.D.C. Dec. 10, 2021).

two hours.  *Id.*  He also has the "power to preserve order" during the session.  *Id.* § 18.  The Act

even details where the presiding officer, the Speaker, the Senators, the Representatives, the tellers,

and others are to sit in the chamber.  *Id.* § 16.  And it commands that the session "not be dissolved

until the count of electoral votes shall be completed and the result declared."  *Id.*  As this summary

demonstrates, a sitting President has no expressly identified duty to faithfully execute the laws

surrounding the Certification of the Electoral College.  So, perhaps it is not surprising that

President Trump does not identify *any* law relating to the Certification that he was purportedly

executing through his tweets and the January 6 Rally Speech.

Nor does he identify any authority that would support his assertion that merely exhorting

non–Executive Branch officials to act in a certain way is a responsibility within the scope of the

Take Care Clause.  Scholars have emphasized that the Take Care Clause is written in the passive

voice ("take Care that the Laws be faithfully executed").  They have interpreted that construction

to mean that the Framers envisioned not that the President personally would implement the laws

but that their actual execution would be carried out by others subject to the President's direction

and supervision.  *See, e.g.*, Andrew Kent et al., *Faithful Execution and Article II*, 132 HARV. L.

REV. 2111, 2126 (2019); Gillian E. Metzger, *The Constitutional Duty to Supervise*, 124 YALE L.J.

1836, 1875 (2015).  The President's Take Care Clause duty therefore does *not* extend to

government officials over whom he has no power or control.  Here, the Vice President, acting as

President of the Senate, and members of Congress had constitutionally and statutorily prescribed

duties to carry out the Certification.  Their actions are those of a co-equal branch, not subject to

Executive Branch control.  President Trump's advocacy of the scope of their duties and how they should be performed therefore falls outside even the expansive Take Care Clause.[12]

In summoning authority in aid of this argument, President Trump leaves out critical context.  President Trump relies on a law review note for the general proposition that "enforcing election laws . . . [strikes] at the core of the executive branch's duty to faithfully execute the law." *Thompson* Trump Reply at 3 (quoting Alton L. Lightsey, Note, *Constitutional Law:  The Independent Counsel and Supreme Court's Separation of Powers Jurisprudence*, 40 U. FLA. L. REV. 563, 573 (1988)).  What President Trump omits from that quote, however, makes his citation grossly misleading.  The full quote reads: "However, enforcing election laws *through litigation* [strikes] at the core of the executive branch's duty to faithfully execute the law.   It must therefore belong solely to the executive."  Lightsey, *supra*, at 573 (emphasis added).  Including "through litigation" completely changes the meaning of the sentence.  The President can enforce election laws through litigation initiated by the Department of Justice or the Federal Election Commission, agencies over which he has appointment authority.  The case the Lightsey note cites, *Buckley v. Valeo*, makes that clear:  "A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'"  424 U.S. 1, 138 (1976).  This case, of course, does not involve litigation to enforce federal election laws, and so the President's reliance on the Lightsey note is inapt.

---

[12] To be clear, the court does not mean to say that there is no conceivable circumstance in which the President would have a role in faithfully executing the laws pertaining to the Certification of the Electoral College.  The court's holding is limited to President Trump's contention that his mere exhortation to carry out Certification duties in a particular way falls within the Take Care Clause.

The court turns next to President Trump's assertion that his alleged actions all involve speech on matters of public concern and therefore are well within the President's duties. As he puts it: "It is enough that the nature of the activity, a speech by the President, is the type of activity normal and customary to the presidency. Indeed, it was not at the outer perimeter of the President's duties—it was dead center." *Thompson* Trump Reply at 2.

The court agrees with President Trump in two respects. First, speech is unquestionably a critical function of the presidency. "The President of the United States possesses an extraordinary power to speak to his fellow citizens and on their behalf." *Trump v. Hawaii*, 138 S. Ct. 2392, 2417–18 (2018); *see also Columbia Broad. Sys., Inc. v. FCC*, 454 F.2d 1018, 1020 (D.C. Cir. 1971) ("The President's extensive use of the media cannot, of course, be faulted, for there can be no doubt that in the distillation of an informed public opinion such appearances play a very basic role."). Second, his pre–January 6th tweets and the January 6 Rally Speech addressed matters of public concern: the outcome of the 2020 Presidential Election and election integrity. Whatever one thinks of the President's views on those subjects, they plainly were matters of public concern. *See Snyder v. Phelps*, 562 U.S. 443, 453 (2011) ("Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." (internal quotation marks and citations omitted)); *Rankin v. McPherson*, 483 U.S. 378, 387 (1987) (stating the arguably "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern").

But to say that speaking on matters of public concern is a function of the presidency does not answer the question at hand: Were President Trump's words in this case uttered in performance of official acts, or were his words expressed in some other, unofficial capacity? The President's proposed test—that whenever and wherever a President speaks on a matter of public concern he is immune from civil suit—goes too far. It mirrors what the Supreme Court has said cannot be the basis for absolute immunity: "[T]o construct an immunity from suit for unofficial acts grounded purely in the identity of [the President's] office is unsupported by precedent." *Clinton*, 520 U.S. at 695. And the Supreme Court has recognized different capacities in which the person occupying the Office of the President can act: "Presidents and other officials face a variety of demands on their time, . . . some private, some political, and some as a result of official duty." *Id.* at 705 n.40.[13] Thus, to say that the President spoke on a matter of public concern does not dispositively answer the question of whether he enjoys absolute immunity for such speech.

Consider some examples. At a rally promoting his reelection, an incumbent President touts his policy accomplishments and makes promises about a second term, but during his speech he instructs members of the crowd to "punch" a protester "in the face right now." Or, take a President who speaks at a party fundraising event before a group of high-dollar donors, where he not only discusses pending legislation but also falsely and with malice accuses a political opponent who is

---

[13] This observation was made as part of the Supreme Court's rejection of the "distraction" theory as justifying absolute immunity:

> There is, no doubt, some truth to Learned Hand's comment that a lawsuit should be "dread[ed] . . . beyond almost anything else short of sickness and death." We recognize that a President, like any other official or private citizen, may become distracted or preoccupied by pending litigation. Presidents and other officials face a variety of demands on their time, however, some private, some political, and some as a result of official duty. While such distractions may be vexing to those subjected to them, they do not ordinarily implicate constitutional separation-of-powers concerns.

*Clinton*, 520 U.S. at 705 n.40 (citation omitted).

blocking the legislation of running a child-trafficking operation.  Or, consider a President who appears at a campaign event for a candidate of his party who is running for Congress, and during his remarks touts the candidate because his election will help advance his agenda, but also calls on the crowd to destroy property as a sign of support.  In each of these scenarios, the conduct of the President comes in the context of words uttered on matters of public concern, but it is doubtful that anyone would consider the President immune from tort liability for harm resulting from his speech.  To be sure, these scenarios may seem far-fetched, but they illustrate an important point:  blanket immunity cannot shield a President from suit merely because his words touch on matters of public concern.  The context in which those words are spoken and what is said matter.

For their part, Plaintiffs urge the court to reject President Trump's claim of absolute immunity for two reasons:  first, because they "allege that he was acting solely in his personal capacity as a *candidate*," and second, because he "engaged in serious misconduct that obstructed a co-equal branch of government, removing his actions from the outer bounds of permissible presidential conduct."  Bass Pls.' Omnibus Mem. of Law in Opp'n to Defs.' Mots. to Dismiss, ECF No. 29 [hereinafter *Thompson* Pls.' Opp'n], at 65 (internal quotation marks omitted); *see also* Pl. Swalwell's Combined Opp'n to Defs.' Mots. to Dismiss, ECF No. 23 [hereinafter *Swalwell* Opp'n], at 11 (arguing that "Trump conflates his role as a candidate with his role as President"); *Blassingame* Pls.' Opp'n to Def.'s Mot. to Dismiss, ECF No. 21 [hereinafter *Blassingame* Pls.' Opp'n], at 6 ("Article II does not provide Trump with immunity for inciting an insurrection.").  These formulations present their own set of problems.

For one, the line between President and candidate will not always be clear.  A first-term President is, in a sense, always a candidate for office.  It is not the least bit unusual for first-term Presidents to comment on public policy or foreign affairs at campaign events, or, in this day, to

34

announce policy changes by tweet during an election year. Plaintiffs offer no principled

constitutional basis on which to discern how to categorize such acts.[14]

As for their contention that immunity cannot extend to a President that incites a mob to

attack a co-equal branch of government, while having surface appeal, it too runs into an analytical

problem. If what Plaintiffs mean to say is that an alleged violation of law by a President cannot

fall within the outer perimeter of his official duties, the Supreme Court rejected that very argument

in *Fitzgerald*. Such a "construction," the Court said, "would subject the President to trial on

virtually every allegation that an action was unlawful, or was taken for a forbidden purpose.

Adoption of this construction thus would deprive absolute immunity of its intended effect."

*Fitzgerald*, 457 U.S. at 756–57. Plaintiffs' position also runs up against the Court's admonition

that a test for immunity that depends upon "a President's motives" "could be highly intrusive." *Id.*

at 756. Predicating an immunity determination on whether President Trump intended to cause a

riot arguably would require just such an inquiry.[15]

---

[14] At oral argument and in a post-hearing filing, Plaintiffs proposed that the court could rely on an Office of Legal Counsel Opinion from 1982, Payment of Expenses Associated with Travel by the President and Vice President, 6 Op. O.L.C. 214 (1982), to distinguish between a President's official duties and campaign activities. *See* Hr'g Tr. 33; Pls.' Notice of Suppl. Authority, ECF No. 59 (on *Thompson* docket). That Opinion adopts a "reasonable connection" to "official purposes" test to differentiate the two capacities. 6 Op. O.L.C. at 216. The court is skeptical that a test rooted in statutory and administrative rules on spending of appropriations can define the scope of a *constitutional* immunity.

[15] That said, the court would be remiss in not pointing out that there is at least some historical support for Plaintiffs' position. In *Fitzgerald*, the Court found persuasive Justice Story's analysis on presidential immunity. 457 U.S. at 749 (quoting 3 J. STORY, COMMENTARIES OF THE CONSTITUTION OF THE UNITED STATES § 1563, at 418–19 (1st ed. 1833)). Justice Story also commented on the open question of "whether, under the constitution, any acts are impeachable, except such, as are committed under colour of office." 2 Commentaries § 799. In other words, does the constitutional remedy of impeachment extend to official acts only, or can it be based on unofficial conduct? In addressing this issue, Justice Story did not formulate a firm opinion, but he did make the following observation:

> In the argument upon Blount's impeachment, it was pressed with great earnestness, that there is not a syllable in the constitution, which confines impeachments to official acts, and it is against the plainest dictates of common sense, that such restraint should be imposed upon it. *Suppose a judge should countenance, or aid insurgents in a meditated conspiracy or insurrection against the government. This is not a judicial act*; and yet it ought certainly to be impeachable.

### iii. *The President's challenged acts*

Rather than apply the parties' proffered categorial rules to the immunity question, the court thinks the better course is to evaluate the defense on the specific facts alleged and, based on those facts, determine whether President Trump's words were spoken in furtherance of a presidential function. That is the approach that the D.C. Circuit took in *Banneker Ventures, LLC v. Graham*, a case in which then–Board Member of the Washington Metropolitan Area Transit Authority ("WMATA") Jim Graham asserted absolute immunity from a suit accusing him of improperly interfering with a developer's ultimately unsuccessful project negotiations with WMATA. 798 F.3d 1119, 1139 (D.C. Cir. 2015). The court viewed Graham's immunity defense, in part, through the lens of federal common law and asked whether Graham's alleged conduct fell within the scope of his official duties. *Id.* at 1140. It applied the "within the outer perimeter of [an official's] line of duty" test as demarcating the line between Graham's official and unofficial acts. *Id.* (quoting *Barr v. Matteo*, 360 U.S. 564, 575 (1959)). The trial court had found that all of Graham's alleged tortious acts were immune, but the D.C. Circuit criticized the trial court for "conceiv[ing] of the inquiry at too high a level" and for not "analyzing each challenged act." *Id.* at 1141; *id.* ("At a high enough level of generality, almost any act that has any relationship to an overarching duty . . . will be immunized."). "The appropriate focus," the court wrote, "is on the relationship between 'the act complained of' and the corresponding 'matters committed by law to [the official's] control or supervision.'" *Id.* (quoting *Barr*, 360 U.S. at 573). The court noted that

---

*Id.* § 802 (emphasis added). Justice Story's mention of "Blount's impeachment" refers to the impeachment of Senator William Blount of Tennessee in 1797, who stood accused of conspiring with British officials and others in a plot to establish British control over the Spanish-controlled territories of Louisiana and the Floridas. The House impeached Blount, but the Senate ultimately dismissed the charges because Blount had already been expelled and the Senate concluded it no longer had jurisdiction over him. *See Impeachment Trial of Senator William Blount, 1799*, U.S. SENATE, https://www.senate.gov/about/powers-procedures/impeachment/impeachment-blount htm (last visited Feb. 8, 2022). This tidbit of history does lend some credence to the notion that a high government official who "aid[s] insurgents in a meditated conspiracy or insurrection against the government" is not acting in an official capacity.

"[o]ne way that an official acts manifestly beyond his authority is through the use of 'manifestly excessive means,' even if he does so in the conduct of duties otherwise within his official purview." *Id.* at 1141 (citation omitted). The court emphasized that the burden of establishing immunity rests on the official claiming it. *Id.* at 1140.

Concededly, the scope-of-duty evaluation undertaken in *Graham* was quite rigorous, and such rigor arguably should not apply here with equal force. This case involves the President of the United States, not a board member of a public agency. (*Barr*, on which *Graham* relied, involved the acting director of a federal agency.) There are separation-of-powers considerations at play here that were not present in *Graham*. Nevertheless, the court believes that *Graham*'s basic approach applies; that is, in evaluating a presidential claim of absolute immunity the court must consider the relationship of the challenged conduct to the claimed corresponding function of the President.

In undertaking this analysis, the court starts from the following premise, as to which there should be no dispute: The Office of the President has no preference for who occupies it. Article II of the Constitution, which defines the powers and duties of the President, is agnostic as to whether a sitting President is elected to a new term. So, too, is federal statutory law. A function of the presidency therefore is *not* to secure or perpetuate incumbency. Plaintiffs' allegations against President Trump accuse him of doing just that: devoting his last weeks in office to continuing his term as President of the United States through the Electoral College vote and certification process, even though he did not prevail in the general election.

Among his first alleged acts following the general election were tweets criticizing state officials for not doing enough to enable him to prevail in their states. *Swalwell* Compl. ¶ 36 (criticizing the governors of Arizona and Georgia and saying, "If they were with us, we would

37

have already won both"). The President also directly contacted local election officials and state legislators in Michigan, Pennsylvania, and Georgia to allegedly pressure them to overturn their election results. *Id.* ¶¶ 37–54. These efforts included urging local Michigan officials to reverse their certification of election results, *id.* ¶ 38, and saying to Georgia's Secretary of State, "I just want to find 11,780 votes, which is one more than we have," *id.* ¶ 53. He would later call that Georgia state official an "enemy of the people." *Thompson* Compl. ¶ 47. President Trump also filed multiple lawsuits in jurisdictions in which he did not prevail. *Id.* ¶ 36. Those suits plainly were directed at securing incumbency. They, like his tweets and direct outreach to state election officials, were not official acts.

The same is true with respect to his tweets regarding rallies that occurred in Washington, D.C., in November and December 2020. Those tweets did not advocate any policy changes or legislation. Rather, they expressly stated or implied that the rallies would help him remain President. *Blassingame* Compl. ¶¶ 23, 25, 26 (tweeted photo of rally captioned "We will WIN!"); *id.* ¶ 27 (tweet stating "WE HAVE JUST BEGUN TO FIGHT!!!").

That, too, was the purpose of the January 6 Rally. President Trump invited people to Washington, D.C., for the event. *Id.* ¶ 32. In a tweet referencing the January 6 Rally, he encouraged his followers to "Never give up." *Swalwell* Compl. ¶ 56. On the eve of the January 6 Rally, the President's tweets turned to Vice President Pence. *Blassingame* Compl. ¶ 38. The President expressed the view that the Vice President had the power, as President of the Senate, to reject states' Electoral College certifications and return them to be recertified. *Id.* The clear purpose of such recertification would be to allow Electoral College votes to be recast in his favor: "All Mike Pence has to do is send them back to the States, AND WE WIN." *Id.* These tweets were not official acts but issued to help him "win."

Nor did planning for the January 6 Rally involve official duties. Those acts took place largely through President Trump's campaign organization. In mid-December, the campaign used campaign funds to pay Event Strategies, Inc., the company that would secure the permit for the January 6 Rally. *Blassingame* Compl. ¶ 31. The campaign's Director of Finance was listed as the "VIP Lead" for the rally, *Swalwell* Compl. ¶ 97, and a "top Trump campaign fundraiser oversaw the logistics, budgeting, funding and messaging" for the rally, *Thompson* Compl. ¶ 68. The Trump campaign and various related entities paid more than $3.5 million to assist in organizing. *Blassingame* Compl. ¶ 39. President Trump also allegedly participated directly in the planning. He was involved in decisionmaking about the speaking lineup and music selection. *Thompson* Compl. ¶ 69. And, critically, to the surprise of rally organizers, President "Trump and his campaign proposed that the rally include a march to the Capitol," even though the permit they had obtained did not allow for one. *Id.* ¶¶ 69, 90 (alleging that the permit expressly provided: "This permit does not authorize a march from the Ellipse"). Organizing the January 6 Rally involved no presidential function.

And then there is the January 6 Rally Speech itself. The court has considered it in its entirety, analyzing it beyond the words quoted in the Complaints. The court will go into greater detail about the Speech later in this opinion. For present purposes it suffices to say that while the Speech did touch on matters of public concern (namely President Trump's pledge to work on election laws in a second term), the main thrust of the Speech was not focused on policy or legislation. It was to complain about perceived cases of election fraud that led President-elect Biden to win more votes in closely contested states, to urge members of Congress to object to certain state certifications, and to exhort the Vice President to return those certifications to those states to be recertified. Much like the tweets leading up to the January 6 Rally, the words spoken

39

by the President—without delving into the motivation behind them—reflect an electoral purpose, not speech in furtherance of any official duty.

To deny a President immunity from civil damages is no small step. The court well understands the gravity of its decision. But the alleged facts of this case are without precedent, and the court believes that its decision is consistent with the purposes behind such immunity. Subjecting a president to potential liability for the acts described in the Complaints will not "diver[t] . . . the President's attention during the decisionmaking process" with "needless worry as to the possibility of damages actions stemming from any particular official decision." *Clinton*, 520 U.S. at 694 n.19. After all, the President's actions here do not relate to his duties of faithfully executing the laws, conducting foreign affairs, commanding the armed forces, or managing the Executive Branch. They entirely concern his efforts to remain in office for a second term. These are unofficial acts, so the separation-of-powers concerns that justify the President's broad immunity are not present here. "If the Judiciary may severely burden the Executive Branch by reviewing the legality of the President's official conduct, and if it may direct appropriate process to the President himself, it must follow that the federal courts have power to determine the legality of his unofficial conduct." *Id.* at 705. The court therefore may "determine the legality" of President Trump's acts that are alleged to have given rise to Plaintiffs' injuries on January 6th.

### iv.    *Section 1986 claim*

The foregoing comes with one important caveat: President Trump is immune as to Swalwell's failure-to-act claim under § 1986. That provision states:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned [in section 1985 of this title], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such

40

wrongful act, which such person by reasonable diligence could have prevented.

42 U.S.C. § 1986. The statutory provision is unique. It requires persons with knowledge of a conspiracy proscribed in § 1985 and with the means to prevent the conspiracy to take affirmative actions to do so. A person who refuses or neglects to exercise such power is liable for damages to those persons whose injuries could have been prevented.

Swalwell alone asserts a claim under § 1986 against President Trump. He alleges that President Trump knew about the alleged § 1985 conspiracy, had the power to prevent it, and failed to exercise "reasonable diligence" to avoid harm. Specifically, he asserts that "when it was clear that rioters had stormed the Capitol, and Congress was unable to certify the results of the Electoral College vote, [President Trump] had the power to stop the rioters but refused and, instead, encouraged them." *Swalwell* Compl. ¶ 190. That allegation, it would seem, makes out a § 1986 claim against the President.

But the President cannot be held liable for his failure to exercise his presidential powers, at least under § 1986. Just as he is immune for acts that fall within the outer perimeter of his official responsibilities, so too must he be immune for alleged failures to exercise that official responsibility. Were it otherwise, Presidents routinely would be subject to suit for not doing more or for not acting at all. Absolute immunity would be gutted if a plaintiff could avoid it simply by alleging a failure to exercise presidential power. The court therefore dismisses Swalwell's § 1986 claim.[16]

---

[16] If Swalwell contends that President Trump is liable under § 1986 because he himself is an alleged coconspirator and had the power to stop the conspiracy, the court is dubious that § 1986 can sustain such a construction. If accepted, it would mean that any coconspirator of a § 1985 conspiracy with some degree of authority is likewise liable under § 1986. The court is skeptical that Congress intended such an interpretation. In any event, Swalwell does not specifically articulate a reading of § 1986 that would rest on the President's failure to act *before* the rally-goers stormed the Capitol. *See Swalwell* Compl. ¶ 90.

41

### 3.    The Political Question Doctrine

President Trump raises a related jurisdictional argument:  these cases present a nonjusticiable political question.  *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) (stating that, when a case involves a political question, "a court lacks the authority to decide the dispute").  The political question doctrine removes from the purview of the courts cases that "revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."  *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).  The doctrine bars a court's "jurisdiction only when the Constitution textually commits 'the issue' to be adjudicated in the case 'to a coordinate political department,' or when there is 'a lack of judicially discoverable and manageable standards for resolving it.'"  *Hourani v. Mirtchev*, 796 F.3d 1, 8 (D.C. Cir. 2015) (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)).  President Trump's effort to morph this case into one presenting a political question fails.

For starters, the court already has held that the President's actions leading up to the riot at the Capitol building were not undertaken in his official capacity.  To that extent, these cases implicate no policy choice or value determination committed to the Executive Branch.  That holding alone takes this case outside of the political question doctrine.

But even if the court uses the doctrine's analytical framework, President Trump fares no better.  He first argues that because this suit is "based upon the words or action of the President," an adjudication "would improperly regulate the executive department, in violation of Article II, § 1 which requires that the executive power be exercised solely by the President."  *Thompson* Trump Mot. at 11–12.  If by that argument the President means that any suit touching on presidential speech gives rise to a political question, that cannot be, because the Constitution says

42

nothing about a President's speech. Moreover, the Supreme Court has never held that just because a case involves review of a President's claimed exercise of his general Article II executive powers it is nonjusticiable. That is not the law. *See, e.g.*, *Youngstown Sheet & Tube*, 343 U.S. at 587 (rejecting claimed presidential authority to seize steel mills based on Article II's grant of Executive power in the President).

The President next argues that to adjudicate these cases would force the court "to make a value determination about what is or is not proper for the President to say during a political speech when advocating for governmental action." *Thompson* Trump Mot. at 12. It is true that, in a sense, an adjudication here might involve a "judgment" of the President's speech, "[b]ut that has never been enough, by itself, to trigger the political question doctrine's jurisdictional bar." *Cf. Hourani*, 796 F.3d at 8 (stating that the fact that a judgment might implicate the acts of a foreign nation, by itself, does not create a nonjusticiable political question). A suit against the President often has political overtones, but "courts cannot avoid their responsibility merely 'because the issues have political implications.'" *Zivotofsky*, 566 U.S. at 196 (quoting *INS v. Chadha*, 462 U.S. 919, 943 (1983)).

President Trump also tries a different approach. He suggests that because he was impeached by the House but acquitted by the Senate for his actions relating to January 6th, a judicial inquiry of his conduct raises a political question because it might "displace the Senate as the final arbiter on the subject of impeachment, showing disrespect for a co-equal branch." *Blassingame* Trump Mot. at 14. But, of course, this court is in no sense conducting a review of the impeachment proceedings; nor could it do so. *See Nixon*, 506 U.S. at 230–31 (holding that a court lacks the constitutional authority to review the Senate's impeachment trial procedures). Its concern is with the President's potential civil liability for the events of January 6th. The mere fact

43

that these cases and the impeachment proceedings pertain to the same subject matter does not implicate the political question doctrine.

### 4. The Impeachment Judgment Clause

President Trump also seeks dismissal based upon his impeachment proceedings in a different way: he contends that the Impeachment Judgment Clause forecloses civil liability of someone who is not convicted following an impeachment trial. The court understands this argument to challenge its subject matter jurisdiction. The Impeachment Judgment Clause provides:

> Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law.

U.S. Const. art. I, § 3, cl. 7. According to the President, because the Impeachment Judgment Clause speaks only to further action against a "Party convicted," and is silent as to a person not convicted, it follows that the Clause "forbids further litigation of the same claims by those **acquitted** by the Senate." *Thompson* Trump Mot. at 13.

In support of this reading, the President invokes the *expressio unius est exclusio alterius* canon of statutory interpretation, which means that "expressing one item of [an] associated group or series excludes another left unmentioned." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002) (alteration in original) (citation omitted); *Thompson* Trump Mot. at 13. But that canon does not apply. For one, the President cites no case in which the Supreme Court has used that canon of *statutory* construction to directly interpret a clause of the Constitution, and the court has struggled to find one. *Cf. U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 793 n.9 (1995) (relying on one Framer's commentary to observe that "the Framers were well aware of the *expressio unius*

44

argument that would result from their wording of the Qualifications Clauses"); *Salamanca Twp. v. Wilson*, 109 U.S. 627, 628 (1883) (applying canon to interpretation of state constitution); *Pine Grove Twp. v. Talcott*, 86 U.S. 666, 675 (1873) (same). Even if the canon were to apply, "it has force only when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (citation omitted); *see also Echazabal*, 536 U.S. at 81 ("The canon depends on identifying a series of two or more terms or things that should be understood to go hand in hand, which [is] abridged in circumstances supporting a sensible inference that the term left out must have been meant to be excluded."). The Impeachment Judgment Clause does not contain an "associated group or series" or "two or more terms or things"; it only addresses the non-preclusive effect of a conviction following impeachment. The Supreme Court has said that "[w]e do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." *Barnhart*, 537 U.S. at 168. President Trump offers no evidence to support a conclusion that the Framers intended for the absence of any reference to an acquitted officer following impeachment to mean that such official could not be subject to judicial process.

In fact, the historical evidence is to the contrary. An Office of Legal Counsel (OLC) Opinion from 2000, which the President himself cites, provides a helpful summary. *See Whether a Former President May Be Indicted and Tried for the Same Offense for Which He Was Impeached by the House and Acquitted by the Senate*, 24 Op. O.L.C. 110, 113 (2000). That opinion concludes, "We are unaware of any evidence suggesting that the framers and ratifiers of the Constitution chose the phrase 'the party convicted' with a negative implication in mind." *Id.* at 120.

45

> Indeed, if the Impeachment Judgment Clause were intended to imply that acquittal by the Senate would block criminal prosecution for the same offenses, one would expect that at least one participant in the process of framing and ratifying the Constitution would have pointed out this negative implication. We are aware of none.

*Id.* at 121–24. The court finds the OLC's exhaustive historical recitation of the origins of the Impeachment Disqualification Clause to be persuasive. The court therefore draws no negative implication from the words of the Impeachment Judgment Clause that would bar civil liability of a President acquitted following impeachment.[17]

### 5. *Res Judicata and Collateral Estoppel*

President Trump attempts to make one last use of his impeachment proceedings: he contends that his acquittal bars litigation of the present claims on the grounds of res judicata and collateral estoppel. *Thompson* Trump Mot. at 13–14. He devotes scant attention to this argument in *Thompson* and *Swalwell*—largely one conclusory paragraph in each motion, *id.* at 14; *Swalwell* Trump Mot. at 14–15—but devotes more attention to it in *Blassingame*, *Blassingame* Trump Mot. at 14–18. The court addresses it as if fully raised in all three cases.

The doctrine of res judicata, also known as claim preclusion, provides that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980).

> Under the doctrine of res judicata . . . a subsequent lawsuit will be barred if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and

---

[17] In his *Blassingame* motion, President Trump makes a further argument. He contends that the Impeachment Judgment Clause's use of the word "Indictment" to start the series "Indictment, Trial, Judgment and Punishment, according to Law" underscores that "an individual *convicted* is only potentially liable for follow on criminal charges brought by the government rather than a civil suit on the same issues." *Blassingame* Trump Mot. at 21 (emphasis added). The court already has rejected the contention that the Impeachment Judgment Clause implicitly forecloses further action against an acquitted individual. President Trump does not, however, make the alternative argument that, even if an *acquitted* official can be subject to some judicial process, the word "Indictment" implies that such process can only be criminal and not civil in nature. *See id.* at 21–22. The court therefore does not address that contention.

> (3) there has been a final, valid judgment on the merits, (4) by a
> court of competent jurisdiction.

*Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006).  The related doctrine of collateral

estoppel, or issue preclusion, provides that "once a court has decided an issue of fact or law

necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different

cause of action involving a party to the first case."  *Allen*, 449 U.S. at 94.

> [C]ollateral estoppel bars successive litigation of an issue of fact or
> law when "(1) the issue is actually litigated; (2) determined by a
> valid, final judgment on the merits; (3) after a full and fair
> opportunity for litigation by the parties or their privies; and (4) under
> circumstances where the determination was essential to the
> judgment, and not merely dictum.".

*Capitol Servs. Mgmt., Inc. v. Vesta Corp.*, 933 F.3d 784, 794 (D.C. Cir. 2019) (citation omitted).

Applying these preclusion doctrines strikes the court as more complicated that it might

seem at first blush.  Plaintiffs, for instance, argue that the President's Senate impeachment trial is

not a prior "litigation" because the term "litigation" is defined to mean the resolution of disputes

in a court of law.  *See Thompson* Pls.' Opp'n at 73.  But the Supreme Court has recognized that

preclusion principles can bind an Article III court based on a final judgment from an administrative

agency acting in a judicial capacity.  *See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S.

138, 148 (2015) ("Both this Court's cases and the Restatement make clear that issue preclusion is

not limited to those situations in which the same issue is before two *courts*.").  And, there is a more

than colorable argument to be made that the Senate acts in a judicial capacity when "try[ing]" an

official on an Article of Impeachment.  *See, e.g.*, *In re Comm. on the Judiciary, U.S. House of

Representatives*, 951 F.3d 589, 596 (D.C. Cir. 2020) ("The constitutional text confirms that a

Senate impeachment trial is a judicial proceeding."), *vacated and remanded sub nom. Dep't of

Just. v. House Comm. on the Judiciary*, 142 S. Ct. 46 (2021).  Plaintiffs also argue that the "claims"

47

here are different because they rest on federal and District of Columbia law, as opposed to the sole charge of "Incitement of Insurrection" lodged against the President by the House. *See Thompson* Pls.' Opp'n at 73; *Blassingame* Pls.' Opp'n at 19. But Plaintiffs read the "same claim" element too narrowly, because "[w]hether two cases implicate the same cause of action turns on whether they share the same 'nucleus of facts.'" *Apotex, Inc. v. FDA*, 393 F.3d 210, 217 (D.C. Cir. 2004) (citation omitted). The impeachment trial and this case clearly do.

Still, the court thinks that neither doctrine applies for several reasons. First, the text of the Impeachment Judgment Clause does not support their application. As discussed, that Clause expressly contemplates that a person impeached and convicted could face a criminal trial. *See Nixon*, 506 U.S. at 234 ("[T]he Framers recognized that most likely there would be two sets of proceedings for individuals who commit impeachable offenses—the impeachment trial and a separate criminal trial."). The court also has concluded that neither the text nor the history of the Clause forecloses a subsequent proceeding, criminal or civil, for a person acquitted following impeachment. *See supra* pp. 44–46. If that is correct, it would be an odd result to then say that the acquitted individual could use the non-conviction by the Senate to have preclusive effect, which would thwart any second proceeding. To accept the President's application of res judicata and collateral estoppel here would add an implicit preclusion bar to the Impeachment Judgment Clause where there is none.

Second, although it is not a settled question, the court doubts that any Plaintiff is in privity with the House of Representatives if one deems the House as the opposing party in an impeachment trial. The *Blassingame* Plaintiffs certainly are not in privity with members of the House. Swalwell and the Bass Plaintiffs are members of the House, but in voting for the Article of Impeachment and, in Swalwell's case, prosecuting it, those Plaintiffs were acting in their legislative capacities

48

as representatives of their constituents. The Supreme Court has long recognized that the law treats members of Congress differently depending on the capacity in which they are acting. *See, e.g.*, *Raines*, 521 U.S. at 820–21 (distinguishing between personal and institutional injuries for purposes of a legislator's standing); *United States v. Brewster*, 408 U.S. 501, 507 (1972) ("The immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress . . . ."). Here, they seek relief not as legislators but for injuries they suffered personally.

Third, applying preclusion principles here would require the court to assess the adequacy of the Senate proceedings, an inquiry that is nonjusticiable. *See Nixon*, 506 U.S. at 229–30, 237–38 (declining to decide whether the authority conferred on the Senate "to try all Impeachments" precluded certain Senate impeachment procedures). For instance, assessing whether Plaintiffs here had "a full and fair opportunity for litigation" for purposes of collateral estoppel would require the court to evaluate the adequacy of the Senate procedures used during the President's impeachment trial. *See* Restatement (Second) of Judgments § 28(3) (Am. L. Inst. 1982) (stating that issue preclusion may not apply where "differences in the quality or extensiveness of the procedures followed in the two courts or by factors relating to the allocation of jurisdiction between them"). This the court cannot do.

Finally, it is impossible to discern whether there was a "final, valid judgment on the merits" for purposes of res judicata, *Smalls*, 471 F.3d at 192, and what issues of fact or law the Senate deemed "necessary to its judgment" for purposes of collateral estoppel, *Allen*, 449 U.S. at 94. The Senate made no written findings, and individual Senators were not required to explain the reason for their vote for acquittal. In fact, if the court looks beyond the pleadings, several Senators, including Senate Minority Leader Mitch McConnell, publicly stated that they voted to acquit

because the Senate lacked jurisdiction to punish a former President. *See Swalwell* Opp'n at 36. An acquittal on jurisdictional grounds arguably does not constitute a "judgment on the merits" for purposes of res judicata. *Cf. Kasap v. Folger Nolan Fleming & Douglas, Inc.*, 166 F.3d 1243, 1248 (D.C. Cir. 1999) (stating that "dismissals for lack of jurisdiction are not decisions on the merits and therefore have no *res judicata* effect on subsequent attempts to bring suit in a court of competent jurisdiction"). Nor would such an acquittal have any bearing on this court's jurisdiction for purposes of collateral estoppel.

The court therefore holds that neither res judicata nor collateral estoppel bars these suits or precludes litigation of any issue or fact.

### B.    Failure to State a § 1985(1) Claim

Having concluded that all claims against Defendants, except one (Swalwell's § 1986 claim), are justiciable, the court now turns to the question of whether Plaintiffs have stated a claim under § 1985(1). All Defendants argue that Plaintiffs have not. Their arguments are as follows: (1) Swalwell and the Bass Plaintiffs lack statutory standing to bring suit under § 1985(1); (2) Swalwell and the Bass Plaintiffs are not "covered federal officials" under § 1985(1);[18] (3) no Plaintiff can state a claim because members of Congress were not discharging a "duty" on January 6th; and (4) Plaintiffs have failed to allege a plausible conspiracy among Defendants and others. The court rejects the first three arguments outright. As to the fourth, the court finds that Plaintiffs have pleaded a plausible § 1985(1) conspiracy against President Trump, the Oath Keepers, and Tarrio, but not Trump Jr. and Giuliani.

---

[18] President Trump does not advance these first two arguments against the *Blassingame* Plaintiffs, and because statutory standing is not jurisdictional, *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–28 (2014), the court treats them as forfeited as to the *Blassingame* Plaintiffs.

50

    *1.    Statutory Standing*

Inquiry into a plaintiff's statutory standing asks whether the plaintiff "has a cause of action under the statute." *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 & n.4 (2014). That question requires a court "to determine the meaning of the congressionally enacted provision creating a cause of action." *Id.* at 128. In doing so, the court "appl[ies] traditional principles of statutory interpretation." *Id.* The ultimate question is not whether in the court's "judgment Congress *should* have authorized [the plaintiff's] suit, but whether Congress in fact did so." *Id.*

Section 1985 authorizes a "party" that is "injured in his person or property" to bring suit to recover damages for such injury against any "one or more of the conspirators" of a conspiracy proscribed by § 1985(1). 42 U.S.C. § 1985(3). No one makes the argument that such broad text might permit a suit by anyone who can satisfy the requirements of Article III, and likely for good reason: The Supreme Court in *Lexmark* rejected such an expansive reading of the remedial provision of the Lanham Act, which authorizes suit by "'any person who believes that he or she is likely to be damaged' by a defendant's false advertising." *Lexmark*, 572 U.S. at 129 (quoting 15 U.S.C. § 1125(a)). Instead, the court relied on "two relevant background principles": the "zone of interests and proximate causality." *Id.* at 129. Applying those principles, the Court held, "supplies the relevant limits on who may sue." *Id.* at 134. In this case, there can be no genuine dispute at this stage that Defendants' alleged acts were the proximate cause of Plaintiffs' claimed injuries, and so the court does not dwell on that requirement. The court focuses on the zone of interests.

The Supreme Court has "presume[d]" that "a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" *Id.* at

129 (citation omitted). Though originally formulated in the context of challenges under the Administrative Procedure Act, the Court has "made clear" that the zone-of-interests analysis "applies to all statutorily created causes of action." *Id.* A court should look to "the interests protected" by the statute to determine whether a plaintiff comes with its zone of interests. *Id.* at 131.

The interests protected by § 1985(1) are decidedly broad. As the Seventh Circuit observed in *Stern v U.S. Gypsum*:

> [W]e think it important to note here that Congress, in enacting what became § 1985(1), did not fashion a narrow and limited remedy applicable only to the southern states in 1871. The outrageous conditions there at that time were, no doubt, what induced Congress to act, but it chose to do so with a statute cast in general language of broad applicability and unlimited duration.

547 F.2d at 1335 (citations omitted). The court also noted that the Supreme Court had accorded the Reconstruction-Era civil rights statutes "a sweep as broad as [their] language." *Id.* at 1336 (alteration in original) (quoting *United States v. Price*, 383 U.S. 787, 801 (1966)). Viewed in this way, the Seventh Circuit had little trouble concluding that § 1985(1)'s protections extended to an Internal Revenue Service Agent who claimed the defendants had conspired to defame and discredit him to his superiors. *Id.* at 1335–36. It strains credulity to think that Reconstruction-Era members of Congress meant to protect low-level Executive Branch employees but not themselves.

The statutory text supports this conclusion. Section 1985(1) makes unlawful conspiracies whose object is a person who occupies "any office, trust, or place of confidence under the United States" or is "any officer of the United States." 42 U.S.C. § 1985(1). The words used by Congress here are decidedly expansive and, on their face, would seem to encompass members of Congress. President Trump nevertheless insists that these words must be read in tandem with their usage in the Constitution. President Trump thus maintains that the word "officer" includes only persons

52

"appoint[ed] by the President, or of one of the courts of justice[,] or heads of departments authorized by law to make such an appointment." *Thompson* Trump Mot. at 16–17 (quoting *United States v. Mouat*, 124 U.S. 303, 307 (1888)). Similarly, he contends that the phrase "any office, trust, or place of confidence" must be read consistent with Article I, § 1, which states that "no Senator or Representative, or Person holding an Office of Trust or Profit under the United States," shall serve as an Elector. *Thompson* Trump Mot. at 16. Because the Constitution distinguishes between members of Congress and a "Person holding an Office of Trust or Profit under the United States," he asserts, the Bass Plaintiffs and Swalwell do not hold "any office, trust, or place of confidence" for purposes of § 1985(1). *Id.* at 17–18. He also focuses on the modifier "under the United States" and points to Article I, § 6, which disqualifies "a Member of either House during his Continuance in Office" from "holding any Office under the United States." *Id.* at 17. So, in short, President Trump argues that because the Bass Plaintiffs and Swalwell are not identified as among those protected by § 1985(1), they cannot bring a claim under it.

The court doubts that Congress intended to use the Constitution as a dictionary for interpreting the words found in § 1985(1). President Trump points to no case or legislative history to support his preferred reading. To the contrary, cases like *Stern* have read the scope of § 1985(1) broadly, consistent with its words. *Cf.* 1 Op. O.L.C. 274, 276 (1977) (opining, in the context of interpreting § 1985(1)'s identically worded, companion criminal statute, 28 U.S.C. § 372, that "[t]he broad purpose of protecting the Federal presence as fully as possible therefore supports a broad, rather than a narrow, reading of the word 'office'"). This court does the same.

Moreover, the Supreme Court has not reflexively imported constitutional meanings into federal statutes, as President Trump urges the court to do. *Lamar v. United States*, 240 U.S. 60 (1916), is illustrative. There, a defendant who presented himself as a member of the House of

53

Representatives was convicted of impersonating "an officer of the United States." *Lamar*, 240 U.S. at 64. On appeal, the defendant asserted, much like President Trump does here, "that the interpretation of the Constitution was involved in the decision that a Congressman is an officer of the United States." *Id.* The Court soundly rejected that argument, saying "[a]s to the construction of the Constitution being involved, it obviously is not." *Id.* at 65. "[W]ords may be used in a statute in a different sense from that in which they are used in the Constitution." *Id*. The pertinent question, the Court said, was what "officer" meant not in the Constitution but in the criminal code. *Id.* The same is true here.

To conduct that inquiry the court focuses on the meaning of the words used in § 1985(1). Courts "normally interpret[] a statute in accord with the ordinary public meaning of its terms at the time of its enactment. After all, only the words on the page constitute the law adopted by Congress and approved by the President." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1738 (2020). Starting with the word "office," the Bass Plaintiffs have convincingly shown that Reconstruction-Era dictionaries defined that term to include legislators. One law dictionary defined "office" to mean "a right to exercise a public function or employment, and to take the fees and emoluments belonging to it," and identified as an example of a "political office" "the office of the president of the United States, of the heads of departments, [or] of *the members of the legislature*." JOHN BOUVIER, LAW DICTIONARY, ADAPTED TO THE CONSTITUTION AND LAWS OF THE UNITED STATES OF AMERICA, AND OF THE SEVERAL STATES OF THE UNION 259 (5th ed. 1855) (emphasis added).[19] That same dictionary defines "officer" to include "members of congress." *Id.* at 260. Other dictionaries from that period are to the same effect. 2 ALEXANDER M. BURRILL, A LAW DICTIONARY AND GLOSSARY 257 (2d ed. 1867) (defining "office" to mean any "position or

---

[19] According to a Westlaw search, the Supreme Court has cited various editions of Bouvier's *Law Dictionary* over 50 times, most recently in 2019 in *Peter v. NantKwest, Inc.*, 140 S. Ct. 365, 372 (2019).

station in which a person is employed to perform certain duties," including "[a] station or employment conferred by election of the people"); EDWARD HOPPER & J.J.S. WHARTON, LAW LEXICON, OR DICTIONARY OF JURISPRUDENCE: EXPLAINING THE TECHNICAL WORDS AND PHRASES EMPLOYED IN THE SEVERAL DEPARTMENTS OF ENGLISH LAW 537 (2d ed. 1860) (defining an "office" as "that function by virtue whereof a person has some employment in the affairs of another, whether judicial, ministerial, *legislative*, municipal, ecclesiastical" (emphasis added)).

The Reconstruction-Era Congress also would have understood the term "trust" to include members of Congress. In fact, the term had a meaning broader than the term "office." It included "a confidence reposed in one person for the benefit of another." BURRILL, *supra*, at 549. And, though the term "place of confidence" does not appear in the legal dictionaries of the day, its natural meaning must be as all-encompassing as "trust." There can be little doubt that the plain text of § 1985(1) reaches members of Congress.[20]

President Trump pushes back on none of this definitional history.[21] Instead, he cites Supreme Court and lower court decisions that use the term "federal officer" in describing the persons protected under § 1985(1). *Thompson* Trump Reply at 18. For instance, he cites *Kush v. Rutledge*, in which the Court, when describing the "classes of prohibited conspiracy" under § 1985, said that § 1985(1) made unlawful interference with "the performance of official duties by federal

---

[20] The Bass Plaintiffs also convincingly cite legislative history to buttress their argument that members of Congress are within the reach of § 1985(1). *Thompson* Pls.' Opp'n at 22–27. The court need not recite that legislative history here because the meaning of the words found in § 1985(1) plainly encompasses members of Congress.

[21] President Trump does cite a law review article for the proposition that "in common law, an office of trust or profit referred exclusively to those in the employ in the executive, judiciary, or the church," and did not include legislators. *Thompson* Trump Mot. at 17–18 (citing Benjamin Cassady, *"You've Got Your Crook, I've Got Mine": Why the Disqualification Clause Doesn't (Always) Disqualify*, 32 QUINNIPIAC L. REV. 209, 278–79 (2014)). But this is just another argument to tie § 1985(1)'s terms to similar words in the Constitution. The cited law review article was reviewing the historical underpinning of the Impeachment Clause, which states that "Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any *Office of honor, Trust or Profit* under the United States." Art. I, § 3, cl. 7 (emphasis added); *see also* Cassady, *supra*, at 277 ("This interpretation—that legislators are not officers who hold offices of 'honor, Trust or Profit'—is buttressed by the text, history, and structure of the Constitution."). But for the reasons already discussed, the meaning of the terms in § 1985(1) is not bound by the meaning of similar terms in the Constitution.

55

officers." 460 U.S. 719, 724 (1983). Similarly, the Ninth Circuit in *Canlis v. San Joaquin Sheriff's Posse Comitatus* said that "the clear import of [§ 1985(1)'s] language is that the statute's protections extend exclusively to the benefit of federal officers." 641 F.2d 711, 717 (9th Cir. 1981). Other courts have put forth the same formulation. *See Miller v. Indiana Hosp.*, 562 F. Supp. 1259, 1281 (W.D. Pa. 1983) (observing that "§ 1985(1) . . . only protects federal officers"); *Lobosco v. Falsetti*, No. 09-1455 (JAP), 2010 WL 4366209, at *3 (D.N.J. Oct. 28, 2010) (citing *Miller*, 562 F. Supp. 1259); *Diulus v. Churchill Valley Country Club*, 601 F. Supp. 677, 681 (W.D. Pa. 1985) ("Section 1985(1), by its terms, proscribes only conspiracies which interfere with the performance of official duties by federal officers."). From these cases President Trump asserts that "the phrase, 'office, trust, or place of confidence under the United States' in § 1985(1) is all merged to mean federal officer." *Thompson* Trump Reply at 19.

But no case says any such thing. A reading of the above-cited cases makes evident that the courts were using "federal officer" as shorthand for persons protected under § 1985(1) and, in the lower-court decisions, to distinguish such persons from state and local officials or private citizens. Of course, the term "federal officer" never appears in § 1985(1), and none of the cited cases engages in a textual analysis of § 1985(1) at all. The definitional shorthand of "federal officer" is of no use in the present case. And, in the end, President Trump's argument still requires equating "officer" with the meaning of the term as used in the Constitution. The court already has rejected that equivalency. The question here is whether the Reconstruction-Era Congress would have understood members of Congress to occupy an "office, trust, or place of confidence under the United States" or qualify as an "officer of the United States." They certainly would have.

The court therefore finds that members of Congress plainly are within § 1985(1)'s zone of interests. Swalwell and the Bass Plaintiffs therefore have statutory standing to advance a claim.

56

2.      *Whether Plaintiffs Are "Covered Federal Officials" Under § 1985(1)*

President Trump advances a variation of the above argument, which the foregoing discussion largely resolves. He contends that to successfully plead a § 1985(1) claim a plaintiff must allege conspiratorial action directed against a "covered federal official," and because members of the House do not so qualify, Swalwell and the Bass Plaintiffs fail to state a claim. *Thompson* Trump Mot. at 26 n.8; *Swalwell* Trump Mot. at 29 n.12. For the same reasons the court found Swalwell and the Bass Plaintiffs to have statutory standing, the court rejects the instant contention: the plain words of § 1985(1), as they would have been understood during the Reconstruction Era, reach members of Congress. Therefore, a conspiracy to interfere with the discharge of their duties, by force, intimidation, or threat states a § 1985(1) claim.

But there is a bit more to say here. The Bass Plaintiffs advance an additional theory for stating a claim under § 1986 that does not depend on their occupying an office or position protected under § 1985(1). They contend that the alleged conspiracy also was designed to "prevent, by force, intimidation, or threat any person from *accepting or holding* any office, trust, or place of confidence under the United States." 42 U.S.C. § 1985(1) (emphasis added). Those persons that the alleged conspiracy prevented from "accepting or holding" such office were President-elect Biden and Vice President–elect Harris. *See Thompson* Pls.' Opp'n at 30–31 (explaining that the "broader aim of the conspiracy was to prevent President Biden and Vice President Harris from 'accepting or holding'" their elected offices). The court agrees with this alternative theory. The Offices of the President and the Vice President unquestionably qualify as "any office, trust, or place of confidence under the United States." Persons seeking to "accept[] or hold[]" those offices therefore are, in President Trump's terms, "covered federal officials." So, even if the Bass Plaintiffs are not "covered federal officials," President-elect Biden and Vice President–elect Harris

57

are, and a conspiracy directed at preventing them from accepting or holding office states a § 1985(1) claim. Under this alternative theory of conspiracy, the Bass Plaintiffs would be able to seek damages as "person[s]" injured by that alleged conspiracy. 42 U.S.C. § 1985(3).

3.    <em>Whether Members of Congress Were Discharging a "Duty" on January 6th</em>

The Oath Keepers advance an argument that no other Defendant does. They maintain that members of Congress were not discharging any "duty" on January 6th. *Thompson* Oath Keepers' Mot. at 4–8. They contend that the Constitution requires the opening of electoral ballots "in the presence of . . . the House of Representatives," U.S. Const. amend. XII, and therefore vests in individual members no duty but only "the *opportunity* to observe" the Electoral College vote. *Id.* at 7–8. In the Oath Keepers' view, because § 1985(1) prohibits conspiracies to prevent federal officials from "discharging any duties," the Bass Plaintiffs cannot state a claim.

This reading of the Constitution defies common sense. The House of Representatives can only act through its individual members. The Certification of the Electoral College vote, in particular the opening of Electoral ballots, cannot proceed "in the presence" of the House unless its individual members show up. Concededly, the Constitution does not expressly require a member to appear for the Certification. But the Constitution lacks such express appearance requirements as a general matter. Article I, which establishes the Congress and defines its powers, nowhere requires that an individual Senator or Representative appear for any particular proceeding. Article I, § 7, for example, which sets forth the process for passing legislation, does not require a Senator or Representative to cast a vote, but no one would reasonably say that the Constitution affords them only an "opportunity" to vote but no duty. The Oath Keepers' argument is also too myopic. It ignores the Electoral Count Act, which does define roles for individual Senators and Representatives in the certification process, including making objections to ballots

58

and, importantly, debating and voting on such objections. *See supra* pp. 29–30. Swalwell and the Bass Plaintiffs allege that they were at the Capitol on January 6th for those very purposes. *Swalwell* Compl. ¶ 10 (alleging that Swalwell "was at the Capitol performing his official duties as a member . . . to count the Electoral College votes and certify the winner of the 2020 Presidential election"); *Thompson* Compl. ¶¶ 12–21 (alleging that, for example, one member Plaintiff "was present in the Capitol on January 6, 2021, prepared to discharge her duties of tallying ballots of the Electoral College and certifying the results of the 2020 presidential election").

The Oath Keepers' reading also is inconsistent with the broad scope of § 1985(1). Under their reading, only expressly mandated acts qualify as a "duty," and everyday discretionary acts—like voting on legislation or nominees, speaking to the press, or meeting with a constituent—would not. A member of Congress is not *required* to do any of those things. To read § 1985(1) to not reach such acts would eviscerate its purpose.

The court also notes that the Oath Keepers' argument does nothing to defeat the Bass Plaintiffs' alternative theory of liability under § 1985(1): that the charged conspiracy was intended to prevent the President-elect and the Vice President–elect from "accepting or holding" office. On this alternative theory, it does not matter whether members of the House had a "duty."

Finally, the Oath Keepers make two additional arguments that the court quickly dismisses. First, they contend that the Bass Plaintiffs have pleaded themselves out of a claim because they allege that the Joint Session of Congress was in recess at the time rioters entered the Capitol building and, therefore, the "delay" in the proceedings occasioned on January 6th was due to "this internal reason," not Defendants' conduct. *Thompson* Oath Keepers' Mot. at 9. That argument makes little sense for it does not matter what initially caused the Joint Session to recess or when it occurred: the alleged interference occurred during the hours that it took to remove the Oath

59

Keepers and others from the Capitol building, when the Bass Plaintiffs otherwise would have been discharging their duty to certify election results. Second, the Oath Keepers argue that "Plaintiffs further allege that each member in his or her personal capacity were delayed, but this states no constitutional violation as a matter of law because the Constitutional provisions asserted in the complaint do not speak to or address delay of the proceeding." *Id.* It is not at all clear what the Oath Keepers mean by this. The Bass Plaintiffs assert that the Oath Keepers' conduct both prevented and delayed discharge of their duties; § 1985(1) requires no textual hook in the Constitution to define the interfered-with duty, although there is one here, or the ways in which someone might prevent such duty from being discharged.

### 4. Pleading of a Conspiracy

The court now reaches the most significant of Defendants' sufficiency-of-pleading contentions: that all Plaintiffs have failed to plead a plausible conspiracy. Section 1985(1) is a conspiracy statute, and so pleading a plausible conspiracy is an essential element of all Plaintiffs' § 1985(1) claims.

Before evaluating the sufficiency of the allegations, the court must address two arguments made by Trump and Giuliani about the pleading requirements. Invoking the standard under Rule 9(b), they have insisted that Plaintiffs must plead conspiracy with "particularity." *See, e.g.*, *Thompson* Trump Mot. at 25; *Thompson* Giuliani Mot. at 10. Not so. The Supreme Court in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 169 (1993), held that Rule 9(b)'s heightened pleading standard applies only to the two instances identified in the Rule: "the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b). *Leatherman*, 507 U.S. at 168 (rejecting heightened pleading standard for a claim under § 1983). Neither circumstance applies here.

60

Second, Trump and Giuliani contend that Swalwell and the Bass Plaintiffs must plead "actual malice" as part of their § 1985(1) claim because they are public officials. *Thompson* Trump Mot. at 26; *Thompson* Giuliani Mot. at 11. Again, not so. The element of "actual malice" derives from defamation claims against public figures. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). Courts have applied an "actual malice" requirement to claims under § 1985, but only when the conspiracy involved defamatory conduct. *See Barr*, 370 F.3d at 1202–03 ("Both the Supreme Court and this court have made clear that the constitutional protections available to defendants charged with defaming public officials may extend to other civil actions alleging reputational or emotional harm from the publication of protected speech."). No such conduct is alleged here. Plus, a state-of-mind element that would require Plaintiffs to prove that a defendant made a statement with "knowledge that it was false or with reckless disregard of whether it was false or not" would make little sense in the context of a claim for conspiracy to interfere with discharge of a federal legislator's duties through force, intimidation, or threat. *New York Times Co.*, 376 U.S. at 279–80.

### a.   Principles of civil conspiracy

With these two issues out of the way, the court turns to describing the general principles of civil conspiracy. The term "conspiracy," particularly in the minds of non-lawyers, likely conjures images of people meeting secretly to hatch a plan to violate the law. That is certainly one type of conspiracy. But the law does not require such a degree of deliberation, formality, or coordination. Conspiracies can be, and often are, established with far less direct proof.

"A civil conspiracy is defined as an agreement between two or more people to participate in an unlawful act or a lawful act in an unlawful manner." *Hobson v. Wilson*, 737 F.2d 1, 51 (D.C. Cir. 1984). The agreement can be either express *or* tacit. *Halberstam v. Welch*, 705 F.2d 472, 476

61

(D.C. Cir. 1983). So, a plaintiff "*need not* show that the members entered into any express or formal agreement, or that they directly, by words spoken or in writing, stated between themselves what their object or purpose was to be, or the details thereof, or the means by which the object or purpose was to be accomplished." 3B FED. JURY PRAC. & INSTR. § 167:30, Westlaw (database updated Jan. 2022) (quoting federal standard jury instruction for claims brought under § 1985(3) (emphasis added)). It is enough "that members of the conspiracy in some way or manner, or through some contrivance, positively or tacitly[,] came to a mutual understanding to try to accomplish a common and unlawful plan." *Id.* All coconspirators must share in the general conspiratorial objective, though they need not know all the details of the plan or even possess the same motives. *Hobson*, 737 F.2d at 51. They need not know the identities of other coconspirators. *Id.* In short, a civil conspiracy requires a showing "that there was a single plan, the essential nature and general scope of which were known to each person who is to be held responsible for its consequences." *Id.* at 51–52 (cleaned up). And, to be actionable, there must be an overt act in furtherance of the conspiracy that results in injury. *Id.* at 52.

At this stage of the case—on motions to dismiss—Plaintiffs' burden to establish a conspiracy is lighter than it would be following discovery. A plaintiff at this stage must draft a complaint "with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. Such factual matter must establish "plausible grounds to infer an agreement" but not "a probability requirement at the pleading stage." *Id.* The standard for pleadings "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id.*

62

b.    The alleged conspiracy

Before assessing the sufficiency of Plaintiffs' pleadings, it is important to bear in mind what the alleged unlawful conspiracy is and what it is not.  It is not that Defendants conspired to sow doubt and mistrust about the legitimacy of the electoral process and results of the 2020 presidential election.  Nor is it that Defendants worked together to influence, pressure, or coerce local officials, members of Congress, and the Vice President to overturn a lawful election result. Though many Americans might view such conduct to be undemocratic or far worse, neither example is an actionable conspiracy under § 1985(1).  The conspiracy alleged is that Defendants agreed "to prevent, by force, intimidation, or threat," (1) Swalwell and the Bass Plaintiffs from discharging their duties in certifying the results of the presidential election and (2) the President-elect and Vice President–elect from "accepting or holding" their offices.[22]  It is this conspiracy that Plaintiffs must plausibly establish through well-pleaded facts.  The court begins with a detailed summary of those facts and then, assuming those facts to be true, assesses their sufficiency as to each coconspirator.

i.    *Summary of allegations*[23]

According to Plaintiffs, in the months leading up to January 6th, President Trump and his allies created the conditions that would enable the violence that happened that day.  The President's role during this period was multifaceted.  It included regularly issuing false tweets insisting, among other things, that the elections in those states and localities where he had not prevailed were rampant with voter fraud; that he actually had won in those places when in truth he had lost; that

_____

[22] The *Blassingame* Plaintiffs do not allege that the conspiracy's purpose was to prevent them from discharging their duties, but they do allege that they were injured as a result of the conspiracy to disrupt the Certification of the Electoral College vote.  *Blassingame* Compl. ¶ 226.

[23] In this section, the court does not include citations to the Complaints to support these facts to avoid cluttering up the text.  There is no dispute that the Complaints make these allegations.

63

"big city . . . crooks" had plotted to "steal votes"; that if certain Republican governors had done more he would have won; and that a voting-machine vendor had helped rig elections. President Trump also directly contacted state and local election officials in places where he had lost to convince them to take steps to reverse their election results. And, he invited supporters to come to Washington, D.C., for a rally on January 6th, the day of the Certification of the Electoral College vote. President Trump directly participated in rally planning, and his campaign committee provided substantial funding and organizational assistance. Giuliani and Trump Jr. aided the President in the foregoing efforts. They coordinated with him, spread similar disinformation, contacted state and local election officials, and agreed to speak at the January 6 Rally.

According to the Complaints, President Trump convinced his supporters that the election had been stolen from him and, importantly, them. These supporters included organized groups, such as the Proud Boys and the Oath Keepers. Some supporters, responding to President Trump's tweets, engaged in acts of intimidation toward state and local election officials. For example, after President Trump said that a Georgia election official was an "enemy of the people," that official received threats of violence and assassinations. When another Georgia official asked President Trump to condemn these actions, urging him to "Stop inspiring people to commit acts of violence," and warned that "Someone is going to get shot, someone is going to get killed," the President remained silent. Another state election official had armed protesters descend on her home.

Some supporters organized and attended rallies, including two in Washington, D.C., on November 14, 2020, and December 12, 2020. The Proud Boys and the Oath Keepers attended these District of Columbia–based events. At the December 12 rally, an Oath Keepers leader said that President Trump "needs to know from you that you are with him, [and] that if he does not do it now while he is Commander in Chief, we're going to have to do it ourselves later, in a much

64

more desperate, much more bloody war." Violence also broke out in connection with these rallies. Police clashed with some of the President's supporters. Dozens were arrested, persons were stabbed, police were injured, and property destroyed.

President Trump first promoted the January 6 Rally on December 19, 2020, announcing on Twitter: "Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild!" Some of the President's supporters interpreted the President's tweet as a call to violence. Some followers on the message board TheDonald.win openly talked of bringing weapons to Washington, D.C., and engaging in acts of violence. Some on Twitter and Facebook posted about "Operation Occupy the Capitol" and used hashtags such as #OccupyCapitols. The Proud Boys and the Oath Keepers, for their part, began active planning for January 6th, including reaching an agreement to work together. Oath Keepers leaders announced on Facebook "an alliance" and "a plan with the Proud Boys." Tarrio posted on the social media site Parler that the Proud Boys would "turn out in record numbers on Jan 6th" but would be "incognito" and "spread across downtown DC in smaller teams." The Proud Boys and the Oath Keepers prepared for the January 6 Rally by obtaining tactical equipment, communications equipment, and bear mace.

On the eve and the morning of the January 6 Rally, the President tweeted yet again that the election had been rife with fraud and insisted that the Vice President could send ballots back to the states for recertification. He also tweeted that Washington, D.C., "is being inundated by people who don't want to see an election victory stolen by emboldened Radical Left Democrats. Our Country has had enough, they won't take it anymore!"

Supporters, including the Proud Boys and Oath Keepers, arrived at the Ellipse for the January 6 Rally before 9:00 a.m. They heard from various speakers, including Giuliani and

65

Trump Jr. (more on their statements below), both of whom repeated false claims about the election being stolen and asserted that the Vice President could block the Certification. President Trump spoke last.[24] He gave a 75-minute speech based on the false premise that he had won the election and that it had been stolen from him and those gathered. At the start, he said that "Our country has had enough. We will not take it anymore and that's what this is all about. And to use a favorite term that all of you people really came up with, we will 'stop the steal.'" Early in the speech he alluded to rally-goers marching to the Capitol building. The President told the assembled crowd that "Mike Pence is going to have to come through for us. And if he doesn't, that will be a sad day for our country because you're sworn to uphold our Constitution. Now it is up to Congress to confront this egregious assault on our democracy." He continued:

> And after this, we're going to walk down—and I'll be there with you—we're going to walk down. We're going to walk down any one you want, but I think right here. We're going to walk down to the Capitol, and we're going to cheer on our brave senators, and congressmen and women. And we're probably not going to be cheering so much for some of them because you'll never take back our country with weakness.
>
> You have to show strength, and you have to be strong. We have come to demand that Congress do the right thing and only count the electors who have been lawfully slated, lawfully slated. I know that everyone here will soon be marching over to the Capitol building to peacefully and patriotically make your voices heard. Today we will see whether Republicans stand strong for integrity of our elections, but whether or not they stand strong for our country, our country.

The President's call for a march to the Capitol was not, however, authorized. It was something that he and his campaign had devised. The Rally's permit said: "This permit does not authorize a march from the Ellipse."

---

[24] A full transcript of the President's remarks can be found on the *Thompson* docket. Def. Oath Keepers' Mot. for Leave to File Am., Suppl. Ex. in Supp. of the Oath Keepers' Mot. to Dismiss, ECF No. 57, Ex. 2, ECF No. 57-2.

As the President's speech continued, the crowd grew increasingly animated. The President told them that if the Vice President did not send ballots back for recertification, "you will have a President of the United States for four years . . . who was voted on by a bunch of stupid people who lost all of these states. You will have an illegitimate president. That is what you will have, and we can't let that happen." At some point after, the crowd began shouting "Storm the Capitol," "Invade the Capitol Building," and "Take the Capitol Right Now." They also began to chant "Fight Like Hell" and "Fight for Trump."[25] At the conclusion of his speech, the President told the rally-goers: "I said, 'Something's wrong here. Something's really wrong. Can't have happened.' And we fight like hell and if you don't fight like hell, you're not going to have a country anymore." Almost immediately after, he told the crowd:

> So, we're going to walk down Pennsylvania Avenue . . . and we're going to the Capitol and we're going to try and give—the Democrats are hopeless. They're never voting for anything. But we're going to try to give our Republicans, the weak ones, because the strong ones don't need any of our help, we're going to try and give them the kind of pride and boldness they need to take back our country. So, let's walk down Pennsylvania Avenue.

Meanwhile, before the President's speech had concluded, the Proud Boys had already breached the outer perimeter of the Capitol grounds. One Proud Boys member shouted, "Let's take the fucking Capitol!," to which one responded, "Don't yell it, do it." They then broke into smaller groups and began breaking through exterior barricades. By the time the crowd arrived from the Ellipse, those barricades had been compromised. The crowd eventually overwhelmed Capitol police and was able to enter the building. Some rioters told Capitol police officers, "[W]e

---

[25] There is a conflict between two Complaints as to when these shouts and chants took place. According to the Bass Plaintiffs, the chants to lay siege to the Capitol took place during the President's speech and shouts to fight for the President took place after he concluded speaking. *Thompson* Compl. ¶ 88. The *Blassingame* Plaintiffs say just the opposite. Their version is that the chants regarding the Capitol took place after the President concluded his remarks and the shouts to fight for him occurred during his speech. *Blassingame* Compl. ¶ 61. The court does not attempt to resolve that factual conflict here.

are listening to Trump—your boss" and "We were invited here by the President of the United States." Some entered the House chamber, and others, the Speaker of the House's office. The Oath Keepers entered the building in a military-style formation, dressed in paramilitary equipment, helmets, and reinforced vests. One message exchanged among them said: "We have a good group. We have about 30–40 of us. We are sticking together and sticking to the plan." As a result of rioters entering and remaining in the Capitol, Congress and the Vice President were prevented from proceeding with the Certification of the Electoral College vote as planned.

President Trump had not, as promised, joined the crowd at the Capitol. Instead, he was already back at the White House by the time rioters entered the Capitol. He began watching live televised reports of the siege. He first tweeted a video of his Rally Speech. Then, about fifteen minutes *after* rioters had entered the Capitol building, President Trump tweeted:

> Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify correct set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify. USA demands truth!

Rioters at the Capitol building repeated the tweet on megaphones. Minutes later, the President called Senator Mike Lee looking for Senator Tommy Tuberville; Senator Lee informed the President that the Vice President was being evacuated by the Secret Service and that he had to go. Later, when House Leader Kevin McCarthy spoke to the President by phone and urged him to call off the rioters, the President responded: "Well, Kevin, I guess these people are more upset about the election than you are." About a half hour after rioters had entered the Capitol building, the President tweeted: "Please support our Capitol Police and Law Enforcement. They are truly on the side of our Country. Stay peaceful!" Approximately 90 minutes later, at 4:17 p.m., the President tweeted a video in which he again repeated that the election had been stolen but told his

68

supporters to go home.  He said to them, "I know your pain.  I know you're hurt," and added, "We

love you.  You're very special."  At 5:40 p.m., law enforcement finally cleared the Capitol

building.  At 6:00 p.m., the President sent another tweet:

> These are the things and events that happen when a sacred landslide
> election victory is so unceremoniously & viciously stripped away
> from great patriots who have been badly & unfairly treated for so
> long.  Go home with love & in peace.  Remember this day forever!

Congress would resume the Certification later that night and would complete it at 3:41 a.m. the

next day.

### ii.     *President Trump*

Viewing the foregoing well-pleaded facts in the light most favorable to Plaintiffs, and

drawing all reasonable inferences in their favor, *see Hurd v. District of Columbia*, 864 F.3d 671,

675 (D.C. Cir. 2017), the court concludes that the Complaints establish a plausible § 1985(1)

conspiracy involving President Trump.  That civil conspiracy included the Proud Boys, the Oath

Keepers, Tarrio, and others who entered the Capitol on January 6th with the intent to disrupt the

Certification of the Electoral College vote through force, intimidation, or threats.

Recall, a civil conspiracy need not involve an express agreement; so, the fact that President

Trump is not alleged to have ever met, let alone sat down with, a Proud Boy or an Oath Keeper to

hatch a plan is not dispositive.  A tacit agreement—one that is "implied or indicated . . . but not

actually expressed"—is enough.  *Tacit*, MERRIAM-WEBSTER'S DICTIONARY, https://www

.merriam-webster.com/dictionary/tacit (last visited Feb. 8, 2022).  The key is that the conspirators

share the same general conspiratorial objective, or a single plan the essential nature and general

scope of which is known to all conspirators.  *See Hobson*, 737 F.2d at 51–52.  Multiple factors

make President Trump's involvement in the alleged § 1985(1) conspiracy plausible.

69

First, a court "must initially look to see if the alleged joint tortfeasors are pursuing the same goal—although performing different functions—and are in contact with one another." *Halberstam*, 705 F.2d at 481. Both elements are present here. The President, the Proud Boys, the Oath Keepers, and others "pursu[ed] the same goal": to disrupt Congress from completing the Electoral College certification on January 6th. That President Trump held this goal is, at least, plausible based on his words and actions. He repeatedly tweeted false claims of election fraud and corruption, contacted state and local officials to overturn election results, and urged the Vice President to send Electoral ballots back for recertification. The President communicated directly with his supporters, inviting them to Washington, D.C., to a rally on January 6th, the day of the Certification, telling them it would be "wild." He directly participated in the rally's planning, and his campaign funded the rally with millions of dollars. At the rally itself, the President gave a rousing speech in which he repeated the false narrative of a stolen election. The crowd responded by chanting and screaming, "Storm the Capitol," "Invade the Capitol," "Take the Capitol right now," and "Fight for Trump." Still, the President ended his speech by telling the crowd that "we fight like hell and if you don't fight like hell, you're not going to have a country anymore." Almost immediately after these words, he called on rally-goers to march to the Capitol to give "pride and boldness" to reluctant lawmakers "to take back our country." Importantly, it was the President and his campaign's idea to send thousands to the Capitol while the Certification was underway. It was not a planned part of the rally. In fact, the permit expressly stated that it did "not authorize a march from the Ellipse." From these alleged facts, it is at least plausible to infer that, when he called on rally-goers to march to the Capitol, the President did so with the goal of disrupting lawmakers' efforts to certify the Electoral College votes. The Oath Keepers, the Proud Boys, and others who forced their way into the Capitol building plainly shared in that unlawful goal.

70

Second, it is also plausible that the President was aware of the essential nature and general scope of the conspiracy. *See Hobson*, 737 F.2d at 51–52. He knew the respective roles of the conspirators: his was to encourage the use of force, intimidation, or threats to thwart the Certification from proceeding, and organized groups such as the Proud Boys and the Oath Keepers would carry out the required acts. The President expressed knowledge of the Proud Boys during a presidential debate, in which he said, "Proud Boys, stand back and stand by." He also likely knew of the Oath Keepers based on the group's public profile at pro-Trump rallies in Washington, D.C. It is reasonable to infer that the President knew that these were militia groups and that they were prepared to partake in violence for him. The same is true of other supporters. The President and his advisors allegedly "actively monitored" websites where supporters made violent posts, and such posts were discussed on Fox News, a media outlet regularly viewed by the President. He also would have known about violent threats made against state election officials, which he had refused to condemn. The President thus plausibly would have known that a call for violence would be carried out by militia groups and other supporters.

Third, Plaintiffs' allegations show a call-and-response quality to the President's communications, of which the President would have been aware. The Complaints contain numerous examples of the President's communications being understood by supporters as direct messages to them and, in the case of the January 6 Rally, as a call to action. When he told the Proud Boys to "stand back, and stand by," Tarrio tweeted in response, "Standing by sir." After publicly criticizing state election officials, some of those election officials became the object of threats of violence. When the President tweeted an invitation to the January 6 Rally, pro-Trump message boards and social media lit up with some supporters expressing a willingness to act violently, if needed. Based on these allegations, it is reasonable to infer that before January 6th

71

the President would have known about the power of his words and that, when asked, some of his supporters would do as he wished. On January 6th they did so. When he called on them to march to the Capitol, some responded, "Storm the Capitol." Thousands marched down Pennsylvania Avenue as directed. And, when some were inside the Capitol, they told officers, "We were invited here by the President of the United States." Even the President's counsel conceded that an invitation to commit a tort and the acceptance to do so would establish a civil conspiracy. Hr'g Tr. at 67–68; *see also id.* at 56–57 (same concession by Giuliani's counsel); *id.* at 82 (same concession by the Oath Keepers' counsel). A plausible causal connection between the President's words and the response of some supporters is therefore well pleaded. *Cf. Hobson*, 737 F.2d at 54 (observing that "the flow of information back and forth, coupled with evidence of efforts to impede plaintiffs' rights . . . conceivably could have sufficed to permit a jury to infer that an agreement existed among certain persons . . . to disrupt plaintiffs' activities").

Fourth, the President's January 6 Rally Speech can reasonably be viewed as a call for collective action. The President's regular use of the word "we" is notable. To name just a few examples: "We will not take it anymore"; "We will 'stop the steal'"; "We will never give up"; "We will never concede"; "We will not take it anymore"; "All Mike Pence has to do is send it back to the states to recertify, and we become president"; "[W]e're going to have to fight much harder"; "We can't let that happen"; "We're going to walk down . . ."; "We fight like hell"; "We're going to walk down Pennsylvania Avenue." "We" used repeatedly is this context implies that the President and rally-goers would be acting together towards a common goal. That is the essence of a civil conspiracy.

72

And, finally, a tacit agreement involving the President is made all the more plausible by his response to the violence that erupted at the Capitol building.[26]  Approximately twelve minutes after rioters entered the Capitol building, the President sent a tweet criticizing the Vice President for not "hav[ing] the courage to do what should have been done to protect our Country."  Rioters repeated that criticism at the Capitol, some of whom saw it as encouragement to further violence. It is reasonable to infer that the President would have understood the impact of his tweet, since he had told rally-goers earlier that, in effect, the Vice President was the last line of defense against a stolen election outcome.  The President also took advantage of the crisis to call Senator Tuberville; it is reasonable to think he did so to urge delay of the Certification.  And then, around 6:00 p.m., after law enforcement had cleared the building, the President issued the following tweet: "These are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long.  Go home with love & in peace.  Remember this day forever!"  A reasonable observer could read that tweet as ratifying the violence and other illegal acts that took place at the Capitol only hours earlier.  *See Hobson*, 737 F.2d at 53 (agreeing that "evidence of a pattern of mutually supportive activity over a period of time provides a reasonable basis for inferring that parties are engaged in a common pursuit" (cleaned up)).

The President argues that, at most, Plaintiffs have pleaded that the President "made political statements . . . at a rally meant to persuade political officials."  *Thompson* Trump Mot. at 27.  But that contention misses the forest for the trees.  It ignores the larger context of the Rally Speech.

---

[26] With respect to the President's post–Rally Speech conduct, the court for present purposes considers only those acts that plausibly were undertaken in his unofficial capacity.  Circuit precedent suggests that immunized action (or inaction) cannot be considered.  *See Banneker Ventures*, 798 F.3d at 1145 (instructing trial court on remand to "evaluate whether the actions that it concludes would *not be immunized*, taken together, state a claim against Graham for tortious interference or civil conspiracy" (emphasis added)).

For months, the President led his supporters to believe the election was stolen. When some of his supporters threatened state election officials, he refused to condemn them. Rallies in Washington, D.C., in November and December 2020 had turned violent, yet he invited his supporters to Washington, D.C., on the day of the Certification. They came by the thousands. And, following a 75-minute speech in which he blamed corrupt and weak politicians for the election loss, he called on them to march on the very place where Certification was taking place. The President's narrow characterization of his conduct accounts for none of this.

The President also contends that a conspiracy involving him not only is "far-fetched, but it is also in direct opposition to many of the statements made by Mr. Trump at the very rally." *Id.* at 28. The only portion of the Speech he cites to support that proposition is that, early on, he said that rally-goers soon would be "marching over to the Capitol building to peacefully and patriotically make your voices heard." *See id.* The President certainly uttered those words. But he also uttered others, which he ignores. Immediately before directing them to the Capitol, he told rally-goers that they would need to "fight like hell and if you don't fight like hell, you're not going to have a country anymore." When those supporters did "fight like hell," just as he had told them to, the President did not demand they act "peacefully and patriotically." He instead tweeted that "Mike Pence didn't have the courage to do what should have been done to protect our Country." Later, he referred to those who had attacked the Capitol as "great patriots," and told them to, "Remember this day forever!" These other statements by the President stand in stark contrast to his passing observation that rally-goers would soon be "peacefully and patriotically" marching to the Capitol. Those three words do not defeat the plausibility of Plaintiffs' § 1985(1) claim at this stage.

74

88

The President also dismisses two allegations as weak and speculative that purport to tie him to the Proud Boys and the Oath Keepers. The court relies on neither at this juncture but thinks one may prove significant in discovery. The first is an allegation that "a person associated with the Trump White House communicated with a member of the Proud Boys by phone." *Thompson* Compl. ¶ 70. The court agrees that this is a speculative allegation and has not considered it. The other concerns the President's confidant, Roger Stone. Stone posted on Parler in late December that he had met with the President "to ensure that Donald Trump continues as our president." Shortly thereafter, Stone spoke with Tarrio, and later he used the Oath Keepers as his security detail for the January 6 Rally. The court does not rely on these allegations to establish the President's knowledge of the Proud Boys or the Oath Keepers. Other alleged facts make that inference plausible. That said, Stone's connections to both the President and these groups in the days leading up to January 6th is a well-pleaded fact. Discovery might prove that connection to be an important one.

The President also suggests that, at most, Plaintiffs have pleaded independent, parallel conduct that does not make out a plausible conspiracy under *Twombly*. *Thompson* Trump Reply at 21–22. But that argument ignores the multiple ways in which the President interacted with his supporters, including organized groups. The Complaints detail how the President's tweets led to threats of violence against state election officials; how his tweet inviting supporters to Washington, D.C., on January 6th was understood by some to be a call to action; and how he called on thousands to participate in an unauthorized march on the Capitol building that ended in acts of violence. That is a pattern of mutually supportive activity that supports a plausible conspiracy. *Hobson*, 737 F.2d at 53. Such mutually supportive activity distinguishes this case from *Twombly*, in which the Court

held that the complaint failed to allege a conspiracy because market factors, not concerted action, were a more plausible explanation for the alleged conduct. *See Twombly*, 550 U.S. at 566–69.

Finally, the President argues that Plaintiffs cannot construct a conspiracy based on "Mr. Trump's political activity," which is protected speech. *Thompson* Trump. Mot. at 28. The court addresses the President's First Amendment defense below.

### iii.   Giuliani

The court reaches a different conclusion as to Giuliani. There is little doubt that Plaintiffs have adequately pleaded that Giuliani was involved in a conspiracy to "engage[] in a months-long misinformation campaign to convince Trump's supporters that the election had been illegally stolen." *Thompson* Pls.' Opp'n at 42. But, as the court stated earlier, such a conspiracy does not violate § 1985(1). What Plaintiffs must plausibly establish is that Giuliani conspired to prevent Congress from discharging its duties on January 6th by force, intimidation, or threat. There, they fall short.

In addition to his pre–January 6th actions—which alone do not establish Giuliani as a § 1985(1) conspirator—Plaintiffs point to two of Giuliani's acts that occurred on January 6th: (1) his rally speech, in which he said, "So, let's have trial by combat" and "We're going to fight to the very end to make sure that doesn't happen," and (2) a phone call that he made to members of Congress, urging them to delay the Certification. *Thompson* Pls.' Opp'n at 42–43. These allegations, individually and taken together, do not "nudge[]" Plaintiffs' § 1985(1) claim against Giuliani "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

As to his rally remarks, the court believes Giuliani's words are not enough to make him part of a § 1985(1) conspiracy. Critically, Giuliani uttered no words that resembled a call to action. "Trial by combat" was not accompanied by a direction to do anything. And, given the speaker,

76

those words were not likely to move the crowd to act. There is no allegation that anyone took Giuliani's words as permission to enter the Capitol. And there are no allegations that Giuliani at any time before January 6th uttered words advocating or inspiring violence. Indeed, as discussed further below, the court holds that Giuliani's rally remarks are constitutionally protected speech. Nor is Giuliani alleged to have been involved in rally planning or known that the President would direct the crowd to march to the Capitol. And he did not express solidarity with the rally-goers after some violently assaulted police and forced their way into the Capitol. Giuliani's words at the rally are not sufficiently additive to make him a § 1985(1) coconspirator.

Neither are his phone calls to lawmakers on January 6th after the Capitol was breached. There is some conflict among Plaintiffs on this allegation. The Bass Plaintiffs allege that such calls were made "while the insurrection was ongoing." *Thompson* Compl. ¶ 138. The *Blassingame* Plaintiffs, on the other hand, say that two such calls occurred at 7:00 p.m., after law enforcement had cleared the Capitol. *Blassingame* Compl. ¶ 128. Whatever the timing of those calls, they at most establish Giuliani as an opportunist, not someone who shared in the same general conspiratorial objective as others *before* the violence at the Capitol occurred. Though Giuliani unquestionably was a central figure in the President's efforts to sow doubt and mistrust in the election's outcome, the court cannot say, based on the facts alleged, that he plausibly shared the common conspiratorial goal of violently disrupting the Certification.

*iv.*    *Trump Jr.*

The court reaches the same conclusion as to Trump Jr. The allegations against him are even thinner than those against Giuliani. Before January 6th, he sent false and misleading tweets about the election and publicly criticized officials who did not support his father. He also spoke at the rally, during which he repeated false claims about election fraud and theft. He also warned

77

Republicans who failed to back the President, "we're coming for you, and we're gonna have a good time doing it." As discussed below, the court believes these words to be protected speech. That is all Plaintiffs have attributed to Trump Jr.[27] He is not alleged to have participated in rally planning, known that the President would direct a march to the Capitol, or expressed support for the rioters and their actions. The allegations against Trump Jr. are insufficient to make him a coconspirator in a plan to disrupt Congress from performing its duties.

### v.    *The Oath Keepers*

The Oath Keepers also challenge the sufficiency of the conspiracy allegations against them. But that argument goes nowhere. At a minimum, the alleged facts establish a § 1985(1) conspiracy between the Oath Keepers and the Proud Boys. After the President's announcement of the January 6 Rally, a leader of the group posted a Facebook message that he had "organized an alliance between Oath Keepers . . . and Proud Boys. We have decided to work together and shut this shit down." Days later, another leader posted on Facebook that the Oath Keepers had "orchestrated a plan with the Proud Boys." Those statements, if true, would be direct evidence of a civil conspiracy. The Complaints also detail each group's preparations for January 6th, and they allege that members from each group forcibly entered the Capitol building intent on disrupting the Certification. These well-pleaded allegations easily establish a plausible § 1985(1) conspiracy between the two groups.

The Oath Keepers make two primary contentions. First, they maintain that the *Thompson* complaint lacks sufficient details, such as names of the leaders who posted to Facebook, to establish a conspiracy. *Thompson* Oath Keepers' Mot. at 14. But Rule 8's notice-pleading rules

---

[27] Swalwell also includes in his Complaint a photograph of Trump Jr. from May 2019 that purports to show him wearing a t-shirt bearing the symbol of a militia group known as the Three Percenters. Swalwell Compl. ¶ 96. The Three Percenters are among the groups alleged to have stormed the Capitol. But this effort to tie Trump Jr. to the alleged conspiracy is tenuous, at best.

apply here, and the Oath Keepers have not cited any case that requires the specificity they demand to survive a motion to dismiss. Second, they complain that they are being held responsible for the acts of the group's members. *See id.* at 15. Plaintiffs, however, have pleaded sufficient facts to establish *respondeat superior* liability at this stage.

vi.    <u>Tarrio</u>

Tarrio's role in the conspiracy is established through well-pleaded allegations. It is reasonable to infer that, as the leader of the Proud Boys, he would have participated in forming the announced "alliance" and "orchestrated plan" with the Oath Keepers. *Thompson* Compl. ¶ 63. He also said that the Proud Boys would be there in "record numbers on Jan 6th," would be "incognito," and would "spread across downtown DC in smaller teams." *Id.* ¶ 64. It is also reasonable to infer that he would have been involved in the Proud Boys' collection of tactical vests, military-style communication equipment, and bear mace. *Id.* ¶ 65. These allegations are sufficient to plausibly establish Tarrio as a conspirator.

*    *    *

To sum up, the court holds that Plaintiffs have successfully pleaded a § 1985(1) conspiracy claim against President Trump, the Oath Keepers, and Tarrio. They have fallen short as to Giuliani and Trump Jr.

### C.    Failure to State a § 1986 Claim

The court already has held that President Trump is immune from suit as to Swalwell's § 1986 claim. The question remains whether Swalwell has stated such a claim against the other defendants, Giuliani and Trump Jr. He has not.

Recall, § 1986 provides a cause of action against anyone who has "knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be

79

committed, and having the power to prevent or aid in preventing the commission of the same, neglects or refuses so to do." 42 U.S.C. § 1986. Thus, if Giuliani or Trump Jr. "knew of a [§ 1985(1)] conspiracy, were in a position to prevent the implementation of that conspiracy, and neglected or refused to prevent it, they are liable under § 1986." *Park v. City of Atlanta*, 120 F.3d 1157, 1160 (11th Cir. 1997). Swalwell's pleading falls short in two respects. First, it fails to plead sufficient facts establishing that Giuliani or Trump Jr. knew of a tacit plan to prevent members of Congress from discharging their duties. The Complaint does not, for example, allege either was involved in the planning of the January 6 Rally or knew in advance that the President would call on rally-goers, including organized groups, to march on the Capitol while Congress was in session. Second, it does not allege that Giuliani or Trump Jr. had the "power" to prevent such conspiracy. Few courts appear to have addressed this element, but those finding the requisite power to be present have done so where the defendant was a government official or employee with some formal authority to act. *See, e.g.*, *Peck v. United States*, 470 F. Supp. 1003, 1013 (S.D.N.Y. 1979) (FBI agents); *Santiago v. City of Philadelphia*, 435 F. Supp. 136, 156 (E.D. Pa. 1977) (mayor and city managing director who had "some authority, though limited, to control policies and practices"), *abrogated on other grounds by Chowdhury v. Reading Hosp. & Med. Ctr.*, 677 F.2d 317 (3d Cir. 1982). Giuliani and Trump Jr., as personal lawyer to the President and the President's son, respectively, evidently do not so qualify. Swalwell's Complaint thus fails to plead a § 1986 claim against Giuliani and Trump Jr.

## D. The First Amendment Defense

The court thus far has held that President Trump is not immune from suit as to Plaintiffs' § 1985(1) claim and that Plaintiffs have successfully pleaded such claim against him. The question remains, however, whether that claim (and others) can move forward when, as here, the President's

alleged conspiratorial acts are predicated entirely on his speech. This is a substantial constitutional question. The First Amendment grants all citizens expansive protections in what they can say, but that protection must be particularly guarded when it comes to the President of the United States. As the Supreme Court has repeatedly reminded, a President's position in our system of government is unique and his duties and responsibilities "are of unrivaled gravity and breadth." *Vance*, 140 S. Ct. at 2425. A President could not function effectively if there were a risk that routine speech might hale him into court. Only in the most extraordinary circumstances could a court *not* recognize that the First Amendment protects a President's speech. But the court believes this is that case. Even Presidents cannot avoid liability for speech that falls outside the expansive reach of the First Amendment. The court finds that in this one-of-a-kind case the First Amendment does not shield the President from liability.

### 1.    *The First Amendment and Speech on Matters of Public Concern*

The Supreme Court has spoken in soaring terms about the First Amendment's protection of speech on matters of public concern. "Expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.'" *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (citation omitted). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964). The First Amendment embodies our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.*, 376 U.S. at 270. Such speech may "well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* "Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases. An advocate must be free to stimulate his

81

audience with spontaneous and emotional appeals for unity and action in a common cause." *Claiborne Hardware*, 458 U.S. at 928.

Protection for speech on matters of public concern is decidedly capacious, but it is not unbounded. "The presence of protected activity . . . does not end the relevant constitutional inquiry. Governmental regulation that has an incidental effect on First Amendment freedoms may be justified in certain narrowly defined instances." *Id.* at 912. But when considering liability in such "narrowly defined instances," courts must tread carefully. When, as here, liability is based in part on "a public address—which predominantly contained highly charged political rhetoric— [the court must] approach this suggested basis of liability with extreme care." *Id.* at 926–27. Such care extends even when, as in this case, the allegation is that speech produced violence. "When violence occurs during activity protected by the First Amendment, that provision mandates 'precision of regulation' with respect to 'the grounds that may give rise to damages liability' as well as 'the persons who may be held accountable for those damages.'" *McKesson v. Doe*, 141 S. Ct. 48, 50 (2020) (quoting *Claiborne Hardware*, 458 U.S. at 916–17).

Thus, the court's task here is to determine whether a "narrowly defined instance" applies to President Trump's speech such that he "may be held accountable" for the damages it may have caused. Plaintiffs here advance two such "narrowly defined instances": (1) the President participated in an unlawful conspiracy and (2) the President's January 6 Rally Speech incited violence. *Thompson* Pls.' Opp'n at 49–56; *Swalwell* Opp'n at 18–19; *Blassingame* Pls.' Opp'n at 36–39. The court considers in turn each of these grounds for denying President Trump's speech First Amendment protection.

82

a. Participation in an unlawful conspiracy

Plaintiffs say that "conspiratorial statements and agreements in furtherance of unlawful actions are not protected by the First Amendment." *Thompson* Pls.' Opp'n at 50. They cite various cases for various propositions, including that the First Amendment does not authorize "knowing association with a conspiracy," *id.* at 50 (quoting *Scales v. United States*, 367 U.S. 203, 229 (1961)); it does not confer a right to "impede or obstruct" a government employee's "performance of duty by threats," *id* (quoting *United States v. Varani*, 435 F.2d 758, 762 (6th Cir. 1970)); it does not protect "speech integral to criminal conduct," *Blassingame* Pls.' Opp'n at 18 (quoting *United States v. Alvarez*, 567 U.S. 709, 717 (2012)); and it does not "immunize[] [speech] from regulation when [it] is used as an integral part of conduct which violates a valid statute," *id.* at 18–19 (quoting *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 514 (1972)).

But the court finds these broad-stroke principles inapt here. For one, cases like *Scales*, *Varani*, and *Alvarez* involve criminal conspiracies, which the Supreme Court seems to have put in its own category. Plaintiffs sometimes suggest that the President engaged in *criminal* conduct, but what is before the court is a civil conspiracy, and it would be imprudent for the court to assess whether factual allegations in a *civil* complaint make out *criminal* conduct. Even the low probable-cause standard is higher than Rule 8's plausibility standard. Other cases, like *California Motor Transport*, arise in the context of economic regulation, involving, for example, statutes barring monopolization or concerted activity, where the speech at issue usually is not on matters of public concern. Speech used to facilitate the fixing of prices or the manipulation of markets is naturally afforded less First Amendment protection than a presidential speech on a matter of public concern.

Speech on matters of public concern may even be protected if it is part of a concerted violation of law. That is the lesson of the Supreme Court's decision in *Claiborne Hardware*.

83

There, Mississippi state courts had found the NAACP; its state field secretary, Charles Evers; and others liable for losses incurred by white merchants as a result of a boycott—a kind of civil conspiracy—that violated state law "on three separate conspiracy theories." 458 U.S. at 891. Indeed, the Mississippi Supreme Court had found that the defendants "had *agreed* to use force, violence, and 'threats' to effectuate the boycott." *Id.* at 895. The Supreme Court observed that the boycott was "supported by speeches and nonviolent picketing" aimed at expressing dissatisfaction with "the social structure that denied them rights to equal treatment and respect"— plainly matters of public concern. *Id.* at 907. The Court, in assessing the defendants' plea for First Amendment protection, did not dismiss it out of hand merely because the defendants had conspired to violate state law. Rather, in recognition of the weighty First Amendment values at stake, the Court narrowed the scope of inquiry to whether any of the business losses were caused by speech that was not otherwise protected under the First Amendment—namely, speech that caused violence or constituted threats of violence. *Id.* at 916. Once the Court identified speech that might so qualify, it did not declare the speech unprotected because it was part of a conspiracy; instead, it evaluated the speech under the narrow "incitement" standard announced in *Brandenburg v. Ohio*, 395 U.S. 444 (1969).

The court here must follow the same path the Court did in *Claiborne Hardware*. President Trump's speech cannot be deemed unprotected merely because Plaintiffs have alleged it to be part of a conspiratorial agreement to violate a civil statute. Instead, because his speech is on a matter of public concern, it will lose its First Amendment protection only if it meets the stringent *Brandenburg* "incitement" standard. *See Tri-Corp Housing, Inc. v. Bauman*, 826 F.3d 446, 449 (7th Cir. 2016) (recognizing that public officials have the right to "urge their constituents to act in particular ways . . . , as long as they refrain from making the kind of threats that the Supreme Court

84

treats as subject to control under the approach of *Brandenburg*" (citation omitted)).  It is to that inquiry the court now turns.

### b.    *Brandenburg* and incitement

A trio of Supreme Court cases has come to define the incitement exception to the First Amendment.  They are *Brandenburg*, *Hess v. State of Indiana*, and *Claiborne Hardware*.  A brief discussion of each helps to frame the determination this court must make.

*Brandenburg* involved the conviction of a member of the Ku Klux Klan under Ohio's Criminal Syndicalism statute.  395 U.S. at 444.[28]  Two films of the defendant were introduced at trial.  One showed him among twelve hooded Klansmen, surrounding a large wooden cross, which they burned.  Words uttered on the film included statements disparaging of Black and Jewish people.  The defendant also said the following: "We're not a revengent organization, but if our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance taken.  We are marching on Congress July the Fourth, four hundred thousand strong . . . ."  *Id.* at 446.  Seen on the film, and introduced into evidence, were a pistol, shotgun, and ammunition.  *Id.* at 445–46.  The second film was along the same lines.  *Id.* at 447.  The Supreme Court overturned the defendant's conviction, finding the films to be protected speech.  Articulating what is now termed the "*Brandenburg* test," the Court said that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."  *Id.*  Thus, *Brandenburg* has come to stand for the proposition that "mere advocacy" of

---

[28] Numerous states passed criminal syndicalism laws in the early part of the 20th century "with the purpose of making it illegal for individuals or groups to advocate radical political and economic changes by criminal or violent means."  Dale Mineshima-Lowe, *Criminal Syndicalism Laws*, THE FIRST AMENDMENT ENCYCLOPEDIA, https://www.mtsu.edu/first-amendment/article/942/criminal-syndicalism-laws (last visited Feb. 8, 2022).

the use of force or violence is protected speech; only when speech is directed at inciting imminent lawless action, and likely to do so, does it lose the cloak of the First Amendment's protection.

Four years later, in *Hess v. State of Indiana*, the Court applied *Brandenburg* to a defendant convicted under Indiana's disorderly conduct statute. 414 U.S. 105, 105–06 (1973). The defendant was participating in a demonstration of between 100 and 150 people when the sheriff gave an order to clear the streets. As the sheriff passed him, Hess was standing off the street and said words to the effect of "We'll take the fucking street later" or "We'll take the fucking street again." *Id.* at 107. Witnesses testified that Hess did not appear to be exhorting the crowd to go back into the street, was not addressing any particular person, and though loud, was no louder than anyone else in the area. *Id.* Applying *Brandenburg*, the Court overturned Hess's conviction. The Court observed that Hess's statement was "[a]t best, . . . counsel for present moderation, at worst, it amounted to nothing more than advocacy of illegal action at some indefinite future time." *Id.* at 108. The Court said that, because Hess was not directing his statement to any person or group of persons, it could not be said he was advocating any action. *Id.* Also, "since there was no evidence or rational inference from the import of the language, that his words were intended to produce, and likely to produce, imminent disorder," his words could not be punished based on the mere "tendency to lead to violence," as the Indiana Supreme Court had held. *Id.* at 108–09 (citation omitted).

The last of the three cases is *Claiborne Hardware*, the facts of which the court already has briefly discussed. The Court evaluated Charles Evers's speech in the context of the boycott, during which he said to several hundred people, referring to boycott violators, "If we catch any of you going in any of them racist stores, we're gonna break your damn neck." 458 U.S. at 902. In another speech Evers warned that "the Sheriff could not sleep with boycott violators at night," an

86

implicit threat to Black persons that retaliation for shopping at white establishments could come at any moment without the protection of law enforcement. *Id.* The Court held that the "emotionally charged rhetoric of Charles Evers' speeches did not transcend the bounds of protected speech set forth in *Brandenburg*." *Id.* at 928. The court acknowledged that Evers had used "strong language" and observed that if his "language had been followed by acts of violence, a substantial question would be presented whether Evers could be held liable for the consequences of that lawful conduct." *Id.* However, "[w]hen such appeals do not incite lawless action, they must be regarded as protected speech." *Id.* The Court also said that "[i]f there were other evidence of his authorization of wrongful conduct, the references to discipline in the speeches could be used to corroborate that evidence." *Id.* at 929. But because there was no evidence that "Evers authorized, ratified, or directly threatened acts of violence," his words could not be used for such purpose. *Id.* The Court therefore vacated the damages award against Evers.

The Supreme Court has not had occasion to apply the *Brandenburg* test in the 40 years since *Claiborne Hardware*. Scholars have given it attention, but few federal appellate court decisions have applied it. The parties have not cited any D.C. Circuit case applying *Brandenburg*, and the court has not found one.[29] One treatise has distilled *Brandenburg* into a three-part test, requiring proof that "(1) the speaker *subjectively intended incitement*; (2) in context, the words used were *likely to produce* imminent, lawless action; and (3) the words used by the speaker *objectively encouraged* and urged and provoked *imminent* action." 5 RONALD D. ROTUNDA & JOHN E. NOWAK, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE § 20.15(d),

---

[29] The D.C. Circuit addressed *Brandenburg* in *National Organization for Women v. Operation Rescue*, but in the context of evaluating the terms of an injunction, not applied to any particular speech. 37 F.3d 646, 657 (D.C. Cir. 1994).

Westlaw (database updated May 2021). An en banc panel of the Sixth Circuit articulated a similar three-part test:

> The *Brandenburg* test precludes speech from being sanctioned as incitement to riot unless (1) the speech explicitly or implicitly encouraged the use of violence or lawless action, (2) the speaker intends the speech will result in the use of violence or lawless action, and (3) the imminent use of violence or lawless action is the likely result of his speech.

*Bible Believers v. Wayne County*, 805 F.3d 228, 246 (6th Cir. 2015) (en banc). The court does not take a position on whether defining *Brandenburg*'s standard as a three-part test is useful, or even accurate.[30] The key to the *Brandenburg* exception is incitement: whether the speech "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447.

In making that evaluation, both the words spoken and the context in which they are spoken matter. The Supreme Court said as much in *Young v. American Mini Theaters*:

> The question whether speech is, or is not, protected by the First Amendment often depends on the content of the speech. Thus, the line between permissible advocacy and impermissible incitation to crime or violence depends, not merely on the setting in which speech occurs, but also on exactly what the speaker had to say.

427 U.S. 50, 66 (1976). Similarly, the Court in *FCC v. Pacifica Foundation* observed that the

> classic exposition of the proposition that both the content and the context of speech are critical elements of First Amendment analysis is Mr. Justice Holmes' statement for the Court in *Schenck v. United States*[:] . . . "[T]he character of every act depends upon the circumstances in which it is done . . . . The most stringent protection of free speech would not protect a man falsely shouting fire in a theater and causing a panic . . . ."

---

[30] The Rotunda and Nowak treatise's three-factor test has been called into question insofar as it requires inquiry into whether the speaker "objectively encouraged and urged and provoked imminent action." The Sixth Circuit has declined to wholly embrace such an "objective" element, except insofar as the *Brandenburg* inquiry must focus on "the words used by the speaker . . . , not how they may be heard by a listener." *Nwanguma v. Trump*, 903 F.3d 604, 613 (6th Cir. 2018).

88

438 U.S. 726, 744 (1978) (quoting *Schenck v. United States*, 249 U.S. 47, 52 (1919)).

Bearing the foregoing principles in mind, the court turns to evaluate President Trump's speech under *Brandenburg*.

### c.    President Trump's speech

Plaintiffs do not contend that President Trump's words prior to the January 6 Rally Speech (almost entirely through tweets) meets the *Brandenburg* incitement exception. They focus on the Rally Speech, so the court does, too, starting with a summary of what he said.[31]

The President spoke for 75 minutes. He spun a narrative in which he told those present that the election was "rigged" and "stolen," and not just from him, but from *them*. He told attendees at the start that "*our* election victory" had been taken away, "*we* won this election," and "[*w*]*e* didn't lose." He urged on the crowd, "We will never give up. We will never concede. It doesn't happen. You don't concede when there's theft involved. . . . We will not take it anymore . . . . [W]e will 'stop the steal.'" He said that elections in "Third World Countries" are "more honest" than the election that had just taken place. The President said all of this within the first few minutes of his remarks.

He then told the crowd what had to happen for them to "win" the election. "[I]f Mike Pence does the right thing, we win the election." "All Mike Pence has to do is send it back to the states to recertify, and we become president, and you are the happiest people." And he warned what would happen if the Vice President did not act: "[W]e're stuck with a president who lost the election by a lot, and we have to live with that for four more years. We're not going to let that happen."

---

[31] The court has considered the Rally Speech in its entirety. *See supra* note 24. The recitation below summarizes those remarks as they were made chronologically, and it omits citations for ease of reading.

89

The President identified who was to blame for the "stolen" and "rigged" election: "radical left Democrats," "weak Republicans," "the fake news," and "Big tech," among others. He specifically identified those who he thought were the "weak Republicans" who would bear responsibility for a lost election: then–Senate Majority Leader McConnell, Representative Elizabeth Cheney, and Governor Brian Kemp (calling him "one of the dumbest governors in the United States"). He accused the media of "suppressing thought" and "suppress[ing] speech" and said it "was the enemy of the people. It's the biggest problem we have in this country." He told the crowd,

> [W]e're going to have to fight much harder, and Mike Pence is going to have to come through for us. And if he doesn't, that will be a sad day for our country because you're sworn to uphold our Constitution. Now it is time for Congress to confront this egregious assault on our democracy.

It was at this point that the President first said anything about a march to the Capitol. He said,

> [A]fter this, we're going to walk down—and I'll be there with you— we're going to walk down to the Capitol, and we're going to cheer on our brave senators, and congressmen and women. And we're probably not going to be cheering so much for some of them because you'll never take back our country with weakness. You have to show strength, and you have to be strong.

He then said, "We have come to demand that Congress do the right thing and only count the electors who have been lawfully slated, lawfully slated," and he added that "everyone here will soon be marching to the Capitol building to peacefully and patriotically make your voices heard."

Moments later, he focused the crowd's attention on the Certification. Referring to the Capitol, he said,

> [W]e see a very important event though, because right over there, right there, we see the event going to take place. . . . We're going to see whether or not we have great and courageous leaders or whether

or not we have leaders that should be ashamed of themselves
throughout history, throughout eternity, they'll be ashamed. And
you know what? If they do the wrong thing, we should never ever
forget that they did. Never forget. We should never ever forget.

The President continued, telling the crowd repeatedly that the election had been stolen.
"We've amassed overwhelming evidence about a fake election," he said to them. Changes in
election procedure at the state level had "paved the way for fraud on a scale never seen before."
He then recited a litany of false claims about the ways in which the election had been stolen in
Pennsylvania (e.g., over 200,000 more ballots cast than voters), Wisconsin (e.g., postal service
workers were told to backdate 100,000 ballots), Georgia (e.g., election officials pulled "boxes . . .
and suitcases of ballots out from under a table"), Arizona (e.g., 36,000 ballots were cast by
noncitizens), Nevada (e.g., more than 42,000 double votes), and Michigan (e.g., thousands and
thousands of ballots were improperly backdated). In the midst of reciting these examples of fraud,
the President regularly alluded to what the Vice President had to do. He told rally-goers that, if
Mike Pence failed to act, "You will have an illegitimate president, that's what you'll have. And
we can't let that happen." He said, "I'm not hearing good stories" about the Vice President. And
he again told those assembled that the election was a fraud: "this is the most fraudulent thing
anybody's—This is a criminal enterprise. This is a criminal enterprise." And, he said that when
fraud occurs "it breaks up everything, doesn't it? What you catch somebody in a fraud, you're
allowed to go by very different rules. So I hope Mike has the courage to do what he has to do."

In the final moments of his speech, the President spoke about the country's future. He said
he had to be "careful" in saying he was confident in our nation's future: "If we allow this group
of people to illegally take over our country, because it's illegal when the votes are illegal, when
the way they got there is illegal, when the States that vote are given false and fraudulent
information." He also warned that, because of a potential change in administration, "the

91

[immigrant] caravans are forming again.  They want to come in again and rip off our country.

Can't let it happen."

Finally, the President told them he suspected impropriety on election night itself: "Something's wrong here.  Something's really wrong.  Can't have happened."  And then he said: "And we fight.  We fight like hell and if you don't fight like hell, you're not going to have a country anymore."  Moments later, he concluded and told those assembled:

> So we're going to, we're going to walk down Pennsylvania Avenue, I love Pennsylvania Avenue, and we're going to the Capitol and we're going to try and give—the Democrats are hopeless.  They're never voting for anything, not even one vote.  But we're going to try to give our Republicans, the weak ones, because the strong ones don't need any of our help, we're going to try and give them the kind of pride and boldness that they need to take back our country.  So let's walk down Pennsylvania Avenue.

### d.     *Brandenburg* applied to the January 6 Rally Speech

The President's words on January 6th did not explicitly encourage the imminent use of violence or lawless action, but that is not dispositive.  In *Hess*, the Supreme Court recognized that words can *implicitly* encourage violence or lawlessness.  In reversing Hess's conviction, the Court held that there was "no evidence or *rational inference* from *the import* of the language" intended to produce, or likely to produce, imminent disorder.  414 U.S. at 109 (emphasis added).  By considering the "import of the language," and the "rational inferences" the words produce, the Court signaled that there is no safe haven under *Brandenburg* for the strategic speaker who does not directly and unequivocally advocate for imminent violence or lawlessness, but does so through unmistakable suggestion and persuasion.    Federal appellate courts have understood the *Brandenburg* exception to reach implicit encouragement of violent acts.  *See, e.g.*, *Bible Believers*, 805 F.3d at 246 (inquiring as the first element whether "the speech explicitly or implicitly encouraged the use of violence or lawless action").

92

Having considered the President's January 6 Rally Speech in its entirety and in context, the court concludes that the President's statements that, "[W]e fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore," and "[W]e're going to try to and give [weak Republicans] the kind of pride and boldness that they need to take back our country," immediately before exhorting rally-goers to "walk down Pennsylvania Avenue," are plausibly words of incitement not protected by the First Amendment. It is plausible that those words were implicitly "directed to inciting or producing imminent lawless action and [were] likely to produce such action." *Brandenburg*, 395 U.S. at 447.

The "import" of the President's words must be viewed within the broader context in which the Speech was made and against the Speech as a whole. Before January 6th, the President and others had created an air of distrust and anger among his supporters by creating the false narrative that the election literally was stolen from underneath their preferred candidate by fraud and corruption. Some of his supporters' beliefs turned to action. In the weeks after the election, some had made threats against state election officials and others clashed with police in Washington, D.C., following pro-Trump rallies. The President would have known about these events, as they were widely publicized. Against this backdrop, the President invited his followers to Washington, D.C., on January 6th. It is reasonable to infer that the President would have known that some supporters viewed his invitation as a call to action. President Trump and his advisors "actively monitored" pro-Trump websites and social media. *Thompson* Compl. ¶ 66. These forums lit up in response to the rally announcement. Some supporters explicitly called for violence on January 6th (e.g., calling for "massing hangings and firing squads"). Others took direct aim at the Certification itself (e.g., stating that people in the Capitol should "leave in one of two ways: dead or certifying Trump the rightful winner") or at law enforcement ("Cops don't have 'standing' if

93

they are laying on the ground in a pool of their own blood."). *Thompson* Compl. ¶¶ 56–63; *Swalwell* Compl. ¶ 89; *Blassingame* Compl. ¶¶ 33–34. These violent posts were discussed "by media outlets regularly viewed by President Trump, including Fox News." *Thompson* Compl. ¶ 66. The prospect of violence had become so likely that a former aide to the President predicted in a widely publicized statement that "there will be violence on January 6th because the President himself encourages it." *Id.* Thus, when the President stepped to the podium on January 6th, it is reasonable to infer that he would have known that some in the audience were prepared for violence.

Yet, the President delivered a speech he understood would only aggravate an already volatile situation. For 75 uninterrupted minutes, he told rally-goers that the election was "rigged" and "stolen," at one point asserting that "Third World Countries" had more honest elections. He identified who the culprits were of the election fraud: "radical Left Democrats" and "weak" Republicans. They were the ones who had stolen *their* election victory, he told them. He directed them not to "concede," and urged them to show "strength" and be "strong." They would not be able to "take back [their] country with weakness." He told them that the rules did not apply: "When you catch somebody in a fraud, you're allowed to go by very different rules." And they would have an "illegitimate President" if the Vice President did not act, and "we can't let that happen." These words stoked an already inflamed crowd, which had heard for months that the election was stolen and that "weak politicians" had failed to help the President.

So, when the President said to the crowd at the end of his remarks, "We fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore," moments before instructing them to march to the Capitol, the President's speech plausibly crossed the line into unprotected territory. These words did not "amount[] to nothing more than illegal action at some indefinite future time." *Hess*, 414 U.S. at 108. President Trump's words were, as Justice

94

Douglas termed it, "speech . . . brigaded with action." *Brandenburg*, 395 U.S. at 456 (Douglas, J., concurring). They were plausibly "directed to inciting or producing imminent lawless action and [were] likely to incite or produce such action." *Hess*, 414 U.S. at 108–09.

In his motions, President Trump largely avoids any real scrutiny of the actual words he spoke or the context in which they were spoken. His tack entails essentially three arguments. First, citing Justice Stevens's dissent in *Morse v. Frederick*, 551 U.S. 393, 442–43 (2007), he contends that Plaintiffs' attempt to fit President Trump's speech in the *Brandenburg* box improperly relies on how its listeners interpreted the speech rather than his actual words. *See Blassingame* Trump Mot. at 25 (citing *Morse*, 551 U.S. at 442–43 (Stevens, J., dissenting) (observing that the distinction between advocacy and incitement "could not depend on how" others understood speech; to hold otherwise would leave "'the speaker . . . wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning'" (quoting *Thomas v. Collins*, 323 U.S. 516, 535 (1945)))). The court has no quarrel with the proposition that an incitement-speech inquiry cannot turn on the subjective reaction of the listener. *See Nwanguma v. Trump*, 903 F.3d 604, 613 (6th Cir. 2018) ("It is the words used by the speaker that must be the focus of the incitement inquiry, not how they may be heard by a listener.").[32]   In conducting the inquiry above the court assiduously avoided relying on any allegations that Plaintiffs made about any person's reaction to the President's January 6 Rally Speech. (And, Plaintiffs did make such allegations. *See, e.g.*, *Thompson* Compl. ¶¶ 88, 122; *Blassingame* Compl. ¶¶ 61, 93.) The court's conclusion rests on the words spoken and their context, including the audience to whom the President spoke and when he spoke to them.

---

[32] The court takes no position on whether the subjective reaction of a listener might have *some* relevance to the inquiry.

95

Next, the President focuses on the fact that when he first alluded to marching to the Capitol, he said he expected rally-goers "to peacefully and patriotically make your voices heard." *Blassingame* Trump Mot. at 25. Those words are a factor favoring the President. *See Nwanguma*, 903 F.3d at 611–12 (holding that the allegation that candidate Trump's repetition of the words "get 'em out of here," directed at protesters attending a campaign rally, were inciting words was "undercut[]" by the accompanying words "don't hurt 'em"). That is why the court recited those words in summarizing his Speech. But the President's passing reference to "peaceful[] and patriotic[]" protest cannot inoculate him against the conclusion that his exhortation, made nearly an hour later, to "fight like hell" immediately before sending rally-goers to the Capitol, within the context of the larger Speech and circumstances, was not protected expression.

Finally, President Trump plays a game of what-aboutism, citing fiery speeches from Democratic legislators, including Plaintiff Waters, which he says likewise would not be protected speech if the court were to find, as it has, that the President's is not. *Thompson* Trump Reply at 8, 11–13. The court does not find such comparators useful. Each case must be evaluated on its own merits, as the court has done above. If the President's larger point is that a speaker only in the rarest of circumstances should be held liable for political speech, the court agrees. *Cf. Bible Believers*, 805 F.3d at 244 (observing in a case involving religious expression that "[i]t is not an easy task to find that speech rises to such a dangerous level that it can be deemed incitement to riot"). That is why the court determines, as discussed below, that Giuliani's and Trump Jr.'s words are protected speech. But what is lacking in their words is present in the President's: an implicit call for imminent violence or lawlessness. He called for thousands "to fight like hell" immediately before directing an unpermitted march to the Capitol, where the targets of their ire were at work, knowing that militia groups and others among the crowd were prone to violence. *Brandenburg*'s

imminence requirement is stringent, and so finding the President's words here inciting will not lower the already high bar protecting political speech.[33]

*    *    *

The nineteenth century English philosopher John Stuart Mill was a fierce advocate of free speech. But Mill understood that not all speech should be protected. In his work *On Liberty*, Mill wrote, "No one pretends that actions should be as free as opinions. On the contrary, even opinions lose their immunity, when the circumstances in which they are expressed are such as to constitute their expression a positive instigation to some mischievous act." JOHN STUART MILL, ON LIBERTY 100 (London, John W. Parker & Son, 2d ed. 1859). As an example Mill offered the following:

> An opinion that corn-dealers are starvers of the poor, or that private property is robbery, ought to be unmolested when simply circulated through the press, but may justly incur punishment when delivered orally to an excited mob assembled before the house of a corn-dealer, or when handed about among the same mob in the form of a placard.

*Id.* at 100–01. President Trump's January 6 Rally Speech was akin to telling an excited mob that corn-dealers starve the poor in front of the corn-dealer's home. He invited his supporters to Washington, D.C., after telling them for months that corrupt and spineless politicians were to blame for stealing an election *from them*; retold that narrative when thousands of them assembled on the Ellipse; and directed them to march on the Capitol building—the metaphorical corn-dealer's house—where those very politicians were at work to certify an election that he had lost. The

---

[33] President Trump additionally has argued that, if the court were to hold that he could be potentially liable under § 1985(1) for his speech, such an interpretation would raise overbreadth and void-for-vagueness concerns. *Thompson* Trump Mot. at 21–22. But such challenges make little sense, as the President cannot seriously contend that § 1985(1) either sweeps in too much protected speech (an overbreadth challenge) or does not provide fair notice of what it prohibits (void for vagueness). In any event, the President does not develop either argument, devoting only a half-page to them. *See id.* The court therefore declines to address them any more than it has. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

Speech plausibly was, as Mill put it, a "positive instigation of a mischievous act." Dismissal of Plaintiffs' claims on First Amendment grounds is not warranted.

### e. Giuliani and Trump Jr.

As the court already has said, it finds that Giuliani's and Trump Jr.'s words spoken before and on January 6th are protected expression. None of their words, explicitly or implicitly, rose to the level of a call for imminent use of violence or lawless action. That is true even of Giuliani saying, "Let's have trial by combat." That statement was made in the context of his assertion that the election was rife with criminal fraud, and that he was "willing to stake "[his] reputation," and the President would too, "on the fact we're going to find criminality." But Giuliani never said anything about where or when the "trial by combat" would occur. Giuliani's statement is therefore, at most, "advocacy of illegal action at some indefinite future time." *Hess*, 414 U.S. at 108. The "trial by combat" line is surely provocative, but it is not unprotected speech. *See Claiborne Hardware*, 458 U.S. at 928 (holding that where "spontaneous and emotional appeals for unity and action in a common cause . . . . do not incite lawless action, they must be regarded as protected speech").

Accordingly, the court dismisses all federal and District of Columbia–law claims brought by Swalwell and the Bass Plaintiffs against Giuliani and Trump Jr.

### f. Oath Keepers

The Oath Keepers also contend that the § 1985(1) claim against them must be dismissed because their alleged acts were protected speech, assembly, and petitioning. *Thompson* Oath Keepers Mot. at 27–28. The court quickly dispenses with this argument. "The First Amendment does not protect violence." *Claiborne Hardware*, 458 U.S. at 916. The Oath Keepers are alleged to have acted violently by breaching the Capitol building, "with the rest of the riotous mob,"

wearing "paramilitary equipment, helmets, reinforced vests and clothing with Oath Keepers paraphernalia, moving in a regimented manner as members of the military are trained." *Thompson* Compl. ¶ 126.  Such actions, if true, are not entitled to First Amendment protection.

The court also notes that, if the court were to dismiss the § 1985(1) claim against the Oath Keepers for failing to overcome a First Amendment defense, Plaintiffs could easily cure any deficiency through amendment.  "The security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government."  *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716 (1931).  The court can take judicial notice that ten members of the Oath Keepers, including its leader Stewart Rhodes, have been charged with seditious conspiracy.  *See Thompson v. Linda & A., Inc.*, 779 F. Supp. 2d 139, 144 n.2 (D.D.C. 2011) ("The Court may take judicial notice of public records like docket sheets and other court documents."); Indictment, *United States v. Rhodes*, No. 22-cr-15 (APM) (D.D.C.), ECF No. 1. There is no First Amendment protection for such alleged conduct.

## F.     District of Columbia–law claims

What remains to address are President Trump's motions to dismiss the District of Columbia–law claims asserted by Swalwell and the *Blassingame* Plaintiffs.  (Recall, the Bass Plaintiffs advance only a single federal claim under § 1985(1).)   The court considers these arguments solely as to President Trump because the court already has dismissed those claims brought by Swalwell against Giuliani and Trump Jr. on First Amendment grounds.  The court takes up the District of Columbia–law claims in the order in which they appear in Swalwell's Complaint, followed by any unique claims asserted by the *Blassingame* Plaintiffs.  The court will note in the header when the claims overlap.

99

*1.    Negligence Per Se Based on Violation of District of Columbia Criminal
Statutes (*Swalwell *Counts 3 and 4 and* Blassingame *Counts 4 and 5*)

Swalwell and the *Blassingame* Plaintiffs advance two similar claims, which Swalwell

styles as "Negligence *Per Se*" and the *Blassingame* Plaintiffs style as "Violation of Public Safety

Statute."  *Swalwell* Compl. at 50–51; *Blassingame* Compl. at 40–41.  The court understands these

claims to advance a theory under District of Columbia law that violations of criminal statutes can

create civil liability.  *See Marusa v. District of Columbia*, 484 F.2d 828, 834 (D.C. Cir. 1973)

(setting forth "guidelines for determining whether violation of a criminal statute can create civil

liability").  The court will refer to these as Plaintiffs' "negligence per se" claims.[34]  Here, Swalwell

and the *Blassingame* Plaintiffs seek to predicate liability on alleged violations of D.C. Code § 22-

1322, which prohibits inciting of a riot, and D.C. Code § 22-1321, which prohibits acts of

disorderly conduct.

At oral argument, the court expressed skepticism that the negligence per se counts state

claims under District of Columbia law.  *See* Hr'g Tr., at 180–90.  But the court's skepticism is

nowhere matched by an argument in President Trump's motions to dismiss.  The court has searched

in vain for a contention that these claims must be dismissed because a violation of the referenced

criminal statutes fails to state a cause of action.  The President's motions do not address this theory

of liability generally or Plaintiffs' negligence per se claims specifically, let alone advance the

concerns the court raised during oral argument.  *See Swalwell* Trump Motion at 32–37;

*Blassingame* Trump Motion at 33–41.  The closest the President's brief comes to addressing these

claims is when he argues that President Trump owed no duty to Swalwell, *see Swalwell* Trump

---

[34] The court recognizes that calling these claims "negligence per se" is a bit of a misnomer because both depend on knowing and willful violations of the criminal law.  Nevertheless, District of Columbia law does recognize that violations of certain types of criminal statutes may give rise to civil liability under the rubric of "negligence *per se*" if the statute is intended to promote safety.  *See McCracken v. Walls-Kaufman*, 717 A.2d 346, 354 (D.C. 1998).

Mot. at 33–34, but that argument is not made in the context of negligence per se law.[35]  The President briefly addresses the anti-riot and disorderly conduct laws, but his argument is that those statutes do not reach political speech.  *Blassingame* Trump Mot. at 33.  But the court already has held that the President's January 6 Rally Speech was not protected expression.

Ultimately, notwithstanding the court's expressed doubts about the validity of the negligence per se claims, it is not the court's job to raise arguments that a party has not.  Accordingly, the negligence per se counts survive the motions to dismiss.

## 2.    *District of Columbia Anti-Bias Statute (*Swalwell *Count 5)*

Swalwell also puts forth a claim under the District of Columbia anti-bias statute, D.C. Code § 22-3704.  That statute provides a civil cause of action for, as relevant here, "any person who incurs injury to his or her person or property as a result of an intentional act that demonstrates an accused's prejudice based on the actual or perceived . . . political affiliation of a victim of the subject designated act," "[i]rrespective of any criminal prosecution or result of a criminal prosecution."   The statute defines "designated act" to mean a "criminal act, including . . . assault . . . and . . . inciting . . . assault." D.C. Code § 22-3701(2).  Swalwell alleges that President Trump committed these crimes and that they were "motivated by [Swalwell's] political affiliation as a political opponent of Donald Trump."  *Swalwell* Compl. ¶ 210.

The court expressed doubt at oral argument that prejudice based on "affiliation as a political opponent of Donald Trump" qualifies as "political affiliation" for purposes of the District of Columbia anti-bias law.  *See* Hr'g Tr., 190–91.  The term "affiliation" is undefined in the statute; its ordinary meaning is "the state of belonging to a particular religious or political group."

---

[35] District of Columbia law seems to recognize that a qualifying public-safety criminal statute itself may create a duty, in some cases to the public at large.  *See, e.g.*, *Zhou v. Jennifer Mall Restaurant, Inc.*, 534 A.2d 1268, 1275 (D.C. 1987) (holding that violation of statute that imposes criminal sanctions on tavern keepers for serving intoxicated patrons created a duty extending to the general public).

*Affiliation*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary /affiliation (last visited Feb. 10, 2022). Opposing the President of the United States would not seem to fit that definition. But President Trump does not make this argument. *See Swalwell* Trump Mot. at 35–36. So, the court declines to dismiss on that ground.

President Trump advances two other arguments. First, he contends that Swalwell's anti-bias claim fails "for all the reasons discussed elsewhere, especially since, incredibly, he alleges the use of political language he finds offensive gives rise not only to a cause of action but an actual crime." *Id.* To the extent the court already has rejected arguments made "elsewhere," it rejects them here, again. As for President Trump's contention that offensive political language cannot give rise to an anti-bias cause of action, that mischaracterizes what the statute says and what Swalwell pleads. The statute does not make political speech a crime or actionable. Rather, it provides a cause of action for the victim of a crime that is motivated by bias. Here, Swalwell alleges that he was the victim of a criminal assault or incitement of an assault that was motivated by his "political affiliation." *Swalwell* Compl. ¶¶ 209–214.[36] The claim therefore cannot be dismissed on the ground that the statute makes offensive political speech unlawful.

Second, President Trump argues that the statute only allows for recovery for injury to an individual's "person or property," D.C. Code § 22-3704, and that Swalwell only seeks recovery "for psychological or emotional harm," which is "fatal to his bias claim." *Id.* at 35–36. But that argument goes nowhere because the anti-bias law expressly permits recovery of "[a]ctual or nominal damages for economic or non-economic loss, including damages for emotional distress."

---

[36] In his reply brief, President Trump recharacterizes Swalwell's anti-bias claim as alleging that because the President committed "all of the other torts" alleged in the Complaint and "because he committed these torts with prejudice, President Trump is liable under § 22-3704." Reply in Supp. of Defs. Trump & Trump Jr.'s Mot. to Dismiss, ECF No. 44 [hereinafter *Swalwell* Trump Reply], at 29. But that is not what Swalwell has alleged, nor what the statute permits as a ground for recovery. The "designated act" must be "a criminal act," not a mere tort, D.C. Code § 22-3701(2), and Swalwell accuses the President of predicate criminal, not tortious, acts, *Swalwell* Compl. ¶¶ 213–214.

D.C. Code § 22-3704(a)(2).[37]  Swalwell therefore can proceed with his claim under the District of Columbia anti-bias law.

### 3. Intentional and Negligent Infliction of Emotional Distress (Swalwell Counts 6 and 7)

Swalwell asserts a claim of intentional infliction of emotional distress (IIED) and an additional claim of negligence infliction of emotional distress (NIED).  To state a claim for IIED, a plaintiff must allege "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff [to suffer] severe emotional distress." *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163 (D.C. 2013).  To state a claim for NIED, a plaintiff must plead that (1) the defendant acted negligently, (2) the plaintiff suffered either a physical impact or was within the 'zone of danger' of the defendant's actions, and (3) the plaintiff suffered emotional distress that was "serious and verifiable." *Wright v. United States*, 963 F. Supp. 7, 18 (D.D.C. 1997) (quoting *Jones v. Howard Univ., Inc.*, 589 A.2d 419, 424 (D.C. 1991)).[38] President Trump argues that Swalwell's pleading falls short on the first and third elements on both claims. *Swalwell* Trump Mot. at 36–37.  The court agrees as to the third element of both claims.

"Severe emotional distress" for purposes of a IIED claim is a high bar.  It "requires a showing beyond mere 'mental anguish and stress' and must be 'of so acute a nature that harmful physical consequences are likely to result.'" *Competitive Enterprise v. Mann*, 150 A.3d 1213, 1261 (D.C. 2016).  "Serious and verifiable" distress for an NIED claim is a lower bar, but it must manifest in some concrete way, such as "by an external condition or by symptoms clearly

---

[37] In the penultimate line of his reply brief, President Trump asserts: "Even still, calling someone a radical left Democrat does not amount to prejudice." *Swalwell* Trump Reply at 29.  This seems to be an argument challenging the sufficiency of Swalwell's pleading of the element of prejudice.  Because it is raised for the first time in the reply brief in a single, unadorned sentence, the court declines to consider it.

[38] The District of Columbia Court of Appeals has moved away from the physical "zone of danger" requirement for some NIED claims, but that exception is limited to cases in which the defendant had a relationship with the plaintiff, or had undertaken obligations to the plaintiff, of a nature that necessarily implicates the plaintiff's well-being. *See Sibley v. St. Albans Sch.*, 134 A.3d 789, 798 (D.C. 2016).  That line of cases obviously is not implicated here.

103

indicative of a resultant pathological, physiological, or mental state." *Jones v. Howard Univ., Inc.*, 589 A.2d 419, 424 (D.C. 1991) (emphasis omitted). Swalwell's pleading meets neither of these standards. His pleading is largely conclusory. *Swalwell* Compl. ¶ 223 (alleging that "Defendants' actions caused severe emotional distress"); *id.* ¶ 226 (alleging that "plaintiff suffered severe emotional distress"). Swalwell does, however, describe his thoughts and emotions when he was in the House chamber, heard rioters pounding on the door and smashing glass to enter, and saw Capitol police draw their weapons and barricade the entrances. *Id.* ¶ 224. He states that, during these events, he texted his wife, "I love you very much. And our babies." *Id.* ¶ 225. The court does not minimize the trauma and shock Swalwell felt on January 6th, but his pleading simply does not meet the high bar for either an IIED or NIED claim. Those counts will be dismissed.

Before moving to the next claim, the court notes that the *Blassingame* Plaintiffs also brought an IIED claim (Count 3). They have voluntarily dismissed that claim. *Blassingame* Pls.' Opp'n at 32 n.12. That count will be dismissed without prejudice.

> 4. *Aiding and Abetting Common Law Assault* (Swalwell *Count 8 and* Blassingame *Count 2)*

Next, the court takes up Plaintiffs' common law assault claims based on an aiding-and-abetting theory of liability. *Swalwell* Compl. ¶¶ 237–252; *Blassingame* Compl. ¶¶ 163–168. President Trump's motion in *Swalwell* does not separately address the aiding-and-abetting-assault claim, but he extensively addresses it in his *Blassingame* motion. *See generally Swalwell* Trump Mot.; *Blassingame* Trump Mot. at 33–40. The court will exercise its discretion and consider those arguments in both cases.[39]

---

[39] President Trump contends for the first time in his *Swalwell* reply brief that aiding and abetting a tort is not a recognized cause of action under District of Columbia law. *Swalwell* Trump Reply at 25–26. That argument comes too late, and the court declines to consider it.

*Halberstam v. Welch* remains the high-water mark of the D.C. Circuit's explanation of aiding-and-abetting liability. The court there articulated two particular principles pertinent to this case. It observed that "the fact of encouragement was enough to create joint liability" under an aiding-and-abetting theory, but "[m]ere presence . . . would not be sufficient." 705 F.2d at 481. It also said that "[s]uggestive words may also be enough to create joint liability when they plant the seeds of action and are spoken by a person in an apparent position of authority." *Id.* at 481–82. A "position of authority" gives a "suggestion extra weight." *Id.* at 482.

Applying those principles here, Plaintiffs have plausibly pleaded a common law claim of assault based on an aiding-and-abetting theory of liability. A focus just on the January 6 Rally Speech—without discounting Plaintiffs' other allegations—gets Plaintiffs there at this stage. President Trump's January 6 Speech is alleged to have included "suggestive words" that "plant[ed] the seeds of action" and were "spoken by a person in an apparent position of authority." He was not "merely present." Additionally, Plaintiffs have plausibly established that had the President not urged rally-goers to march to the Capitol, an assault on the Capitol building would not have occurred, at least not on the scale that it did. That is enough to make out a theory of aiding-and-abetting liability at the pleadings stage.

President Trump urges the court to scrutinize Plaintiffs' aiding-and-abetting theory under the five factors set forth in the Restatement (Second) of Torts § 876(b), as cited in *Halberstam*. *Blassingame* Trump Mot. at 36–37. The five Restatement factors are (1) the nature of the act encouraged, (2) the amount and kind of assistance given, (3) the defendant's absence or presence at the time of the tort, (4) his relation to the tortious actor, and (5) the defendant's state of mind. The *Halberstam* court also considered as an additional, sixth factor the duration of the assistance

105

provided. *Halberstam*, 705 F.2d at 484. Evaluating Plaintiffs' theory under these six factors only supports the plausibility of President Trump's liability as an aider and abettor.

*Nature of the act encouraged*. The nature of the act here—violent and lawless conduct at the Capitol incited by President Trump's Rally Speech—supports a finding that President Trump "substantial[ly]" contributed to the underlying tort. *Halberstam*, 705 F.2d at 484. President Trump contends that this factor favors him because he admonished the crowd to "be peaceful, well before any violence was conducted by anyone listening to the speech," thus attenuating the "temporal connection" between his words and the tortious act. *Blassingame* Trump Mot. at 36. But that contention ignores the President's later words encouraging the crowd, "We fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore," occurring only moments before he sent rally-goers on a march to the Capitol ("So let's walk down Pennsylvania Avenue").

*Amount and kind of assistance given*. The court in *Halberstam* observed that this was a "significant factor," using as an illustration a case in which the aider and abettor through his words had "sparked" the action. 705 F.2d at 484. That is precisely what is alleged to have happened here. President Trump resists this view, arguing he "was not even present at the time of the conduct, nor did he provide any equipment, information, or any other kind of assistance." *Blassingame* Trump Mot. at 37–38. This, however, ignores Plaintiffs' theory, which the court has found plausible, that the President's words at the rally sparked what followed.

*Presence at the time of the tort.* For the reasons already discussed, the fact President Trump was not at the Capitol itself does not allow him to avoid potential aiding-and-abetting liability. *See Halberstam*, 705 F.2d at 484 (noting that presence is not a requirement); *id.* at 488 (finding liability even though the defendant was not present at the time of the assisted act).

*Relation to the tortfeasor*. *Halberstam* says that an aider and abettor's "position of authority len[ds] greater force to his power of suggestion." *Id.* at 484. The application of that factor here requires little discussion. The President nevertheless pushes back, asserting that because the tortfeasors were not known to the President, this factor cuts in his favor. *Blassingame* Trump Mot. at 37. Leaving aside that Plaintiffs have pleaded that the President did *know* about organized militia groups, *Halberstam* makes clear that the aider and abettor need not have a personal relationship with the tortfeasor to be in a position of authority. *Halberstam*, 705 F.2d at 484 (citing *Cobb v. Indian Springs, Inc.*, 522 S.W.2d 383 (Ark. 1975) (finding aiding-and-abetting liability where a security guard urged a young driver with a new car to give the car a high-speed test run that injured a bystander)).

*State of mind.* As to this factor, the court has found that Plaintiffs have plausibly alleged that the President was of one mind with organized groups and others to participate in violent and unlawful acts to impede the Certification. Thus, this factor is supported by more than, as the President contends, his alleged pleasure in watching news coverage of the events as they unfolded at the Capitol building. *Blassingame* Trump Mot. at 37.

*Duration of the assistance provided.* The *Halberstam* court considered an additional, sixth factor, the duration of the assistance provided. This factor also weighs against President Trump. True, the Rally Speech itself was relatively short in duration, but the invitation for the Rally came two weeks earlier. The duration is longer still if the court considers his tweets prior to that invitation. Importantly, even President Trump admits that his "sporadic tweets and speeches" present a "stronger argument" for "conspiracy" liability. *Id.* at 37–38. That duration also supports aiding-and-abetting liability.

107

Accordingly, the court holds that Swalwell and the *Blassingame* Plaintiffs have stated a claim for common law assault based on an aiding-and-abetting theory of liability.

### 5.    *Negligence (*Swalwell *Count 9)*

The last of Swalwell's claims is negligence.  Swalwell alleges that "[i]n directing a crowd of thousands to march on the Capitol—particularly considering their violence-laden commands— the Defendants owed a duty of care to the Plaintiff and to everyone in the Capitol to exercise reasonable care in directing the mob's actions."  *Swalwell* Compl. ¶ 255.  He further contends that President Trump breached that duty by, among other things, urging rally-goers to "fight like hell." *Id.* ¶ 257.  Thus, under Swalwell's negligence claim, the President's lack of care with his words caused others to riot, resulting in his injuries.  Importantly, such a theory is analytically distinct from the theory that underlies Swalwell's § 1985(1) and aiding-and-abetting theories, which rest on the President's *intentional* use of words to encourage violence or lawlessness.  *See Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 916 (D.C. Cir. 2015) (observing that "intent and negligence are regarded as mutually exclusive grounds for liability" (alterations omitted) (quoting *District of Columbia v. Chinn*, 839 A.2d 701, 706 (D.C. 2003))).

When, as here, a plaintiff seeks to hold a defendant liable for negligence for injuries resulting from intervening criminal acts, "heightened foreseeability factors directly into the duty analysis because a defendant is only liable for the intervening criminal acts of another if the criminal act is so foreseeable that a duty arises to guard against it."  *Bd. of Trustees of Univ. of D.C. v. DiSalvo*, 974 A.2d 868, 871 (D.C. 2009) (internal quotation marks omitted).  The crux of heightened foreseeability is a showing of the defendant's "increased awareness of the danger of a *particular criminal act*."  *Id.* at 872 (emphasis added).  "It is not sufficient to establish a general possibility that the crime would occur, because . . . the mere possibility of crime is easily

108

envisioned and heightened foreseeability requires more precision." *Id.* at 872–73.  Such precision

involves, "if not awareness of the precise risk, close similarity in nature or temporal and spatial

proximity to the crime at issue." *Id.* at 874.  Thus, for example, in *DiSalvo*, the D.C. Court of

Appeals said that, to establish a duty, the plaintiff "had to establish that [the university] had an

increased awareness of the risk of a violent, armed assault in the parking garage." *Id.* at 872.

Similarly, in *Sigmund v. Starwood Urban Retail VI, LLC*, to establish a duty, the D.C. Circuit

demanded proof of similar crimes in a case in which the plaintiff was injured by a pipe bomb in

his building's garage.  617 F.3d 512, 516 (D.C. Cir. 2010).

Accordingly, to establish that President Trump had a duty to Swalwell to take care of the

words he used in the Rally Speech, Swalwell must plead facts establishing that the President had

an increased awareness of a risk of a violent assault at the Capitol.  Not surprisingly, he does not

meet this demanding standard.  He therefore cannot advance a theory of negligence liability based

on the theory that the President's lack of care in selecting his words caused his injuries.  His only

viable theory is to show that President Trump acted intentionally, which he has sufficiently

pleaded.

### 6.    *The* Blassingame *Plaintiffs' Additional "Claims"*

The *Blassingame* Plaintiffs advance three counts not asserted by Swalwell: (1) directing

assault and battery (Count 1); (2) punitive damages (Count 6); and (3) civil conspiracy (Count 8).

As to the first of these unique "claims," the court does not understand the difference, in this case,

between "directing" an assault and aiding and abetting one.  They seem one and the same.

Nevertheless, the court will not dismiss Count 1; Plaintiffs may be able to clarify and refine this

claim through discovery.  Count 6—punitive damages—is not a freestanding claim, but a type of

damages, so it is dismissed, without prejudice to seeking such damages, if liability is established

109

and if appropriate. And, Count 8—civil conspiracy—is "not independently actionable" under District of Columbia law; rather, it is a "means for establishing vicarious liability." *See Halberstam*, 705 F.2d at 479. Count 8 is therefore dismissed, without prejudice to seeking to use civil conspiracy as a theory of vicarious liability.

### G.    Brooks's Motion for Westfall Act Certification

At long last, the court arrives at the final matter before it: Brooks's request for certification under the Westfall Act. Under that Act, if the Attorney General certifies that a federal employee "was acting within the scope of his office or employment at the time of the incident out of which [a] claim arose," the employee shall be dismissed from the action and the United States substituted as the defendant. 28 U.S.C. § 2679(d)(1). Such certification and substitution do not, however, extend to an action brought against an employee for a "violation of a statute of the United States under which such action against an individual is otherwise authorized." *Id.* § 2679(b)(2)(B). In this matter, the Attorney General refused to certify that Brooks was acting within the scope of his office, i.e., in his legislative capacity, when he gave his speech at the January 6 Rally. U.S. Resp. to Brooks at 1. The congressman nevertheless asks the court to make the requisite certification as to Swalwell's tort claims. 28 U.S.C. § 2679(d)(3) (authorizing courts to certify a defendant-employee's acts as within the scope of office or employment).

The court need not grapple with this issue. A dispute over certification under the Westfall Act does not appear to be a question regarding the court's subject matter jurisdiction, so the court is not required to consider it before the merits. The court instead invites Brooks to file a motion to dismiss for failure to state a claim. The court is prepared to grant such motion for the same reasons it dismisses all claims against Giuliani and Trump Jr.: Brooks's remarks on January 6th were political speech protected by the First Amendment for which he cannot be subject to liability.

110

## IV.    CONCLUSION AND ORDER

For the foregoing reasons, the court holds as follows with respect to each of the three actions:

*Thompson v. Trump.* Giuliani's motion to dismiss is granted and the motions to dismiss of President Trump, the Oath Keepers, and Tarrio are denied.

*Swalwell v. Trump.* The motions to dismiss of Trump Jr. and Giuliani are granted as to all claims. The motion to dismiss as to President Trump is denied as to:

(1) the § 1985(1) claim (Count 1)

(2) the negligence per se claims (Counts 3 and 4)

(3) violation of the District of Columbia's anti-bias law (Count 5), and

(4) aiding and abetting assault (Count 8)

and granted as to:

(5) the § 1986 claim (Count 2)

(6) intentional infliction of emotional distress (Count 6)

(7) negligent infliction of emotional (Count 7) distress, and

(8) negligence (Count 9).

The court defers ruling on Brooks's Westfall Act certification petition and instead invites him to file a motion to dismiss, which the court will grant.

*Blassingame v. Trump*. President Trump's motion to dismiss is denied as to:

(1) the § 1985(1) claim (Count 7)

(2) directing/aiding and abetting assault (Counts 1 and 2)

(3) violations of public safety statutes (i.e, negligence per se) (Counts 4 and 5)

and granted as to:

111

(4) intentional infliction of emotional distress (Count 3)

(5) punitive damages (Count 6)

(6) civil conspiracy in violation of common law (Count 8).

Dated:  February 18, 2022

Amit P. Mehta
United States District Court Judge

112