## ORAL ARGUMENT NOT YET SCHEDULED
### No. 22-5069
### (Consolidated with 22-7030, 22-7031)

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

JAMES BLASSINGAME AND SIDNEY HEMBY,

*Appellees,*

v.

DONALD J. TRUMP,

*Appellant.*

———————————————

On Appeal from the United States District Court
for the District of Columbia

———————————————

## JOINT APPENDIX

———————————————

Jesse R. Binnall
Molly McCann
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com
molly@binnall.com

## COUNSEL FOR PRESIDENT DONALD J. TRUMP

# TABLE OF CONTENTS

*TABLE OF CONTENTS* ..................................................................... 2

*RELEVANT DOCKET ENTRIES FROM  THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA* ........................................... 3

*AMENDED COMPLAINT (Blassingame And Hemby v. Trump)* ............................. 20

*COMPLAINT (Swalwell v. Trump, et al.)* .............................................. 70

*AMENDED COMPLAINT (Thompson, et al., v. Trump, et al.)* ............................ 135

*OPINION AND ORDER* ................................................................. 202

*TRANSCRIPT OF PROCEEDINGS* ........................................................ 314

*NOTICE OF APPEAL (Blassingame And Hemby v. Trump)* ................................ 366

*NOTICE OF APPEAL (Swalwell v. Trump, et al.)* ...................................... 368

*NOTICE OF APPEAL (Thompson, et al., v. Trump, et al.)* ............................. 370

*CERTIFICATE OF SERVICE* ............................................................ 371

# RELEVANT DOCKET ENTRIES FROM
# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

*Blassingame And Hemby v. Trump,* Case No. 1:21-cv-858-APM

| Date Filed | # | Docket Text |
|---|---|---|
| 4/28/21 | 3 | AMENDED COMPLAINT against DONALD J. TRUMP with Jury Demand filed by JAMES BLASSINGAME, SIDNEY HEMBY. (Malone, Patrick) (Entered: 04/28/2021) |
| 6/24/21 | 10 | MOTION to Dismiss *for failure to state a claim*, MOTION to Dismiss for Lack of Jurisdiction by DONALD J. TRUMP. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order) (Binnall, Jesse) (Entered: 06/24/2021) |
| 7/8/21 | 14 | MOTION for Leave to File *Brief of Amici Curiae In Support of Plaintiffs* by Floyd Abrams, ERWIN CHEMERINSKY, MARTHA MINOW, LAURENCE H. TRIBE. (Attachments: # 1 Brief of Amici Curiae, # 2 Text of Proposed Order [Proposed] Order Granting Motion For Leave To File Brief of Amici Curiae) (Marais, Nicholas) (Entered: 07/08/2021) |
| 7/8/21 | 16 | MOTION for Leave to File *Amicus Brief* by Campaign Legal Center Action. (Attachments: # 1 Proposed Order, # 2 Proposed Amicus Brief, # 3 Appendix A, # 4 Appendix B) (Smith, Paul) (Entered: 07/08/2021) |
| 7/9/21 | | MINUTE ORDER granting 14 Motion for Leave to File Brief of Amici Curiae Floyd Abrams, Erwin Chemerinsky, Martha Minow, and Laurence H. Tribe in Support of Plaintiffs. |

Signed by Judge Amit P. Mehta on 7/9/2021. (lcapm3) (Entered: 07/09/2021)

7/9/21 | MINUTE ORDER granting 16 Motion for Leave to File Amicus Curiae Brief in Support of the Briefs in Opposition to Defendants' Motion to Dismiss by Campaign Legal Center Action. Signed by Judge Amit P. Mehta on 7/9/2021. (lcapm1) (Entered: 07/09/2021)

7/22/21 | 21 | Memorandum in opposition to re 10 MOTION to Dismiss *for failure to state a claim* MOTION to Dismiss for Lack of Jurisdiction *Plaintiffs' Opposition to Defendant's Motion to Dismiss* filed by JAMES BLASSINGAME, SIDNEY HEMBY. (Attachments: # 1 Text of Proposed Order Proposed Order) (Malone, Patrick) Modified docket event/text on 7/23/2021 (eg). (Entered: 07/22/2021)

7/29/21 | 25 | AMICUS BRIEF by EVAN H. CAMINKER, ANDREW KENT, SHELDON NAHMOD, DAPHNA RENAN, PETER M. SHANE. (eg) (Entered: 07/30/2021)

8/16/21 | 28 | REPLY to opposition to motion re 10 MOTION to Dismiss *for failure to state a claim* MOTION to Dismiss for Lack of Jurisdiction filed by DONALD J. TRUMP. (Binnall, Jesse) (Entered: 08/16/2021)

8/16/21 | 29 | AMICUS BRIEF by JARED HOLT. (eg) (Entered: 08/23/2021)

12/16/21 | NOTICE of Hearing: Oral Argument set for 1/10/2022 at 1:00 PM in Courtroom 10 before Judge Amit P. Mehta. Members of the public or media may also access this hearing by dialing the

|  |  | court's toll-free public access line: (877) 848-7030, access code 321-8747. (zjd)(Entered: 12/16/2021) |
|---|---|---|
| 1/4/22 |  | NOTICE of Hearing: The Oral Argument set for 1/10/2022 at 1:00 PM before Judge Amit P. Mehta will proceed via videoconference. The courtroom deputy will circulate connection information to counsel. Members of the public or media may access this hearing by dialing the court's toll-free public access line: (877) 848-7030, access code 321-8747. (zjd) (Entered: 01/04/2022) |
| 1/5/22 | 30 | ORDER establishing schedule for the oral argument for pending motions to dismiss on January 10, 2022. The time designations noted within are collective across all three cases (to the extent applicable), not per party per case. The court encourages each side, where appropriate, to designate a lead counsel on a particular topic. Please see attached Order for further details. Signed by Judge Amit P. Mehta on 01/05/2022. (lcapm3) (Main Document 52 replaced on 1/6/2022) (zjd). (Entered: 01/05/2022) |
| 1/10/22 |  | Minute Entry for proceedings held before Judge Amit P. Mehta: Oral Argument held via videoconference on 1/10/2022. Arguments heard and taken under advisement. (Court Reporter: William Zaremba) (zjd) (Entered: 01/10/2022) |
| 1/14/22 | 31 | NOTICE OF SUPPLEMENTAL AUTHORITY by JAMES BLASSINGAME, SIDNEY HEMBY (Malone, Patrick) (Entered: 01/14/2022) |
| 1/14/22 | 32 | NOTICE OF SUPPLEMENTAL AUTHORITY by JAMES BLASSINGAME, SIDNEY HEMBY (Malone, Patrick) (Entered: 01/14/2022) |

1/25/22    35    TRANSCRIPT OF ORAL ARGUMENT VIA ZOOM PROCEEDINGS before Judge Amit P. Mehta held on January 10, 2022; Page Numbers: 1-236. Date of Issuance: January 25, 2022. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form.
For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 2/15/2022. Redacted Transcript Deadline set for 2/25/2022. Release of Transcript Restriction set for 4/25/2022. (wz) (Entered: 01/25/2022)

2/18/22    37    MEMORANDUM OPINION AND ORDER granting in part and denying in part Defendant's 10 Motion to Dismiss. Please see attached Memorandum Opinion and Order for further

details. Signed by Judge Amit P. Mehta on 02/18/2022. (lcapm3) (Entered: 02/18/2022)

| | | |
|---|---|---|
| 3/18/22 | 39 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 37 Order on Motion to Dismiss, Order on Motion to Dismiss/Lack of Jurisdiction by DONALD J. TRUMP. Filing fee $ 505, receipt number CDCDC-9113388. Fee Status: Fee Paid. Parties have been notified. (Binnall, Jesse) (Entered: 03/18/2022) |
| 3/22/22 | | USCA Case Number 22-5069 for 39 Notice of Appeal to DC Circuit Court, filed by DONALD J. TRUMP. (zeg) (Entered: 03/23/2022) |
| 3/25/22 | | CLERK'S ORDER [1940608] FILED CONSOLIDATING CASES 22-7030, 22-7031 (CONSOLIDATION STARTED 03/25/2022) WITH 22-5069 [22-5069, 22-7030, 22-7031] [ENTERED: 03/25/2022 01:32 PM] |

*Swalwell v. Trump, et al.,* Case No. 1:21-cv-586-APM

| Date Filed | # | Docket Text |
|---|---|---|
| 3/5/21 | 1 | COMPLAINT against All Defendants with Jury Demand (Filing fee $ 402 receipt number ADCDC-8280044) filed by ERIC SWALWELL. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons) (Caleb, Joseph) (Entered: 03/05/2021) |
| 5/17/21 | 13 | MOTION to Dismiss *pursuant to FED. R. CIV. P. 12(b)(6)* by RUDOLPH W. GIULIANI. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order) (Sibley, Joseph) (Entered: 05/17/2021) |

| 5/24/21 | 14 | MOTION to Dismiss *for lack of jurisdiction and failure to state a claim* by DONALD J. TRUMP, JR, DONALD J. TRUMP. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order) (Binnall, Jesse) (Entered: 05/24/2021) |
| 7/8/21 | 22 | MOTION for Leave to File *Brief of Amici Curiae In Support of Plaintiffs* by Floyd Abrams, ERWIN CHEMERINSKY, MARTHA MINOW, LAURENCE H. TRIBE. (Attachments: # 1 Brief of Amici Curiae, # 2 Text of Proposed Order [Proposed] Order Granting Motion For Leave To File Brief of Amici Curiae)(Marais, Nicholas) (Entered: 07/08/2021) |
| 7/8/21 | 23 | Memorandum in opposition to re 14 MOTION to Dismiss *for lack of jurisdiction and failure to state a claim*, 13 MOTION to Dismiss *pursuant to FED. R. CIV. P. 12(b)(6)* filed by ERIC SWALWELL. (Andonian, Philip) (Entered: 07/08/2021) |
| 7/8/21 | 27 | MOTION for Leave to File *Amicus Brief* by Campaign Legal Center Action. (Attachments: # 1 Proposed Order, # 2 Proposed Amicus Brief, # 3 Appendix A, # 4 Appendix B)(Smith, Paul) (Entered: 07/08/2021) |
| 7/16/21 | 30 | AMICUS BRIEF by EVAN H. CAMINKER, ANDREW KENT, SHELDON NAHMOD, DAPHNA RENAN, PETER M. SHANE. (eg) (Entered: 07/16/2021) |
| 7/28/21 | 35 | MOTION for Leave to File *an Amicus Curiae Brief in Support of the Plaintiffs* by JARED HOLT. (Attachments: # 1 Proposed Amicus Curiae Brief, # 2 Text of Proposed Order) (Williams, Jonathan) (Entered: 07/28/2021) |

| | | |
|---|---|---|
| 7/28/21 | | MINUTE ORDER granting 22 Motion for Leave to File Brief of Amici Curiae In Support of Plaintiffs by Floyd Abrams, Erwin Chemerinsky, Martha Minow, and Laurence H. Tribe. Signed by Judge Amit P. Mehta on 7/28/2021. (lcapm3) (Entered: 07/28/2021) |
| 7/28/21 | | MINUTE ORDER granting 27 Motion for Leave to File Amicus Brief by Campaign Legal Center Action. Signed by Judge Amit P. Mehta on 7/28/2021. (lcapm3) (Entered: 07/28/2021) |
| 8/16/21 | 43 | REPLY to opposition to motion re 13 MOTION to Dismiss *pursuant to FED. R. CIV. P. 12(b)(6)* filed by RUDOLPH W. GIULIANI. (Sibley, Joseph) (Entered: 08/16/2021) |
| 8/16/21 | 44 | REPLY to opposition to motion re 14 MOTION to Dismiss *for lack of jurisdiction and failure to state a claim* filed by DONALD J. TRUMP, DONALD J. TRUMP, JR. (Binnall, Jesse) (Entered: 08/16/2021) |
| 12/16/21 | | NOTICE of Hearing: Oral Argument set for 1/10/2022 at 1:00 PM in Courtroom 10 before Judge Amit P. Mehta. Members of the public or media may also access this hearing by dialing the court's toll-free public access line: (877) 848-7030, access code 321-8747. (zjd) (Entered: 12/16/2021) |
| 1/3/22 | | NOTICE TO PARTIES. I provide this Notice so that the parties are aware of my prior professional relationships with counsel for Plaintiff Representative Eric Swalwell. From 2002 to 2005, I was employed as a trial lawyer at the Public Defender Service for the District of Columbia ("PDS"). Counsel Philip Andonian and |

Joseph Caleb also were trial lawyers at PDS during that time period. Additionally, from 2007 to 2014, I was counsel and then partner at Zuckerman Spaeder LLP. Counsel Matthew Kaiser was an associate at the firm from 2007 to 2009, as I understand it. Since leaving these places of work, I have maintained no more than a social relationship with Messrs. Andonian, Caleb, and Kaiser, largely, if not exclusively, through periodic professional events. I do not believe that these relationships are grounds for recusal but nevertheless provide this Notice in the interest of full disclosure. Signed by Judge Amit P. Mehta on 01/03/2022. (lcapm3) (Entered: 01/03/2022)

| | | |
|---|---|---|
| 1/4/22 | | NOTICE of Hearing: The Oral Argument set for 1/10/2022 at 1:00 PM before Judge Amit P. Mehta will proceed via videoconference. The courtroom deputy will circulate connection information to counsel. Members of the public or media may access this hearing by dialing the court's toll-free public access line: (877) 848-7030, access code 321-8747. (zjd) (Entered: 01/04/2022) |
| 1/10/22 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Oral Argument held via videoconference on 1/10/2022. Arguments heard and taken under advisement. (Court Reporter: William Zaremba) (zjd) (Entered: 01/10/2022) |
| 1/14/22 | 51 | NOTICE OF SUPPLEMENTAL AUTHORITY by ERIC SWALWELL (Andonian, Philip) (Entered: 01/14/2022) |
| 1/14/22 | 52 | NOTICE OF SUPPLEMENTAL AUTHORITY by ERIC SWALWELL (Andonian, Philip) (Entered: 01/14/2022) |

| | | |
|---|---|---|
| 1/25/22 | 55 | TRANSCRIPT OF ORAL ARGUMENT VIA ZOOM PROCEEDINGS before Judge Amit P. Mehta held on January 10, 2022; Page Numbers: 1-236. Date of Issuance: January 25, 2022. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form.<br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 2/15/2022. Redacted Transcript Deadline set for 2/25/2022. Release of Transcript Restriction set for 4/25/2022. (wz) (Entered: 01/25/2022) |
| 2/18/22 | 56 | MEMORANDUM OPINION AND ORDER (1) granting Defendant Giuliani's 13 Motion to Dismiss and (2) granting in part and denying in part Defendants President Trump & Trump Jr.'s 14 Motion to Dismiss. The court defers ruling on |

Defendant Rep. Mo Brooks's 20 Petition to Certify and invites him to file a motion to dismiss. Please see attached Memorandum Order and Opinion for further details. Signed by Judge Amit P. Mehta on 02/18/2022. (lcapm3) (Entered: 02/18/2022)

| | | |
|---|---|---|
| 3/18/22 | 60 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 56 Order on Motion to Dismiss,,,, Order on Motion for Miscellaneous Relief, by DONALD J. TRUMP. Filing fee $ 505, receipt number ADCDC-9113372. Fee Status: Fee Paid. Parties have been notified. (Binnall, Jesse) (Entered: 03/18/2022) |
| 3/25/22 | | USCA Case Number 22-7030 for 60 Notice of Appeal to DC Circuit Court, filed by DONALD J. TRUMP. (zjf) (Entered: 03/25/2022) |
| 3/25/22 | | CLERK'S ORDER [1940608] filed consolidating cases 22-7030, 22-7031 (Consolidation started 03/25/2022) with 22-5069 [22-5069, 22-7030, 22-7031] [Entered: 03/25/2022 01:32 PM] |

*Thompson, et. al. v. Trump, et al.,* Case No. 1:21-cv-400-APM

| Date Filed | # | Docket Text |
|---|---|---|
| 4/7/21 | 11 | MOTION for Leave to File *Amended Complaint* by BENNIE G. THOMPSON. (Attachments: # 1 Exhibit Amended Complaint, # 2 Text of Proposed Order) (Sellers, Joseph) (Entered: 04/07/2021) |
| 4/7/21 | | MINUTE ORDER granting Plaintiff's 11 Motion for Leave to File Amended Complaint. Federal Rule of Civil Procedure 15(a)(1)(B) permits a plaintiff to amend his pleading once as a matter of right up to 21 days after a defendant has |

served a responsive pleading or motion under
Rule 12(b), (e), or (f). No defendant has yet filed a
responsive pleading or motion. Accordingly,
Plaintiff timely seeks to amend his pleading as a
matter of right. The Amended Complaint
therefore will be the operative pleading in this
case. Defendants shall answer or otherwise
respond to the Amended Complaint by May 26,
2021. Signed by Judge Amit P. Mehta on
4/7/2021. (lcapm3) (Entered: 04/07/2021)

| | | |
|---|---|---|
| 5/26/21 | 20 | MOTION to Dismiss by OATH KEEPERS. (Morgan, Kerry) (Entered: 05/26/2021) |
| 5/26/21 | 21 | MOTION to Dismiss *pursuant to Fed. R. Civ. P. 12(b)(6)* by RUDOLPH W. GIULIANI. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order) (Sibley, Joseph) (Entered: 05/26/2021) |
| 5/26/21 | 22 | MOTION to Dismiss *for lack of jurisdiction and failure to state a claim* by DONALD J. TRUMP. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order) (Binnall, Jesse) (Entered: 05/26/2021) |
| 6/4/21 | 26 | RESPONSE re 22 MOTION to Dismiss *for lack of jurisdiction and failure to state a claim* filed by OATH KEEPERS. (Morgan, Kerry) (Entered: 06/04/2021) |
| 7/1/21 | 29 | Memorandum in opposition to re 21 MOTION to Dismiss *pursuant to Fed. R. Civ. P. 12(b)(6)*, 22 MOTION to Dismiss *for lack of jurisdiction and failure to state a claim*, 20 MOTION to Dismiss filed by KAREN R. BASS, STEPHEN I COHEN, BONNIE WATSON COLEMAN, VERONICA ESCOBAR, PRAMILA JAYAPAL, |

HENRY C. JOHNSON, MARCIA KAPTUR,
BARBARA J. LEE, JERROLD NADLER,
BENNIE G. THOMPSON, MAXINE WATERS.
(Attachments: # 1 Appendix, # 2 Appendix)
(Sellers, Joseph) (Entered: 07/01/2021)

7/8/21    30    MOTION for Leave to File *Amici Curiae Brief in
Support of Plaintiffs* by Evan H. Caminker,
Andrew Kent, Sheldon Nahmod, Daphna Renan,
PETER M. SHANE. (Attachments: # 1 Exhibit
Brief of Law Professors as Amici Curiae in
Support of Plaintiffs, # 2 Text of Proposed Order
Proposed Order) (Gorod, Brianne) (Entered:
07/08/2021)

7/8/21    31    MOTION for Leave to File *Brief of Amici Curiae
In Support of Plaintiffs* by Floyd Abrams,
ERWIN CHEMERINSKY, MARTHA MINOW,
LAURENCE H. TRIBE. (Attachments: # 1 Brief
of Amici Curiae, # 2 Text of Proposed Order
[Proposed] Order Granting Motion For Leave To
File Brief of Amici Curiae) (Marais, Nicholas)
(Entered: 07/08/2021)

7/8/21    34    MOTION for Leave to File *Amicus Brief* by
Campaign Legal Center Action. (Attachments: #
1 Proposed Order, # 2 Proposed Amicus Brief,
# 3 Appendix A, # 4 Appendix B) (Smith, Paul)
(Entered: 07/08/2021)

7/19/21    38    REPLY to opposition to motion re 20 MOTION to
Dismiss filed by OATH KEEPERS. (Morgan,
Kerry) (Entered: 07/19/2021)

7/28/21    40    MOTION for Leave to File *an Amicus Curiae
Brief in Support of the Plaintiffs* by JARED
HOLT. (Attachments: # 1 Proposed Amicus

Curiae Brief, # 2 Text of Proposed Order)
(Williams, Jonathan) (Entered: 07/28/2021)

7/28/21            MINUTE ORDER granting 30 Motion for Leave
                   to File Amici Curiae Brief in Support of
                   Plaintiffs. Signed by Judge Amit P. Mehta on
                   7/28/2021. (lcapm3) (Entered: 07/28/2021)

7/28/21            MINUTE ORDER granting 31 Motion for Leave
                   to File Brief of Amici Curiae In Support of
                   Plaintiffs. Signed by Judge Amit P. Mehta on
                   7/28/2021. (lcapm3) (Entered: 07/28/2021)

7/28/21            MINUTE ORDER granting 34 Motion for Leave
                   to File Amicus Brief by Campaign Legal Center
                   Action. Signed by Amit P. Mehta on 7/28/2021.
                   (lcapm3) (Entered: 07/28/2021)

8/16/21      42    REPLY to opposition to motion re 21 MOTION to
                   Dismiss *pursuant to Fed. R. Civ. P. 12(b)(6)* filed
                   by RUDOLPH W. GIULIANI. (Sibley, Joseph)
                   (Entered: 08/16/2021)

8/16/21      43    REPLY to opposition to motion re 22 MOTION to
                   Dismiss *for lack of jurisdiction and failure to
                   state a claim* filed by DONALD J. TRUMP.
                   (Binnall, Jesse) (Entered: 08/16/2021)

10/11/21           MINUTE ORDER granting Jared Holt's Motion
                   for Leave to File an Amicus Curiae Brief in
                   Support of the Plaintiffs. As no Defendant
                   opposes the motion, Mr. Holt's Motion is granted.
                   Signed by Judge Amit P. Mehta on 10/09/2021.
                   (lcapm3) (Entered: 10/11/2021)

12/16/21           NOTICE of Hearing: Oral Argument set for
                   1/10/2022 at 1:00 PM in Courtroom 10 before
                   Judge Amit P. Mehta. Members of the public or

media may also access this hearing by dialing the court's toll-free public access line: (877) 848-7030, access code 321-8747. (zjd) (Entered: 12/16/2021)

1/4/22          NOTICE of Hearing: The Oral Argument set for 1/10/2022 at 1:00 PM before Judge Amit P. Mehta will proceed via videoconference. The courtroom deputy will circulate connection information to counsel. Members of the public or media may access this hearing by dialing the court's toll-free public access line: (877) 848-7030, access code 321-8747. (zjd) (Entered: 01/04/2022)

1/10/22         Minute Entry for proceedings held before Judge Amit P. Mehta: Oral Argument held via videoconference on 1/10/2022. Arguments heard and taken under advisement. (Court Reporter: William Zaremba) (zjd) (Entered: 01/10/2022)

1/11/22    56   SUPPLEMENTAL MEMORANDUM to re 20 MOTION to Dismiss *demanding filing of complete documents embodying conversations and speech relied upon by the Amended Complaint to attempt to show a conspiracy that might include the OATH KEEPERS pursuant to FedREvidence 106 and McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184 (2nd Cir. 2007)* filed by OATH KEEPERS. (Attachments: # 1 Supplement Supplemental Exhibit of Documents (message posts and speech transcript) relied upon in the Amended Complaint to allege a conspiracy, # 2 Exhibit Transcript of Donald Trump's January 6, 2021, speech proving that there was no conspiracy offered, proposed, suggested or entered into involving the Oath Keepers) (Moseley, Jonathon) (Entered: 01/11/2022)

1/12/22    57    SUPPLEMENTAL MEMORANDUM to re 20
MOTION to Dismiss *demanding filing of
complete documents embodying conversations
and speech relied upon by the Amended
Complaint to attempt to show a conspiracy that
might include the OATH KEEPERS pursuant to
FedREvidence 106 and McCarthy v. Dun &
Bradstreet Corp., 482 F.3d 184 (2nd Cir. 2007) --
AMENDED* filed by OATH KEEPERS.
(Attachments: # 1 Supplement exhibit of
Documents (message posts and speech transcript)
relied upon in the Amended Complaint to allege a
conspiracy,, # 2 Exhibit Transcript of Donald
Trump's January 6, 2021, speech proving that
there was no conspiracy offered, proposed,
suggested or entered into involving the Oath
Keepers) (Moseley, Jonathon) (Entered:
01/12/2022)

1/14/22    59    NOTICE OF SUPPLEMENTAL AUTHORITY by
ALL Plaintiffs (Sellers, Joseph) (Entered:
01/14/2022)

1/25/22    63    TRANSCRIPT OF ORAL ARGUMENT VIA
ZOOM PROCEEDINGS before Judge Amit P.
Mehta held on January 10, 2022; Page Numbers:
1-236. Date of Issuance: January 25, 2022. Court
Reporter/Transcriber: William Zaremba;
Telephone number: (202) 354-3249. Transcripts
may be ordered by submitting the Transcript
Order Form.
For the first 90 days after this filing date, the
transcript may be viewed at the courthouse at a
public terminal or purchased from the court
reporter referenced above. After 90 days, the
transcript may be accessed via PACER. Other
transcript formats, (multi-page, condensed, PDF

or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:**
The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 2/15/2022. Redacted Transcript Deadline set for 2/25/2022. Release of Transcript Restriction set for 4/25/2022.(wz) (Entered: 01/25/2022)

| | | |
|---|---|---|
| 1/25/22 | 64 | NOTICE *OF INTENTION TO JOIN PENDING MOTIONS TO DISMISS* by ENRIQUE TARRIO re 21 MOTION to Dismiss *pursuant to Fed. R. Civ. P. 12(b)(6)*, 22 MOTION to Dismiss *for lack of jurisdiction and failure to state a claim* (Hull, John) (Entered: 01/25/2022) |
| 1/26/22 | | MINUTE ORDER. The court treats Defendant Enrique Tarrio as having joined in the motions filed at ECF Nos. 21 and 22, insofar as they are applicable to him. Signed by Judge Amit P. Mehta on 01/26/2022. (lcapm3) (Entered: 01/26/2022) |
| 2/18/22 | 66 | MEMORANDUM OPINION AND ORDER (1) denying Defendant Oath Keepers' 20 Motion to Dismiss; (2) granting Defendant Giuliani's 21 Motion to Dismiss; and (3) denying Defendant President Trump's 22 Motion to Dismiss. |

Further, with respect to Defendant Tarrio's 64 Notice of Intention to Join Motions to Dismiss, dismissal is also denied as to him. Please see attached Memorandum Opinion and Order for further details. Signed by Judge Amit P. Mehta on 02/18/2022. (lcapm3) Modified on 2/20/2022 (lcapm3). (Entered: 02/18/2022)

3/18/22    69    NOTICE OF APPEAL TO DC CIRCUIT COURT as to 66 Order on Motion to Dismiss,,,,,,,,, by DONALD J. TRUMP. Filing fee $ 505, receipt number ADCDC-9113347. Fee Status: Fee Paid. Parties have been notified. (Binnall, Jesse) (Entered: 03/18/2022)

3/25/22    USCA Case Number 22-7031 for 69 Notice of Appeal to DC Circuit Court filed by DONALD J. TRUMP. (zeg) (Entered: 03/25/2022)

3/25/22    CLERK'S ORDER [1940608] FILED CONSOLIDATING CASES 22-7030, 22-7031 (CONSOLIDATION STARTED 03/25/2022) WITH 22-5069 [22-5069, 22-7030, 22-7031] [ENTERED: 03/25/2022 01:32 PM]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **JAMES BLASSINGAME** | : | |
| and | : | |
| **SIDNEY HEMBY** | : | |
| Plaintiffs, | : | |
| v. | : | Case No.: 1:21-cv-858-APM |
|  | : | Judge Amit P. Mehta |
| **DONALD J. TRUMP** | : | |
| Defendant. | : | |

---

## <u>AMENDED COMPLAINT</u>

1. This is a complaint for damages by U.S. Capitol Police officers for physical and emotional injuries caused by Defendant Donald Trump's wrongful conduct inciting a riot on January 6, 2021, by his followers trying to overturn the results of the 2020 presidential election.

### I.     THE PARTIES

2. The Plaintiffs James Blassingame and Sidney Hemby are United States Capitol Police officers. They are both residents and citizens of Maryland. The Defendant Donald J. Trump was the 45th President of the United States, from January 20, 2017, to January 20, 2021. He is a resident and citizen of Florida.

### II.     JURISDICTION AND VENUE

3. This Court has jurisdiction under 28 U.S.C. § 1332(a)(1) because the parties are of diverse citizenship. The amount in controversy exceeds $75,000, not counting interest and costs.

4.      This Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims under
        42 U.S.C. § 1985(1).

5.      This Court has supplemental jurisdiction over Plaintiffs' non-federal law claims under 28
        U.S.C. § 1367.

6.      Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(2) because most
        of the events giving rise to the claims occurred in the District of Columbia.

### III.    FACTUAL BACKGROUND

#### A.    Introduction

7.      PFC James Blassingame is a 17-year veteran of the United States Capitol Police (USCP).
        PFC Sidney Hemby is an 11-year veteran of the USCP.

8.      Both United States Capitol Police Officers reported for duty on January 6, 2021, without
        any suspicion that they would soon become the targets of Trump's followers. Those
        followers had assembled in Washington at Trump's calling for a rally at the White House
        Ellipse that quickly evolved into a violent insurrection at the Capitol.

9.      The insurrectionists were spurred on by Trump's conduct over many months in getting
        his followers to believe his false allegation that he was about to be forced out of the
        White House because of massive election fraud by his presidential adversary Joe Biden,
        and that the convening of Congress on January 6 to count the Electoral College results
        and declare the winner was their last chance to "stop the steal."

10.     The insurrectionist mob, which Trump had inflamed, encouraged, incited, directed, and
        aided and abetted, forced its way over and past the Plaintiffs and their fellow officers,
        pursuing and attacking them inside and outside the United States Capitol, and causing the
        injuries complained of herein.

2

11.  As a result of Trump's speech on January 6th, 2021, his conduct and statements leading up to and on that date, and his refusal on that date to tell his followers to stop their continued violence at the Capitol, Trump engaged in unlawful conduct that resulted in injuries to United States Capitol Police officers and Metropolitan Police Department officers, including the Plaintiffs. These legal violations include:

- Directing Assault and Battery
- Aiding and Abetting Assault and Battery
- Directing Intentional Infliction of Emotional Distress
- Liability *Per Se* for Violation of D.C. Code § 22-1322 – Inciting to Riot
- Liability *Per Se* for Violation of D.C. Code § 22-1321 – Disorderly Conduct
- Conspiracy in Violation of 42 U.S.C. § 1985
- Civil Conspiracy

### B.    Trump's Conduct Leading Up To the 2020 Presidential Election

12.  During his 2016 campaign, and throughout his presidency, Trump had threatened violence towards his opponents, encouraged his followers to commit acts of violence, and condoned acts of violence by his followers, including white supremacists and far right-wing hate groups.

13.  Trump's stoking of violence by his followers accelerated during the 2020 presidential campaign. During the first presidential debate between candidates Trump and Biden, held on September 29, 2020, Trump repeatedly asserted, without evidence, that the election would be fraudulent and rigged:

- "There's fraud. They found them [ballots] in creeks. They found some, just happened to have the name Trump just the other day in a wastepaper basket . . . . This is going to be a fraud like you've never seen;"

- "It's a rigged election;"

- "This is not going to end well."

3

14.    Asked during that first presidential debate by moderator Chris Wallace to condemn white supremacists and far right-wing hate groups, Trump responded, "Proud Boys, stand back and stand by." Minutes later, the Chairman of the Proud Boys, Enrique Tarrio, posted a message on Parler, a social networking service popular among extremist groups, saying, "Standing by sir." The Proud Boys were then standing by on January 6, when they coordinated, instigated, and led many of the most pivotal actions of the rioters' rush into the Capitol Building. At a morning meeting before the Capitol was stormed, Proud Boy Daniel Scott aka Milkshake shouted, "Let's take the fucking Capitol."

15.    At the first presidential debate, Wallace asked if Trump—whom the Constitution excluded from any official role in the counting of ballots, the counting of electoral votes, or the certification of the election, but who had tremendous sway as a candidate over the conduct of his supporters—would urge his supporters to "stay calm" following the election, and "not to engage in any civil unrest." Trump responded, "If it's a fair election I am 100% on board. But if I see tens of thousands of ballots being manipulated, I can't go along with that." When Wallace then asked if that meant he was going to "tell your people to take to the streets," Trump did not directly respond, but said, "They [Democrats] cheat. They cheat. Hey, they found ballots in a wastepaper basket three days ago, and they all had the name military ballots. There were military. They all had the name Trump on them." Trump never provided any real evidence to support his claims that Democrats were throwing out ballots that had been cast for him.

16.    In the days leading up to the election, Trump repeated his assertion that his adversaries were "trying to steal" the election, which prepared his followers for more such baseless assertions once the election was over.

### C.     Trump Lost the 2020 Presidential Election and Immediately Stepped Up His False Claims of a Stolen Election

17.     On the night of the election, at 2:30 a.m. on November 4, in a small rally held at the

White House, Trump claimed that he had won the election, even though hundreds of

thousands of votes in key swing states were still being counted. As more votes were

counted, particularly from high-population areas, it became increasingly apparent that Joe

Biden had won the election. This prompted Trump to begin repeatedly tweeting that the

election was being stolen:



18.     These tweets and related statements, while taking advantage of Trump's platform as

President and his ability to incite his followers, were issued in Trump's personal capacity

as a candidate for elected office.

19.     On November 5, Trump made a statement, "If you count the legal votes, I easily win. If

you count the illegal votes, they can try to steal the election from us."

20.     On Saturday, November 7, every major news organization in the country called the
        election for Joe Biden after the count in Pennsylvania showed he held an insurmountable
        lead.

        **D.     Trump Called for a "Wild" Protest on January 6, 2021, and His
                Followers Took His Words as a Call to Arms**

21.     In the weeks following the election, as several states began recounts, Trump continued
        claiming that the election was being stolen, despite offering no evidence that was found
        meritorious by any of the dozens of courts that considered his and his allies' post-election
        lawsuits.

22.     Trump's claims of fraud immediately following the election led to his followers, often
        armed, descending on state capitols and other government buildings throughout the
        country. Between the election on November 3, 2020, and January 6, 2021, there were
        dozens of protests around the country by Trump's followers. Two of these events
        occurred in the nation's capital, and at both police officers were injured trying to restrain
        Trump's followers. Trump knew that both events had turned violent.

23.     Trump promoted a rally planned for November 14, 2020, in Washington, D.C.:

6



24.    On November 14, 2020, Trump followers gathered at Freedom Plaza in Washington,

D.C., a few blocks from the White House, in what would be called the first "Million

MAGA March" (though it was estimated that the crowd numbered in the tens of

thousands). These included members of far right-wing hate groups, including the Proud

Boys, Three Percenters, Oath Keepers, and followers of the QAnon conspiracy theory.

25.    November 14, 2020, Trump issued numerous tweets about the election being stolen,

while tweeting his support for the rally. He also pushed the idea that rallies like this one

might result in him "winning" the election:

7

 **Donald J. Trump** ✔
@realDonaldTrump

⋯

People are not going to stand for having this Election stolen from them by a privately owned Radical Left company, Dominion, and many other reasons!

⚠ This claim about election fraud is disputed



🌐 Dan Scavino🇺🇸🏔 ✔ @DanScavino · 2h

3:07 PM · Nov 14, 2020 · Twitter for iPhone

**40.7K** Retweets   **6.5K** Quote Tweets   **158.5K** Likes



26.     Later in the evening on November 14, violence erupted, as four police officers were injured and over twenty-one arrests were made, including destruction of property, carrying a pistol without a license, inciting violence, and disorderly conduct.

27.     On December 12, 2020, Trump followers again gathered in Washington, D.C., for a second "Million MAGA March," (though again, the actual number of Trump followers who attended was in the thousands). Again, Trump supported the rally, tweeting on the morning of December 12, "WE HAVE JUST BEGUN TO FIGHT!!!"

28.     As before, members of far right-wing hate groups appeared at the second "Million MAGA March," and Trump followers clashed with D.C. police, at least eight of whom were injured. Four people were stabbed. The police made over thirty arrests including ten arrests for assault on a police officer, eleven arrests for simple assault, one arrest for assault with a deadly weapon, and two arrests for possession of a prohibited weapon.

29.     Officials warned Trump that his incendiary rhetoric about the election could cause injury or death, but he persisted. On December 1, 2020, as Trump placed increasing pressure on Georgia election officials to overturn the state's results which favored Joe Biden, one official, Gabriel Sterling, gave a press conference in which he reported on death threats made to Georgia election workers, and addressed Trump, saying, "Mr. President, you have not condemned these actions . . . . This has to stop . . . . Stop inspiring people to commit potential acts of violence. Someone is going to get shot, someone is going to get killed. And it's not right." Despite this, Trump never condemned the threats made against Georgia election officials, and four days before the January 6 insurrection, he implored Georgia Secretary of State Brad Raffensperger during a phone call to throw out enough lawfully cast votes to swing the election in his favor.

30.     As his efforts with state officials and in the courts failed, Trump began to focus on January 6, 2021, the date Congress was set to count the state-certified election results.

31.     On December 15, 2020, the Trump campaign made payments to Event Strategies Inc., the firm that would be named as the production vendor on the permit application for the January 6 rally on the Ellipse.

32.     On December 19, 2020, Trump began promoting a January 6 rally to his followers:



33.    Trump's December 19th tweet about the January 6th rally was understood by many of his

supporters as a literal call to arms. For example, within minutes of Trump posting this

tweet, it was shared on a pro-Trump website called TheDonald.win, with the title:

"Trump Tweet. Daddy Says Be in DC on Jan 6." One user "EvilGuy," said, in response

to Trump's call to action, "I will be open carrying and so will my friends. We have been

11

waiting for Trump to say the word. There is [sic] not enough cops in DC to stop what is coming."



34.     Other users on TheDonald.win commented that they understood Trump's tweet to be "marching orders." One user said, "doesn't matter if they steal the election, if patriots burst into the building by the thousands and cut the heads off the hydra." Another said, "Storm the People's House and retake from the fuckin' commies."  A user called "loveshock" wrote:

> – **loveshock** 3 points 1 hour ago +7 / -4
>
> Cops don't have "standing" if they are laying on the ground in a pool of their own blood.

35.    Law enforcement investigations have uncovered communications from Kelly Meggs, the

self-described leader of the Florida chapter of the Oath Keepers, revealing that within

days, supporters—based on Defendant Trump's call that the rally will be wild—began

plotting traveling to Washington D.C. "to insurrection." Contemporaneous

communications from Meggs indicated he knew the January 6 event would be no mere

"rally," and that the Proud Boys, Oath Keepers, and other militia members were

discussing how to, as described by Meggs, "work together and shut this shit down."

36.    In the week before January 6, Trump repeatedly encouraged his followers to attend the

event and continually referred to "Stop the Steal."



37.    Law enforcement investigations have uncovered location, cellular, and call record data

indicating that in the days just before the January 6 insurrection, a member of the Proud

Boys was in communication with a person associated with the White House.

38.    The day before the January 6 session of Congress, Trump gave his followers further

motivation to "be wild" at the rally, as he promoted the baseless idea that Vice President

13

Mike Pence could single-handedly reject the election outcome based on false claims that some states wanted to "decertify" or "correct" election results that were not in Trump's favor.

> **Donald J. Trump**
> @realDonaldTrump
>
> The Vice President has the power to reject fraudulently chosen electors.
>
> 4:06 PM · Jan 5, 2021
>
> See Donald J. Trump's other Tweets

> **Donald J. Trump**
> @realDonaldTrump
>
> If Vice President @Mike_Pence comes through for us, we will win the Presidency. Many States want to decertify the mistake they made in certifying incorrect & even fraudulent numbers in a process NOT approved by their State Legislatures (which it must be). Mike can send it back!
>
> **This claim about election fraud is disputed**
>
> 6:00 AM · Jan 6, 2021
>
> 269.3K 142.1K people are Tweeting about this







39.     Trump's 2020 campaign, along with its joint fundraising committees, made more than
        $3.5 million in direct payments to people and firms involved in the Washington, D.C.
        demonstrations on January 6.

40.     Trump's continued campaign to incite his followers to violently overturn the results of
        the election reflected the fact that under the U.S. Constitution, the President's official
        responsibilities do not include determining the outcome of a presidential election. All his
        conduct inciting his followers was conducted in his personal capacity as a candidate for
        elected office, not in any official capacity as President.

41.     The Constitution prescribes that the selection of electors shall be determined by "each
        state." U.S. Const. art. II, sec. 1, cl. 2. The Constitution prescribes no role for the sitting
        president in their selection.

42.     The selection of the next president is made by the electors when they "meet in their
        respective states and vote by ballot for President and Vice-President." U.S. Const.,

15

amend. XII. The Constitution prescribes no role for the sitting president in determining the outcome of that vote.

43.    The Framers were so committed to excluding the sitting president from a role in the selection of the next president that they prohibited electors from holding an Office of Trust or Profit under the United States, U.S. Const. art. II, sec. 1, cl. 2, lest those electors otherwise "be suspected of too great devotion to the President in office." The Federalist No. 68 (Alexander Hamilton).

44.    The Constitution prescribes that the counting of the votes that are cast and certified by the Electors in their respective states shall be conducted by the President of the Senate in the presence of the Senate and House of Representatives. The Constitution prescribes no role for the sitting president in determining the outcome of that count either.

### E.    January 6, 2021

45.    On January 6, 2021, thousands of Trump's followers congregated on the National Mall near the White House. Many were armed members of far right-wing hate organizations like the Proud Boys. Trump issued a directive for Republicans to "FIGHT" early in the day:

16



46.     United States Capitol Police Officer PFC James Blassingame reported to work at 5:30

        a.m., but on the way to the Capitol, he could see that this was different from the many

        protests he had seen at the Capitol over his years in service.

47.     At 5:15 a.m., he could see large numbers of people walking up D Street, carrying flags

        bearing symbols and slogans including "MAGA" slogans, "Trump 2020," and "Don't

        Tread on Me."

48.     Ordinarily, US Capitol Police shifts began with "roll call," to disseminate information

        from the command staff. On January 6, 2021, Officer Blassingame's shift omitted "roll

        call."

49.     Instead, he was sent to staff the steps on Neptune Plaza, at the Library of Congress's

        Jefferson Building, across the street from the East Front of the Capitol.

50.     By 7 a.m., Officer Blassingame could see that a large group of people was amassing on

        the plaza, directly in front of the East Front of the United States Capitol.

17

51.     He said to his USCP colleague: "This isn't going to be what they think it's going to be."
Throughout the morning, Officer Blassingame was on "outside patrol" on the east side of
First Street S.E., across from the Capitol building.

52.     Officer Hemby was assigned to the Civil Disturbance Unit, which was also unusual.
There were no briefings about what he and his fellow officers should expect.

53.     The day immediately felt to Officer Hemby like it would be out of the norm, because of
the number of people assembling.

54.     He was sent to his post in front of the Rotunda Steps on the East Front of the Capitol,
behind bicycle racks set up to maintain a perimeter around the building. He was
instructed only to make sure he and the other officers should "space out," because they
did not have enough coverage.

55.     Officer Hemby was used to seeing the plaza on the East Front of the Capitol wide open
and mostly empty. The presence of small numbers of protestors was not a big concern or
unusual, but this day, their number and aggressiveness were unprecedented in his
experience.

56.     On January 6, a stage had been set up by the protesters, and the gathering crowd was
shouting, singing, praying, swearing, and yelling. Among the more common chants he
heard were "Stop the Steal," and "Fight for Trump."

57.     Someone had set up speakers, from which Officer Hemby could hear Trump's speeches
from prior dates being broadcast.

58.     Beginning at 7 a.m., speakers took to the stage at the Ellipse, just south of the White
House, where thousands of protesters had gathered to listen. The rally was broadcast live
on several news outlets, and could be watched streaming over the internet, and could

therefore be watched by those protesters who were not on the Ellipse itself, including those already near the Capitol. Numerous Trump allies spoke before Trump took the stage, all of whom repeated the message that the election had been stolen, that the country as they knew it was about to fall, and that it was up to the crowd to save the country, in the words of Trump's personal attorney Rudy Giuliani, in a "trial by combat."

59.    The rally at the ellipse was a private event, organized in part by Trump's former campaign staff. As the *Wall Street Journal* reported, the event was "arranged and funded by a small group including a top Trump campaign fundraiser and donor facilitated by far-right show host Alex Jones."

60.    Trump took the stage at noon on January 6, 2021. In an hour and fifteen-minute speech, Trump repeatedly claimed that the election had been "rigged" and "stolen," and said:

- "They rigged it like they've never rigged an election before;"

- "We will never concede, it doesn't happen. You don't concede when there's theft involved. Our country has had enough. We will not take it anymore and that's what this is all about. To use a favorite term that all of you people really came up with, we will stop the steal;"

- "When you catch somebody in a fraud, you're allowed to go by very different rules;"

- "You'll never take back our country with weakness. You have to show strength, and you have to be strong;"

- "And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore;"

- "And we're going to the Capitol . . . . But we're going to try and give our Republicans, the weak ones because the strong ones don't need any of our help. We're going to try and give them the kind of pride and boldness that they need to take back our country."

61.    As he was making these remarks, Trump's followers on the Ellipse began chanting "Fight like Hell," and "Fight for Trump." After he was done speaking, they changed to, "Storm the Capitol," "Invade the Capitol Building," and "Take the Capitol right now."

62.    At the Capitol, Officers Blassingame and Hemby watched the crowd swell on the east
       side of the Capitol.

63.    While Trump was speaking, at 12:49 p.m., Capitol Police responded to a report of a
       possible explosive device at the Republican National Committee Headquarters, which
       was later identified as a pipe bomb. Shortly afterward, a second pipe bomb was found at
       the headquarters of the Democratic National Committee. Both were three blocks from the
       Capitol.

64.    Both Officers Blassingame and Hemby heard the "10-100" radio call for the suspicious
       packages at the Republican and Democratic National Headquarters.

65.    As Trump concluded his speech near the White House, his followers who were already at
       the Capitol became insurrectionists. Thousands of them broke through police barricades
       and stormed up the steps of the Capitol on both fronts of the building, attacking and
       injuring police officers, including the Plaintiffs. The insurrectionists finally entered the
       Capitol itself, intent on committing further acts of violence against elected officials,
       where the insurrectionists continued to attack police officers. Many of these
       insurrectionists have since been charged with crimes.

66.    Some of these protesters broke through the outer perimeter of barricades west of the
       Capitol building while Trump was still speaking, at 12:53 p.m. By 1:03 p.m., they had
       pushed Capitol Police onto the west Capitol steps. Many of them wore Trump hats and
       shirts, waved Trump flags, and bore Trump insignia around their necks. As the
       insurrectionists began battling with police, one was overheard saying, "It's us versus the
       cops!" A man yelled at police through a megaphone plastered with stickers from

20

"InfoWars," a website operated by the right-wing conspiracy theorist Alex Jones, "You are traitors to the country!"

67.   At 1:00 p.m., Capitol Police Chief Steven Sund called for backup from the Metropolitan Police Department, which deployed approximately 100 officers to the Capitol grounds within minutes. Shortly thereafter, Chief Sund asked House Sergeant at Arms Paul Irving and Senate Sergeant at Arms Michael Stenger to declare an emergency and call for the deployment of the National Guard. Shortly after that, Officer Hemby could hear on his radio that crowds on the West Front of the Capitol were trying to push through the bike rack barriers and the officers posted there.

68.   The crowd on the East Front was growing throughout the 1 o'clock hour. Officer Hemby and other officers were spaced out along the line of bike racks, responding to protesters' periodic attempts to push through the bike racks.

69.   By 1:30 p.m., on the West Front of the Capitol, Capitol Police officers were forced by insurrectionists to the top of the Capitol steps. Meantime, Trump's speech had ended, and many more thousands of protesters began marching toward the Capitol. About forty percent of the phones tracked near the rally stage on the National Mall during the speeches were found in and around the Capitol during the insurrection, showing that many of those who were listening to Trump's speech followed his direction to march on the Capitol.

70.   At around 1:45 p.m., the insurrectionists overcame the Capitol Police officers protecting the Capitol's west steps, and the officers pulled back into the Capitol itself.

21

JA - 40

71.    Officer Blassingame had been called to the Capitol from his post across the plaza on the East Front and was inside the Capitol building when he heard on his radio that the West Front steps had been overtaken by the insurrectionists.

72.    Officer Blassingame looked out the west doors and was shocked to see that four of his colleagues were pinned to the doors by a large and surging crowd of aggressive people dressed in Trump and MAGA gear and hats and carrying large Trump campaign flags.

73.    Officer Hemby heard in real time on his radio when the officers on the West Front were overcome, and immediately after, just before 2 p.m., the crowd began to swell and surge on the East Front.

74.    Officer Hemby believed that more officers would come to help, but because the West Front had already been breached and officers were being attacked on that side of the Capitol, no one else was available.

75.    Officer Hemby looked to his left and saw that the crowd had broken through the barriers. A tidal wave of insurrectionists attacked the plaza steps, and due to the size and aggressiveness of the crowd, Officer Hemby and his colleagues were quickly outnumbered.

76.    As people dressed in Trump gear and carrying large Trump flags stormed through the barriers, Officer Hemby knew he and the other officers would be unable to hold them against the relentless pushing and shoving.

77.    Officer Hemby ran to the East Front stairs to try to stop the crowd, but it was too late, and the crowd was too large and aggressive.

78.    The crowd chased him and his fellow officers to the top of the stairs and forced them against the doors.

79.   At 1:49 p.m.,[1] after Trump had returned to the White House, and was reportedly watching

on TV as events were unfolding at the Capitol, he tweeted out the entirety of his speech:



80.   At 1:59 p.m., insurrectionists pushed Capitol Police to the top of the east Capitol steps,

and by 2:10 p.m., insurrectionists began attempting to break into the building through

windows on the west side.

81.   The Proud Boys made up a large portion of the first wave of insurrectionists to breach the

Capitol and assault Capitol Police. Proud Boys also took deliberate steps to prevent the

Capitol Police from securing the Capitol against unlawful entrants. And Proud Boy

Dominic Pezzola, who was one of the first rioters to gain entrance into the Capitol after

---

[1] On January 8, 2021, Twitter permanently suspended Donald Trump's personal account, removing his tweets from view. Publicly available archives of Trump's tweets are limited and as a result, some of the images of Trump's tweets used in this Complaint, such as the one in this paragraph, feature timestamps from other than the Eastern Time Zone.

he used a Capitol Police shield to break a window, stated on a video subsequently posted to social media: "Victory smoke in the Capitol, boys. This is fucking awesome. I knew we could take this motherfucker over [if we] just tried hard enough."

82.  An FBI Special Agent later submitted an affidavit in support of a criminal complaint against Pezzola stating that Pezzola was part of a group that "said that anyone they got their hands on they would have killed, including Nancy Pelosi," and that they "would have killed [Vice President] Mike Pence if given the chance."[2]

83.  Officer Hemby was crushed against the doors on the east side trying to hold the insurrectionists back. Over and over, he tried to tell the insurrectionists that the doors opened outward and that pressing him into the door would do no good.

84.  But the insurrectionists continued to scream, "Fight for Trump," "Stop the Steal," and various other slogans, as they struck him with their fists and whatever they had in their hands. Things were being thrown at him, and he was sprayed with chemicals that irritated his eyes, skin, and throat.

85.  Some of the mob wore military-style tactical gear. One man had gloves with hard knuckles. One attacker dropped a knife, which a fellow officer kicked behind the officers and out of the insurrectionist's reach.

86.  One insurrectionist screamed in Officer Hemby's face that he was "disrespecting the badge," and that the officers were "not patriots."

87.  Eventually, the insurrectionists did get inside the Capitol from the East Front. For hours, as the grounds were cleared of Defendant's followers, Officer Hemby continued to man his post at the top of the Rotunda steps outside the East Front of the Capitol. The

---

[2] (Brackets in original).

24

insurrectionists were demanding that Officer Hemby and his fellow officers get out of the

way so the mob could get to the Congress members. They were trying to convince

officers to join their side and fight against Congress. Officer Hemby and his fellow

officers stood their ground.

88.   Officer Hemby was attacked relentlessly. He was bleeding from a cut located less than an

inch from his eye. He had cuts and abrasions on his face and hands and his body was

pinned against a large metal door, fending off attacks.

89.   His primary focus was to survive and simply get home.

90.   By 2:12 p.m., the insurrectionists entered the building through broken windows on both

sides of the Capitol, opening up a door for additional insurrectionists to enter.

91.   Some of those who entered had guns. Some were in helmets and tactical gear. Many

carried baseball bats, Trump flags, hockey sticks, fire extinguishers, stolen police shields,

collapsible batons, and other weapons.

92.   Shortly thereafter, Vice President Pence was removed from the Senate chamber and the

Senate was called into recess. Capitol Police confronted the insurrectionists but were

greatly outnumbered. Outside the Capitol, the mob shouted, "Hang Mike Pence!" and had

erected a gallows.

93.   Inside the Capitol, the insurrectionists continued to physically attack Capitol Police,

while taunting them, saying, among other things, "You're outnumbered. There's a

fucking million of us out there. And we are listening to Trump—your boss," "We can

take you out," and, "We were invited here by the President of the United States."

94.   As Officers James Blassingame and Sidney Hemby attempted to protect themselves from

the insurrectionists, Trump watched the events unfold on live television. Those who were

with him claimed that Trump was "delighted" and was "confused about why other people
on his team weren't as excited as he was." Others described Trump as "borderline
enthusiastic" about the unfolding violence.

95.    Officer Blassingame and the small group of officers with him inside the Capitol were
powerless to help the officers he could see on the other side of the doors, pinned to the
West Front of the Capitol building.

96.    Officer Blassingame heard the call: "They're coming through the windows!" and ran to
the stairs to the Crypt area on the first floor, directly below the Rotunda.

97.    Inside the Crypt with a small group of USCP officers, Officer Blassingame looked north
and saw a sea of people running toward him.

98.    The hallway to the north of the Crypt was a choking point, and as the crowd entered the
Crypt, it quickly filled with insurrectionists.

99.    Officer Blassingame was one of just eight or nine officers facing the insurrectionists
charging into the Crypt. The USCP officers tried to form a line against the
insurrectionists but were dramatically outnumbered and overwhelmed as they became the
targets of the mob's attack.

100.    The insurrectionists were enraged and inflamed – chanting and shouting "Stop the Steal!"
"We're patriots!" "It's our right!" and "Our House!"

101.    The insurrectionists were throwing items, and striking Officer Blassingame and the other
USCP officers with their fists and weapons.

102.    Among the weapons Officer Blassingame could see were flagpoles like those he had seen
on D Street early in the morning; water bottles; bottles of other unknown liquids; parts of

26

signs they were ripping from the walls of the Crypt and hallway; and flags, flagpoles, and rope-line posts that had been taken from the Crypt and other parts of the Capitol building.

103.   The insurrectionists were clad in and carrying Trump, QAnon, Proud Boys, and Oath Keepers-themed clothing, hats, and flags. Law enforcement investigations have since revealed that Jessica Marie Watkins, a member of the Oath Keepers, stated on an Oath Keeper communication channel during the insurrection that "We have a good group . . . . We are sticking together and sticking to the plan."

104.   Foremost in Officer Blassingame's mind was the terrifying certainty that the insurrectionists were interested in him and the other officers not going home to their families that night.

105.   The front line of insurrectionists was being pressed from behind by waves of newly arriving insurrectionists.

106.   Then a forceful surge of insurrectionists pushed forward and slammed Officer Blassingame against a stone column. He struck his spine and the back of his head and was unable to move.

107.   For the first time in his life, people were yelling into his face, calling him a "nigger" repeatedly and throughout the attack in the Crypt. He lost count of the many times the racial slur was hurled at him.

108.   Insurrectionists threatened him they would "fuck you up if you don't get out of our way," and to "get down or I'll put you down."

109.   The insurrectionists struck Officer Blassingame in his face, head, chest, arms, and what felt like every part of his body. Insurrectionists used their fists and had weapons that

ranged from flagpoles to stanchions and building directional signs, water bottles and other objects he could not identify.

110.   The threats and attacks on Officer Blassingame seemed endless.

111.   Officer Blassingame's sole focus was to do what he could to survive.

112.   Eventually, he was able to unpin himself from the column and move toward the South hallway, where he thought there might be more officers. As he moved through the hallway, he tried to bring other officers with him.

113.   Once free from the insurrectionist mob, Officer Blassingame went toward Representative Steve Scalise's office in the Capitol to assist the evacuation of members, which was being staged in the Ways and Means Committee meeting room.

114.   In a phone call to the White House, House Minority Leader Kevin McCarthy begged Trump to call off the insurrectionists, pleading with him that the rioters were all Trump followers. Trump refused to do so, and told McCarthy, "Well, Kevin, I guess these people are more upset about the election than you are."

115.   Sen. Ben Sasse has stated that White House officials reported that Defendant Trump was "delighted" to hear of the Capitol break-in and further that he was excited that rioters were "pushing against Capitol Police trying to get into the building."

116.   As Trump watched his followers (to whom he had lied when he told them that he would be joining them in walking to the Capitol) terrorize the Capitol and attack the police who guarded it, Trump's advisors urged him to make a statement calling on his followers to stop. Trump chose not to condemn the attack. Instead, at 2:24 p.m., Trump tweeted, and further incited his followers against his own Vice President whose life was being threatened:



117.    An insurrectionist at the Capitol read this tweet aloud from the steps of the Capitol.

Insurrectionists then chanted, "Mike Pence is a traitor," and continued their assault.

118.    Then, at 2:38 p.m., an hour after the first breach, Trump still chose not to call off the

attack, but instead issued a banal statement of support for law enforcement, and stated,

"stay peaceful" when he could see that his followers at the Capitol were anything but.



119. At around 2:44 p.m., Ashli Babbitt, an Air Force veteran and Trump follower, was shot and killed as she attempted to climb through a broken window in a set of locked doors that led to where House members were fleeing.

120. Officer Blassingame was at the Ways and Means room and heard that gunshot upstairs. At the time, he did not have any idea who had been shot or had done the shooting. He did not know whether it was a singular event or the beginning of something even more dangerous than he had already faced.

121. His reflexive reaction to the gunshot sent him further into "survival mode." He rapidly assessed whether it would be necessary to draw guns. But even in the face of that reflex, he continued to help protect members of Congress who were sheltering in the Ways and Means room.

122. He remained locked down in the Ways and Means room with members for hours, in a scenario that presented a different threat to his health and safety. Officer Blassingame was acutely aware that many in the Ways and Means room were neither masked nor socially distanced from Covid-19 transmission. He had no option but to remain in place.

123. By 3:00 p.m., the District of Columbia local government issued a notice of an emergency citywide curfew to begin at 6 p.m.

124. Meanwhile, Trump's followers at the Capitol shouted, "We want Trump!" They attacked officers with rocks, bottles, fire extinguishers, metal poles, bear spray, and pepper spray. Officers reported being "flanked" and "los[ing] the line." For hours, officers were forced into hand-to-hand combat to prevent more rioters from entering the Capitol.

125. At 4:17 p.m., Trump tweeted a recorded video directed to his followers as they continued to ransack the Capitol. In the video, Trump told the insurrectionists, "I know your pain, I

know you're hurt," and repeated his "big lie" about the stolen election that had driven the

insurrectionists to the Capitol in the first place. He then said to his followers who had

invaded the Capitol, assaulted and severely injured police officers, destroyed property,

and generally tried to overthrow the Congress as it carried out its duty of certifying a

presidential election: "Go home. We love you. You're very special."

126.   At around 5:40 p.m., Capitol Police, with reinforcements from the Metropolitan Police

and the National Guard, finally were able to begin to clear the Capitol. By that time, 140

police officers were physically hurt, and many more would be emotionally scarred. One

Capitol police officer suffered a fatal stroke linked to the events of January 6 and two

others took their own lives shortly thereafter.

127.   After the world had just watched the insurrectionists attack police, threaten members of

Congress, and destroy property within the Capitol, Trump explained the day's events,

once again reiterating his "big lie" and celebrating his followers' actions:



**Donald J. Trump** ✔
@realDonaldTrump

These are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long. Go home with love & in peace. Remember this day forever!

ⓘ This claim of election fraud is disputed, and this Tweet can't be replied to, Retweeted, or liked due to a risk of violence

6:01 PM · Jan 6, 2021 · Twitter for iPhone

128.   At approximately 7 p.m., Trump's agent Rudolph Giuliani attempted to leave a voicemail for Sen. Tuberville (but then left the voicemail in another Senator's voicemail box, who then subsequently released the messaged to the press) requesting that Sen. Tuberville "try to just slow [the congressional vote] down . . . so that we can get ourselves into tomorrow."

129.   At about 7:30 p.m., Officer Blassingame was finally able to leave the Ways and Means room.

130.   As he walked through the halls of the Capitol, the aerosol chemicals from the bear spray, pepper spray, and tear gas burned his eyes and throat. It was so strong, that even hours after he left the Capitol, he could taste it in his mouth.

131.   Throughout the dangerous and chaotic day, his family could see some of what was happening to Officer Blassingame in real time, but he was unable to communicate to comfort and reassure his wife and family in real time.

132.   It was not clear to him on January 6 that he would survive to make it home.

133.   He did finally get home at midnight, but only to return for a 7 a.m. shift the next morning, which would be the beginning of a month of twelve- to sixteen-hour shifts.

134.   Officer Blassingame suffered injuries to his head and back. He continues to have pain in his back, and the severe emotional toll the January 6 insurrection has taken on Officer Blassingame continues to reveal itself.

135.   He is haunted by the memory of being attacked, and of the sensory impacts—the sights, sounds, smells and even tastes of the attack remain close to the surface. He experiences guilt of being unable to help his colleagues who were simultaneously being attacked; and of surviving where other colleagues did not.

136. The weight on Officer Blassingame has been heavy and pervasive. He was not able to sleep and he could not talk about what happened, even with his wife and friends.

137. He suffered from depression that he could not address because he was too consumed with a sense of obligation to continue on with his professional responsibilities. Because the attack happened in the place to which he reports daily, he is unable to avoid most of the triggers of his emotional reactions.

138. Officer Hemby remained on the East Front of the Capitol until the complex was cleared of insurrectionists.

139. He was unable to seek medical assistance until after 9 p.m.

140. At first, Officer Hemby did not fully appreciate how physically and mentally exhausted he was.

141. When he got home on the night of January 6, 2021, he was in a heightened emotional state and unable to sleep. He relived the moments he was under attack. He felt unsafe and each time he drifted off to sleep, he was awakened by the fear that people were trying to break into his home.

142. As a result of the attack, Officer Hemby's left hand and left knee became swollen and painful. He was sprayed in the face and body with chemical sprays. His back and neck ached, and his skin burned.

143. Officer Hemby is under the care or an orthopedic medical specialist and receives physical therapy two to three days per week for his neck and back.

144. He continues to sleep poorly and feels hyper-aware and on high alert during his waking hours.

145.   Officer Hemby normally has a calm demeanor but has struggled to manage the emotional

fallout from being relentlessly attacked. He has spoken with Employee Assistance

Program counselors to talk about managing the emotional impact of being targeted and

dealing with the level of aggression to which he was subjected.

146.   But for the fact that so many of his fellow officers were also injured and unable to report

for duty, Officer Hemby would have used leave to recover from his injuries.

### F.      Lawmakers in the Capitol Recognized Trump as the Instigator of the Attack

147.   In the aftermath of the January 6 insurrection, leaders within Trump's own party publicly

said that Trump's "big lie" about the election and his provocation of his followers caused

the January 6 insurrection.

a.      In a February 18, 2021 statement, Sen.  Mitt Romney (R-Utah) said, "I hear many

calls for unity. It is apparent that calling for unity while at the same time

appeasing the big lie of a stolen election is a fraud. It is the lie that caused the

division. It is in the service of that lie that a mob invaded the Capitol on January

6th."

b.      On January 12, 2021, Liz Cheney (R-Wyo.), the third highest ranking Republican

in the House of Representatives, said, "The President of the United States

summoned this mob, assembled the mob, and lit the flame of this attack.

Everything that followed was his doing. None of this would have happened

without the President. The President could have immediately and forcefully

intervened to stop the violence. He did not. There has never been a greater

betrayal by a President of the United States of his office and his oath to the

Constitution."

34

c.    On Feb. 13, 2021, Senator Mitch McConnell (R-Ky.) said:

There's no question, none, that President Trump is practically and morally responsible for provoking the events of the day.

The people who stormed this building believed they were acting on the wishes and instructions of their president, and having that belief was a foreseeable consequence of the growing crescendo of false statements, conspiracy theories and reckless hyperbole which the defeated president kept shouting into the largest megaphone on planet Earth. He did not do his job. He didn't take steps so federal law could be faithfully executed and order restored. No. Instead, according to public reports, he watched television happily – happily – as the chaos unfolded. Even after it was clear to any reasonable observer that Vice President Pence was in serious danger.

McConnell also said:

President Trump is still liable for everything he did while he was in office, as an ordinary citizen, unless the statute of limitations has run, still liable for everything he did while in office, didn't get away with anything yet – yet.

We have a criminal justice system in this country. We have civil litigation. And former presidents are not immune from being held accountable by either one.

### G.    The Insurrectionists Have Since Stated They Stormed the Capitol at Trump's Direction

148.    Many of the rioters cited Trump's words and conduct as the inspiration for their violent

actions. For example, the day after the insurrection, Jacob Angeli Chansley (the "QAnon

Shaman") called the FBI to tell them that "he came as a part of a group effort, with other

'patriots' from Arizona, at the request of the President that all 'patriots' come to D.C. on

January 6, 2021." Later, Chansley's lawyer Al Watkins said in an interview, "Let's roll

the tape. Let's roll the months of lies, and misrepresentations and horrific innuendo and

hyperbolic speech by our president designed to inflame, enrage, motivate . . . What's

really curious is the reality that our president, as a matter of public record, invited these

individuals, as president, to walk down to the Capitol with him." He also said that

Chansley "regrets very much having . . . just been duped by the president."

149.    Attorneys for Proud Boys member William Chrestman, said in court papers that Trump

gave the mob "explicit permission and encouragement" to do what they did, providing

those who obeyed him with "a viable defense against criminal liability." They further

stated on Chrestman's behalf, "It is an astounding thing to imagine storming the United

States Capitol with sticks and flags and bear spray, arrayed against armed and highly

trained law enforcement. Only someone who thought they had an official endorsement

would even attempt such a thing. And a Proud Boy who had been paying attention would

very much believe he did."

## IV.    LIABILITY

### COUNT ONE
### (Directing Assault and Battery)

150.    James Blassingame and Sidney Hemby adopt and incorporate the prior paragraphs as if

set forth fully herein and further state:

151.    Through his words and conduct described herein, Defendant, Donald J. Trump, directed

and ratified the intentional torts of assault and battery committed by his followers on

James Blassingame and Sidney Hemby.

152.    As the leader of this violent mob, who took their cues from his campaign rhetoric and

personal Tweets and traveled from around the country to the nation's capital at Trump's

invitation for the January 6 rally, Trump was in a position of extraordinary influence over

his followers, who committed assault and battery on James Blassingame and Sidney

Hemby.

36

153. Trump, by his words and conduct, directed the mob that stormed the Capitol and assaulted and battered James Blassingame and Sidney Hemby.

154. For several hours after the mob had stormed the Capitol, Trump had the continuing ability to issue statements through traditional media and his personal Twitter account but refused to communicate anything to his followers that might discourage their relentless assault and battery on James Blassingame and Sidney Hemby and their fellow officers at the Capitol. Trump thereby ratified the conduct of his followers and ensured that the assaults on the Plaintiffs and fellow officers would last much longer, worsening the physical and emotional injuries of the Plaintiffs and other officers.

155. When he finally did make statements late in the afternoon, Trump further ratified the tortious conduct when he again said that the election had been stolen by fraud, and that his followers had every reason to be angry, and by announcing support, praise and love for his followers.

156. It appeared to James Blassingame and Sidney Hemby that Trump's followers then had the ability to carry out the harmful and offensive contact.

157. The words and conduct of Trump's followers caused James Blassingame and Sidney Hemby to fear imminent physical harm.

158. Trump's followers committed battery, and unlawfully and intentionally touched and used force on Plaintiffs in a harmful, offensive, and insulting way.

159. Trump's followers directly contacted, struck, put into motion objects that directly hit James Blassingame and Sidney Hemby, and sprayed them with chemical agents that burned their exposed eyes, face, and body.

160. James Blassingame and Sidney Hemby suffered physical injuries because of the batteries to which they were subjected.

161. Had Trump committed directly the conduct committed by his followers, it would have subjected Trump to direct liability.

162. The unlawful and intentional acts that Defendant directed his followers to commit on January 6, 2021, were a direct and proximate cause of James Blassingame and Sidney Hemby's injuries, pain, suffering, and other damages.

## COUNT TWO
### (Aiding and Abetting Assault and Battery)

163. James Blassingame and Sidney Hemby adopt and incorporate the prior paragraphs as if set forth fully herein and further state:

164. Through his words and conduct described throughout this Complaint, Defendant, Donald J. Trump, aided and abetted the intentional torts of assault and battery committed by his followers on James Blassingame and Sidney Hemby, as described in Count One.

165. Trump aided and abetted his followers' assault and battery on James Blassingame and Sidney Hemby through his suggestive words and encouragement leading up to and on January 6, 2021, which were spoken from his position of the leader of a powerful political movement, including a private militia that was expressly "standing by" for his call to action, and gave his message extra weight.

166. Trump's words and encouragement leading up to and on January 6, 2021, created a foreseeable risk of harm to James Blassingame and Sidney Hemby.

167. Had Trump committed directly the conduct committed by his followers, it would have subjected Trump to direct liability.

168.   The unlawful and intentional acts that Trump aided and abetted his followers to commit on January 6, 2021, were a direct and proximate cause of James Blassingame and Sidney Hemby's injuries, pain, suffering, and other damages.

## COUNT THREE
### (Directing Intentional Infliction of Emotional Distress)

169.   James Blassingame adopts and incorporates the prior paragraphs as if set forth fully herein and further states:

170.   Through his words and conduct described herein, Defendant, Donald J. Trump, directed the Intentional Infliction of Emotional Distress committed by his followers on James Blassingame.

171.   Defendant further committed the intentional tort of Intentional Infliction of Emotional Distress, by his ratification of his followers' words and conduct directed at James Blassingame as described herein.

172.   Trump's followers engaged in conduct that was extreme and outrageous, and so beyond the bounds of decency that it is regarded as atrocious and utterly intolerable in a civilized society.

173.   In the United States Capitol Crypt, Trump's followers hurled racial slurs and threatened James Blassingame, calling him a "nigger" more times than he could count, while he was under direct attack.

174.   This extreme and outrageous conduct was intended to cause James Blassingame's emotional distress or was carried out with reckless disregard of whether the conduct would cause James Blassingame to suffer emotional distress.

175.   As a result of this extreme and outrageous conduct, James Blassingame suffered severe emotional distress. He feared for his life and worried he would not be able to return home

39

to his family that night, has had sleepless nights, and relives the extreme and outrageous conduct to which he was subjected on January 6, 2021.

176.    Defendant's refusal to condemn his followers' conduct for several hours, even as their extreme and outrageous conduct was being broadcast in real time, was a ratification of that conduct.

177.    Defendant further ratified the conduct when he announced support, praise and even love for his followers, and repeated that they had every reason to be angry and that the election had been stolen by fraud.

178.    The Defendant is liable for the severe emotional distress that was intentionally inflicted on James Blassingame as if he had committed the conduct himself.

179.    For all these reasons, the Defendant is liable to James Blassingame for intentional infliction of emotional distress and for all damages arising therefrom.

**COUNT FOUR**
**(Violation of a Public Safety Statute: D.C. Code § 22-1322 – Inciting to Riot)**

180.    James Blassingame and Sidney Hemby adopt and incorporate the prior paragraphs as if set forth fully herein and further state:

181.    Defendant, Donald J. Trump, is per se liable for his violation of two District of Columbia public safety statutes on January 6, 2021.

182.    D.C. Code § 22-1322(b) makes it a criminal offense to willfully incite or urge other persons to engage in a riot.

183.    The statute defines a "riot" as "a public disturbance involving an assemblage of 5 or more persons which by tumultuous and violent conduct or the threat thereof creates grave danger of damage or injury to property or persons." D.C. Code § 22-1322(a).

40

184.   D.C. Code § 22-1322 was enacted to protect public safety officials and others from violence caused by rioting.

185.   Through his words in the months during the 2020 presidential election and speaking from his position as the leader of a powerful political movement, including a private militia that was expressly "standing by," Trump planted the seeds to create a public disturbance which by tumultuous and violent conduct or the threat thereof would create grave danger or injury to property and persons.

186.   More particularly, on the morning of January 6, 2021, Trump addressed his followers at the rally at the Ellipse, and explicitly directed them to march to the Capitol.

187.   Defendant's followers, already primed by his months of inflammatory rhetoric, were spurred to direct action.

188.   Defendant's words and conduct violated D.C. Code §§ 22-1322(b) and were a cause of tumultuous and violent conduct that created grave danger of damage or injury to property or persons, including James Blassingame and Sidney Hemby.

189.   Defendant, by violating this statute, is liable per se and thereby liable for James Blassingame and Sidney Hemby's injuries and damages.

**COUNT FIVE**
**(Violation of a Public Safety Statute:**
**D.C. Code § 22-1321 (a)(1), (a)(2), and (b) – Disorderly Conduct)**

190.   James Blassingame and Sidney Hemby adopt and incorporate the prior paragraphs as if set forth fully herein and further state:

191.   Defendant, Donald J. Trump, is per se liable for his violation of two District of Columbia public safety statutes on January 6, 2021.

41

192.   On January 6, 2021, there was in effect in the District of Columbia a statute that was enacted to protect James Blassingame and Sidney Hemby and persons in their position, and to prevent the type of events that are described herein.

193.   D.C. Code § 22-1321 (a)(1) makes it unlawful, in any place open to the general public, for a person to intentionally or recklessly act in such a manner as to cause another person to be in reasonable fear that a person is likely to be harmed.

194.   D.C. Code § 22-1321 (a)(2) makes it unlawful, in any place open to the general public, for a person to incite or provoke violence where there is a likelihood that such violence will ensue.

195.   D.C. Code § 22-1321(b) makes it unlawful "for a person to engage in loud, threatening, or abusive language, or disruptive conduct, with the intent and effect of impeding or disrupting the orderly conduct of a lawful public gathering."

196.   James Blassingame and Sidney Hemby are among the members of the class that the statute was enacted to protect.

197.   Through his words in the months following the 2020 presidential election and speaking from his position as the leader of a powerful political movement, including a private militia that was expressly "standing by," Defendant planted the seeds that made likely the violence that was unleashed on James Blassingame and Sidney Hemby on January 6, 2021.

198.   Defendant repeatedly asserted that he and his followers were victims of a massive fraud and conspiracy that had resulted in the theft of the 2020 Presidential election.

199.   More particularly, on the morning of January 6, 2021, Defendant addressed his followers at the Ellipse, and explicitly directed them to march to the Capitol.

200.   Defendant's words, when he spoke them, were words likely to produce violence in others.

201.   Defendant's followers, already primed by his months of inflammatory rhetoric, were spurred to direct action.

202.   By directing his followers as he did leading up to and on January 6, 2021, Defendant intentionally and recklessly acted in such a manner as to cause James Blassingame and Sidney Hemby to be in reasonable fear that they were likely to be harmed.

203.   Defendant's provocative words and actions leading up to and on January 6, 2021, were likely to incite and provoke violence in others and did in fact incite and provoke violence directed at James Blassingame and Sidney Hemby.

204.   Defendant's loud, threatening, and abusive language and conduct leading up to and on January 6, 2021, were intended to and did impede and disrupt the orderly conduct of the lawful public gathering to count the certified electoral votes to declare Joe Biden the winner of the 2020 presidential election.

205.   Defendant's words and conduct in the months before and on January 6, 2021, violated D.C. Code § 1321 and were a cause of the violence that ensued in places in the District of Columbia open to the general public.

206.   Defendant's violation of D.C. Code § 1321 caused severe injury and damages to James Blassingame and Sidney Hemby.

207.   Defendant, by violating this statute, is per se liable for James Blassingame and Sidney Hemby's injuries and damages.

43

## COUNT SIX
### (Punitive Damages)

208.    James Blassingame and Sidney Hemby adopt and incorporate the prior paragraphs as if set forth fully herein.

209.    Trump's words and conduct leading up to and on January 6, 2021, and his ratification through silence when words and action were necessary, and his further ratification by direct praise of the rioters, as set forth herein, demonstrated a willful and wanton disregard for and a reckless indifference to James Blassingame and Sidney Hemby's safety and that of their fellow officers.

210.    Trump's words and conduct leading up to and on January 6, 2021, were intentionally tortious and in violation of federal and D.C. statutes.

211.    His words and conduct gave direction to and aided and abetted his followers in the commission of intentional torts of assault, battery, and intentional infliction of emotional distress that caused injury to James Blassingame and Sidney Hemby.

212.    Those words and conduct incited the riot and disorderly conduct in violation of D.C. law on January 6, 2021, that caused injury to James Blassingame and Sidney Hemby. Accordingly, James Blassingame and Sidney Hemby request punitive damages in an amount consistent with the evidence to be shown at trial against Trump to punish him for his intentional and wanton and reckless conduct, and to deter others from engaging in similar behavior.

## COUNT SEVEN
### (Conspiracy in Violation of 42 U.S.C. §1985(1))

213.    James Blassingame and Sidney Hemby adopt and incorporate the prior paragraphs as if set forth fully herein.

44

214.   The Reconstruction-era law known as the Ku Klux Klan Act, 42 U.S.C. §1985(1)

"Preventing Officer from Performing Duties," defines conspiracy to interfere with civil

rights:

> If two or more persons in any State or Territory conspire to prevent, by
> force, intimidation, or threat, any person from accepting or holding any
> office, trust, or place of confidence under the United States, or from
> discharging any duties thereof; or to induce by like means any officer of the
> United States to leave any State, district, or place, where his duties as an
> officer are required to be performed, or to injure him in his person or
> property on account of his lawful discharge of the duties of his office, or
> while engaged in the lawful discharge thereof, or to injure his property so
> as to molest, interrupt, hinder, or impede him in the discharge of his official
> duties[.]

215.   Under 42 U.S.C. §1985(3):

> [I]f one or more persons engaged therein do, or cause to be done, any act in
> furtherance of the object of such conspiracy, whereby another is injured in
> his person or property, or deprived of having and exercising any right or
> privilege of a citizen of the United States, the party so injured or deprived
> may have an action for the recovery of damages occasioned by such injury
> or deprivation, against any one or more of the conspirators.

216.   On information and belief, Defendant Trump agreed and conspired with his followers to

stage an attack on the Capitol to prevent Congress and Vice President Mike Pence, by

force, intimidation, or threat, from discharging their duties of certifying the winners of

the 2020 presidential election. Trump and his followers further agreed and conspired to

prevent, by force, intimidation, or threat, Joseph Biden and Kamala Harris from accepting

and/or holding their respective offices as President and Vice President.

217.   As described more fully above, communications between the co-conspirators began as

early as September 2020. The Proud Boys were then "standing by" on December 19,

when Defendant Trump publicized the "Stop the Steal" Rally, and called for attendees to

"be there" as it "will be wild!".

45

218.　The Proud Boys, Oath Keepers, and other militia members then took overt acts in furtherance of a conspiracy to—in the words of Oath Keeper Kelly Meggs—"work together and shut this shit down." "[S]hut this shit down" referred to a plan to accomplish the objective of a Section 1985(1) conspiracy—using force, intimidation, and threats to prevent Congress and Vice President Mike Pence from discharging their duties of certifying the winners of the 2020 presidential election as well as using force, intimidation, and threats to prevent Joseph Biden and Kamala Harris from accepting and/or holding their respective offices as President and Vice President.

219.　Members of the conspiracy engaged in multiple meetings directed at accomplishing the object of the conspiracy; obtained paramilitary gear and supplies included tactical vests, protective equipment, and radio equipment; and took steps to remain incognito and mask their participation in the conspiracy.

220.　When the militia conspirators converged on the District of Columbia, Defendant Trump knowingly gave a speech urging them, among other things, that "when you catch someone in a fraud, you're allowed to go by very different rules" and "if you don't fight like hell, you're not going to have a country anymore," the natural and probable consequence of which would be to lead the mob to storm the Capitol and accomplish the objective of a Section 1985(1) conspiracy—using force, intimidation, and threats to prevent Congress and Vice President Mike Pence from discharging their duties of certifying the winners of the 2020 presidential election as well as using force, intimidation, and threats to prevent Joseph Biden and Kamala Harris from accepting and/or holding their respective offices as President and Vice President.

221.   On information and belief, Defendant Trump intended the natural and probable consequences of the act he knowingly did, namely the use of force, intimidation, and threats to prevent Congress and Vice President Mike Pence from discharging their duties of certifying the winners of the 2020 presidential election as well as the use of force, intimidation, and threats to prevent Joseph Biden and Kamala Harris from accepting and/or holding their respective offices as President and Vice President. That intent, and approval of the events of January 6th, is further confirmed by, among other things, his delight when hearing of the Capitol break-in as well as his excitement that militia members were pushing against Capitol Police trying to get into the Capitol Building.

222.   When Proud Boy Dominic Pezzola stated that he knew that the Proud Boys could "take this motherfucker over [if we] just tried hard enough," he was referring to a common plan to accomplish the objective of a Section 1985(1) conspiracy—using force, intimidation, and threats to prevent Congress and Vice President Mike Pence from discharging their duties of certifying the winners of the 2020 presidential election as well as using force, intimidation, and threats to prevent Joseph Biden and Kamala Harris from accepting and/or holding their respective offices as President and Vice President.

223.   When Jessica Marie Watkins, a member of the Oath Keepers, stated on an Oath Keeper communication channel that "We have a good group . . . . We are sticking together and sticking to the plan," she was referring to a plan to accomplish the objective of a Section 1985(1) conspiracy—using force, intimidation, and threats to prevent Congress and Vice President Mike Pence from discharging their duties of certifying the winners of the 2020 presidential election as well as using force, intimidation, and threats to prevent Joseph

47

Biden and Kamala Harris from accepting and/or holding their respective offices as
President and Vice President.

224.    In leading an attack on the Capitol, the Defendant Trump's co-conspirators took overt
acts in furtherance of their conspiracy with Defendant Trump. Those overt acts caused
James Blassingame and Sidney Hemby to suffer severe injuries.

**COUNT EIGHT**
**(Civil Conspiracy in Violation of Common Law)**

225.    James Blassingame and Sidney Hemby adopt and incorporate the prior paragraphs as if
set forth fully herein.

226.    As described above, Defendant Trump conspired with the Proud Boys and others to,
among other things, incite an unlawful riot on January 6 with the goal of disrupting
congressional certification of President Biden's electoral victory.

227.    In furtherance of that conspiracy, one or more conspirators engaged in a riot and stormed
the Capitol on January 6.

228.    As a direct, proximate, and foreseeable result of that conspiracy, James Blassingame and
Sidney Hemby suffered severe injuries.

**V.    PRAYER FOR RELIEF**

WHEREFORE, James Blassingame and Sidney Hemby demand an award of the
following relief:

a.    Judgment against Donald J. Trump on all Counts set forth herein;

b.    Compensatory damages in an amount consistent with the evidence to be shown at
trial, in excess of $75,000 for each of them, plus interest and costs;

c.    Punitive damages in an amount consistent with the evidence to be shown at trial,
plus interest and costs;

48

d.      Costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988, and

e.      Such other relief as the Court and jury deem necessary and just.

Respectfully submitted,

/s/ Patrick A. Malone
Patrick A. Malone (Bar No. 397142)
Daniel Scialpi (Bar No. 997556)
Heather J. Kelly (DC Bar No. 453154) (*motion for admission forthcoming*)
PATRICK MALONE & ASSOCIATES, P.C.
1310 L Street, N.W., Suite 800
Washington, D.C. 20005
P:  202-742-1500
F:  202-742-1515
pmalone@patrickmalonelaw.com
dscialpi@patrickmalonelaw.com
hkelly@patrickmalonelaw.com


Anne Tindall (Bar No. 494607)
Cameron Kistler (Bar No. 1008922)
Erica Newland (*motion for admission forthcoming*)
UNITED TO PROTECT DEMOCRACY
2020 Pennsylvania Ave. NW, #163
Washington, D.C. 20006
P: 202-579-4582
anne.tindall@protectdemocracy.org
cameron.kistler@protectdemocracy.org
erica.newland@protectdemocracy.org


John Paredes (*motion for admission forthcoming*)
Ngozi J. Nezianya (*motion for admission forthcoming*)
UNITED TO PROTECT DEMOCRACY
115 Broadway, 5th Floor
New York, N.Y. 10006
P: 202-579-4582
john.paredes@protectdemocracy.org
ngozi.nezianya@protectdemocracy.or

49

Benjamin L. Berwick (Bar No. MA0004)
UNITED TO PROTECT DEMOCRACY
15 Main St., Suite 312
Watertown, MA 02472
P: 202-579-4582
ben.berwick@protectdemocracy.org

**JURY DEMAND**

The Plaintiffs demand trial by jury.

/s/ Patrick A. Malone
Patrick A. Malone, Esq.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Representative ERIC SWALWELL<br>174 Cannon House Office Building<br>U.S. House of Representatives<br>Washington, D.C. 20515,<br><br>    Plaintiff,<br><br>  v.<br><br>DONALD J. TRUMP<br>(in his personal capacity)<br>The Mar-A-Lago Club<br>1100 S. Ocean Blvd.<br>Palm Beach, FL 33480,<br><br>DONALD J. TRUMP JR.<br>425 E. 58th Street<br>Apt. 12 CD<br>New York, NY 10022,<br><br>Representative MO BROOKS<br>(in his personal capacity)<br>2185 Rayburn House Office Building<br>U.S. House of Representatives<br>Washington, D.C. 20515,<br><br>and<br><br>RUDOLPH GIULIANI<br>Rudolph W. Giuliani, PLLC<br>445 Park Avenue<br>18th Floor<br>New York, NY 10022,<br><br>    Defendants. | Case No. _____<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

1.    The peaceful transfer of power is a sacrament of American democracy.  Donald

Trump, his son Donald Trump Jr., his advisor Rudy Giuliani, and Congressman Mo Brooks,

together with many others, defiled that sacrament through a campaign of lies and incendiary rhetoric which led to the sacking of the United States Capitol on January 6, 2021.

2.      Donald Trump lost the 2020 presidential election; he was unwilling to accept defeat.  Trump lied to his followers, telling them that the certification of Joe Biden's election was a "coup" and that their country was being stolen from them.  The Defendants filed frivolous lawsuits, all of which failed.  The Defendants tried to intimidate state officials, none of whom caved to the pressure.  Out of options and out of time, the Defendants called their supporters to Washington, D.C. on the day Congress met to certify Joe Biden's win, telling them to "Stop the Steal" and "be wild."  Thousands came to the District in response.  Some planned violence at the Capitol in advance; some were stirred to violence by the Defendants' words on that day.

3.      Trump implored the crowd to "fight like hell" and "walk down Pennsylvania Avenue . . . to the Capitol."  According to an analysis of cell phone location data, approximately 40% of the rally attendees did just that.[1]

4.      As a direct and foreseeable consequence of the Defendants' false and incendiary allegations of fraud and theft, and in direct response to the Defendants' express calls for violence at the rally, a violent mob attacked the U.S. Capitol.  Many participants in the attack have since revealed that they were acting on what they believed to be former President Trump's orders in service of their country.

5.      The mob disrupted the certification of the vote in the Electoral College.  Rioters threatened to hang Vice President Mike Pence and kill the Speaker of the House, Nancy Pelosi, and they terrorized and injured scores of others, including the Plaintiff.

---

[1]      https://www.nytimes.com/2021/02/05/opinion/capitol-attack-cellphone-data.html

6.      Many members of Congress, including the Plaintiff, were trapped in the House chamber as plainclothes officers barricaded doors and held off the mob at gunpoint.  Fearing for their lives, the Plaintiff and others masked their identities as members of Congress, texted loved ones in case the worst happened, and took shelter throughout the Capitol complex.

7.      As the Plaintiff and hundreds of others—including police officers, other elected officials, and rank-and-file workers at the Capitol—were put in mortal danger, and as the seat of American Democracy was desecrated by the insurgent mob, the Defendants watched the events unfold on live television.  Those with knowledge claimed that during this moment of national horror, Trump was "delighted" and was "confused about why other people on his team weren't as excited as he was."  Others described Trump as "borderline enthusiastic" about the unfolding violence.

8.      The horrific events of January 6 were a direct and foreseeable consequence of the Defendants' unlawful actions.  As such, the Defendants are responsible for the injury and destruction that followed.

## I.
## PARTIES

### Plaintiff Eric Swalwell

9.      Plaintiff Eric Swalwell is beginning his fifth term as a member of the United States House of Representatives from California's 15th Congressional District.  He is a member of the House Permanent Select Committee on Intelligence, where he serves as Chair of the Intelligence Modernization and Readiness Subcommittee, as well as a member of the House Judiciary Committee.  Before his election to the House in 2012, Congressman Swalwell spent seven years as a prosecutor in the Alameda County District Attorney's office in his home state of California.  In 2021, Speaker of the House Nancy Pelosi appointed Congressman Swalwell as

3

one of nine House impeachment managers for Donald Trump's historic second impeachment trial.

10.     On January 6, 2021, Congressman Swalwell was at the Capitol performing his official duties as a member of the U.S. House of Representatives to count the Electoral College votes and certify the winner of the 2020 Presidential election.

11.     Congressman Swalwell was in the House chambers when the violent mob entered the Capitol, ransacked offices, and set out to kill members of Congress and other officials.  He was on the House floor the moment plainclothes officers barricaded doors and held the rioters at gunpoint to prevent them from entering the chamber.

**Defendants**

12.     Defendants are the former President of the United States and three close associates who conspired with him and others, including the rioters who breached the Capitol on January 6, to prevent Congress from certifying President Biden's victory in the 2020 presidential election.

**Defendant Donald J. Trump**

13.     Donald J. Trump was the 45th President of the United States.  He ran for reelection in 2020 and lost.  He has a lengthy history of normalizing violence through his rhetoric and social media communications.  After his electoral defeat, Trump and the other Defendants conspired to undermine the election results by alleging, without evidence, that the election had been rigged and by pressuring elected officials, courts, and ultimately Congress to reject the results.

14.     Trump also promoted and spoke at the January 6 rally, the culmination of the Defendants' coordinated efforts to subvert the certification vote which was funded and organized by his campaign and groups supporting his candidacy.  He encouraged his followers to come to

4

Washington, D.C. on January 6, and he encouraged them to go to the Capitol to "fight like hell." Trump directly incited the violence at the Capitol that followed and then watched approvingly as the building was overrun.

15.     Trump did all these things solely in his personal capacity, for his own personal benefit, and to advance his personal interests as a candidate.  For example, he tweeted from his personal Twitter account (@realDonaldTrump) and not from the official, White House, twitter account, and he spoke at the January 6 rally in his capacity as a losing candidate for the Presidency on the day Joseph Biden was being certified as the winning candidate and next President of the United States.

### Defendant Donald J. Trump Jr.

16.     Defendant Donald J. Trump Jr. is the oldest son of former President Trump and the executive vice president of the Trump Organization.  Trump Jr. conspired with the other Defendants to undermine the election results by alleging, without evidence, that the election had been rigged and by pressuring elected officials, courts, and ultimately Congress to reject the results.

17.     Trump Jr. also promoted and spoke at the January 6 rally.  He addressed the crowd at this event and directly incited the violence at the Capitol that followed.

### Defendant Rudolph Giuliani

18.     Defendant Rudolph Giuliani was a close advisor and personal lawyer for former President Trump.  Giuliani conspired with the other Defendants to undermine the election results by alleging, without evidence, that the election had been rigged and by pressuring elected officials, courts, and ultimately Congress to reject the results.  As one of Trump's personal attorneys, Giuliani participated in the frivolous lawsuits filed on Trump's behalf.

19.     Giuliani also promoted and spoke at the January 6 rally.  Giuliani addressed the crowd at this event and directly incited the violence at the Capitol that followed.

### Defendant Mo Brooks

20.     Defendant Mo Brooks is a member of the United States House of Representatives from Alabama's Fifth Congressional District.  Brooks—acting in his personal capacity—conspired with the other Defendants to undermine the election results by alleging, without evidence, that the election had been rigged and by pressuring elected officials, courts, and ultimately Congress to reject the results.

21.     Brooks also promoted and spoke at the January 6 rally.  Brooks addressed the crowd at this event and directly incited the violence at the Capitol that followed.

## II.
## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this case because the Plaintiff's federal conspiracy claims arise under the laws of the United States.  It has jurisdiction over the Plaintiff's state law claims because they are so closely related to the federal claims as to form part of the same case or controversy.  *See* 28 U.S.C. §§ 1331, 1367; 42 U.S.C. §§ 1985, 1986.

23.     Venue is proper in this Court because a substantial part of the conduct giving rise to the claims in the case, including the violent attack on the Capitol the Defendants incited, occurred in the District of Columbia.  *See* 28 U.S.C. § 1391(b)(2).

24.     This Court has personal jurisdiction over all the Defendants because they committed these violations in the District of Columbia.  *See* Fed. R. Civ. P. 4(k)(1)(A); D.C. Code § 13-423.

### III.
### RELEVANT FACTUAL BACKGROUND

**Trump's Deliberate Efforts to Undermine the Election Results**

25.     Months before a single poll had opened for the 2020 election, Trump and the

Trump campaign began accusing Democrats of trying to "steal the election," calling the lawful

state decisions about how to conduct an election in the midst of a world-wide pandemic—

supervised, where appropriate, by the courts—"the scandal of our times."  He repeatedly made

such statements, right up to the days immediately preceding the election:





26.     When election day (November 3) arrived, however, Trump said nothing of

election fraud for much of the day, almost surely because he led Biden in the early returns.

27.     Democrats more so than Republicans chose to vote by mail, given the starkly

partisan views of the Covid-19 pandemic.  Where most Republican leaders urged supporters to

7

vote in person, Democratic leaders sought to prioritize safety and social-distancing, encouraging people to vote by mail.[2]  Mail-in ballots were often counted much later than in-person ballots. Of the battleground states that largely decided the 2020 election—Pennsylvania, Wisconsin, Michigan, Ohio, Georgia, Nevada, and Arizona—Pennsylvania and Wisconsin do not begin *processing* mail-in ballots until election day, and only Arizona and Nevada began *counting* mail-in ballots earlier than election day.[3]

28.    Toward the end of the day on November 3, however, the returns moved in Biden's direction, as most pundits and analysts had predicted, and Trump's lead substantially dwindled.  As his outlook soured over this news, and realizing that his reelection campaign was going to be unsuccessful, Trump decided to renew his claims of voter fraud.

29.    At 12:49 a.m., on November 4, Trump took to Twitter to accuse unnamed individuals from attempting to steal his victory.



30.    A little more than an hour later, Trump accused a "very sad group of people" of "trying to disenfranchise" the millions of people who had voted for him.[4]

---

[2]      *See, e.g.*, https://www.theguardian.com/us-news/2020/dec/03/democrats-mail-in-voting-2020-election-analysis.

[3]      https://www.npr.org/2020/10/23/926258497/when-will-mail-in-ballots-be-counted-see-states-processing-timelines.

[4]      A video of Trump's entire address can be found online at https://www.c-span.org/video/?477710-1/president-trump-remarks-election-status.  The referenced statements appear at the 00:59 second mark.

31.     Later in the day, Trump doubled down on his claims of fraud, falsely declaring

victory in the battlegrounds of Pennsylvania, Georgia, North Carolina, and Michigan, even as

hundreds of thousands of votes in those states were still being counted and the polls were

showing an increasing advantage for Biden.[5]

32.     The following morning, November 5, less than 48 hours after the polls had closed,

Trump tweeted "Stop the Count" and "Stop the Fraud," slogans frequently repeated throughout

the day on January 6 prior to and during the attack on the Capitol.  He sent these tweets in an

effort to keep his reelection prospects alive, despite the mounting reasons to believe he had been

defeated.



33.     Trump gave his first prime-time speech since the election the evening of

November 5.  He opened his remarks to the nation with a stunning false assertion, "If you count

the legal votes, I easily win.  If you count the illegal votes, they can try to steal the election from

us."[6]  He echoed that sentiment on Twitter a short while later:

Donald J. Trump
@realdonaldtrump

*I easily WIN the Presidency of the United States with LEGAL VOTES CAST. The
OBSERVERS were not allowed, in any way, shape, or form, to do their job and
therefore, votes accepted during this period must be determined to be ILLEGAL
VOTES. U.S. Supreme Court should decide!*

Nov 6th 2020 - 2:22:47 AM EST · Twitter for iPhone ·  View on Twitter

---

[5]     Biden eventually won three of these four states, claiming Pennsylvania, Michigan, and
Georgia.
[6]     https://www.c-span.org/video/?477858-1/president-trump-challenges-latest-election-
results-claims-voter-fraud.

34.     Trump's allegations of wrongdoing in those first days after the election sparked

confrontations nationwide between his supporters and election officials:





35.     Trump soon after began directing his criticisms at individual elected officials.  His

supporters, in turn, began targeting those officials for harassment and threats.  For example,

armed supporters of the former President, encouraged by him, surrounded the home of the

Michigan Secretary of State, while Trump-supporting militias demanded a "citizen tribunal" at

the Georgia Capitol.

10

36.     President Biden went on to win the states of Arizona[7] and Georgia.[8]  Yet, in the

first half of December, Trump attacked the Republican governors of these states, accusing them

of "fight[ing] harder against us than do the Radical Left Dems."  He lamented their lack of

fealty to him, stating if these governors "were with us, we would already have won both

Arizona and Georgia":





37.     Trump also attempted to pressure state electors to improperly overturn the

election results in their states.  He directed particular attention to officials in Michigan,

Pennsylvania, and Georgia.  He personally attempted to cajole these officials to overturn the

election results and directed his followers to intimidate these perceived adversaries.

---

[7]     https://www.archives.gov/files/ascertainment-arizona.pdf
[8]     https://www.archives.gov/files/electoral-college/2020/ascertainment-georgia.pdf

11

### Michigan

38.     In November 2020, bipartisan election officials in Wayne County, Michigan unanimously certified the election results for President Biden.  Trump then tried to pressure two Republican members of that board to change their minds.  In response, these two officials in fact tried—unsuccessfully—to rescind their votes certifying the election results.

39.     Trump next contacted Michigan Senate Majority Leader Mike Shirkey and Speaker of the Michigan House of Representatives Lee Chatfield.  Trump likewise pressured them to overturn Michigan's election results, even meeting them in person to pressure them to undo the results of the election.  Those efforts, too, proved unsuccessful.

40.     Undeterred, Trump falsely declared on December 5, "You know I won almost every county in Michigan, almost every district.  We should have won that state very easily. We have a similar type of governor I think but I'll let you know that in about a week."

41.     In what should have been an obvious sign of the risk inflammatory language could pose on January 6, some of Trump's followers heard his claims as a directive to act.  And they responded.  A large group of armed protestors convened at the home of the Michigan Secretary of State chanting, "Stop the steal!," "You're a threat to our democracy!," and "You're a threat to a free and honest election!"  The protestors made explicit demands that the Secretary overturn the state's election results.

42.     Trump's efforts to overturn the election results in Michigan were unsuccessful.

43.     There were no election irregularities in Michigan sufficient to change the final Presidential vote count in that state.  Joe Biden won the Presidential vote in Michigan.[9]

---

[9]      https://www.archives.gov/files/ascertainment-michigan.pdf

12

**Pennsylvania**

44.    Trump also attempted to interfere with officials in Pennsylvania.  Trump

contacted Pennsylvania State Senate Majority Leader Kim Ward and Pennsylvania Speaker of

the House of Representatives Brian Cutler.  Trump directly and falsely told Senator Ward,

"There was fraud in the voting."

45.    On November 25, 2020, Trump participated by phone in a Pennsylvania State

Republican Senate policy hearing and attempted to convince the state legislators that there had

been massive fraud in the commonwealth's voting.  Trump spoke directly to the lawmakers,

telling them, "This election has to be turned around."  He further falsely claimed that he had

won Pennsylvania and other swing states "by a lot."

46.    As he had in Michigan, Trump personally met with Republican members of the

Pennsylvania legislature to pressure them to overturn the commonwealth's election results.

47.    Trump's efforts to overturn the results in Pennsylvania were unsuccessful.

48.    There were no election irregularities in Pennsylvania sufficient to change the final

Presidential vote count in that commonwealth.  Joe Biden won the Presidential vote in

Pennsylvania.[10]

**Georgia**

49.    Trump went to especially extraordinary lengths to overturn the election results in

Georgia, a reliably Republican stronghold for decades that Trump believed was in jeopardy.

After Secretary of State Bradford Raffensperger stated his belief that the state's election results

in favor of President Biden were accurate, Trump lashed out at him.  He called Raffensperger an

---

[10]      https://www.archives.gov/files/electoral-college/2020/ascertainment-pennsylvania.pdf

"enemy of the people" and directed at least 17 tweets at him, referring to him as a "disaster,"

"obstinate," and a "so-called 'Republican[].'"

50.    In what should have been another warning to the Defendants about the impact of

their words at the January 6 rally, some of Trump's followers responded to the claims of fraud

and Trump's personal attacks on Raffensperger by targeting Raffensperger and his family with

violent threats.  His wife was told, "Your husband deserves to face a firing squad."  He himself

was told, "You better not botch this recount . . . your life depends on it" and that he and his

family "should be put on trial for treason and face execution."

51.    In December of 2020, Trump pressured Georgia Governor Brian Kemp to hold a

special session of the legislature to appoint electors who would cast electoral votes for Trump.

52.    That same month, Trump called the Chief Investigator for the Georgia Bureau of

Investigations, which was conducting an audit of signatures on absentee ballots.  Trump

implored the investigator to "find the fraud" and told him that he would be a "national hero" if

he was successful in doing so.

53.    On January 2, 2021, just days before Congress was set to certify the Electoral

College votes, President Trump initiated a conversation with Raffensperger about the alleged

massive voter fraud in Georgia.  The next day, Trump made many misrepresentations about that

conversation to sway public opinion, including that Raffensperger had "no clue" about a number

of alleged voting irregularities in the state.  The media, however, obtained and released an audio

recording of that call.  It showed Trump browbeating Raffensperger to find enough evidence of

fraud to change the state's election result.  Trump claimed that Raffensperger was aware of

election fraud—telling him "you know what they did and you're not reporting it."  Trump told

14

Raffensperger that he had won the state of Georgia.  Trump made an explicit request to

Raffensperger: "I just want to find 11,780 votes, which is one more than we have."

54.    There were no election irregularities in Georgia sufficient to change the final

Presidential vote count in that state.  Joe Biden won the Presidential vote in Georgia.

55.    In addition to Michigan, Pennsylvania, and Georgia, Trump took aim at officials

in other Republican-led jurisdictions for the same reasons.

56.    Trump's claims of widespread fraud and election-rigging were rebuked by

numerous executive agencies, including the Federal Bureau of Investigation, the Department of

Justice, and the Department of Homeland Security.[11]  Trump lashed out at them as well,

berating them for their refusal to address "the biggest SCAM in our nation's history."  Trump

coupled this message with a call to action on January 6:



57.    On January 5, the night before the rally, Trump tweeted about the thousands of

people flooding D.C. who did not want to see the country "stolen" by "Radical Left Democrats:

---

[11] https://www.brennancenter.org/our-work/research-reports/its-official-election-was-secure

15

JA - 84





**Donald J. Trump** ✔
@realDonaldTrump

Washington is being inundated with people who don't want to see an election victory stolen by emboldened Radical Left Democrats. Our Country has had enough, they won't take it anymore! We hear you (and love you) from the Oval Office. MAKE AMERICA GREAT AGAIN!

10:05 PM · Jan 5, 2021    ⓘ

58.    Then, less than 10 minutes later, he attacked "the weak and ineffective RINO [Republican In Name Only] section of the Republican Party," threatening that the "thousands of people pouring into D.C. … won't stand for a landslide election victory to be stolen":



**Defendants Conspire With Trump to Overturn the Election**

59.    The other Defendants—Mo Brooks, Rudolph Giuliani, and Donald Trump Jr.—all conspired with Trump, each other, and others to subvert the will of the people in the 2020 election.  While those efforts culminated with the attack on January 6, they began long before then.

        **Rudolph Giuliani**

60.    Rudolph Giuliani spearheaded another arm of Trump's efforts to subvert the election: the numerous challenges in the courts.  He led a legal team that eventually filed 62 lawsuits seeking to undo the election results, all in key battleground states.

16

61.     Virtually all those lawsuits were rejected outright.  Judges appointed by Republicans and Democrats—including those appointed by Trump himself—determined the claims brought by Giuliani and the others were baseless.  Judges derided the allegations in these suits as "without merit" and "flat-out wrong."  One judge opined that what would "undermine the public's trust in the election" was not the alleged massive fraud Trump alleged, but the Court overturning the results of a landslide election based on no evidence of systemic wrongdoing at all:



62.     In December 2020, Giuliani, who was not a government official, tried to convince acting Deputy Secretary of Homeland Security Ken Cuccinelli to have the Department of Homeland Security illegally seize voting machines.  The Deputy Secretary refused to do so.

63.     While he was baselessly seeking to undo the election in the courts, Giuliani was also repeatedly spreading Trump's unsubstantiated claims of massive voter fraud through traditional and social media.

64.     Focusing on the Defendants' final means of subverting the election—blocking certification of President Biden's victory—Giuliani advanced the argument that Vice President

Pence could unilaterally block certification of the Electoral College vote, a position almost universally rejected by legal scholars, and by Vice President Pence himself.

65.     At 6:34 p.m. on January 5, Giuliani tweeted a link to a YouTube video from his show "Common Sense" entitled, "Watch this Before January 6th."  The video purported to explain why it was permissible for Vice President Pence to block certification of the Electoral College vote the next day.  Giuliani tweeted a retweet of that post later that night and again the following morning, shortly before Trump spoke at the rally.

66.     A little over an hour later, on January 5 at 7:44 p.m., Giuliani made clear that he would be at the rally.  He also volunteered that President Trump would "be joining us" there.

67.     As recounted below, Giuliani would tell the crowd at the rally the next day that it was perfectly legal for Vice President Pence to block certification of the vote—even though most experts disagreed—and he suggested that Pence's failure to do so would be an act of cowardice, if not outright treason.  He then told the rally-goers, shortly before many of them stormed the Capitol, that it was time for "trial by combat."

**Donald Trump Jr.**

68.     In the weeks before the January 6 rally, Donald Trump Jr. repeatedly spread his father's baseless claims of massive, widespread voter fraud.

69.     For example, on November 6, Donald Trump Jr. tweeted:



18

70.     As early as November 18, an analysis commissioned by ABC News confirmed

that "[f]alse and misleading election-related claims, already running rampant on social media in

the wake of this year's race, were given an exponential boost in exposure after they were shared

by Donald Trump Jr. and Eric Trump."[12]  Trump Jr. understood this to be the case and

intentionally spread the misleading claims with the intent of raising their public profile.

71.     Trump Jr. did these things in an effort to overturn the 2020 Presidential election

results and to aid the other Defendants' efforts to do the same.

72.     Upon information and belief, Trump Jr. continued to spread such claims through

January 6.  He has since deleted numerous social media posts related to the events of January 6,

including all his Twitter posts prior to January 28, 2021.

73.     Trump Jr. also repeatedly criticized "weak Republicans" and "radical left

Democrats" as making the cover-up of this alleged massive voter fraud possible.[13]

74.     On January 5, Donald Trump Jr. shared a video on Instagram with a call to "Be

Brave. Do Something.":



---

[12]     *See* Catherine Sanz, "Eric Trump, Donald Trump Jr. amplified claims of election fraud,
analysis shows," ABCNews.com (Nov. 18, 2020), *available at*
https://abcnews.go.com/Politics/eric-trump-donald-trump-jr-amplified-claims-
election/story?id=74261329.

[13]     *See* https://www.instagram.com/p/CHQANEVlj6i/?hl=en

75.     Trump Jr. did these things in an effort to overturn the 2020 Presidential election results and to aid the other Defendants' efforts to do the same.

76.     The day before the rally, Trump Jr.'s girlfriend, Kimberly Guilfoyle, spoke with "Stop the Steal" organizer Ali Alexander who relayed "The president's mood is he's in fighter mode and today will determine which Republicans are going to suffer his wrath going forward."[14]

77.     As recounted below, when Trump Jr. spoke at the rally the next day, he would again attack "radical Left Democrats" and "weak Republicans," and again claim that the election had been stolen from his father and the American people.

**<u>Mo Brooks</u>**

78.     On November 5—long before any evidence of alleged widespread fraud could possibly have been obtained, but the same day that Trump addressed the nation about the alleged massive election fraud that did not exist—Brooks tweeted that he "lack[ed] faith that this was an honest election."  He said that, as a House member, he would be "very hesitant to certify the results of this election if Joe Biden wins":



---

14      https://www.mediamatters.org/january-6-insurrection/stop-steal-organizer-ali-alexanders-pre-january-6-calls-violence-weve-got

79.     Brooks separately tweeted that day, "Count Every LEGAL Vote!," the same phrase Trump would use in his national address later that day:



80.     On November 18, Brooks previewed the Defendants' endgame should their other efforts fail, retweeting a journalist who quoted him as saying that Congress can reject the electoral college votes "of any state":



81.     On November 19—the same day that that Trump personally pressured Michigan elected officials—Brooks reiterated that "Congress controls who becomes president."[15]

_____

[15]     https://www.youtube.com/watch?v=_cdumF-u0Rw&list=PLKDm1nJ92oevVohc-GdCb6tCnJ_5iW-Zd

21

82.     One week later, on November 27, Brooks proclaimed that "Joe Biden DID NOT win lawful vote majority in Georgia" and that Congress should reject its electoral votes:



83.     Brooks did these things in an effort to overturn the 2020 Presidential election results and to aid the other Defendants' efforts to do the same.

84.     Brooks posted on Twitter that Trump personally had invited Brooks to speak on January 6 about how "Socialist Democrats" had managed to "steal this election" (Brooks identified Trump by tagging Trump's personal Twitter account):



22

As recounted below, Brooks told the attendees at the rally that their country was literally being taken from them, that the scale of wrongdoing was of historical proportions, that it was time to start "kicking ass," and that the individuals who were there that day had to be ready to perhaps sacrifice *even their lives* for their country.

85.    Brooks said all these things solely in his personal capacity for his own benefit and/or personal partisan aims.

<div align="center">

**Trump's Call to "Be There, will be wild!"**
**Is Understood As a Call to Violence**

</div>

86.    On December 19, 2020, after the Electoral College had voted to elect Joe Biden President, then-losing-candidate Trump promoted a "[b]ig protest on January 6." He told his followers to "Be there, will be wild!":



87.    Particularly considering Trump's prior directive to a white supremacist group—the Proud Boys—to "stand by," Trump's tweet claiming that it was "statistically impossible to have lost the 2020 Election" was accurately understood by his followers to be a signal that the country had fallen, and a call to violence in response.

88.    For example, within minutes of Trump's "be wild" tweet, it was shared on TheDonald.win with the title: "Trump Tweet.  Daddy Says Be in DC on Jan 6."  One user

"EvilGuy," said, in response to Trump's call to action, "I will be open carrying and so will my friends. We have been waiting for Trump to say the word. There is [sic] not enough cops in DC to stop what is coming."

89. Other responses were in a similar vein. MrMcGreenGenes wrote "Well, shit. We've got marching orders bois." ("Bois" is a likely reference to the "Bugaloo Bois" a right-wing extremist group.) Buttfart88 similarly understood Trump's tweet as "marching orders."

> – MrMcGreenGenes 558 points 2 hours ago +559 / -1
>
> Well, shit. We've got marching orders, bois.

> – Buttfart88 25 points 2 hours ago +25 / -0
>
> Trump just finally dropped the marching order at 1:00 in the morning. Holy shit lmao

NamelessKing understood Trump's tweet as a call to bring weapons to D.C. on the same day Congress was to certify the Electoral College vote:

> – NamelessKing 34 points 2 hours ago +35 / -1
>
> "Will Be Wild" is a hidden message for us to be prepared ....as in armed.
>
> could also mean he's posted military in certain places while they all wait for the results to be handed down.

PepeVsCommies took this as signal to use "any means necessary":

> Protest in DC on Jan 6!!! Let's all turn up and show them they can't steal the election!!! Trump tweets: "Be there, will be wild"
> posted 1 hour ago by PepeVsCommies +118 / -0
>
> WE NEED TO MAKE OUR VOICES HEARD, using any means necessary!!!

Perhaps most tellingly, SWORDofLIBERTY and justinkayz understood Trump's tweet as a call to do exactly what the rioters did—"burst into [the Capitol] by the thousands."

> – SWORDofLIBERTY 2 points 9 hours ago +2 / -0
>
> doesn't matter if they steal the election, if patriots burst into the building by the thousands and cut the heads off the hydra.
>
> They make the wrong choice with thousands of armed pissed patriots outside, they made their choice, and you have to make yours.

> – justinkayz 1 point 5 hours ago +1 / -0
>
> Storm the People's House and retake it from the fuckin' commies

Others discussed shooting police officers and bringing weapons.

> – loveshock 3 points 1 hour ago +7 / -4
>
> Cops don't have "standing" if they are laying on the ground in a pool of their own blood.

> – BathouseBarry 2 points 18 minutes ago +2 / -0
>
> And we will be armed, and we won't leave.

90.     Trump intended his supporters to interpret his "will be wild" tweet as a call to violence, and he knew they had done just that.

91.     Some of Trump's supporters engaged with him on Twitter about their plans to be a part of his "Cavalry."



92.     Similarly, on Facebook, many planned violence on January 6 in response to Trump's tweet.  For example, one California group built on "Trust, Dedication, and Survival" promoted "Operation Occupy the Capitol" on January 6 tagging the post #wearethestorm and #1776Rebels.[16]

---

[16]     See generally https://www.techtransparencyproject.org/articles/capitol-attack-was-months-making-facebook



93.     One conspiracy theorist, and Trump supporter, tweeted that he was ready to die for Trump.  The Arizona Republican Party retweeted his message, asking its followers "He is [ready to die for Trump].  Are you?"[17]

94.     In response to Trump's tweets calling people to Washington, D.C. on January 6, militia groups also began to strategize an assault on the Capitol by sharing maps of the Capitol and coordinating supplies and outfits to wear.

95.     The Three Percenters were one of these militia groups, and indeed many of its members were among those who stormed the Capitol on January 6.

---

[17]     See https://www.washingtonpost.com/politics/2021/01/06/lets-have-trial-by-combat-how-trump-allies-egged-violent-scenes-wednesday and https://twitter.com/AZGOP/status/1336186861891452929?ref_src=twsrc%5Etfw

27

96. Trump Jr. previously has showed support for the Three Percenters. In May 2019, he posted a picture on Instagram showing himself in a t-shirt with the Three Percenters logo[18] prominently displayed.

18 https://www.adl.org/resources/backgrounders/three-percenters

**Defendants Incite Violence at the Rally**

97.   The rally on January 6 was organized and funded by Trump's campaign

organization, Donald J. Trump for President ("the Campaign").  The Campaign paid an entity

called Event Strategies to obtain the permit for the rally.  The permit for the rally listed the

Campaign's director of finance operations as the "VIP Lead" for the rally.

98.   At 10:00 p.m. on January 5, Trump put down his final marker as a losing

candidate, declaring that Vice President Mike Pence had the authority to overturn the election

results and hand him a victory:



99.   Trump's tweet was intended to convince the tens of thousands of supporters who

had traveled to D.C. for the rally that Vice President Pence was uniquely situated to save

Trump's presidency.

100.   By the morning of January 6, thousands of Trump supporters had flooded

Washington, D.C.  Many were prepared for violence and had plans to attack the Capitol.  Many

more were there for a political rally.  The extremists who had been plotting the attack breached

the Capitol as planned.  The Defendants, and others, incited many of the other attendees to

violence, whipping them into a frenzy and turning them into a violent mob that participated in the attack.

101.   The rally opened at 7:00 a.m. on January 6.  From that time until shortly after 1:00 p.m., a series of speakers took the stage to lash out against the election results and to demand action by lawmakers from both political parties.

102.   The Defendants and others spoke at the rally.

103.   Amy Kremer, the head of the group Women For America First—one of the rally's principal organizers—told the crowd that Trump "asked us to show up today, and I don't think he's going to be disappointed."  She repeated the lie that President Biden "did not win this election!"  "We know that there was voter fraud, we absolutely know it," she went on, "and that's why we're here, to stop the steal."  She spoke of the crowd's role in apocalyptic terms: "This isn't about stealing an election from Donald Trump, this is about stealing an election from We the People, and we are here to save the republic."  "You guys," she implored them, "we cannot back down."  The crowd cheered in response.

104.   Trump and Trump Jr., standing backstage, heard Ms. Kremer say all those things to the crowd, including that they literally were there to "save the republic" and not to back down, and heard the crowd cheer in response.

105.   Mo Brooks also addressed the crowd at the rally, after Kremer had spoken.  The theme of Brooks' speech was that patriots are sometimes required to make extraordinary sacrifices for their country, and that day, January 6, was one such occasion.

106.   Brooks told the crowd, just one minute into his speech, "We are great because our ancestors sacrificed their blood, their sweat, their tears, their fortunes, and sometimes their

lives." He continued that the country faced a crisis of historical magnitude, its greatest crisis since World War II, and perhaps even the Civil War:

> We are here today because America is at risk unlike it has been in decades, and perhaps centuries.

107. He told the crowd that "Socialist Democrats" were attacking their freedoms and had literally stolen an election from them, and now had to be stopped:

> We are not gonna let the socialists rip the heart out of our country. We are not gonna let them continue to corrupt our elections and steal from us our God-given right to control our nation's destiny.

108. And he told the crowd, before repeating his theme, that it was time to start "kicking ass":

> Today is the day American patriots start taking down names and kicking ass! [Crowd cheers.] Now, our ancestors sacrificed their blood, their sweat, their tears, their fortunes, and sometimes their lives, to give us, their descendants, an America that is the greatest nation in world history. So I have a question for you: Are you willing to do the same? My answer is yes. Louder! Are you willing to do what it takes to fight for America? Louder!! Will you fight for America?!

109. Brooks said all those things solely in his personal capacity for his benefit and/or his personal partisan aims.

110. Trump and Trump Jr., standing backstage, heard Brooks say all those things to the crowd, and heard the crowd cheer in response.

111. Giuliani also spoke at the rally, after Brooks and Kremer had spoken. He told the crowd, falsely, that it was "perfectly legal" for Vice President Pence unilaterally to block certification of the Electoral College votes, suggesting to the lay crowd that any failure by Vice President Pence to do so could have no legitimate constitutional basis, but instead would amount to cowardice and even treason.

31

112.    To further foment the crowd, Giuliani confirmed the magnitude of what it would mean for certification to occur:

> This has been a year in which they have invaded our freedom of speech, our freedom of religion, our freedom to move, our freedom to live.  I'll be darned if they're going to take away our free and fair vote.  And we're going to fight to the very end to make sure that doesn't happen.

113.    Giuliani also falsely claimed, "This was the worst election in American history." "This election was stolen," he said, and "it has to be vindicated *to save our country*."

114.    Giuliani, who had led Trump's string of unsuccessful efforts to block certification in courts of law, declared instead, "Let's have trial by combat."  The crowd cheered.

115.    Trump and Trump Jr., standing backstage, heard Giuliani say those things, and heard the crowd cheer, particularly in response to his statement advocating "trial by combat" as the way forward.

116.    Donald Trump Jr. also spoke at the rally, after Giuliani, Brooks, and Kremer had spoken.  Like the others, Trump Jr. falsely told the crowd that the election had been stolen from his father.  In what should have been a sign of how the crowd was receiving the Defendants' claims and allegations, spontaneous chants of "Fight for Trump!  Fight for Trump!" rose up as Trump Jr. lambasted the alleged "glaring inconsistencies" and "statistical impossibilities" that allegedly had made President Biden's win possible.

117.    Trump Jr. also said the assembled crowd "should be a message to all the Republicans who have not been willing to actually fight.  The people who did nothing to stop the steal.  This gathering should send a message to them: this isn't their Republican party anymore.  This is Donald Trump's Republican party."

118.    Trump Jr., knowing full well how his father had attacked Vice President Pence in recent days for his intended refusal to block certification, went on to blast other Republicans who refused to fight for his father:

> This is the Republican party that's not just going to roll over and die because the Democrats would like you to.  That is what so many in the Republican establishment have created.  That sort of mentality: Ok, we'll turn the other cheek.  We'll roll over and die.  We'll fold and give up.  No more!  So to those Republicans—many of which may be voting on things in the coming hours—you have an opportunity today.  You can be a hero, or you can be a zero.  And the choice is yours, but we are all watching!

119.    Trump Jr. concluded by stating, "If you're gonna be the zero, and not the hero, we're coming for you, and we're gonna have a good time doing it."  The crowd cheered in response.

120.    Trump, standing backstage, heard Trump Jr. say those things, and heard the crowd cheer in response.

121.    Donald Trump was the final speaker at the rally.  He began his remarks at approximately 12:00 p.m. and concluded around 1:15 p.m., just after the first skirmishes between insurgents and Capitol Police officers were breaking out at the Capitol.

122.    In his remarks, Trump said "We took them by surprise and this year, they rigged an election.  They rigged it like they've never rigged an election before."

123.    Trump continued that "Hundreds of thousands of American patriots are committed to the honesty of our elections and the integrity of our glorious Republic.  All of us here today do not want to see our election victory stolen by emboldened radical left Democrats, which is what they're doing and stolen by the fake news media.  That's what they've done and what they're doing.  We will never give up."

124.   Trump also said "We will never concede, it doesn't happen. You don't concede when there's theft involved.  Our country has had enough.  We will not take it anymore and that's what this is all about.  To use a favorite term that all of you people really came up with, we will stop the steal."  In referring to "the steal," Trump meant the certification of Joseph Biden as President, which was underway at the Capitol.

125.   As the crowd chanted "Fight for Trump," Trump responded, "we will not let them silence your voices.  We're not gonna let it happen."

126.   Trump gave the crowd permission to break the rules; he told them that "[w]hen you catch somebody in a fraud, you're allowed to go by very different rules."

127.   While Trump was speaking, at around 12:45 p.m., a pipe bomb was found at the Republican National Committee headquarters.  Another was found at the Democratic National Committee headquarters about thirty minutes later.

128.   Trump continued to incite the crowd.  Trump concluded his speech by reminding the crowd that they'll "never take back our country with weakness.  You have to show strength, and you have to be strong."  He told the crowd to "walk down Pennsylvania Avenue.  I love Pennsylvania Avenue.  And we're going to the Capitol … But we're going to try and give our Republicans, the weak ones because the strong ones don't need any of our help.  We're going to try and give them the kind of pride and boldness that they need to take back our country."  The crowd cheered in response.



"And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore" …"You'll never take back our country with weakness. You have to show strength, and you have to be strong."

Donald Trump Jr., standing backstage, heard Trump say those things, and heard the crowd cheer in response.

### Violence Starts at the Capitol

129.   Trump and the other Defendants had put out a clear call to action, and the crowd responded.  As Trump was instructing them to go to the Capitol, insurgents were already forcing their way through barricades, attempting to breach the building, while blasting Trump's speech on a bullhorn.

130.   The violence escalated quickly.  After Trump's speech ended, insurgents charged the hill surrounding the Capitol and began scaling the building's outer walls.  Officers reported that rioters were attacking them with metal poles.  Law enforcement and local leaders put out calls for help.  Officers called for reinforcements as the mob pulled down the gates erected to protect the Capitol, attacked officers, and started throwing explosives.

131.   At 1:34 p.m., the House Sergeant at Arms and D.C. Mayor Muriel Bowser both asked for backup.

132.   At around 1:45 p.m., frenzied Trump supporters surged passed Capitol Police officers protecting the Capitol's West steps.  By 1:49 p.m., the situation had gotten so volatile

that the Capitol Police requested the assistance of the National Guard.  One officer declared,

"We're going to give riot warnings.  We're going to try to get compliance.  But this is now

effectively a riot."

133.    Meanwhile, Trump stood by, encouraging the mob to continue the violence.  At

the same time the mob was declared a riot, Trump tweeted his entire speech from the rally:



134.    About half an hour later, at 2:12 p.m., insurgents breached the Capitol.  They

broke windows using riot shields and poles, climbed into the building, and opened the doors for

the mob to storm the interior of the Capitol.  Some of those insurgents were in helmets and full

tactical gear; others carried baseball bats, Trump flags, hockey sticks, and crutches; they had

flex cuffs and climbing gear; some were equipped with their own radio system; others, stun

guns and explosives:

36



135.    As the mob was running rampant through the Capitol, Secret Service ushered

Vice President Pence off the Senate floor.  The mob chanted, "Hang Mike Pence!"  Insurgents

outside the Capitol erected a noose and gallows:



136.    The mob specifically targeted other elected officials as well.  Armed and

organized insurrectionists trained their sights on Speaker of the House Nancy Pelosi.  They

sought her out on the House floor and in her office—which they ransacked—terrorized her staff,

and publicly declared their intent to kill her.  Capitol Police officers were forced to quickly

evacuate Speaker Pelosi from the House Rostrum.

137.    By 2:20 p.m., Capitol Police announced that the Capitol had been breached and

was on full lockdown.  Members of Congress trapped inside the House, including the Plaintiff

here, were instructed to put on gas masks located underneath their seats because tear gas was

being deployed as a countermeasure.

138.    At 2:24 p.m., almost an hour after rioters descended on the Capitol, and as they were storming the hallways in search of members, Trump sent out a tweet with the clear intent to further inflame the mayhem, and which directly imperiled his own Vice President: "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution."



139.    This tweet was repeated by rioters at the Capitol on megaphones, who understood Trump's tweet to be encouragement to further violence.

140.    In response to this tweet, members of the mob continued to chant "Hang Mike Pence!" and "Mike Pence is a Bitch!" as they continued their siege.

141.    At around 2:26 p.m., Trump called Senator Mike Lee's cell phone looking for Senator Tuberville.  Senator Lee handed the phone to Senator Tuberville who reported stating, "I looked at the phone and it said the White House on it, I said hello, the President said a few words.  I said, 'Mr. President they are taking our Vice President out and they want me to get off the phone and I've got to go.'"

142.    In another phone call, House Minority Leader Kevin McCarthy begged Trump to call off the rioters, pleading with him that the rioters were all Trump supporters.  In response,

Trump told McCarthy, "Well, Kevin, I guess these people are more upset about the election than you are."

143.   While the feral mob grew more violent, climbed over balconies, and erected nooses in front of the Capitol, Trump's staff and advisors pleaded with him to address the nation and put an end to the violence.  At 2:38 p.m., an hour after the first breach, Trump obliged, but stopped far short of calling off the mob or condemning the assault that was still underway:



144.   At around 2:44 p.m., Ashli Babbit, an Air Force veteran and Trump supporter, was shot and killed by Capitol Police.  By 3:00 p.m., the District issued notice of an emergency citywide curfew to begin at 6 p.m.

145.   Meanwhile, the mob inside the Capitol shouted, "We want Trump!"  The mob continued attacking officers with a variety of munitions—rocks, bottles, metal poles, bear spray, and pepper spray.  Officers reported being "flanked" and "los[ing] the line."  For hours, officers were forced into hand-to-hand combat to prevent more rioters from entering the Capitol.

146.   All these events were widely reported in print, television, and online media outlets, and Trump and the other Defendants were aware of this coverage.

147.   At 4:17 p.m., Trump tweeted a recorded video directed to his supporters as they continued to ransack the Capitol:



In the video, Trump told the mob, "I know your pain, I know you're hurt," and repeated his lies about a stolen election that had driven the insurgents to the Capitol in the first place. In the same breath he told the mob to go home, he also said, "We love you. You're very special."

148.    Predictably, just as Trump and the other Defendants had intended, the mayhem continued. A woman was later trampled to death by rioters while the mob rushed to breach a tunnel entrance of the Capitol.

149.    At around 5:40 p.m., the police finally began to clear the Capitol, and Congressional leaders announced they would proceed with the certification of the Electoral College Votes. By that time, the mob had thoroughly pillaged the premises: they had shattered windows, damaged statues, broken doors, vandalized offices, stolen laptops, shattered a mirror, desecrated the Speaker's office, and stolen the Speaker's lectern. In total, six people lost their lives because of the riot, 140 officers were hurt, and scores of people were left emotionally and physically injured, including the Plaintiff.

150.    At 6:01 p.m., five hours after insurgents had begun their siege on the Capitol and had threatened to kill Vice President Pence and others, Trump finally released a statement that directly addressed the violence. Once again, however, the message fell well short of a forceful

40

condemnation or rebuke.  In another recorded video, Trump said, in a chilling "I told you so" moment, that "These are the things and events that happen when a sacred landslide victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long."  He then told the members of the violent mob, who continued to occupy the Capitol and terrorize Plaintiff and other members to "Go home with love & in peace. Remember this day forever!"



151.   Many of the rioters cited Trump himself as the inspiration for their violent actions.[19]  For example, the attorney for Jacob Anthony (the "Qanon Shaman") explained that "he came as a part of a group effort, with other 'patriots' from Arizona, at the request of the President that all 'patriots' come to D.C. on January 6, 2021."

152.   In doing all of that, Trump acted well outside the outer perimeter of his official responsibility as president in the waning days of his term in office.  His words and actions in lying about massive, coordinated fraud, improperly pressuring state legislators to overturn specific state results, seeking to undo such results through largely frivolous lawsuits, and in inciting a crowd while knowing some of his supporters were willing to react to his claims with political violence, all were meant to serve his own partisan and individual aims.

---

[19]      https://www.washingtonpost.com/politics/2021/02/09/over-over-over-arrested-rioters-say-what-spurred-them-trump/

41

## The Aftermath of the Riot

153.   The reaction to Trump's words and actions was swift.  That night, both Twitter and Facebook suspended Trump's accounts.  Facebook removed Trump's posts, explaining that "on balance these posts contribute to, rather than dimmish, the risk of ongoing violence."  Twitter initially shut down Trump's account for 12 hours, citing "repeated and severe violations of [its] Civic Integrity policy."[20]  The next day, Facebook announced it would suspend Trump's account indefinitely.  Facebook CEO Mark Zuckerberg also criticized Trump for "use of our platform to incite violent insurrection against a democratically elected government."  One day after that, on January 8, Twitter permanently suspended Trump's account "due to the risk of further incitement of violence."

154.   In the days that followed the January 6 insurgency, other social-media platforms were shuttered, including Parler and "r/The_Donald," a prominent community on Reddit dedicated to Trump.  Their decisions also were prompted by concerns about further incitement of violence.

155.   Lawmakers from both parties also condemned Trump for his role in the violence at the Capitol.

## Trump Continues to Spread Dangerous Lies
## Even After the Events of January 6

156.   For his part, Trump continues to recite the lie that the 2020 election was stolen from him in an unprecedented act of fraud, even amidst reports that some of his supporters are still intent on engaging in acts of political violence to protest the election.  On February 28, in an address at the Conservative Political Action Conference, he spent 10 minutes of a 90-minute

---

[20]      https://www.cnn.com/2021/01/06/tech/twitter-lock-trump-account/index.html

speech claiming the election was stolen and saying what should be done to make sure it does not

happen again.[21]  He told the crowd such things as, "This election was rigged," "They used

COVID as a way of cheating," and, "The level of dishonesty is not to be believed."  He said

those things despite wide reporting just days earlier that supporters of his were intent on

committing acts of violence in connection with another political rite—President Biden's first

State of the Union address to Congress.[22]

157.    President Trump's speech made clear he intends to continue insisting that the

2020 election was a massive fraud that requires widespread reform.  "We can never let this or

other abuses of the 2020 election be repeated or happen again," he said, "can never let that

happen again."  And he indicated he may intend to pursue the purportedly needed reform as

president:  "But who knows, who knows?  I may even decide to beat them for a third time.

Okay?  For a third time."

158.    In doing all of that, President Trump made clear he poses a risk of inciting future

political violence.

### Trump is Impeached For His Role in the Violence

159.    On January 13, 2021, then-President Trump was impeached for the second time in

his Presidency by the House of Representatives.  In part, the Impeachment Resolution states:

---

[21]      The speech can be viewed at https://www.c-span.org/video/?509084-1/president-trump-addresses-cpac&live.  A transcript of the speech can be found at
https://www.rev.com/blog/transcripts/donald-trump-cpac-2021-speech-transcript.
[22]      *See, e.g.*, CNN.com, "Capitol Police chief warns militia groups want to 'blow up the Capitol' when Biden addresss Congress" (Feb. 25, 2021), *available at*
https://www.cnn.com/2021/02/25/politics/us-capitol-attack-house-hearing-pittman-blodgett/index.html; USAToday.com, "Feds on guard for domestic extremists targeting Biden's address to Congress" (Feb.. 26, 2021), *available at*
https://www.usatoday.com/story/news/politics/2021/02/26/biden-address-congress-watched-domestic-extremist-threat-feds/6835780002/.

On January 6, 2021, pursuant to the 12th Amendment to the Constitution of the United States, the Vice President of the United States, the House of Representatives, and the Senate met at the United States Capitol for a Joint Session of Congress to count the votes of the Electoral College.  In the months preceding the Joint Session, President Trump repeatedly issued false statements asserting that the Presidential election results were the product of widespread fraud and should not be accepted by the American people or certified by State or Federal officials.  Shortly before the Joint Session commenced, President Trump, addressed a crowd at the Ellipse in Washington, D.C.  There, he reiterated false claims that "we won this election, and we won it by a landslide."  He also willfully made statements that, in context, encouraged – and foreseeably resulted in – lawless action at the Capitol, such as: "if you don't fight like hell you're not going to have a country any more."  Thus incited by President Trump, members of the crowd he had addressed, in an attempt to, among other objectives, interfere with the Joint Session's solemn constitutional duty to certify the results of the 2020 Presidential election, unlawfully breached and vandalized the Capitol, injured and killed law enforcement personnel, menaced Members of Congress, the Vice President, and Congressional personnel, and engaged in other violent, deadly, destructive and seditious acts.

160.    The Impeachment Resolution was delivered to the United States Senate on January 25, 2021.

161.    Trial in the Senate began on February 9, 2021 and concluded four days later, on February 13.  Shortly after closing arguments, the Senate voted to acquit.

162.    Although Senate Minority Leader Mitch McConnel and other Republican Senators had voted for acquittal, they were unequivocal that Trump's actions were clearly unacceptable.

163.    In a particularly sharp rebuke, Senator McConnell said of Trump's conduct:

There's no question, none, that President Trump is practically and morally responsible for provoking the events of the day.

The people who stormed this building believed they were acting on the wishes and instructions of their president, and having that belief was a foreseeable consequence of the growing crescendo of false statements, conspiracy theories and

reckless hyperbole which the defeated president kept shouting into the largest megaphone on planet Earth.

He did not do his job.  He didn't take steps so federal law could be faithfully executed and order restored.  No.  Instead, according to public reports, he watched television happily – happily – as the chaos unfolded.  Even after it was clear to any reasonable observer that Vice President Pence was in serious danger.[23]

164.    McConnell continued:

President Trump is still liable for everything he did while he was in office, as an ordinary citizen, unless the statute of limitations has run, still liable for everything he did while in office, didn't get away with anything yet – yet.

We have a criminal justice system in this country. We have civil litigation.  And former presidents are not immune from being held accountable by either one.

165.    Another prominent Republican Senator, John Thune (R-SD), the Senate Republican whip, when asked how Trump should be held accountable, said "One way, obviously, would be in a court of law."[24]  This suit follows.

**IV.**
**CLAIMS FOR RELIEF**

**COUNT 1**
**Conspiracy to Violate Civil Rights (Interference with Official Duties)**
**42 U.S.C. § 1985(1)**
**(Against all Defendants)**

166.    The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if set forth here in full.

167.    A violation of 42 U.S.C. § 1985(1) occurs when two or more persons conspire to do any one or more of the following:

---

[23]    https://www.npr.org/sections/trump-impeachment-trial-live-updates/2021/02/13/967701180/after-vote-mcconnell-torched-trump-as-practically-and-morally-responsible-for-ri

[24]    https://www.cnn.com/2021/01/29/politics/senate-republicans-trump-impeachment-capitol-riot/index.html

a.   "prevent by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States";

b.   "[prevent an official by force, intimidation, or threat] from discharging any duties thereof";

c.   "induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed";

d.   "injure [an official] in [their] person or property on account of [their] lawful discharge of the duties of [their] office, or while engaged in the lawful discharge thereof"; and/or

e.   "injure [an official's] property so as to molest, interrupt, hinder, or impede [them] in the discharge of [their] official duties."

168.   As described more fully in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired with one another to undertake a course of action to prevent President Joseph Biden and Vice President Kamala Harris from being certified as the winners of the 2020 presidential election and from accepting and/or holding their respective offices.

169.   As described more fully in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others to prevent members of Congress, including the Plaintiff, and Vice President Mike Pence from counting the Electoral College Votes and certifying President Biden and Vice President Harris as the winners of the 2020 presidential election.

**JA - 115**

170.    As described more fully in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired among themselves and with others to induce members of Congress, including the Plaintiff, and Vice President Pence to leave the United States Capitol grounds, or some part thereof, including the Senate and House chambers, while they were performing their official duties as required by the 12th Amendment to the United States Constitution and other federal law.

171.    As described more fully in this Complaint, the Defendants among themselves and with others agreed and conspired to injure members of Congress, including the Plaintiff, and Vice President Pence, while they were engaged in the lawful discharge of their duties to count the Electoral College votes and certify the winners of the 2020 presidential election.

172.    As described more fully in this Complaint, the Defendants among themselves and others, conspired to injure the property of members of Congress, including the Plaintiff, to interrupt, hinder, and impede the performance of their official duties to count the Electoral College votes and certify the winners of the 2020 presidential election.

173.    As described more fully in this Complaint, the Defendants made public statements knowingly designed to undermine public confidence in the election.  Such statements included falsely claiming that the election had been "rigged" and that fraudulent voting had been widespread enough to affect the outcome.  These statements were intended to have the effect, and did have the effect, of communicating strategies for accomplishing the aims of the Defendants' illegal conspiracy to other members of the conspiracy, including the persons who took violent action on January 6, 2021.

174.    As described more fully in this Complaint, the Defendants also encouraged, directed, and incited others to confront state and local officials about the Defendants' false

47

claims of election-rigging and fraud. The purpose of this conduct was to build public support for these claims. These statements were intended to have the effect, and did have the effect, of communicating strategies for accomplishing the aims of the Defendants' illegal conspiracy to other members of the conspiracy, including the persons who took violent action on January 6, 2021.

175.   As described more fully in this Complaint, the Defendants promoted, supported, and endorsed a rally near the White House on January 6, 2021, the very same day the Plaintiff and other lawmakers participated in a joint session of Congress to count and certify the Electoral College votes from the 2020 presidential election.

176.   Among other purposes, the purpose of the rally was to gather a crowd in an effort to incite them to disrupt the certification of the Electoral College votes by Congress, including the Plaintiff, and to deny President Biden and Vice President Harris their respective offices.

177.   Donald Trump tweeted to his supporters that the January 6 rally "will be wild!" and in fact tens of thousands of his supporters made the trip to the District to participate in the event. Many of those supporters understood Trump's tweet to be a call to violent action to stop members of Congress from certifying the Electoral College vote. Trump's tweets were, in essence, an offer to join a conspiracy to disrupt members of Congress from performing their duties. By answering his call, the co-conspirators, including the other Defendants here, indicated their agreement to his unlawful conspiracy to disrupt Congress and deny office to President Biden and Vice President Harris.

178.   Donald Trump Jr. addressed the large crowd at the January 6 rally. He said that the Republican party was now "Donald Trump's Republican party" and it was "not just going to roll over and die." He also told Republicans "if you're gonna be the zero, and not the hero,

we're coming for you, and we're gonna have a good time doing it."  Trump Jr. intended these words as a threat of violence or intimidation to coerce members of Congress to disregard the election results.  Each of the other Defendants was aware of Trump Jr.'s remarks and endorsed and supported them as part of, and in furtherance of, the Conspiracy.

179.    Mo Brooks addressed the large crowd at the January 6 rally.  He said "America is at risk unlike it has been in decades, and perhaps centuries."  He told the crowd to start "kicking ass," and he spoke with reverence, at a purportedly peaceful demonstration, of how "our ancestors sacrificed their blood, sweat, their tears, their fortunes, *and sometimes their lives*," before shouting at the crowd "Are you willing to do the same?!"  Brooks intended these words as a threat of violence or intimidation to block the certification vote from even occurring and/or to coerce members of Congress to disregard the results of the election.  Each of the other Defendants was aware of Brooks' remarks and endorsed and supported them as part of, and in furtherance of, the Conspiracy.

180.    Rudolph Giuliani addressed the large crowd at the January 6 rally.  He repeated the demonstrably false claim that Vice President Pence had the unilateral power to block certification of the Electoral College votes.  He also said they would "fight to the very end to make sure" the election was not stolen, before stating "Let's have trial by combat."  Giuliani intended these words as a threat of violence or intimidation to coerce members of Congress to disregard the results of the election.  Each of the other Defendants was aware of Giuliani's remarks and endorsed and supported them as part of, and in furtherance of, the Conspiracy.

181.    Donald Trump addressed the large crowd at the January 6 rally.  He said "they rigged an election. They rigged it like they've never rigged an election before."  He said "We will never concede, it doesn't happen. You don't concede when there's theft involved.  Our

49

country has had enough.  We will not take it anymore and that's what this is all about."  Right before turning the crowd loose on the Capitol, Trump exclaimed, "You'll never take back our country with weakness.  You have to show strength, and you have to be strong."  Trump intended these words as a threat of violence or intimidation to coerce members of Congress to disregard the results of the election.  Each of the other Defendants was aware of Trump's remarks and endorsed and supported them as part of, and in furtherance of, the Conspiracy.

182.   Each of the Defendants was aware of each other's incendiary remarks at the rally—and other, similar statements—and endorsed and supported them as part of, and in furtherance of, the Conspiracy.

183.   Under § 1985, any "party so injured or deprived" as a result of acts committed in furtherance of the conspiracy "may have an action for the recovery of damages occasioned by such injury or deprivation against any one or more of the conspirators."

184.   The Plaintiff here is a "party so injured or deprived" by acts committed by the Defendants in furtherance of the conspiracy.

**COUNT 2**
**Neglect to Prevent Interference with Civil Rights**
**42 U.S.C. § 1986**
**(<u>Against all Defendants</u>)**

185.   The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if set forth here in full.

186.   It is a violation of 42 U.S.C. § 1986 for any person with "knowledge that any of the wrongs conspired [under § 1985] to be done … are about to be committed," and, while having "power to prevent or aid in preventing the commission of same," "neglects or refuses to do so."

187.    No later than January 6, 2021, as described more fully in this Complaint, the Defendants, by force, intimidation, or threat, conspired to prevent President Joseph Biden and Vice President Kamala Harris from being certified as the winners of the 2020 presidential election and from accepting and/or holding their respective offices.

188.    As such, the Defendants knew that wrongs conspired to be done were about to be committed—namely, by the Defendants themselves and their supporters.

189.    The Defendants commanded the attendance of tens of thousands of individuals at the rally in the District on January 6, 2021 for the purpose of coercing members of Congress to disregard the election results, and further incited thousands to violently storm the Capitol building shortly thereafter.

190.    Moreover, when it was clear that rioters had stormed the Capitol, and Congress was unable to certify the results of the Electoral College vote, the Defendants had the power to stop the rioters but refused and, instead, encouraged them.

191.    The power to intentionally provoke the wrongs at issue *a fortiori* includes the power to prevent or aid in preventing the same, and the Defendants chose not to do so in violation of 42 U.S.C. § 1986.

## COUNT 3
### Negligence *Per Se*
### (Violation of D.C. Code §§ 22-1322 – Incitement to Riot)
### (Against all Defendants)

192.    The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if set forth here in full.

193.    D.C. Code § 22-1322 makes it a criminal offense to "willfully incite[] or urge[] other persons to engage in a riot." D.C. Code § 22-1322(b). The statute defines a "riot" as "a public disturbance involving an assemblage of 5 or more persons which by tumultuous and

violent conduct or the threat thereof creates grave danger of damage or injury to property or persons." D.C. Code § 22-1322(a).

194.   Section 22-1322, on its face, is a statute designed to promote public safety.

195.   Under District of Columbia law, statutes designed to promote public safety can establish a standard of care for a tort claim, such that their violation can amount to negligence *per se*.

196.   The Defendants violated that statute through their willful conduct by, among other things:

a.   insisting for several weeks that the country was no longer a functioning republic, but instead was literally being seized in a massive, coordinated act of fraud;

b.   repeating those same falsehoods to the assembled crowd on January 6;

c.   then—while knowing the propensity of some of Trump's supporters to engage in political violence—saying the following highly inflammatory things, among others:

i.   it was time to "start taking down names and kicking ass," they must be willing to sacrifice "their blood, their sweat," and maybe even "their lives";

ii.   "the fight begins today";

iii.   it was time for "trial by combat";

iv.   "we're coming for you";

v.   "you're allowed to go by very different rules"; and

vi.   "you have to show strength."

52

197.   The Defendants, in short, convinced the mob that something was occurring that—if actually true—might indeed justify violence to some, and then sent that mob to the Capitol with violence-laced calls for immediate action.

198.   Trump further demonstrated his willfulness in inciting the riot by refusing to call it off for hours as it wreaked havoc, even telling Representative Kevin McCarthy that the rioters' actions proved they simply cared more about the election that he did.  When Trump did finally address the mob, he did so intentionally in highly equivocal language that largely praised them and blamed the riot on the alleged election fraud.

199.   As described, the Plaintiff was harmed by the rioting mob the Defendants incited.

200.   The Defendants are therefore liable to the Plaintiff for negligence *per se*, and for all damages arising therefrom.

## COUNT 4
### Negligence *Per Se*
### (Violation of D.C. Code § 22-1321(a)(2) – Disorderly Conduct)
### (<u>Against all Defendants</u>)

201.   The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if set forth here in full.

202.   D.C. Code § 1321 makes it a misdemeanor to "incite or provoke violence where there is a likelihood that such violence will ensue."  D.C. Code § 22-1321(a)(2).

203.   Section 22-1321, like Section 22-1322, is a statute designed to promote public safety.

204.   Under District of Columbia law, statutes designed to promote public safety can establish a standard of care for a tort claim, such that their violation can amount to negligence *per se*.

205.     For all the reasons identified in Count 3, the Defendants violated D.C. Code § 22-1321.

206.     The harms that resulted from the Defendants' violation is precisely the kind of harm that Section 22-1322 is designed to prevent.

207.     The Defendants are therefore liable to the Plaintiff for negligence *per se*, and for all damages arising therefrom.

## COUNT 5
### Bias-related Crimes
### (Inciting Assault, Inciting to Riot, Disorderly Conduct and Terrorism)
### D.C. Code §§ 22-404, 22-1805, 22-1321, 22-1322(c), 22-3152, 22-3153, 22-3704
### <u>(Against all Defendants)</u>

208.     The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if set forth here in full.

209.     D.C. Code § 22-3704 provides a "civil cause of action" for victims of bias-motivated crimes, "[i]rrespective of any criminal prosecution or the result of a criminal prosecution" of those crimes. D.C. Code § 22-3704(a). Among the biases that qualify is "the actual or perceived . . . political affiliation of a victim." *Id.* "Political affiliation" under the statute extends beyond party and includes an individual's stance for or against specific political figures.

210.     The Defendants and the rioters plainly were motivated by the Plaintiff's political affiliation as a political opponent of Donald Trump. The Defendants repeatedly directed their attacks at "Socialist Democrats," as well as "weak-kneed Republicans" and "RINOs." The crowd that gathered on January 6 repeatedly cheered these attacks, and the rioters who breached the Capitol specifically sought out certain prominent Democrats and at least one prominent Republican, Vice President Pence, whom Trump had repeatedly called out by name.

211.   This bias was demonstrated by the following statements, among many others:

   d.   Trump Jr.: "The people who did nothing to stop the steal.  This gathering should send a message to them: this isn't their Republican party anymore. This is Donald Trump's Republican party."

   e.   Trump: "All of us here today do not want to see our election victory stolen by emboldened radical-left Democrats, which is what they're doing."

   f.   Trump: "For years, Democrats have gotten away with election fraud and weak Republicans.  And that's what they are.  There's so many weak Republicans."

   g.   Trump: "They're weak Republicans, they're pathetic Republicans and that's what happens."

   h.   Trump: "If this happened to the Democrats, there'd be hell all over the country going on.  There'd be hell all over the country.  But just remember this: You're stronger, you're smarter, you've got more going than anybody. And they try and demean everybody having to do with us.  And you're the real people, you're the people that built this nation.  You're not the people that tore down our nation.

   i.   Trump: "The weak Republicans, and that's it.  I really believe it.  I think I'm going to use the term, the weak Republicans.  You've got a lot of them.  And you got a lot of great ones.  But you got a lot of weak ones.  They've turned a blind eye, even as Democrats enacted policies that chipped away our jobs, weakened our military, threw open our borders and put America last.

   j.   Trump: "They also want to indoctrinate your children in school by teaching them things that aren't so.  They want to indoctrinate your children.  It's all

part of the comprehensive assault on our democracy, and the American people

are finally standing up and saying no.  This crowd is, again, a testament to it."

k.   Trump: "So I hope Mike has the courage to do what he has to do.  And I hope

he doesn't listen to the RINOs and the stupid people that he's listening to."

212.   The Defendants' conduct violated multiple D.C. criminal statutes.

213.   D.C. Code § 22-404 criminalizes assault and behavior that "threatens another in a

menacing manner."  As described in Count 3, D.C. Code § 22-1322 criminalizes inciting a riot.

And as described in Count 4, D.C. Code § 22-1321 criminalizes disorderly conduct.

214.   Under D.C. Code § 22-1805, "inciting, . . . aiding or abetting the principal

offender" of any criminal offense makes one criminally liable as if they too were a principal

offender.

215.   As described in Counts 3, 4, and 8, the Defendants are directly responsible for,

and additionally are responsible for aiding and abetting, the violence that occurred at the Capitol

on January 6, which actions amount to incitement to riot, disorderly conduct, and assault.

216.   The Defendants' actions also violated D.C.'s Anti-Terrorism Act.  That act

criminalizes acts of terrorism, including providing or soliciting material support or resources for

acts of terrorism.  D.C. Code § 22-3153.  The statute further defines an "act of terrorism" as a

"specified offense" intended to, among other things, "influence the policy or conduct of a unit of

government by intimidation or coercion."  D.C. Code § 22-3152(1).

217.   "Specified offense[s]" under the Anti-Terrorism Act include D.C. Code §§ 22-

2101 (Murder in the first degree); 22-2106 (Murder of law enforcement officer or public safety

employee); 22-2103 (Murder in the second degree); 22-2105 (Manslaughter); 22-2001

(Kidnapping and conspiracy to kidnap); 22-401 (Assault with intent to kill only); 22-406

(Mayhem or maliciously disfiguring); 22-301 (Arson); and 22-303 (Malicious burning, destruction, or injury of another's property, if the property is valued at $500,000 or more).  D.C. Code § 22-3152(8)(A)-(J).

218.   A "specified offense" for purposes of the Anti-Terrorism Act also includes "an attempt or conspiracy to commit any of" the above offenses.  D.C. Code § 22-3152(8)(K).

219.   The Defendants violated the Anti-Terrorism Act on January 6.  They told the crowd—as they had been saying for weeks—that the presidency was literally being stolen from them, then suggested they "start taking names and kicking ass," that they engage in "trial by combat," and that they play by "very different rules" before sending them to march on the Capitol.  The Defendants did this for the purpose of "influenc[ing] the policy or conduct of a unit of government," *i.e.*, Congress.

220.   For all these reasons, the Defendants are liable to the Plaintiff for violating D.C. Code § 22-3704, and for all damages arising therefrom.

**COUNT 6**
**Intentional Infliction of Emotional Distress**
**(<u>Against all Defendants</u>)**

221.   The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if set forth here in full.

222.   In claiming for weeks that President Biden's victory was in fact the largest act of fraud in American history; in seeing that some of Trump's supporters were willing to engage in violence in response to such claims; and in using highly inflammatory language in repeating the false claims of fraud at the rally before sending the crowd to the Capitol, the Defendants engaged in conduct so outrageous in character, and so extreme in degree, as to go beyond all

possible bounds of decency.  That fact is almost universally recognized in the widespread, bipartisan condemnation of Trump's words and actions that day.

223.    The riot that erupted in direct response to the Defendants' actions caused severe emotional distress to the Plaintiff.

224.    Plaintiff Eric Swalwell was inside the Capitol complex at all relevant times and was in the House chamber attempting to certify the results of the 2020 Presidential election when the violent mob breached the Capitol.  The Plaintiff heard the mob pound on the chamber doors and smash glass in an effort to get inside.  He watched as Capitol Police officers drew their weapons, barricaded entrances, and ordered the Plaintiff and other members of Congress to seek shelter, put on gas masks, and take cover in case there was gunfire.  The Plaintiff prepared himself for possible hand-to-hand combat as he took off his jacket and tie and searched for makeshift instruments of self-defense.  He listened in shock as the House Chaplain—a veteran of war herself—began praying for the members from the Rostrum.

225.    As the Plaintiff watched this horror unfold, he texted with his wife in what he felt could be his last moments, telling her "I love you very much.  And our babies."

226.    As a result of this, the Plaintiff suffered severe emotional distress.

227.    After telling them for weeks that their country was literally being taken from them and knowing the propensity of some of Trump's supporters to engage in violence, the Defendants made the highly inflammatory remarks described above.  Defendants intentionally, or at a minimum recklessly, caused the severe emotional distress suffered by the Plaintiff in connection with the January 6 attack.  Statements by Republican and Democratic officials alike—and by several individuals arrested for their roles in the riot—all have recognized the

direct link between statements made by the Defendants at the rally and the mob's decision to breach the Capitol.

228.   The Defendants are furthermore vicariously liable for the severe emotional distress caused by the rioters' actions that day.  The Defendants, with the rioters, jointly sought to prevent the lawful certification of President Biden's Electoral College victory.  The Defendants furthermore encouraged the rioters to do so through violent means.  Trump's refusal to condemn those acts for several hours, and then to do so equivocally while still expressing support and praise—which the other Defendants knew of and agreed to support—is further evidence of their agreement to block certification by any means.

229.   For those same reasons, the Defendants also are liable to the Plaintiff for aiding and abetting the rioters' acts of intentional infliction of emotional distress.

230.   For all these reasons, the Defendants are liable to the Plaintiff for intentional infliction of emotional distress and for all damages arising therefrom.

**COUNT 7**
**Negligent Infliction of Emotional Distress**
**(Against all Defendants)**

231.   The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if set forth here in full.

232.   In claiming for weeks that President Biden's victory was in fact the largest act of fraud in American history; in seeing that some of Trump's supporters were willing to engage in violence in response to such claims; and in using highly inflammatory language in repeating the false claims of fraud at the rally before sending the crowd to the Capitol, the Defendants at a minimum acted negligently.

233.   As described in this Complaint, the Plaintiff here was well within the zone of danger created by the Defendants' actions.  Congressman Swalwell was on the House floor when the mob reached the doors to the chamber, and he watched in horror as Capitol Police officers barricaded doors, held off the mob at gunpoint, and ordered the Plaintiff and others to put on gas masks and seek shelter from tear gas and potential gunfire.

234.   As described earlier in the Complaint, the Defendants' actions caused the Plaintiff to suffer severe emotional distress.

235.   For the same reasons identified in Count 7, the Defendants are furthermore vicariously liable for, and aided and abetted, the rioters' negligent infliction of emotional distress upon the Plaintiff.

236.   For all these reasons, the Defendants are liable to the Plaintiff for negligent infliction of emotional distress and for all damages arising therefrom.

**COUNT 8**
**Aiding and Abetting Common-Law Assault**
**(<u>Against all Defendants</u>)**

237.   The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if set forth here in full.

238.   On January 6, 2021, a mob of individuals, incited by the Defendants, stormed the Capitol.

239.   The Plaintiff was inside the Capitol as the mob gathered outside.  The mob attacked law enforcement officers protecting the entrance and intentionally and unlawfully forced its way inside the building.

60

240.   Many individuals in the mob either carried weapons or used objects such as poles and fire extinguishers as weapons before and after entering the building.  Some individuals in the mob also carried restraints such as plastic handcuffs and rope.

241.   The mob also unlawfully and intentionally entered non-public areas of the Capitol building, including the members' private offices.  Members of the mob damaged and vandalized personal and public property and stole documents, electronics, and other items from some members' offices.

242.   As the mob made its way through the Capitol looking for Members, participants threatened to kill numerous individuals, including, but not limited to, Vice President Mike Pence and Speaker of the House Nancy Pelosi.  The mob terrorized and injured scores of people inside and outside of the Capitol, including the Plaintiff.

243.   As described previously in the Complaint, the Plaintiff was harmed by the rioting mob the Defendants incited.

244.   The mob's intentional and unlawful entry into the Capitol, and the words and actions of its participants before and after entry, caused the Plaintiff to fear imminent physical harm.

245.   The Plaintiff in fact suffered harm because of the assault.

246.   The Defendants aided and abetted each other and the mob of individuals that stormed the Capitol and assaulted the Plaintiff.

247.   The Defendants were aware that their actions prior to and on January 6, 2021 promoted and encouraged the mob to storm the Capitol and assault the Plaintiff and others.

248.   Before directing the mob to the Capitol, the Defendants instructed them to "fight like hell," "start taking down names and kicking ass," and that it was time for "trial by combat."

249.    The Defendants intended these words to be taken literally.

250.    For several hours after the mob had stormed the Capitol, the Defendants refused to communicate anything to the mob that might discourage continued unlawful action.

251.    The Defendants knowingly and substantially assisted in the assault that was perpetrated upon the Plaintiff.  The Defendants riled up the crowd and directed and encouraged the mob to attack the Capitol and seek out members of Congress and assault them.

252.    For all these reasons, the Defendants are liable to the Plaintiff for assault and for all damages arising therefrom.

<div align="center">

**COUNT 9**
**Negligence**
**(<u>Against all Defendants</u>)**

</div>

253.    The Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if set forth here in full.

254.    The Defendants' actions prior to and on January 6 promoted and encouraged the mob to storm the Capitol and assault the Plaintiff.

255.    In directing a crowd of thousands to march on the Capitol—particularly considering their violence-laden commands—the Defendants owed a duty of care to the Plaintiff and to everyone in the Capitol to exercise reasonable care in directing the mob's actions.

256.    Given the magnitude of wrongdoing the Defendants had alleged was about to occur, and the violent reaction of some Trump supporters on multiple prior occasions in response to the very same claims, it was reasonably foreseeable to the Defendants that members of the crowd might act violently if sufficiently inflamed that day and insufficiently instructed to remain peaceful and law-abiding.

257.   In (1) repeating their claims that what was about to occur was a fraud of historical magnitude, (2) blaming the fraud on the Plaintiff and other similarly-situated officials, and then (3) sending the crowd off with exhortations to "fight like hell," to "start taking down names and kicking ass," to have "trial by combat," and to play by "very different rules," all for the literal purpose of "sav[ing] the republic," the Defendants breached the duty of care they owed to the Plaintiff and others.

258.   The harm suffered by the Plaintiff was reasonably foreseeable given the Defendants' statements on January 6, considering the magnitude of the wrong they had said for weeks was happening and their knowledge of past violent reactions in response to the same message.

259.   As described in this Complaint, the Plaintiff suffered harm as a result of the events of January 6.

260.   The injury to the Plaintiff was proximately caused by the Defendants' breach of their duty of care.

261.   For all these reasons, the Defendants are liable to the Plaintiff for negligence and for all damages arising therefrom.

**V.**
**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests this Court to enter a judgment in his favor and grant relief against the Defendants as follows:

(1)   Order the Defendants to pay actual money damages to the Plaintiff in an amount to be determined at trial;

(2)   Order the Defendants to pay punitive damages to the Plaintiff in an amount to be determined at trial;

(3)     Declare that the Defendants violated the law as set forth above;

(4)     Order the Defendants to provide written notice to the Plaintiff no less than 7 days before any rally or other public event in Washington, D.C., on a day when significant election or election certification activity is taking place, and when the rally is planned to have more than 50 people in attendance, to allow the Plaintiff to determine whether to seek relief from the Court to prevent further violence or disruption to the proper functioning of the federal government;

(5)     Award the Plaintiff reasonable attorneys' fees and costs for his investigation and prosecution of this action; and

(6)     Grant any such additional relief as the Court deems just and proper.

## VI.
## JURY DEMAND

The Plaintiff demands a trial by jury by the maximum number of jurors permitted by law.

Dated: March 5, 2021                    Respectfully submitted,

CALEB ANDONIAN PLLC
Joseph Caleb (D.C. Bar No. 495383)
Philip Andonian (D.C. Bar No. 490792)
1156 Fifteenth Street, N.W., Ste. 510
Washington, D.C. 20005
Tel: (202) 787-5792
Email:  joe@calebandonian.com
              phil@calebandonian.com


KAISERDILLON PLLC
Matthew Kaiser (D.C. Bar No. 486272)
Sarah Fink (D.C. Bar No. 166663)
1099 Fourteenth Street, N.W., 8th Fl.

64

Washington, D.C. 20005
Tel: (202) 640-2850
Email: mkaiser@kaiserdillon.com
sfink@kaiserdillon.com

_____

COBURN & GREENBAUM PLLC
Barry Coburn (D.C. Bar No. 358020)
Marc Eisenstein (D.C. Bar No. 1007208)
1710 Rhode Island Avenue, N.W., 2nd Fl.
Washington, D.C. 20036
Tel: (202) 643-9472
Email: barry@coburngreenbaum.com
marc@coburngreenbaum.com

*Attorneys for the Plaintiff*

65

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HON. BENNIE G. THOMPSON, *in his personal capacity*, 2466 Rayburn House Office Building U.S. House of Representatives Washington, DC 20515, | ) ) ) ) ) ) |
| HON. KAREN R. BASS, *in her personal capacity,* 2021 Rayburn House Office Building U.S. House Representatives Washington, DC 20515, | ) ) ) ) ) |
| HON. STEPHEN I. COHEN, *in his personal capacity*, 2104 Rayburn House Office Building U.S. House of Representatives Washington, DC 20515, | ) ) ) ) ) ) |
| HON. VERONICA ESCOBAR, *in her personal capacity,* 1505 Longworth House Office Building U.S. House of Representatives Washington, DC 20515, | ) ) ) ) ) ) |
| HON. PRAMILA JAYAPAL*, in her personal capacity,* 2346 Rayburn House Office Building U.S. House of Representatives Washington, DC 20515, | ) ) ) ) ) ) |
| HON. HENRY C. JOHNSON, JR., *in his personal capacity*, 2400 Rayburn House Office Building U.S. House of Representatives Washington, DC 20515, | ) ) ) ) ) ) |
| HON. MARCIA C. KAPTUR, *in her personal capacity,* 2186 Rayburn House Office Building U.S. House of Representatives Washington, DC 20515, | ) ) ) ) ) ) |

Civil Action No. 1:21-CV-400-APM

AMENDED COMPLAINT

JURY TRIAL REQUESTED

HON. BARBARA J. LEE, *in her personal*                )
*capacity,*                                            )
2470 Rayburn House Office Building                     )
U.S. House of Representatives                          )
Washington, DC 20515,                                  )
                                                       )
HON. JERROLD NADLER, *in his personal*                 )
*capacity,*                                            )
2132 Rayburn House Office Building                     )
U.S. House of Representatives                           )
Washington, DC 20515,                                  )
                                                       )
HON. MAXINE WATERS, *in her personal*                  )
*capacity,*                                            )
2221 Rayburn House Office Building                     )
U.S. House of Representatives                          )
Washington, DC 20515,                                  )
                                                       )
HON. BONNIE M. WATSON COLEMAN, *in*  )
*her personal capacity*,                               )
168 Cannon House Office Building                       )
U.S. House of Representatives                          )
Washington, DC 20515                                   )
                                                       )
Plaintiffs,                                            )
                                                       )
v.                                                     )
                                                       )
DONALD J. TRUMP, *solely in his personal*              )
*capacity*                                             )
Mar-A-Lago                                             )
1100 S. Ocean Blvd.                                    )
Palm Beach, Florida 33480-5004,                        )
                                                       )
RUDOLPH W. GIULIANI,                                   )
Rudolph W Giuliani, PLLC                               )
445 Park Ave FL 18                                     )
New York, NY 10022-2606,                               )
                                                       )
OATH KEEPERS,                                          )
Attn: Stewart Rhodes                                   )
1030 E. Hwy 377                                        )
Ste 110-285                                            )
Granbury, TX 76048                                     )
4625 West Nevso Drive, Suite 2 & 3                     )

Las Vegas, NV, 89103, and       )
       )
PROUD BOYS INTERNATIONAL, L.L.C.,  )
c/o Jason L. Van Dyke       )
108 Durango Dr., Crossroads, TX, 76227,  )
       )
WARBOYS LLC,       )
Attn: Enrique Tarrio       )
5730 NW 2nd Street       )
Miami, Florida 33126,       )
       )
ENRIQUE TARRIO       )
5730 NW 2nd Street       )
Miami, Florida 33126       )
       )
Defendants.       )
_____ )

## TABLE OF CONTENTS

Page

JURISDICTION AND VENUE ................................................................................. 3

THE PARTIES ........................................................................................................ 4

STATEMENT OF FACTS ...................................................................................... 10

    I.      Defendant Trump Laid the Groundwork for the January 6 Attack by
          Praising Violent Supporters ................................................................ 10

    II.     Defendants Trump and Giuliani Mobilized Violent Supporters with a
          Misinformation Campaign ................................................................... 11

    III.    Defendant Trump Encouraged Violence Against Officials Who Refused to
          Lie About the Election Results ............................................................ 14

    IV.    In December 2020 and January 2021, Defendants' Plans for the January 6
          Insurrection Took Shape ...................................................................... 16

    V.     By January 5, 2021, Defendants Were Poised for the Violent Insurrection ........ 21

    VI.    The Morning of January 6, 2021, Defendants Attempted to Execute a
          Multi-Faceted Campaign to Prevent Congress from Certifying the Election
          Results ................................................................................................ 21

    VII.   Defendants Proud Boys and Oath Keepers and Their Co-Conspirators
          Invaded the Capitol ............................................................................. 26

    VIII.  A Bipartisan Group of Officials Recognize Defendant Trump's
          Culpability for the January 6 Assault on the Capitol ........................... 37

    IX.    Plaintiffs Were Injured by Defendants' Conduct .................................. 39

    a.     The Honorable Bennie Thompson .................................................... 39

    b.     The Honorable Karen Bass ................................................................ 41

    c.     The Honorable Stephen Cohen .......................................................... 42

    d.     The Honorable Veronica Escobar ...................................................... 43

    e.     The Honorable Pramila Jayapal ......................................................... 46

    f.     The Honorable Henry C. "Hank" Johnson, Jr. ................................... 50

## TABLE OF CONTENTS

Page

g.   The Honorable Marcy Kaptur .......................................................... 52

h.   The Honorable Barbara Lee ........................................................... 54

i.   The Honorable Jerrold Nadler ....................................................... 56

j.   The Honorable Maxine Waters ...................................................... 57

k.   The Honorable Bonnie Watson Coleman ..................................... 58

CAUSE OF ACTION ................................................................................ 60

PRAYER FOR RELIEF ............................................................................ 62

1.      On and before January 6, 2021, the Defendants Donald J. Trump, Rudolph W.
Giuliani, Proud Boys, and Oath Keepers conspired to incite an assembled crowd to march upon
and enter the Capitol of the United States for the common purpose of disrupting, by the use of
force, intimidation, and threat, the approval by Congress of the count of votes cast by members
of the Electoral College as required by Article II, Section 1 and the Twelfth Amendment of the
United States Constitution.  In doing so, the Defendants each intended to prevent, and ultimately
delayed, members of Congress from convening and discharging their duty commanded by the
United States Constitution to approve the results of the Electoral College in order to elect the
next President and Vice President of the United States.

2.      Plaintiffs, the Honorable Bennie G. Thompson, the Honorable Karen Bass, the
Honorable Stephen Cohen, the Honorable Veronica Escobar, the Honorable Pramila Jayapal, the
Honorable Henry C. Johnson, Jr., the Honorable Marcy Kaptur, the Honorable Barbara Lee, the
Honorable Jerrold Nadler, the Honorable Maxine Waters, and the Honorable Bonnie Watson
Coleman, all Members of the United States House of Representatives, bring this action against
the Defendants for conspiring to prevent them and other members of Congress from discharging
these official duties, in violation of 42 U.S.C. § 1985(1).  Enacted as the "Ku Klux Klan Act" in
1871, Section 1985(1) was intended to protect against conspiracies that, by force, intimidation,
or threat, sought to prevent members of Congress from discharging their official duties.  The
statute was enacted in response to violence and intimidation in which the Ku Klux Klan and
other organizations were engaged during that time period.

3.      The Defendants conspired to prevent, by force, intimidation, and threats, the
Plaintiffs, as members of Congress, from discharging their official duties to approve the count of

1

votes cast by members of the Electoral College following the presidential election held in November 2020.

4.      In furtherance of this common goal of preventing the timely approval of the Electoral College vote count, the Defendants acted in concert to incite and then carry out a riot at the Capitol by promoting an assembly of persons to engage in tumultuous and violent conduct or the threat of it that created grave danger of harm to the Plaintiffs and to other members of Congress.

5.      This conduct jointly undertaken to threaten the Plaintiffs and other members of Congress in order to disrupt the Electoral College vote count was part of an ongoing course of action pursued by the Defendants for the purpose of contesting the announced results of the presidential election held in November 2020 and preventing the duly elected President and Vice President from attaining approval by Congress of their election necessary to their inauguration.

6.      The insurrection at the Capitol was a direct, intended, and foreseeable result of the Defendants' unlawful conspiracy.  It was instigated according to a common plan that the Defendants pursued since the election held in November 2020, culminating in an assembly denominated as the "Save America" rally held at the Ellipse in Washington, D.C. on January 6, 2021, during which Defendants Trump and Giuliani incited a crowd of thousands to descend upon the Capitol in order to prevent or delay through the use of force and intimidation the counting of Electoral College votes in the hope that Defendants could achieve a different outcome of the election.  As part of this unified plan to prevent the counting of Electoral College votes, Defendants Proud Boys and Oath Keepers, through their leadership, acted in concert to spearhead the assault on the Capitol while the angry mob that Defendants Trump and Giuliani incited descended on the Capitol.  The carefully orchestrated series of events that unfolded at the

Save America rally and the storming of the Capitol was no accident or coincidence.  It was the intended and foreseeable culmination of a carefully coordinated campaign to interfere with the legal process required to confirm the tally of votes cast in the Electoral College.

7.      While not all of the Defendants in this action were physically present at the Capitol during this attack on the Plaintiffs and other members of Congress, the events that occurred were the natural, foreseeable, and intended consequence of the Defendants' coordinated campaign to use force, intimidation and threats in an attempt to prevent Congress from discharging its legally required duty to preside over, and approve, the count of the Electoral College votes which ultimately confirmed that Defendant Trump's opponent was elected the next President of the United States.

8.      Accordingly, this action seeks the award of compensatory damages to redress the harm to the Plaintiffs caused by the Defendants' use of intimidation, harassment, and threats of violence to interfere with the discharge of their legally required duties as members of Congress and punitive damages to punish the Defendants for the reckless and malicious manner in which they acted and to enjoin and deter a recurrence of this unlawful conduct.

## **JURISDICTION AND VENUE**

9.      This Court has jurisdiction over the subject matter of this suit pursuant to 28 U.S.C. § 1331 because the claim in this case arises under the laws of the United States.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

3

## THE PARTIES

11.     Plaintiff Bennie G. Thompson is the duly elected Representative of the Second Congressional District of Mississippi.  On January 6, 2021, Rep. Thompson was present in the Capitol in order to discharge his legally required duty to observe and approve the count of votes cast by members of the Electoral College for the election of President and Vice-President of the United States.  As described in more detail below, Rep. Thompson was hindered, delayed, impeded, and almost completely prevented from carrying out these duties because of the Defendants' unlawful actions.  Rep. Thompson brings this suit in his personal capacity.

12.     Plaintiff Karen Bass is the duly elected Representative from California's Thirty-Seventh Congressional District.  On January 6, 2021, Rep. Bass was present in the Capitol in order to discharge her constitutional duty to observe and approve the votes cast by members of the Electoral College for the election of President and Vice President of the United States.  As described in more detail below, Rep. Bass was impeded and almost completely prevented from carrying out these duties because of Defendants' unlawful actions.  Rep. Bass brings this suit in her personal capacity.

13.     Plaintiff Stephen Cohen is the duly elected Representative from Tennessee's Ninth Congressional District.  On January 6, 2021, Rep. Cohen was present in the Capitol in order to discharge his constitutional duty to observe and approve the votes cast by members of the Electoral College for the election of President and Vice President of the United States.  As described in more detail below, Rep. Cohen was impeded and almost completely prevented from carrying out these duties because of Defendants' unlawful actions.  Rep. Cohen brings this suit in his personal capacity.

4

JA - 143

14.     Plaintiff Veronica Escobar is the duly elected Representative from Texas's Sixteenth Congressional District.  On January 6, 2021, Rep. Escobar was present in the Capitol in order to discharge her constitutional duty to observe and approve the votes cast by members of the Electoral College for the election of President and Vice President of the United States.  As described in more detail below, Rep. Escobar was impeded and almost completely prevented from carrying out these duties because of Defendants' unlawful actions.  Rep. Escobar brings this suit in her personal capacity.

15.     Plaintiff Pramila Jayapal is the duly elected Representative from Washington's Seventh Congressional district.  On January 6, 2021, Rep. Jayapal was present in the Capitol in order to discharge her constitutional duty to observe and approve the votes cast by members of the Electoral College for the election of President and Vice President of the United States.  As described in more detail below, Rep. Jayapal was impeded and almost completely prevented from carrying out these duties because of Defendants' unlawful actions.  Rep. Jayapal brings this suit in her personal capacity.

16.     Plaintiff Henry C. "Hank" Johnson, Jr. is the duly elected Representative from Georgia's Fourth Congressional District.  On January 6, 2021, Rep. Johnson was present in the Capitol in order to discharge his constitutional duty to observe and approve the votes cast by members of the Electoral College for the election of President and Vice President of the United States.  As described in more detail below, Rep. Johnson was impeded and almost completely prevented from carrying out these duties because of Defendants' unlawful actions.  Rep. Johnson brings this suit in his personal capacity.

17.     Plaintiff Marcy Kaptur is the duly elected Representative for Ohio's Ninth Congressional District.  Rep. Kaptur was present in the Capitol on January 6, 2021, prepared to

discharge her duties of tallying the ballots of the Electoral College and certifying the results of the 2020 presidential election.  As described in more detail below, Rep. Kaptur was impeded and almost completely prevented from carrying out these duties because of Defendants' unlawful actions.  Rep. Kaptur brings this suit in her personal capacity.

18.    Plaintiff Barbara Lee is the duly elected Representative for California's Thirteenth Congressional District.  Rep. Lee was present in the Capitol on January 6, 2021, prepared to discharge her duties of tallying the ballots of the Electoral College and certifying the results of the 2020 presidential election.  As described in more detail below, Rep. Lee was impeded and almost completely prevented from carrying out these duties because of Defendants' unlawful actions.  Rep. Lee brings this suit in her personal capacity.

19.    Plaintiff Jerrold Nadler is the duly elected Representative for New York's Tenth Congressional District.  Rep. Nadler was at the Capitol on January 6, 2021, prepared to discharge his constitutional duties of tallying the ballots of the Electoral College and certifying the results of the 2020 presidential election.  As described in more detail below, Rep. Nadler was impeded and almost completely prevented from carrying out these duties because of Defendants' unlawful actions.  Rep. Nadler brings this suit in his personal capacity.

20.    Plaintiff Maxine Waters is the duly election Representative from California's Forty-Third Congressional District.  Rep. Waters was present in the Capitol on January 6, 2021, prepared to discharge her duties of tallying ballots of the Electoral College and certifying the results of the 2020 presidential election.  As described in more detail below, Rep. Waters was impeded and almost completely prevented from carrying out these duties because of Defendants' unlawful actions.  Rep. Waters brings this suit in her personal capacity.

21.     Plaintiff Bonnie Watson Coleman is the duly elected Representative from New Jersey's Twelfth Congressional District.  Rep. Watson Coleman was present in the Capitol on January 6, 2021, prepared to discharge her duties of tallying ballots of the Electoral College and certifying the results of the 2020 presidential election.  As described in more detail below, Rep. Watson Coleman was impeded and almost completely prevented from carrying out these duties because of Defendants' unlawful actions.  Rep. Watson Coleman brings this suit in her personal capacity.

22.     Defendant Donald J. Trump was the President of the United States from January 20, 2017 until noon Eastern Standard Time on January 20, 2021.  Defendant Trump is a resident of the state of Florida.  As described in more detail below, Defendant Trump, acting solely in his personal capacity, conspired with others to prevent, by force, intimidation, and threats, the Plaintiffs and other members of Congress from discharging their duties to approve the results of the Electoral College vote and certify the results of the presidential election held in November 2020.  Defendant Trump's actions in furtherance of the conspiracy were far outside the scope of his official duties and were taken to advance his continued efforts to campaign and secure reelection to the presidency, notwithstanding actions taken by the states and members of the Electoral College that confirmed his defeat.  The tweets published by Defendant Trump, for example, which are reported below in this Amended Complaint, came from his personal (rather than official) Twitter account, and when he spoke to the assembled crowd on January 6, 2021, he continued to hold himself out as a viable candidate for the Presidency.  Indeed, Defendant Trump's campaign and the campaign's joint fundraising committees made direct payments of at least $3.5 million to organizers of the January 6 events.

7

23.     Defendant Rudolph William Giuliani has acted as a confidant of Defendant Trump.  The actions attributed to Defendant Giuliani were undertaken in his personal capacity and not as an officer of the United States.  He is a resident of New York.  As discussed in more detail below, Defendant Giuliani acted in concert with other Defendants with the intention and undertaking steps to prevent the Plaintiffs and other members of Congress from discharging their duties to approve the results of the Electoral College vote and certify the results of the presidential election held in November 2020.

24.     Defendant Proud Boys International, L.L.C. was a Texas Limited Liability Company with main offices located in Crossroads, Texas.  On February 10, 2021 (six days before the initial Complaint in this case was filed), this L.L.C. was terminated by its registered agent and director, Jason Lee Van Dyke.

25.     Defendant Warboys LLC is a Florida Limited Liability Company with main offices in Miami, Florida.  Warboys LLC was incorporated in Florida in July 2020, and the registered address for Warboys LLC is the same address as a former Proud Boys entity, Proud Boys, LLC, which was terminated in September 2019.  Warboys LLC's registered agent is Proud Boys Chairman Enrique Tarrio, and its managers are Joseph R. Biggs and Ethan M. Nordean, all three of whom were directly responsible for coordinating Proud Boys members in the leadup to and during the assault on the Capitol on January 6, 2021, as described in the allegations below.  Warboys LLC operated in conjunction with Proud Boys International, L.L.C., and through its leadership, was involved in planning, promoting and carrying out the insurrection at the Capitol on January 6, 2021.

26.     Defendant Enrique Tarrio is a resident of Miami, Florida.  Since 2017, he has been a member of the Proud Boys, and since November 20, 2018, he has been the Chairman of

the Proud Boys – the highest role in, and the face of, the organization.  Defendant Tarrio is also

the registered agent of Defendant Warboys LLC and has been known to wear paraphernalia of

both Proud Boys and Warboys at rallies and other public gatherings of Proud Boys members.

Defendant Tarrio frequently responds to requests for comment to media organizations on behalf

of the Proud Boys, and he frequently leads Proud Boys rallies and gives direction to Proud Boys

members.  Defendant Tarrio was directly responsible for planning and promoting the January 6

insurrection at the Capitol and has served as an alter ego of the Proud Boys and Warboys, and

possibly other entities that have been used to fund and operate the Proud Boys organization.

27.     The Proud Boys organization (Proud Boys International, L.L.C., Warboys LLC,

and Enrique Tarrio, as an alter ego of those organizations, hereinafter collectively referred to as

the "Proud Boys") has multiple chapters in the United States and describes itself as a "pro-

Western fraternal organization for men who refuse to apologize for creating the modern world;

aka Western Chauvinists."  Proud Boys members have participated in multiple events that

supported and promoted views that were highly critical of positions advanced during the

presidential campaign of then-former Vice President Biden and views that were strongly

supportive of positions advanced during the presidential campaign of Defendant Trump.  It also

has repeatedly employed and supported the use of violence in its opposition to views with which

it differed, such as the views expressed by leaders of the Black Lives Matter movement.  Proud

Boys members can often be identified by the yellow and black colors they wear as well as by

logos and emblems that are identified with the Proud Boys organization.  As described in more

detail below, Proud Boys was involved in organizing and carrying out the insurrection at the

Capitol on January 6, 2021, in pursuit of a purpose shared by Defendants Trump and Giuliani, as

9

part of a jointly conceived and executed plan to prevent the counting of Electoral Votes confirming Defendant Trump's opponent as the next President.

28.     Defendant Oath Keepers is a militia organization incorporated as a non-profit corporation in Nevada, with its main office located in Las Vegas, Nevada, whose members are comprised of current and former military and law enforcement officers who express the view that the federal government is trying to strip American citizens of their rights.  The organization's name is derived from the oath that all military and police take to "defend the Constitution against all enemies, foreign and domestic."  The organization and its leadership have routinely stated that it is preparing for or engaged in a civil war.  As described in more detail below, Oath Keepers was directly involved in organizing and carrying out the insurrection at the Capitol on January 6, 2021 in pursuit of a purpose shared by Defendants Trump, Giuliani and Proud Boys.

## STATEMENT OF FACTS

**I.      Defendant Trump Laid the Groundwork for the January 6 Attack by Praising Violent Supporters**

29.     Even before the election, Defendant Trump repeatedly declined to agree that, regardless of the outcome, he would ensure a peaceful transition of power.  In doing so, he solicited the support of, and endorsed the belligerent and violent actions of, organizations such as the Proud Boys (which expressed support for his reelection).

30.     For example, during the September 29, 2020 presidential debate, Defendant Trump was asked: "[A]re you willing, tonight, to condemn white supremacists and militia groups and to say that they need to stand down and not add to the violence in a number of these cities?"  In response, Defendant Trump said: "Give me a name, give me a name, go ahead who would you like me to condemn?"  When then-former Vice President Biden answered, "Proud Boys," Defendant Trump condoned, rather than condemned, their violent conduct, speaking directly to

10

members of the group: "Proud Boys, stand back and stand by."  Understanding that Defendant

Trump was endorsing their violent conduct and enlisting them for future conflicts, Proud Boys

Chairman Tarrio responded by tweeting: "Standing by sir."

31.     During this time, Defendant Trump actively and enthusiastically supported armed

protesters who used threats and, at times, violence in the pursuit of their political and social

agendas.  For example, after state governments began implementing restrictions on access to

public facilities in response to the spread of the COVID-19, Defendant Trump referred to

supporters who threatened the use of violence in resisting these restrictions as the "Trump Army"

and the "first line of defense when it comes to fighting off the Liberal mob."

32.     In another illustration of Defendant Trump's endorsement of the threat of

violence, after a caravan of Trump supporters swarmed a Biden campaign bus on November 1,

2020, nearly causing a violent accident and leading to the cancellation of a Biden campaign

event, Defendant Trump praised the mob, saying, "These patriots did nothing wrong."

Defendant Trump later tweeted a video of the incident with the caption "I LOVE TEXAS."

## II.   **Defendants Trump and Giuliani Mobilized Violent Supporters with a Misinformation Campaign**

33.     Before a single vote was cast, Defendant Trump claimed that he would be the

winner of the presidential election and the only way he could lose was through fraud.  On

August 17, 2020, Defendant Trump said that "the only way we're going to lose this election is if

this election is rigged."  Soon thereafter, he insisted that "[t]he only way they can take this

election from us is if this is a rigged election."  He repeated this contention often in the ensuing

months.  In other words, no matter how the American people voted, Trump would claim he won,

and if the voters decided otherwise, he would claim fraud.

34.     As vote counts began to reveal that Defendant Trump lost the November 3, 2020 presidential election, Defendants Trump and Giuliani launched a misinformation campaign, trying to convince violent supporters—and the American public—that the announced vote tallies were the product of fraud and that Defendant Trump in fact won the election, notwithstanding that these assertions were repeatedly rejected by the courts and the states to which they were presented.

35.     On November 4, 2020, Defendant Trump declared that he had won the presidential election, notwithstanding that some votes cast had not yet been counted.

36.     After all the votes had been counted and former Vice President Joseph Biden was declared the victor, Defendants Trump and Giuliani and Defendant Trump's supporters embarked on a campaign to challenge as fraudulent the vote results in more than 60 lawsuits filed in various state and federal courts.

37.     Notwithstanding that the allegations of fraud were repeatedly rejected by the courts in which these suits were filed, Defendants Trump and Giuliani together maintained that Defendant Trump had actually prevailed in the election and continued to attack the integrity of the state election offices and officials and the election results in those states that reported Defendant Trump received fewer votes than former Vice President Biden.  Defendant Trump also attacked the integrity and capability of courts and judges that ruled against their meritless lawsuits.

38.     Defendant Trump communicated these inflammatory and demonstrably false views through various social media outlets, including Twitter, on which he had 89 million followers.  Similarly, at a press conference held in the parking lot of Four Seasons Total Landscaping in Pennsylvania held on November 7, 2020, Defendant Giuliani stated that there

had been widespread voter fraud in Philadelphia and Pittsburgh which he claimed accounted for Defendant Trump's loss in that state.  Both cities have large African American populations.

39.     Defendant Giuliani claimed that Philadelphia had "a sad history of voter fraud." He also called out by name deceased African Americans, whom he falsely claimed were still allowed to vote.

40.     Defendants Trump and Giuliani engaged in this misinformation campaign in order to convince Trump's supporters that they were victims of a massive electoral conspiracy that threatened their democracy and the country's continued existence.

41.     In the weeks and months following the election, Defendant Giuliani, in concert with Defendant Trump, issued statements from his personal Twitter account alleging that the election was fraudulent, including unsupported claims that the election was part of a massive conspiracy by "big city … crooks" in multiple states to "steal votes" from Defendant Trump's supporters.  Defendant Giuliani also sent tweets during the same time period promoting the January 6 rally.

42.     On November 19, 2020, Defendant Giuliani said, "The margin in Michigan was 146,121, and these ballots were all cast basically in Detroit, that Biden won 80-20.  So, you see a change as a result in the election in Michigan if you take out Wayne County, so it's a very significant case."  As a result, Defendant Giuliani advocated rejecting in their entirety the votes cast by voters in Detroit, the population of which is 78 percent African American.  No evidence of such fraud was ever produced or found by any court or state agency.

43.     In still another episode in this campaign to instill doubt in the integrity of the electoral process, Defendant Giuliani, in coordination with Defendant Trump, asserted at a press conference held on November 19, 2020 that Defendant Trump's loss in Wisconsin was attributed

to fraud in voting in Milwaukee and Madison, Wisconsin, both of which have large African American populations.

44.     In response to Defendant Trump and Giuliani's coordinated and repeated assertions that voting in states where Defendant Trump lost was tainted by fraud, some supporters of Defendant Trump, with his urging and support, harassed election workers in Arizona, Georgia, Michigan, Nevada, Pennsylvania, Wisconsin and other states and attempted to interfere with and/or stop the vote count in those states.

45.     Undeterred, Defendant Trump continually sought to cast doubt on the integrity of the electoral process in states where he lost and encouraging supporters to do the same, notwithstanding that state election officials found no evidence of fraud and even his own Attorney General acknowledged that the U.S. Department of Justice had uncovered no evidence of widespread voter fraud that could have changed the outcome of the 2020 election.

### III.   Defendant Trump Encouraged Violence Against Officials Who Refused to Lie About the Election Results

46.     Although state officials rebutted the allegations of fraud and urged calmer exchanges over the election results, supporters of Defendant Trump, with his expressed support, continued to engage in personal, accusatory, and at times violent attacks.

47.     For example, Defendants Trump and Giuliani attempted to apply pressure on state officials in order to overturn the election of President Biden.  When this effort failed in Georgia, Defendant Trump publicly stated that the Georgia Secretary of State was an "enemy of the people" for insisting that Georgia's election was not tainted by fraud.  In response, to these November 26 remarks, Defendant Trump's followers threatened violence and assassination against the Georgia Secretary of State.

48.     On November 30, 2020, Joseph diGenova, one of the Trump campaign's attorneys, called into a television show and suggested that Christopher Krebs, a former federal election official who refused to say that the 2020 election was not secure, should be "taken out at dawn and shot."

49.     In a televised address on December 1, 2020, Georgia Republican election official Gabriel Sterling warned Defendant Trump about the foreseeable consequences of these remarks: "Mr. President, you have not condemned these actions. … This has to stop. … Stop inspiring people to commit potential acts of violence.  Someone is going to get shot, someone is going to get killed.  And it's not right."

50.     Defendant Trump did not heed this warning, and the threats continued unabated. On December 6, 2020, for example, armed protestors arrived at the home of Michigan Secretary of State Jocelyn Benson, threatening violence after the results of the election.

51.     On December 8, 2020, the official Twitter account of the Arizona GOP asked supporters if they were willing to die for Defendant Trump, accompanied by a clip from the movie "Rambo."

52.     Acknowledging the existence of these threats of violence, Trump endorsed rather than discouraged them.  For example, on December 10, 2020, Defendant Trump tweeted: "People are upset, and they have a right to be.  Georgia not only supported Trump in 2016, but now.  This is the only State in the Deep South that went for Biden?  Have they lost their minds? This is going to escalate dramatically.  This is a very dangerous moment in our history...."

53.     As states finished certifying the official election results, confirming that Defendant Trump had lost the presidential election, Defendants Trump and Giuliani—in a coordinated manner and using the same language—began characterizing the presidential election

15

as stolen and encouraged supporters to take desperate measures, including the use of force, intimidation, and threats, to change the outcome.

54. On December 12, 2020, "Stop the Steal" rallies occurred across the country. At the "Stop the Steal" rally in Washington, D.C., an Oath Keepers leader said that Defendant Trump, "needs to know from you that you are with him, [and] that if he does not do it now while he is commander in chief, we're going to have to do it ourselves later, in a much more desperate, much more bloody war … Let's get it on now, while he is still the commander in chief." That same day, Defendant Trump tweeted in support of this rally, then tweeted, "WE HAVE JUST BEGUN TO FIGHT!!!"

**IV.  In December 2020 and January 2021, Defendants' Plans for the January 6 Insurrection Took Shape**

55. On December 19, 2020, Defendant Trump focused the violent efforts to change the results of the election on the congressional proceedings to certify the Electoral College vote count, tweeting: "Statistically impossible to have lost the 2020 Election" and "Big protest in DC on January 6th. Be there, will be wild!"

56. Within five minutes of this tweet, a user on www.TheDonald.win—a heavily used pro-Trump online forum that became a key planning platform for the insurrection—posted a link to the tweet with the headline "TRUMP TWEET. DADDY SAYS BE IN DC ON JAN. 6TH." The post was pinned to the homepage of www.TheDonald.win by moderators and garnered 4,683 comments and 20,663 upvotes (whereby users signal an approval of a post) within five days.

57. Many users on www.TheDonald.win construed Defendant Trump's December 19 tweet as "marching orders," and posted comments such as "THE COMMANDER IN CHIEF HAS ISSUED HIS ORDERS" and "If you've been waiting for a signal, THAT'S IT." One user

on www.TheDonald.win posted "Roger that.  Standing by no longer," referring to the

September 29, 2020, Presidential Debate where Defendant Trump told the Proud Boys to "stand

back and stand by."

58.     Users on www.TheDonald.win also heard President Trump's statement that the

protests "will be wild" as an instruction, with one user explaining "'Will Be Wild' is a hidden

message for us to be prepared …. as in armed."  On December 27, 2020, the same user posted on

www.TheDonald.win "surround the enemy" together with a map of the US Capitol that had a red

perimeter drawn around it with the instruction "create perimeter"; the map also provided the

location of Capitol access tunnels.

59.     Comments on this post included discussions about how long the perimeter should

be, the number of people needed to defend it, what strategies they could use to overcome law

enforcement, and how they could use radios to communicate.

60.     Another widely circulated post on www.TheDonald.win titled

"MAGA_CAVALRY D.C. Caravan MAIN FLYER" presented a color-coded graphic with "rally

points" for groups coming to Washington, D.C.  It also suggested times when the groups should

leave their "rally points" so they could arrive in D.C. simultaneously.

61.     Some posts on www.TheDonald.win provided lists of items recommended for the

rally, including pepper spray, batons, tasers, bullet proof vests, and knives.  Other posts

discussed the rally as the "last stand" and repeated calls for violence, including "mass hangings

and firing squads."  In the words of one user, "[e]ither Trump wins or we water the tree of liberty

with blood."

62.     Posts similar to those on www.TheDonald.win appeared on other social media

websites popular with Trump supporters, including Parler, Gab, Twitter, and Facebook.  For

17

example, Trump supporters on Twitter and Facebook posted about "Operation Occupy the Capitol" and used hashtags such as #OccupyCapitols. As one supporter posted on social media, "The objective is Congress," and people in the Capitol should "leave in one of two ways: dead or certifying Trump the rightful winner." Some posts even suggested that Defendant Trump would pardon those arrested for participating in the violence.

63.     Defendants Proud Boys and Oath Keepers were directly involved in this violent planning. An Oath Keepers leader has stated that the group coordinated with the Proud Boys about how members of the two organizations would work together during the insurrection on January 6. This Oath Keepers leader posted a Facebook message on December 19, 2020 stating, "[T]his week I organized an alliance between Oath Keepers … and Proud Boys. We have decided to work together and shut this shit down." This leader sent another Facebook message on December 22 saying Defendant Trump "wants us to make it WILD that's what he's saying. He called us all to the Capitol and wants us to make it wild!!! … Gentlemen we are heading to DC pack your shit!!" This Oath Keepers leader then posted a Facebook message on December 25, 2020 discussing communications with Proud Boys leadership and how the Oath Keepers had "*orchestrated a plan with the Proud Boys*" (emphasis added).

64.     On December 29, 2020, Enrique Tarrio, Chairman of the Proud Boys, posted a message on the social media site Parler about the demonstration planned for January 6, 2021. Among other things, Tarrio announced that the Proud Boys would "turn out in record numbers on Jan 6th but this time with a twist… We will not be wearing our traditional Black and Yellow. We will be incognito and we will be spread across downtown DC in smaller teams. And who knows … we might dress in all BLACK for the occasion." Law enforcement investigating the Capitol insurrection has attributed the statement about dressing in "all BLACK" as a reference to

18

dressing like the group known as "Antifa," whom the Proud Boys have identified as an enemy of their movement and are often depicted in the media wearing all black attire to demonstrations.

65.     In the days leading up to the insurrection, Proud Boys leaders obtained equipment, including tactical vests, military-style communication equipment and bear mace, for their members, which could be used during the siege on the Capitol.  The Proud Boys set up a secure, encrypted communications channel called "Boots on the Ground" to coordinate the group's activities during the insurrection.  Approximately 60 people participated in that channel during the insurrection.

66.     Defendant Trump knew of the hundreds of social media posts from his supporters providing the details of how they would storm the Capitol and violently take over Congress on January 6, as Defendant Trump and his advisors actively monitored the websites where his followers made these posts.  These violent posts were also discussed by media outlets regularly viewed by Defendant Trump, including Fox News.  Law enforcement, including the FBI, issued explicit warnings of violence based on these social media posts.  And in widely publicized remarks on December 28, 2020, former White House official Olivia Troye expressed concern "that there will be violence on January 6th because the president himself encourages it."  Ms. Troye continued, "This is what [Trump] does.  He tweets.  He incites it.  He gets his followers and supporters to behave in this manner, and these people think they they're being patriotic because they are supporting Donald Trump."

67.     Despite these dire warnings, Defendant Trump expressed support for his followers' violent plans.  On January 1, 2021, for example, Defendant Trump retweeted a tweet from the chair of Women for America First, an organizer of the "Save America" rally, stating,

"The calvary [*sic*] is coming, Mr. President!"  In response to the tweet, Defendant Trump said, "A great honor!"

68.     With the help of his campaign and his associates, Defendant Trump also provided logistical support for the January 6 protests.  Defendant Trump's campaign and the campaign's joint fundraising committees made direct payments of at least $3.5 million to organizers of the January 6 events.  And a top Trump campaign fundraiser oversaw the logistics, budgeting, funding and messaging for the January 6 rally.

69.     After Defendant Trump decided he would speak at the Save America rally on January 6, he became more actively involved in decisions concerning the event, including the speaking lineup and even the music that would be played.  Defendant Trump and his campaign proposed that the rally include a march to the Capitol.  An organizer of the Save America rally later told reporters he was surprised to learn that the event would involve a march from the Ellipse to the Capitol.  Before the White House became involved, he said, the plan had been to stay at the Ellipse until the counting of the Electoral College votes was completed.

70.     The White House was also in contact with the Proud Boys.  An FBI review of phone records showed that, in the days leading up to the rally, a person associated with the Trump White House communicated with a member of the Proud Boys by phone.

71.     At the same time, Defendant Trump was in contact with long-time associate Roger Stone, who was in contact with both the Proud Boys and the Oath Keepers.  Mr. Stone posted on the social media website Parler that, at the end of December, he met with Defendant Trump to "ensure that Donald Trump continues as our president."  Proud Boys leader Enrique Tarrio confirmed that he called Roger Stone in early January.  Members of the Oath Keepers agreed to serve as Mr. Stone's security detail during the January 6 protests.

20

## V.     By January 5, 2021, Defendants Were Poised for the Violent Insurrection

72.     By January 5, 2021, members of the Proud Boys and the Oath Keepers—among other pro-Trump demonstrators—had flocked to Washington, D.C.  As a January 5 *Washington Post* article observed, D.C. was "bracing for potentially violent protests, egged on by President Trump himself."

73.     That day, the leader of the "Stop the Steal" event led a crowd of Trump supporters assembled in Freedom Plaza in Washington, D.C., in a chant of: "Victory or death!"

74.     Proud Boys leader Joseph Biggs sent instructions to members using the secure "Boots on the Ground" channel, telling them to "avoid getting into any shit" on the eve of the event, because "[t]omorrow's the day."  Biggs then said "Just trying to get our numbers.  So we can plan accordingly for tonight and tomorrow's plan."  Later, he assured the group: "We have a plan."

## VI.    The Morning of January 6, 2021, Defendants Attempted to Execute a Multi-Faceted Campaign to Prevent Congress from Certifying the Election Results

75.     On the morning of January 6, 2021, before the Congressional approval of the Electoral College vote count was scheduled to occur, Defendant Trump sent a message by Twitter to Vice President Pence, urging him to prevent the count of state-certified Electoral College ballots required by Article II, Section 1 and the Twelfth Amendment to the United States Constitution, in the hope that Defendant Trump could achieve a different outcome of the election.  Still acting in his personal capacity as a candidate, Defendant Trump stated, "All Mike Pence has to do is send [the election] back to the States, AND WE WIN."

76.     The Electoral Count Act of 1887 requires that Congress convene on January 6 at 1:00 PM of the year after each presidential election so that the ballots cast by members of the Electoral College can be counted as required by Article II, Section 1 and the Twelfth

21

Amendment.  The Twelfth Amendment expressly provides: "The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes *shall then be counted*; The person having the greatest Number of votes for President, *shall be the President*" (emphasis added).  It is beyond dispute that, on January 6, Joseph Biden had the greatest number of Electoral College votes for President.  The Vice President, acting as President of the Senate, is required to formally declare the victor in the election based on an accurate count of the electoral votes.

77.     Defendant Trump's demand of Vice President Pence as the President of the Senate, that he decline to count the Electoral College ballots and, instead of declaring the winner of the election, send the election back to the states, was in direct contravention of the legal requirements that the Constitution and the Electoral Count Act of 1887 imposed on the Vice President.

78.     By January 6, the counting of the Electoral College votes and the official declaration of Joseph Biden as the winner of the election could not be stopped by any lawful means.  Vice President Pence had written Defendant Trump a letter stating, in relevant part, "It is my considered judgment that my oath to support and defend the Constitution constrains me from claiming unilateral authority to determine which electoral votes should be counted and which should not."

79.     Having lost all legal avenues of challenging the election, Defendants Trump and Giuliani resorted to the only means they regarded as available to reelect Defendant Trump, which were to employ force, threats, and intimidation directed towards members of Congress to delay and prevent the final approval of the results of the Electoral College balloting.

80.     On the morning of January 6, 2021, before the "Save America" rally, Defendant Trump urged his followers to resist the final count of the Electoral College ballots, misinforming them in a tweet that "The States want to redo their votes.  They found out they voted on a FRAUD.  Legislatures never approved.  Let them do it.  BE STRONG!"  No state ever expressed the view, attributed to them by Defendant Trump, that they wanted to "redo their votes." Furthermore, in the history of this nation, there has never been any such "redo" nor has any court ever ruled that a hypothetical "redo" would be lawful.

81.     At the rally, Defendant Giuliani spoke immediately before Defendant Trump.  In remarks mirroring Defendant Trump's prior messages, Defendant Giuliani began by making a series of statements about the election contradicted by the state election officers, calling the votes lawfully cast in favor of President Biden "crooked ballots" and stating that he was "going to find criminality" and "proof this election was stolen."  Defendant Giuliani falsely told the crowd that it was "perfectly legal" for Vice President Pence to unilaterally block Congress from certifying the Electoral College votes, as Defendant Trump had previously demanded, and referred to a failure by Vice President Pence to block the certification as unlawful or treasonous.  Then, he incited the crowd to take violent action, stating, "If we're right, a lot of them will go to jail.  *So, let's have trial by combat.*  I'm willing to stake my reputation, the President is willing to stake his reputation, on the fact that we're going to find criminality there … I'll be darned if they're going to take our free and fair vote … *We're going to fight to the very end* to make sure that doesn't happen" (emphasis added).

82.     Then, Defendant Trump addressed the assembled crowd.  Defendant Trump began by condemning his political opposition and repeating the same unproven accusation, rejected by the state election officers, that the election was stolen from him: "They rigged an

election.  They rigged it like they've never rigged an election before …. Hundreds of thousands of American patriots are committed to the honesty of our elections and the integrity of our glorious Republic.  All of us here today do not want to see our election victory stolen by emboldened radical left Democrats, which is what they're doing and stolen by the fake news media.  That's what they've done and what they're doing.  We will never give up.  We will never concede, it doesn't happen.  You don't concede when there's theft involved."  No state or court had credited Defendant Trump's assertion that his opportunity to win the presidential election was "stolen" from him.

83.   Defendant Trump then stated, "Our country has had enough.  We will not take it anymore and that's what this is all about.  To use a favorite term that all of you people really came up with, we will stop the steal."  As he had done repeatedly since the 2020 election, Defendant Trump meant he would stop certification of Joseph Biden as President, as was scheduled to take place later that day at the Capitol.

84.   Defendant Trump went on to instruct his followers in what he wanted them to do: "We must stop the steal and then we must ensure that such outrageous election fraud never happens again, can never be allowed to happen again, but we're going forward."

85.   Then, knowing that the crowd was armed and that the assembled masses had threatened violence, Defendant Trump stoked their anger further and urged them to take action to disrupt the process for counting and approving the Electoral College ballots: "Republicans are constantly fighting like a boxer with his hands tied behind his back.  It's like a boxer, and we want to be so nice.  We want to be so respectful of everybody, including bad people.  We're going to have to fight much harder and Mike Pence is going to have to come through for us.  If he doesn't, that will be a sad day for our country because you're sworn to uphold our

24

constitution.  Now it is up to Congress to confront this egregious assault on our democracy.
After this, we're going to walk down, and I'll be there with you.  We're going to walk down.
We're going to walk down any one you want, but I think right here.  *We're going walk down to
the Capitol*, and we're going to cheer on our brave Senators, and Congressmen and women.
We're probably not going to be cheering so much for some of them because *you'll never take
back our country with weakness.  You have to show strength, and you have to be strong*"
(emphasis added).

86.     As shown above, in a direct effort to increase the number of his followers who
would journey to the Capitol, Defendant Trump falsely told them, "I'll be there with you."
Notwithstanding this statement, Defendant Trump never traveled to the Capitol on January 6,
2021 to join the rioters whom he dispatched.

87.     Defendant Trump then told the crowd that it could not allow Biden to be deemed
the winner of the election: "Mike Pence has to agree to send [the electoral count] back [to the
states]. . . . If you don't do that, that means you will have a President of the United States for four
years . . .  who was voted on by a bunch of stupid people who lost all of these states.  You will
have an illegitimate president.  That is what you will have, *and we can't let that happen*"
(emphasis added).

88.     Showing strength, the crowd began shouting and chanting, "Storm the Capitol,"
"Invade the Capitol Building," and "Take the Capitol right now."  Approving of those chants,
Defendant Trump pressed on: "The radical left knows exactly what they're doing.  They're
ruthless and it's time that somebody did something about it."  As the crowd shouted and bustled,
he gave them permission to break the rules, assuring them: "*when you catch somebody in a
fraud, you're allowed to go by very different rules*. . . . Something is wrong here, something is

25

really wrong, can't have happened and we fight, we fight like hell, and if you don't fight like hell, you're not going to have a country anymore" (emphasis added).  The crowd answered in a chant: "Fight like Hell. Fight for Trump."

89.    Defendant Trump directed his screaming supporters to descend upon the Capitol: "So we are going to … walk down Pennsylvania Avenue …, and we are going to the Capitol, and we are going to try and give … our Republicans, the weak ones because the strong ones don't need any of our help, we're … going to try and give them the kind of pride and boldness that they need to take back our country.  So, let's walk down Pennsylvania Avenue."

90.    The permit obtained for the Save America rally expressly provided: "This permit does not authorize a march from the Ellipse."  Defendant Trump nevertheless instructed the angry crowd to march from the Ellipse to the Capitol for the purpose of "fight[ing] like hell," and therefore directed the crowd to take action outside the bounds of what the permit authorized.

**VII.    Defendants Proud Boys and Oath Keepers and Their Co-Conspirators Invaded the Capitol**

91.    The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police.  Only authorized people with appropriate identification were allowed access inside the U.S. Capitol.

92.    On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.  Metal barriers were placed along pedestrian entrances approximately one hundred feet from the west side entrance to the Capitol.

93.    On January 6, 2021, at approximately 1:00 PM, in accordance with the Constitution and federal law dictating the means by which Congress counts the states' Electoral Votes, including the date and time such counting shall occur, a joint session of the United Sates

26

Congress convened at the United States Capitol to certify the vote count of the 2020 presidential election.

94.     At approximately 12:50 PM on January 6, 2021, Defendant Proud Boys, rallied by leaders Joseph Biggs and Ethan Nordean, coalesced and marched towards the Capitol while Trump was speaking at the Save America rally.

95.     En route to the Capitol, members of Defendant Proud Boys were engaged in various chants and response calls, including "Fuck Antifa!" and "Whose streets?  Our streets!"

96.     While the Proud Boys were assembled near the Capitol, one Proud Boys member was video recorded shouting, "Let's take the fucking Capitol!"  In response, other Proud Boys members chastised the member for shouting this, with another Proud Boys member stating, "Let's not fucking yell that, alright," and another member stating, "Don't yell it, do it."

97.     At the direction of the Defendant Proud Boys rally organizers, many Proud Boys members abandoned their organization's colors of black and yellow in order to wear the black attire associated with Antifa.

98.     Proud Boys members, acting according to a carefully coordinated plan and at the direction of their leadership, broke up into small groups so that they could push past the Capitol barriers from multiple entry points without signaling to police that they were working together; these smaller groups communicated with each other through the use of military-style communication devices.

99.     At approximately 12:52 PM, Mr. Biggs dispatched the leader of the assault on the Capitol entrance.  Following him, more members of Defendant Proud Boys descended on the Capitol, breaking through the metal barriers erected a hundred feet from the Capitol Building and overcoming the Capitol Police officers stationed there to repel any incursion on the Capitol.

Defendant Proud Boys launched this assault while Trump was speaking at the ellipse, and as members broke through the barricades, they blasted Trump's speech on a bullhorn.

100.    Soon after Proud Boys had cleared the barricades, Defendant Trump finished his speech and dispatched the angry crowd to the Capitol.

101.    By the time the thousands of demonstrators who heard Trump's speech arrived at the Capitol, the Proud Boys had already begun compromising the protections erected by the Capitol Police near the base of the building.

102.    As a result, the crowd that arrived passed easily through the outer ring of barriers and was able to confront and ultimately overwhelm an inner array of Capitol Police and barricades established as the last line of defense outside the Capitol Building.

103.    Proud Boys members and leaders acted according to an intentional and premeditated plan to rely on non-Proud Boys rioters (whom the Proud Boys described as "normies" or "normiecons") to join forces with the Proud Boys in overtaking Capitol Police security forces.

104.    Proud Boys coordinated their assault with the rioters who, at the direction of Defendants Trump and Giuliani, created chaos and mayhem surrounding the Capitol such that security forces were spread thin and weakened, thus allowing both Proud Boys and non-Proud Boys insurrectionists to gain entry in the building.  The crowd that Defendants Trump and Giuliani incited to march upon and forcibly enter the Capitol erected gallows on the Capitol grounds and displayed a noose.

105.    At the time the rioters initially broke into the Capitol, members of the House of Representatives and the Senate were engaged in debating the tally of the votes cast by members of the Electoral College.

106.    Defendant Trump was watching live televised reports of the forcible entry into the Capitol and the violence committed by the crowd dispatched by Defendants Trump and Giuliani. Rather than take action to attempt to calm the riotous crowd or direct additional law enforcement to the site, Defendant Trump egged on members of the riotous crowd by tweeting at 1:49 PM a video of the "Save America" rally filmed shortly before, where he had rallied the crowd with his clarion call: "Our country has had enough.  We will not take it anymore and that's what this is all about . . . You'll never take back our country with weakness.  You have to show strength, and you have to be strong."

107.    Shortly after 2:00 PM, the riotous crowd breached the Capitol Building. Windows and barricades were broken as the mob stormed into the National Statuary Hall, the heart of the Capitol Building.

108.    Video recorded a member of Defendant Proud Boys as he broke through a Capitol window at approximately 2:11 PM, using the clear-plastic shield seized from an overcome Capitol Police officer.  Thereafter, members of the crowd, including some from the Defendant Proud Boys, entered the Capitol through the broken window and then opened a door, through which the riotous crowd streamed into the Capitol.

109.    The member of Defendant Proud Boys who broke through the window with a plastic shield then posted a self-congratulatory video of himself smoking a cigar in celebration of his unlawful entry, declaring: "Victory smoke in the Capitol, boys … I knew we could take this shit over if we tried hard enough."

110.    Other video live streamed to the social media site Parler captured Defendant Proud Boys leader Joseph Biggs, who had entered the Capitol, responding to an inquiry asking, "Hey Biggs, what do you gotta say" by smiling and pronouncing, "This is awesome!"

29

111.    Shortly after the Capitol was breached, the Senate was called into recess.

112.    Chaos and violence reigned as riotous members of the crowd inflamed by remarks from Defendants Trump and Giuliani streamed into the Capitol, overcoming most of the remaining Capitol Police and descending upon Capitol offices of members of Congress and their staff.  Rioters beat on the doors of the Chamber of the House of Representatives where Defendant Thompson and other members of the House were forced to shelter in place.

113.    Employing ear pieces and walkie-talkies in order to communicate with each other and coordinate their attack on the Capitol, members of Defendant Proud Boys inside the Capitol Building continued to lead and coordinate facets of the attack on the Capitol in order to interfere with the tally of Electoral College votes in which members of Congress were engaged.

114.    Yet another video depicted a member of Defendant Proud Boys inside the Capitol saying, "We just went ahead and stormed the Capitol.  It's about to get ugly."  He was surrounded by riotous supporters who chanted "Our house" and were accompanied by another member of Defendant Proud Boys who called for "Nancy," to summon the Speaker of the House of the United States House of Representatives, Nancy Pelosi.

115.    Thereafter, members of Defendant Proud Boys and members of the riotous crowd whose invasion of the Capitol was incited by Defendants Trump and Giuliani roamed the Capitol, entering and rifling through member offices, including the office of House Speaker Nancy Pelosi, leaving furniture and files in disarray and removing personal and official effects including laptops containing confidential information.  As they roamed the Capitol Building, members of Defendant Proud Boys and members of the riotous crowd chanted, "Fight for Trump."

30

116.    Members of Defendant Proud Boys as well as members of the riotous crowd also searched for members of Congress in the halls and rooms of the Capitol.  Several rioters carried plastic handcuffs that would have permitted them to detain members of Congress whom they encountered.

117.    Notwithstanding that Republican members of Congress trapped in the Capitol transmitted appeals to the White House to take immediate action to stop the insurrection, no action was forthcoming as Defendant Trump continued to watch the insurrection unfold in live televised reports.

118.    Soon after members of the riotous crowd dispatched by Defendants Trump and Giuliani forcibly entered the Capitol and began roaming its halls and offices, Defendant Trump, through his personal Twitter account, called upon them to disrupt the Electoral College ballot count, tweeting that "Mike Pence didn't have the courage to do what should have been done …"

119.    This tweet was repeated by rioters at the Capitol on megaphones, who understood Trump's tweet to be encouragement to further violence.

120.    When the Capitol was breached shortly after 2:00 PM, then-Vice President Pence was present at the Capitol in his capacity as President of the Senate, in order to preside over the tally of the Electoral College ballots.

121.    Having declined to suspend the Electoral College vote tally as Defendant Trump urged him to do, then-Vice President Pence himself became a target of the crowd's threats and intimidation, along with members of Congress, as rioters chanted "Hang Mike Pence."

122.    Once inside the Capitol, some members of the riotous crowd confirmed they were acting upon the direction and at the behest of Defendant Trump.  When the crowd confronted Capitol Police inside the Capitol, they warned the Capitol Police officers, "You're outnumbered.

31

There's a fucking million of us out there.  And we are listening to Trump – your boss."

Apparently believing that Defendant Trump's inciteful remarks authorized and directed them to

enter and overtake the Capitol, leaders of the riotous crowd also told Capitol Police, "We were

invited here by the President of the United States."  Rioters parading through the halls of the

Capitol carried flags and wore clothing and other paraphernalia bearing the name of their leader:

"Trump."

      123.    After the rioters breached the Capitol, House Minority Leader Kevin McCarthy

pleaded with Defendant Trump to call off the rioters, emphasizing that the rioters were all Trump

supporters.  Dismissive of Leader McCarthy's warning, Defendant Trump told McCarthy, "Well,

Kevin, I guess these people are more upset about the election than you are."

      124.    As House Republican Conference Chair the Honorable Elizabeth L. Cheney

stated in her vote in favor of the Article of Impeachment on January 12, 2021, Defendant Trump

"summoned this mob, assembled the mob, and lit the flame of this attack.  Everything that

followed was his doing.  None of this would have happened without the President."

      125.    Then Senate Majority Leader Senator Mitch McConnell likewise observed in

remarks delivered on the Senate floor on January 19, 2021 the pivotal role of Defendant Trump

in inciting the attack on the Capitol, stating, "The mob was fed lies.  They were provoked by the

President and other powerful people and they tried to use fear and violence to stop a specific

proceeding of the first branch of the federal government which they did not like."

      126.    Acting in concert with Defendant Proud Boys and the rest of the riotous mob

entering the Capitol, members of Defendant Oath Keepers wore paramilitary equipment,

helmets, reinforced vests and clothing with Oath Keepers paraphernalia, moving in a regimented

manner as members of the military are trained.  Pursuing a purpose shared by Defendants Trump

and Giuliani as well as Defendant Proud Boys, Defendant Oath Keepers played a leadership role

of the riotous crowd and provided military-style assistance sufficient to overcome the Capitol

Police resistance.

127.    Oath Keepers leaders recruited members in the weeks leading up to the Capitol

insurrection and provided military training to its recruits and members so that they would be

prepared for the violent actions the group would take that day.

128.    Members of Defendant Oath Keepers were equally clear that the purpose of their

unlawful presence at the Capitol was to interfere with the tally of Electoral College votes.  One

member of Defendant Oath Keepers, for example, posted a photograph of herself at the Capitol

on the social media site Parler, along with the statement: "Me before forcing entry into the

Capitol Building.  #stopthesteal #stormthecapitol #oathkeepers #ohiomilitia."  Another post late

in the day declared: "Yeah.  We stormed the Capitol today.  Teargassed, the whole, 9.  Pushed

our way into the Rotunda.  Made it into the Senate even.  The news is lying (even Fox) about the

Historical Events we created today."

129.    Like Defendant Proud Boys, members of Defendant Oath Keepers communicated

with portable devices that permitted them to coordinate their activities in the Capitol.  A message

later posted on Facebook for example revealed Defendant Oath Keepers was transmitting

intelligence about the location of members of Congress whom they were hunting.  It said: "All

members are in the tunnels under capital seal them in.  Turn on gas."  Another message

transmitted to Defendant Oath Keepers leader Thomas Caldwell during the attack reported:

"Tom, all legislators are down in the Tunnels 3 floors down," and "Go through back house

chamber doors facing N left down hallway down steps."  Still another message among members

of Defendant Oath Keepers revealed the organized manner in which they pursued their mission:

33

"We have a good group.  We have about 30-40 of us.  We are sticking together and sticking to the plan."

130.    Reflecting on their success in interfering with the tally of the Electoral College votes, Defendant Oath Keepers leader Thomas Caldwell posted a message on Facebook at nearly 8:00 PM on the same day with a video of himself inside the Capitol and the message: "Us storming the castle.  Please share.  Sharon was with me.  I am such an instigator!  She was ready for it man!  Didn't even mind the tear gas."

131.    Gloating over their perceived success, Caldwell then sent another message reporting: "Proud boys scuffled with cops and drove them inside to hide.  Breached the doors. One guy made it all the way to the house floor, another to Pelosi's office.  A good time."

132.    Viewing their success in disrupting the Congress as a model for similar actions in the future, Caldwell sent another message stating: "We need to do this at the local level.  Let's storm the capitol in Ohio.  Tell me when!"

133.    Members of the riotous crowd prominently displayed a Confederate flag within the walls of the Capitol.  Widely viewed as a symbol of the subjugation of African Americans as slaves by the dominant white slave holders as well as a powerful reminder of the insurrection caused by the secession of the southern states before the Civil War, members of the riotous crowd carried the Confederate Flag as a banner reflecting much of the sentiment motivating many who invaded the Capitol.

134.    Outside the Capitol, rioters attacked Capitol Police officers, yelling "traitors" at those law enforcement officers who were trying to protect the Capitol and the members of the House of Representatives and Senate.

135.    Rioters sprayed law enforcement officers with bear mace, a concentrated pepper spray designed to deter bear attacks which is unsafe for use on humans.

136.    Capitol Police officers were dragged and kicked.

137.    At least one officer was beaten with the pole attached to an American flag.

138.    While the rioting crowd was forcibly entering the Capitol, roaming its halls and desecrating its offices, that same day Defendant Giuliani joined the other Defendants in seeking to delay and derail the tally of the Electoral College ballots by calling members of Congress, urging them to do everything they could to "slow it down" and "delay" the Electoral College vote count in Congress, in order to serve Defendant Trump's goal of returning the election to the states where a different outcome could be arranged.  In these phone call communications with selected members of Congress while the insurrection was ongoing on January 6, Defendant Giuliani urged: "And I know they're reconvening at eight tonight, but the only strategy we can follow is to object to numerous states and raise issues so that we get ourselves into tomorrow ideally until the end of tomorrow."

139.    In these phone calls with selected members of Congress, Defendant Giuliani introduced himself as the "President's lawyer," invoking the authority of, and conveying his agreement with the plans of, Defendant Trump.  Defendant Giuliani was Defendant Trump's personal attorney and counsel of record for Defendant Trump in multiple lawsuits following the November election, and has at all times represented Defendant Trump only in Defendant Trump's personal capacity.

140.    At 6:01 PM, Defendant Trump expressed the view that the insurrection attempted by the rioting crowd dispatched by Trump and Giuliani and the accompanying violence at the Capitol were justified and to be expected, tweeting: "These are the things and events that happen

35

when a sacred landslide election victory is so unceremoniously & viciously stripped away from

great patriots who have been badly & unfairly treated for so long.  Go home with love & in

peace.  Remember this day forever!"  Defendant Trump made these statements notwithstanding

that no state or court credited the claims of fraud that he and those acting on his behalf had

raised.

141.    The final announcement by Vice President Mike Pence of the count of the

Electoral College votes, which provided the imprimatur of Congress on the results of the

presidential election held in 2020, did not occur until 3:41 AM the next morning, January 7,

2021.

142.    Five people died during the course of the riot or from injuries sustained during the

riot.

143.    Fights between rioters and officers of the Capitol Police resulted in the

hospitalization of more than 50 officers.

144.    Faced with the threat of criminal prosecution, many of the rioting crowd members

justified their presence and their actions as occurring because Defendants Trump and/or Giuliani

instructed them to proceed in this unruly and disruptive manner, and that these individuals were

following orders from their then-President and his attorney.

145.    Rather than recognizing they had participated in a violent insurrection against the

government, some rioters were led to believe that they were authorized to overtake the Capitol to

prevent the fraudulent election of then-former Vice President Joseph Biden, given the factually

baseless statements made in the days and weeks before by Defendants Trump and Giuliani and

the directions to the assembled crowd at the Save America rally.

36

146.    Some of those who followed Defendant Trump's directions and stormed the

Capitol, including leaders of the Proud Boys, have since stated that they believed their actions

were lawful, as they were acting at the direction of Defendant Trump, whom they believed to be

the country's chief law enforcement officer.

147.    Many former members of Defendant Trump's administration, including former

White House Chief of Staff John Kelly, former White House Chief of Staff Mick Mulvaney,

former Secretary of Defense Jim Mattis, former Attorney General Bill Barr, former Ambassador

to the United Nations John Bolton, and former National Security Advisor H.R. McMaster, have

stated that Defendant Trump was directly responsible for the insurrection.

## VIII.    A Bipartisan Group of Officials Recognize Defendant Trump's Culpability for the January 6 Assault on the Capitol

148.    On January 13, 2021, an Article of Impeachment was passed by a bipartisan

majority of the House of Representatives, citing Defendant Trump for inciting the violence

perpetrated at the Capitol.  The Article of Impeachment provides, in part:

> On January 6, 2021, pursuant to the 12th Amendment to the
> Constitution of the United States, the Vice President of the United
> States, the House of Representatives, and the Senate met at the
> United States Capitol for a Joint Session of Congress to count the
> votes of the Electoral College.  In the months preceding the Joint
> Session, President Trump repeatedly issued false statements
> asserting that the Presidential election results were the product of
> widespread fraud and should not be accepted by the American
> people or certified by State or Federal officials.  Shortly before the
> Joint Session commenced, President Trump, addressed a crowd at
> the Ellipse in Washington, D.C.  There, he reiterated false claims
> that "we won this election, and we won it by a landslide."  He also
> willfully made statements that, in context, encouraged — and
> foreseeably resulted in — lawless action at the Capitol, such as: "if
> you don't fight like hell you're not going to have a country
> anymore."  Thus incited by President Trump, members of the
> crowd he had addressed, in an attempt to, among other objectives,
> interfere with the Joint Session's solemn constitutional duty to
> certify the results of the 2020 Presidential election, unlawfully
> breached and vandalized the Capitol, injured and killed law

37

enforcement personnel, menaced Members of Congress, the Vice
President, and Congressional personnel, and engaged in other
violent, deadly, destructive and seditious acts.

149.   At the conclusion of President Trump's impeachment trial, the Senate voted to

acquit Defendant Trump, finding Defendant Trump not guilty of inciting the deadly riot at the

Capitol by a vote of 57 to 43.

150.   Minutes after voting to acquit Defendant Trump, however, Senate Minority

Leader Mitch McConnell gave a speech on the floor of the Senate.  Senator McConnell began by

acknowledging Defendant Trump's culpability: "There is no question that President Trump is

practically and morally responsible for provoking the events of that day.  The people who

stormed this building believed they were acting on the wishes and instructions of their president.

And their having that belief was a foreseeable consequence of the growing crescendo of false

statements, conspiracy theories, and reckless hyperbole which the defeated President kept

shouting into the largest megaphone on planet Earth."  However, like the other Senators who

voted to acquit Defendant Trump, Senator McConnell did not believe that the impeachment

process was constitutional.  Senator McConnell went on to state that "President Trump is still

liable for everything he did while he was in office, as an ordinary citizen, unless the statute of

limitations has run, still liable for everything he did while in office, didn't get away with

anything yet – yet.  We have a criminal justice system in this country.  We have civil litigation.

And former presidents are not immune from being held accountable by either one."

IX.   **Plaintiffs Were Injured by Defendants' Conduct**

a.   **The Honorable Bennie Thompson**

151.   When the attack on the Capitol began, Plaintiff Thompson was seated in Gallery C of the House of Representatives, prepared to discharge his duties to supervise and eventually vote on approval of the count of the Electoral College ballots.

152.   Plaintiff Thompson was present when the proceeding began at 1:00 PM, as required by the Electoral Count Act of 1887.

153.   Between approximately 2:15 and 2:20 PM, soon after rioters had breached the Capitol Building, the House was called into recess.

154.   Plaintiff Thompson heard rioters pounding on the door of the House Chamber and saw security guards move furniture to blockade the door.  He then heard the rioters trying to break into the Chamber refer to Speaker Pelosi as a "bitch," saying they wanted to get their hands on her and refer to Vice President Pence as having betrayed President Trump.

155.   Plaintiff Thompson witnessed security personnel draw their firearms to protect Plaintiff Thompson and other members of Congress, who were there to perform their legally required duties, from the violent rioters who were attempting to disrupt, and ultimately did disrupt, this important function of Congress.

156.   Through the blocked doors, Plaintiff Thompson heard threats of physical violence against any member who attempted to proceed to approve the Electoral College ballot count.

157.   Plaintiff Thompson heard a gunshot, the source of which, at the time, was unknown to him, although he later learned that it had killed one of the rioters who had forced her way into the Capitol lobby.

39

158.    Capitol security instructed Plaintiff Thompson and the other lawmakers to lie on the floor, don gas masks that were stored under seats in the gallery, and to move to the other side of the gallery.  After an extended period of time had elapsed, during which Plaintiff Thompson and his colleagues were unable to move or leave the gallery because the rioters posed a continuing threat to their safety, Capitol security led Plaintiff Thompson and the other lawmakers through a tunnel out of the Capitol to the Longworth House Office Building ("Longworth"), where they were directed to shelter in a room with 200-300 other lawmakers, staff members, and family members.

159.    During this period, Plaintiff Thompson received telephone calls from his wife who reported what she saw on the televised reports of violence at the Capitol.  Plaintiff Thompson ultimately moved to a different room in Longworth, and at about 6:00 PM was moved to a secure location in the Capitol.

160.    Plaintiff Thompson personally witnessed rioters who had gotten far into the building and were lying face down on the floor and restrained after being arrested by security.

161.    All these events took place during a worldwide COVID-19 pandemic.  Plaintiff Thompson was 72 years old at the time and therefore within the age group for which the virus posed the greatest risk to his health.

162.    By being required to shelter in place, Plaintiff Thompson and other members of Congress were forced to occupy space that did not allow for the social distancing measures that minimized the risk of transmission of the virus.

163.    Shortly after the siege on the Capitol ended, at least two other members of Congress who shared the confined space with Plaintiff Thompson tested positive for COVID-19.

164.     Until the proceedings with the count of the Electoral College ballots resumed at approximately 8:00 PM, Plaintiff Thompson and other members were barred from leaving the Capitol Building because their safety remained at risk from rioting crowd members who were still present.

165.     During this entire time, Plaintiff Thompson reasonably feared for his physical safety.  While trapped in the building, during the siege by the rioters that Defendants unleashed on the Capitol, Plaintiff Thompson feared for his life and worried that he might never see his family again.

**b.**     **The Honorable Karen Bass**

166.     Rep. Bass was present when the proceedings began at 1:00 PM, as required by the Electoral Count Act of 1887.

167.     Shortly before the attack on the Capitol began, Rep. Bass left the Gallery to walk to her office in the Rayburn House Office Building ("Rayburn"), where she was to conduct a video conference call.  As she walked, she saw the crowd of Defendant Trump's supporters through the window.

168.     Upon walking into her office, Rep. Bass learned that the Capitol had been breached.  Had she walked slower, or been delayed even by a few minutes, she would have been subject to attack when the rioters breached the building.

169.     Rep. Bass was directed by the Capitol Police to shelter in place in her office. Rep. Bass posted a video on social media while in her office.  Her concern for her safety grew when an officer directed her to take down the post, as the video revealed her location and could expose her to harm from the rioters.

41

170.     Fearing for her safety, Rep. Bass remained in her office until the insurrection was quelled and she confirmed it was safe to leave.

171.     At about 8:00 PM, Rep. Bass returned to the Capitol to discharge her duty to observe and ultimately approve the count of the Electoral College ballots and ratify the results of the 2020 presidential election.  She remained in the Capitol until the early morning of January 7 in order to perform those duties.

172.     The riot has shaken Rep. Bass's faith in the security of the Capitol.  For days after the riot, she was troubled by the realization that she could have been seriously harmed or killed by the rioters at the Capitol.

**c.     The Honorable Stephen Cohen**

173.     When the attack on the Capitol began, Rep. Cohen was seated in the Gallery of the House of Representatives, prepared to discharge his constitutional duties of tallying the ballots of the Electoral College and certifying the results of the 2020 presidential election.

174.     Rep. Cohen was present when the proceedings began at 1:00 PM, as required by the Electoral Count Act of 1887.

175.     Shortly after the proceedings began, Rep. Cohen heard loud shouts and aggressive banging on the doors from outside the Gallery.  The officers within the room gave instructions to the members to retrieve, and be prepared to don, gas masks stored below their seats.  As he heard these threatening noises grow louder and more insistent, Rep. Cohen became increasingly fearful that his personal safety was in jeopardy.  Anticipating that he might not emerge from the House Gallery alive, he began to contemplate whether he would want to be buried with his family in Memphis or at the Congressional Cemetery.

176.     When the Capitol Police directed members sitting in the House Gallery to evacuate, they were directed to traverse the Gallery to arrive at the exit.  This evacuation required Rep. Cohen to walk the length of the Gallery, navigating narrow paths between closely positioned rows of seats and surmounting multiple aisle railings.  As Rep. Cohen had contracted polio as a child that left him with a limp, the need to exit the House Gallery rapidly impaired his balance, causing him to fear that he would fall.

177.     Following evacuation from the Gallery, Rep. Cohen walked out into a public hall where an officer called for an elevator.  Rep. Cohen took the elevator to the sub-basement.  From there, he went to his office in Rayburn.  Once inside his office, he locked the two doors, turned off the lights so no one would know he was there, and grabbed a baseball bat for protection.  He sat in his chair, with the bat in his hands or lying next to him for two to three hours.

178.     Following the incidents described above, Rep. Cohen developed difficulties falling and staying asleep that he had not previously suffered and difficulties with his digestion that he had not suffered before.  He became jumpy whenever he heard a loud or unfamiliar noise in his home.  He also had recurring fears that he was not as safe as he had previously believed, renewing his thoughts about the choice of places where he would be buried.

**d.     The Honorable Veronica Escobar**

179.     When the attack on the Capitol began, Rep. Escobar was seated in the front row of the Gallery of the House of Representatives, prepared to discharge her constitutional duties of tallying the ballots of the Electoral College and certifying the results of the 2020 presidential election.

180.     Rep. Escobar was present when the proceedings began at 1:00 PM, as required by the Electoral Count Act of 1887.

181.    Shortly after the proceedings began, Rep. Escobar learned that the Cannon House Office Building ("Cannon") was being evacuated and then saw the Speaker of the House escorted from the House floor.  While she had received no formal notice that rioters had entered the Capitol, inquiries about her safety from family member text messages and reports on social media left her feeling that the Capitol was under attack.  Nonetheless, she expected the law enforcement officers present would ably protect the Capitol and the members present within it.

182.    Rep. Escobar grew more fearful for her safety when she saw law enforcement officers escort the Speaker of the House and other leadership off the House floor.  Her fears increased when the doors of the House Chamber were shut and a Capitol Police officer instructed her and the other members present to retrieve the gas masks from under their chairs.  She grew more alarmed that her safety might be jeopardized when she began hearing shouts and banging from people outside the House Gallery.  Her heart began racing as she realized she might be trapped in the House Gallery, unable to protect herself from what sounded like an angry mob. Her fears were heightened even further when the Capitol Police informed her that tear gas had been released in Statuary Hall and she realized she did not know how to properly wear the gas mask provided her.

183.    Eventually Rep. Escobar was instructed to evacuate the House Gallery, which required her to walk to the other side of the Gallery.  She had to traverse narrow paths between the rows of seats and crouch under a number of railings that separate the sections of the Gallery. When she reached the other side of the Gallery, she saw that doors to the House Chamber had been barricaded with furniture and was startled by the sounds of shattering glass.  She feared rioters would reach another door to the House Chamber that she saw was neither barricaded nor guarded by the Capitol Police.

44

184.     During the time required for Rep. Escobar to cross the entire Gallery, she heard sharp noises and banging, prompting her on several occasions to take cover behind the wall in the front of the Gallery.  When Rep. Escobar and other members with her finally reached the other side of the Gallery, they were instructed to lie down on the floor of the Gallery.  She felt their safety was in great jeopardy when she saw police officers standing behind a door barricaded with furniture, with their firearms drawn towards the door.  The glass in the windows was broken and she could see faces of rioters on the other side of the officers.

185.     After hearing the rioters shouting outside the House Chamber and banging on the Chamber doors, punctuated by a loud gunshot, Rep. Escobar feared that an officer had been shot and that the mob had entered the Speaker's Lobby, located adjacent to the House Chamber, putting her life in imminent danger.  Hoping that a nearby Capitol Police officer who was guarding a door to the House Gallery would be her last line of defense, she pleaded with him not to admit anyone whose identity was not confirmed.

186.     When Rep. Escobar was finally evacuated from the Gallery, she saw several intruders who had been apprehended lying face down on the floor.  Eventually, she reached the sub-basement of the House Chamber and found her way to a large room in Longworth where she and other members were directed to remain.  As there was insufficient space in the hearing room for members to maintain the social distance prescribed by the CDC, and many members were unwilling to wear masks, she became worried that she was being exposed to a heightened risk of contracting COVID-19.  She waited in the anteroom with several other members.  At the direction of the Capitol Police, she sheltered in this room for several hours before she was able to return to her office, where she remained until she returned to the House Chamber when the proceedings resumed.  She remained in the House until about 3:00 AM.

187.    When Rep. Escobar had returned to the House after leaving Longworth, she saw the floor littered with broken glass and other debris, reminiscent of a crime scene.

188.    Rep. Escobar struggled to fall asleep that night and has had difficulty, as never before, sleeping in the weeks following January 6, 2021.  She suffered from violent nightmares and has since talked with mental health professionals as a direct result of these events.

**e.    The Honorable Pramila Jayapal**

189.    When the attack on the Capitol began, Rep. Jayapal was seated in the Gallery of the House of Representatives, prepared to discharge her constitutional duties of tallying the ballots of the Electoral College and certifying the results of the 2020 presidential election.

190.    Rep. Jayapal was present when the proceedings began at 1:00 PM, as required by the Electoral Count Act of 1887.

191.    Shortly after the proceedings began, she received an email notification from the Capitol Police reporting the evacuation of Cannon.

192.    Soon thereafter, Rep. Jayapal sent a text message stating, "Police have been breached.  Chaos is going to break out and violence too."  Believing that the Chamber of the House of Representatives was the most secure place she could be and having received no direction otherwise, Rep. Jayapal remained in the House Gallery, confident that the Capitol Police were able to protect her.

193.    At about this time, Rep. Jayapal saw on social media to which she had access that rioters breached the Capitol, and she began hearing shouts, screams and other loud noises outside the House Gallery.  Another Member of Congress showed her a photo of a rioter who was inside the Senate Chamber holding flex cuff restraints.

46

194.    A little while later, Rep. Jayapal saw the Speaker of the House, other House leadership, and the members on the House floor evacuate, causing her to begin questioning her safety in the House Gallery.

195.    Then Rep. Jayapal saw the Capitol Police barricading the doors of the House Chamber, heightening her concerns about her safety in the House Gallery.

196.    Soon thereafter, the Capitol Police instructed Rep. Jayapal and others in the House Gallery to retrieve from under their seats, and put on, gas masks which she had never been trained to use.

197.    Then the Capitol Police instructed Rep. Jayapal and other members seated in the House Gallery that they needed to move to the other end of the Gallery, though they were not told why.  To reach the other side of the Gallery, Rep. Jayapal was required to crouch down and walk under multiple railings to travel through the various sections of the Gallery.  As she was recovering from surgery for the replacement of her knee that required her to move slowly and use a cane, traversing the Gallery was very difficult and painful, especially when she had to crouch under the railings.

198.    Once she reached the other side of the Gallery, Rep. Jayapal and the members who were in the Gallery with her were instructed to get down on the floor.  This was extremely difficult for Rep. Jayapal because of her recent surgery.  Once Rep. Jayapal was on the floor, she looked down on the main floor of the Chamber and saw the doors to the main floor had been barricaded and law enforcement was positioned in a semi-circle around the doors with guns drawn.  She also heard rioters banging on the doors of the Gallery and saw Capitol Police officers using their bodies to hold those doors closed.  Her fear for her safety spiked when she heard a gunshot, believing it was a shot into the House Chamber.

199.    Rep. Jayapal's fear for her safety increased when she noticed it wasn't possible to barricade the doors to the House Gallery, as the furniture was bolted to the floor.  As her very limited mobility precluded her from moving quickly and, she feared, would render it impossible for her to rapidly escape any physical threats, she considered as a last resort using her cane and gas mask to defend herself from attacks by rioters in the event they entered the Gallery.  As she heard some members around her begin praying, Rep. Jayapal was struck by the realization that she might lose her life or suffer severe injury in the Gallery.

200.    Eventually, Capitol Police officers permitted Rep. Jayapal to exit the Gallery, which required her to pass by a group of rioters prone on the floor, whose conduct was so violent that the law enforcement officers had to secure them with drawn firearms.

201.    The exit from the Gallery required Rep. Jayapal to descend several tiers of stairs very slowly, leaning on another Member of Congress for support.  The pain in her knee was excruciating.

202.    Eventually, she descended to the sub-basement level.  As the congressional trains were not running that day, Rep. Jayapal limped through the tunnel to Longworth where she had initially been directed to shelter.  On her way to Longworth, she got on the escalators to Rayburn.  At that point, a Capitol Police officer instructed Rep. Jayapal and the small group of other members with her to instead go to a large room in Rayburn.

203.    Finally, Rep. Jayapal arrived at the room in Rayburn, exhausted and drained by the throbbing pain in her greatly swollen knee.

204.    The room to which Rep. Jayapal was directed was densely populated by many members of Congress, forcing the members in proximity to each other much closer than the CDC social distancing guidelines prescribed to minimize the risk of COVID-19 infection.  While Rep.

48

Jayapal continuously wore a mask prescribed by the CDC, she saw many members in the room who were not wearing protective masks, exposing her to a "super spreader event." Having been confined to this room to ensure her safety from the rioters who invaded the Capitol, Rep. Jayapal was compelled to remain there for nearly five hours, during which she was inevitably exposed to members with and without masks, none of whom were socially distant from the others.

205.   Rep. Jayapal was permitted to depart from Rayburn at about 8:00 PM, at which time she returned directly to the House Chamber; she remained there until approximately 3:30 AM on January 7, 2021, when the voting concluded that ratified the results of the Electoral College balloting.

206.   In the week prior to these events, Rep. Jayapal tested negative twice for the COVID-19 virus. Several days after she was confined to the room in Rayburn with members who refused to wear protective masks, she exhibited symptoms such as fever, chills, extreme exhaustion, and difficulty breathing. On Monday, January 11, Rep. Jayapal tested positive for COVID-19.

207.   As Rep. Jayapal's symptoms worsened and she experienced greater difficulty breathing, her pre-existing conditions of asthma and pre-diabetes qualified her for the Monoclonal Antibody Treatment for COVID-19. Notwithstanding this treatment, she continued to experience COVID-19 symptoms for at least seven days and did not fully recover for six weeks.

208.   The events described above caused Rep. Jayapal physical pain to her knee that endured well after she returned from discharging her duty to ratify the results of the Electoral College vote. Prior to January 6, Rep. Jayapal was informed by her physical therapist and surgeon that her recovery from the knee-replacement surgery was ahead of schedule. After

being required to bend her knee to maneuver under the railings in the House Gallery, crouch down on the floor, crawl on her knees, stand back up, and traverse multiple staircases and long walkways, Rep. Jayapal endured significant pain and experienced setbacks in her knee replacement surgery recovery.

209.    Following these events, Rep. Jayapal's physical therapist informed her that no individual recovering from knee replacement surgery would be able to easily get down on the floor only five weeks post-operation.  Her range of movement decreased following these events and her recovery was slowed.  Her recovery was also negatively impacted by her COVID-19 diagnosis, as she could not continue her physical therapy schedule regularly for several weeks.

210.    In addition to the pain and suffering caused Rep. Jayapal by the events alleged above, she also suffered grave fear for her personal safety while she was confined in the House Chamber.  In the days following the events of January 6, Rep. Jayapal spoke with mental health professionals in both group and individual settings about fears for her safety that she had never encountered before.  Her need for counseling was a direct result of the attack on the Capitol.

**f.    The Honorable Henry C. "Hank" Johnson, Jr.**

211.    When the attack on the Capitol began, Rep. Johnson was seated in the Gallery of the House of Representatives, prepared to discharge his duties to supervise and eventually vote on approval of the count of the Electoral College ballots.

212.    Rep. Johnson was present shortly after the proceedings began at 1:00 PM, as required by the Electoral Count Act of 1887.

213.    After the proceedings had been underway for a little while, Rep. Johnson heard noises that sounded like a commotion, bumping, and shuffling.  Such noises were not typical at the Capitol for such an event, causing him to begin worrying whether there was trouble nearby.

214.     Shortly thereafter, the Capitol Police instructed Rep. Johnson and other members to retrieve and put on gas masks that were stored under their seats in the Gallery.  Sometime later, he and other members were instructed to make their way to the Gallery exit, requiring him to navigate with difficulty narrow paths between the rows of seats and surmount railings between Gallery sections.  As he continued to hear banging on the House Chamber doors and increasingly virulent shouting, he feared the situation was serious and might end badly for him and other members nearby.

215.     His fear that he might be unable to evade the growing efforts to enter the House Chamber by loud and boisterous intruders were heightened even further when he heard a gunshot, prompting him to drop to the floor in a crouch as the Capitol Police instructed Rep. Johnson and other members to lie on the floor.

216.     After exiting the Gallery, he was surprised and troubled to see intruders who were secured by law enforcement officers, lying face down on the floor, where they were guarded by officers with drawn weapons.

217.     Eventually, Rep. Johnson was directed to shelter in Longworth, where he remained for several hours.  Immediately upon arriving at the Longworth room and throughout his time sheltering there, he was forced to stand with other members who, because of their number, could not be socially distant from each other, as the CDC prescribed to minimize transmission of the COVID-19 virus.  And many members declined to wear masks, as the CDC prescribed.  As Rep. Johnson was 66 years old at the time, he feared during the time he sheltered in Longworth that he would contract the virus and jeopardize his health after having fled conditions that jeopardized his safety.

218.     After he sheltered in Longworth for several hours, he returned to the Capitol where he completed his responsibility to oversee and approve the results of the Electoral College balloting.

g.     **The Honorable Marcy Kaptur**

219.     When the attack on the Capitol began, Rep. Kaptur was seated in the Gallery of the House of Representatives, prepared to discharge her constitutional duties of tallying the ballots of the Electoral College and certifying the results of the 2020 presidential election.

220.     Rep. Kaptur was present when the proceedings began at 1:00 PM, as required by the Electoral Count Act of 1887.

221.     Sometime after the proceedings were underway, Rep. Kaptur witnessed law enforcement officers escort the Vice President and the Speaker of the House off the House floor. Another Member of the House leadership attempted to preside over the debate, but the proceedings were totally interrupted by loud and unruly shouting and banging heard nearby. Rep. Kaptur also heard echoing sounds in the stairwell of the Capitol.  Then a Capitol Police officer ran into the House Chamber, announcing that the police were trying to gain control of some corridors that had been breached by rioters, prompting some concern that her safety and that of other members might be in jeopardy.  Thereafter, the House was called into recess and she and other members were instructed to remain seated.

222.     While she was seated in the Gallery, Rep. Kaptur grew increasingly worried about the safety of the members and staff as she heard loud noises and bangs in the hallways outside the House Chamber that sounded like logs being pounded against the doors.  She grew increasingly eager to exit the Gallery, as she feared that hostile intruders might enter the House Chamber and put her safety at risk.

52

223.    Rep. Kaptur's worries that threats to her safety were nearby were heightened when a Capitol Police officer announced that tear gas had been launched in the Rotunda and urged them to put on gas masks stored under their seats.  Rep. Kaptur had not been trained on how to remove the gas mask from its case and metallic shrink-wrapping or how to use the gas mask.  She faced a dilemma that worried her, as she feared wearing a gas mask would fog up her glasses, making it difficult to see clearly and ultimately to exit.

224.    Her concern for her safety grew as banging on the Gallery doors became louder and more frequent and she saw an officer pushing back on a heavy door.

225.    Rep. Kaptur, being one of about a dozen members feeling stranded in the Gallery for some time, was eventually instructed to exit the area by crossing to the opposite side of the Gallery.   Her exit was delayed and made more difficult by the need to pass through many sets of low-rise railings by either climbing over the railings or crouching under them.  Several members ahead of her struggled to crouch below these railings.  But when she reached the other end of the Gallery, Rep. Kaptur was directed by the Capitol Police to crouch down and hide behind the short balcony wall and wait quietly.  As the intruders continued to storm the hallways and bang on the Gallery doors, she was informed there was still no safe exit.  There was no means to assure who might be on the other side of the Gallery's exit.

226.    While Rep. Kaptur hid on the floor of the Gallery, her fear for her safety and that of her colleagues was confirmed when an officer directed a photographer to cease his efforts to photograph the surroundings, as the flash of the camera might reveal their location to the rioters immediately outside the House Chamber.  Rep. Kaptur remained on the Gallery floor for close to half an hour before she was finally allowed to exit.  Her last view of the House floor was of

several law enforcement officers standing with their firearms drawn towards the doors to the House Chamber.

227.    After she exited the Gallery, Rep. Kaptur traveled a long distance through hallways and stairwells down to the sub-basement, where she finally arrived at a very crowded room where other members and their staffs sheltered.  After leaving threats to her physical safety, Rep. Kaptur grew concerned for her health, as she was directed to shelter in a room in which members could not remain socially distant and many refused to wear masks, as the CDC prescribed as the means to minimize the risk of contracting COVID-19.  Rep. Kaptur was 74 years old at the time and therefore within the age group for which the virus posed the greatest risk to her health.

228.    Rep. Kaptur was required to remain in this room for several hours until she was informed that it was safe to return to her office.  She returned to her office and joined her staff at approximately 9:00 PM, at which point she left the Capitol complex and returned home.

**h.    The Honorable Barbara Lee**

229.    When the attack on the Capitol began, Rep. Lee was seated in the House of Representatives, prepared to discharge her constitutional duties of tallying the ballots of the Electoral College and certifying the results of the 2020 presidential election.

230.    Rep. Lee was present when the proceedings began at 1:00 PM, as required by the Electoral Count Act of 1887.

231.    Shortly after the proceedings began, Rep. Lee saw reports that Cannon was being evacuated.  When the Speaker of the House and other members of the House leadership were escorted from the Chamber, Rep. Lee concluded that, taken together, these two events reflected some kind of threat was nearby.

54

232.    Rep. Lee began to harbor concerns about her safety when Capitol Police officers locked the doors to the House Chamber and told the members who remained to shelter in place.

233.    Shortly thereafter, Rep. Lee's fear for her safety grew when saw news reports transmitted to her mobile telephone that violent intruders had breached the outer perimeter of the Capitol and had entered Statuary Hall.

234.    Her fears for her safety grew even higher when the Capitol Police officers warned that she may need to shelter on the House floor and heard someone say that bullets might be coming in.  The instruction that followed, that she prepare to put on a gas mask for which she was never trained to use, compounded her fears, as she expected that the intruders would be using tear gas or another chemical irritant.  As this chaos unfolded, Capitol Police told Rep. Lee and others on the House floor that they needed to evacuate.  Rep. Lee and others hurried off the House floor through the Speaker's Lobby and then escaped down three or four flights of stairs.

235.    After traveling through tunnels in the sub-basement, she arrived in Longworth and was brought to a room where a large number of other members of Congress and staffers sheltered in place.  After leaving threats to her physical safety, Rep. Lee realized the place where she was directed to shelter would pose a threat to her health, as there was insufficient room for the members in the room to social distance themselves, as the CDC prescribed, and many refused to wear masks, as the CDC directed in order to minimize transmission of the COVID-19 virus. Rep. Lee was 74 years old at the time and therefore within the age group for which the virus posed the greatest risk to her health.

236.    At about 8:00 PM, Rep. Lee was permitted to leave the room in Longworth in which she had sheltered for several hours.  She returned directly to the House Chamber where

she remained until approximately 3:30 AM on January 7, 2021 when the voting concluded that ratified the results of the Electoral College balloting.

237.    The events on January 6 described above left Rep. Lee feeling that she had narrowly escaped serious injury or death on that date, prompting her to finalize her plans for her estate.

### i.    <u>The Honorable Jerrold Nadler</u>

238.    Rep. Nadler was present when the proceedings began at 1:00 PM, as required by the Electoral Count Act of 1887.

239.    Shortly after an objection was made to the counting of the certified Electoral College ballots from Arizona, Rep. Nadler went to his office in Rayburn to wait until the joint session of Congress was reconvened.  After arriving at his office, Rep. Nadler learned that the Capitol had been breached by boisterous and threatening intruders.

240.    Having seen that violent intruders had entered the Capitol and needing to remain nearby to participate in the votes needed to ratify the results of the 2020 presidential election, Rep. Nadler believed he needed to shelter in place in Rayburn.

241.    Believing that if the intruders could enter the Capitol, they could also enter Rayburn, he began searching for a place in which he could shelter in place safely.  After considering places in his personal office that might be safe, he concluded the plate bearing his name on his office door made his office a target of hostile intruders in the event they entered the building.  Therefore, Rep. Nadler sought refuge in the nearby offices of the House Judiciary Committee where his name did not appear on the exterior.

242.    Rep. Nadler sheltered in place in the Judiciary Committee office for hours awaiting confirmation that the riot had been quelled.  Throughout this time, Rep. Nadler

genuinely feared for his safety.  Anticipating that he might need to evacuate Rayburn on short

notice, he prepared a "go bag" with materials he might need in the immediate future.  Having

watched reports of the menacing and aggressive behavior of the rioters who entered the Capitol,

Rep. Nadler had serious concerns that his personal safety and even his life would be jeopardized

in the event the intruders came to Rayburn.

> **j.**     **The Honorable Maxine Waters**

243.   Rep. Waters was present when the proceedings began at 1:00 PM, as required by

the Electoral Count Act of 1887.

244.    Shortly before the attack on the Capitol began, Rep. Waters left the Gallery to

walk to her office in Rayburn and wait for the joint session to reconvene.

245.    Upon arrival at her office, Rep. Waters learned from televised news reports that

rioters had breached the Capitol Plaza and had advanced to the Capitol Building.  She watched as

the rioters forcibly entered the Capitol and violently charged police officers, fearful that her own

safety was in jeopardy.

246.    Rep. Waters telephoned the Chief of the Capitol Police to discuss the dangerous

situation that was unfolding.  Having been informed on that telephone call of the scope and force

of the incursion into the Capitol, Rep. Waters immediately barricaded herself in her office.

247.    Although Rep. Waters was later advised by the Capitol Police that she could join

other Members who were sheltering in the Cannon Building, she declined the offer out of fear

for her safety.  Instead, she remained barricaded in her office.

248.    After several hours had elapsed, the Capitol Police informed her that the rioters

had been contained.  Thereafter, Rep. Waters returned to the Capitol to discharge her duty to

observe and ultimately approve the count of the Electoral College ballots and ratify the results of

the 2020 Presidential election.  She remained in the Capitol until the early morning of January 7 in order to perform those duties.

249.     Since the riot, Rep. Waters has had increased worries about her safety, and has felt compelled to increase the amount of security personnel with whom she travels to and from her home.

**k.**     **The Honorable Bonnie Watson Coleman**

250.     On January 6, Rep. Watson Colman arrived at the Capitol earlier than she had originally planned because she was evacuated from her apartment due to a bomb found near her building.

251.     Rep. Watson Coleman was in the Capitol when the proceedings began at 1:00 PM, as required by the Electoral Count Act of 1887.

252.     Rep. Watson Colman, her husband, and one of her staffers arrived at the Capitol shortly before the time at which the rioters descended on the Capitol.  Upon arriving, Rep. Watson Colman planned to go to the attending physician's office to attend to a minor medical need.  As she walked toward that office, she could see and hear the rioters as they came down the hallway.

253.     An officer instructed Rep. Watson Colman, her husband, and the staffer to get behind him.  The officer escorted them to a small room near the physician's office.  Inside the room, Rep. Watson Coleman, her husband, the staffer, and a nurse locked themselves behind two doors.  Rep. Watson Coleman could hear chants of "USA," along with other shouts and menacing noises from the insurgents in the next hallway.  While trapped in the room, Rep. Watson Coleman hoped that, if the rioters broke down the first door, the second thicker door would be strong enough to keep them out of the room.

58

254.     After several hours had transpired, during which she heard the menacing sounds of the violent and hostile intruders and feared that their entry would cause her physical harm, members of the Capitol Police banged on the door to reassure her that she could leave the place where she had sheltered.

255.     Thereafter, Rep. Watson Coleman and the others were taken through a tunnel to Longworth.  Rep. Watson Coleman, who suffers from chronic obstructive pulmonary disease, had to stop multiple times during the trek to catch her breath.

256.     Upon arriving in Longworth, Rep. Watson Coleman realized that while she may have left behind the threat of physical assault, she was going to be exposed to another health risk. The large number of members confined to the same room made it impossible for her to socially distance herself from others, as the CDC had recommended, and the multiple members who refused to wear masks posed a significant risk of COVID-19 transmission to her.  As Rep. Watson Coleman was 75 years old at the time and had a pre-existing pulmonary medical condition, she had a heightened risk of infection and of experiencing severe symptoms.  After being confined in this room for several hours, she arranged to move to the office of another Member of Congress where there were far fewer people.  She remained there until she was permitted to return to the Capitol.

257.     Prior to being trapped at the Capitol, Rep. Watson Coleman had consistently taken measures to limit potential exposure to the COVID-19 virus.  She had been tested for the virus as recently as January 3, 2021, and the results were negative.

258.     After learning from the attending physician that persons with her in Longworth were testing positive for COVID-19, on Monday, January 9, 2021, Rep. Watson Coleman submitted to a test that day.  Following the test, Rep. Watson Coleman learned that her results

were positive.  Her age and medical condition permitted her access to the Monoclonal Antibody

Treatment for COVID-19, which she began receiving the same day as she received the test

results.  Her physician informed her that, absent her partial vaccination and special antibody

treatment, her life would have been in jeopardy.  Notwithstanding the prompt medical treatment

she received, Rep. Watson Coleman still suffered from congestion, coughing, and fatigue.

## **CAUSE OF ACTION**

### **Violation of the Ku Klux Klan Act**

259.     Plaintiffs incorporate herein by reference the allegations contained in all

preceding paragraphs.

260.     Under the Ku Klux Klan Act, 42 U.S.C. § 1985(1), Defendants may not "conspire

to prevent, by force, intimidation, or threat, any person … holding any office, trust, or place of

confidence under the United States … from discharging any duties thereof; or to induce by like

means any officer of the United States to leave any … place[] where his duties as an officer are

required to be performed, or … to molest, interrupt, hinder, or impede him in the discharge of his

official duties."

261.     Defendants Trump, Giuliani, Proud Boys and Oath Keepers plotted, coordinated,

and executed a common plan to prevent Congress from discharging its official duties in

certifying the results of the presidential election.

262.     In furtherance of this conspiracy, Defendants Trump and Giuliani engaged in a

concerted campaign to misinform their supporters and the public, encouraging and promoting

force, intimidation and threats in furtherance of their common plan to promote the re-election of

Defendant Trump, even after the states had certified election results decisively showing he lost

the election, and to disrupt the legally required process before Congress to supervise the counting of the Electoral College ballots and certify the results of that count.

263.    As a result, Defendant Trump acted beyond the outer perimeter of his official duties and therefore is susceptible to suit in his personal capacity.

264.    The activities alleged above were undertaken by all Defendants as co-conspirators for the purpose of seeking to prevent each of the Plaintiffs named above and other members of Congress from certifying that former Vice President Biden won the presidential election.

265.    As a result of the acts set out in the above paragraphs committed in furtherance of this conspiracy, each of the Plaintiffs named above was hindered and impeded in the discharge of his or her official duties and suffered the deprivation of the right to be free from intimidation and threats in the discharge of his or her official duties, as explicitly protected under Ku Klux Klan Act.  During the time when the Capitol was under attack, each of the Plaintiffs named above suffered emotional harm.

266.    As a result, each of the Plaintiffs named above seeks an award of compensatory damages.

267.    As the unlawful actions taken by the Defendants were malicious and in reckless disregard of federally protected rights, each of the Plaintiffs named above seeks an award of punitive damages to punish the Defendants for engaging in a concerted and continuing course of unlawful conduct and to deter the Defendants and others from engaging in similar unlawful conduct in the future.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request an award of the following relief:

      A.      A declaratory judgment that the actions described herein constitute a violation of 42 U.S.C. § 1985(1);

      B.      Injunctive relief enjoining Defendants from engaging in future violations of 42 U.S.C. § 1985(1);

      C.      Compensatory damages to each Plaintiff named above in amounts to be determined at trial;

      D.      Punitive damages to each Plaintiff named above in amounts to be determined at trial;

      E.      An award of costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988;

      F.      Such other relief as the Court deems necessary and just.

Dated: April 7, 2021

Respectfully submitted,

/s/ Janette Louard

Janette Louard (*pro hac vice motion to be filed*)
Anthony P. Ashton, Bar No. MD0096
Anna Kathryn Barnes, Bar No. 1719493 (*motion for admission pending*)
NAACP
Office of General Counsel
4805 Mount Hope Drive
Baltimore, MD 21215
Telephone: (410) 580-5777
jlouard@naacpnet.org
aashton@naacpnet.org
abarnes@naacpnet.org

/s/ Joseph M. Sellers

Joseph M. Sellers, Bar No. 318410
Brian Corman, Bar No. 1008635
Alison S. Deich, Bar No. 1572878 (*motion for admission pending*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, N.W. Suite 500, East Tower Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
jsellers@cohenmilstein.com
bcorman@cohenmilstein.com
adeich@cohenmilstein.com

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BENNIE G. THOMPSON et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 21-cv-00400 (APM) |
| | ) | |
| DONALD J. TRUMP et al., | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| ERIC SWALWELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 21-cv-00586 (APM) |
| | ) | |
| DONALD J. TRUMP et al., | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| JAMES BLASSINGAME & SIDNEY HEMBY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 21-cv-00858 (APM) |
| | ) | |
| DONALD J. TRUMP, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

January 6, 2021 was supposed to mark the peaceful transition of power.  It had been that way for over two centuries, one presidential administration handing off peacefully to the next.  President Ronald Reagan in his first inaugural address described "the orderly transfer of authority" as "nothing less than a miracle."[1]  Violence and disruption happened in other countries, but not here.  This is the United States of America, and it could never happen to our democracy.

But it did that very afternoon.  At around 1:30 p.m., thousands of supporters of President Donald J. Trump descended on the U.S. Capitol building, where Congress had convened a Joint Session for the Certification of the Electoral College vote.  The crowd had just been at the Ellipse attending a "Save America" rally, where President Trump spoke.  At the end of his remarks, he told rally-goers, "we fight, we fight like hell, and if you don't fight like hell, you're not going to have a country anymore."  The President then directed the thousands gathered to march to the Capitol—an idea he had come up with himself.  About 45 minutes after they arrived, hundreds of the President's supporters forced their way into the Capitol building.  Many overcame resistance by violently assaulting United States Capitol Police ("Capitol Police") with their fists and with weapons.  Others simply walked in as if invited guests.  As Capitol Police valiantly fought back and diverted rioters, members of Congress adjourned the Joint Session and scrambled to safety.

---

[1] President Reagan said on that day:

> To a few of us here today, this is a solemn and most momentous occasion; and yet, in the history of our Nation, it is a commonplace occurrence.  The orderly transfer of authority as called for in the Constitution routinely takes place as it has for almost two centuries and few of us stop to think how unique we really are.  In the eyes of many in the world, this every-4-year ceremony we accept as normal is nothing less than a miracle.

President Ronald W. Reagan, First Inaugural Address (Jan. 20, 1981), https://www.reaganfoundation .org/media/128614/inaguration.pdf (last visited Feb. 17, 2022).

2

So, too, did the Vice President of the United States, who was there that day in his capacity as President of the Senate to preside over the Certification.  Five people would die, dozens of police officers suffered physical and emotional injuries and abuse, and considerable damage was done to the Capitol building.  But, in the end, after law enforcement succeeded in clearing rioters from the building, Congress convened again that evening and certified the next President and Vice President of the United States.  The first ever presidential transfer of power marred by violence was over.

These cases concern who, if anyone, should be held civilly liable for the events of January 6th.  The plaintiffs in these cases are eleven members of the House of Representatives in their personal capacities and two Capitol Police officers, James Blassingame and Sidney Hemby ("*Blassingame* Plaintiffs").  Taken together, they have named as defendants:  President Trump; the President's son, Donald J. Trump Jr.; the President's counsel, Rudolph W. Giuliani; Representative Mo Brooks; and various organized militia groups—the Proud Boys, Oath Keepers, and Warboys— as well as the leader of the Proud Boys, Enrique Tarrio.

Plaintiffs' common and primary claim is that Defendants violated 42 U.S.C. § 1985(1), a provision of a Reconstruction-Era statute known as the Ku Klux Klan Act of 1871.  The Act was aimed at eliminating extralegal violence committed by white supremacist and vigilante groups like the Ku Klux Klan and protecting the civil rights of freedmen and freedwomen secured by the Fourteenth Amendment.  Section 1985(1) is not, however, strictly speaking a civil rights provision; rather, it safeguards federal officials and employees against conspiratorial acts directed at preventing them from performing their duties.   It provides:

> If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or

3

> to injure him in his person or property on account of his lawful
> discharge of the duties of his office, or while engaged in the lawful
> discharge thereof, or to injure his property so as to molest, interrupt,
> hinder, or impede him in the discharge of his official duties.

42 U.S.C. § 1985(1).  The statute, in short, proscribes conspiracies that, by means of force, intimidation, or threats, prevent federal officers from discharging their duties or accepting or holding office.  A party injured by such a conspiracy can sue any coconspirator to recover damages. *Id.* § 1985(3).

Plaintiffs all contend that they are victims of a conspiracy prohibited by § 1985(1).  They claim that, before and on January 6th, Defendants conspired to prevent members of Congress, by force, intimidation, and threats, from discharging their duties in connection with the Certification of the Electoral College and to prevent President-elect Joseph R. Biden and Vice President–elect Kamala D. Harris from accepting or holding their offices.  More specifically, they allege that, before January 6th, President Trump and his allies purposely sowed seeds of doubt about the validity of the presidential election and promoted or condoned acts of violence by the President's followers, all as part of a scheme to overturn the November 2020 presidential election.  Those efforts culminated on January 6th, when the President's supporters, including organized militia groups and others, attacked the Capitol building while Congress was in a Joint Session to certify the Electoral College votes.  Notably, Plaintiffs allege that President Trump's January 6 Rally Speech incited his supporters to commit imminent acts of violence and lawlessness at the Capitol. Plaintiffs all claim that they were physically or emotionally injured, or both, by the acts of the conspirators.

Plaintiffs advance other claims, as well.  Swalwell alleges a violation of § 1986, a companion provision to § 1985.  42 U.S.C. § 1986.  That statute makes a person in a position of power who knows about a conspiracy prohibited by § 1985, and who neglects or refuses to take

4

steps to prevent such conspiracy, liable to a person injured by the conspiracy. Swalwell claims that President Trump, Trump Jr., Giuliani, and Brooks violated § 1986 by refusing to act to prevent the violence at the Capitol. Swalwell and the *Blassingame* Plaintiffs also advance numerous common law torts and statutory violations under District of Columbia law.

All Defendants have appeared except the Proud Boys and Warboys. Defendants have moved to dismiss all claims against them. They advance a host of arguments that, in the main, seek dismissal for lack of subject matter jurisdiction or for failure to state a claim. The parties have submitted extensive briefing on a range of constitutional, statutory, and common law issues. The court held a five-hour-long oral argument to consider them.

After a full deliberation over the parties' positions and the record, the court rules as follows: (1) President Trump's motion to dismiss is denied as to Plaintiffs' § 1985(1) claim and certain District of Columbia–law claims and granted as to Swalwell's § 1986 claim and certain District of Columbia–law claims; (2) Trump Jr.'s motion to dismiss is granted; (3) Giuliani's motion to dismiss is granted; (4) the Oath Keepers' motion to dismiss is denied; and (5) Tarrio's motion to dismiss is denied. Separately, Brooks has moved to substitute the United States as the proper party under the Westfall Act. The court declines to rule on that motion and instead invites Brooks to file a motion to dismiss, which the court will grant for the same reasons it has granted Trump Jr.'s and Giuliani's motions.

## II.   BACKGROUND

### A.   Facts Alleged

This summary of the alleged facts is drawn from the complaints in all three cases. There is substantial overlap, but there are some differences. The court has not referenced every fact alleged across the three complaints; this factual recitation is meant to summarize the main

5

allegations.  Additionally, a citation to one complaint should not be understood to mean that the allegation is not present in the other complaints.  The court has limited the citations in the interest of efficiency.  Additional facts will be referenced as appropriate in the Discussion section.

As is required on a motion to dismiss, the court assumes these facts to be "true (even if doubtful in fact)."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  These are *not* the court's factual findings.

    1.   *The Weeks Following the Election*

    a.   <u>False claims of election fraud and theft</u>

President Trump began to sow seeds of doubt about the validity of the November 2020 presidential election in the weeks leading up to Election Day.  Am. Compl., *Blassingame v. Trump*, No. 21-cv-00858 (APM) (D.D.C.), ECF No. 3 [hereinafter *Blassingame* Compl.], ¶ 13. He claimed, among other things, that there would be "fraud," the election was "rigged," and his adversaries were "trying to steal" victory from him.  *Id.* ¶¶ 13, 16; Compl., *Swalwell v. Trump*, No. 21-cv-00586 (APM) (D.D.C.), ECF No. 1 [hereinafter *Swalwell* Compl.]; Mot. for Leave to File Am. Compl., ECF No. 11, Am. Compl., ECF No. 11-1, [hereinafter, *Thompson* Compl.], ¶ 33.[2]

On election night, the President claimed victory before all the votes were counted.  He tweeted that "they are trying to STEAL the Election.  We will never let them do it."  *Blassingame* Compl. ¶ 17.  He also would say in a primetime television address the next day, "If you count the legal votes, I easily win.  If you count the illegal votes, they can try to steal the election from us." *Swalwell* Compl. ¶ 33.

---

[2] Subsequent citations to filings from these three dockets omit the case name and number.  Context and/or the title of the filing should make clear to which docket a particular filing belongs.

The President's allies joined him in making similar claims.  For example, on November 5, 2020, Brooks tweeted that he "lack[ed] faith that this was an honest election."  *Id.* ¶ 78. On November 6, 2021, Trump Jr. tweeted that his father's campaign was uncovering evidence of voter fraud and that the media was creating a false narrative that voter fraud was not real.  *Id.* ¶ 69. On November 7, 2020, one of President Trump's lawyers, Rudolph Giuliani, held a press conference in suburban Philadelphia, during which he asserted that there was rampant voter fraud in Philadelphia and Pittsburgh, which accounted for the President's loss in Pennsylvania. *Thompson* Compl. ¶ 38.

<div align="center">

b.   Efforts to influence state and local election officials

</div>

The President also took his case directly to state and local election officials.  These meetings occurred by phone and in person, and centered mostly on Georgia, Michigan, and Pennsylvania.  *Swalwell* Compl. ¶¶ 39, 45, 49, 52.  In some instances, these efforts were followed by threatening words and conduct by some supporters.

In Georgia, for example, the President called Georgia's Secretary of State an "enemy of the people" and tweeted about him over a dozen times.  *Swalwell* Compl. ¶ 49.  The Secretary and his family were then targeted by some of the President's supporters with threats of violence and death.  *Id.* ¶ 50.  Another Georgia state official pleaded with the President to condemn death threats made to election workers in Georgia, but he refused to do so.  *Blassingame* Compl. ¶ 29.

In another instance, in Michigan, on December 5, 2020, the President falsely declared that he had won almost every county in the state.  *Swalwell* Compl. ¶ 40.  The next day armed protesters went to the home of Michigan's Secretary of State, demanding she overturn the election results. *Thompson* Compl. ¶ 50.  During these weeks, the President also tweeted criticism of Republican

<div align="center">

7

</div>

governors in Arizona and Georgia, claiming that "[i]f they were with us, we would have already won both." *Swalwell* Compl. ¶ 36.

During these efforts, and aware of the threats directed against state election officials, the President tweeted, "People are upset, and they have a right to be." *Thompson* Compl. ¶ 52.

The President's allies, including Brooks and Giuliani, continued to support the President's campaign to undo the election results. Brooks, for example, tweeted false claims that President-elect Joe Biden had not won Georgia, and he also announced that he would object to certifying the Electoral College ballots from Georgia. *Swalwell* Compl. ¶ 82. Giuliani also continued his efforts, falsely suggesting in mid-November that irregularities in Detroit were the reason for the President's loss. *Thompson* Compl. ¶ 42. He asked then–Deputy Secretary of Homeland Security Ken Cuccinelli to seize voting machines. *Swalwell* Compl. ¶ 62. A Trump campaign attorney even suggested that an election official should be shot. *Thompson* Compl. ¶ 48.

### c.      "Stop the Steal" rallies

Dozens of protests sprung up around the country. *Blassingame* Compl. ¶ 22. Two in Washington, D.C., turned violent. On the evening of November 14, 2020, multiple police officers were injured and nearly two dozen arrests were made. *Id.* ¶ 26. Then, on December 12, 2020, supporters of the President clashed with District of Columbia police, injuring eight of them, which led to over 30 arrests, many for acts of assault. *Id.* ¶ 28. The President was aware of these rallies, as he tweeted about them, and he would have known about the violence that accompanied them. *Id.* ¶¶ 25, 27.

Organized militia groups attended these events in Washington, D.C. One of them was the Proud Boys. During a pre-election debate, the moderator asked whether President Trump would denounce white supremacist groups. When the President asked, "[W]ho would you like me to

condemn?," Vice President Biden suggested the "Proud Boys," to which the President responded, "Proud Boys, stand back, and stand by." *Thompson* Compl. ¶ 30.  Tarrio, the head of the Proud Boys, tweeted in response, "Standing by sir." *Id.*

Another militia group that came to Washington, D.C., for these rallies was the Oath Keepers.  At the December rally, an Oath Keepers leader told the assembled crowd, the President "needs to know from you that you are with him, [and] that if he does not do it while he is commander in chief, we're going to have to do it ourselves later, in a much more desperate, much more bloody war." *Id.* ¶ 54.

### 2.    Preparations for the January 6 Rally

On December 19, 2020, President Trump announced that there would be a rally in Washington, D.C., on January 6th, the day of the Certification of the Electoral College: "Big protest in D.C. on January 6th.  Be there, will be wild!" *Swalwell* Compl. ¶ 86.  The President and his campaign were involved in planning and funding the rally.  He participated in selecting the speaker lineup and music, and his campaign made direct payments of $3.5 million to rally organizers. *Thompson* Compl. ¶¶ 68–69.  Significantly, the rally was not permitted for a march from the Ellipse. *Id.* ¶ 90.  The President and his campaign came up with the idea for a march to the Capitol. *Id.* ¶ 69.

Pro-Trump message boards and social media lit up after the President's tweet announcing the January 6 Rally.  Some followers viewed the President's tweet as "marching orders."  One user posted, referring to the President's debate statement to the Proud Boys, "standing by no longer." *Swalwell* Compl. ¶ 88; *Thompson* Compl. ¶ 57.  Other supporters explicitly contemplated "[s]torm[ing] the [Capitol]," and some posted about "Operation Occupy the Capitol" or tweeted using the hashtag #OccupyCapitols. *Swalwell* Compl. ¶ 89; *Thompson* Compl. ¶ 62.

The President knew that his supporters had posted such messages.  He and "his advisors actively monitored the websites where his followers made these posts."  *Thompson* Compl. ¶ 66.  News outlets, including Fox News, discussed them, as well.  *Id.*  On December 28, 2020, in widely publicized remarks, a former White House aide predicted, "there will be violence on January 6th because the president himself encourages it."  *Id.*

Trump's allies also worked to promote the January 6 Rally.  Trump Jr. posted a video on Instagram asking his followers to "Be Brave. Do Something."  *Swalwell* Compl. ¶ 74.  Giuliani tweeted a video purporting to explain how Vice President Mike Pence could block the certification of the election results.  *Id.* ¶ 65.  Brooks posted on social media on the eve of the rally that the President "asked [him] personally to speak & tell the American people about the election system weaknesses that the Socialist Democrats exploited to steal this election."  *Id.* ¶ 84.

At the same time, members of the Proud Boys and the Oath Keepers began their preparations for the rally in earnest.  On December 19 and 25, 2020, leaders of the Oath Keepers announced that they had "organized an alliance" and "orchestrated a plan" with the Proud Boys.  *Thompson* Compl. ¶ 63.  Tarrio said that the Proud Boys would turn out in "record numbers."  *Id.* ¶ 64.  The groups also secured tactical and communications equipment.  *Id.* ¶ 65.  The Oath Keepers recruited additional members and prepared them with military-style training.  *Id.* ¶ 127.

### 3.   *January 6th—The Riot at the Capitol Building*

The "Save America" rally on the Ellipse began at about 7:00 a.m.  *Blassingame* Compl. ¶ 58.  Brooks took the stage around 8:50 a.m.  *Swalwell* Compl. ¶ 84.  The Congressman said, among other things, that "[w]e are great because our ancestors sacrificed their blood, their sweat, their tears, their fortunes, and sometimes their lives," and that "[t]oday is the day American patriots start taking down names and kicking ass!"  *Id.* ¶¶ 106, 108.  After Brooks finished, Giuliani spoke.

10

He repeated that the "election was stolen" and said that it "has to be vindicated to save our country." *Id.* ¶ 113.  Then, in the context of discussing how disputes over election fraud might be resolved, he proclaimed, "Let's have trial by combat!"  *Id.* ¶ 114.  Trump Jr. gave the last speech before the President took to the podium.  He spent much of his remarks claiming that the Republican Party belongs to Donald Trump.  He also warned Republican members of Congress, "If you're gonna be the zero, and not the hero, we're coming for you, and we're gonna have a good time doing it."  *Id.* ¶¶ 117–119.

At about noon, President Trump took the stage.  *Id.* ¶ 121.  The court will discuss the President's speech in much greater detail later in this opinion, so recites only portions here.  The President spoke for 75 minutes, and during that time, he pressed the false narrative of a stolen election.  He suggested that Vice President Pence could return Electoral College ballots to the states, allowing them to recertify Electors, which would bring about an election victory.  He urged rally-goers to "fight like hell," and he told them that "you're allowed to go by very different rules" when fraud occurs.  *Swalwell* Compl. ¶¶ 126, 128.  Early in the speech he referenced a march to the Capitol and said he knew the crowd would be going there to "peacefully and patriotically" make their voices heard.  An hour later, he punctuated his speech by saying that the election loss "can't have happened and we fight, we fight like hell, and if you don't fight like hell, you're not going to have a country anymore."  *Thompson* Compl. ¶ 88.  He then directed his supporters to the Capitol.  The crowd at various points responded, "Fight Like Hell. Fight for Trump," and at other points, "Storm the Capitol," "Invade the Capitol Building," and "Take the Capitol right now." *Blassingame* Compl. ¶ 61; *Thompson* Compl. ¶ 88.[3]  Responding to the President's call, thousands marched to the Capitol building after he finished his remarks.

---

[3] As discussed later, these Complaints make different allegations about the timing of these shouts and chants.

Meanwhile, Congress had convened a Joint Session at 1:00 p.m. to certify the Electoral College vote. *Thompson* Compl. ¶ 93. Outside the building, some supporters already had begun confrontations with Capitol Police. Even before the President's speech had concluded, the Proud Boys, operating in small groups, had begun to breach the outer perimeter of the Capitol. *Blassingame* Compl. ¶ 66; *Thompson* Compl. ¶¶ 98–100. The Ellipse crowd began to arrive by 1:30 p.m. *Blassingame* Compl. ¶ 69. As their numbers grew, the crowd overwhelmed police and exterior barriers and entered the Capitol by 2:12 p.m. *Swalwell* Compl. ¶ 134. The Oath Keepers were among the crowd. *Thompson* Compl. ¶ 126. The Joint Session was suspended, and the Vice President and members of Congress were evacuated. *Id.* ¶ 111; *Swalwell* Compl. ¶¶ 135–136. Police officers, including the *Blassingame* Plaintiffs, were injured as violent confrontations continued with the President's supporters.

### 4.   The President's Response

After his speech, the President returned to the White House and watched the events at the Capitol unfold on television. *Thompson* Compl. ¶ 106. Despite pleas from advisors and Congressmen, the President did not immediately call on his supporters to leave the Capitol building. *Blassingame* Compl. ¶¶ 114, 116; *Thompson* Compl. ¶ 123. At about 2:24 p.m., after rioters had entered the Capitol, he sent a tweet critical of the Vice President for lacking "the courage to do what should have been done to protect our Country and our Constitution." *Blassingame* Compl. ¶ 116. Eventually, two hours later, the President would tell his supporters to stand down. He tweeted a video calling on them to "[g]o home. We love you. You're very special." *Id.* ¶ 125.

The President sent one more tweet that day. After police had cleared the Capitol, around 6:00 p.m., the President said: "These are the things and events that happen when a sacred landslide

12

election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long. . . .   Remember this day forever!"   *Id.* ¶ 127.

The House of Representatives would later pass a single Article of Impeachment accusing President Trump of "Inciting an Insurrection," but the Senate would acquit him after he left office.

**B.   Procedural History**

*1.*   Thompson v. Trump

The *Thompson* case was the first to come before the court on February 16, 2021.   *See* Compl., ECF No. 1.   The plaintiffs in that case are ten members of the House of Representatives.[4] Although the case is captioned *Thompson v. Trump*, the court will refer to these plaintiffs as the "Bass Plaintiffs"—after the second named plaintiff, Representative Karen R. Bass—because the lead plaintiff, Representative Bennie G. Thompson, voluntarily dismissed his claims after his appointment to serve as the chair of the Select Committee to Investigate the January 6th Attack on the United States Capitol.   *See* Notice of Voluntary Dismissal, ECF No. 39.   Although all are elected officials, the Bass Plaintiffs have filed suit in their personal capacities.   *See Thompson* Compl.

The Bass Plaintiffs have named six defendants:   President Trump, Giuliani, the Oath Keepers, Proud Boys International, Warboys LLC, and Tarrio.   *Id.*   They assert a single claim against all Defendants: a violation of 42 U.S.C. § 1985(1).   *Id.* at 60.   All Defendants except the Proud Boys and Warboys have appeared and moved to dismiss the claim against them.   *See* Def. Oath Keepers' Mot. to Dismiss, ECF No. 20 [hereinafter *Thompson* Oath Keepers' Mot.]; Def. Giuliani's Mot. to Dismiss, ECF No. 21, Mem. of P. & A. in Supp. of Def.'s Mot. to Dismiss, ECF No. 21-1 [hereinafter *Thompson* Giuliani Mot.]; Def. Trump's Mot. to Dismiss, ECF No. 22, Mem.

---

[4] The plaintiffs are Representatives Karen R. Bass, Stephen I. Cohen, Veronica Escobar, Pramila Jayapal, Henry C. Johnson, Jr., Marcia C. Kaptur, Barbara J. Lee, Jerrold Nadler, Maxine Waters, and Bonnie M. Watson Coleman.

in Supp. of Def. Trump's Mot. to Dismiss, ECF No. 22-1 [hereinafter *Thompson* Trump Mot.];

Def. Tarrio's Notice of Intention to Join Mots. to Dismiss, ECF No. 64.

>    *2.*    Swalwell v. Trump

Representative Eric Swalwell filed his action on March 5, 2021, also in his personal

capacity. *Swalwell* Compl. He named as defendants President Trump, Trump Jr., Brooks, and

Giuliani. His Complaint advances a host of federal and District of Columbia–law claims against

all Defendants: (1) violation of § 1985(1) (Count 1); (2) violation of 42 U.S.C. § 1986 (Count 2);

(3) two counts of negligence per se predicated on violations of District of Columbia anti-rioting

and disorderly conduct criminal statutes (Counts 3 and 4); (4) violation of the District of Columbia

anti-bias statute, D.C. Code § 22-3701 *et seq.* (Count 5); (5) intentional infliction of emotional

distress (Count 6); (6) negligent infliction of emotional distress (Count 7); (7) aiding and abetting

common law assault (Count 8); and (8) negligence (Count 9). *Id.* at 45–62.

Each Defendant except Brooks has moved to dismiss all claims against him. *See* Def.

Giuliani's Mot. to Dismiss, ECF No. 13, Mem. of P. & A. in Supp. of Def.'s Mot. to Dismiss, ECF

No. 13-1 [hereinafter *Swalwell* Giuliani Mot.]; Defs. Trump & Trump Jr.'s Mot. to Dismiss, ECF

No. 14, Mem. in Supp. of Trump & Trump Jr.'s Mot. to Dismiss, ECF No. 14-1 [hereinafter

*Swalwell* Trump Mot.].

Brooks has moved for a scope-of-office certification under the Westfall Act, 28 U.S.C.

§ 2679. *See* Pet. to Certify Def. Mo Brooks Was Acting Within Scope of His Office or

Employment, ECF No. 20. Under the Westfall Act, if the Attorney General certifies that a tort

claim against an employee of government—including a member of Congress—arises from conduct

performed while "acting within the scope of his office or employment," the United States is to be

substituted as the defendant. 28 U.S.C. § 2679(d)(1). Brooks asked the Attorney General for a

Westfall Act certification, but he declined the request. *See* U.S. Resp. to Def. Mo Brooks's Petition to Certify He Was Acting Within Scope of His Office or Employment, ECF No. 33 [hereinafter U.S. Resp. to Brooks]. Notwithstanding the Attorney General's denial, the Westfall Act authorizes a court to make the requisite certification. *See* 28 U.S.C. § 2679(d)(3) ("In the event that the Attorney General has refused to certify scope of office or employment under this section, the employee may at any time before trial petition the court to find and certify that the employee was acting within the scope of his office or employment."). Brooks seeks such relief from the court.

> *3.*     Blassingame v. Trump

The third action is brought by James Blassingame and Sidney Hemby, two Capitol Police officers who were on duty and injured on January 6th. They name only President Trump as a defendant. *Blassingame* Compl. They advance numerous federal and District of Columbia–law claims: (1) directing assault and battery (Count 1); (2) aiding and abetting assault and battery (Count 2); (3) directing intentional infliction of emotional distress (Count 3); (4) two counts of negligence per se predicated on violations of District of Columbia anti-rioting and disorderly conduct criminal statutes (Counts 4 and 5); (5) punitive damages (Count 6); (6) violation of § 1985(1) (Count 7); and (7) civil conspiracy in violation of common law (Count 8). *See id.* at 36–48.

Defendant Trump has moved to dismiss all counts against him. Def. Trump's Mot. to Dismiss, ECF No. 10, Def.'s Mem. in Supp. of His Mot. to Dismiss, ECF No. 10-1 [hereinafter *Blassingame* Trump Mot.].

> *4.*     *The Motions to Dismiss*

Defendants' arguments for dismissal are the same across all three cases. Generally, all Defendants contend the following: (1) Plaintiffs lack standing to sue under Article III of the

Constitution; (2) the First Amendment bars Plaintiffs' claims; and (3) Plaintiffs have failed to state

claims under § 1985(1) and District of Columbia law.  President Trump advances a number of

contentions that are specific to him: (1) he is absolutely immune from suit; (2) the political question

doctrine renders these cases nonjusticiable; (3) the Impeachment Judgment Clause bars civil suits

against a government official, like him, acquitted following impeachment; and (4) the doctrines of

res judicata and collateral estoppel premised on his acquittal by the Senate preclude all of

Plaintiffs' claims.

The court held oral argument on January 10, 2022, on Defendants' motions.  *See* Hr'g Tr.,

ECF No. 63.

## III.    DISCUSSION

This section consists of two subparts:  a discussion of (1) whether the court has subject

matter jurisdiction to hear these actions, and if it does, (2) whether Plaintiffs have stated cognizable

claims.  The court begins, where it must, with determining whether it has jurisdiction to hear these

matters.

### A.      Subject Matter Jurisdiction

Defendants' challenge to the court's subject matter jurisdiction requires the court to make

four inquiries:  (1) whether Plaintiffs have Article III standing to sue, (2) whether President Trump

enjoys absolute immunity from suit, (3) whether the cases present a political question that is

nonjusticiable as to President Trump, and (4) whether the claims against President Trump are

barred by the Impeachment Judgment Clause.[5]  The court also addresses in this portion of the

---

[5] President Trump raises another contention under the rubric of Article III standing but misclassifies it.  He insists that Swalwell and the Bass Plaintiffs cannot bring suit under § 1985(1) because such a claim "is only available to specific federal officials," which does not include members of Congress.  *Thompson* Trump Mot. at 16.  Therefore, he says, "Plaintiffs are not of a class of individuals who have *standing* to bring a claim under § 1985(1)." *Id.* at 18 (emphasis added).  This type of argument is commonly referred to as "statutory standing."  *See Lexmark Int'l, Inc. v. Static*

16

opinion President Trump's res judicata and collateral estoppel defenses, which, although not jurisdictional in nature, logically fit here because they are premised on his acquittal following impeachment.

The court holds that (1) all Plaintiffs have plausibly established Article III standing, (2) President Trump is not absolutely immune from suit, except as to Swalwell's § 1986 failure-to-act claim (Count 2), (3) the political question doctrine does not bar the court's review, (4) the Impeachment Judgment Clause does not foreclose the claims against President Trump, and (5) the doctrines of res judicata and collateral estoppel do not preclude litigation of the case or any claim or fact against President Trump.  The court takes up these issues in the order listed.

### 1.    *Article III Standing*

The Article III standing arguments made by Defendants are of two varieties.  First, President Trump maintains that Swalwell and the Bass Plaintiffs "have not alleged a particularized injury causally connected to Mr. Trump."  *Thompson* Trump Mot. at 15; *Swalwell* Trump Mot. at 16–17 (arguing that Swalwell "failed to allege any concrete injury caused by Defendants").  Second, the Oath Keepers contend that the Bass Plaintiffs lack standing to sue in their personal capacities to redress the alleged interference with their official duty to attend and participate in the Certification of the Electoral College vote.  *Thompson* Oath Keepers' Mot. at 17.  Neither contention has merit.

---

*Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014).  The Supreme Court has made clear, however, that a question of statutory standing does not implicate the court's subject matter jurisdiction, that is, the court's power to hear a case. *See id.*  Rather, a dispute as to statutory standing simply requires a court to determine whether a plaintiff "has a cause of action under the statute."  *Id.* at 128.  It is therefore an argument properly addressed pursuant to Federal Rule of Civil Procedure 12(b)(6), not Rule 12(b)(1).  The court thus takes up President Trump's statutory standing argument below in the section addressing whether Swalwell and the Bass Plaintiffs have stated a claim under § 1985(1).

a.    The elements of standing

A plaintiff in federal court bears the burden of showing that she meets the "irreducible constitutional minimum" of Article III standing: (1) injury in fact, (2) causation, and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). To establish standing at the motion to dismiss stage, the plaintiff "must state a plausible claim that [she has] suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (internal quotation marks omitted). The court must accept the well-pleaded allegations of the complaint as true and draw all inferences in favor of the plaintiff. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

The primary question the court faces concerns "injury in fact, the first and foremost of standing's three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (internal quotation marks and alteration omitted). In one sense that inquiry here is easy; in another, it is a bit more complicated. The easy establishment of a concrete injury is in *Blassingame* and as to one Plaintiff in *Thompson*. "If a defendant has caused physical . . . injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). The *Blassingame* Plaintiffs claim to have suffered physical injury. *Blassingame* Compl. ¶ 83 ("Officer Hemby was crushed against the doors on the east side trying to hold the insurrectionists back."); *id.* ¶ 88 (alleging Officer Hemby suffered "cuts and abrasions" over his face and hands); *id.* ¶ 109 ("The insurrectionists struck Officer Blassingame in his face, head, chest, arms, and what felt like every part of his body.").[6] So, too, does Bass Plaintiff Jayapal. *See*

---

[6] Although President Trump does not contest the *Blassingame* Plaintiffs' standing except for a cursory mention in the one-page motion to which he attaches his memorandum, Def. Trump's Mot. to Dismiss, ECF No. 10; *see generally Blassingame* Trump Mot., the court nevertheless addresses it. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)

18

*Thompson* Compl. ¶¶ 197, 203, 208 (alleging that she had a recent knee-replacement surgery and the evacuation from the House Gallery caused her to suffer "throbbing pain in her greatly swollen knee," and that she "endured significant pain and experienced setbacks in her knee replacement surgery recovery"). Because only one plaintiff must establish standing in *Thompson*, the court need not inquire as to the other Bass Plaintiffs. *See In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012).

The more challenging question surrounding injury in fact relates to Swalwell in his individual case. He does not allege any physical injury, only emotional harm. *Swalwell* Compl. ¶¶ 149, 223 (claiming "severe emotional distress"). For his common law claims, such harm is sufficient to establish an injury in fact. *See, e.g., TransUnion LLC*, 141 S. Ct. at 2211 n.7 (acknowledging that emotional or psychological injury suffices for the tort of intentional infliction of emotional distress). But not automatically so for his claims under § 1985(1) and § 1986 of the Ku Klux Klan Act. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (stating that "a plaintiff must demonstrate standing for each claim he seeks to press" (internal quotation marks omitted)). As to those claims, a question remains whether emotional harm is sufficiently "concrete" to establish Article III standing. *Spokeo*, 578 U.S. at 340. To determine "whether [such an] intangible harm" is sufficiently concrete, courts must consider "both history and the judgment of Congress." *Id.* As to history, "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* at 341. And, as to Congress's judgment, courts must ask "whether Congress has permissibly sought to 'elevate to the status of legally cognizable

---

(stating that federal courts have an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party").

injuries concrete *de facto* injuries that were previously inadequate in law[.]'"  *Magruder v. Capital One, Nat'l Ass'n*, 540 F. Supp. 3d 1, 7 (D.D.C. 2021) (quoting *Spokeo*, 578 U.S. at 341).

The parties have devoted scant attention to these questions.  The court has considered them, however, and concludes that emotional harm is sufficiently concrete to establish Article III standing for claims asserted under § 1985(1) and § 1986.  Starting with history, the alleged intangible harm here—emotional distress—has long been accepted as a basis for certain types of suits in American courts.  "Emotional harm has long-standing recognition as a compensable injury as a parasitic harm to personal injury or property damage claims, usually referred to as a claim for pain and suffering."  Betsy J. Grey, *The Future of Emotional Harm*, 83 FORDHAM L. REV. 2605, 2610 (2015).  Additionally, "[c]ommon law . . . traditionally recognized emotional harm claims as a component of trespassory torts like assault, false imprisonment, and defamation, allowing a presumption of damages without a showing of related physical injury."  *Id.*  This common law tradition dovetails with the plain text of § 1985(1) and Congress's reasons for enacting it.  The statute creates a cause of action for a person "injured in his person or property" due to a proscribed conspiracy.  42 U.S.C. § 1985(3).  The statute makes no distinction between physical and emotional injury, and in that sense it aligns with the common law tradition of permitting recovery for emotional distress for certain torts without a showing of physical injury.  And, though the statute "was enacted by a Congress acutely aware of the massive and frequently violent resistance in the southern states to federal Reconstruction after the Civil War," *Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1334 (7th Cir. 1977), courts have broadly interpreted § 1985(1) consistent with its "terms and legislative intent . . . , which [are] directed against efforts to impede governmental operations by interfering with officials in the discharge of their duties."  *Lawrence v. Acree*, 665 F.2d 1319, 1329 (D.C. Cir. 1981) (Wald, J., concurring) (citing *Stern*, 547 F.2d 1329).  Permitting

20

recovery for emotional harm arising from such interference is consistent with that intent. The court thus concludes that "history and the judgment of Congress" support recognizing emotional harm as a concrete injury to establish standing to bring claims under § 1985(1) and § 1986.

This conclusion is buttressed, at least implicitly, by two D.C. Circuit decisions. In both *Barr v. Clinton*, 370 F.3d 1196 (D.C. Cir. 2004), and *Hall v. Clinton*, 285 F.3d 74 (D.C. Cir. 2002), the court faced claims brought under § 1985(1). In *Barr*, the court dismissed the claim based on the statute of limitations and the First Amendment, 370 F.3d at 1202–03, and in *Hall*, it dismissed based on the statute of limitations alone, 285 F.3d at 82. In both cases, the plaintiff alleged emotional distress as their injury, *Barr*, 370 F.3d at 1200; *Hall*, 285 F.3d at 77, yet in neither did the court address whether emotional harm was a concrete injury for purposes of Article III. Perhaps that is because the sufficiency of such injury was so obvious it did not need to be addressed. *Barr* and *Hall* therefore support the court's conclusion.

President Trump also contests whether Swalwell and the Bass Plaintiffs have plausibly demonstrated the second element of standing—causation. He contends that their claimed injuries were caused not by his challenged actions, but by "the independent and intervening acts of third-party rioters." *Swalwell* Trump Mot. at 16. He also contends that causation is lacking because "Plaintiffs did not properly allege a conspiracy." *Thompson* Trump Mot. at 15. But these arguments misconstrue the standing inquiry. In "reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003); *see also Weissman v. Nat'l R.R. Passenger Corp.*, 21 F.4th 854, 857 (D.C. Cir. 2021) (citing *City of Waukesha*, 320 F.3d 228). Thus, in assessing Plaintiffs' standing here, the court must assume that Plaintiffs have successfully pleaded an

actionable conspiracy under § 1985(1): that is, President Trump did conspire "to prevent, by force, intimidation, or threat," (1) President Biden and Vice President Harris "from accepting or holding any office, trust, or place of confidence under the United States" and (2) members of Congress from lawfully discharging their constitutional and statutory duties with respect to certifying the Electoral College vote. Viewed in this way, it is apparent that Plaintiffs' injuries are "fairly traceable" to President Trump's alleged actions as a coconspirator, and "not the result of the *independent* action of some third party not before the court." *Lujan*, 504 U.S. at 560 (cleaned up) (emphasis added).

Finally, Plaintiffs' injuries are redressable with money damages. The court therefore is satisfied that Plaintiffs have sufficiently alleged the requisite elements of standing.[7]

### b.   Legislator standing

The Oath Keepers take a different tack on standing. They assert that the Bass Plaintiffs' injuries are *institutional* in nature—that is, they derive exclusively from their positions as members of the House. The Oath Keepers contend that if their injuries are so understood, the Bass Plaintiffs, as individual members, lack standing to vindicate an institutional injury. Oath Keepers Mot. at 17–26. The court might agree with this line of argument if the Bass Plaintiffs were claiming no more than that the riot interfered with their abilities to carry out their legislative duties. But that is not what they allege. They do not advance an institutional injury, such as the "dilut[ion] [of] their Article I voting power." *Raines v. Byrd*, 521 U.S. 811, 817 (1997) (internal quotation marks omitted). Their injuries are instead personal: emotional distress in the main, as well as physical

---

[7] Certain Plaintiffs seek injunctive relief in addition to damages. *See Swalwell* Compl. at 64; *Thompson* Compl. at 62. The standing inquiry for injunctive relief is different, as it requires a plaintiff to establish a likelihood of *future* harm. *In re Navy Chaplaincy,* 697 F.3d at 1178 ("It is sufficient that plaintiffs have demonstrated a 'likelihood of injury that rises above the level of unadorned speculation—that is, a realistic danger that [they] will suffer future harm." (internal quotation marks omitted)). Plaintiffs have not plausibly pleaded at this stage any likelihood of future injury.

injury to Jayapal.  *Thompson* Compl. ¶ 265 ("During the time when the Capitol was under attack, each of the Plaintiffs named above suffered emotional harm.").  Personal harm is the basis for their standing and, as discussed, it is sufficient for purposes of Article III.[8]

>  2.  *Presidential Immunity*

The court turns next to the question of presidential immunity.  President Trump contends that under the Supreme Court's decision in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), he is absolutely immune from damages liability in all three cases because his alleged conduct fell within the "outer perimeter" of his official presidential responsibilities.  *See Swalwell* Trump Mot. at 8–11; *Thompson* Trump Mot. at 8–11; *Blassingame* Trump Mot. at 7–13.  This is not an easy issue. It is one that implicates fundamental norms of separation of powers and calls on the court to assess the limits of a President's functions.  And, historical examples to serve as guideposts are few. After careful consideration, the court concludes that, on the facts alleged, absolute immunity does not shield President Trump from suit, except as to Swalwell's § 1986 failure-to-act claim.

>  a.  The scope of a President's absolute immunity against damages liability

The court's discussion naturally begins with the Supreme Court's decision in *Nixon v. Fitzgerald*.  In that case, a former federal employee sued President Richard Nixon and various Executive Branch officials for damages arising from his termination from employment. *Fitzgerald*, 457 U.S. at 733–39.  The plaintiff claimed that President Nixon was directly involved in his firing and that the action was undertaken in retaliation for his having publicly revealed during

---

[8] It is understandable why the Oath Keepers interpreted the Bass Plaintiffs' claimed injury to include an impairment of their official duties.  Their Complaint states that "each of the Plaintiffs named above was hindered and impeded in the discharge of his or her official duties and suffered the deprivation of the right to be free from intimidation and threats in the discharge of his or her official duties, as explicitly protected under the Ku Klux Klan Act."  *Thompson* Compl. ¶ 265.  That certainly sounds like an institutional injury.  In any event, the Bass Plaintiffs have expressly disavowed such a theory of standing.  Bass Pls.' Omnibus Mem. of Law in Opp'n to Defs.' Mots. to Dismiss, ECF No. 29, at 20 ("Plaintiffs, however, are *not* seeking damages for an impaired ability to certify the results of the election.").

congressional hearings cost overruns in the Department of the Air Force. *See id.* The plaintiff asserted two statutory claims and one claim under the First Amendment against President Nixon, who by that point no longer occupied the Office of the President. *See id.* After the D.C. Circuit declined to dismiss the case on the ground of absolute presidential immunity, the Supreme Court took up the question of the "scope of immunity available to a President of the United States." *Id.* at 741.

The Court held that President Nixon enjoyed absolute immunity from the plaintiff's suit: "[W]e hold that petitioner, as former President of the United States, is entitled to absolute immunity from damages liability predicated on his official acts." *Id.* at 749. The Court continued: "We consider this immunity a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers." *Id.* Central to the Court's determination was the "unique position in the constitutional scheme" that the President occupies. *Id.* The Court observed that, "as the chief constitutional officer of the Executive Branch," the President is "entrusted with supervisory and policy responsibilities of the utmost discretion and sensitivity." *Id.* at 750. Those responsibilities include taking care that the laws be faithfully executed; conducting foreign affairs; and managing the Executive Branch. *Id.*; *see also Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020) (describing the President's "duties, which range from faithfully executing the laws to commanding the Armed Forces," as "of unrivaled gravity and breadth"). Though the Court had previously held that qualified immunity struck the proper separation-of-powers balance for cabinet officers, the Court said that "[t]he President's unique status under the Constitution distinguishes him from other executive officials." *Fitzgerald*, 457 U.S. at 750. For a President, "diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government." *Id.* at 751. Indeed, because the

24

President must concern himself with "matters likely to 'arouse the most intense feelings,'" "there exists the greatest public interest in providing an official the maximum ability to deal fearlessly and impartially with the duties of his office." *Id.* at 752 (internal quotation marks omitted). The Court also weighed the "sheer prominence" of the President's office, which makes him "an easily identifiable target for suits for civil damages." *Id.* at 752–53. "Cognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Id.*

The Court then defined the scope of a President's absolute immunity. It observed that "the sphere of protected action must be related closely to the immunity's justifying purposes." *Id.* at 755. That principle militated in favor of expansive immunity: "In view of the special nature of the President's constitutional office and functions, we think it appropriate to recognize absolute Presidential immunity from damages liability for acts within the 'outer perimeter' of his official responsibility." *Id.* at 756. The Court recognized that given the "broad variety of areas, many of them highly sensitive," of presidential discretionary responsibility, in "many cases it would be difficult to determine which of the President's innumerable 'functions' encompassed a particular action." *Id.* Such function could not, however, be defined by probing the President's motive for the contested action or by simply claiming a violation of law. The plaintiff in *Fitzgerald*, for example, could not avoid the immunity bar by alleging that the President's motive for terminating him was retaliatory, and thus unlawful, and therefore fell outside the outer perimeter of his duties. *See id.* at 756. Such a "construction would subject the President to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose." *Id.* President Nixon thus enjoyed absolute immunity from suit because it was clearly within his constitutional and

25

statutory authority to prescribe reorganizations and reductions in force within a military branch—the stated reason for Plaintiff's termination. *Id.* at 757. Such action "lay well within the outer perimeter of [a President's] authority." *Id.*

*Fitzgerald* thus established a scope of presidential immunity for civil money damages that is unquestionably capacious, though not categorical. The Supreme Court contemplated that, at least, there might be *some* actions by a President that would fall outside the outer perimeter of his official responsibilities and expose him to a civil suit. What lay beyond the outer perimeter would come into some focus fifteen years later in *Clinton v. Jones*.

There, President Bill Clinton, while in office, faced a suit by Paula Jones that, in the main, alleged that he had engaged in sexually inappropriate conduct while he was the Governor of Arkansas and had retaliated against her for rebuffing his advances. *Clinton v. Jones*, 520 U.S. 681, 686 (1997).[9] Such acts, the Court said, were "unrelated to any of his official duties as President of the United States and, indeed, occurred before he was elected to that office." *Id.* at 686. President Clinton nevertheless urged the Court to hold that "the Constitution affords the President temporary immunity from civil damages litigation arising out of events that occurred before he took office." *Id.* at 692. The Court rejected the President's call for "temporary immunity." *Id.* It reasoned that the principal rationale for affording certain public servants absolute immunity was to enable "such officials to perform their designated functions effectively without fear that a particular decision may give rise to personal liability," and that such rationale did not apply to "unofficial conduct." *Id.* at 693–94. The Court emphasized that in defining the scope of immunity

---

[9] *Clinton v. Jones* also involved a claim of defamation that arose while President Clinton was in office. The claim was that "persons authorized to speak for the President publicly branded [the plaintiff] a liar by denying that the incident had occurred." 520 U.S. at 685. The question of immunity as to the defamation claim was not before the Court, though it did observe in passing that the defamation claim "may involve conduct within the outer perimeter of the President's official responsibilities." *Id.* at 686 & n.3.

26

it had taken a "functional approach," and that "immunities are grounded in the nature of the function performed, not the identity of the actor who performed it." *Id.* at 694–95 (internal quotation marks omitted). It concluded: "With respect to acts taken in his 'public character'—that is, official acts—the President may be disciplined principally by impeachment, not by private lawsuits for damages. But he is otherwise subject to the laws for his purely private acts." *Id.* at 696.[10]

### b.   The parties' positions on official-acts immunity

Guided by the foregoing principles, the court turns to the parties' arguments. President Trump bears the burden of establishing that he is immune from suit. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1140 (D.C. Cir. 2015).

The complained-of actions of the President in these matters can be generally framed as falling into three categories: his pre–January 6th tweets, the January 6 Rally Speech, and his failure to promptly act once the Capitol was breached by rioters. President Trump argues that these acts fall into two presidential "functions": (1) the constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const., art. II, § 3, and (2) speaking on matters of public concern. *Swalwell* Trump Mot. at 8–11; *Blassingame* Trump Mot. 12; Reply in Supp. of Def. President Trump's Mot. to Dismiss, ECF No. 43 [hereinafter *Thompson* Trump Reply], at 3–6. Across his various briefs, President Trump describes these functions in different ways. With respect to faithful execution of the laws, President Trump says that he "had an ever-present duty to ensure that the election laws were followed, including the certification process." *Thompson* Trump Reply

---

[10] The Court also made clear in *Clinton*, and later in *Vance v. Trump*, that the "dominant concern" for crafting broad immunity in *Fitzgerald* "was not mere distraction but the distortion of the Executive's 'decisionmaking process' with respect to official acts that would stem from 'worry as to the possibility of damages.'" *Vance*, 140 S. Ct. at 2426 (quoting *Clinton*, 520 U.S. at 694 n.19). President Trump alludes to a "distraction" rationale in his papers, *see Thompson* Trump Mot. at 9, but he does not seriously advocate for it, recognizing instead that the "distortion" rationale is the predominant reason for affording a President absolute immunity from civil suit for official acts.

27

at 3.  Quoting from a law review student note, he says that enforcing election laws is "at the core of the executive branch's duty to faithfully execute the law."  *Id.* (internal quotation marks and citation omitted).  As to speaking on matters of public concern, the President argues that he "was engaged in discretionary action pursuant to his Constitutional duty to ensure that the laws were faithfully executed by petitioning Congress not to certify the electors from States with ongoing election challenges."  *Blassingame* Trump Mot. at 10–11.  Elsewhere he contends that the speech and social media posts complained of by Plaintiffs all addressed matters of public concern and thus are "within the outer perimeter of the Presidential office."  *Thompson* Trump Reply at 5.  "[A] political speech by the President is not at the 'outer perimeter' of his duties," he says; rather, "it is at dead center."  *Swalwell* Trump Mot. at 9.

The court finds that President Trump's Take Care Clause argument is misleading and wrong as a matter of law, and that his contention with respect to speech of public concern is too simplistic.

### i.    *The Take Care Clause*

Article II, Section 3 vests in the President the authority to "take Care that the Laws be faithfully executed."  Those are "sweeping words," *Myers v. United States*, 272 U.S. 52, 122 (1926), but they do not confer limitless presidential authority or the authority to encroach on the powers vested in the co-equal branches, *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–88 (1952).  Presidential authority remains constrained by the Constitution and the laws that Congress enacts.  *See id.* at 587 ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker."); *id.* at 588 ("The President's order does not direct that a congressional policy be executed in a manner

prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President.").

President Trump cites no constitutional provision or federal statute that grants or vests in the President (or the Executive Branch) any power or duty with respect to the Certification of the Electoral College vote, at least in the manner in which he conceives it.  That is because there is none.  The Constitution spells out the respective responsibilities of various actors in the election of the President.[11]  The Constitution provides that States are to select Electors who will cast votes for President and Vice President, and the Electors transmit a tally of those votes to the President of the Senate.  U.S. Const. art. II, § 1, cl. 3; *id.* amend. XII.  The President of the Senate "in the presence of the Senate and House of Representatives" shall "open all the certificates and the votes shall then be counted."  *Id.* amend. XII.  A sitting President is prescribed no role.

The Electoral Count Act, Pub. L. No. 49-90, 24 Stat. 373 (1887), fills in procedural details not addressed in the Constitution.  It, too, prescribes no role for a sitting President.  A Joint Session of the Senate and the House of Representatives must meet "at the hour of 1 o'clock in the afternoon" on "the sixth day of January succeeding every meeting of the electors." 3 U.S.C. § 15. The President of the Senate, as the presiding officer, opens the certificates of the electoral votes and hands them to tellers appointed by each House, who make a list of the votes.  *Id.*  When announcing each certificate, the President of the Senate calls for objections, which if made must be in writing and signed by one Senator and one member of the House of Representatives.  *Id.* Thereafter, the Senate and the House withdraw to their respective chambers to consider each objection, and "each Senator and Representative may speak to such objection or question five minutes, and not more than once[.]"  *Id.* § 17.  The presiding officer must cut the debate off after

---

[11] The below summary is pulled, some of it verbatim, from Judge Friedrich's decision in *United States v. Sandlin*, No. 21-cr-88 (DLF), 2021 WL 5865006, at *4 (D.D.C. Dec. 10, 2021).

two hours.  *Id.*  He also has the "power to preserve order" during the session.  *Id.* § 18.  The Act

even details where the presiding officer, the Speaker, the Senators, the Representatives, the tellers,

and others are to sit in the chamber.  *Id.* § 16.  And it commands that the session "not be dissolved

until the count of electoral votes shall be completed and the result declared."  *Id.*  As this summary

demonstrates, a sitting President has no expressly identified duty to faithfully execute the laws

surrounding the Certification of the Electoral College.  So, perhaps it is not surprising that

President Trump does not identify *any* law relating to the Certification that he was purportedly

executing through his tweets and the January 6 Rally Speech.

Nor does he identify any authority that would support his assertion that merely exhorting

non–Executive Branch officials to act in a certain way is a responsibility within the scope of the

Take Care Clause.  Scholars have emphasized that the Take Care Clause is written in the passive

voice ("take Care that the Laws be faithfully executed").  They have interpreted that construction

to mean that the Framers envisioned not that the President personally would implement the laws

but that their actual execution would be carried out by others subject to the President's direction

and supervision.  *See, e.g.*, Andrew Kent et al., *Faithful Execution and Article II*, 132 HARV. L.

REV. 2111, 2126 (2019); Gillian E. Metzger, *The Constitutional Duty to Supervise*, 124 YALE L.J.

1836, 1875 (2015).  The President's Take Care Clause duty therefore does *not* extend to

government officials over whom he has no power or control.  Here, the Vice President, acting as

President of the Senate, and members of Congress had constitutionally and statutorily prescribed

duties to carry out the Certification.  Their actions are those of a co-equal branch, not subject to

Executive Branch control.  President Trump's advocacy of the scope of their duties and how they should be performed therefore falls outside even the expansive Take Care Clause.[12]

In summoning authority in aid of this argument, President Trump leaves out critical context.  President Trump relies on a law review note for the general proposition that "enforcing election laws . . . [strikes] at the core of the executive branch's duty to faithfully execute the law." *Thompson* Trump Reply at 3 (quoting Alton L. Lightsey, Note, *Constitutional Law:  The Independent Counsel and Supreme Court's Separation of Powers Jurisprudence*, 40 U. FLA. L. REV. 563, 573 (1988)).  What President Trump omits from that quote, however, makes his citation grossly misleading.  The full quote reads: "However, enforcing election laws *through litigation* [strikes] at the core of the executive branch's duty to faithfully execute the law.   It must therefore belong solely to the executive."  Lightsey, *supra*, at 573 (emphasis added).  Including "through litigation" completely changes the meaning of the sentence.  The President can enforce election laws through litigation initiated by the Department of Justice or the Federal Election Commission, agencies over which he has appointment authority.  The case the Lightsey note cites, *Buckley v. Valeo*, makes that clear:  "A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'"  424 U.S. 1, 138 (1976).  This case, of course, does not involve litigation to enforce federal election laws, and so the President's reliance on the Lightsey note is inapt.

---

[12] To be clear, the court does not mean to say that there is no conceivable circumstance in which the President would have a role in faithfully executing the laws pertaining to the Certification of the Electoral College.  The court's holding is limited to President Trump's contention that his mere exhortation to carry out Certification duties in a particular way falls within the Take Care Clause.

ii.    *Speech on matters of public concern*

The court turns next to President Trump's assertion that his alleged actions all involve speech on matters of public concern and therefore are well within the President's duties. As he puts it: "It is enough that the nature of the activity, a speech by the President, is the type of activity normal and customary to the presidency. Indeed, it was not at the outer perimeter of the President's duties—it was dead center." *Thompson* Trump Reply at 2.

The court agrees with President Trump in two respects. First, speech is unquestionably a critical function of the presidency. "The President of the United States possesses an extraordinary power to speak to his fellow citizens and on their behalf." *Trump v. Hawaii*, 138 S. Ct. 2392, 2417–18 (2018); *see also Columbia Broad. Sys., Inc. v. FCC*, 454 F.2d 1018, 1020 (D.C. Cir. 1971) ("The President's extensive use of the media cannot, of course, be faulted, for there can be no doubt that in the distillation of an informed public opinion such appearances play a very basic role."). Second, his pre–January 6th tweets and the January 6 Rally Speech addressed matters of public concern: the outcome of the 2020 Presidential Election and election integrity. Whatever one thinks of the President's views on those subjects, they plainly were matters of public concern. *See Snyder v. Phelps*, 562 U.S. 443, 453 (2011) ("Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." (internal quotation marks and citations omitted)); *Rankin v. McPherson*, 483 U.S. 378, 387 (1987) (stating the arguably "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern").

But to say that speaking on matters of public concern is a function of the presidency does not answer the question at hand: Were President Trump's words in this case uttered in performance of official acts, or were his words expressed in some other, unofficial capacity? The President's proposed test—that whenever and wherever a President speaks on a matter of public concern he is immune from civil suit—goes too far. It mirrors what the Supreme Court has said cannot be the basis for absolute immunity: "[T]o construct an immunity from suit for unofficial acts grounded purely in the identity of [the President's] office is unsupported by precedent." *Clinton*, 520 U.S. at 695. And the Supreme Court has recognized different capacities in which the person occupying the Office of the President can act: "Presidents and other officials face a variety of demands on their time, . . . some private, some political, and some as a result of official duty." *Id.* at 705 n.40.[13] Thus, to say that the President spoke on a matter of public concern does not dispositively answer the question of whether he enjoys absolute immunity for such speech.

Consider some examples. At a rally promoting his reelection, an incumbent President touts his policy accomplishments and makes promises about a second term, but during his speech he instructs members of the crowd to "punch" a protester "in the face right now." Or, take a President who speaks at a party fundraising event before a group of high-dollar donors, where he not only discusses pending legislation but also falsely and with malice accuses a political opponent who is

---

[13] This observation was made as part of the Supreme Court's rejection of the "distraction" theory as justifying absolute immunity:

> There is, no doubt, some truth to Learned Hand's comment that a lawsuit should be "dread[ed] . . . beyond almost anything else short of sickness and death." We recognize that a President, like any other official or private citizen, may become distracted or preoccupied by pending litigation. Presidents and other officials face a variety of demands on their time, however, some private, some political, and some as a result of official duty. While such distractions may be vexing to those subjected to them, they do not ordinarily implicate constitutional separation-of-powers concerns.

*Clinton*, 520 U.S. at 705 n.40 (citation omitted).

blocking the legislation of running a child-trafficking operation.  Or, consider a President who appears at a campaign event for a candidate of his party who is running for Congress, and during his remarks touts the candidate because his election will help advance his agenda, but also calls on the crowd to destroy property as a sign of support.  In each of these scenarios, the conduct of the President comes in the context of words uttered on matters of public concern, but it is doubtful that anyone would consider the President immune from tort liability for harm resulting from his speech.  To be sure, these scenarios may seem far-fetched, but they illustrate an important point:  blanket immunity cannot shield a President from suit merely because his words touch on matters of public concern.  The context in which those words are spoken and what is said matter.

For their part, Plaintiffs urge the court to reject President Trump's claim of absolute immunity for two reasons:  first, because they "allege that he was acting solely in his personal capacity as a *candidate*," and second, because he "engaged in serious misconduct that obstructed a co-equal branch of government, removing his actions from the outer bounds of permissible presidential conduct."  Bass Pls.' Omnibus Mem. of Law in Opp'n to Defs.' Mots. to Dismiss, ECF No. 29 [hereinafter *Thompson* Pls.' Opp'n], at 65 (internal quotation marks omitted); *see also* Pl. Swalwell's Combined Opp'n to Defs.' Mots. to Dismiss, ECF No. 23 [hereinafter *Swalwell* Opp'n], at 11 (arguing that "Trump conflates his role as a candidate with his role as President"); *Blassingame* Pls.' Opp'n to Def.'s Mot. to Dismiss, ECF No. 21 [hereinafter *Blassingame* Pls.' Opp'n], at 6 ("Article II does not provide Trump with immunity for inciting an insurrection."). These formulations present their own set of problems.

For one, the line between President and candidate will not always be clear.  A first-term President is, in a sense, always a candidate for office.  It is not the least bit unusual for first-term Presidents to comment on public policy or foreign affairs at campaign events, or, in this day, to

announce policy changes by tweet during an election year. Plaintiffs offer no principled constitutional basis on which to discern how to categorize such acts.[14]

As for their contention that immunity cannot extend to a President that incites a mob to attack a co-equal branch of government, while having surface appeal, it too runs into an analytical problem. If what Plaintiffs mean to say is that an alleged violation of law by a President cannot fall within the outer perimeter of his official duties, the Supreme Court rejected that very argument in *Fitzgerald*. Such a "construction," the Court said, "would subject the President to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose. Adoption of this construction thus would deprive absolute immunity of its intended effect." *Fitzgerald*, 457 U.S. at 756–57. Plaintiffs' position also runs up against the Court's admonition that a test for immunity that depends upon "a President's motives" "could be highly intrusive." *Id.* at 756. Predicating an immunity determination on whether President Trump intended to cause a riot arguably would require just such an inquiry.[15]

---

[14] At oral argument and in a post-hearing filing, Plaintiffs proposed that the court could rely on an Office of Legal Counsel Opinion from 1982, Payment of Expenses Associated with Travel by the President and Vice President, 6 Op. O.L.C. 214 (1982), to distinguish between a President's official duties and campaign activities. *See* Hr'g Tr. 33; Pls.' Notice of Suppl. Authority, ECF No. 59 (on *Thompson* docket). That Opinion adopts a "reasonable connection" to "official purposes" test to differentiate the two capacities. 6 Op. O.L.C. at 216. The court is skeptical that a test rooted in statutory and administrative rules on spending of appropriations can define the scope of a *constitutional* immunity.

[15] That said, the court would be remiss in not pointing out that there is at least some historical support for Plaintiffs' position. In *Fitzgerald*, the Court found persuasive Justice Story's analysis on presidential immunity. 457 U.S. at 749 (quoting 3 J. Story, Commentaries of the Constitution of the United States § 1563, at 418–19 (1st ed. 1833)). Justice Story also commented on the open question of "whether, under the constitution, any acts are impeachable, except such, as are committed under colour of office." 2 Commentaries § 799. In other words, does the constitutional remedy of impeachment extend to official acts only, or can it be based on unofficial conduct? In addressing this issue, Justice Story did not formulate a firm opinion, but he did make the following observation:

> In the argument upon Blount's impeachment, it was pressed with great earnestness, that there is not a syllable in the constitution, which confines impeachments to official acts, and it is against the plainest dictates of common sense, that such restraint should be imposed upon it. *Suppose a judge should countenance, or aid insurgents in a meditated conspiracy or insurrection against the government. This is not a judicial act*; and yet it ought certainly to be impeachable.

35

###### iii.   *The President's challenged acts*

Rather than apply the parties' proffered categorial rules to the immunity question, the court thinks the better course is to evaluate the defense on the specific facts alleged and, based on those facts, determine whether President Trump's words were spoken in furtherance of a presidential function.  That is the approach that the D.C. Circuit took in *Banneker Ventures, LLC v. Graham*, a case in which then–Board Member of the Washington Metropolitan Area Transit Authority ("WMATA") Jim Graham asserted absolute immunity from a suit accusing him of improperly interfering with a developer's ultimately unsuccessful project negotiations with WMATA. 798 F.3d 1119, 1139 (D.C. Cir. 2015).  The court viewed Graham's immunity defense, in part, through the lens of federal common law and asked whether Graham's alleged conduct fell within the scope of his official duties.  *Id.* at 1140.  It applied the "within the outer perimeter of [an official's] line of duty" test as demarcating the line between Graham's official and unofficial acts. *Id.* (quoting *Barr v. Matteo*, 360 U.S. 564, 575 (1959)).  The trial court had found that all of Graham's alleged tortious acts were immune, but the D.C. Circuit criticized the trial court for "conceiv[ing] of the inquiry at too high a level" and for not "analyzing each challenged act."  *Id.* at 1141; *id.* ("At a high enough level of generality, almost any act that has any relationship to an overarching duty . . . will be immunized.").  "The appropriate focus," the court wrote, "is on the relationship between 'the act complained of' and the corresponding 'matters committed by law to [the official's] control or supervision.'"  *Id.* (quoting *Barr*, 360 U.S. at 573).  The court noted that

-----

*Id.* § 802 (emphasis added).  Justice Story's mention of "Blount's impeachment" refers to the impeachment of Senator William Blount of Tennessee in 1797, who stood accused of conspiring with British officials and others in a plot to establish British control over the Spanish-controlled territories of Louisiana and the Floridas.  The House impeached Blount, but the Senate ultimately dismissed the charges because Blount had already been expelled and the Senate concluded it no longer had jurisdiction over him.  *See Impeachment Trial of Senator William Blount, 1799*, U.S. SENATE, https://www.senate.gov/about/powers-procedures/impeachment/impeachment-blount htm (last visited Feb. 8, 2022).  This tidbit of history does lend some credence to the notion that a high government official who "aid[s] insurgents in a mediated conspiracy or insurrection against the government" is not acting in an official capacity.

36

"[o]ne way that an official acts manifestly beyond his authority is through the use of 'manifestly excessive means,' even if he does so in the conduct of duties otherwise within his official purview." *Id.* at 1141 (citation omitted). The court emphasized that the burden of establishing immunity rests on the official claiming it. *Id.* at 1140.

Concededly, the scope-of-duty evaluation undertaken in *Graham* was quite rigorous, and such rigor arguably should not apply here with equal force. This case involves the President of the United States, not a board member of a public agency. (*Barr*, on which *Graham* relied, involved the acting director of a federal agency.) There are separation-of-powers considerations at play here that were not present in *Graham*. Nevertheless, the court believes that *Graham*'s basic approach applies; that is, in evaluating a presidential claim of absolute immunity the court must consider the relationship of the challenged conduct to the claimed corresponding function of the President.

In undertaking this analysis, the court starts from the following premise, as to which there should be no dispute: The Office of the President has no preference for who occupies it. Article II of the Constitution, which defines the powers and duties of the President, is agnostic as to whether a sitting President is elected to a new term. So, too, is federal statutory law. A function of the presidency therefore is *not* to secure or perpetuate incumbency. Plaintiffs' allegations against President Trump accuse him of doing just that: devoting his last weeks in office to continuing his term as President of the United States through the Electoral College vote and certification process, even though he did not prevail in the general election.

Among his first alleged acts following the general election were tweets criticizing state officials for not doing enough to enable him to prevail in their states. *Swalwell* Compl. ¶ 36 (criticizing the governors of Arizona and Georgia and saying, "If they were with us, we would

have already won both").  The President also directly contacted local election officials and state legislators in Michigan, Pennsylvania, and Georgia to allegedly pressure them to overturn their election results.  *Id.* ¶¶ 37–54.  These efforts included urging local Michigan officials to reverse their certification of election results, *id.* ¶ 38, and saying to Georgia's Secretary of State, "I just want to find 11,780 votes, which is one more than we have," *id.* ¶ 53.  He would later call that Georgia state official an "enemy of the people."  *Thompson* Compl. ¶ 47.  President Trump also filed multiple lawsuits in jurisdictions in which he did not prevail.  *Id.* ¶ 36.  Those suits plainly were directed at securing incumbency.  They, like his tweets and direct outreach to state election officials, were not official acts.

The same is true with respect to his tweets regarding rallies that occurred in Washington, D.C., in November and December 2020.  Those tweets did not advocate any policy changes or legislation.  Rather, they expressly stated or implied that the rallies would help him remain President.  *Blassingame* Compl. ¶¶ 23, 25, 26 (tweeted photo of rally captioned "We will WIN!"); *id.* ¶ 27 (tweet stating "WE HAVE JUST BEGUN TO FIGHT!!!").

That, too, was the purpose of the January 6 Rally.  President Trump invited people to Washington, D.C., for the event.  *Id.* ¶ 32.  In a tweet referencing the January 6 Rally, he encouraged his followers to "Never give up."  *Swalwell* Compl. ¶ 56.  On the eve of the January 6 Rally, the President's tweets turned to Vice President Pence.  *Blassingame* Compl. ¶ 38.  The President expressed the view that the Vice President had the power, as President of the Senate, to reject states' Electoral College certifications and return them to be recertified.  *Id.*  The clear purpose of such recertification would be to allow Electoral College votes to be recast in his favor: "All Mike Pence has to do is send them back to the States, AND WE WIN."  *Id.*  These tweets were not official acts but issued to help him "win."

Nor did planning for the January 6 Rally involve official duties.  Those acts took place largely through President Trump's campaign organization.  In mid-December, the campaign used campaign funds to pay Event Strategies, Inc., the company that would secure the permit for the January 6 Rally.  *Blassingame* Compl. ¶ 31.  The campaign's Director of Finance was listed as the "VIP Lead" for the rally, *Swalwell* Compl. ¶ 97, and a "top Trump campaign fundraiser oversaw the logistics, budgeting, funding and messaging" for the rally, *Thompson* Compl. ¶ 68.  The Trump campaign and various related entities paid more than $3.5 million to assist in organizing.  *Blassingame* Compl. ¶ 39.  President Trump also allegedly participated directly in the planning.  He was involved in decisionmaking about the speaking lineup and music selection.  *Thompson* Compl. ¶ 69.  And, critically, to the surprise of rally organizers, President "Trump and his campaign proposed that the rally include a march to the Capitol," even though the permit they had obtained did not allow for one.  *Id.* ¶¶ 69, 90 (alleging that the permit expressly provided: "This permit does not authorize a march from the Ellipse").  Organizing the January 6 Rally involved no presidential function.

And then there is the January 6 Rally Speech itself.  The court has considered it in its entirety, analyzing it beyond the words quoted in the Complaints.  The court will go into greater detail about the Speech later in this opinion.  For present purposes it suffices to say that while the Speech did touch on matters of public concern (namely President Trump's pledge to work on election laws in a second term), the main thrust of the Speech was not focused on policy or legislation.  It was to complain about perceived cases of election fraud that led President-elect Biden to win more votes in closely contested states, to urge members of Congress to object to certain state certifications, and to exhort the Vice President to return those certifications to those states to be recertified.  Much like the tweets leading up to the January 6 Rally, the words spoken

by the President—without delving into the motivation behind them—reflect an electoral purpose, not speech in furtherance of any official duty.

To deny a President immunity from civil damages is no small step.  The court well understands the gravity of its decision.  But the alleged facts of this case are without precedent, and the court believes that its decision is consistent with the purposes behind such immunity. Subjecting a president to potential liability for the acts described in the Complaints will not "diver[t] . . . the President's attention during the decisionmaking process" with "needless worry as to the possibility of damages actions stemming from any particular official decision." *Clinton*, 520 U.S. at 694 n.19.  After all, the President's actions here do not relate to his duties of faithfully executing the laws, conducting foreign affairs, commanding the armed forces, or managing the Executive Branch.  They entirely concern his efforts to remain in office for a second term.  These are unofficial acts, so the separation-of-powers concerns that justify the President's broad immunity are not present here.  "If the Judiciary may severely burden the Executive Branch by reviewing the legality of the President's official conduct, and if it may direct appropriate process to the President himself, it must follow that the federal courts have power to determine the legality of his unofficial conduct." *Id.* at 705.  The court therefore may "determine the legality" of President Trump's acts that are alleged to have given rise to Plaintiffs' injuries on January 6th.

<div align="center">

*iv.*    <u>*Section 1986 claim*</u>

</div>

The foregoing comes with one important caveat:  President Trump is immune as to Swalwell's failure-to-act claim under § 1986.  That provision states:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned [in section 1985 of this title], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such

<div align="center">

40

</div>

> wrongful act, which such person by reasonable diligence could have
> prevented.

42 U.S.C. § 1986.  The statutory provision is unique.  It requires persons with knowledge of a conspiracy proscribed in § 1985 and with the means to prevent the conspiracy to take affirmative actions to do so.  A person who refuses or neglects to exercise such power is liable for damages to those persons whose injuries could have been prevented.

Swalwell alone asserts a claim under § 1986 against President Trump.  He alleges that President Trump knew about the alleged § 1985 conspiracy, had the power to prevent it, and failed to exercise "reasonable diligence" to avoid harm.  Specifically, he asserts that "when it was clear that rioters had stormed the Capitol, and Congress was unable to certify the results of the Electoral College vote, [President Trump] had the power to stop the rioters but refused and, instead, encouraged them."  *Swalwell* Compl. ¶ 190.  That allegation, it would seem, makes out a § 1986 claim against the President.

But the President cannot be held liable for his failure to exercise his presidential powers, at least under § 1986.  Just as he is immune for acts that fall within the outer perimeter of his official responsibilities, so too must he be immune for alleged failures to exercise that official responsibility.  Were it otherwise, Presidents routinely would be subject to suit for not doing more or for not acting at all.  Absolute immunity would be gutted if a plaintiff could avoid it simply by alleging a failure to exercise presidential power.  The court therefore dismisses Swalwell's § 1986 claim.[16]

---

[16] If Swalwell contends that President Trump is liable under § 1986 because he himself is an alleged coconspirator and had the power to stop the conspiracy, the court is dubious that § 1986 can sustain such a construction.  If accepted, it would mean that any coconspirator of a § 1985 conspiracy with some degree of authority is likewise liable under § 1986.  The court is skeptical that Congress intended such an interpretation.  In any event, Swalwell does not specifically articulate a reading of § 1986 that would rest on the President's failure to act *before* the rally-goers stormed the Capitol.  *See Swalwell* Compl. ¶ 90.

>       3.      *The Political Question Doctrine*

President Trump raises a related jurisdictional argument:  these cases present a nonjusticiable political question.  *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) (stating that, when a case involves a political question, "a court lacks the authority to decide the dispute").  The political question doctrine removes from the purview of the courts cases that "revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."  *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).  The doctrine bars a court's "jurisdiction only when the Constitution textually commits 'the issue' to be adjudicated in the case 'to a coordinate political department,' or when there is 'a lack of judicially discoverable and manageable standards for resolving it.'"  *Hourani v. Mirtchev*, 796 F.3d 1, 8 (D.C. Cir. 2015) (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)).  President Trump's effort to morph this case into one presenting a political question fails.

For starters, the court already has held that the President's actions leading up to the riot at the Capitol building were not undertaken in his official capacity.  To that extent, these cases implicate no policy choice or value determination committed to the Executive Branch.  That holding alone takes this case outside of the political question doctrine.

But even if the court uses the doctrine's analytical framework, President Trump fares no better.  He first argues that because this suit is "based upon the words or action of the President," an adjudication "would improperly regulate the executive department, in violation of Article II, § 1 which requires that the executive power be exercised solely by the President."  *Thompson Trump Mot.* at 11–12.  If by that argument the President means that any suit touching on presidential speech gives rise to a political question, that cannot be, because the Constitution says

nothing about a President's speech.  Moreover, the Supreme Court has never held that just because

a case involves review of a President's claimed exercise of his general Article II executive powers

it is nonjusticiable.  That is not the law.  *See, e.g.*, *Youngstown Sheet & Tube*, 343 U.S. at 587

(rejecting claimed presidential authority to seize steel mills based on Article II's grant of Executive

power in the President).

The President next argues that to adjudicate these cases would force the court "to make a

value determination about what is or is not proper for the President to say during a political speech

when advocating for governmental action."  *Thompson* Trump Mot. at 12.  It is true that, in a sense,

an adjudication here might involve a "judgment" of the President's speech, "[b]ut that has never

been enough, by itself, to trigger the political question doctrine's jurisdictional bar."  *Cf. Hourani*,

796 F.3d at 8 (stating that the fact that a judgment might implicate the acts of a foreign nation, by

itself, does not create a nonjusticiable political question).  A suit against the President often has

political overtones, but "courts cannot avoid their responsibility merely 'because the issues have

political implications.'"  *Zivotofsky*, 566 U.S. at 196 (quoting *INS v. Chadha*, 462 U.S. 919, 943

(1983)).

President Trump also tries a different approach.  He suggests that because he was

impeached by the House but acquitted by the Senate for his actions relating to January 6th, a

judicial inquiry of his conduct raises a political question because it might "displace the Senate as

the final arbiter on the subject of impeachment, showing disrespect for a co-equal branch."

*Blassingame* Trump Mot. at 14.  But, of course, this court is in no sense conducting a review of

the impeachment proceedings; nor could it do so.  *See Nixon*, 506 U.S. at 230–31 (holding that a

court lacks the constitutional authority to review the Senate's impeachment trial procedures).  Its

concern is with the President's potential civil liability for the events of January 6th.  The mere fact

43

that these cases and the impeachment proceedings pertain to the same subject matter does not implicate the political question doctrine.

4.      *The Impeachment Judgment Clause*

President Trump also seeks dismissal based upon his impeachment proceedings in a different way:  he contends that the Impeachment Judgment Clause forecloses civil liability of someone who is not convicted following an impeachment trial.  The court understands this argument to challenge its subject matter jurisdiction.  The Impeachment Judgment Clause provides:

> Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law.

U.S. Const. art. I, § 3, cl. 7.  According to the President, because the Impeachment Judgment Clause speaks only to further action against a "Party convicted," and is silent as to a person not convicted, it follows that the Clause "forbids further litigation of the same claims by those **acquitted** by the Senate."  *Thompson* Trump Mot. at 13.

In support of this reading, the President invokes the *expressio unius est exclusio alterius* canon of statutory interpretation, which means that "expressing one item of [an] associated group or series excludes another left unmentioned."  *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002) (alteration in original) (citation omitted); *Thompson* Trump Mot. at 13.  But that canon does not apply.  For one, the President cites no case in which the Supreme Court has used that canon of *statutory* construction to directly interpret a clause of the Constitution, and the court has struggled to find one.  *Cf. U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 793 n.9 (1995) (relying on one Framer's commentary to observe that "the Framers were well aware of the *expressio unius*

argument that would result from their wording of the Qualifications Clauses"); *Salamanca Twp. v. Wilson*, 109 U.S. 627, 628 (1883) (applying canon to interpretation of state constitution); *Pine Grove Twp. v. Talcott*, 86 U.S. 666, 675 (1873) (same).  Even if the canon were to apply, "it has force only when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (citation omitted); *see also Echazabal*, 536 U.S. at 81 ("The canon depends on identifying a series of two or more terms or things that should be understood to go hand in hand, which [is] abridged in circumstances supporting a sensible inference that the term left out must have been meant to be excluded.").  The Impeachment Judgment Clause does not contain an "associated group or series" or "two or more terms or things"; it only addresses the non-preclusive effect of a conviction following impeachment.  The Supreme Court has said that "[w]e do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." *Barnhart*, 537 U.S. at 168.  President Trump offers no evidence to support a conclusion that the Framers intended for the absence of any reference to an acquitted officer following impeachment to mean that such official could not be subject to judicial process.

In fact, the historical evidence is to the contrary.  An Office of Legal Counsel (OLC) Opinion from 2000, which the President himself cites, provides a helpful summary.  *See* Whether a Former President May Be Indicted and Tried for the Same Offense for Which He Was Impeached by the House and Acquitted by the Senate, 24 Op. O.L.C. 110, 113 (2000).  That opinion concludes, "We are unaware of any evidence suggesting that the framers and ratifiers of the Constitution chose the phrase 'the party convicted' with a negative implication in mind." *Id.* at 120.

45

> Indeed, if the Impeachment Judgment Clause were intended to
> imply that acquittal by the Senate would block criminal prosecution
> for the same offenses, one would expect that at least one participant
> in the process of framing and ratifying the Constitution would have
> pointed out this negative implication.  We are aware of none.

*Id.* at 121–24.  The court finds the OLC's exhaustive historical recitation of the origins of the

Impeachment Disqualification Clause to be persuasive.  The court therefore draws no negative

implication from the words of the Impeachment Judgment Clause that would bar civil liability of

a President acquitted following impeachment.[17]

> 5.      *Res Judicata and Collateral Estoppel*

President Trump attempts to make one last use of his impeachment proceedings: he

contends that his acquittal bars litigation of the present claims on the grounds of res judicata and

collateral estoppel.  *Thompson* Trump Mot. at 13–14.  He devotes scant attention to this argument

in *Thompson* and *Swalwell*—largely one conclusory paragraph in each motion, *id.* at 14; *Swalwell*

Trump Mot. at 14–15—but devotes more attention to it in *Blassingame*, *Blassingame* Trump Mot.

at 14–18.  The court addresses it as if fully raised in all three cases.

The doctrine of res judicata, also known as claim preclusion, provides that "a final

judgment on the merits of an action precludes the parties or their privies from relitigating issues

that were or could have been raised in that action."  *Allen v. McCurry*, 449 U.S. 90, 94 (1980).

> Under the doctrine of res judicata . . . a subsequent lawsuit will be
> barred if there has been prior litigation (1) involving the same claims
> or cause of action, (2) between the same parties or their privies, and

---

[17] In his *Blassingame* motion, President Trump makes a further argument.  He contends that the Impeachment Judgment Clause's use of the word "Indictment" to start the series "Indictment, Trial, Judgment and Punishment, according to Law" underscores that "an individual *convicted* is only potentially liable for follow on criminal charges brought by the government rather than a civil suit on the same issues."  *Blassingame* Trump Mot. at 21 (emphasis added).  The court already has rejected the contention that the Impeachment Judgment Clause implicitly forecloses further action against an acquitted individual.  President Trump does not, however, make the alternative argument that, even if an *acquitted* official can be subject to some judicial process, the word "Indictment" implies that such process can only be criminal and not civil in nature.  *See id.* at 21–22.  The court therefore does not address that contention.

46

(3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction.

*Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006). The related doctrine of collateral estoppel, or issue preclusion, provides that "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen*, 449 U.S. at 94.

> [C]ollateral estoppel bars successive litigation of an issue of fact or law when "(1) the issue is actually litigated; (2) determined by a valid, final judgment on the merits; (3) after a full and fair opportunity for litigation by the parties or their privies; and (4) under circumstances where the determination was essential to the judgment, and not merely dictum.".

*Capitol Servs. Mgmt., Inc. v. Vesta Corp.*, 933 F.3d 784, 794 (D.C. Cir. 2019) (citation omitted).

Applying these preclusion doctrines strikes the court as more complicated that it might seem at first blush. Plaintiffs, for instance, argue that the President's Senate impeachment trial is not a prior "litigation" because the term "litigation" is defined to mean the resolution of disputes in a court of law. *See Thompson* Pls.' Opp'n at 73. But the Supreme Court has recognized that preclusion principles can bind an Article III court based on a final judgment from an administrative agency acting in a judicial capacity. *See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 148 (2015) ("Both this Court's cases and the Restatement make clear that issue preclusion is not limited to those situations in which the same issue is before two *courts*."). And, there is a more than colorable argument to be made that the Senate acts in a judicial capacity when "try[ing]" an official on an Article of Impeachment. *See, e.g., In re Comm. on the Judiciary, U.S. House of Representatives*, 951 F.3d 589, 596 (D.C. Cir. 2020) ("The constitutional text confirms that a Senate impeachment trial is a judicial proceeding."), *vacated and remanded sub nom. Dep't of Just. v. House Comm. on the Judiciary*, 142 S. Ct. 46 (2021). Plaintiffs also argue that the "claims"

here are different because they rest on federal and District of Columbia law, as opposed to the sole charge of "Incitement of Insurrection" lodged against the President by the House. *See Thompson* Pls.' Opp'n at 73; *Blassingame* Pls.' Opp'n at 19. But Plaintiffs read the "same claim" element too narrowly, because "[w]hether two cases implicate the same cause of action turns on whether they share the same 'nucleus of facts.'" *Apotex, Inc. v. FDA*, 393 F.3d 210, 217 (D.C. Cir. 2004) (citation omitted). The impeachment trial and this case clearly do.

Still, the court thinks that neither doctrine applies for several reasons. First, the text of the Impeachment Judgment Clause does not support their application. As discussed, that Clause expressly contemplates that a person impeached and convicted could face a criminal trial. *See Nixon*, 506 U.S. at 234 ("[T]he Framers recognized that most likely there would be two sets of proceedings for individuals who commit impeachable offenses—the impeachment trial and a separate criminal trial."). The court also has concluded that neither the text nor the history of the Clause forecloses a subsequent proceeding, criminal or civil, for a person acquitted following impeachment. *See supra* pp. 44–46. If that is correct, it would be an odd result to then say that the acquitted individual could use the non-conviction by the Senate to have preclusive effect, which would thwart any second proceeding. To accept the President's application of res judicata and collateral estoppel here would add an implicit preclusion bar to the Impeachment Judgment Clause where there is none.

Second, although it is not a settled question, the court doubts that any Plaintiff is in privity with the House of Representatives if one deems the House as the opposing party in an impeachment trial. The *Blassingame* Plaintiffs certainly are not in privity with members of the House. Swalwell and the Bass Plaintiffs are members of the House, but in voting for the Article of Impeachment and, in Swalwell's case, prosecuting it, those Plaintiffs were acting in their legislative capacities

as representatives of their constituents.  The Supreme Court has long recognized that the law treats members of Congress differently depending on the capacity in which they are acting.  *See, e.g.*, *Raines*, 521 U.S. at 820–21 (distinguishing between personal and institutional injuries for purposes of a legislator's standing); *United States v. Brewster*, 408 U.S. 501, 507 (1972) ("The immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress . . . .").  Here, they seek relief not as legislators but for injuries they suffered personally.

Third, applying preclusion principles here would require the court to assess the adequacy of the Senate proceedings, an inquiry that is nonjusticiable.  *See Nixon*, 506 U.S. at 229–30, 237–38 (declining to decide whether the authority conferred on the Senate "to try all Impeachments" precluded certain Senate impeachment procedures).  For instance, assessing whether Plaintiffs here had "a full and fair opportunity for litigation" for purposes of collateral estoppel would require the court to evaluate the adequacy of the Senate procedures used during the President's impeachment trial.  *See* Restatement (Second) of Judgments § 28(3) (Am. L. Inst. 1982) (stating that issue preclusion may not apply where "differences in the quality or extensiveness of the procedures followed in the two courts or by factors relating to the allocation of jurisdiction between them").  This the court cannot do.

Finally, it is impossible to discern whether there was a "final, valid judgment on the merits" for purposes of res judicata, *Smalls*, 471 F.3d at 192, and what issues of fact or law the Senate deemed "necessary to its judgment" for purposes of collateral estoppel, *Allen*, 449 U.S. at 94.  The Senate made no written findings, and individual Senators were not required to explain the reason for their vote for acquittal.  In fact, if the court looks beyond the pleadings, several Senators, including Senate Minority Leader Mitch McConnell, publicly stated that they voted to acquit

49

because the Senate lacked jurisdiction to punish a former President.  *See Swalwell* Opp'n at 36.

An acquittal on jurisdictional grounds arguably does not constitute a "judgment on the merits" for

purposes of res judicata.  *Cf. Kasap v. Folger Nolan Fleming & Douglas, Inc.*, 166 F.3d 1243,

1248 (D.C. Cir. 1999) (stating that "dismissals for lack of jurisdiction are not decisions on the

merits and therefore have no *res judicata* effect on subsequent attempts to bring suit in a court of

competent jurisdiction").  Nor would such an acquittal have any bearing on this court's jurisdiction

for purposes of collateral estoppel.

The court therefore holds that neither res judicata nor collateral estoppel bars these suits or

precludes litigation of any issue or fact.

### B.    Failure to State a § 1985(1) Claim

Having concluded that all claims against Defendants, except one (Swalwell's § 1986

claim), are justiciable, the court now turns to the question of whether Plaintiffs have stated a claim

under § 1985(1).  All Defendants argue that Plaintiffs have not.  Their arguments are as follows:

(1) Swalwell and the Bass Plaintiffs lack statutory standing to bring suit under § 1985(1);

(2) Swalwell and the Bass Plaintiffs are not "covered federal officials" under § 1985(1);[18] (3) no

Plaintiff can state a claim because members of Congress were not discharging a "duty" on

January 6th; and (4) Plaintiffs have failed to allege a plausible conspiracy among Defendants and

others.  The court rejects the first three arguments outright.  As to the fourth, the court finds that

Plaintiffs have pleaded a plausible § 1985(1) conspiracy against President Trump, the Oath

Keepers, and Tarrio, but not Trump Jr. and Giuliani.

---

[18] President Trump does not advance these first two arguments against the *Blassingame* Plaintiffs, and because statutory standing is not jurisdictional, *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–28 (2014), the court treats them as forfeited as to the *Blassingame* Plaintiffs.

1.      *Statutory Standing*

Inquiry into a plaintiff's statutory standing asks whether the plaintiff "has a cause of action under the statute." *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 & n.4 (2014). That question requires a court "to determine the meaning of the congressionally enacted provision creating a cause of action." *Id.* at 128. In doing so, the court "appl[ies] traditional principles of statutory interpretation." *Id.* The ultimate question is not whether in the court's "judgment Congress *should* have authorized [the plaintiff's] suit, but whether Congress in fact did so." *Id.*

Section 1985 authorizes a "party" that is "injured in his person or property" to bring suit to recover damages for such injury against any "one or more of the conspirators" of a conspiracy proscribed by § 1985(1). 42 U.S.C. § 1985(3). No one makes the argument that such broad text might permit a suit by anyone who can satisfy the requirements of Article III, and likely for good reason: The Supreme Court in *Lexmark* rejected such an expansive reading of the remedial provision of the Lanham Act, which authorizes suit by "'any person who believes that he or she is likely to be damaged' by a defendant's false advertising." *Lexmark*, 572 U.S. at 129 (quoting 15 U.S.C. § 1125(a)). Instead, the court relied on "two relevant background principles": the "zone of interests and proximate causality." *Id.* at 129. Applying those principles, the Court held, "supplies the relevant limits on who may sue." *Id.* at 134. In this case, there can be no genuine dispute at this stage that Defendants' alleged acts were the proximate cause of Plaintiffs' claimed injuries, and so the court does not dwell on that requirement. The court focuses on the zone of interests.

The Supreme Court has "presume[d]" that "a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" *Id.* at

51

129 (citation omitted).  Though originally formulated in the context of challenges under the Administrative Procedure Act, the Court has "made clear" that the zone-of-interests analysis "applies to all statutorily created causes of action."  *Id.*  A court should look to "the interests protected" by the statute to determine whether a plaintiff comes with its zone of interests.  *Id.* at 131.

The interests protected by § 1985(1) are decidedly broad.  As the Seventh Circuit observed in *Stern v U.S. Gypsum*:

> [W]e think it important to note here that Congress, in enacting what became § 1985(1), did not fashion a narrow and limited remedy applicable only to the southern states in 1871.  The outrageous conditions there at that time were, no doubt, what induced Congress to act, but it chose to do so with a statute cast in general language of broad applicability and unlimited duration.

547 F.2d at 1335 (citations omitted).  The court also noted that the Supreme Court had accorded the Reconstruction-Era civil rights statutes "a sweep as broad as [their] language."  *Id.* at 1336 (alteration in original) (quoting *United States v. Price*, 383 U.S. 787, 801 (1966)).  Viewed in this way, the Seventh Circuit had little trouble concluding that § 1985(1)'s protections extended to an Internal Revenue Service Agent who claimed the defendants had conspired to defame and discredit him to his superiors.  *Id.* at 1335–36.  It strains credulity to think that Reconstruction-Era members of Congress meant to protect low-level Executive Branch employees but not themselves.

The statutory text supports this conclusion.  Section 1985(1) makes unlawful conspiracies whose object is a person who occupies "any office, trust, or place of confidence under the United States" or is "any officer of the United States."  42 U.S.C. § 1985(1).  The words used by Congress here are decidedly expansive and, on their face, would seem to encompass members of Congress.  President Trump nevertheless insists that these words must be read in tandem with their usage in the Constitution.  President Trump thus maintains that the word "officer" includes only persons

"appoint[ed] by the President, or of one of the courts of justice[,] or heads of departments authorized by law to make such an appointment." *Thompson* Trump Mot. at 16–17 (quoting *United States v. Mouat*, 124 U.S. 303, 307 (1888)). Similarly, he contends that the phrase "any office, trust, or place of confidence" must be read consistent with Article I, § 1, which states that "no Senator or Representative, or Person holding an Office of Trust or Profit under the United States," shall serve as an Elector. *Thompson* Trump Mot. at 16. Because the Constitution distinguishes between members of Congress and a "Person holding an Office of Trust or Profit under the United States," he asserts, the Bass Plaintiffs and Swalwell do not hold "any office, trust, or place of confidence" for purposes of § 1985(1). *Id.* at 17–18. He also focuses on the modifier "under the United States" and points to Article I, § 6, which disqualifies "a Member of either House during his Continuance in Office" from "holding any Office under the United States." *Id.* at 17. So, in short, President Trump argues that because the Bass Plaintiffs and Swalwell are not identified as among those protected by § 1985(1), they cannot bring a claim under it.

The court doubts that Congress intended to use the Constitution as a dictionary for interpreting the words found in § 1985(1). President Trump points to no case or legislative history to support his preferred reading. To the contrary, cases like *Stern* have read the scope of § 1985(1) broadly, consistent with its words. *Cf.* 1 Op. O.L.C. 274, 276 (1977) (opining, in the context of interpreting § 1985(1)'s identically worded, companion criminal statute, 28 U.S.C. § 372, that "[t]he broad purpose of protecting the Federal presence as fully as possible therefore supports a broad, rather than a narrow, reading of the word 'office'"). This court does the same.

Moreover, the Supreme Court has not reflexively imported constitutional meanings into federal statutes, as President Trump urges the court to do. *Lamar v. United States*, 240 U.S. 60 (1916), is illustrative. There, a defendant who presented himself as a member of the House of

Representatives was convicted of impersonating "an officer of the United States." *Lamar*, 240 U.S. at 64.   On appeal, the defendant asserted, much like President Trump does here, "that the interpretation of the Constitution was involved in the decision that a Congressman is an officer of the United States." *Id.*   The Court soundly rejected that argument, saying "[a]s to the construction of the Constitution being involved, it obviously is not." *Id.* at 65.   "[W]ords may be used in a statute in a different sense from that in which they are used in the Constitution." *Id*.   The pertinent question, the Court said, was what "officer" meant not in the Constitution but in the criminal code. *Id.*   The same is true here.

To conduct that inquiry the court focuses on the meaning of the words used in § 1985(1). Courts "normally interpret[] a statute in accord with the ordinary public meaning of its terms at the time of its enactment. After all, only the words on the page constitute the law adopted by Congress and approved by the President." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1738 (2020).   Starting with the word "office," the Bass Plaintiffs have convincingly shown that Reconstruction-Era dictionaries defined that term to include legislators.   One law dictionary defined "office" to mean "a right to exercise a public function or employment, and to take the fees and emoluments belonging to it," and identified as an example of a "political office" "the office of the president of the United States, of the heads of departments, [or] of *the members of the legislature*." JOHN BOUVIER, LAW DICTIONARY, ADAPTED TO THE CONSTITUTION AND LAWS OF THE UNITED STATES OF AMERICA, AND OF THE SEVERAL STATES OF THE UNION 259 (5th ed. 1855) (emphasis added).[19]   That same dictionary defines "officer" to include "members of congress." *Id.* at 260.   Other dictionaries from that period are to the same effect.   2 ALEXANDER M. BURRILL, A LAW DICTIONARY AND GLOSSARY 257 (2d ed. 1867) (defining "office" to mean any "position or

---

[19] According to a Westlaw search, the Supreme Court has cited various editions of Bouvier's *Law Dictionary* over 50 times, most recently in 2019 in *Peter v. NantKwest, Inc.*, 140 S. Ct. 365, 372 (2019).

station in which a person is employed to perform certain duties," including "[a] station or employment conferred by election of the people"); EDWARD HOPPER & J.J.S. WHARTON, LAW LEXICON, OR DICTIONARY OF JURISPRUDENCE: EXPLAINING THE TECHNICAL WORDS AND PHRASES EMPLOYED IN THE SEVERAL DEPARTMENTS OF ENGLISH LAW 537 (2d ed. 1860) (defining an "office" as "that function by virtue whereof a person has some employment in the affairs of another, whether judicial, ministerial, *legislative*, municipal, ecclesiastical" (emphasis added)).

The Reconstruction-Era Congress also would have understood the term "trust" to include members of Congress. In fact, the term had a meaning broader than the term "office." It included "a confidence reposed in one person for the benefit of another." BURRILL, *supra*, at 549. And, though the term "place of confidence" does not appear in the legal dictionaries of the day, its natural meaning must be as all-encompassing as "trust." There can be little doubt that the plain text of § 1985(1) reaches members of Congress.[20]

President Trump pushes back on none of this definitional history.[21] Instead, he cites Supreme Court and lower court decisions that use the term "federal officer" in describing the persons protected under § 1985(1). *Thompson* Trump Reply at 18. For instance, he cites *Kush v. Rutledge*, in which the Court, when describing the "classes of prohibited conspiracy" under § 1985, said that § 1985(1) made unlawful interference with "the performance of official duties by federal

---

[20] The Bass Plaintiffs also convincingly cite legislative history to buttress their argument that members of Congress are within the reach of § 1985(1). *Thompson* Pls.' Opp'n at 22–27. The court need not recite that legislative history here because the meaning of the words found in § 1985(1) plainly encompasses members of Congress.

[21] President Trump does cite a law review article for the proposition that "in common law, an office of trust or profit referred exclusively to those in the employ in the executive, judiciary, or the church," and did not include legislators. *Thompson* Trump Mot. at 17–18 (citing Benjamin Cassady, *"You've Got Your Crook, I've Got Mine": Why the Disqualification Clause Doesn't (Always) Disqualify*, 32 QUINNIPIAC L. REV. 209, 278–79 (2014)). But this is just another argument to tie § 1985(1)'s terms to similar words in the Constitution. The cited law review article was reviewing the historical underpinning of the Impeachment Clause, which states that "Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any *Office of honor, Trust or Profit* under the United States." Art. I, § 3, cl. 7 (emphasis added); *see also* Cassady, *supra*, at 277 ("This interpretation—that legislators are not officers who hold offices of 'honor, Trust or Profit'—is buttressed by the text, history, and structure of the Constitution."). But for the reasons already discussed, the meaning of the terms in § 1985(1) is not bound by the meaning of similar terms in the Constitution.

officers." 460 U.S. 719, 724 (1983). Similarly, the Ninth Circuit in *Canlis v. San Joaquin Sheriff's Posse Comitatus* said that "the clear import of [§ 1985(1)'s] language is that the statute's protections extend exclusively to the benefit of federal officers." 641 F.2d 711, 717 (9th Cir. 1981). Other courts have put forth the same formulation. *See Miller v. Indiana Hosp.*, 562 F. Supp. 1259, 1281 (W.D. Pa. 1983) (observing that "§ 1985(1) . . . only protects federal officers"); *Losco v. Falsetti*, No. 09-1455 (JAP), 2010 WL 4366209, at *3 (D.N.J. Oct. 28, 2010) (citing *Miller*, 562 F. Supp. 1259); *Diulus v. Churchill Valley Country Club*, 601 F. Supp. 677, 681 (W.D. Pa. 1985) ("Section 1985(1), by its terms, proscribes only conspiracies which interfere with the performance of official duties by federal officers."). From these cases President Trump asserts that "the phrase, 'office, trust, or place of confidence under the United States' in § 1985(1) is all merged to mean federal officer." *Thompson* Trump Reply at 19.

But no case says any such thing. A reading of the above-cited cases makes evident that the courts were using "federal officer" as shorthand for persons protected under § 1985(1) and, in the lower-court decisions, to distinguish such persons from state and local officials or private citizens. Of course, the term "federal officer" never appears in § 1985(1), and none of the cited cases engages in a textual analysis of § 1985(1) at all. The definitional shorthand of "federal officer" is of no use in the present case. And, in the end, President Trump's argument still requires equating "officer" with the meaning of the term as used in the Constitution. The court already has rejected that equivalency. The question here is whether the Reconstruction-Era Congress would have understood members of Congress to occupy an "office, trust, or place of confidence under the United States" or qualify as an "officer of the United States." They certainly would have.

The court therefore finds that members of Congress plainly are within § 1985(1)'s zone of interests. Swalwell and the Bass Plaintiffs therefore have statutory standing to advance a claim.

56

2.    *Whether Plaintiffs Are "Covered Federal Officials" Under § 1985(1)*

President Trump advances a variation of the above argument, which the foregoing discussion largely resolves.  He contends that to successfully plead a § 1985(1) claim a plaintiff must allege conspiratorial action directed against a "covered federal official," and because members of the House do not so qualify, Swalwell and the Bass Plaintiffs fail to state a claim. *Thompson* Trump Mot. at 26 n.8; *Swalwell* Trump Mot. at 29 n.12.  For the same reasons the court found Swalwell and the Bass Plaintiffs to have statutory standing, the court rejects the instant contention:   the plain words of § 1985(1), as they would have been understood during the Reconstruction Era, reach members of Congress.  Therefore, a conspiracy to interfere with the discharge of their duties, by force, intimidation, or threat states a § 1985(1) claim.

But there is a bit more to say here.  The Bass Plaintiffs advance an additional theory for stating a claim under § 1986 that does not depend on their occupying an office or position protected under § 1985(1).  They contend that the alleged conspiracy also was designed to "prevent, by force, intimidation, or threat any person from *accepting or holding* any office, trust, or place of confidence under the United States." 42 U.S.C. § 1985(1) (emphasis added).  Those persons that the alleged conspiracy prevented from "accepting or holding" such office were President-elect Biden and Vice President–elect Harris.  *See Thompson* Pls.' Opp'n at 30–31 (explaining that the "broader aim of the conspiracy was to prevent President Biden and Vice President Harris from 'accepting or holding'" their elected offices).  The court agrees with this alternative theory.  The Offices of the President and the Vice President unquestionably qualify as "any office, trust, or place of confidence under the United States."  Persons seeking to "accept[] or hold[]" those offices therefore are, in President Trump's terms, "covered federal officials."  So, even if the Bass Plaintiffs are not "covered federal officials," President-elect Biden and Vice President–elect Harris

57

are, and a conspiracy directed at preventing them from accepting or holding office states a § 1985(1) claim. Under this alternative theory of conspiracy, the Bass Plaintiffs would be able to seek damages as "person[s]" injured by that alleged conspiracy. 42 U.S.C. § 1985(3).

3. *Whether Members of Congress Were Discharging a "Duty" on January 6th*

The Oath Keepers advance an argument that no other Defendant does. They maintain that members of Congress were not discharging any "duty" on January 6th. *Thompson* Oath Keepers' Mot. at 4–8. They contend that the Constitution requires the opening of electoral ballots "in the presence of . . . the House of Representatives," U.S. Const. amend. XII, and therefore vests in individual members no duty but only "the *opportunity* to observe" the Electoral College vote. *Id.* at 7–8. In the Oath Keepers' view, because § 1985(1) prohibits conspiracies to prevent federal officials from "discharging any duties," the Bass Plaintiffs cannot state a claim.

This reading of the Constitution defies common sense. The House of Representatives can only act through its individual members. The Certification of the Electoral College vote, in particular the opening of Electoral ballots, cannot proceed "in the presence" of the House unless its individual members show up. Concededly, the Constitution does not expressly require a member to appear for the Certification. But the Constitution lacks such express appearance requirements as a general matter. Article I, which establishes the Congress and defines its powers, nowhere requires that an individual Senator or Representative appear for any particular proceeding. Article I, § 7, for example, which sets forth the process for passing legislation, does not require a Senator or Representative to cast a vote, but no one would reasonably say that the Constitution affords them only an "opportunity" to vote but no duty. The Oath Keepers' argument is also too myopic. It ignores the Electoral Count Act, which does define roles for individual Senators and Representatives in the certification process, including making objections to ballots

58

and, importantly, debating and voting on such objections.  *See supra* pp. 29–30.  Swalwell and the Bass Plaintiffs allege that they were at the Capitol on January 6th for those very purposes. *Swalwell* Compl. ¶ 10 (alleging that Swalwell "was at the Capitol performing his official duties as a member . . . to count the Electoral College votes and certify the winner of the 2020 Presidential election"); *Thompson* Compl. ¶¶ 12–21 (alleging that, for example, one member Plaintiff "was present in the Capitol on January 6, 2021, prepared to discharge her duties of tallying ballots of the Electoral College and certifying the results of the 2020 presidential election").

The Oath Keepers' reading also is inconsistent with the broad scope of § 1985(1).  Under their reading, only expressly mandated acts qualify as a "duty," and everyday discretionary acts— like voting on legislation or nominees, speaking to the press, or meeting with a constituent—would not.  A member of Congress is not *required* to do any of those things.  To read § 1985(1) to not reach such acts would eviscerate its purpose.

The court also notes that the Oath Keepers' argument does nothing to defeat the Bass Plaintiffs' alternative theory of liability under § 1985(1):  that the charged conspiracy was intended to prevent the President-elect and the Vice President–elect from "accepting or holding" office.  On this alternative theory, it does not matter whether members of the House had a "duty."

Finally, the Oath Keepers make two additional arguments that the court quickly dismisses. First, they contend that the Bass Plaintiffs have pleaded themselves out of a claim because they allege that the Joint Session of Congress was in recess at the time rioters entered the Capitol building and, therefore, the "delay" in the proceedings occasioned on January 6th was due to "this internal reason," not Defendants' conduct.  *Thompson* Oath Keepers' Mot. at 9.  That argument makes little sense for it does not matter what initially caused the Joint Session to recess or when it occurred:  the alleged interference occurred during the hours that it took to remove the Oath

Keepers and others from the Capitol building, when the Bass Plaintiffs otherwise would have been discharging their duty to certify election results. Second, the Oath Keepers argue that "Plaintiffs further allege that each member in his or her personal capacity were delayed, but this states no constitutional violation as a matter of law because the Constitutional provisions asserted in the complaint do not speak to or address delay of the proceeding." *Id.* It is not at all clear what the Oath Keepers mean by this. The Bass Plaintiffs assert that the Oath Keepers' conduct both prevented and delayed discharge of their duties; § 1985(1) requires no textual hook in the Constitution to define the interfered-with duty, although there is one here, or the ways in which someone might prevent such duty from being discharged.

### 4.  *Pleading of a Conspiracy*

The court now reaches the most significant of Defendants' sufficiency-of-pleading contentions: that all Plaintiffs have failed to plead a plausible conspiracy. Section 1985(1) is a conspiracy statute, and so pleading a plausible conspiracy is an essential element of all Plaintiffs' § 1985(1) claims.

Before evaluating the sufficiency of the allegations, the court must address two arguments made by Trump and Giuliani about the pleading requirements. Invoking the standard under Rule 9(b), they have insisted that Plaintiffs must plead conspiracy with "particularity." *See, e.g.*, *Thompson* Trump Mot. at 25; *Thompson* Giuliani Mot. at 10. Not so. The Supreme Court in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 169 (1993), held that Rule 9(b)'s heightened pleading standard applies only to the two instances identified in the Rule: "the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b). *Leatherman*, 507 U.S. at 168 (rejecting heightened pleading standard for a claim under § 1983). Neither circumstance applies here.

Second, Trump and Giuliani contend that Swalwell and the Bass Plaintiffs must plead "actual malice" as part of their § 1985(1) claim because they are public officials. *Thompson* Trump Mot. at 26; *Thompson* Giuliani Mot. at 11. Again, not so. The element of "actual malice" derives from defamation claims against public figures. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). Courts have applied an "actual malice" requirement to claims under § 1985, but only when the conspiracy involved defamatory conduct. *See Barr*, 370 F.3d at 1202–03 ("Both the Supreme Court and this court have made clear that the constitutional protections available to defendants charged with defaming public officials may extend to other civil actions alleging reputational or emotional harm from the publication of protected speech."). No such conduct is alleged here. Plus, a state-of-mind element that would require Plaintiffs to prove that a defendant made a statement with "knowledge that it was false or with reckless disregard of whether it was false or not" would make little sense in the context of a claim for conspiracy to interfere with discharge of a federal legislator's duties through force, intimidation, or threat. *New York Times Co.*, 376 U.S. at 279–80.

### a.    Principles of civil conspiracy

With these two issues out of the way, the court turns to describing the general principles of civil conspiracy. The term "conspiracy," particularly in the minds of non-lawyers, likely conjures images of people meeting secretly to hatch a plan to violate the law. That is certainly one type of conspiracy. But the law does not require such a degree of deliberation, formality, or coordination. Conspiracies can be, and often are, established with far less direct proof.

"A civil conspiracy is defined as an agreement between two or more people to participate in an unlawful act or a lawful act in an unlawful manner." *Hobson v. Wilson*, 737 F.2d 1, 51 (D.C. Cir. 1984). The agreement can be either express *or* tacit. *Halberstam v. Welch*, 705 F.2d 472, 476

(D.C. Cir. 1983).  So, a plaintiff "*need not* show that the members entered into any express or formal agreement, or that they directly, by words spoken or in writing, stated between themselves what their object or purpose was to be, or the details thereof, or the means by which the object or purpose was to be accomplished."  3B FED. JURY PRAC. & INSTR. § 167:30, Westlaw (database updated Jan. 2022) (quoting federal standard jury instruction for claims brought under § 1985(3) (emphasis added)).  It is enough "that members of the conspiracy in some way or manner, or through some contrivance, positively or tacitly[,] came to a mutual understanding to try to accomplish a common and unlawful plan."  *Id.*  All coconspirators must share in the general conspiratorial objective, though they need not know all the details of the plan or even possess the same motives.  *Hobson*, 737 F.2d at 51.  They need not know the identities of other coconspirators. *Id.*  In short, a civil conspiracy requires a showing "that there was a single plan, the essential nature and general scope of which were known to each person who is to be held responsible for its consequences."  *Id.* at 51–52 (cleaned up).  And, to be actionable, there must be an overt act in furtherance of the conspiracy that results in injury.  *Id.* at 52.

At this stage of the case—on motions to dismiss—Plaintiffs' burden to establish a conspiracy is lighter than it would be following discovery.  A plaintiff at this stage must draft a complaint "with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556.  Such factual matter must establish "plausible grounds to infer an agreement" but not "a probability requirement at the pleading stage."  *Id.*  The standard for pleadings "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  *Id.*  "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice."  *Id.*

b.    <u>The alleged conspiracy</u>

Before assessing the sufficiency of Plaintiffs' pleadings, it is important to bear in mind what the alleged unlawful conspiracy is and what it is not.  It is not that Defendants conspired to sow doubt and mistrust about the legitimacy of the electoral process and results of the 2020 presidential election.  Nor is it that Defendants worked together to influence, pressure, or coerce local officials, members of Congress, and the Vice President to overturn a lawful election result. Though many Americans might view such conduct to be undemocratic or far worse, neither example is an actionable conspiracy under § 1985(1).  The conspiracy alleged is that Defendants agreed "to prevent, by force, intimidation, or threat," (1) Swalwell and the Bass Plaintiffs from discharging their duties in certifying the results of the presidential election and (2) the President-elect and Vice President–elect from "accepting or holding" their offices.[22]  It is this conspiracy that Plaintiffs must plausibly establish through well-pleaded facts.  The court begins with a detailed summary of those facts and then, assuming those facts to be true, assesses their sufficiency as to each coconspirator.

i.    <u>Summary of allegations</u>[23]

According to Plaintiffs, in the months leading up to January 6th, President Trump and his allies created the conditions that would enable the violence that happened that day.  The President's role during this period was multifaceted.  It included regularly issuing false tweets insisting, among other things, that the elections in those states and localities where he had not prevailed were rampant with voter fraud; that he actually had won in those places when in truth he had lost; that

---

[22] The *Blassingame* Plaintiffs do not allege that the conspiracy's purpose was to prevent them from discharging their duties, but they do allege that they were injured as a result of the conspiracy to disrupt the Certification of the Electoral College vote.  *Blassingame* Compl. ¶ 226.

[23] In this section, the court does not include citations to the Complaints to support these facts to avoid cluttering up the text.  There is no dispute that the Complaints make these allegations.

"big city . . . crooks" had plotted to "steal votes"; that if certain Republican governors had done more he would have won; and that a voting-machine vendor had helped rig elections. President Trump also directly contacted state and local election officials in places where he had lost to convince them to take steps to reverse their election results. And, he invited supporters to come to Washington, D.C., for a rally on January 6th, the day of the Certification of the Electoral College vote. President Trump directly participated in rally planning, and his campaign committee provided substantial funding and organizational assistance. Giuliani and Trump Jr. aided the President in the foregoing efforts. They coordinated with him, spread similar disinformation, contacted state and local election officials, and agreed to speak at the January 6 Rally.

According to the Complaints, President Trump convinced his supporters that the election had been stolen from him and, importantly, them. These supporters included organized groups, such as the Proud Boys and the Oath Keepers. Some supporters, responding to President Trump's tweets, engaged in acts of intimidation toward state and local election officials. For example, after President Trump said that a Georgia election official was an "enemy of the people," that official received threats of violence and assassinations. When another Georgia official asked President Trump to condemn these actions, urging him to "Stop inspiring people to commit acts of violence," and warned that "Someone is going to get shot, someone is going to get killed," the President remained silent. Another state election official had armed protesters descend on her home.

Some supporters organized and attended rallies, including two in Washington, D.C., on November 14, 2020, and December 12, 2020. The Proud Boys and the Oath Keepers attended these District of Columbia–based events. At the December 12 rally, an Oath Keepers leader said that President Trump "needs to know from you that you are with him, [and] that if he does not do it now while he is Commander in Chief, we're going to have to do it ourselves later, in a much

more desperate, much more bloody war."  Violence also broke out in connection with these rallies.  Police clashed with some of the President's supporters.  Dozens were arrested, persons were stabbed, police were injured, and property destroyed.

President Trump first promoted the January 6 Rally on December 19, 2020, announcing on Twitter: "Statistically impossible to have lost the 2020 Election.  Big protest in D.C. on January 6th.  Be there, will be wild!"  Some of the President's supporters interpreted the President's tweet as a call to violence.  Some followers on the message board TheDonald.win openly talked of bringing weapons to Washington, D.C., and engaging in acts of violence.  Some on Twitter and Facebook posted about "Operation Occupy the Capitol" and used hashtags such as #OccupyCapitols.  The Proud Boys and the Oath Keepers, for their part, began active planning for January 6th, including reaching an agreement to work together.  Oath Keepers leaders announced on Facebook "an alliance" and "a plan with the Proud Boys."  Tarrio posted on the social media site Parler that the Proud Boys would "turn out in record numbers on Jan 6th" but would be "incognito" and "spread across downtown DC in smaller teams."  The Proud Boys and the Oath Keepers prepared for the January 6 Rally by obtaining tactical equipment, communications equipment, and bear mace.

On the eve and the morning of the January 6 Rally, the President tweeted yet again that the election had been rife with fraud and insisted that the Vice President could send ballots back to the states for recertification.  He also tweeted that Washington, D.C., "is being inundated by people who don't want to see an election victory stolen by emboldened Radical Left Democrats.  Our Country has had enough, they won't take it anymore!"

Supporters, including the Proud Boys and Oath Keepers, arrived at the Ellipse for the January 6 Rally before 9:00 a.m.  They heard from various speakers, including Giuliani and

Trump Jr. (more on their statements below), both of whom repeated false claims about the election being stolen and asserted that the Vice President could block the Certification.  President Trump spoke last.[24]  He gave a 75-minute speech based on the false premise that he had won the election and that it had been stolen from him and those gathered.  At the start, he said that "Our country has had enough.  We will not take it anymore and that's what this is all about.  And to use a favorite term that all of you people really came up with, we will 'stop the steal.'"  Early in the speech he alluded to rally-goers marching to the Capitol building.  The President told the assembled crowd that "Mike Pence is going to have to come through for us.  And if he doesn't, that will be a sad day for our country because you're sworn to uphold our Constitution.  Now it is up to Congress to confront this egregious assault on our democracy."  He continued:

> And after this, we're going to walk down—and I'll be there with you—we're going to walk down. We're going to walk down any one you want, but I think right here. We're going to walk down to the Capitol, and we're going to cheer on our brave senators, and congressmen and women. And we're probably not going to be cheering so much for some of them because you'll never take back our country with weakness.
>
> You have to show strength, and you have to be strong.  We have come to demand that Congress do the right thing and only count the electors who have been lawfully slated, lawfully slated.  I know that everyone here will soon be marching over to the Capitol building to peacefully and patriotically make your voices heard.  Today we will see whether Republicans stand strong for integrity of our elections, but whether or not they stand strong for our country, our country.

The President's call for a march to the Capitol was not, however, authorized.  It was something that he and his campaign had devised.  The Rally's permit said: "This permit does not authorize a march from the Ellipse."

---

[24] A full transcript of the President's remarks can be found on the *Thompson* docket.  Def. Oath Keepers' Mot. for Leave to File Am., Suppl. Ex. in Supp. of the Oath Keepers' Mot. to Dismiss, ECF No. 57, Ex. 2, ECF No. 57-2.

As the President's speech continued, the crowd grew increasingly animated.  The President told them that if the Vice President did not send ballots back for recertification, "you will have a President of the United States for four years . . . who was voted on by a bunch of stupid people who lost all of these states.  You will have an illegitimate president.  That is what you will have, and we can't let that happen."  At some point after, the crowd began shouting "Storm the Capitol," "Invade the Capitol Building," and "Take the Capitol Right Now."  They also began to chant "Fight Like Hell" and "Fight for Trump."[25]  At the conclusion of his speech, the President told the rally-goers: "I said, 'Something's wrong here.  Something's really wrong.  Can't have happened.' And we fight like hell and if you don't fight like hell, you're not going to have a country anymore." Almost immediately after, he told the crowd:

> So, we're going to walk down Pennsylvania Avenue . . . and we're going to the Capitol and we're going to try and give—the Democrats are hopeless.  They're never voting for anything.  But we're going to try to give our Republicans, the weak ones, because the strong ones don't need any of our help, we're going to try and give them the kind of pride and boldness they need to take back our country. So, let's walk down Pennsylvania Avenue.

Meanwhile, before the President's speech had concluded, the Proud Boys had already breached the outer perimeter of the Capitol grounds.  One Proud Boys member shouted, "Let's take the fucking Capitol!," to which one responded, "Don't yell it, do it."  They then broke into smaller groups and began breaking through exterior barricades.  By the time the crowd arrived from the Ellipse, those barricades had been compromised.  The crowd eventually overwhelmed Capitol police and was able to enter the building.  Some rioters told Capitol police officers, "[W]e

---

[25] There is a conflict between two Complaints as to when these shouts and chants took place.  According to the Bass Plaintiffs, the chants to lay siege to the Capitol took place during the President's speech and shouts to fight for the President took place after he concluded speaking.  *Thompson* Compl. ¶ 88.  The *Blassingame* Plaintiffs say just the opposite.  Their version is that the chants regarding the Capitol took place after the President concluded his remarks and the shouts to fight for him occurred during his speech.  *Blassingame* Compl. ¶ 61.  The court does not attempt to resolve that factual conflict here.

are listening to Trump—your boss" and "We were invited here by the President of the United States." Some entered the House chamber, and others, the Speaker of the House's office. The Oath Keepers entered the building in a military-style formation, dressed in paramilitary equipment, helmets, and reinforced vests. One message exchanged among them said: "We have a good group. We have about 30–40 of us. We are sticking together and sticking to the plan." As a result of rioters entering and remaining in the Capitol, Congress and the Vice President were prevented from proceeding with the Certification of the Electoral College vote as planned.

President Trump had not, as promised, joined the crowd at the Capitol. Instead, he was already back at the White House by the time rioters entered the Capitol. He began watching live televised reports of the siege. He first tweeted a video of his Rally Speech. Then, about fifteen minutes *after* rioters had entered the Capitol building, President Trump tweeted:

> Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify correct set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify. USA demands truth!

Rioters at the Capitol building repeated the tweet on megaphones. Minutes later, the President called Senator Mike Lee looking for Senator Tommy Tuberville; Senator Lee informed the President that the Vice President was being evacuated by the Secret Service and that he had to go. Later, when House Leader Kevin McCarthy spoke to the President by phone and urged him to call off the rioters, the President responded: "Well, Kevin, I guess these people are more upset about the election than you are." About a half hour after rioters had entered the Capitol building, the President tweeted: "Please support our Capitol Police and Law Enforcement. They are truly on the side of our Country. Stay peaceful!" Approximately 90 minutes later, at 4:17 p.m., the President tweeted a video in which he again repeated that the election had been stolen but told his

supporters to go home.  He said to them, "I know your pain.  I know you're hurt," and added, "We

love you.  You're very special."  At 5:40 p.m., law enforcement finally cleared the Capitol

building.  At 6:00 p.m., the President sent another tweet:

> These are the things and events that happen when a sacred landslide
> election victory is so unceremoniously & viciously stripped away
> from great patriots who have been badly & unfairly treated for so
> long.  Go home with love & in peace.  Remember this day forever!

Congress would resume the Certification later that night and would complete it at 3:41 a.m. the

next day.

### ii.    *President Trump*

Viewing the foregoing well-pleaded facts in the light most favorable to Plaintiffs, and

drawing all reasonable inferences in their favor, *see Hurd v. District of Columbia*, 864 F.3d 671,

675 (D.C. Cir. 2017), the court concludes that the Complaints establish a plausible § 1985(1)

conspiracy involving President Trump.  That civil conspiracy included the Proud Boys, the Oath

Keepers, Tarrio, and others who entered the Capitol on January 6th with the intent to disrupt the

Certification of the Electoral College vote through force, intimidation, or threats.

Recall, a civil conspiracy need not involve an express agreement; so, the fact that President

Trump is not alleged to have ever met, let alone sat down with, a Proud Boy or an Oath Keeper to

hatch a plan is not dispositive.  A tacit agreement—one that is "implied or indicated . . . but not

actually expressed"—is enough.  *Tacit*, MERRIAM-WEBSTER'S DICTIONARY, https://www

.merriam-webster.com/dictionary/tacit (last visited Feb. 8, 2022).  The key is that the conspirators

share the same general conspiratorial objective, or a single plan the essential nature and general

scope of which is known to all conspirators.  *See Hobson*, 737 F.2d at 51–52.  Multiple factors

make President Trump's involvement in the alleged § 1985(1) conspiracy plausible.

First, a court "must initially look to see if the alleged joint tortfeasors are pursuing the same goal—although performing different functions—and are in contact with one another." *Halberstam*, 705 F.2d at 481. Both elements are present here. The President, the Proud Boys, the Oath Keepers, and others "pursu[ed] the same goal": to disrupt Congress from completing the Electoral College certification on January 6th. That President Trump held this goal is, at least, plausible based on his words and actions. He repeatedly tweeted false claims of election fraud and corruption, contacted state and local officials to overturn election results, and urged the Vice President to send Electoral ballots back for recertification. The President communicated directly with his supporters, inviting them to Washington, D.C., to a rally on January 6th, the day of the Certification, telling them it would be "wild." He directly participated in the rally's planning, and his campaign funded the rally with millions of dollars. At the rally itself, the President gave a rousing speech in which he repeated the false narrative of a stolen election. The crowd responded by chanting and screaming, "Storm the Capitol," "Invade the Capitol," "Take the Capitol right now," and "Fight for Trump." Still, the President ended his speech by telling the crowd that "we fight like hell and if you don't fight like hell, you're not going to have a country anymore." Almost immediately after these words, he called on rally-goers to march to the Capitol to give "pride and boldness" to reluctant lawmakers "to take back our country." Importantly, it was the President and his campaign's idea to send thousands to the Capitol while the Certification was underway. It was not a planned part of the rally. In fact, the permit expressly stated that it did "not authorize a march from the Ellipse." From these alleged facts, it is at least plausible to infer that, when he called on rally-goers to march to the Capitol, the President did so with the goal of disrupting lawmakers' efforts to certify the Electoral College votes. The Oath Keepers, the Proud Boys, and others who forced their way into the Capitol building plainly shared in that unlawful goal.

70

Second, it is also plausible that the President was aware of the essential nature and general scope of the conspiracy. *See Hobson*, 737 F.2d at 51–52. He knew the respective roles of the conspirators: his was to encourage the use of force, intimidation, or threats to thwart the Certification from proceeding, and organized groups such as the Proud Boys and the Oath Keepers would carry out the required acts. The President expressed knowledge of the Proud Boys during a presidential debate, in which he said, "Proud Boys, stand back and stand by." He also likely knew of the Oath Keepers based on the group's public profile at pro-Trump rallies in Washington, D.C. It is reasonable to infer that the President knew that these were militia groups and that they were prepared to partake in violence for him. The same is true of other supporters. The President and his advisors allegedly "actively monitored" websites where supporters made violent posts, and such posts were discussed on Fox News, a media outlet regularly viewed by the President. He also would have known about violent threats made against state election officials, which he had refused to condemn. The President thus plausibly would have known that a call for violence would be carried out by militia groups and other supporters.

Third, Plaintiffs' allegations show a call-and-response quality to the President's communications, of which the President would have been aware. The Complaints contain numerous examples of the President's communications being understood by supporters as direct messages to them and, in the case of the January 6 Rally, as a call to action. When he told the Proud Boys to "stand back, and stand by," Tarrio tweeted in response, "Standing by sir." After publicly criticizing state election officials, some of those election officials became the object of threats of violence. When the President tweeted an invitation to the January 6 Rally, pro-Trump message boards and social media lit up with some supporters expressing a willingness to act violently, if needed. Based on these allegations, it is reasonable to infer that before January 6th

<div align="center">71</div>

the President would have known about the power of his words and that, when asked, some of his supporters would do as he wished.  On January 6th they did so.  When he called on them to march to the Capitol, some responded, "Storm the Capitol."  Thousands marched down Pennsylvania Avenue as directed.  And, when some were inside the Capitol, they told officers, "We were invited here by the President of the United States."  Even the President's counsel conceded that an invitation to commit a tort and the acceptance to do so would establish a civil conspiracy.  Hr'g Tr. at 67–68; *see also id.* at 56–57 (same concession by Giuliani's counsel); *id.* at 82 (same concession by the Oath Keepers' counsel).  A plausible causal connection between the President's words and the response of some supporters is therefore well pleaded.  *Cf. Hobson*, 737 F.2d at 54 (observing that "the flow of information back and forth, coupled with evidence of efforts to impede plaintiffs' rights . . . conceivably could have sufficed to permit a jury to infer that an agreement existed among certain persons . . . to disrupt plaintiffs' activities").

Fourth, the President's January 6 Rally Speech can reasonably be viewed as a call for collective action.  The President's regular use of the word "we" is notable.  To name just a few examples:  "We will not take it anymore"; "We will 'stop the steal'"; "We will never give up"; "We will never concede"; "We will not take it anymore"; "All Mike Pence has to do is send it back to the states to recertify, and we become president"; "[W]e're going to have to fight much harder"; "We can't let that happen"; "We're going to walk down . . ."; "We fight like hell"; "We're going to walk down Pennsylvania Avenue."  "We" used repeatedly is this context implies that the President and rally-goers would be acting together towards a common goal.  That is the essence of a civil conspiracy.

And, finally, a tacit agreement involving the President is made all the more plausible by his response to the violence that erupted at the Capitol building.[26]  Approximately twelve minutes after rioters entered the Capitol building, the President sent a tweet criticizing the Vice President for not "hav[ing] the courage to do what should have been done to protect our Country."  Rioters repeated that criticism at the Capitol, some of whom saw it as encouragement to further violence. It is reasonable to infer that the President would have understood the impact of his tweet, since he had told rally-goers earlier that, in effect, the Vice President was the last line of defense against a stolen election outcome.  The President also took advantage of the crisis to call Senator Tuberville; it is reasonable to think he did so to urge delay of the Certification.  And then, around 6:00 p.m., after law enforcement had cleared the building, the President issued the following tweet: "These are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long.  Go home with love & in peace.  Remember this day forever!"  A reasonable observer could read that tweet as ratifying the violence and other illegal acts that took place at the Capitol only hours earlier.  *See Hobson*, 737 F.2d at 53 (agreeing that "evidence of a pattern of mutually supportive activity over a period of time provides a reasonable basis for inferring that parties are engaged in a common pursuit" (cleaned up)).

The President argues that, at most, Plaintiffs have pleaded that the President "made political statements . . . at a rally meant to persuade political officials."  *Thompson* Trump Mot. at 27.  But that contention misses the forest for the trees.  It ignores the larger context of the Rally Speech.

---

[26] With respect to the President's post–Rally Speech conduct, the court for present purposes considers only those acts that plausibly were undertaken in his unofficial capacity.  Circuit precedent suggests that immunized action (or inaction) cannot be considered.  *See Banneker Ventures*, 798 F.3d at 1145 (instructing trial court on remand to "evaluate whether the actions that it concludes would *not be immunized*, taken together, state a claim against Graham for tortious interference or civil conspiracy" (emphasis added)).

73

For months, the President led his supporters to believe the election was stolen.  When some of his supporters threatened state election officials, he refused to condemn them.  Rallies in Washington, D.C., in November and December 2020 had turned violent, yet he invited his supporters to Washington, D.C., on the day of the Certification.  They came by the thousands.  And, following a 75-minute speech in which he blamed corrupt and weak politicians for the election loss, he called on them to march on the very place where Certification was taking place.  The President's narrow characterization of his conduct accounts for none of this.

The President also contends that a conspiracy involving him not only is "far-fetched, but it is also in direct opposition to many of the statements made by Mr. Trump at the very rally." *Id.* at 28.  The only portion of the Speech he cites to support that proposition is that, early on, he said that rally-goers soon would be "marching over to the Capitol building to peacefully and patriotically make your voices heard." *See id.*  The President certainly uttered those words.  But he also uttered others, which he ignores.  Immediately before directing them to the Capitol, he told rally-goers that they would need to "fight like hell and if you don't fight like hell, you're not going to have a country anymore."  When those supporters did "fight like hell," just as he had told them to, the President did not demand they act "peacefully and patriotically."  He instead tweeted that "Mike Pence didn't have the courage to do what should have been done to protect our Country."  Later, he referred to those who had attacked the Capitol as "great patriots," and told them to, "Remember this day forever!"  These other statements by the President stand in stark contrast to his passing observation that rally-goers would soon be "peacefully and patriotically" marching to the Capitol.  Those three words do not defeat the plausibility of Plaintiffs' § 1985(1) claim at this stage.

74

The President also dismisses two allegations as weak and speculative that purport to tie him to the Proud Boys and the Oath Keepers. The court relies on neither at this juncture but thinks one may prove significant in discovery. The first is an allegation that "a person associated with the Trump White House communicated with a member of the Proud Boys by phone." *Thompson* Compl. ¶ 70. The court agrees that this is a speculative allegation and has not considered it. The other concerns the President's confidant, Roger Stone. Stone posted on Parler in late December that he had met with the President "to ensure that Donald Trump continues as our president." Shortly thereafter, Stone spoke with Tarrio, and later he used the Oath Keepers as his security detail for the January 6 Rally. The court does not rely on these allegations to establish the President's knowledge of the Proud Boys or the Oath Keepers. Other alleged facts make that inference plausible. That said, Stone's connections to both the President and these groups in the days leading up to January 6th is a well-pleaded fact. Discovery might prove that connection to be an important one.

The President also suggests that, at most, Plaintiffs have pleaded independent, parallel conduct that does not make out a plausible conspiracy under *Twombly*. *Thompson* Trump Reply at 21–22. But that argument ignores the multiple ways in which the President interacted with his supporters, including organized groups. The Complaints detail how the President's tweets led to threats of violence against state election officials; how his tweet inviting supporters to Washington, D.C., on January 6th was understood by some to be a call to action; and how he called on thousands to participate in an unauthorized march on the Capitol building that ended in acts of violence. That is a pattern of mutually supportive activity that supports a plausible conspiracy. *Hobson*, 737 F.2d at 53. Such mutually supportive activity distinguishes this case from *Twombly*, in which the Court

held that the complaint failed to allege a conspiracy because market factors, not concerted action, were a more plausible explanation for the alleged conduct.  *See Twombly*, 550 U.S. at 566–69.

Finally, the President argues that Plaintiffs cannot construct a conspiracy based on "Mr. Trump's political activity," which is protected speech.  *Thompson* Trump. Mot. at 28.  The court addresses the President's First Amendment defense below.

### iii.   *Giuliani*

The court reaches a different conclusion as to Giuliani.  There is little doubt that Plaintiffs have adequately pleaded that Giuliani was involved in a conspiracy to "engage[] in a months-long misinformation campaign to convince Trump's supporters that the election had been illegally stolen." *Thompson* Pls.' Opp'n at 42.  But, as the court stated earlier, such a conspiracy does not violate § 1985(1).  What Plaintiffs must plausibly establish is that Giuliani conspired to prevent Congress from discharging its duties on January 6th by force, intimidation, or threat.  There, they fall short.

In addition to his pre–January 6th actions—which alone do not establish Giuliani as a § 1985(1) conspirator—Plaintiffs point to two of Giuliani's acts that occurred on January 6th: (1) his rally speech, in which he said, "So, let's have trial by combat" and "We're going to fight to the very end to make sure that doesn't happen," and (2) a phone call that he made to members of Congress, urging them to delay the Certification.  *Thompson* Pls.' Opp'n at 42–43.  These allegations, individually and taken together, do not "nudge[]" Plaintiffs' § 1985(1) claim against Giuliani "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

As to his rally remarks, the court believes Giuliani's words are not enough to make him part of a § 1985(1) conspiracy.  Critically, Giuliani uttered no words that resembled a call to action. "Trial by combat" was not accompanied by a direction to do anything.  And, given the speaker,

76

those words were not likely to move the crowd to act.  There is no allegation that anyone took Giuliani's words as permission to enter the Capitol.   And there are no allegations that Giuliani at any time before January 6th uttered words advocating or inspiring violence.  Indeed, as discussed further below, the court holds that Giuliani's rally remarks are constitutionally protected speech. Nor is Giuliani alleged to have been involved in rally planning or known that the President would direct the crowd to march to the Capitol.  And he did not express solidarity with the rally-goers after some violently assaulted police and forced their way into the Capitol.  Giuliani's words at the rally are not sufficiently additive to make him a § 1985(1) coconspirator.

Neither are his phone calls to lawmakers on January 6th after the Capitol was breached. There is some conflict among Plaintiffs on this allegation.  The Bass Plaintiffs allege that such calls were made "while the insurrection was ongoing."  *Thompson* Compl. ¶ 138.   The *Blassingame* Plaintiffs, on the other hand, say that two such calls occurred at 7:00 p.m., after law enforcement had cleared the Capitol.  *Blassingame* Compl. ¶ 128.  Whatever the timing of those calls, they at most establish Giuliani as an opportunist, not someone who shared in the same general conspiratorial objective as others *before* the violence at the Capitol occurred.  Though Giuliani unquestionably was a central figure in the President's efforts to sow doubt and mistrust in the election's outcome, the court cannot say, based on the facts alleged, that he plausibly shared the common conspiratorial goal of violently disrupting the Certification.

### iv.   *Trump Jr.*

The court reaches the same conclusion as to Trump Jr.  The allegations against him are even thinner than those against Giuliani.  Before January 6th, he sent false and misleading tweets about the election and publicly criticized officials who did not support his father.  He also spoke at the rally, during which he repeated false claims about election fraud and theft.  He also warned

Republicans who failed to back the President, "we're coming for you, and we're gonna have a good time doing it."  As discussed below, the court believes these words to be protected speech.  That is all Plaintiffs have attributed to Trump Jr.[27]  He is not alleged to have participated in rally planning, known that the President would direct a march to the Capitol, or expressed support for the rioters and their actions.  The allegations against Trump Jr. are insufficient to make him a coconspirator in a plan to disrupt Congress from performing its duties.

<p style="text-align:center"><i>v.    The Oath Keepers</i></p>

The Oath Keepers also challenge the sufficiency of the conspiracy allegations against them.  But that argument goes nowhere.  At a minimum, the alleged facts establish a § 1985(1) conspiracy between the Oath Keepers and the Proud Boys.  After the President's announcement of the January 6 Rally, a leader of the group posted a Facebook message that he had "organized an alliance between Oath Keepers . . . and Proud Boys.  We have decided to work together and shut this shit down."  Days later, another leader posted on Facebook that the Oath Keepers had "orchestrated a plan with the Proud Boys."  Those statements, if true, would be direct evidence of a civil conspiracy.  The Complaints also detail each group's preparations for January 6th, and they allege that members from each group forcibly entered the Capitol building intent on disrupting the Certification.  These well-pleaded allegations easily establish a plausible § 1985(1) conspiracy between the two groups.

The Oath Keepers make two primary contentions.  First, they maintain that the *Thompson* complaint lacks sufficient details, such as names of the leaders who posted to Facebook, to establish a conspiracy.  *Thompson* Oath Keepers' Mot. at 14.  But Rule 8's notice-pleading rules

---

[27] Swalwell also includes in his Complaint a photograph of Trump Jr. from May 2019 that purports to show him wearing a t-shirt bearing the symbol of a militia group known as the Three Percenters.  Swalwell Compl. ¶ 96.  The Three Percenters are among the groups alleged to have stormed the Capitol.  But this effort to tie Trump Jr. to the alleged conspiracy is tenuous, at best.

<div style="text-align:center">78</div>

apply here, and the Oath Keepers have not cited any case that requires the specificity they demand to survive a motion to dismiss.  Second, they complain that they are being held responsible for the acts of the group's members.  *See id.* at 15.  Plaintiffs, however, have pleaded sufficient facts to establish *respondeat superior* liability at this stage.

<div align="center">

*vi.*    <u>*Tarrio*</u>

</div>

Tarrio's role in the conspiracy is established through well-pleaded allegations.  It is reasonable to infer that, as the leader of the Proud Boys, he would have participated in forming the announced "alliance" and "orchestrated plan" with the Oath Keepers.  *Thompson* Compl. ¶ 63. He also said that the Proud Boys would be there in "record numbers on Jan 6th," would be "incognito," and would "spread across downtown DC in smaller teams."  *Id.* ¶ 64.  It is also reasonable to infer that he would have been involved in the Proud Boys' collection of tactical vests, military-style communication equipment, and bear mace.  *Id.* ¶ 65.  These allegations are sufficient to plausibly establish Tarrio as a conspirator.

<div align="center">

*      *      *

</div>

To sum up, the court holds that Plaintiffs have successfully pleaded a § 1985(1) conspiracy claim against President Trump, the Oath Keepers, and Tarrio.  They have fallen short as to Giuliani and Trump Jr.

**C.    Failure to State a § 1986 Claim**

The court already has held that President Trump is immune from suit as to Swalwell's § 1986 claim.  The question remains whether Swalwell has stated such a claim against the other defendants, Giuliani and Trump Jr.  He has not.

Recall, § 1986 provides a cause of action against anyone who has "knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be

<div align="center">

79

</div>

committed, and having the power to prevent or aid in preventing the commission of the same, neglects or refuses so to do." 42 U.S.C. § 1986. Thus, if Giuliani or Trump Jr. "knew of a [§ 1985(1)] conspiracy, were in a position to prevent the implementation of that conspiracy, and neglected or refused to prevent it, they are liable under § 1986." *Park v. City of Atlanta*, 120 F.3d 1157, 1160 (11th Cir. 1997). Swalwell's pleading falls short in two respects. First, it fails to plead sufficient facts establishing that Giuliani or Trump Jr. knew of a tacit plan to prevent members of Congress from discharging their duties. The Complaint does not, for example, allege either was involved in the planning of the January 6 Rally or knew in advance that the President would call on rally-goers, including organized groups, to march on the Capitol while Congress was in session. Second, it does not allege that Giuliani or Trump Jr. had the "power" to prevent such conspiracy. Few courts appear to have addressed this element, but those finding the requisite power to be present have done so where the defendant was a government official or employee with some formal authority to act. *See, e.g.*, *Peck v. United States*, 470 F. Supp. 1003, 1013 (S.D.N.Y. 1979) (FBI agents); *Santiago v. City of Philadelphia*, 435 F. Supp. 136, 156 (E.D. Pa. 1977) (mayor and city managing director who had "some authority, though limited, to control policies and practices"), *abrogated on other grounds by Chowdhury v. Reading Hosp. & Med. Ctr.*, 677 F.2d 317 (3d Cir. 1982). Giuliani and Trump Jr., as personal lawyer to the President and the President's son, respectively, evidently do not so qualify. Swalwell's Complaint thus fails to plead a § 1986 claim against Giuliani and Trump Jr.

### D.     The First Amendment Defense

The court thus far has held that President Trump is not immune from suit as to Plaintiffs' § 1985(1) claim and that Plaintiffs have successfully pleaded such claim against him. The question remains, however, whether that claim (and others) can move forward when, as here, the President's

80

alleged conspiratorial acts are predicated entirely on his speech.  This is a substantial constitutional

question.  The First Amendment grants all citizens expansive protections in what they can say, but

that protection must be particularly guarded when it comes to the President of the United States.

As the Supreme Court has repeatedly reminded, a President's position in our system of government

is unique and his duties and responsibilities "are of unrivaled gravity and breadth."  *Vance*, 140

S. Ct. at 2425.  A President could not function effectively if there were a risk that routine speech

might hale him into court.  Only in the most extraordinary circumstances could a court *not*

recognize that the First Amendment protects a President's speech.  But the court believes this is

that case.  Even Presidents cannot avoid liability for speech that falls outside the expansive reach

of the First Amendment.  The court finds that in this one-of-a-kind case the First Amendment does

not shield the President from liability.

### 1.    The First Amendment and Speech on Matters of Public Concern

The Supreme Court has spoken in soaring terms about the First Amendment's protection

of speech on matters of public concern.  "Expression on public issues 'has always rested on the

highest rung of the hierarchy of First Amendment values.'"  *NAACP v. Claiborne Hardware Co.*,

458 U.S. 886, 913 (1982) (citation omitted).  "[S]peech concerning public affairs is more than self-

expression; it is the essence of self-government."  *Garrison v. Louisiana*, 379 U.S. 64, 74–75

(1964).  The First Amendment embodies our "profound national commitment to the principle that

debate on public issues should be uninhibited, robust, and wide-open."  *New York Times Co.*, 376

U.S. at 270.  Such speech may "well include vehement, caustic, and sometimes unpleasantly sharp

attacks on government and public officials."  *Id.*  "Strong and effective extemporaneous rhetoric

cannot be nicely channeled in purely dulcet phrases.  An advocate must be free to stimulate his

audience with spontaneous and emotional appeals for unity and action in a common cause." *Claiborne Hardware*, 458 U.S. at 928.

Protection for speech on matters of public concern is decidedly capacious, but it is not unbounded. "The presence of protected activity . . . does not end the relevant constitutional inquiry. Governmental regulation that has an incidental effect on First Amendment freedoms may be justified in certain narrowly defined instances." *Id.* at 912. But when considering liability in such "narrowly defined instances," courts must tread carefully. When, as here, liability is based in part on "a public address—which predominantly contained highly charged political rhetoric—[the court must] approach this suggested basis of liability with extreme care." *Id.* at 926–27. Such care extends even when, as in this case, the allegation is that speech produced violence. "When violence occurs during activity protected by the First Amendment, that provision mandates 'precision of regulation' with respect to 'the grounds that may give rise to damages liability' as well as 'the persons who may be held accountable for those damages.'" *McKesson v. Doe*, 141 S. Ct. 48, 50 (2020) (quoting *Claiborne Hardware*, 458 U.S. at 916–17).

Thus, the court's task here is to determine whether a "narrowly defined instance" applies to President Trump's speech such that he "may be held accountable" for the damages it may have caused. Plaintiffs here advance two such "narrowly defined instances": (1) the President participated in an unlawful conspiracy and (2) the President's January 6 Rally Speech incited violence. *Thompson* Pls.' Opp'n at 49–56; *Swalwell* Opp'n at 18–19; *Blassingame* Pls.' Opp'n at 36–39. The court considers in turn each of these grounds for denying President Trump's speech First Amendment protection.

a.    Participation in an unlawful conspiracy

Plaintiffs say that "conspiratorial statements and agreements in furtherance of unlawful actions are not protected by the First Amendment." *Thompson* Pls.' Opp'n at 50.  They cite various cases for various propositions, including that the First Amendment does not authorize "knowing association with a conspiracy," *id.* at 50 (quoting *Scales v. United States*, 367 U.S. 203, 229 (1961)); it does not confer a right to "impede or obstruct" a government employee's "performance of duty by threats," *id* (quoting *United States v. Varani*, 435 F.2d 758, 762 (6th Cir. 1970)); it does not protect "speech integral to criminal conduct," *Blassingame* Pls.' Opp'n at 18 (quoting *United States v. Alvarez*, 567 U.S. 709, 717 (2012)); and it does not "immunize[] [speech] from regulation when [it] is used as an integral part of conduct which violates a valid statute," *id.* at 18–19 (quoting *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 514 (1972)).

But the court finds these broad-stroke principles inapt here.  For one, cases like *Scales*, *Varani*, and *Alvarez* involve criminal conspiracies, which the Supreme Court seems to have put in its own category.  Plaintiffs sometimes suggest that the President engaged in *criminal* conduct, but what is before the court is a civil conspiracy, and it would be imprudent for the court to assess whether factual allegations in a *civil* complaint make out *criminal* conduct.  Even the low probable-cause standard is higher than Rule 8's plausibility standard.  Other cases, like *California Motor Transport*, arise in the context of economic regulation, involving, for example, statutes barring monopolization or concerted activity, where the speech at issue usually is not on matters of public concern.  Speech used to facilitate the fixing of prices or the manipulation of markets is naturally afforded less First Amendment protection than a presidential speech on a matter of public concern.

Speech on matters of public concern may even be protected if it is part of a concerted violation of law.  That is the lesson of the Supreme Court's decision in *Claiborne Hardware*.

83

There, Mississippi state courts had found the NAACP; its state field secretary, Charles Evers; and others liable for losses incurred by white merchants as a result of a boycott—a kind of civil conspiracy—that violated state law "on three separate conspiracy theories."  458 U.S. at 891.  Indeed, the Mississippi Supreme Court had found that the defendants "had *agreed* to use force, violence, and 'threats' to effectuate the boycott."  *Id.* at 895.  The Supreme Court observed that the boycott was "supported by speeches and nonviolent picketing" aimed at expressing dissatisfaction with "the social structure that denied them rights to equal treatment and respect"— plainly matters of public concern.  *Id.* at 907.  The Court, in assessing the defendants' plea for First Amendment protection, did not dismiss it out of hand merely because the defendants had conspired to violate state law.  Rather, in recognition of the weighty First Amendment values at stake, the Court narrowed the scope of inquiry to whether any of the business losses were caused by speech that was not otherwise protected under the First Amendment—namely, speech that caused violence or constituted threats of violence.  *Id.* at 916.  Once the Court identified speech that might so qualify, it did not declare the speech unprotected because it was part of a conspiracy; instead, it evaluated the speech under the narrow "incitement" standard announced in *Brandenburg v. Ohio*, 395 U.S. 444 (1969).

The court here must follow the same path the Court did in *Claiborne Hardware*.  President Trump's speech cannot be deemed unprotected merely because Plaintiffs have alleged it to be part of a conspiratorial agreement to violate a civil statute.  Instead, because his speech is on a matter of public concern, it will lose its First Amendment protection only if it meets the stringent *Brandenburg* "incitement" standard.  *See Tri-Corp Housing, Inc. v. Bauman*, 826 F.3d 446, 449 (7th Cir. 2016) (recognizing that public officials have the right to "urge their constituents to act in particular ways . . . , as long as they refrain from making the kind of threats that the Supreme Court

84

treats as subject to control under the approach of *Brandenburg*" (citation omitted)).  It is to that inquiry the court now turns.

>       b.       *Brandenburg* and incitement

A trio of Supreme Court cases has come to define the incitement exception to the First Amendment.  They are *Brandenburg*, *Hess v. State of Indiana*, and *Claiborne Hardware*.  A brief discussion of each helps to frame the determination this court must make.

 *Brandenburg* involved the conviction of a member of the Ku Klux Klan under Ohio's Criminal Syndicalism statute.  395 U.S. at 444.[28]  Two films of the defendant were introduced at trial.  One showed him among twelve hooded Klansmen, surrounding a large wooden cross, which they burned.  Words uttered on the film included statements disparaging of Black and Jewish people.  The defendant also said the following: "We're not a revengent organization, but if our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance taken.  We are marching on Congress July the Fourth, four hundred thousand strong . . . ."  *Id.* at 446.  Seen on the film, and introduced into evidence, were a pistol, shotgun, and ammunition.  *Id.* at 445–46.  The second film was along the same lines.  *Id.* at 447.  The Supreme Court overturned the defendant's conviction, finding the films to be protected speech.  Articulating what is now termed the "*Brandenburg* test," the Court said that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."  *Id.*  Thus, *Brandenburg* has come to stand for the proposition that "mere advocacy" of

---

[28] Numerous states passed criminal syndicalism laws in the early part of the 20th century "with the purpose of making it illegal for individuals or groups to advocate radical political and economic changes by criminal or violent means." Dale Mineshima-Lowe, *Criminal Syndicalism Laws*, THE FIRST AMENDMENT ENCYCLOPEDIA, https://www.mtsu.edu /first-amendment/article/942/criminal-syndicalism-laws (last visited Feb. 8, 2022).

the use of force or violence is protected speech; only when speech is directed at inciting imminent lawless action, and likely to do so, does it lose the cloak of the First Amendment's protection.

Four years later, in *Hess v. State of Indiana*, the Court applied *Brandenburg* to a defendant convicted under Indiana's disorderly conduct statute.  414 U.S. 105, 105–06 (1973).  The defendant was participating in a demonstration of between 100 and 150 people when the sheriff gave an order to clear the streets.  As the sheriff passed him, Hess was standing off the street and said words to the effect of "We'll take the fucking street later" or "We'll take the fucking street again."  *Id.* at 107.  Witnesses testified that Hess did not appear to be exhorting the crowd to go back into the street, was not addressing any particular person, and though loud, was no louder than anyone else in the area.  *Id.* Applying *Brandenburg*, the Court overturned Hess's conviction.  The Court observed that Hess's statement was "[a]t best, . . . counsel for present moderation, at worst, it amounted to nothing more than advocacy of illegal action at some indefinite future time."  *Id.* at 108.  The Court said that, because Hess was not directing his statement to any person or group of persons, it could not be said he was advocating any action.  *Id.*  Also, "since there was no evidence or rational inference from the import of the language, that his words were intended to produce, and likely to produce, imminent disorder," his words could not be punished based on the mere "tendency to lead to violence," as the Indiana Supreme Court had held.  *Id.* at 108–09 (citation omitted).

The last of the three cases is *Claiborne Hardware*, the facts of which the court already has briefly discussed.  The Court evaluated Charles Evers's speech in the context of the boycott, during which he said to several hundred people, referring to boycott violators, "If we catch any of you going in any of them racist stores, we're gonna break your damn neck."  458 U.S. at 902.  In another speech Evers warned that "the Sheriff could not sleep with boycott violators at night," an

implicit threat to Black persons that retaliation for shopping at white establishments could come at any moment without the protection of law enforcement. *Id.* The Court held that the "emotionally charged rhetoric of Charles Evers' speeches did not transcend the bounds of protected speech set forth in *Brandenburg.*" *Id.* at 928. The court acknowledged that Evers had used "strong language" and observed that if his "language had been followed by acts of violence, a substantial question would be presented whether Evers could be held liable for the consequences of that lawful conduct." *Id.* However, "[w]hen such appeals do not incite lawless action, they must be regarded as protected speech." *Id.* The Court also said that "[i]f there were other evidence of his authorization of wrongful conduct, the references to discipline in the speeches could be used to corroborate that evidence." *Id.* at 929. But because there was no evidence that "Evers authorized, ratified, or directly threatened acts of violence," his words could not be used for such purpose. *Id.* The Court therefore vacated the damages award against Evers.

The Supreme Court has not had occasion to apply the *Brandenburg* test in the 40 years since *Claiborne Hardware.* Scholars have given it attention, but few federal appellate court decisions have applied it. The parties have not cited any D.C. Circuit case applying *Brandenburg*, and the court has not found one.[29] One treatise has distilled *Brandenburg* into a three-part test, requiring proof that "(1) the speaker *subjectively intended incitement*; (2) in context, the words used were *likely to produce* imminent, lawless action; and (3) the words used by the speaker *objectively encouraged* and urged and provoked *imminent* action." 5 RONALD D. ROTUNDA & JOHN E. NOWAK, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE § 20.15(d),

---

[29] The D.C. Circuit addressed *Brandenburg* in *National Organization for Women v. Operation Rescue*, but in the context of evaluating the terms of an injunction, not applied to any particular speech. 37 F.3d 646, 657 (D.C. Cir. 1994).

87

Westlaw (database updated May 2021).  An en banc panel of the Sixth Circuit articulated a similar three-part test:

> The *Brandenburg* test precludes speech from being sanctioned as incitement to riot unless (1) the speech explicitly or implicitly encouraged the use of violence or lawless action, (2) the speaker intends the speech will result in the use of violence or lawless action, and (3) the imminent use of violence or lawless action is the likely result of his speech.

*Bible Believers v. Wayne County*, 805 F.3d 228, 246 (6th Cir. 2015) (en banc).  The court does not take a position on whether defining *Brandenburg*'s standard as a three-part test is useful, or even accurate.[30]  The key to the *Brandenburg* exception is incitement:  whether the speech "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447.

In making that evaluation, both the words spoken and the context in which they are spoken matter.  The Supreme Court said as much in *Young v. American Mini Theaters*:

> The question whether speech is, or is not, protected by the First Amendment often depends on the content of the speech.  Thus, the line between permissible advocacy and impermissible incitation to crime or violence depends, not merely on the setting in which speech occurs, but also on exactly what the speaker had to say.

427 U.S. 50, 66 (1976).  Similarly, the Court in *FCC v. Pacifica Foundation* observed that the

> classic exposition of the proposition that both the content and the context of speech are critical elements of First Amendment analysis is Mr. Justice Holmes' statement for the Court in *Schenck v. United States*[:] . . .  "[T]he character of every act depends upon the circumstances in which it is done . . . .  The most stringent protection of free speech would not protect a man falsely shouting fire in a theater and causing a panic . . . ."

---

[30] The Rotunda and Nowak treatise's three-factor test has been called into question insofar as it requires inquiry into whether the speaker "objectively encouraged and urged and provoked imminent action."  The Sixth Circuit has declined to wholly embrace such an "objective" element, except insofar as the *Brandenburg* inquiry must focus on "the words used by the speaker . . . , not how they may be heard by a listener."  *Nwanguma v. Trump*, 903 F.3d 604, 613 (6th Cir. 2018).

438 U.S. 726, 744 (1978) (quoting *Schenck v. United States*, 249 U.S. 47, 52 (1919)).

Bearing the foregoing principles in mind, the court turns to evaluate President Trump's speech under *Brandenburg*.

c.      President Trump's speech

Plaintiffs do not contend that President Trump's words prior to the January 6 Rally Speech (almost entirely through tweets) meets the *Brandenburg* incitement exception.  They focus on the Rally Speech, so the court does, too, starting with a summary of what he said.[31]

The President spoke for 75 minutes.  He spun a narrative in which he told those present that the election was "rigged" and "stolen," and not just from him, but from *them*.  He told attendees at the start that "*our* election victory" had been taken away, "*we* won this election," and "[*w*]e didn't lose."  He urged on the crowd, "We will never give up.  We will never concede.  It doesn't happen.  You don't concede when there's theft involved. . . .   We will not take it anymore . . . .  [W]e will 'stop the steal.'"  He said that elections in "Third World Countries" are "more honest" than the election that had just taken place.  The President said all of this within the first few minutes of his remarks.

He then told the crowd what had to happen for them to "win" the election.  "[I]f Mike Pence does the right thing, we win the election."  "All Mike Pence has to do is send it back to the states to recertify, and we become president, and you are the happiest people."  And he warned what would happen if the Vice President did not act: "[W]e're stuck with a president who lost the election by a lot, and we have to live with that for four more years.  We're not going to let that happen."

---

[31] The court has considered the Rally Speech in its entirety.  *See supra* note 24.  The recitation below summarizes those remarks as they were made chronologically, and it omits citations for ease of reading.

The President identified who was to blame for the "stolen" and "rigged" election: "radical left Democrats," "weak Republicans," "the fake news," and "Big tech," among others.  He specifically identified those who he thought were the "weak Republicans" who would bear responsibility for a lost election:  then–Senate Majority Leader McConnell, Representative Elizabeth Cheney, and Governor Brian Kemp (calling him "one of the dumbest governors in the United States").  He accused the media of "suppressing thought" and "suppress[ing] speech" and said it "was the enemy of the people.  It's the biggest problem we have in this country."  He told the crowd,

> [W]e're going to have to fight much harder, and Mike Pence is going to have to come through for us.  And if he doesn't, that will be a sad day for our country because you're sworn to uphold our Constitution.  Now it is time for Congress to confront this egregious assault on our democracy.

It was at this point that the President first said anything about a march to the Capitol.  He said,

> [A]fter this, we're going to walk down—and I'll be there with you— we're going to walk down to the Capitol, and we're going to cheer on our brave senators, and congressmen and women.  And we're probably not going to be cheering so much for some of them because you'll never take back our country with weakness.  You have to show strength, and you have to be strong.

He then said, "We have come to demand that Congress do the right thing and only count the electors who have been lawfully slated, lawfully slated," and he added that "everyone here will soon be marching to the Capitol building to peacefully and patriotically make your voices heard."

Moments later, he focused the crowd's attention on the Certification.  Referring to the Capitol, he said,

> [W]e see a very important event though, because right over there, right there, we see the event going to take place. . . .  We're going to see whether or not we have great and courageous leaders or whether

or not we have leaders that should be ashamed of themselves
throughout history, throughout eternity, they'll be ashamed. And
you know what? If they do the wrong thing, we should never ever
forget that they did. Never forget. We should never ever forget.

The President continued, telling the crowd repeatedly that the election had been stolen.
"We've amassed overwhelming evidence about a fake election," he said to them. Changes in
election procedure at the state level had "paved the way for fraud on a scale never seen before."
He then recited a litany of false claims about the ways in which the election had been stolen in
Pennsylvania (e.g., over 200,000 more ballots cast than voters), Wisconsin (e.g., postal service
workers were told to backdate 100,000 ballots), Georgia (e.g., election officials pulled "boxes . . .
and suitcases of ballots out from under a table"), Arizona (e.g., 36,000 ballots were cast by
noncitizens), Nevada (e.g., more than 42,000 double votes), and Michigan (e.g., thousands and
thousands of ballots were improperly backdated). In the midst of reciting these examples of fraud,
the President regularly alluded to what the Vice President had to do. He told rally-goers that, if
Mike Pence failed to act, "You will have an illegitimate president, that's what you'll have. And
we can't let that happen." He said, "I'm not hearing good stories" about the Vice President. And
he again told those assembled that the election was a fraud: "this is the most fraudulent thing
anybody's—This is a criminal enterprise. This is a criminal enterprise." And, he said that when
fraud occurs "it breaks up everything, doesn't it? What you catch somebody in a fraud, you're
allowed to go by very different rules. So I hope Mike has the courage to do what he has to do."

In the final moments of his speech, the President spoke about the country's future. He said
he had to be "careful" in saying he was confident in our nation's future: "If we allow this group
of people to illegally take over our country, because it's illegal when the votes are illegal, when
the way they got there is illegal, when the States that vote are given false and fraudulent
information." He also warned that, because of a potential change in administration, "the

91

[immigrant] caravans are forming again.  They want to come in again and rip off our country.  Can't let it happen."

Finally, the President told them he suspected impropriety on election night itself: "Something's wrong here.  Something's really wrong.  Can't have happened."  And then he said: "And we fight.  We fight like hell and if you don't fight like hell, you're not going to have a country anymore."  Moments later, he concluded and told those assembled:

> So we're going to, we're going to walk down Pennsylvania Avenue, I love Pennsylvania Avenue, and we're going to the Capitol and we're going to try and give—the Democrats are hopeless.  They're never voting for anything, not even one vote.  But we're going to try to give our Republicans, the weak ones, because the strong ones don't need any of our help, we're going to try and give them the kind of pride and boldness that they need to take back our country.  So let's walk down Pennsylvania Avenue.

### d.   *Brandenburg* applied to the January 6 Rally Speech

The President's words on January 6th did not explicitly encourage the imminent use of violence or lawless action, but that is not dispositive.  In *Hess*, the Supreme Court recognized that words can *implicitly* encourage violence or lawlessness.  In reversing Hess's conviction, the Court held that there was "no evidence or *rational inference* from *the import* of the language" intended to produce, or likely to produce, imminent disorder.  414 U.S. at 109 (emphasis added).  By considering the "import of the language," and the "rational inferences" the words produce, the Court signaled that there is no safe haven under *Brandenburg* for the strategic speaker who does not directly and unequivocally advocate for imminent violence or lawlessness, but does so through unmistakable suggestion and persuasion.  Federal appellate courts have understood the *Brandenburg* exception to reach implicit encouragement of violent acts.  *See, e.g.*, *Bible Believers*, 805 F.3d at 246 (inquiring as the first element whether "the speech explicitly or implicitly encouraged the use of violence or lawless action").

Having considered the President's January 6 Rally Speech in its entirety and in context, the court concludes that the President's statements that, "[W]e fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore," and "[W]e're going to try to and give [weak Republicans] the kind of pride and boldness that they need to take back our country," immediately before exhorting rally-goers to "walk down Pennsylvania Avenue," are plausibly words of incitement not protected by the First Amendment. It is plausible that those words were implicitly "directed to inciting or producing imminent lawless action and [were] likely to produce such action." *Brandenburg*, 395 U.S. at 447.

The "import" of the President's words must be viewed within the broader context in which the Speech was made and against the Speech as a whole. Before January 6th, the President and others had created an air of distrust and anger among his supporters by creating the false narrative that the election literally was stolen from underneath their preferred candidate by fraud and corruption. Some of his supporters' beliefs turned to action. In the weeks after the election, some had made threats against state election officials and others clashed with police in Washington, D.C., following pro-Trump rallies. The President would have known about these events, as they were widely publicized. Against this backdrop, the President invited his followers to Washington, D.C., on January 6th. It is reasonable to infer that the President would have known that some supporters viewed his invitation as a call to action. President Trump and his advisors "actively monitored" pro-Trump websites and social media. *Thompson* Compl. ¶ 66. These forums lit up in response to the rally announcement. Some supporters explicitly called for violence on January 6th (e.g., calling for "massing hangings and firing squads"). Others took direct aim at the Certification itself (e.g., stating that people in the Capitol should "leave in one of two ways: dead or certifying Trump the rightful winner") or at law enforcement ("Cops don't have 'standing' if

they are laying on the ground in a pool of their own blood."). *Thompson* Compl. ¶¶ 56–63; *Swalwell* Compl. ¶ 89; *Blassingame* Compl. ¶¶ 33–34. These violent posts were discussed "by media outlets regularly viewed by President Trump, including Fox News." *Thompson* Compl. ¶ 66. The prospect of violence had become so likely that a former aide to the President predicted in a widely publicized statement that "there will be violence on January 6th because the President himself encourages it." *Id.* Thus, when the President stepped to the podium on January 6th, it is reasonable to infer that he would have known that some in the audience were prepared for violence.

Yet, the President delivered a speech he understood would only aggravate an already volatile situation. For 75 uninterrupted minutes, he told rally-goers that the election was "rigged" and "stolen," at one point asserting that "Third World Countries" had more honest elections. He identified who the culprits were of the election fraud: "radical Left Democrats" and "weak" Republicans. They were the ones who had stolen *their* election victory, he told them. He directed them not to "concede," and urged them to show "strength" and be "strong." They would not be able to "take back [their] country with weakness." He told them that the rules did not apply: "When you catch somebody in a fraud, you're allowed to go by very different rules." And they would have an "illegitimate President" if the Vice President did not act, and "we can't let that happen." These words stoked an already inflamed crowd, which had heard for months that the election was stolen and that "weak politicians" had failed to help the President.

So, when the President said to the crowd at the end of his remarks, "We fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore," moments before instructing them to march to the Capitol, the President's speech plausibly crossed the line into unprotected territory. These words did not "amount[] to nothing more than illegal action at some indefinite future time." *Hess*, 414 U.S. at 108. President Trump's words were, as Justice

<div align="center">94</div>

Douglas termed it, "speech . . . brigaded with action." *Brandenburg*, 395 U.S. at 456 (Douglas, J., concurring). They were plausibly "directed to inciting or producing imminent lawless action and [were] likely to incite or produce such action." *Hess*, 414 U.S. at 108–09.

In his motions, President Trump largely avoids any real scrutiny of the actual words he spoke or the context in which they were spoken. His tack entails essentially three arguments. First, citing Justice Stevens's dissent in *Morse v. Frederick*, 551 U.S. 393, 442–43 (2007), he contends that Plaintiffs' attempt to fit President Trump's speech in the *Brandenburg* box improperly relies on how its listeners interpreted the speech rather than his actual words. *See Blassingame* Trump Mot. at 25 (citing *Morse*, 551 U.S. at 442–43 (Stevens, J., dissenting) (observing that the distinction between advocacy and incitement "could not depend on how" others understood speech; to hold otherwise would leave "'the speaker . . . wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning'" (quoting *Thomas v. Collins*, 323 U.S. 516, 535 (1945)))). The court has no quarrel with the proposition that an incitement-speech inquiry cannot turn on the subjective reaction of the listener. *See Nwanguma v. Trump*, 903 F.3d 604, 613 (6th Cir. 2018) ("It is the words used by the speaker that must be the focus of the incitement inquiry, not how they may be heard by a listener.").[32] In conducting the inquiry above the court assiduously avoided relying on any allegations that Plaintiffs made about any person's reaction to the President's January 6 Rally Speech. (And, Plaintiffs did make such allegations. *See, e.g.*, *Thompson* Compl. ¶¶ 88, 122; *Blassingame* Compl. ¶¶ 61, 93.) The court's conclusion rests on the words spoken and their context, including the audience to whom the President spoke and when he spoke to them.

---

[32] The court takes no position on whether the subjective reaction of a listener might have *some* relevance to the inquiry.

Next, the President focuses on the fact that when he first alluded to marching to the Capitol, he said he expected rally-goers "to peacefully and patriotically make your voices heard." *Blassingame* Trump Mot. at 25. Those words are a factor favoring the President. *See Nwanguma*, 903 F.3d at 611–12 (holding that the allegation that candidate Trump's repetition of the words "get 'em out of here," directed at protesters attending a campaign rally, were inciting words was "undercut[]" by the accompanying words "don't hurt 'em"). That is why the court recited those words in summarizing his Speech. But the President's passing reference to "peaceful[] and patriotic[]" protest cannot inoculate him against the conclusion that his exhortation, made nearly an hour later, to "fight like hell" immediately before sending rally-goers to the Capitol, within the context of the larger Speech and circumstances, was not protected expression.

Finally, President Trump plays a game of what-aboutism, citing fiery speeches from Democratic legislators, including Plaintiff Waters, which he says likewise would not be protected speech if the court were to find, as it has, that the President's is not. *Thompson* Trump Reply at 8, 11–13. The court does not find such comparators useful. Each case must be evaluated on its own merits, as the court has done above. If the President's larger point is that a speaker only in the rarest of circumstances should be held liable for political speech, the court agrees. *Cf. Bible Believers*, 805 F.3d at 244 (observing in a case involving religious expression that "[i]t is not an easy task to find that speech rises to such a dangerous level that it can be deemed incitement to riot"). That is why the court determines, as discussed below, that Giuliani's and Trump Jr.'s words are protected speech. But what is lacking in their words is present in the President's: an implicit call for imminent violence or lawlessness. He called for thousands "to fight like hell" immediately before directing an unpermitted march to the Capitol, where the targets of their ire were at work, knowing that militia groups and others among the crowd were prone to violence. *Brandenburg*'s

96

imminence requirement is stringent, and so finding the President's words here inciting will not lower the already high bar protecting political speech.[33]

*       *       *

The nineteenth century English philosopher John Stuart Mill was a fierce advocate of free speech.  But Mill understood that not all speech should be protected.  In his work *On Liberty*, Mill wrote, "No one pretends that actions should be as free as opinions.  On the contrary, even opinions lose their immunity, when the circumstances in which they are expressed are such as to constitute their expression a positive instigation to some mischievous act."  JOHN STUART MILL, ON LIBERTY 100 (London, John W. Parker & Son, 2d ed. 1859).  As an example Mill offered the following:

> An opinion that corn-dealers are starvers of the poor, or that private property is robbery, ought to be unmolested when simply circulated through the press, but may justly incur punishment when delivered orally to an excited mob assembled before the house of a corn-dealer, or when handed about among the same mob in the form of a placard.

*Id.* at 100–01.  President Trump's January 6 Rally Speech was akin to telling an excited mob that corn-dealers starve the poor in front of the corn-dealer's home.  He invited his supporters to Washington, D.C., after telling them for months that corrupt and spineless politicians were to blame for stealing an election *from them*; retold that narrative when thousands of them assembled on the Ellipse; and directed them to march on the Capitol building—the metaphorical corn-dealer's house—where those very politicians were at work to certify an election that he had lost.  The

---

[33] President Trump additionally has argued that, if the court were to hold that he could be potentially liable under § 1985(1) for his speech, such an interpretation would raise overbreadth and void-for-vagueness concerns.  *Thompson* Trump Mot. at 21–22.  But such challenges make little sense, as the President cannot seriously contend that § 1985(1) either sweeps in too much protected speech (an overbreadth challenge) or does not provide fair notice of what it prohibits (void for vagueness).  In any event, the President does not develop either argument, devoting only a half-page to them.  *See id.*  The court therefore declines to address them any more than it has. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

Speech plausibly was, as Mill put it, a "positive instigation of a mischievous act." Dismissal of Plaintiffs' claims on First Amendment grounds is not warranted.

###### e.  Giuliani and Trump Jr.

As the court already has said, it finds that Giuliani's and Trump Jr.'s words spoken before and on January 6th are protected expression. None of their words, explicitly or implicitly, rose to the level of a call for imminent use of violence or lawless action. That is true even of Giuliani saying, "Let's have trial by combat." That statement was made in the context of his assertion that the election was rife with criminal fraud, and that he was "willing to stake "[his] reputation," and the President would too, "on the fact we're going to find criminality." But Giuliani never said anything about where or when the "trial by combat" would occur. Giuliani's statement is therefore, at most, "advocacy of illegal action at some indefinite future time." *Hess*, 414 U.S. at 108. The "trial by combat" line is surely provocative, but it is not unprotected speech. *See Claiborne Hardware*, 458 U.S. at 928 (holding that where "spontaneous and emotional appeals for unity and action in a common cause . . . . do not incite lawless action, they must be regarded as protected speech").

Accordingly, the court dismisses all federal and District of Columbia–law claims brought by Swalwell and the Bass Plaintiffs against Giuliani and Trump Jr.

###### f.  Oath Keepers

The Oath Keepers also contend that the § 1985(1) claim against them must be dismissed because their alleged acts were protected speech, assembly, and petitioning. *Thompson* Oath Keepers Mot. at 27–28. The court quickly dispenses with this argument. "The First Amendment does not protect violence." *Claiborne Hardware*, 458 U.S. at 916. The Oath Keepers are alleged to have acted violently by breaching the Capitol building, "with the rest of the riotous mob,"

wearing "paramilitary equipment, helmets, reinforced vests and clothing with Oath Keepers paraphernalia, moving in a regimented manner as members of the military are trained." *Thompson* Compl. ¶ 126. Such actions, if true, are not entitled to First Amendment protection.

The court also notes that, if the court were to dismiss the § 1985(1) claim against the Oath Keepers for failing to overcome a First Amendment defense, Plaintiffs could easily cure any deficiency through amendment. "The security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government." *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716 (1931). The court can take judicial notice that ten members of the Oath Keepers, including its leader Stewart Rhodes, have been charged with seditious conspiracy. *See Thompson v. Linda & A., Inc.*, 779 F. Supp. 2d 139, 144 n.2 (D.D.C. 2011) ("The Court may take judicial notice of public records like docket sheets and other court documents."); Indictment, *United States v. Rhodes*, No. 22-cr-15 (APM) (D.D.C.), ECF No. 1. There is no First Amendment protection for such alleged conduct.

### F.    District of Columbia–law claims

What remains to address are President Trump's motions to dismiss the District of Columbia–law claims asserted by Swalwell and the *Blassingame* Plaintiffs. (Recall, the Bass Plaintiffs advance only a single federal claim under § 1985(1).) The court considers these arguments solely as to President Trump because the court already has dismissed those claims brought by Swalwell against Giuliani and Trump Jr. on First Amendment grounds. The court takes up the District of Columbia–law claims in the order in which they appear in Swalwell's Complaint, followed by any unique claims asserted by the *Blassingame* Plaintiffs. The court will note in the header when the claims overlap.

      1.     *Negligence Per Se Based on Violation of District of Columbia Criminal Statutes (*Swalwell *Counts 3 and 4 and* Blassingame *Counts 4 and 5*)

Swalwell and the *Blassingame* Plaintiffs advance two similar claims, which Swalwell styles as "Negligence *Per Se*" and the *Blassingame* Plaintiffs style as "Violation of Public Safety Statute." *Swalwell* Compl. at 50–51; *Blassingame* Compl. at 40–41. The court understands these claims to advance a theory under District of Columbia law that violations of criminal statutes can create civil liability. *See Marusa v. District of Columbia*, 484 F.2d 828, 834 (D.C. Cir. 1973) (setting forth "guidelines for determining whether violation of a criminal statute can create civil liability"). The court will refer to these as Plaintiffs' "negligence per se" claims.[34] Here, Swalwell and the *Blassingame* Plaintiffs seek to predicate liability on alleged violations of D.C. Code § 22-1322, which prohibits inciting of a riot, and D.C. Code § 22-1321, which prohibits acts of disorderly conduct.

At oral argument, the court expressed skepticism that the negligence per se counts state claims under District of Columbia law. *See* Hr'g Tr., at 180–90. But the court's skepticism is nowhere matched by an argument in President Trump's motions to dismiss. The court has searched in vain for a contention that these claims must be dismissed because a violation of the referenced criminal statutes fails to state a cause of action. The President's motions do not address this theory of liability generally or Plaintiffs' negligence per se claims specifically, let alone advance the concerns the court raised during oral argument. *See Swalwell* Trump Motion at 32–37; *Blassingame* Trump Motion at 33–41. The closest the President's brief comes to addressing these claims is when he argues that President Trump owed no duty to Swalwell, *see Swalwell* Trump

---

[34] The court recognizes that calling these claims "negligence per se" is a bit of a misnomer because both depend on knowing and willful violations of the criminal law. Nevertheless, District of Columbia law does recognize that violations of certain types of criminal statutes may give rise to civil liability under the rubric of "negligence *per se*" if the statute is intended to promote safety. *See McCracken v. Walls-Kaufman*, 717 A.2d 346, 354 (D.C. 1998).

Mot. at 33–34, but that argument is not made in the context of negligence per se law.[35]   The President briefly addresses the anti-riot and disorderly conduct laws, but his argument is that those statutes do not reach political speech.   *Blassingame* Trump Mot. at 33.   But the court already has held that the President's January 6 Rally Speech was not protected expression.

Ultimately, notwithstanding the court's expressed doubts about the validity of the negligence per se claims, it is not the court's job to raise arguments that a party has not. Accordingly, the negligence per se counts survive the motions to dismiss.

### 2.   *District of Columbia Anti-Bias Statute (*Swalwell *Count 5)*

Swalwell also puts forth a claim under the District of Columbia anti-bias statute, D.C. Code § 22-3704.   That statute provides a civil cause of action for, as relevant here, "any person who incurs injury to his or her person or property as a result of an intentional act that demonstrates an accused's prejudice based on the actual or perceived . . . political affiliation of a victim of the subject designated act," "[i]rrespective of any criminal prosecution or result of a criminal prosecution."   The statute defines "designated act" to mean a "criminal act, including . . . assault . . . and . . . inciting . . . assault."   D.C. Code § 22-3701(2).   Swalwell alleges that President Trump committed these crimes and that they were "motivated by [Swalwell's] political affiliation as a political opponent of Donald Trump."   *Swalwell* Compl. ¶ 210.

The court expressed doubt at oral argument that prejudice based on "affiliation as a political opponent of Donald Trump" qualifies as "political affiliation" for purposes of the District of Columbia anti-bias law.   *See* Hr'g Tr., 190–91.   The term "affiliation" is undefined in the statute; its ordinary meaning is "the state of belonging to a particular religious or political group."

---

[35] District of Columbia law seems to recognize that a qualifying public-safety criminal statute itself may create a duty, in some cases to the public at large.   *See, e.g.*, *Zhou v. Jennifer Mall Restaurant, Inc.*, 534 A.2d 1268, 1275 (D.C. 1987) (holding that violation of statute that imposes criminal sanctions on tavern keepers for serving intoxicated patrons created a duty extending to the general public).

*Affiliation*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary
/affiliation (last visited Feb. 10, 2022).  Opposing the President of the United States would not
seem to fit that definition.  But President Trump does not make this argument.  *See Swalwell* Trump
Mot. at 35–36.  So, the court declines to dismiss on that ground.

President Trump advances two other arguments.  First, he contends that Swalwell's anti-
bias claim fails "for all the reasons discussed elsewhere, especially since, incredibly, he alleges the
use of political language he finds offensive gives rise not only to a cause of action but an actual
crime."  *Id.*  To the extent the court already has rejected arguments made "elsewhere," it rejects
them here, again.  As for President Trump's contention that offensive political language cannot
give rise to an anti-bias cause of action, that mischaracterizes what the statute says and what
Swalwell pleads.  The statute does not make political speech a crime or actionable.  Rather, it
provides a cause of action for the victim of a crime that is motivated by bias.  Here, Swalwell
alleges that he was the victim of a criminal assault or incitement of an assault that was motivated
by his "political affiliation."  *Swalwell* Compl. ¶¶ 209–214.[36]  The claim therefore cannot be
dismissed on the ground that the statute makes offensive political speech unlawful.

Second, President Trump argues that the statute only allows for recovery for injury to an
individual's "person or property," D.C. Code § 22-3704, and that Swalwell only seeks recovery
"for psychological or emotional harm," which is "fatal to his bias claim."  *Id.* at 35–36.  But that
argument goes nowhere because the anti-bias law expressly permits recovery of "[a]ctual or
nominal damages for economic or non-economic loss, including damages for emotional distress."

---

[36] In his reply brief, President Trump recharacterizes Swalwell's anti-bias claim as alleging that because the President
committed "all of the other torts" alleged in the Complaint and "because he committed these torts with prejudice,
President Trump is liable under § 22-3704."  Reply in Supp. of Defs. Trump & Trump Jr.'s Mot. to Dismiss, ECF No.
44 [hereinafter *Swalwell* Trump Reply], at 29.  But that is not what Swalwell has alleged, nor what the statute permits
as a ground for recovery.  The "designated act" must be "a criminal act," not a mere tort, D.C. Code § 22-3701(2),
and Swalwell accuses the President of predicate criminal, not tortious, acts, *Swalwell* Compl. ¶¶ 213–214.

D.C. Code § 22-3704(a)(2).[37]  Swalwell therefore can proceed with his claim under the District of Columbia anti-bias law.

> 3.   *Intentional and Negligent Infliction of Emotional Distress (*Swalwell *Counts 6 and 7)*

Swalwell asserts a claim of intentional infliction of emotional distress (IIED) and an additional claim of negligence infliction of emotional distress (NIED).  To state a claim for IIED, a plaintiff must allege "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff [to suffer] severe emotional distress." *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163 (D.C. 2013).  To state a claim for NIED, a plaintiff must plead that (1) the defendant acted negligently, (2) the plaintiff suffered either a physical impact or was within the 'zone of danger' of the defendant's actions, and (3) the plaintiff suffered emotional distress that was "serious and verifiable." *Wright v. United States*, 963 F. Supp. 7, 18 (D.D.C. 1997) (quoting *Jones v. Howard Univ., Inc.*, 589 A.2d 419, 424 (D.C. 1991)).[38] President Trump argues that Swalwell's pleading falls short on the first and third elements on both claims.  *Swalwell* Trump Mot. at 36–37.  The court agrees as to the third element of both claims.

"Severe emotional distress" for purposes of a IIED claim is a high bar.  It "requires a showing beyond mere 'mental anguish and stress' and must be 'of so acute a nature that harmful physical consequences are likely to result.'"  *Competitive Enterprise v. Mann*, 150 A.3d 1213, 1261 (D.C. 2016).  "Serious and verifiable" distress for an NIED claim is a lower bar, but it must manifest in some concrete way, such as "by an external condition or by symptoms clearly

---

[37] In the penultimate line of his reply brief, President Trump asserts: "Even still, calling someone a radical left Democrat does not amount to prejudice."  *Swalwell* Trump Reply at 29.  This seems to be an argument challenging the sufficiency of Swalwell's pleading of the element of prejudice.  Because it is raised for the first time in the reply brief in a single, unadorned sentence, the court declines to consider it.

[38] The District of Columbia Court of Appeals has moved away from the physical "zone of danger" requirement for some NIED claims, but that exception is limited to cases in which the defendant had a relationship with the plaintiff, or had undertaken obligations to the plaintiff, of a nature that necessarily implicates the plaintiff's well-being. *See Sibley v. St. Albans Sch.*, 134 A.3d 789, 798 (D.C. 2016).  That line of cases obviously is not implicated here.

indicative of a resultant pathological, physiological, or mental state." *Jones v. Howard Univ., Inc.*, 589 A.2d 419, 424 (D.C. 1991) (emphasis omitted). Swalwell's pleading meets neither of these standards. His pleading is largely conclusory. *Swalwell* Compl. ¶ 223 (alleging that "Defendants' actions caused severe emotional distress"); *id.* ¶ 226 (alleging that "plaintiff suffered severe emotional distress"). Swalwell does, however, describe his thoughts and emotions when he was in the House chamber, heard rioters pounding on the door and smashing glass to enter, and saw Capitol police draw their weapons and barricade the entrances. *Id.* ¶ 224. He states that, during these events, he texted his wife, "I love you very much. And our babies." *Id.* ¶ 225. The court does not minimize the trauma and shock Swalwell felt on January 6th, but his pleading simply does not meet the high bar for either an IIED or NIED claim. Those counts will be dismissed.

Before moving to the next claim, the court notes that the *Blassingame* Plaintiffs also brought an IIED claim (Count 3). They have voluntarily dismissed that claim. *Blassingame* Pls.' Opp'n at 32 n.12. That count will be dismissed without prejudice.

        4.   *Aiding and Abetting Common Law Assault* (Swalwell *Count 8 and* Blassingame *Count 2)*

Next, the court takes up Plaintiffs' common law assault claims based on an aiding-and-abetting theory of liability. *Swalwell* Compl. ¶¶ 237–252; *Blassingame* Compl. ¶¶ 163–168. President Trump's motion in *Swalwell* does not separately address the aiding-and-abetting-assault claim, but he extensively addresses it in his *Blassingame* motion. *See generally Swalwell* Trump Mot.; *Blassingame* Trump Mot. at 33–40. The court will exercise its discretion and consider those arguments in both cases.[39]

---

[39] President Trump contends for the first time in his *Swalwell* reply brief that aiding and abetting a tort is not a recognized cause of action under District of Columbia law. *Swalwell* Trump Reply at 25–26. That argument comes too late, and the court declines to consider it.

*Halberstam v. Welch* remains the high-water mark of the D.C. Circuit's explanation of aiding-and-abetting liability. The court there articulated two particular principles pertinent to this case. It observed that "the fact of encouragement was enough to create joint liability" under an aiding-and-abetting theory, but "[m]ere presence . . . would not be sufficient." 705 F.2d at 481. It also said that "[s]uggestive words may also be enough to create joint liability when they plant the seeds of action and are spoken by a person in an apparent position of authority." *Id.* at 481–82. A "position of authority" gives a "suggestion extra weight." *Id.* at 482.

Applying those principles here, Plaintiffs have plausibly pleaded a common law claim of assault based on an aiding-and-abetting theory of liability. A focus just on the January 6 Rally Speech—without discounting Plaintiffs' other allegations—gets Plaintiffs there at this stage. President Trump's January 6 Speech is alleged to have included "suggestive words" that "plant[ed] the seeds of action" and were "spoken by a person in an apparent position of authority." He was not "merely present." Additionally, Plaintiffs have plausibly established that had the President not urged rally-goers to march to the Capitol, an assault on the Capitol building would not have occurred, at least not on the scale that it did. That is enough to make out a theory of aiding-and-abetting liability at the pleadings stage.

President Trump urges the court to scrutinize Plaintiffs' aiding-and-abetting theory under the five factors set forth in the Restatement (Second) of Torts § 876(b), as cited in *Halberstam*. *Blassingame* Trump Mot. at 36–37. The five Restatement factors are (1) the nature of the act encouraged, (2) the amount and kind of assistance given, (3) the defendant's absence or presence at the time of the tort, (4) his relation to the tortious actor, and (5) the defendant's state of mind. The *Halberstam* court also considered as an additional, sixth factor the duration of the assistance

105

provided. *Halberstam*, 705 F.2d at 484. Evaluating Plaintiffs' theory under these six factors only supports the plausibility of President Trump's liability as an aider and abettor.

*Nature of the act encouraged.* The nature of the act here—violent and lawless conduct at the Capitol incited by President Trump's Rally Speech—supports a finding that President Trump "substantial[ly]" contributed to the underlying tort. *Halberstam*, 705 F.2d at 484. President Trump contends that this factor favors him because he admonished the crowd to "be peaceful, well before any violence was conducted by anyone listening to the speech," thus attenuating the "temporal connection" between his words and the tortious act. *Blassingame* Trump Mot. at 36. But that contention ignores the President's later words encouraging the crowd, "We fight. We fight like hell and if you don't fight like hell, you're not going to have a country anymore," occurring only moments before he sent rally-goers on a march to the Capitol ("So let's walk down Pennsylvania Avenue").

*Amount and kind of assistance given.* The court in *Halberstam* observed that this was a "significant factor," using as an illustration a case in which the aider and abettor through his words had "sparked" the action. 705 F.2d at 484. That is precisely what is alleged to have happened here. President Trump resists this view, arguing he "was not even present at the time of the conduct, nor did he provide any equipment, information, or any other kind of assistance." *Blassingame* Trump Mot. at 37–38. This, however, ignores Plaintiffs' theory, which the court has found plausible, that the President's words at the rally sparked what followed.

*Presence at the time of the tort.* For the reasons already discussed, the fact President Trump was not at the Capitol itself does not allow him to avoid potential aiding-and-abetting liability. *See Halberstam*, 705 F.2d at 484 (noting that presence is not a requirement); *id.* at 488 (finding liability even though the defendant was not present at the time of the assisted act).

<div align="center">106</div>

*Relation to the tortfeasor*.   *Halberstam* says that an aider and abettor's "position of authority len[ds] greater force to his power of suggestion." *Id.* at 484.  The application of that factor here requires little discussion.  The President nevertheless pushes back, asserting that because the tortfeasors were not known to the President, this factor cuts in his favor. *Blassingame* Trump Mot. at 37.  Leaving aside that Plaintiffs have pleaded that the President did *know* about organized militia groups, *Halberstam* makes clear that the aider and abettor need not have a personal relationship with the tortfeasor to be in a position of authority. *Halberstam*, 705 F.2d at 484 (citing *Cobb v. Indian Springs, Inc.*, 522 S.W.2d 383 (Ark. 1975) (finding aiding-and-abetting liability where a security guard urged a young driver with a new car to give the car a high-speed test run that injured a bystander)).

*State of mind.*   As to this factor, the court has found that Plaintiffs have plausibly alleged that the President was of one mind with organized groups and others to participate in violent and unlawful acts to impede the Certification.  Thus, this factor is supported by more than, as the President contends, his alleged pleasure in watching news coverage of the events as they unfolded at the Capitol building. *Blassingame* Trump Mot. at 37.

*Duration of the assistance provided.*   The *Halberstam* court considered an additional, sixth factor, the duration of the assistance provided.  This factor also weighs against President Trump.  True, the Rally Speech itself was relatively short in duration, but the invitation for the Rally came two weeks earlier.  The duration is longer still if the court considers his tweets prior to that invitation.  Importantly, even President Trump admits that his "sporadic tweets and speeches" present a "stronger argument" for "conspiracy" liability. *Id.* at 37–38.  That duration also supports aiding-and-abetting liability.

Accordingly, the court holds that Swalwell and the *Blassingame* Plaintiffs have stated a claim for common law assault based on an aiding-and-abetting theory of liability.

### 5.    *Negligence (*Swalwell *Count 9)*

The last of Swalwell's claims is negligence.  Swalwell alleges that "[i]n directing a crowd of thousands to march on the Capitol—particularly considering their violence-laden commands—the Defendants owed a duty of care to the Plaintiff and to everyone in the Capitol to exercise reasonable care in directing the mob's actions."  *Swalwell* Compl. ¶ 255.  He further contends that President Trump breached that duty by, among other things, urging rally-goers to "fight like hell." *Id.* ¶ 257.  Thus, under Swalwell's negligence claim, the President's lack of care with his words caused others to riot, resulting in his injuries.  Importantly, such a theory is analytically distinct from the theory that underlies Swalwell's § 1985(1) and aiding-and-abetting theories, which rest on the President's *intentional* use of words to encourage violence or lawlessness.  *See Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 916 (D.C. Cir. 2015) (observing that "intent and negligence are regarded as mutually exclusive grounds for liability" (alterations omitted) (quoting *District of Columbia v. Chinn*, 839 A.2d 701, 706 (D.C. 2003))).

When, as here, a plaintiff seeks to hold a defendant liable for negligence for injuries resulting from intervening criminal acts, "heightened foreseeability factors directly into the duty analysis because a defendant is only liable for the intervening criminal acts of another if the criminal act is so foreseeable that a duty arises to guard against it."  *Bd. of Trustees of Univ. of D.C. v. DiSalvo*, 974 A.2d 868, 871 (D.C. 2009) (internal quotation marks omitted).  The crux of heightened foreseeability is a showing of the defendant's "increased awareness of the danger of a *particular criminal act*."  *Id.* at 872 (emphasis added).  "It is not sufficient to establish a general possibility that the crime would occur, because . . . the mere possibility of crime is easily

envisioned and heightened foreseeability requires more precision." *Id.* at 872–73. Such precision involves, "if not awareness of the precise risk, close similarity in nature or temporal and spatial proximity to the crime at issue." *Id.* at 874. Thus, for example, in *DiSalvo*, the D.C. Court of Appeals said that, to establish a duty, the plaintiff "had to establish that [the university] had an increased awareness of the risk of a violent, armed assault in the parking garage." *Id.* at 872. Similarly, in *Sigmund v. Starwood Urban Retail VI, LLC*, to establish a duty, the D.C. Circuit demanded proof of similar crimes in a case in which the plaintiff was injured by a pipe bomb in his building's garage. 617 F.3d 512, 516 (D.C. Cir. 2010).

Accordingly, to establish that President Trump had a duty to Swalwell to take care of the words he used in the Rally Speech, Swalwell must plead facts establishing that the President had an increased awareness of a risk of a violent assault at the Capitol. Not surprisingly, he does not meet this demanding standard. He therefore cannot advance a theory of negligence liability based on the theory that the President's lack of care in selecting his words caused his injuries. His only viable theory is to show that President Trump acted intentionally, which he has sufficiently pleaded.

### 6.    *The* Blassingame *Plaintiffs' Additional "Claims"*

The *Blassingame* Plaintiffs advance three counts not asserted by Swalwell: (1) directing assault and battery (Count 1); (2) punitive damages (Count 6); and (3) civil conspiracy (Count 8). As to the first of these unique "claims," the court does not understand the difference, in this case, between "directing" an assault and aiding and abetting one. They seem one and the same. Nevertheless, the court will not dismiss Count 1; Plaintiffs may be able to clarify and refine this claim through discovery. Count 6—punitive damages—is not a freestanding claim, but a type of damages, so it is dismissed, without prejudice to seeking such damages, if liability is established

and if appropriate.  And, Count 8—civil conspiracy—is "not independently actionable" under District of Columbia law; rather, it is a "means for establishing vicarious liability."  *See Halberstam*, 705 F.2d at 479.  Count 8 is therefore dismissed, without prejudice to seeking to use civil conspiracy as a theory of vicarious liability.

### G.    Brooks's Motion for Westfall Act Certification

At long last, the court arrives at the final matter before it:  Brooks's request for certification under the Westfall Act.  Under that Act, if the Attorney General certifies that a federal employee "was acting within the scope of his office or employment at the time of the incident out of which [a] claim arose," the employee shall be dismissed from the action and the United States substituted as the defendant.  28 U.S.C. § 2679(d)(1).  Such certification and substitution do not, however, extend to an action brought against an employee for a "violation of a statute of the United States under which such action against an individual is otherwise authorized."  *Id.* § 2679(b)(2)(B).  In this matter, the Attorney General refused to certify that Brooks was acting within the scope of his office, i.e., in his legislative capacity, when he gave his speech at the January 6 Rally.  U.S. Resp. to Brooks at 1.  The congressman nevertheless asks the court to make the requisite certification as to Swalwell's tort claims.  28 U.S.C. § 2679(d)(3) (authorizing courts to certify a defendant-employee's acts as within the scope of office or employment).

The court need not grapple with this issue.  A dispute over certification under the Westfall Act does not appear to be a question regarding the court's subject matter jurisdiction, so the court is not required to consider it before the merits.  The court instead invites Brooks to file a motion to dismiss for failure to state a claim.  The court is prepared to grant such motion for the same reasons it dismisses all claims against Giuliani and Trump Jr.:  Brooks's remarks on January 6th were political speech protected by the First Amendment for which he cannot be subject to liability.

## IV.    CONCLUSION AND ORDER

For the foregoing reasons, the court holds as follows with respect to each of the three actions:

*Thompson v. Trump.*  Giuliani's motion to dismiss is granted and the motions to dismiss of President Trump, the Oath Keepers, and Tarrio are denied.

*Swalwell v. Trump.*  The motions to dismiss of Trump Jr. and Giuliani are granted as to all claims.  The motion to dismiss as to President Trump is denied as to:

> (1) the § 1985(1) claim (Count 1)

> (2) the negligence per se claims (Counts 3 and 4)

> (3) violation of the District of Columbia's anti-bias law (Count 5), and

> (4) aiding and abetting assault (Count 8)

and granted as to:

> (5) the § 1986 claim (Count 2)

> (6) intentional infliction of emotional distress (Count 6)

> (7) negligent infliction of emotional (Count 7) distress, and

> (8) negligence (Count 9).

The court defers ruling on Brooks's Westfall Act certification petition and instead invites him to file a motion to dismiss, which the court will grant.

*Blassingame v. Trump.*  President Trump's motion to dismiss is denied as to:

> (1) the § 1985(1) claim (Count 7)

> (2) directing/aiding and abetting assault (Counts 1 and 2)

> (3) violations of public safety statutes (i.e, negligence per se) (Counts 4 and 5)

and granted as to:

111

(4)  intentional infliction of emotional distress (Count 3)

(5)  punitive damages (Count 6)

(6)  civil conspiracy in violation of common law (Count 8).

Dated:  February 18, 2022

_____
Amit P. Mehta
United States District Court Judge

112

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BENNIE G. THOMPSON, ET AL.,            )
                                       )
          Plaintiffs,                  )
                                       )    CV No. 21-400
     vs.                               )    Washington, D.C.
                                       )    January 10, 2022
DONALD J. TRUMP, ET AL.,               )    1:09 p.m.
                                       )
          Defendants.                  )
_____)
                                       )
ERIC SWALWELL, ET AL.,                 )
                                       )
          Plaintiffs,                  )
                                       )
     vs.                               )    CV No. 21-586
                                       )
DONALD J. TRUMP, ET AL.,               )
                                       )
          Defendants.                  )
_____)
                                       )
JAMES BLESSINGER, ET AL.,              )
                                       )
          Plaintiffs,                  )
                                       )
     vs.                               )
                                       )    CV No. 21-858
DONALD J. TRUMP, ET AL.,               )
                                       )
          Defendants.                  )
_____)


TRANSCRIPT OF ORAL ARGUMENT VIA ZOOM PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

```
For the
Thompson Plaintiffs:              Joseph M. Sellers
                                  COHEN MILSTEIN
                                  SELLERS & TOLL PLLC
                                  1100 New York Avenue, NW
                                  Suite 500 East Tower
                                  Washington, D.C. 20005
                                  (202) 408-4604
                                  Email:
                                  jsellers@cohenmilstein.com

For the
Swalwell Plaintiffs:              Philip C. Andonian
                                  CALEB ANDONIAN PLLC
                                  1100 H Street, NW
                                  Suite 315
                                  Washington, D.C. 20005
                                  (202) 953-9850
                                  Email: phil@calebandonian.com

                                  William Bullock Pittard, IV
                                  KAISER DILLON, PLLC
                                  1099 14th Street
                                  Suite 800 West
                                  Washington, D.C. 20005
                                  (202) 640-2850
                                  Email:
                                  wpittard@kaiserdillon.com

For the
Blassingame Plaintiffs:           Patrick A. Malone
                                  PATRICK MALONE & ASSOCIATES,
                                  P.C.
                                  1310 L Street, NW
                                  Suite 800
                                  Washington, D.C. 20005
                                  (202) 742-1500
                                  Email:
                                  pmalone@patrickmalonelaw.com
```

```
APPEARANCES CONTINUED:

For Defendant
Donald J. Trump:              Jesse R Binnall
                             BINNALL LAW GROUP
                             717 King Street
                             Suite 200
                             Alexandria, VA 22314
                             (703) 888-1943
                             Email: jesse@binnall.com


For Defendant
Rudolph W. Giuliani:          Joseph D. Sibley, IV
                             CAMARA & SIBLEY LLP
                             1108 Lavaca St
                             Suite 110263
                             Austin, TX 78701
                             (713) 966-6789
                             Email: sibley@camarasibley.com


For Defendant
Enrique Tarrio:               John Daniel Hull, IV
                             HULL MCGUIRE PC
                             1420 N Street, NW
                             Washington, D.C. 20005
                             (202) 429-6520
                             Email: jdhull@hullmcguire.com


For Defendant
Oath Keepers:                 Jonathon Alden Moseley
                             JONATHON MOSELEY
                             ATTORNEY AT LAW
                             5765-F Burke Centre Parkway
                             #337
                             Burke, VA 22015
                             (703) 656-1230
                             Email: contact@jonmoseley.com
```

APPEARANCES CONTINUED:

For Defendant
Representative Mo Brooks:        Pro Se
                                Representative Mo Brooks
                                1000 New Jersey Avenue, SE
                                Unit 1208
                                Washington, D.C. 20003


For Non-Party Respondent
United States of America:       Brian M. Boynton
                                DOJ-CIV
                                950 Pennsylvania Avenue NW
                                Washington, D.C. 20530
                                (202) 514-4015
                                Email:
                                brian.m.boynton@usdoj.gov


Court Reporter:                 William P. Zaremba
                                Registered Merit Reporter
                                Certified Realtime Reporter
                                Official Court Reporter
                                E. Barrett Prettyman CH
                                333 Constitution Avenue, NW
                                Washington, D.C. 20001
                                (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

```
 1                     P R O C E E D I N G S
 2          COURTROOM DEPUTY:  Good afternoon, Your Honor.
 3          THE COURT:  Good afternoon.
 4          COURTROOM DEPUTY:  This is an oral argument for
 5   Civil Action 21-400, Bennie G. Thompson, et al., versus
 6   Donald J. Trump, et al; Civil Action 21-586, Eric Swalwell,
 7   et al., versus Donald J. Trump, et al.; and Civil Action
 8   21-CV-858, James Blessinger, et al., versus Donald J. Trump.
 9               Joseph Sellers for the Thompson Plaintiffs.
10               Philip Andonian and William Pittard for the
11   Swalwell Plaintiffs.
12               And Patrick Malone for the Blassingame Plaintiffs.
13               Jesse Binnall for Defendant Trump.
14               Joseph Sibley for Defendant Giuliani; John Hull
15   for Defendant Tarrio; Jonathon Moseley for the Oath Keepers
16   Defendants.
17               Representative Mo Brooks as a pro se litigant.
18               And Brian Boynton for the DOJ for Non-Party
19   Respondent United States of America.
20          THE COURT:  Okay.
21               Good afternoon, everybody, and welcome to our
22   virtual courtroom.  I hope everybody is safe and healthy and
23   your families are doing well in this new year.
24               We've got a fair amount to cover this afternoon.
25   So I just want to raise one preliminary issue, and that
```

1    concerns Mr. Moseley and the Oath Keepers' motion.

2              I know, Mr. Moseley, you've recently entered your

3    appearance in the case; there's a pending motion on behalf

4    of the Oath Keepers.  If you want to make argument today,

5    you're certainly free to do so on appropriate issues that

6    pertain to your client.

7              I was intending to take that motion under

8    consideration after today's hearing, so I wanted to just

9    make you aware that you're certainly invited to make

10   argument on behalf of your client, okay?

11             MR. MOSELEY:  Thank you, Your Honor.

12             I expect other counsel to overlap very

13   effectively, so we'll see.

14             THE COURT:  Okay.

15             All right.  So I issued an order last week that

16   laid out the order in which we'll take up the issues this

17   afternoon; there are a number of them.  And I've tried to

18   apportion some time to each of those, and I'll try and stick

19   to that as much as possible.

20             So why don't we go ahead and get started.  And

21   we'll begin on the presidential immunity and Article III

22   standing questions, and why don't we begin.

23             And if there's counsel who will be speaking on

24   behalf of a particular topic on behalf of all the parties on

25   one side, please just let me know that; otherwise, what I'll

```
 1   do is -- if that happens, what I'll do is then turn to the
 2   other lawyers and ask if they'd like to add anything at the
 3   end of that particular presentation.
 4          So why don't we begin with Mr. Binnall and hear
 5   first from him on the presidential immunity issue.
 6          MR. BINNALL:  May it please the Court.
 7          Jesse Binnall on behalf of President Trump.
 8   And I also represent Donald Trump, Jr., in the case brought
 9   by Congressman Swalwell.
10          Your Honor, as a preliminary matter, I would like
11   to reserve four minutes on this issue for rebuttal, if that
12   would be allowed.  And I think that should be easy on this
13   one because I think we're the only defendants that this
14   particular argument applies to.
15          THE COURT:  That's fine, Mr. Binnall.  Go ahead.
16          We don't have -- I'm not keeping a formal clock
17   here, so you'll have an opportunity for rebuttal.
18          MR. BINNALL:  Thank you very much, Your Honor.
19          Your Honor, these cases should be dismissed
20   because they never should have been brought in the first
21   place.  The complaints themselves are devoid of any legal
22   basis.  Instead, they're chock-full of propaganda that's
23   meant to achieve a political rather than a legal objective.
24          On January 6th, President Trump spoke to Americans
25   gathered by the Ellipse, and his message was clear:
```

```
1   Those gathered would peacefully and patriotically make their
2   voices heard.
3           But that unequivocal statement was ignored in all
4   the pleadings that have been brought by the plaintiffs in
5   these cases.  Instead, they want the Court to disregard
6   firmly entrenched precedent regarding bedrock constitutional
7   principles involving separation of powers and freedom of
8   speech, among others.
9           And the congressional Democrat plaintiffs are
10  hoping that this Court will help them score points against a
11  political rival at the expense of the Constitution.  That is
12  an invitation that this Court should firmly reject.
13          THE COURT:  Can we turn, Mr. Binnall, to the
14  actual legal issues, rather than framing this in rhetorical
15  terms.
16          Let me just start with what is the test under
17  Nixon v. -- under Nixon, presidential immunity, I assume you
18  agree, is limited to official acts, correct?
19          MR. BINNALL:  Presidential immunity, it's -- the
20  phrase used is not "official acts," it's everything within
21  the outer perimeters of the responsibilities of the
22  presidency.
23          THE COURT:  Right.
24          MR. BINNALL:  And I say that because, official
25  acts is something that, for instance, is used in qualified
```

```
 1  immunity analyses.
 2            THE COURT:  Right.  That's fair.
 3            And the Supreme Court adopts a functional test for
 4  purposes of determining what's within the outer perimeter.
 5  So I think the question to you is, how is the -- how are the
 6  allegations in this complaint, how do they fall within the
 7  outer perimeter under that functional test?  What function
 8  was President Trump performing by virtue of the various
 9  Tweets that are identified in the complaint, and his -- most
10  importantly, the speech that he made on January 6th?
11            Are you still there, Mr. Binnall?
12            There you are.
13            MR. BINNALL:  I am, Your Honor.
14            Can you hear me okay?
15            THE COURT:  I can, yes.
16            MR. BINNALL:  Okay.
17            THE COURT:  My view switched for a moment.
18            MR. BINNALL:  Yes, sir.
19            Your Honor, a couple things.
20            First of all, the test was actually described as
21  much broader.  And matter of fact, in the *Fitzgerald* case,
22  the respondents in that case argued for a functional
23  approach that was similar to qualified immunity, and the
24  Court specifically rejected a functional approach, and
25  instead they said it's very broad.  And the language the
```

1    Court used in *Fitzgerald* made clear that it was very broad.

2            So to the Court's question about how these really

3    fall within the outer perimeter of the presidency, first

4    off, this has to be a content-neutral analysis.  This is not

5    an analysis where you can really look at the words that are

6    spoken in order to determine whether this is falling within

7    the outer perimeter or not.  If that was, it would be more

8    akin to the qualified-immunity approach that the *Fitzgerald*

9    courts are citing.

10            THE COURT:  But you would have me ignore what

11    he said in its entirety to determine whether it falls within

12    his presidential functions or not?

13            MR. BINNALL:  Yes, sir.

14            What I would have you do for presidential immunity

15    is I would have you look at the type of act that was being

16    conducted.

17            So, for instance, speaking to the American people.

18    Giving a speech is something that Presidents do using the

19    bully pulpit.  Bully pulpit is, I believe, a phrase that

20    President Theodore Roosevelt came up and is something that

21    has been repeated since then, and giving speeches --

22            THE COURT:  So a content-neutral review, in your

23    view, would require me to find presidential immunity for any

24    presidential statement made to the American people even if

25    it has nothing to do with the Office of the President and

1    the duties of the President?

2            MR. BINNALL:  That's right.

3            And let me give you some examples of that,

4    Your Honor, is that why it can't just be limited to

5    something that we say Presidents are actively involved in,

6    such as, for instance, signing or vetoing legislation.

7            Recently, President Biden has spoken about the use

8    of the legislative filibuster.  The legislative filibuster

9    has nothing to do with the presidency, but that's very

10   typical.

11          THE COURT:  No, no, I understand.  But those are

12   more core legislative than government function type

13   speeches.

14          But the plaintiffs' position is that the words

15   that were spoken on January the 6th had nothing to do with

16   the Office of the President, had everything to do with

17   President Trump's capacity as a candidate for office.

18   So why is that wrong?

19          I guess the question -- let me first ask:  Do you

20   agree that statements made by a President in his capacity as

21   a candidate would fall outside absolute immunity?

22          MR. BINNALL:  Not necessarily, Your Honor.

23          But there's an important point here.

24          As the plaintiffs --

25          THE COURT:  Well, hang on.

1          When you say "not necessarily," help me

2   understand -- tell me where you think the line is supposed

3   to be drawn.

4          MR. BINNALL:  Sure.

5          THE COURT:  Say the President is making a campaign

6   speech, pure campaign speech, current President, all

7   Presidents do it, is that something that is subject to and

8   enjoys presidential immunity?

9          MR. BINNALL:  Generally it would, Your Honor.

10          And let me use this as an example.

11          Let's say the President is running for re-election

12   and gives a State of the Union Address, and then the

13   president, as Presidents typically do, hit the trail after

14   that State of the Union Address and say many of those same

15   things on the -- as part of their campaign.  Just because

16   the President is no longer in front of Congress advocating

17   policies but is advocating policies as part of a campaign,

18   that in no way limits the fact that the President --

19          THE COURT:  But isn't that contrary -- that kind

20   of analysis contrary to what the Supreme Court has said,

21   which is that context matters when we're thinking about

22   immunity issues and the impact it's going to have on the

23   function of the presidency?

24          I mean, to say that a speech before Congress is

25   equivalent to a campaign trail stump speech seems to me to

```
 1    not be consistent with what the Supreme Court has said what
 2    we ought to be thinking about in terms of the scope of
 3    immunity.
 4           MR. BINNALL:  What the Supreme Court said is that
 5    it is -- that presidential immunity is intentionally broad
 6    and it reaches all the way to anything that is within that
 7    outer perimeter.
 8           And it's important to note that the arguments that
 9    are brought up in this case by the plaintiffs are the
10    same -- are functionally the same as by the respondents in
11    the Fitzgerald case that we're trying to argue for some
12    level of qualified immunity, and that's not the direction
13    that --
14           THE COURT:  Well, look, I would agree with you --
15    to the extent they're suggesting I ought to probe the
16    President's motives, I would agree that that seems to be
17    inappropriate under Fitzgerald.
18           Let me ask you, you know, there are other
19    allegations in this complaint.  So, for example, President--
20    filed lawsuits after November the 3rd.  Would the filing of
21    those lawsuits, in your view, be within the function of the
22    Presidency and subject to immunity?  Let's leave aside the
23    immunity that exists for filing lawsuits, but would you say
24    that he's absolutely immune as President for filing those
25    lawsuits?
```

1          MR. BINNALL:  I would say yes, Your Honor, for a

2     couple reasons.

3          First of all, after November 3rd, as the

4     plaintiffs in these cases have pointed out, the campaign is

5     over.  At that point -- and it's important to note that the

6     January 6th rally is in no way related to the campaign; that

7     the campaign doesn't pay it for it; the campaign is not

8     involved with it at all.

9          THE COURT:  That's not true; I mean, at least not

10    according to the allegations.

11          The allegations are that the campaign both

12    contributed money to the January 6th rally and helped

13    organize it, which I have to take as true.  And I don't know

14    whether it's true or not, but that's certainly an

15    allegation.

16          MR. BINNALL:  And there is the 12(b) standard,

17    Your Honor, that I do understand.  It's a little bit

18    possibly different between a 12(b)(6) and what we're looking

19    at here.

20          That being said, I don't think we need to squall

21    over that fact, because, at this stage, you certainly are

22    assuming that these facts as pled are operative, although

23    I don't think they can make those allegations pursuant to

24    the pleading requirements in Rule 11, because it's just not

25    true.

1          That being said --

2          THE COURT:  Can I ask you another question, sir?

3          How about a different act that's alleged in the

4  complaint?

5          The President is alleged to have picked up the

6  phone and called a state official in the state of Georgia

7  after November 3rd and urged that official to scrutinize the

8  election results in Georgia.  That's a very generic way of

9  describing what was said.

10          In your view, does he enjoy presidential immunity,

11  does he enjoy absolute impunity for that act?

12          MR. BINNALL:  Yes, sir, he does.

13          THE COURT:  On what basis?

14          How is he carrying out the function of the

15  presidency by calling a state official and asking a state

16  official to scrutinize state election -- how a state

17  election -- excuse me, an election was carried out by a

18  state?

19          MR. BINNALL:  Your Honor, one of the core

20  constitutional responsibilities of the President is to see

21  that the laws are faithfully executed.

22          THE COURT:  They're not state laws.  They're not

23  state laws.

24          MR. BINNALL:  I'm getting there.

25          THE COURT:  Okay.

1          MR. BINNALL:  When you start to get into the

2     selection of electors, and then pursuant to the election

3     clause of the Constitution, there's this merger of state

4     officials, where they're doing both a federal function and a

5     state function.  And so you're not able to say, in that way,

6     Your Honor, that, well, he's just trying to talk about a

7     state issue.  So that's the first issue, is that because the

8     selection of federal electors is federal in nature, it's

9     still part of his take-care duties.

10          But, you know, more importantly, again, this is

11     part of the general duties of the President to speak, you

12     know, freely and frankly on matters of public concern, as

13     Presidents going all the way back to President Washington

14     have done.

15          And what the Supreme Court makes clear is we

16     are -- in the *Fitzgerald* case, they didn't remove remedies.

17     There are remedies for dealing with something that if

18     members of Congress as these very members of Congress that

19     are in this case right now did.  Every single one of them

20     took advantage of the remedy they had, and they voted for

21     articles of impeachment.  Now, that attempt failed.  Again,

22     President Trump was acquitted.  But that was their remedy.

23     They don't get another bite at the apple here on these

24     questions.

25          THE COURT:  Can I ask:  Is there anything in your

```
 1    view that a President could say or do in his capacity as a
 2    candidate that would not receive immunity?
 3            MR. BINNALL:  Your Honor, for "say," I cannot
 4    think of an example.
 5            For "do," let me give you an example of something
 6    that may very well that I've thought of not be subject to
 7    presidential immunity is, let's say that the President is
 8    acting as an agent of a campaign and signs a lease for an
 9    office.  That's just for the campaign.  That action -- and
10    it's fair for the campaign of just signing a lease -- may
11    very well.
12            You know, although there has -- to my knowledge,
13    never been an example of someone successfully being able to
14    sue a President for something that happened during his term
15    of office, that is something that theoretically would be in
16    a different footing from where we are now and would be a
17    different analysis.
18            But by and large, that absolute immunity of the
19    presidency is very important.  It arises from the same place
20    that -- the same concepts as judicial immunity and
21    prosecutorial acts of immunity come from.
22            And you don't take and start looking at degrees
23    for how much someone might be upset at the actions of a
24    President, any more than you would at how much someone might
25    be upset at the actions of a judge or a prosecutor.  If a
```

```
1   Judge makes a decision on bond and someone gets out and runs
2   over pedestrians like we saw happen in Wisconsin recently,
3   as much as that might infuriate people, judges have to be
4   free to make the right decision in their discretion and not
5   be afraid of civil litigation.  So we can't open up
6   Pandora's box.
7          THE COURT:  So say if I would -- say
8   hypothetically I were to conclude -- or I were to be of the
9   view that the plaintiffs had made out a case of civil
10  conspiracy under 1985(1) in this case, and, two, that the
11  President's speech on January the 6th was not protected
12  activity under the First Amendment because it, at least at
13  this stage plausibly, meets *Brandenburg*, in your view, is
14  that still -- he still would be entitled to absolute
15  immunity even if those two pleading standards had been met
16  for those two particular issues?
17         MR. BINNALL:  Yes, sir, Your Honor.
18         Of course, this is a threshold issue, it has to be
19  decided first and is independent of those questions.  And,
20  of course, we disagree with the premise.
21         But under that hypothetical, Your Honor, it would
22  most certainly still be barred by presidential immunity
23  because of the fact that you cannot take and dive that
24  deeply, as they would have the Court do, as to saying, well,
25  this particular speech is not part of the duties because of
```

 1   what issues he was speaking on and advocating.

 2          The President has been very clear that he was

 3   there at the Ellipse on January 6th as President.  And in

 4   that case, he was advocating for Congress to take or not

 5   take certain actions.

 6          And when a President is speaking about

 7   congressional action, that is something -- we're not at the

 8   outer perimeters here, we are dead center on immunity,

 9   because a President always has the authority to speak about

10   whether or not any of the other branches, frankly, can or

11   should take action.

12          You know, there's the famous example of -- at his

13   State of the Union address of President Obama commenting

14   about a Supreme Court case, the *Citizens United* case.  Now,

15   that's not, again, something that he has direct involvement

16   in, but it is very normal for Presidents to comment and urge

17   action for the co-equal branches of government.

18          And that is exactly what was happening here, is

19   the President was saying that -- was discussing action that

20   was to be before Congress, and that is, again, dead center

21   on the responsibilities of the presidency.

22          THE COURT:  And you take that view even though the

23   President and the Executive Branch has no formal role in the

24   Electoral College votes either by constitutional or statute?

25          MR. BINNALL:  Yes, sir.

```
 1              That is not part of the test is whether that's

 2    part -- because if that were part of the test, it would

 3    substantially narrow the immunity of the President.  So if a

 4    President was to show up at a rally advocating for the Equal

 5    Rights Amendment, passage of the Equal Rights Amendment,

 6    then that speech ostensibly would not be protected by

 7    immunity if that was the test that the Court is discussing

 8    would be the law because --

 9              THE COURT:  And in your view, if the President

10    made a defamatory statement at a campaign rally, that would

11    be also -- at a campaign rally, he makes a defamatory

12    statement, in your view, he would be absolutely immune from

13    suit from such a statement?

14              MR. BINNALL:  Yes, sir.

15              And it's very much the case that when serving as

16    President, Presidents are expected and required to answer,

17    for instance, allegations against them and to make other

18    statements.

19              And when you are President, under the Fitzgerald

20    case, all those issues are such that you would not be

21    subject to being sued civilly.  There are other remedies

22    available but being sued civilly.

23              And the Fitzgerald case is, I think --

24              THE COURT:  Is there anything the President would

25    say, could say, in your view, while President -- because I'm
```

```
1   trying to figure out where the line would be drawn in your
2   view -- is there anything a President could say while
3   President of the United States that could subject him to
4   civil suit?
5           MR. BINNALL:  As far as what the President could
6   say, Your Honor, I've tried to think of examples, and
7   I cannot come up with an example of something that the
8   President says as President that would not be covered by
9   executive privilege, although, like I mentioned before, it's
10  possible that something related, for instance -- you know,
11  the clearest example of something that would not be within
12  the outer perimeters might be a mortgage on a home that was
13  bought clearly before someone was President, and so if the
14  President takes and says something, it would be actionable
15  only relating to that particular mortgage, then perhaps,
16  maybe that would survive a lawsuit being outside of the
17  outer perimeter of the President's duties.
18          But that is a -- even then, it's a purposefully
19  hard row to hoe, because the duties of the President are
20  all-encompassing when that person holds the office.
21          You know, for that term of office, what a
22  President does is constantly part of being the sole person
23  responsible for the Executive Branch of government.  And so
24  it must be broad in order to -- executive immunity must be
25  broad, and it must be other remedies other than civil
```

```
 1    litigation that are used if somebody thinks that a President
 2    needs to be held to account.
 3              THE COURT:  Okay.
 4              Mr. Binnall, one more question but not about
 5    presidential immunity but about Article III standing.
 6              I thought I understood you to suggest in your
 7    papers that none of the plaintiffs here in any of the three
 8    cases have asserted Article III standing.
 9              Do I misunderstand your argument?
10              MR. BINNALL:  Your Honor, I think what we -- I'm
11    trying to remember exactly that statement, and I think
12    there's a couple points:
13              First of all, you have the concreteness
14    Article III standard issue that is simply missing here.
15    And then there is the political question doctrine, which is
16    largely overlapping the presidential immunity question.
17              So we do not --
18              THE COURT:  So let's stick with concreteness,
19    because I don't think the political question doctrine sort
20    of -- at least in terms of the three standing requirements,
21    I'm not sure how it would play in there.
22              But just sticking with concreteness, so is it your
23    view that emotional injury -- well, let's put it backwards:
24    Certainly physical injury, in your view, constitutes
25    concrete injury.  Would you agree with that?
```

```
 1              MR. BINNALL:  If it's caused by the actions of

 2    another, yes.

 3              THE COURT:  Right.  Okay.

 4              And then what about emotional injury, which

 5    everyone has alleged here, that, at a minimum, everybody's

 6    alleged some emotional injury?

 7              MR. BINNALL:  No.

 8              And I think that there's somewhat of a spectrum

 9    here.  But, for instance, Plaintiff Waters was not even on

10    the floor of Congress on January 6th when things were

11    happening that are alleged in this complaint.  And so, you

12    know, certainly for Plaintiff Waters, there's no

13    concreteness of any injury.

14              And further, any other emotional --

15              THE COURT:  Don't I have to assume at this

16    juncture the truth of her allegation that she has suffered

17    emotional injuries?

18              I mean, you may be able to demonstrate after

19    discovery that, in fact, she hasn't had any emotional

20    injuries.  But for purposes of a motion to dismiss, don't

21    I have to assume the truth of her allegation, that she has

22    suffered some emotional injury?

23              MR. BINNALL:  Well, under the 12(b)(1) standard,

24    I would say that the Court is able to look at the

25    reasonableness of that.  And even under 12(b)(6), their
```

```
 1   allegations have to be plausible.

 2           I would say that Plaintiff Waters has not even

 3   come so far as to allege a plausible injury that could

 4   withstand scrutiny under Article III.

 5           And that goes the same for the other -- certainly

 6   the other congressional Democrat plaintiffs as well that

 7   have sued the President, and, on that issue, Donald Trump,

 8   Jr., because of the fact that there is no plausible

 9   allegation that they have a concreteness and any injury that

10   would be caused by anything that either President Trump or

11   Donald Trump, Jr., did.

12           THE COURT:  Okay.

13           All right.  Let me turn then to -- and then I'll

14   give you a few minutes in rebuttal, Mr. Binnall --

15           MR. BINNALL:  Sure.

16           THE COURT:  Let me turn then to counsel for the

17   plaintiffs, and hopefully somebody's going to take the lead

18   on this.

19           MR. SELLERS:  Yes, Your Honor.  It's

20   Joseph Sellers.

21           THE COURT:  Hi, Mr. Sellers.

22           MR. SELLERS:  If it's acceptable to the Court, the

23   arrangement that counsel made for the plaintiffs in the

24   three cases is that I will take the lead on the argument for

25   the first three issues that you've identified, but that one
```

1    or both of my colleagues in the other cases might step in at

2    the very end for one or two issues that are unique to their

3    case, if that's acceptable.

4            THE COURT:  That's fine, Mr. Sellers.

5            MR. SELLERS:  All right.

6            So let me begin with a couple, I think, principles

7    that are virtually impossible to challenge.

8            First of all, the Supreme Court has made clear

9    that the immunity that Mr. Binnall is seeking on behalf of

10   Mr. Trump must be closely related to its purpose, and the

11   purpose is to protect for the discharge of official acts.

12           And, yes, we agree, in reading the *Nixon* case,

13   *Fitzgerald*, that the official acts can extend to the outer

14   perimeter of those duties.  But it's important to recognize,

15   as the Supreme Court observed in the *Clinton v. Jones* case,

16   that the President remains, and I quote, "subject to laws

17   for his purely private actions."  And we contend, for two

18   reasons, that the acts in which Mr. Trump was engaged on

19   January 6th qualify as purely private actions.

20           The Supreme Court has made clear that the duties

21   of the President are conferred by the Constitution and

22   statutes.  And the activities in which Mr. Trump engaged on

23   January 6th, particularly campaigning -- and I'll come back

24   to each of these in a moment -- and fomenting a riot

25   directed at interfering with the functioning of a co-equal

1   branch of government, that neither of those qualify as

2   official actions that even remotely fall within the

3   legitimate duties of the President.

4           Before I speak to those in detail, let me just

5   comment on a few other points that were made.  One is the

6   question of whether the Court should inquire about the

7   content of what was said or what was done.

8           The only way that the Court can assess whether

9   these actions or these remarks fall within those that --

10  categories that are purely private or are arguably within

11  the official duties of the President, is to look at what was

12  said or what was done, not for the purpose of judging and

13  condemning them or judging them and -- I'm assuming

14  Mr. Binnall's argument is they're immune because of the

15  First Amendment.

16          But the Supreme Court in the *Wisconsin* case made

17  the point that -- *Wisconsin v. Mitchell*, that -- in

18  connection with a First Amendment issue -- that speech can

19  still be used as evidence of participation in a particular

20  action -- in their case, it was an unlawful conspiracy --

21  even if it is not actionable in and of itself.

22          In order for the Court to make an assessment of

23  whether Mr. Trump's conduct and his remarks fall within

24  public -- what was it, public duties of the President or

25  purely private acts of the President, you have to make an

 1    assessment of what he was doing.

 2            And merely standing in front of a group of people

 3    and speaking, I mean, he could be promoting treason or some

 4    other thing that goes even beyond what we saw on

 5    January 6th.

 6            And I think the argument that Mr. Binnall has made

 7    is that, as long as he's speaking in front of the public, he

 8    can say whatever he wants and do whatever he wants and he's

 9    still protected.

10            THE COURT:  Let's for a moment -- hang on.

11            For a moment, I want to just be clear, we're

12    talking about immunity from civil suit and not immunity from

13    criminal prosecution.

14            MR. SELLERS:  That is correct.

15            THE COURT:  And I think the Supreme Court has

16    established a broader immunity from civil prosecution, from

17    civil suit than it has from criminal prosecution.  The Court

18    has said that with respect to criminal prosecution, a

19    President can't be criminally prosecuted during the course

20    of his term of presidency, but can be prosecuted afterwards.

21    However, with respect to civil suits, they've said that the

22    President is absolutely immune for any action taken in his

23    capacity within the outer perimeter of the presidential

24    duties.

25            And so Mr. Binnall's point is, look, this is

```
1    President of the United States, he is speaking on a matter
2    of public concern, that is, the integrity of the election,
3    and so the President has the duty to -- or has the authority
4    or it's within his capacity to speak to the American public
5    on matters of American public concern.
6              So why isn't that something that is squarely
7    something to which he enjoys immunity?
8              MR. SELLERS:  Your Honor, because what he spoke
9    about was a campaign issue seeking to secure his
10   re-election.
11             If he were simply speaking about election
12   integrity, for instance, he could have done that without
13   talking, as he did, and we allege, saying all Mike Pence has
14   to do is send the election back to the states and we win.
15             Now, those are not remarks associated with calling
16   attention to election integrity.  I can quote, as you know,
17   a whole slew of other allegations in our complaint, which --
18   of a similar nature that go to the heart of Mr. Trump's
19   efforts to secure his re-election by means of having the
20   electoral-votes count suspended in order to give him an
21   opportunity to do a re-do.  That is not --
22             THE COURT:  I'm sorry, Mr. Sellers, but shouldn't
23   I, as Mr. Binnall has suggested, take a broader view of
24   this?
25             Yes, it's true that undoubtedly a motive of his
```

1    statements was to secure a result that would get him

2    re-elected or have him stay in office.

3         But Mr. Binnall makes the point that, look, there

4    was congressional action being taken on January the 6th, the

5    President has a right and the ability to try and influence

6    that congressional action.  It's within the scope of his

7    authority, whether it's legislation or in this case counting

8    of the Electoral College vote, to try and influence an

9    outcome of a congressional action.

10        So why isn't that the right way to think about

11   this?  If you think about it in that way, that seems to me

12   to be within the outer perimeters, well within the outer

13   perimeters of a President's duties.

14        MR. SELLERS:  Well, for a couple reasons,

15   Your Honor.

16        First of all, as I think you may have observed by

17   questions you asked earlier, the President has no legitimate

18   role in the counting of the electoral ballots.  The 12th

19   Amendment and the statutes that apply entrust that

20   responsibility to the Vice President in counting it before

21   Congress.  There's no legitimate, lawful role for the

22   President in connection with that.

23        And there's clearly no -- I'm moving now to my

24   second argument here, but is no legitimate role absolutely

25   for fomenting an insurrection directed Congress.  And the

1    complaint, we think, ably and plausibly alleges in many

2    respects that this -- that Mr. Trump dispatched a crowd that

3    he assembled, directed them away from the Ellipse,

4    notwithstanding that their permit only permitted them to

5    remain there, told them to go to the Capitol, fight like

6    hell, that they can't re-take the country in a position of

7    weakness.

8            And then, of course, after he saw that they were

9    engaged in breaking into the Capitol, instead of trying to

10   calm them, he retweeted his incendiary remarks from the

11   rally before.

12           THE COURT:  But, Mr. Sellers, can I ask -- I mean,

13   aren't you asking me to do what the Court said was not

14   proper and look into the motives of the President for

15   purposes of immunity?

16           In *Fitzgerald*, the issue was, well, what was the

17   real reason that President Nixon fired Fitzgerald?  And

18   Fitzgerald's view was it was because it was retaliation for

19   speech, and the Supreme Court said, look, it's not

20   appropriate to look into the motive for that action.

21           It seems to me you're asking me to look -- at

22   least for purposes -- let's leave aside the question of

23   pleading, but it seems to me you're asking me to look past

24   the words the President used and try to get into his head

25   about what he was intending to do, and based on that,

 1    conclude he's not entitled to immunity.  That seems to me to

 2    be a step too far in the analysis.

 3         MR. SELLERS:  Yeah, I certainly am not suggesting

 4    that you should examine the motivations.

 5         If you look simply at the actions that he took and

 6    that he directed, both with respect to the campaign activity

 7    in which he engaged, which, taken at his word, is about

 8    seeking to secure his re-election.  What his motives were

 9    doesn't matter, I'm simply looking at the words and the

10    actions that he took.  The same is true with what he did in

11    the remarks he delivered, the effect on the crowd, and then

12    the response that he issued after that.

13         Without regard to what his purpose was, those are

14    actions that have to fall outside the scope of the

15    presidency.  By Mr. Binnall's argument, as I said, the

16    President could promote treason in a public forum.  And by

17    Mr. Binnall's argument, the Court would be powerless to

18    assess whether his conduct was protected by -- was immune.

19    That's inconceivable as something that the Supreme Court had

20    in mind when it said that notwithstanding the broad

21    boundaries that are accorded to protection, that the

22    President -- this is, again, in the *Clinton v. Jones* case --

23    is still subject of the laws for his purely private acts.

24         There is an area outside which the Supreme Court

25    has said, construing the *Fitzgerald* case, that the

1   President's actions -- purely private actions still can

2   subject him to suit.  And if these aren't purely private

3   actions, it's hard to conceive of what would be.

4            THE COURT:  So how would you, if you were me and

5   you're a Court sitting trying to determine --

6            MR. SELLERS:  Right.

7            THE COURT:  -- what factors ought to be

8   considered, this is -- we're sort of forging new ground

9   here.

10           MR. SELLERS:  Yes.

11           THE COURT:  Because there are not a lot of civil

12   actions brought against the President for conduct while in

13   office and Supreme Court cases that even address the issue.

14           So how do I make the distinction or how does any

15   judge make a distinction between what is speech in a purely

16   personal capacity, which you say is not subject to immunity,

17   versus that which is within the Presidential capacity, which

18   does enjoy immunity?

19           MR. SELLERS:  Right.

20           Well, let me start with the easier of the two,

21   I think, which is the election activity.

22           We have a whole body of regulatory authority that

23   already exists and is administered -- I'm going to identify

24   some of it for you -- that gives to the Executive Branch and

25   others guidance on how to allocate expenses that are

1    attributable to campaign activity versus official activity,

2    what activities may be permissibly undertaken in areas of

3    the White House.

4            So some examples beside the *Office of Legal*

5    *Counsel* opinion, which was issued in 1984 by then-Assistant

6    Attorney General Ted Olson, which said, "campaigning for

7    specific candidates is a principal example which should be

8    considered political and not part of the duties of the

9    President."  We cite it in our brief, but it's volume 6 of

10   the Office of Legal Counsel opinion, beginning -- that's

11   page 4, from 1984.

12           But there are other examples.

13           So the accounting for appropriated funds, it's

14   clear that appropriated funds can only be used for the

15   discharge of official duties.  So funds that aren't maybe

16   used for political purposes have to be allocated in some

17   kind of private way and can't be used -- appropriated funds

18   can't be used.  The Federal Election Campaign Act

19   distinguishes between expenses for campaigns and

20   non-campaign official activities.

21           And I understand I could give you other examples,

22   but -- none of these are exactly the situation we have here,

23   but I would suggest to the Court that those are indicia of

24   what qualifies under the broad rubric of campaign activity

25   that's been administered for 30 or 40 years.  This is not

```
 1   just something the Court is being asked to fashion out of
 2   whole cloth, and that those can provide ample guidance.
 3            And under any one of those standards, the activity
 4   in which Mr. Trump engaged on January 6th qualifies as
 5   campaign activity.  There's just no way, given the
 6   private -- the campaign contributions to the event, the
 7   manner -- the remarks that he delivered, the lack of any
 8   legitimate legal role that the President had with respect to
 9   overseeing or influencing the counting of the Electoral
10   College ballots, all of those things suggest that this was a
11   purely private act and was campaign activity.
12            The second category of grounds on which to
13   characterize his actions as outside the scope of permissible
14   Presidential duties, I submit that there are cases, and this
15   isn't one of them, where the line is closer; that is, where
16   the President has engaged in something that would be an
17   unlawful action.
18            But I think that it's, again, hard to conceive of.
19   And I think the Court has to accept, for purposes of the
20   complaint, the well-pleaded allegations, that what's been
21   attributed to Mr. Trump is fomenting an insurrection
22   directed at a co-equal branch of government that was
23   either -- purpose or at least had the effect of disrupting
24   the functioning -- lawful function of the government, of the
25   Congress.
```

1          And I understand that this is not to be

2    distinguished from a traffic ticket, this is something that

3    goes way beyond that.  And, again, I'm not contending

4    that --

5          THE COURT:  So where would you have a court draw

6    the line?

7          I mean, again, I go back to where I was.  You

8    know, in *Nixon versus Fitzgerald*, the allegation was that

9    the President had violated a civil statute by firing someone

10   improperly for speech.

11         MR. SELLERS:  Right.

12         THE COURT:  And here, whether you characterize

13   this as fomenting an insurrection or not, the bottom line

14   is, you've alleged the violation of a civil statute.

15         And it doesn't seem to me that we ought to have or

16   there's any basis or it would be very difficult to have a

17   hierarchy of civil statutes that matter versus those that

18   are less significant.

19         And the violation -- alleged violation in

20   *Fitzgerald* was deemed immune.  It's not clear to me why a

21   violation of this statute ought not to be subject to the

22   same analysis.

23         MR. SELLERS:  Right.

24         So there's a simple answer at least as to part of

25   your question, which is that, in the *Fitzgerald* case,

```
 1   President Nixon, while he may have been alleged to have

 2   engaged in some improper conduct, the action he took was

 3   well within the legitimate scope of his duties.

 4           There was no question this was the heart of

 5   Presidential authority; that he can oversee or direct a

 6   personnel action.  That is core Presidential duty.  The fact

 7   that it may have been allegedly undertaken in an

 8   impermissible way doesn't, as I think the Court properly

 9   concluded, remove it from the protection of the normal

10   activities of the President.

11           Campaign activity has never been viewed as within

12   the normal functioning of the President.  And as I said,

13   there's an enormous administrative infrastructure that

14   exists and is administered every year to ensure that

15   Presidential campaigning, other campaigning members of

16   Congress and others all have to abide by various rules

17   distinguishing between their official duties and their

18   campaign activity.  So that's one distinction.

19           The second one, as I said, about fomenting an

20   insurrection is -- I think if this were a closer call,

21   we would be having a harder time with the second point.  But

22   it is -- it's hard to conceive of a scenario, other than the

23   President traveling down to the Capitol himself and busting

24   through the doors and, you know -- and stopping things

25   himself.  But, of course, he did this with third-party
```

1   agents, with the crowd, he did exactly that.

2           I don't see how -- and, again, I realize the Court

3   wants to articulate a standard that's easily administered,

4   and I guess I'm asking the Court to consider that wherever

5   the close-call standard is, this falls well outside it.

6           THE COURT:  Okay.

7           All right.  Thank you, Mr. Sellers.

8           Is there anything -- I don't know whether your

9   colleagues want to add anything.

10          MR. SELLERS:  Do you want me to -- Well, I --

11  okay.

12          I guess they may.

13          And do you want me to talk about Article III

14  standing or I'll come back to that?

15          THE COURT:  If you want to go ahead and address

16  that, why don't you go ahead and address that, and then I'll

17  ask your colleagues if they want to add anything.

18          MR. SELLERS:  Okay.  Thank you.

19          So, first of all, on the issue of Article III

20  standing, I think it is quite clear, as your questions may

21  have reflected, that each of the plaintiffs has alleged a

22  form of harm that is cognizable under the tort laws of this

23  country and that's the statute Section 1985(1), is a tort,

24  at least provides for tort-like remedies.

25          And so whether Mr. Binnall is not impressed or

```
 1    impressed with the nature and extent of harm of any of our
 2    clients, they all pled cognizable injuries that are
 3    concrete, they're specific, and they attribute them to the
 4    conduct that occurred that was precipitated by the actions
 5    of the conspiracy of the defendants.
 6              So that -- but I want to address another issue,
 7    which maybe I'm going too far, but I thought was in the
 8    Court's mind, and that is why the plaintiffs are entitled to
 9    bring this action in their personal capacity, something
10    that, perhaps, is going to be raised by the Oath Keepers.
11              And if you want me to wait to hear their argument
12    first, I'm happy to do that, but I --
13              THE COURT:  No.  Go ahead.  I don't know whether
14    Mr. -- whether counsel for the Oath Keepers intends to make
15    argument or not.
16              MR. SELLERS:  Well, I know it was in their brief,
17    so I thought I should help the Court by at least addressing
18    it.
19              So the point here is that the statute is, unlike
20    the Raines case -- that's R-a-i-n-e-s --
21              THE COURT:  Right.
22              MR. SELLERS:  -- the case that the Supreme Court
23    decided that's in our brief, where the members of Congress
24    sought to challenge the line-item veto and claimed as the
25    injury that the act diminished the value of their votes,
```

```
 1   their power, which was an official act, and the Court found
 2   that they had no standing to do so, the Court made exactly
 3   the distinction we are making here, which is, the members
 4   have -- or our clients were injured because they were
 5   attempting to discharge their official duties, in the course
 6   of which were injured.
 7           And as such, the statute does not seek -- does not
 8   protect them in their discharge of their official duties;
 9   that is, not ensure that they will be guaranteed their
10   ability to discharge their official duties.  What it's
11   intended to do is protect them against harm while they
12   perform their official duties, and that they have
13   Article III standing to pursue.
14           THE COURT:  Okay.  Understood.
15           All right.  Let me turn mack to Mr. Binnall, and
16   I'll give you a few minutes for rebuttal.
17           And I know Mr. Moseley --
18           MR. MOSELEY:  I'm sorry, Your Honor?
19           MR. MALONE:  One second.
20           THE COURT:  Oh, that's right.  I forgot.
21           Mr. Sellers.
22           MR. SELLERS:  I wanted to give my colleagues a
23   chance to say something if they wanted to.  I apologize.
24           THE COURT:  Right.
25           No, that's all right.  I neglected to turn back to
```

 1  them as well.

 2        MR. MALONE:  Your Honor, Patrick Malone for the

 3  Blassingame Plaintiffs.

 4        Just to underscore Mr. Seller's point about what

 5  is a test for private conduct versus conduct within the

 6  scope of the office, my test would be, is this something

 7  that only a President can do as an official act.  That's

 8  clearly what the Court had in mind in the *Fitzgerald* case.

 9  If you are the President of the United States of America,

10  you have the power to fire this guy, whatever your motives

11  are.

12        But in the situation we're in today, the issue is,

13  is the exact same conduct that --

14        THE COURT:  Mr. Malone, you don't mean to suggest

15  that Presidents' immunity authority must be traced back to

16  some constitutional -- or immunity protection, I should say,

17  has to be traceable to some constitutional or statutory

18  authority, do you?  I mean, that can't be right.

19        MR. MALONE:  Well, is it within the scope -- we're

20  struggling with --

21        THE COURT:  Even legislative immunity, for

22  example, isn't so constrained, right?

23        Legislative immunity for congresspeople isn't

24  constrained only to legislative acts or legislative

25  authority that's derived from Constitution; the courts have

```
 1   viewed it more broadly than that.

 2            MR. MALONE:  Sure.

 3            What I was trying to struggle with is the

 4   distinction between private and public -- or personal

 5   conduct versus public conduct.  I think it goes to the issue

 6   of:  Are you acting as a candidate or are you acting as an

 7   officeholder?

 8            What I want to suggest is that let's just assume a

 9   scenario where some other candidate who was not the

10   incumbent officeholder had lost the election and they gave a

11   big speech saying the election's been stolen, I want all of

12   you thousands of people to march to the Capitol and Stop the

13   Steal.  So this is a non-officeholder in this scenario.

14            Are we really saying that if you happen to be the

15   incumbent in office, you are immune from any tortious injury

16   that happens to people who get in the way of the march to

17   the -- on the Capitol to Stop the Steal, where the incumbent

18   would be immune but his adversary, his opponent, would not

19   be immune?  I don't see how that could be.

20            THE COURT:  Okay.

21            Does Mr. Andonian want to add anything?

22            MR. ANDONIAN:  Yes.  Thank you very much,

23   Your Honor.  Just very briefly.  I just want to piggyback on

24   two points that both my colleagues made.

25            With respect to Mr. Binnall's suggestion that a
```

1   President is essentially never going to be liable civilly

2   for anything that they said while in office, I just wanted

3   to remind the Court that we have an example of a President

4   being held liable for words spoken during the presidency,

5   when Bill Clinton when sanctioned for lying under oath about

6   his relationship with Monica Lewinsky.

7           And, in fact, the courts considered that an

8   unofficial act in the sense that he was speaking an untruth,

9   I think admittedly an untruth that was in violation of the

10  Court's discovery order.  So it's not as though -- that

11  Presidents can do nothing or say nothing while they're in

12  office.  That's beyond the reach of the law in some

13  respects.

14          And the second point I want to make, you know,

15  I think everyone has said this but I just want to make sure

16  it's clear on at least on behalf of my client, Congressman

17  Swalwell, the notion that you cannot look at the words at

18  all and it's just -- if a President happens to be uttering

19  words of any kind when that person is in office, that ends

20  the inquiry.  I mean, that clearly is too broad -- just on

21  its face, that's far too broad, that's no standard at all.

22          But if you look at *Nixon*, the idea was, once the

23  Court determined that the core duty there, exercising powers

24  as commander-in-chief over personnel within one of the other

25  branches, once the Court made that determination, that ended

1    the inquiry.

2            The motive behind why Nixon took the action that

3    he did in the context of a clearly established official

4    duty, that was beyond the scope or out of bounds.  We're not

5    asking the Court to do that here.

6            In other words, it doesn't matter what

7    Donald Trump's motives were in saying and doing the things

8    that he did, whether he was trying to overturn the election

9    or whether he was just doing it for sport, and who knows

10   which one it was.

11           But the fact of the matter is, the words he spoke

12   have legal significance, as we pled that.  And the Court has

13   to at least look at the words to determine whether or not

14   the speech is of an official nature or not.

15           Even Mr. Binnall's own examples require some

16   assessment of what was being said, when he referenced

17   President Obama's speech talking about Citizens United, or

18   he referenced examples of the type of speech a President

19   might make on the trail after the State of the Union.  That

20   still at least requires some threshold examination to

21   determine whether or not we're even talking about an

22   official act.  Here, we're just clearly not, for all of the

23   reasons that Mr. Sellers stated.

24           THE COURT:  Thank you, Mr. Andonian.

25           Mr. Binnall, I'll just give you a couple minutes.

1    We're, not surprisingly, already off schedule here, but

2    go ahead.

3              MR. BINNALL:  Thank you, Your Honor.

4              Initially, regarding the function analysis about

5    it being something that, as Counsel Mr. Malone pointed out,

6    tried to assert, rather, that has to be something that only

7    a President can do.

8              Your Honor, as the Court has already pointed out,

9    it can't be the rule that it has to tie back to some sort of

10   constitutional or statutory rule, but it really kind of --

11   it really goes beyond that, Your Honor.  It needs to be

12   something where there is this bright line, that that

13   President knows that there's not these gray areas, because

14   these gray areas --

15             THE COURT:  Why isn't campaigning a bright line?

16             I mean, Mr. Sellers has posited that, look,

17   there's this entire body of law that has been established

18   both by Congress and by regulation that distinguishes

19   between speech and acts in furtherance of official duties

20   than those on a campaign, and you've got to segregate money,

21   you can't use certain federal resources, you cannot have

22   employees of the Federal Government act in certain ways.

23             I mean, why isn't that a bright line here that can

24   be followed in distinguishing between official duties and

25   unofficial duties?  Even the outer perimeter of those

1   official duties of a President.

2          MR. BINNALL:  I think there are three answers to

3   that, Your Honor.

4          And the first is that if it is speech that would

5   otherwise be protected if it was said outside of the

6   campaign but in his normal Presidential duties, then it does

7   not lose its immunity simply because it's said in the

8   context of a campaign.  And I think that's the most

9   important answer to that, is that if he could say that in a

10  State of the Union Address, the same that he could say it in

11  a speech on the campaign trail, then it does not lose its

12  immunity in that case.

13         Because otherwise it would be the exception that

14  would swallow the rule, because so many of the things that a

15  President does during their entire terms of office is

16  something that is political in nature:  Advocating for, you

17  know, not only their own re-election but the election of

18  their political allies as well.

19         And to say, well, this particular speech, it

20  really was going for a political purpose, rather than a

21  Presidential purpose, we would now see an exception that

22  would swallow the rule, it would lead to too much vagueness

23  in the immunity, that is just something that is not workable

24  for the immunity.

25         Second of all, Your Honor, the issue on the

```
 1    campaign hypothetical at the 12(b) -- at the stage of this
 2    that we're at on this important threshold question, they
 3    would have to meet a higher standard than they've met here,
 4    even if that were the rule, to show that this was a campaign
 5    activity, which I've already pointed out they simply cannot
 6    do.
 7              This was not a campaign activity.  Electioneering,
 8    for instance, has a very specific definition in the law.
 9    This wasn't electioneering; this was not something that the
10    campaign was directly involved in.
11              And so even if that were the rule, they would not
12    be able to meet that standard here.  And so to a certain
13    extent, it's a question that the Court need not consider
14    because it's not adequately pled, and it certainly isn't
15    pled to a plausibility standard, because it's readily
16    available information that this was not part of the
17    campaign.
18              And, finally, Your Honor, in that vein -- well,
19    actually, on the second point still, the Fourth Circuit, in
20    a case that we can find is -- has recently held that the
21    campaign was over in November and there were no more
22    campaign activities at that point.
23              And, finally, Your Honor, anything that had to do
24    with the campaign exception would necessarily start to have
25    courts examining the motives of the speaker, and whether the
```

```
 1   motive was such for a political speech or other Presidential
 2   duties, and that's something that was specifically rejected
 3   by the Fitzgerald court.
 4              THE COURT:  Okay.
 5              Mr. Binnall, I'm going to give you 30 more seconds
 6   to make your last point and then we're going to have to move
 7   on to the next topic.
 8              MR. BINNALL:  Yes, sir.  And I understand the time
 9   concerns here.
10              The other thing that I would just say briefly
11   regarding the Clinton matter is that, I believe that the
12   Clinton matter that was just discussed is not Clinton versus
13   Jones, I think it has to do with the regulation of Bar
14   duties, and that is different -- or someone's Bar status,
15   and that's something that is very different from a suit for
16   damages.  And the --
17              THE COURT:  Well, I think -- well, I think what
18   happened is that the Court that oversaw the Clinton v. Jones
19   case sanctioned the President for his testimony, and then
20   the Supreme Court subsequently took Bar action.
21              MR. BINNALL:  Took Bar action, yes.
22              THE COURT:  Okay.
23              MR. BINNALL:  And so that's very different than a
24   suit for damages.
25              And that's something that is more in the lines of,
```

1    Your Honor, what goes back to the *Burr* case, is that a

2    President is still subject to the subpoena power, for

3    instance, and it has to comply with that.  But that's

4    different from being sued for damages for something that

5    occurred during the President's administration.

6            THE COURT:  Thank you, Counsel.

7            Why don't we move on to the next topic, and that

8    is the pleading of the conspiracy count under 1985(1).  And

9    under that, I included the argument that the plaintiffs have

10   made, that these plaintiffs -- excuse me, that the

11   defendants have made that these plaintiffs don't have

12   statutory standing under the statute.

13           So, Mr. Binnall, I assume we'll begin with you, or

14   will one of your colleagues be taking the lead?

15           MR. BINNALL:  Your Honor, actually, I believe

16   Mr. Sibley is going to start this argument.

17           THE COURT:  All right.

18           Mr. Sibley.

19           MR. SIBLEY:  Your Honor, good afternoon.

20           I'm going to let Mr. Binnall handle the standing

21   issue, because that's really something that they've raised.

22   I'm going to talk about the pleading issue.

23           And it really comes down to one element,

24   Your Honor, and that is under Section 1985.  We have a lot

25   of things that we discussed in our motion, but, really, some

```
1            MR. BINNALL:  That is certainly not something that

2     would be actionable in any circumstance.

3            THE COURT:  No, no.

4            My question is, is that sufficient to establish a

5     conspiracy?  Does that establish the meeting of the minds?

6            MR. BINNALL:  No, it does not, Your Honor.

7            THE COURT:  Why not?

8            MR. BINNALL:  It doesn't, because at this point,

9     it doesn't have -- a conspiracy must be to do something --

10    for a meeting of the minds to do something that is otherwise

11    actionable.  And going and -- and you can't have a

12    conspiracy to exercise a constitutional right.

13           And, moreover, if conspiracy is read so broadly as

14    to allow -- I mean, especially for someone that is the

15    President.

16           THE COURT:  So what do I about the fact that --

17    and I proposed this to your colleague -- that the President

18    didn't denounce the conduct immediately.  And, in fact,

19    about 10 minutes in or so, 12 minutes in, sends a tweet that

20    arguably exacerbated things, to the extent anybody saw it

21    who was inside the Capitol.  What do I do about those facts,

22    that he doesn't do anything for about two hours to tell

23    people to stand down and leave the Capitol?

24           MR. BINNALL:  Inaction --

25           THE COURT:  Isn't that, from a plausibility
```

```
 1   standpoint, enough to at least plausibly infer that the
 2   President agreed with the conduct of the people who were
 3   inside the Capitol that day?
 4              MR. BINNALL:  I think there are two answers to
 5   that.
 6              Because, first of all, the answer is, no, you
 7   cannot have a situation where failure to say something is
 8   itself actionable as being part of the conspiracy.  Saying
 9   nothing is not part of the conspiracy.
10              But the other part, and I think this is extremely
11   important, is that -- this ties back into the executive
12   immunity, the Presidential immunity argument, where you
13   cannot put a situation where a President is obligated to
14   take certain actions and say certain things or be subject to
15   litigation and subject to action by the Court.  That's the
16   Court very much at that point being able to invade the
17   province of the executive.
18              So if you were to go with that theory, you would
19   run straight into, in a very, very strong Presidential
20   immunity argument that there's no way around.
21              But even --
22              THE COURT:  So the President, in your view, is
23   both immune for inciting a riot and failing to stop it?
24   At least if that's what the allegations are and to be
25   believed.
```

1          MR. BINNALL:  Of course, this President did none

2     of those things.

3          THE COURT:  I understand.  I understand that's

4     your view.  But as a legal matter.

5          MR. BINNALL:  As a legal matter and at this stage,

6     he did none of those things.

7          THE COURT:  Okay.

8          MR. BINNALL:  But that being said, the President

9     cannot be subject to judicial action of any sort for damages

10    because he failed to do something, failed to act, because

11    that's now the core essentially --

12         THE COURT:  So let me ask it a different way and

13    be clear about how I'm using this allegation or thinking

14    about this allegation --

15         MR. BINNALL:  Right.

16         THE COURT:  -- or how it ought to be thought of.

17         Not being subject to liability for failing to act

18    on its own, but, rather, at this stage, as allegations that

19    would establish the plausibility of a conspiracy; that is, a

20    plausibility of an agreement.

21         I mean, in, for example, in the Charlottesville

22    case, signs -- you know, there were similar allegations

23    against Richard Spencer, organizing -- assistance with

24    organizing the rally, participating in the rally, speaking

25    at the rally, and then not doing anything to stop the

1    violence.  At least the District Court there found all of

2    that sufficient to establish a conspiracy, that he

3    participated in a conspiracy.

4           MR. BINNALL:  And in this case, Your Honor, when

5    you have someone like President Trump who is speaking only

6    about doing peaceful things, only about protesting lawfully,

7    in a very normal sense in political dialogue...

8           And, that's important, Your Honor.  We can't just

9    shrug that off, as the Court put it, whataboutism.  That's

10   not whataboutism at all.  It's about equal application of

11   the law.  It's about making sure that you don't say the law

12   is one thing for Democrats and another thing for Trump

13   supporters.  That cannot be the law, and it would be wrong

14   to look at that.

15          And the simple fact --

16          THE COURT:  Well, it's -- well, why don't we bring

17   this to a close, and I'll just say this:

18          It's not the law.  It's certainly not the law in

19   my courtroom.  And I don't think of this in terms of the

20   party of anybody who's alleged to have behaved in a

21   particular way.  I'm simply trying to apply the law to the

22   facts as they've been alleged here without any passion or

23   prejudice to anyone, okay?

24          MR. BINNALL:  I absolutely appreciate that,

25   Your Honor, that the Court is trying to do that here.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAMES BLASSINGAME & SIDNEY HEMBY,

Plaintiffs,

v.

DONALD J. TRUMP,

Defendant.

**Civil Case No. 1:21-cv-00858 APM**

## NOTICE OF APPEAL

Defendant Donald J. Trump hereby gives notice of his appeal to the United States Court of Appeals for the D.C. Circuit from this Court's Memorandum Opinion and Order entered on February 18, 2022, denying Defendant's Motion to Dismiss, particularly with respect to his defense of Absolute Immunity. (Dkt. No. 37).

Dated: March 18, 2022

Respectfully submitted,

/s/ Jesse R. Binnall
Jesse R. Binnall (VA022)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com

*Counsel for President Donald J. Trump*

**CERTIFICATE OF SERVICE**

I certify that the foregoing was electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will cause a copy to be sent to all counsel of record.

Dated: March 18, 2022                        /s/ Jesse R. Binnall
                                             Jesse R. Binnall

                                             *Counsel for President Donald J. Trump*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ERIC SWALWELL,

  Plaintiff,

    v.

DONALD J. TRUMP,

  Defendant.

**Civil Case No. 1:21-cv-00586 APM**

### NOTICE OF APPEAL

 Defendant Donald J. Trump hereby gives notice of his appeal to the United States Court of Appeals for the D.C. Circuit from this Court's Memorandum Opinion and Order entered on February 18, 2022, denying Defendant's Motion to Dismiss, particularly with respect to his defense of Absolute Immunity.  (Dkt. No. 56).

Dated: March 18, 2022

Respectfully submitted,

/s/ Jesse R. Binnall
Jesse R. Binnall (VA022)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel:  (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com

*Counsel for President Donald J. Trump*

## CERTIFICATE OF SERVICE

I certify that the foregoing was electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will cause a copy to be sent to all counsel of record.

Dated: March 18, 2022                    /s/ Jesse R. Binnall
                                         Jesse R. Binnall

                                         *Counsel for President Donald J. Trump*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BENNIE G. THOMPSON et al.,

  Plaintiffs,

  v.

DONALD J. TRUMP et al.,

  Defendant.

**Civil Case No. 1:21-cv-00400 APM**

## NOTICE OF APPEAL

Defendant Donald J. Trump hereby gives notice of his appeal to the United States Court of Appeals for the D.C. Circuit from this Court's Memorandum Opinion and Order entered on February 18, 2022, denying Defendant's Motion to Dismiss, particularly with respect to his defense of Absolute Immunity. (Dkt. No. 66).

Dated: March 18, 2022

Respectfully submitted,

/s/ Jesse R. Binnall
Jesse R. Binnall (VA022)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com

*Counsel for President Donald J. Trump*

## CERTIFICATE OF SERVICE

I certify that the foregoing was electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will cause a copy to be sent to all counsel of record.

Dated: March 18, 2022                    /s/ Jesse R. Binnall
                                         Jesse R. Binnall

                                         *Counsel for President Donald J. Trump*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

Dated: July 27, 2022                    Respectfully submitted,

                                        /s/ Jesse R. Binnall
                                        Jesse R. Binnall
                                        Molly McCann
                                        BINNALL LAW GROUP, PLLC
                                        717 King Street, Suite 200
                                        Alexandria, VA 22314
                                        Tel: (703) 888-1943
                                        Fax: (703) 888-1930
                                        jesse@binnall.com
                                        molly@binnall.com
                                        *Attorneys for Donald J. Trump*