ORAL ARGUMENT NOT YET SCHEDULED
No. 22-5069
(Consolidated with 22-7030, 22-7031)

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

JAMES BLASSINGAME AND SIDNEY HEMBY,

*Appellees*,

v.

DONALD J. TRUMP,

*Appellant.*

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**BRIEF FOR APPELLANT
DONALD J. TRUMP**

———————————

Jesse R. Binnall
Molly McCann
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com
molly@binnall.com

**COUNSEL FOR PRESIDENT DONALD J. TRUMP**

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

The parties that appeared before the district court and that are before this Court are:

### 1. Defendant-Appellant

President Donald J. Trump

### 2. Current and Former Attorneys for Defendant-Appellant

<u>Current Attorneys:</u>
Jesse R. Binnall,
Molly McCann
Binnall Law Group, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314

<u>Former Attorneys:</u>

None.

### 3. Plaintiffs-Appellees

**a.** *Thompson et al. v. Donald J. Trump,* Case No. 1:21-cv-400 (APM)

Karen R. Bass, in her personal capacity

Stephen I. Cohen, in his personal capacity

Veronica Escobar, in her personal capacity

Pramila Jayapal, in her personal capacity

Henry C. Johnson, Jr., in his personal capacity

Marcia C. Kaptur, in her personal capacity

Barbara J. Lee, in her personal capacity

Jerrold Nadler, in his personal capacity

Maxine Waters, in her personal capacity

Bonnie M. Watson Coleman, in her personal capacity

Bennie G. Thompson, in his personal capacity[1]

**b.** *Blassingame et al. v. Donald J. Trump,* Case No. 1:21-cv-858 (APM)

James Blassingame

Sidney Hemby

**c.** *Swalwell v. Donald J. Trump,* Case No. 1:21-cv-586 (APM)

Eric Swalwell

## 4. Current and Former Attorneys for Plaintiffs-Appellees

**a.** *Thompson et al. v. Donald J. Trump,* Case No. 1:21-cv-400 (APM)

<u>Current Attorneys:</u>

Joseph M. Sellers
Brian Corman

---

[1] On July 20, 2021, Mr. Thompson voluntarily dismissed his claim with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i). *See* Notice of Voluntary Dismissal With Prejudice Pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i) Solely As To Plaintiff Bennie G. Thompson (Dkt. No. 39), *Thompson, et al. v. Donald J. Trump, et al.*, Case No. 1:21-cv-400 (APM) (D.D.C.).

Alison S. Deich
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, N.W.
Suite 500, East Tower
Washington, D.C. 20005


Janette Louard
Anthony P. Ashton
Anna Kathryn Barnes
NAACP
Office of General Counsel
4805 Mount Hope Drive
Baltimore, Maryland 21215


*Attorneys for the Thompson Plaintiffs*

Former Attorneys:

None.

**b.** *Blassingame et al. v. Donald J. Trump,* Case No. 1:21-cv-00858

Current Attorneys:

Patrick A. Malone
Daniel Scialpi
Patrick Malone & Associates, P.C.
1310 L Street, N.W., Suite 800
Washington, D.C. 20005


Genevieve C. Nadeau
United to Protect Democracy
15 Main Street, Suite 312
Watertown, Massachusetts 02472

Kristy L. Parker
United to Protect Democracy
2020 Pennsylvania Avenue, N.W., Suite 163
Washington, D.C. 20006

Former Attorneys:

None.

c. *Swalwell v. Donald J. Trump,* Case No. 1:21-cv-586 (APM)

Current Attorneys:

Barry Coburn
Marc Eisenstein
Coburn & Greenbaum PLLC
1710 Rhode Island Avenue, N.W., 2nd Floor
Washington, D.C. 20036

Matthew Kaiser
Sarah R. Fink
Kaiser Dillon PLLC
1099 14th Street, N.W.
8th Floor West
Washington, D.C. 20005

Phillip Andonian
Caleb Andonian PLLC
1100 H. Street, N.W., Suite 315
Washington, D.C. 20005

Former Attorneys:

None.

## 5. Other Interested Parties (Amici)

Steven A. Hirsch
Nic Marais
Matan Shacham
Keker, Van Nest, & Peters LLP
633 Battery Street
San Francisco, California 94111-1809
*Attorneys for Amicus Curiae Floyd Abrams, Erwin Chemerinsky, Martha Minow, and Laurence H. Tribe*


Paul M. Smith
Adav Noti
Mark P. Gaber
Jonathan Diaz
Hayden Johnson
1101 14th Street, NW, Suite 400
Washington D.C. 20005
*Attorneys for Amicus Curiae Campaign Legal Center Action*


Elizabeth B. Wydra
Brianne J. Gorod
Dayna J. Zolle
Constitutional Accountability Center
1200 18th Street NW, Suite 501
Washington D.C. 20036
*Attorneys for Amicus Curiae Law Professors*


Christine P. Sun
States United Democracy Center
3749 Buchanan Street, No. 475165
San Francisco, California 94147-3103

Jonathan L. Williams

Jonathan L. Williams, P.A.
113 South Monroe Street, First Floor
Tallahassee, Florida 32301
*Attorneys for Amicus Curiae Jared Holt*

## B. Rulings Under Review

The ruling under review is the Order of the U.S. District Court for the District of Columbia (Mehta, J.), docketed February 18, 2022, denying Defendant-Appellant Donald J. Trump's Motion to dismiss. *Thompson v. Trump*, 2022 WL 503384 (D.D.C. 2022); JA 202 – 313.

## C. Related Cases

The Court has *sua sponte* consolidated the related appeals No. 22-5069, 22-7030, and 22-7031. In addition to these three cases, there are five other cases that are based on similar facts in the district courts.

1. *Conrad Smith et al. v. Donald J. Trump et al.,* Case No. 1:21-cv-2265 (APM) (D.D.C.)

2. *Brianna Kirkland v. Donald J. Trump*, Case No. 1:22-cv-34 (APM) (D.D.C.)

3. *Marcus J. Moore v. Donald J. Trump*, Case No. 1:22-cv-10 (APM) (D.D.C.)

4. *Bobby Tabron et al. v. Donald J. Trump*, Case No. 1:22-cv-11 (APM) (D.D.C.)

5. *Michigan Welfare Rights Organization et al. v. Donald J. Trump et al.,* Case No. 1:20-cv-3388 (EGS) (D.D.C).

Defendant-Appellant is not aware of any other related case pending before this Court or any court.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, ........................................ i

AND RELATED CASES ........................................................... i

TABLE OF CONTENTS ...................................................... viii

TABLE OF AUTHORITIES...................................................... x

JURISDICTIONAL STATEMENT........................................... 1

PRELIMINARY STATEMENT ............................................. 1

STATEMENT OF ISSUE PRESENTED .................................. 3

STATEMENT OF THE CASE .............................................. 3

STANDARD OF REVIEW ................................................... 6

SUMMARY OF THE ARGUMENT........................................ 7

ARGUMENT ................................................................... 8

    I.    The District Court erred when it held that President Trump's speech on matters of public concern was not within the scope of his absolute presidential immunity. ............ 10

    II.    The opposing parties were wrong when they argued President Trump's status as a candidate canceled his immunity and that the subject of his public remarks can be questioned if they are upsetting enough to a section of the electorate............................................................ 18

    III.    There is a limiting principle that guards against abuse: Impeachment. ....................................................... 26

    IV.    The district court's construction of the Take Care Clause was unduly narrow and unsupported by the text of the Constitution or historical practice.................................... 27

CONCLUSION & RELIEF SOUGHT .................................................... 32

STATEMENT ON ORAL ARGUMENT ................................................ 33

CERTIFICATE OF COMPLIANCE ...................................................... 34

CERTIFICATE OF SERVICE ............................................................. 34

# TABLE OF AUTHORITIES

## Cases

*Banneker Ventures, LLC v. Graham*,

    798 F.3d 1119 (D.C. Cir. 2015) ............................................. 8, 15, 16, 17

*Bradley v. Fisher*,

    80 U.S. (13 Wall.) 335 (1871) ................................................................. 23

*Clinton v. Jones*,

    520 U.S. 681 (1997) ...................................................................... 8, 12, 13

*Council on Am. Islamic Relations v. Ballenger*,

    444 F.3d 659, 665 (D.C. Cir. 2006) ....................................................... 25

*Cummings v. Dep't of the Navy*,

    279 F.3d 1051, 1053 (D.C. Cir. 2002) ..................................................... 7

*Elder v. Holloway*,

    510 U.S. 510, 516 (1994) ......................................................................... 7

*Imbler v. Pachtman* ,

    424 U.S. 409 (1976) .......................................................................... 23, 24

*Mitchell v. Forsyth*,

    472 U.S. 511, 524–25 (1985) ................................................................... 1

*Nixon v. Fitzgerald,*

　457 U.S. 731, 751 (1982) ................. 2, 8, 9, 10, 12, 14, 15, 17, 18, 24, 26

*Pierson v. Ray,*

　386 U.S. 547, 554 (1982) ................................................................. 9

*Stump v. Sparkman,*

　435 U.S. 349 (1978) ..................................................................... 23

*Trump v. Vance,*

　140 S. Ct. 2412, 2426 (2020) ...................................................... 24

*Wilson v. Libby,*

　535 F.3d 697, 712 (D.C. Cir. 2008) ........................................... 26

*Wuterich v. Murtha,*

　562 F.3d 375, 377 (D.C. Cir. 2009) ........................................... 25

*Youngstown Sheet & Tube Co. v. Sawyer,*

　343 U.S. 579, 587 (1952) ............................................................ 28

## Statutes

18 U.S.C. § 1507 ............................................................................ 21

28 U.S.C. § 1291 .............................................................................. 1

28 U.S.C. § 1331 .............................................................................. 1

42 U.S.C. §1985(1) ........................................................................... 5

# Other Authorities

2 Debates on the Constitution 480 (J. Elliot ed. 1891)............................ 27

Andrew Kent et. al., *Faithful Execution and Article II*, 132 HARV. L. REV. 2111, 2126 (2019).................................................................... 31

Briefing Room, *Remarks by President Biden on the Supreme Court Decision to Overturn Roe v. Wade*, THE WHITE HOUSE (Jun. 24, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/06/24/remarks-by-president-biden-on-the-supreme-court-decision-to-overturn-roe-v-wade/ ................................................. 22

Gillian E. Metzger, *The Constitutional Duty to Supervise*, 124 YALE L.J. 1836, 1878 (2015).................................................................... 31

JEFFREY K. TULIS, THE RHETORICAL PRESIDENCY, 4 (2017)..................... 20

John Yoo, CRISIS AND COMMAND, 165 (2009) ..................................... 20, 21

Oliver Willis, *Biden says draft Supreme Court abortion ruling is a 'radical decision,'* THE AMERICAN INDEPENDENT (May 3, 2022), https://americanindependent.com/abortion-president-joe-biden-supreme-court-draft-decision-dobbs-roe-v-wade-lgbtq-human-rights/21

Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive During the Second Half-Century*, 26 HARV. J.L. & PUB. POL'Y 667, 725 (2003) ...................................................................................................... 31

Ted Cruz, *The Obama Administration's Unprecedented Lawlessness*, 38 Harv. J.L. & Pub. Pol'y 63, 66 – 67 (2015) .......................................... 29

## JURISDICTIONAL STATEMENT

The district court has statutory jurisdiction because the claims present questions arising under federal law. 28 U.S.C. § 1331. This Court has jurisdiction to hear this appeal of a denial of absolute immunity pursuant to 28 U.S.C. § 1291. *Mitchell v. Forsyth*, 472 U.S. 511, 524–25 (1985) (denying absolute immunity is a "decision 'final' within the meaning of § 1291"). The district court entered its order denying absolute immunity on February 18, 2022. The notices of appeal were timely filed on March 18, 2022.

## PRELIMINARY STATEMENT

This appeal requires the adjudication of a simple but important constitutional issue regarding the separation of powers: whether the scope of presidential absolute immunity continues to reach the outer perimeters of presidential responsibilities or whether the immunity can be undercut if the presidential act in question is unpopular among the judiciary. This question has already been answered by the Supreme

Court, which held that the immunity is rooted in constitutional separation of powers, and it is especially important to the President because he deals with matters that are controversial and arouse intense feelings. *Nixon v. Fitzgerald,* 457 U.S. 731, 751 (1982).

It now must be decided again after the district court wrongly denied immunity by looking beyond the activity involved—political statements and discourse by a sitting president during his term of office—and engaging in the very type of content-based analysis of presidential activity that was firmly rejected by the *Fitzgerald* Court. The district court's analysis would open the flood gates; the exception would swallow the rule. Future courts would be free to look to the political context of the presidential act rather than being constrained to look no further than the nature of the act itself. In an increasingly polarized political environment, it is critical that the judiciary draw bright lines that it will not cross regarding overstepping into the regulation of executive function. The underlying factual dispute regarding the January 6, 2021, violence at the Capitol arouses the passions of many Americans, including members of the bench and bar. Consequently, it is especially important to avoid allowing the judicial department to pass judgment on

the political statements and discourse of the President of the United States. The *Fitzgerald* Court met that challenge forty years ago and this Court should follow course.

## STATEMENT OF ISSUE PRESENTED

Whether President Trump is absolutely immune from the claims made in these lawsuits.

## STATEMENT OF THE CASE

The bully pulpit is a well-established aspect of the American presidency. Like his predecessors, Donald J. Trump, the 45th President of the United States, actively engaged with the American people throughout his term of office to advance his agenda. Indeed, agree or disagree with him, President Trump is known for passionate and patriotic discourse that resonated with tens of millions of Americans who felt forgotten by the Washington D.C. political establishment. His discourse, however, is seen as highly controversial among his political rivals.

Following the 2020 election, President Trump, among many others, raised critical questions about the integrity and results of the election in

several states. In the weeks and months after the election, the President and his supporters were engaged in litigation, recounts, and appeals. While these challenges were ongoing, President Trump was actively communicating with his supporters, the country, and the world about the status of the election.

On January 6, 2021, President Trump gave a speech at the Ellipse near the South Lawn of the White House. He sought election integrity and encouraged his supporters to "peacefully and patriotically make their voices heard" to Congress. The actions of rioters do not strip President Trump of immunity. In the run-up to January 6th and on the day itself, President Trump was acting well within the scope of ordinary presidential action when he engaged in open discussion and debate about the integrity of the 2020 election.

Nevertheless, on February 16, 2021, the *Thompson* Plaintiffs brought suit. They amended their complaint on April 7, 2021. Congressman Swalwell filed his lawsuit on March 5, 2021. The *Blassingame* Plaintiffs followed on March 30, 2021, and filed an amended complaint on April 28, 2021. With threadbare allegations, the plaintiffs are trying to establish liability because of the manner in which others

interpretated President Trump's tweet about the rally on January 6, alleging that it was "understood by many of his supporters as a literal call to arms." JA 30. *See generally* JA 95, 155. Plaintiffs brought their actions for damages against President Trump in his personal capacity, alleging—without support—that a sitting President running for re-election acts in his personal capacity when commenting on the results of an election that he believes violated the Constitution and state laws. *Id.* at 24, 34.

President Trump moved to dismiss the claims. *Id.* at 216. On January 10, 2022, the district court held a consolidated oral argument spanning multiple hours. *Id.* at 217. The district court issued its opinion and order on February 18, 2022, dismissing multiple defendants from the cases and dismissing multiple counts against President Trump. *Id.* at 202-313 Ultimately, the only counts that remain against President Trump are: (1) violation of 42 U.S.C. §1985(1) alleged by all plaintiffs; aiding and abetting assault alleged by Congressman Swalwell and the *Blassingame* Plaintiffs; negligence per se alleged by Congressman Swalwell and the *Blassingame* Plaintiffs; and aiding and abetting assault or directing/aiding and abetting assault as alleged by Congressman

5

Swalwell and the *Blassingame* Plaintiffs, respectively. The court denied President Trump's motion to dismiss on absolute immunity grounds as to these claims.

President Trump filed a timely notice of appeal in each case on March 18, 2022, appealing the denial of his motion to dismiss solely on the issue of absolute immunity. *Id.* at 366–372. This Court consolidated the three cases for consideration on March 25, 2022. This appeal focuses on a discreet issue, whether President Trump is entitled to the absolute immunity afforded all sitting Presidents when acting within the outer perimeters of official activity. The district court was wrong to deprive him of this immunity and its decision should be reversed.

## STANDARD OF REVIEW

This appeal concerns legal questions regarding the scope of absolute immunity, which is reviewed *de novo. See Cummings v. Dep't of the Navy,* 279 F.3d 1051, 1053 (D.C. Cir. 2002) (legal questions are reviewed *de novo*). The Supreme Court has required *de novo* review when courts consider whether immunity applies. *See Elder v. Holloway,* 510 U.S. 510, 516 (1994) (considering the application of qualified immunity).

## SUMMARY OF THE ARGUMENT

The single issue before this Court on interlocutory appeal is whether the district court erred when it denied President Donald J. Trump's motion to dismiss the civil suit below based on absolute immunity. It did. The district court acknowledged that speech on matters of public concern falls within the scope of a president's official functions, and it acknowledged that the security of the 2020 election was a matter of public concern. Nevertheless, the court engaged in a fact-intensive inquiry to determine that President Trump's use of his bully pulpit in this case was unprotected by presidential immunity.

This decision is contrary to clear Supreme Court precedent. In *Nixon v. Fitzgerald,* the Court held that a President is wholly immune from civil suit for actions taken within the outer perimeter of his official functions and that probing the motives of a President's actions is intrusive and forbidden. *Fitzgerald*, 457 U.S. at 749, 756.

The district court relied on language from *Clinton v. Jones*—a case about actions President Clinton took *before* he became president—to improperly narrow presidential immunity and construe an opportunity to probe. The district court then used factors developed by this circuit in

7

*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015)—a case addressing the official immunity of a Washington Metropolitan Area Transit Authority director—to determine the proper immunity of a President of the United States.

This appeal is ultimately very simple. President Trump's contested speech was on a matter of critical public concern, a category of activity well within the outer perimeter of a president's official action. The Supreme Court in *Fitzgerald* made clear that when acting in his official capacity, a President of the United States is immune from civil suit. No probing of his motives is permitted. The plaintiffs below are attempting to thwart that immunity; the court below sanctioned their actions. The decision of the district court should be reversed with direction to grant President Trump's motion to dismiss based on controlling Supreme Court law.

## ARGUMENT

It is settled law that the President of the United States is absolutely immune from civil liability for actions "predicated on his official acts." *Fitzgerald*, 457 U.S. at 749. The Supreme Court has stressed that the

President "occupies a unique position in the constitutional scheme," *id.*, and that private lawsuits against the President raise "unique risks to the effective functioning of government." *Id.* at 751. These risks are heightened by the reality—never more true than today—that the President "must concern himself with matters likely to 'arouse the most intense feelings.'" *Id.* at 752 (citing *Pierson v. Ray*, 386 U.S. 547, 554 (1982)). The "sheer prominence of the President's office" and "the effect of his actions on countless people" make the President "an easily identifiable target for suits for civil damages." *Id.* at 752–53. Because "[c]ognizance of this personal vulnerability frequently could distract a President from [his public] duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve," *id.* at 753, the President has "absolute [] immunity from damages liability." *Id.* at 756.

The scope of this absolute immunity is vast. Although the scope is "determined by function, not office," *id.* at 785 (White, J., dissenting), the Court eschewed "functional lines finer than history and reason would support." *Id.* at 755. A strict functional immunity—as advocated by the *Fitzgerald* dissent—was rejected. So long as the President is acting

9

within "the 'outer perimeter' of his official responsibility," *id.* at 756, his immunity applies.

This unique scope is "rooted in the separation of powers under the Constitution." *Id.* at 753 (internal quotation omitted). Courts thus approach the questions that touch on the President's constitutional responsibilities and status with "judicial deference and restraint." *Id.* This means, among other things, that absolute presidential immunity applies without judicial consideration of the President's motives, which would be "highly intrusive." *Id.* at 756.

Here, however, the district court expressed the same concerns as the dissent in *Fitzgerald* and rejected both President Trump's argument that his speech was on matters of public concern and that, if required, he could rely on the Take Care Clause to justify his actions. The district court erred on both points.

## I.     The District Court erred when it held that President Trump's speech on matters of public concern was not within the scope of his absolute presidential immunity.

The district court agreed, as it had to, that "speech is unquestionably a critical function of the presidency," and it agreed that— whatever one's personal opinion about President Trump's position—his

"pre–January 6th tweets and the January 6 Rally Speech addressed matters of public concern." JA 233. The court even acknowledged that "speaking on matters of public concern is a function of the presidency." *Id.* at 234. And indeed, it is.

Unfortunately, the district court then misconstrued two critical cases on presidential immunity. First, it held that even though President Trump's communications were on matters of public concern, that "d[id] not answer the question at hand: Were President Trump's words in this case uttered in performance of official acts, or were his words expressed in some other, unofficial capacity?" *Id.* The district court framed President Trump's argument as a proposed test "that whenever and wherever a President speaks on a matter of public concern he is immune from civil suit" and held such a test "goes too far." *Id.* But that is exactly the expansive immunity to which President Trump is entitled. *Fitzgerald* did not mince words when it held "in the case of [] merely private suit[s] for damages based on a President's official acts, we hold [judicial action] is not" warranted. *Fitzgerald*, 457 U.S. at 754. Any test that would allow the judiciary to dissect presidential speech on matters of public concern so as to determine whether the speech is "official"—especially when the

11

matter at issue involves government action, such as the certification of electors by Congress—would necessarily run afoul of this unambiguous rule.

Instead of adhering to *Fitzgerald*, the district court and the opposing parties relied on *Clinton v. Jones*, 520 U.S. 681 (1997), which is inapposite. In *Clinton*, Paula Jones brought suit against then-President Bill Clinton for an alleged sexual assault that took place while he was governor of Arkansas. *Id.* at 685. The Court held that Clinton's identity as the current President could not shield him from suit for actions that were clearly not official acts of the President—they were actions that took place before he was even elected. *Id.* at 695. ("[T]o construct an immunity from suit for unofficial acts grounded purely in the identity of [the President's] office is unsupported by precedent.").

The district court drew a rule from *Clinton* that is only applicable to a scenario where a president is sued for actions taken before he was in office. President Trump's test, the court incorrectly held, "mirrors what the Supreme Court has said cannot be the basis for absolute immunity: '[T]o construct an immunity from suit for unofficial acts grounded purely

in the identity of [the President's] office is unsupported by precedent.'" JA 234 (citing *Clinton*, 520 U.S. at 695).

The District Court did not recognize this material difference between *Fitzgerald* and *Clinton*. *Clinton* sheds no light on the *scope* of presidential immunity for acts during a President's term in office because the acts complained of took place before Clinton assumed the office. *Fitzgerald*, however, is directly on point.

In *Fitzgerald*, a former employee of the Air Force sued President Nixon after he left office. Fitzgerald alleged that while Nixon was President, he ordered a reorganization and reduction in force to deliberately eliminate Fitzgerald's position in retaliation for damaging testimony Fitzgerald had given to Congress a year earlier. *Fitzgerald*, 457 U.S. at 734. The Court held that absolute immunity was "a functionally mandated incident of the President's unique office," *id.* at 749, and that President Nixon's actions were within the vast scope of his official duties. *Id.* at 756–57.

President Clinton could not invoke immunity from Paula Jones's suit simply by virtue of his then-present status as President, because the alleged assault took place when he was governor of Arkansas; but

13

President Nixon could claim it in *Fitzgerald*, even if the downsizing he ordered was motivated to target Fitzgerald. Nixon was the sitting President doing something Presidents ordinarily do. In the case before the court now, President Trump was the current President speaking on matters of public concern, something presidents ordinarily do. *Fitzgerald* is clear: If the President is acting in his official capacity—such as communicating to the public on matters of public concern—he is absolutely immune from civil suit. Probing his motives and undertaking a fact-intensive inquiry, as the district court did, is "intrusive" and forbidden by *Fitzgerald*. *Id.* at 756. Examining the contents of a tweet or speech constitutes an intrusion on the executive that the Court found would "subject the President to trial on virtually every allegation that an action was unlawful or was taken for a forbidden purpose," and would "deprive absolute immunity of its intended effect." *Id.*

Many of the district court's hypotheticals of untenable conduct by a president while speaking on matters of public concern highlight how its opinion went wrong. It poses the same concerns raised by the heated *dissent* in *Fitzgerald*. 457 U.S. at 765 (White, J., dissenting) ("I find this approach completely unacceptable. I do not agree that if the Office of

14

President is to operate effectively, the holder of that Office must be permitted, without fear of liability and regardless of the function he is performing, deliberately to inflict injury on others by conduct that he knows violates the law."). The disagreement on what the law *should* be is clear. But the district court is bound to apply the law as it *is*.

Instead, the court tried an end-run around *Fitzgerald* by paying lip service to its mandates while applying the dissent's view of strict functional analysis via a test developed in *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015), a case about the immunity of a director of a public agency. JA 237 ("[T]he better course is to evaluate the defense on the specific facts alleged and, based on those facts, determine whether President Trump's words were spoken *in furtherance* of a presidential function.") (emphasis added).

In *Graham*, a property developer brought multiple tort claims against a director of the Washington Metropolitan Area Transit Authority, alleging, among other things, tortious interference and civil conspiracy in relation to a contract the developer was seeking with the agency. *Graham*, 798 F.3d at 1128. The district court dismissed the claims against Graham on the grounds of official immunity. This circuit

15

reversed, holding that the district court had analyzed the question of immunity at "too high a level of generality," and should have "analyz[ed] each challenged act." *Graham*, 798 F.3d at 1141.

Here, the district court acknowledged that "this case involves the President" and "not a board member of a public agency," but held that nevertheless, "*Graham*'s basic approach applies; that is, in evaluating a presidential claim of absolute immunity the court must consider the relationship of the challenged conduct to the claimed corresponding function of the President." JA 238.

By proceeding in this manner, the district court has either ignored or flouted the reasoning in *Fitzgerald*; this is the exact type of probing that *Fitzgerald* held would be highly intrusive and therefore rejected. First, the radically different offices—public agency official and President of the United States—should have alerted the court it was on the wrong track. *Fitzgerald* pointed to the important and unique role the President plays in our constitutional system, *Fitzgerald*, 457 U.S. at 749, and the "singular importance of the President's duties." *Id.* at 751. It differentiated him in importance even from other senior executive officials. *Id.* at 750.

Second, the *Graham* factors commanded courts to engage in fact-intensive analysis to determine if an official is entitled to immunity and held that an official can lose his immunity "through the use of manifestly excessive means, even if he does so in the conduct of duties otherwise within his official purview." *Graham*, 798 F.3d at 1141 (internal quotations and citations omitted). The Supreme Court held the exact opposite. A president cannot lose his immunity (in a civil context) so long as he is acting within the scope of his official functions, and any intrusive analysis of the President to attempt to strip him of that immunity is forbidden.

Instead, the *Fitzgerald* Court stressed the need for "judicial deference and restraint" when the President's constitutional responsibilities are at stake. *Fitzgerald*, 457 U.S. at 753. The Court held very clearly that although there are areas where courts are warranted in exercising jurisdiction over the President "[i]n the case of [a]merely private suit for damages based on a President's official acts, we hold it is not." *Id.* at 754.

It should be clear that the district court's close examination of the President's words while speaking on matters of public concern is wholly

17

outside the bounds of the Court's *Fitzgerald* decision. It all but guts the robust immunity to which all presidents are entitled.

II.    **The opposing parties were wrong when they argued President Trump's status as a candidate canceled his immunity and that the subject of his public remarks can be questioned if they are upsetting enough to a section of the electorate.**

The Plaintiffs-Appellees argued bellow that President Trump is not shielded by immunity because he was acting as a candidate. The district court correctly rejected that argument, noting that political and campaign style events must be within the outer limits of a president's official functions. It said: "the line between President and candidate will not always be clear. A first-term President is, in a sense, always a candidate for office." JA 235. Furthermore, "[i]t is not the least bit unusual for first-term Presidents to comment on public policy or foreign affairs at campaign events, or, in this day, to announce policy changes by tweet during an election year." *Id.* at 235–36. The district court determined that there is "no principled constitutional basis on which to discern how to categorize such acts." *Id.* at 236.

Although the opposing parties spent a lot of time explaining why President Trump's tweets and speech on an obvious matter of public

concern should not receive presidential immunity, their arguments run headfirst into a fatal flaw: they are struggling against an obvious use of the president's bully pulpit—well within the outer perimeter of a president's official duties. The strength of their feelings on the subjects he was discussing do not overcome *Fitzgerald*'s determination that civil suits against the President for actions within the expansive scope of his official functions are immune.

Despite the arguments below by the opposing parties, maximizing the "bully pulpit" is one of the primary functions of the American President today. There is no doubt that "[s]ince the presidencies of Theodore Roosevelt and Woodrow Wilson, popular or mass rhetoric has become a principal tool of presidential governance. Presidents regularly 'go over the heads' of Congress to the people at large in support of legislation and other initiatives." JEFFREY K. TULIS, THE RHETORICAL PRESIDENCY, 4 (2017). Scholars of the presidency have noted that in our modern era "it is taken for granted that presidents have a duty constantly to defend themselves publicly, to promote policy initiatives nationwide, and to inspirit the population. And for many, this presidential 'function'

is not one duty among many, but rather the heart of the presidency—its essential task." *Id.*

Even before Teddy Roosevelt coined the term "bully pulpit," bold U.S. presidents would pursue their policy goals by appealing directly to the people and taking decisive action. President Andrew Jackson waged all out political war on the Second Bank of the United States and succeeded in dismantling it. Jackson urged the people directly to consider that the Bank's power through its wealth gave "cause to tremble for the purity of our elections." John Yoo, CRISIS AND COMMAND, 165 (2009). When Jackson vetoed the renewal of the Bank's charter, his opponents claimed he was "a demagogue calling for anarchy," and "grabbing for 'despotic power.'" *Id.* at 168. But Jackson "believed that the President should use his powers affirmatively to prevent the other branches from violating his view of the Constitution, even if their policy did not infringe on executive branch prerogatives. *Id.*

President Biden has recently waded into one of the most hotly contested political issues in our country—abortion and the Supreme Court decision in *Dobbs*. In his remarks after the leak of the draft opinion, President Biden said it looked like a "radical decision" and hoped

20

it would not garner the necessary votes, which would require justices to change their positions.[2] In the weeks that followed, anti-abortion protestors put some of the justices under de facto siege, pressuring them to do just that. Several had to flee their homes for safe houses. President Biden did not direct anyone in his administration to condemn the protests outside the private homes of these federal judges, even though such protests are prohibited by law. 18 U.S.C. § 1507. One zealot even travelled to the home of Justice Kavanaugh and his family, intending to assassinate the justice.

President Biden was not deterred by this lawlessness. Instead, once the opinion was released, President Biden continued his divisive rhetoric about the opinion: "This decision is the culmination of a deliberate effort over decades to upset the balance of our law. It's a realization of an extreme ideology and a tragic error by the Supreme Court."[3] Opining

---

[2] Oliver Willis, *Biden says draft Supreme Court abortion ruling is a 'radical decision,'* THE AMERICAN INDEPENDENT (May 3, 2022), https://americanindependent.com/abortion-president-joe-biden-supreme-court-draft-decision-dobbs-roe-v-wade-lgbtq-human-rights/.

[3] Briefing Room, *Remarks by President Biden on the Supreme Court Decision to Overturn Roe v. Wade*, THE WHITE HOUSE (Jun. 24, 2022),                https://www.whitehouse.gov/briefing-room/speeches-

about Supreme Court decisions is not a constitutional function of the presidency. Yet, curtailing the President's ability to freely discuss court decisions by stripping him of his immunity in such instances would be terribly damaging to the Executive Branch. Undercutting the President's ability to freely discuss congressional action is equally harmful.

The plaintiffs (and the district court) also cast absolute immunity as a shocking departure from constitutional norms and the American principle that no man is above the law. But absolute immunity is not an anomaly in our legal system. The Court has long recognized absolute immunity for both judges and prosecutors. In *Stump v. Sparkman*, the Court held that a woman who was sterilized as a minor could not sue the judge who approved the application from the woman's guardian. 435 U.S. 349 (1978). Drawing from precedent from the late 19th century, the Court said that "it was 'a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, [should] be free to act upon his own convictions, without apprehension of personal consequences to himself.'" *Id.* at 355

---

remarks/2022/06/24/remarks-by-president-biden-on-the-supreme-court-decision-to-overturn-roe-v-wade/.

(quoting *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335 (1871)). Therefore, "the scope of the judge's jurisdiction must be construed broadly where the issue is the immunity of the judge." *Id.* at 356. A "judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the 'clear absence of all jurisdiction.'" *Id.* at 356–57.

Under the same theory, the Court extended absolute immunity to prosecutors. In *Imbler v. Pachtman*, a prosecutor knowingly used perjured evidence to secure a conviction. 424 U.S. 409 (1976). Years later the convicted man discovered the abuse, and he sued the prosecutor. The Court granted the prosecutor absolute immunity for the same reason it extended it to judges: "The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages," *id.* at 424–25, especially since "[s]uch suits could be expected with some frequency." *Id.* at 425.

Preserving the confidence of both judges and prosecutors to execute their offices without fear justifies absolute immunity for both. Given his

unique and influential position, if a president is intimidated in his official duties, it represents a monumental assault on the will of the American people and can even work to nullify representative government. A president, more than even judges and prosecutors, "must 'deal fearlessly and impartially with the duties of his office'—not be made 'unduly cautious in the discharge of [those] duties' by the prospect of civil liability for official acts." *Trump v. Vance*, 140 S. Ct. 2412, 2426 (2020) (citing *Fitzgerald*, 457 U.S. at 751–52).

Under the Westfall Act, Congress and the courts have recognized similar protections for members of Congress and Executive Branch officials. The Westfall Act "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Wuterich v. Murtha*, 562 F.3d 375, 377 (D.C. Cir. 2009) (internal citations omitted). Courts have agreed that the scope of that immunity encompasses statements to the press, because a "primary obligation of a [public official] in a representative democracy is to serve and respond to his or her constituents." *Id.* at 385. In *Council on Am. Islamic Relations v. Ballenger*, the court held that a congressman's comments to a reporter about his personal life were within the scope of

his duties because his "ability to do his job as a legislator effectively is tied . . . to the Member's relationship with the public and in particular his constituents and colleagues in the Congress." 444 F.3d 659, 665 (D.C. Cir. 2006). In *Wilson v. Libby*, this Circuit extended the reasoning in *Ballenger* to Executive Branch officials when it held that then-Vice President Cheney and several other Executive Branch officials were acting within the scope of their employment under the Westfall Act when they revealed Valerie Plame Wilson's identity as a CIA operative to the press: "The conduct, then, was in the defendants' scope of employment regardless of whether it was unlawful or contrary to the national security of the United States." 535 F.3d 697, 712 (D.C. Cir. 2008). The President of the United States, more so than even members of Congress or subordinate Executive Branch officials, has a duty to communicate with the American people. And the Westfall Act is narrower than the outer perimeter test of presidential immunity and is necessarily subsumed therein.

### III. There is a limiting principle that guards against abuse: Impeachment.

As the *Fitzgerald* Court admitted, the immunity of the President is sweeping. The dissent in that case, as well as the court below in this case, might chafe that the President seems unassailable in the civil context, but "[t]here remains the constitutional remedy of impeachment."[4] *Fitzgerald*, 457 U.S. at 757. As James Wilson famously noted: "far from being above the laws, [the President] is amenable to them in his private character as a citizen, and in his public character by *impeachment*." 2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution*, 480 (J. Elliot ed. 1891) (emphasis in original).

Of course, a Democratic-controlled House of Representatives already brought impeachment charges against President Trump for allegedly inciting an insurrection on January 6, 2021. Their effort failed, and President Trump was acquitted. These further lawsuits are an

---

[4] The Fitzgerald Court also noted that there are number of other formal and informal checks on a President, including the scrutiny of the press, oversight by Congress, credible threats of impeachment, and his own concern for his legacy. *Id.* at 757.

attempt to thwart that acquittal, and it is just this type of harassment that presidential immunity is meant to foreclose.

### IV.   The district court's construction of the Take Care Clause was unduly narrow and unsupported by the text of the Constitution or historical practice.

Although President Trump argues he does not need to point to a specific clause in the Constitution, the Take Care Clause is one provision on which he could rely. The district court's very narrow interpretation of the Take Care Clause has no basis in law or history.

First, the court misread Supreme Court precedent when it read *Youngstown* to hold that the President's authority to take care must either be based in an explicit constitutional provision beyond the general Take Care Clause, or must be explicitly granted by Congress in a statute. JA 229–231; JA 230 ("President Trump cites no constitutional provision or federal statute that grants or vests in the President (or the Executive Branch) any power or duty with respect to the Certification of the Electoral College vote."). This is a serious misreading of *Youngstown*, the Constitution, and historical practice.

In *Youngstown*, the Supreme Court rejected President Truman's argument that he could seize the steel mills under a "presidential

power…implied from the aggregate of his powers under the Constitution." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). No one disputes that "[i]n the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Id.* But that also reveals nothing about the President's duty to Take Care in this case. President Truman issued an order that infringed on the property rights of private Americans, which is why the Court, noted that "[t]he President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President." *Id.* at 588. This has no bearing on the case at bar, where President Trump was addressing the faithful execution of the constitutional and statutory order. Truman was attempting to execute his own order; Trump was attempting to faithfully execute the Constitution and a congressional statute. While the Court could agree or disagree with his interpretation of those provisions, there is no basis to deny his resilient immunity because of such a disagreement.

Second, the district court relied on various law review articles to hold that the passive construction of the Take Care Clause demonstrates

28

that "the Framers envisioned not that the President personally would implement the laws but that their actual execution would be carried out by others subject to the President's direction and supervision." JA 231. The court drew from this that "[t]he President's Take Care Clause duty . . . does *not* extend to government officials over whom he has no power or control." *Id.* This, too, is an erroneous reading of the Constitution and, indeed, even of the law review articles on which the court relied.

Of course, the Framers anticipated that the President would require agents to help execute his duty—the faithful execution of the laws is an enormous task. But the passive construction of the Take Care Clause was only a reminder that the provision was a duty, not an additional *power*. Ted Cruz, *The Obama Administration's Unprecedented Lawlessness*, 38 Harv. J.L. & Pub. Pol'y 63, 66 – 67 (2015) ("[T]he Take Care Clause imposes a duty on the President, rather than conferring any additional power."). There is no limiting language in the Take Care Clause that narrows the duty to only those laws the President can influence via his executive branch agents nor is a lawsuit the President's only recourse in defending the Constitution. In fact, pointing to lawsuits as the "ultimate remedy," as the district court highlights, necessarily

29

implies there are other, although perhaps inferior, means of enforcement. JA 232.

Historical practice bears out an expansive and largely discretionary understanding of the scope of the Take Care Clause—a political realm the court should avoid. George Washington raised a militia and put down the Whiskey Rebellion; Thomas Jefferson considered the Sedition Act unconstitutional, terminated further prosecutions under it, and pardoned those convicted; Abraham Lincoln is perhaps the ultimate example of a broad reading. "Lincoln simply took it for granted that his duty to defend the Constitution and to faithfully execute the laws implicitly authorized him to take whatever steps were necessary to preserve the Republic, even if those steps were not specifically authorized by any particular constitutional provision." Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive During the Second Half-Century*, 26 HARV. J.L. & PUB. POL'Y 667, 725 (2003).

The plain text of the Constitution, the Supreme Court's statements, and the authors of the articles cited by the district court all speak to the President's duty to take care that all the laws are faithfully executed. The manner in which he does so is not clear, and the law review authority

relied on by the court does not argue otherwise.  Metzger's article even admits that "[e]xactly what such a duty to supervise was understood to mean is less clear." Gillian E. Metzger, *The Constitutional Duty to Supervise*, 124 YALE L.J. 1836, 1878 (2015). Kent's article directly refutes the district court's conclusion: "But this does not exclude direct law execution by the President, especially since 'the executive power' was vested in this office by the first sentence of Article II." In fact, Kent's article admits of a possibility of a very expansive take care duty: "The conceptions of the office of President all seem to contemplate that the laws to be executed would include, at a minimum—and perhaps at a maximum—acts of the national legislature." Andrew Kent et. al., *Faithful Execution and Article II*, 132 HARV. L. REV. 2111, 2126 (2019). Therefore, according to the court's own authority, President Trump had at a minimum or maximum, the duty to "take care" with respect to all national legislation, which would include the Electoral Count Act, and could act in furtherance of that execution himself.

## CONCLUSION & RELIEF SOUGHT

President Trump is shielded by absolute presidential immunity because his statements were on matters of public concern and therefore well within the scope of the robust absolute immunity afforded all presidents. No amount of hyperbole about the violence of January 6, 2021, provides a basis for this Court to carve out an exception to the constitutional separation of powers. Indeed, the very fact that the event is so emotionally charged and controversial makes it more important than ever to reject this attempt to undermine absolute immunity. The decision of the district court should be reversed, and this matter should be remanded with instructions that President Trump be dismissed as a defendant.

Dated: July 27, 2022                    Respectfully submitted,

                                        */s/* Jesse R. Binnall
                                        Jesse R. Binnall
                                        Molly McCann
                                        BINNALL LAW GROUP, PLLC
                                        717 King Street, Suite 200
                                        Alexandria, Virginia 22314
                                        Phone: (703) 888-1943
                                        Fax: (703) 888-1930
                                        jesse@binnall.com
                                        molly@binnall.com
                                        *Attorneys for Donald J. Trump*

32

## STATEMENT ON ORAL ARGUMENT

President Trump respectfully requests oral argument be scheduled in this case due to the complex issues involved and the impact on the future of the executive branch. Absolute immunity has only been directly considered by the courts a handful of times, therefore the Court is likely to benefit from oral argument on this important constitutional question.

## CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this Petition complies with the type-volume limitation of Federal Rule of Appellate Procedure 5(c)(1) because, excluding the parts of the Petition exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), it contains 6,195 words.

Undersigned counsel certifies that this Petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century font.

Dated: July 27, 2022                    Respectfully submitted,

                                        */s/* Jesse R. Binnall
                                        Jesse R. Binnall
                                        *Attorney for Donald J. Trump*

## CERTIFICATE OF SERVICE

I certify that on July 27, 2022, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

                                        */s/* Jesse R. Binnall
                                        Jesse R. Binnall
                                        *Attorney for Donald J. Trump*