**[ORAL ARGUMENT NOT YET SCHEDULED]**
**No. 22-5069**
**(Consolidated with 22-7030, 22-7031)**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

James Blassingame and Sidney Hemby,

*Appellees*,

v.

Donald J. Trump,

*Appellant*.

---

*On Appeal from the*
*United States District Court for the District of Columbia*

---

**BRIEF OF LAW PROFESSORS**
**AS *AMICI CURIAE* IN SUPPORT OF APPELLEES**

---

Elizabeth B. Wydra
Brianne J. Gorod
Charlotte Schwartz
CONSTITUTIONAL
    ACCOUNTABILITY CENTER
1200 18th St. NW, Suite 501
Washington, DC 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae*

## STATEMENT REGARDING CONSENT TO FILE
## AND SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for *amici curiae* represents that counsel for all parties have been sent notice of the filing of this brief. All parties consent to *amici curiae*'s participation.[1]

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *amici curiae* certifies that a separate brief is necessary. *Amici* are law professors whose teaching and research focus on constitutional law, executive immunity, and separation of powers principles. Given their expertise, *amici* have a substantial interest in ensuring that this Court understands that, under binding Supreme Court precedent, a president is not entitled to absolute immunity for actions taken outside the outer perimeter of his official responsibility and that proper application of that precedent compels the conclusion that former President Donald Trump is not entitled to absolute immunity for the unofficial conduct challenged here. *Amici* also have a strong interest in ensuring that this Court recognizes that the separation of powers principles and public policy considerations that the Court relied on to justify that precedent further compel the denial of Trump's bid for absolute immunity.

---

[1] Pursuant to Fed. R. App. P. 29(a), *amici curiae* states that no counsel for a party authored this brief in whole or in part, and no person other than *amici curiae* or its counsel made a monetary contribution to its preparation or submission.

i

A full listing of *amici* appears in the Appendix.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

I.      PARTIES AND *AMICI*

Except for *amici curiae* law professors and any other *amici* who had not yet entered an appearance in this case as of the filing of the Brief for Appellees, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Brief for Appellees.

II.     RULING UNDER REVIEW

Reference to the ruling under review appears in the Brief for Appellees.

III.    RELATED CASES

Reference to any related cases pending before this Court appears in the Brief for Appellees.


Dated: September 30, 2022          By: /s/ Brianne J. Gorod
                                   Brianne J. Gorod
                                   *Counsel for Amici Curiae*

# TABLE OF CONTENTS

                                                                          **Page**

TABLE OF AUTHORITIES ..................................................................... vi

INTEREST OF *AMICI CURIAE* .......................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................ 1

ARGUMENT ........................................................................................ 5

I.    Absolute Presidential Immunity Does Not Shield a Former President
      Sued in His Personal Capacity from Damages Liability for
      Unofficial Conduct ................................................................... 5

      A. Under Supreme Court Precedent, Absolute Presidential
         Immunity Does Not Extend Beyond the Outer Perimeter of a
         President's Official Responsibility................................................ 5

      B. Trump's Conduct in Allegedly Inciting a Riot at the Capitol to
         Violently Disrupt a Constitutionally Mandated Session of
         Congress Went Well Beyond the Outer Perimeter of His Official
         Responsibility and Does Not Warrant Absolute Immunity ........... 10

II.   The Separation of Powers Concerns and Public Policy
      Considerations the Supreme Court Has Invoked to Justify its
      Immunity Precedent Further Compel the Denial of Trump's Claim
      for Absolute Immunity .......................................................... 15

CONCLUSION .................................................................................... 20

APPENDIX ........................................................................................ 1A

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Barr v. Matteo*,
　　360 U.S. 564 (1959) ........................................................... 6

*Butz v. Economou*,
　　438 U.S. 478 (1978) .......................................................... 5

*Chastain v. Sundquist*,
　　833 F.2d 311 (D.C. Cir. 1987) ........................................... 6

*Clinton v. Jones*,
　　520 U.S. 681 (1997) ......................... 3, 5, 6, 8, 9, 10, 12, 15

*Ferri v. Ackerman*,
　　444 U.S. 193 (1979) ....................................................... 4, 7

*Harlow v. Fitzgerald*,
　　457 U.S. 800 (1982) ........................................................ 17

*Nixon v. Sirica*,
　　487 F.2d 700 (D.C. Cir. 1973) ......................................... 15

*Pierson v. Ray*,
　　386 U.S. 547 (1967) .......................................................... 7

*Spalding v. Vilas*,
　　161 U.S. 483 (1896) .......................................................... 6

*Trump v. Vance*,
　　140 S. Ct. 2412 (2020) ...................................... 3, 7, 14, 16

*United States v. Lee*,
　　106 U.S. 196 (1882) .......................................................... 5

*United States v. Nixon*,
　　418 U.S. 683 (1974) .......................................................... 7

*Youngstown Sheet & Tube Co. v. Sawyer*,
　　343 U.S. 579 (1952) .................................................... 12, 18

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Constitutional Provisions, Statutes and Legislative Materials

3 U.S.C. §§ 1-21 ..................................................................... 13

U.S. Const. amend. XII ......................................................... 13

U.S. Const. amend. XX .......................................................... 13

U.S. Const. amend. XXII ....................................................... 13

U.S. Const. art. II, § 1 ............................................................. 7

U.S. Const. art. II, § 3 ........................................................... 13

Books, Articles and Other Authorities

2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (Jonathan Elliot ed., 1863)............................................................................ 6

Daphna Renan, *The President's Two Bodies*, 120 Colum. L. Rev. 1119 (2020)................................................................ 14

Evan Caminker, *Democracy, Distrust, and Presidential Immunities*, 36 Const. Comment. 255 (2021) ................... 19

## INTEREST OF *AMICI CURIAE*

*Amici* are law professors whose teaching and research focus on constitutional law, executive immunity, and separation of powers principles. Given their expertise, *amici* have a substantial interest in ensuring that this Court understands that, under binding Supreme Court precedent, a president is not entitled to absolute immunity for actions taken outside the outer perimeter of his official responsibility and that proper application of that precedent compels the conclusion that former President Donald Trump is not entitled to absolute immunity for the unofficial conduct challenged here.

A full listing of *amici* appears in the Appendix.

## INTRODUCTION AND SUMMARY OF ARGUMENT

On January 6, 2021, then-President Donald Trump allegedly "conspired with his followers to stage an attack on the Capitol to prevent Congress and Vice President Mike Pence, by force, intimidation, or threat, from discharging their duties of certifying the winners of the 2020 presidential election." J.A. 64. Based on these events, two Capitol Police officers and twelve members of Congress filed suit against Trump. The two U.S. Capitol Police officers, James Blassingame and Sidney Hemby, allege that they were on duty at the Capitol when "[t]he insurrectionist mob, which Trump had inflamed, encouraged, incited, directed, and aided and abetted, forced its way over and past [them] and their fellow officers, pursuing and attacking

1

them inside and outside the United States Capitol." *Id.* at 21. They allege that Trump's "unlawful conduct," *id.* at 22, caused them to suffer both physical and emotional injuries, *see id.* at 51-53. The members of Congress allege that they were put "in mortal danger" as the "insurgent mob" "desecrated" the Capitol. *Id.* at 72; *see id.* at 140-41.

Trump filed a motion to dismiss, arguing, among other things, that absolute presidential immunity bars all claims against him relating to the January 6 attack. *See id.* at 224. The district court rejected those arguments, concluding that Trump's actions leading up to the January 6 attack were completely divorced from Trump's presidential responsibilities, and instead constituted part of his "efforts to remain in office for a second term" despite the fact that he lost the election. *Id.* at 241. As the district court put it, "Article II of the Constitution . . . is agnostic as to whether a sitting President is elected to a new term," and therefore Trump's attempts to remain in office at all costs are not protected by absolute immunity. *Id.* at 238. This Court should affirm that ruling. Trump's arguments to the contrary are inconsistent with established Supreme Court precedent, as well as the separation of powers concerns and public policy considerations underlying that precedent.

Although the Supreme Court has held that a president enjoys absolute immunity "from damages liability for acts within the 'outer perimeter' of his official responsibility," *Nixon v. Fitzgerald*, 457 U.S. 731, 756 (1982), the Court has made

2

clear that absolute immunity does not extend to "unofficial conduct" that falls beyond that outer perimeter, *Clinton v. Jones*, 520 U.S. 681, 693 (1997); *see also id.* at 694 (explaining that the Court's reasoning in *Fitzgerald* "provides no support for an immunity for *unofficial* conduct").  In allegedly inciting a riot at the U.S. Capitol to forcibly interfere with Congress's certification of the 2020 presidential election results, *see* J.A. 21, 64, 67—conduct for which Plaintiffs have sued Trump in his personal capacity, *id.* at 34—Trump acted well beyond the scope of his official responsibility as president.  Indeed, Trump took the alleged actions not as president, but as a failed candidate who was trying to prevent the democratic process mandated by the Constitution from playing out.  *Id.* at 24, 34.  Article II, Section 1 of the Constitution and the Twelfth Amendment require Congress—and Congress alone—to count and certify the Electoral College's votes for president and vice president. Trump allegedly incited his supporters to violently interfere with this constitutionally mandated process, one in which the president has no role.  J.A. 60.

Significantly, the Supreme Court has held that presidents are entitled to immunity for their official conduct because, in the Court's view, absolute presidential immunity is needed to preserve the separation of powers and serve the public interest.  The Court has explained that because a president's "duties . . . are of unrivaled gravity and breadth," *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020), separation of powers principles dictate that courts must refrain from reviewing a

president's official actions in private suits for damages, as the threat of such litigation could inhibit the performance of his official functions, *see Fitzgerald*, 457 U.S. at 749-54.  Relatedly, the Court has recognized that in cases challenging the exercise of a president's most sensitive official functions, "there exists the greatest public interest in providing [the president] 'the maximum ability to deal fearlessly and impartially with' the duties of his office."  *Id.* at 752 (quoting *Ferri v. Ackerman*, 444 U.S. 193, 203 (1979)).  Trump, however, seeks to invoke the immunity doctrine as an absolute shield from damages liability for unofficial conduct that allegedly sought to serve his own private interests as a candidate for office by forcibly interfering with the constitutionally mandated functions of Congress.  This Court should not allow Trump to do so.  Instead, the application of binding Supreme Court precedent, as well as separation of powers principles and public policy considerations, compel the denial of Trump's bid for absolute immunity for his personal efforts to incite a crowd to forcibly disrupt congressional proceedings and infiltrate the "People's House."

**ARGUMENT**

I.  **Absolute Presidential Immunity Does Not Shield a Former President Sued in His Personal Capacity from Damages Liability for Unofficial Conduct.**

A.  **Under Supreme Court Precedent, Absolute Presidential Immunity Does Not Extend Beyond the Outer Perimeter of a President's Official Responsibility.**

As the Supreme Court has repeatedly declared, "No man in this country is so high that he is above the law. . . . [The law] is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy." *United States v. Lee*, 106 U.S. 196, 220 (1882); *accord Butz v. Economou*, 438 U.S. 478, 506 (1978).

Consistent with this principle, although the Supreme Court has held that a president is absolutely immune from private suits for damages challenging his "*official acts*," *Fitzgerald*, 457 U.S. at 754 (emphasis added)—or "acts within the 'outer perimeter' of his official responsibility," *id.* at 756—it has "never suggested that the President, or any other official, has an immunity that extends beyond the scope of any action taken in an official capacity," *Jones*, 520 U.S. at 694.  In fact, the Court has flatly rejected the notion that absolute presidential immunity applies to conduct beyond the outer perimeter of the president's official responsibility, emphasizing that a president remains "subject to the laws for his purely private acts." *Id.* at 696; *see also id.* ("'[F]ar from being above the laws, he is amenable to them in

5

his private character as a citizen . . . .'" (quoting 2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 480 (Jonathan Elliot ed., 1863) (Statement of James Wilson)); *cf. Chastain v. Sundquist*, 833 F.2d 311, 315 (D.C. Cir. 1987) (recognizing that absolute executive immunity from suits for damages is "subject only to the requirement that [executive officials'] actions fall within the outer perimeter of their official duties"). In applying the Supreme Court's binding precedent, this Court must reject the former president's "effort to construct an immunity from suit for *unofficial* acts grounded purely in the identity of his [former] office." *Jones*, 520 U.S. at 695 (emphasis added).

The Supreme Court has long applied this "outer perimeter" test to determine the scope of official immunity in other contexts, *see, e.g.*, *Barr v. Matteo*, 360 U.S. 564, 575 (1959) (noting that the fact "that the action here taken was within the outer perimeter of petitioner's line of duty is enough to render the privilege applicable"); *Spalding v. Vilas*, 161 U.S. 483, 498 (1896) (acknowledging that immunity covers the scope of one's "official acts"). It adopted that test in the context of adjudicating a claim of absolute presidential immunity in *Nixon v. Fitzgerald*, a private suit for civil damages against former President Richard Nixon for "actions allegedly taken in the former president's official capacity during his tenure in office," 457 U.S. at 733. The plaintiff in that case, a former management analyst with the U.S. Air Force,

challenged Nixon's involvement in his dismissal from that post, which he alleged violated two federal statutes and the First Amendment. *Id.* at 733-34, 740.

In holding that a president "is entitled to absolute immunity from damages liability *predicated on his official acts*," *id.* at 749 (emphasis added), the Supreme Court reasoned "that the Presidential privilege is 'rooted in the separation of powers under the Constitution,'" *id.* at 753 (quoting *United States v. Nixon*, 418 U.S. 683, 708 (1974)). The Court explained that "[b]ecause of the singular importance of the President's duties," *id.* at 751, and because "a President must concern himself with matters likely to 'arouse the most intense feelings,'" *id.* at 752 (quoting *Pierson v. Ray*, 386 U.S. 547, 554 (1967)), the president must be able to "make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system," *id.* at 752, without fear of private litigation for damages. The threat of such litigation, the Court observed, would "distract a President from his public duties." *Id.* at 753; *see also id.* at 752 (recognizing that immunity "provid[es] an official 'the maximum ability to deal fearlessly and impartially with' the duties of his office" (quoting *Ferri*, 444 U.S. at 203)); *Vance*, 140 S. Ct. at 2425 ("[The president's] duties . . . are of unrivaled gravity and breadth. Quite appropriately, those duties come with protections that safeguard the President's ability to perform his vital functions."). Thus, the Supreme Court has determined that when a president makes those decisions constitutionally entrusted to him as president, separation of powers

principles dictate that courts should refrain from entertaining private suits for damages challenging that official conduct, as such suits could infringe on the president's ability to do his job. *See Fitzgerald*, 457 U.S. at 762 (Burger, C.J., concurring) ("Exposing a President to civil damages actions *for official acts within the scope of the Executive authority* would inevitably subject Presidential actions to undue judicial scrutiny . . . ." (emphasis added)).

In applying its "outer perimeter" test to the facts in *Fitzgerald*, the Court determined that "[i]t clearly is within the President's constitutional and statutory authority to prescribe the manner in which the [Air Force] Secretary will conduct the business of the Air Force." *Id.* at 757 (citing the relevant statute). Thus, the Court concluded that former President Nixon's role in "prescribing reorganizations and reductions in force" was statutorily "mandate[d]" by his office and "lay well within the outer perimeter of his authority." *Id.* His conduct was therefore protected by absolute presidential immunity. *See id.*

In *Clinton v. Jones*, the Court confirmed that absolute presidential immunity does not extend beyond the outer perimeter of a president's official responsibility. 520 U.S. at 694. *Jones* was a private suit for damages against then-President Bill Clinton in which the plaintiff alleged that Clinton had sexually harassed her before he became president. *Id.* at 684-86. The Court examined the rationale underlying its decision in *Fitzgerald*—that "immunity serves the public interest in enabling such

8

officials to perform *their designated functions* effectively without fear that a particular decision may give rise to personal liability," *id.* at 693 (emphasis added), and without "rendering the President 'unduly cautious in the discharge of *his official duties*,'" *id.* at 694 (emphasis added) (quoting *Fitzgerald*, 457 U.S. at 752 n.32)— and concluded that "[t]his reasoning provides no support for an immunity for *unofficial* conduct," *id.* Thus, the Court determined that "[t]he principal rationale for affording certain public servants immunity from suits for money damages arising out of their official acts is inapplicable to unofficial conduct." *Id.* at 692-93. Applying that rationale in *Jones*, the Court observed that Clinton remained "subject to the laws for his purely private acts." *Id.* at 696; *see id.* at 705 ("[I]t must follow that the federal courts have power to determine the legality of his unofficial conduct.").

Trump argues that *Jones* is "only applicable to a scenario where a president is sued for actions taken before he was in office." Appellant Br. 12. But the Court's reasoning in *Clinton v Jones* supports a functional—not merely chronological—analysis of whether particular presidential acts fall within the outer perimeter of the office. In rejecting Clinton's argument that "the Constitution affords the President temporary immunity from civil damages litigation arising out of events that occurred before he took office," the Court emphasized that immunities depend on the need to protect the functions of an office. *Jones*, 520 U.S. at 692. As it explained, "[t]he

9

principal rationale for affording certain public servants immunity from suits for money damages arising out of their official acts is inapplicable to unofficial conduct. . . . [W]e have repeatedly explained that the immunity serves the public interest in enabling such officials to perform their *designated functions* effectively," without fear that doing so will create personal liability. *Id.* at 692-93 (emphasis added). It thus rejected Clinton's "effort to construct [a temporary] immunity from suit for *unofficial* acts grounded purely in the identity of his office," *id.* at 695. (emphasis added), and allowed the case against Clinton to proceed, even though he was president at the time of the lawsuit. *See id.* at 705-06, 708.

> **B.    Trump's Conduct in Allegedly Inciting a Riot at the Capitol to Violently Disrupt a Constitutionally Mandated Session of Congress Went Well Beyond the Outer Perimeter of His Official Responsibility and Does Not Warrant Absolute Immunity.**

Although the president enjoys a wide breadth of authority and many actions by a sitting President (whatever the motivation for them) will be within the outer perimeter of the office, that does not mean that every action a president takes while he is in office lies within the outer perimeter of his official responsibility. That is because, as the Court emphasized in *Jones*, "immunities are grounded in 'the nature of the function performed, not the identity of the actor who performed it,'" 520 U.S. at 695 (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)). Here, the actions that Trump allegedly took on and before January 6 as a disgruntled candidate for office— including inciting a riot at the U.S. Capitol to violently interfere with Congress's

10

approval of the presidential election results—fell far outside the outer perimeter of his official responsibility as president, and he therefore cannot invoke absolute presidential immunity to escape the consequences of those actions.

As the Capitol Police officers assert in detail in the Amended Complaint, Trump took the alleged actions as part of an ongoing course of action "to prevent Congress . . . , by force, intimidation, or threat, from discharging [its] dut[y] of certifying the winners of the 2020 presidential election" and "to prevent, by force, intimidation, or threat, Joseph Biden and Kamala Harris from accepting and/or holding their respective offices as President and Vice President," J.A. 64. According to the Amended Complaint, Trump frequently characterized the election as having been "rigged," *id.* at 22, and "stolen," *id.* at 24, and he repeatedly signaled his support for those who threatened to use violence to achieve his goals, *see id.* at 22; *see, e.g.*, *id.* at 23 (directing a white supremacist group called the Proud Boys to "stand back and stand by"). In promoting the January 6, 2021 rally, which he dubbed "the 'Stop the Steal' Rally," Trump told his supporters to "be there," as it would "be wild!" *Id.* at 64.

When he spoke to the crowd that ultimately gathered on January 6, he explained that Congress was in the process of certifying the election results, telling the crowd that they would "never take back [their] country with weakness. You have to show strength, and you have to be strong." *Id.* at 38. He declared, "[I]f you

11

don't fight like hell, you're not going to have a country anymore," *id.*, prompting the crowd to chant, "Fight like Hell," "Fight for Trump," and "Storm the Capitol," *id*. These statements and others allegedly incited thousands of "insurrectionists" to "br[eak] through police barricades and storm[] up the steps of the Capitol . . . , attacking and injuring police officers . . . . [and] finally enter[ing] the Capitol itself, intent on committing further acts of violence against elected officials." *Id.* at 39.

Although Trump, unlike Clinton, allegedly performed the challenged conduct while he held the office of president, his alleged actions were nevertheless "unrelated to any of his official duties as President of the United States," *Jones*, 520 U.S. at 686, and therefore fell well "outside the outer perimeter" of his presidential responsibility, *Fitzgerald*, 457 U.S. at 756.  The president's power to act "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  The Constitution, as originally written, gave Congress the responsibility to count Electoral College votes, *see* U.S. Const. art. II, § 1 (unamended Constitution), and although the Constitution has repeatedly been amended to address the election, succession, or removal of the president from office, it still specifies no role for the president in the process of counting and certifying those votes, *see, e.g.*, U.S. Const. amends. XII, XX, XXII. Likewise, although Congress has legislated in great detail on this topic, it has also never authorized the president to participate in the counting of electoral votes.  *See*

12

3 U.S.C. §§ 1-21; *see, e.g.*, *id.* § 15 (stating that "Congress shall be in session on the sixth day of January succeeding every meeting of the electors" and that "[t]he Senate and House of Representatives shall meet in the Hall of the House of Representatives . . . on that day" to count and certify the electors' votes).

Moreover, there is plainly no constitutional or legislative authority for an incumbent president to encourage the violent disruption of a congressional proceeding—especially one constitutionally mandated for the democratic transfer of power.  In fact, the only circumstance in which the Constitution explicitly authorizes the president to adjourn Congress and thereby prevent it from meeting is when the House and Senate disagree as to the time for adjournment.  U.S. Const. art. II, § 3.

And even if a president can attempt to influence the process of counting and certifying electoral votes, that does not mean that he can try to disrupt that process for his personal benefit "by force, intimidation, or threat," J.A. 64.  If Vice President Al Gore had conspired to "stage an attack on the Capitol to prevent Congress . . . by force, intimidation, or threat, from discharging [its] duties of certifying the winners of the 20[00] presidential election," J.A. 64, those actions would still have fallen outside his official responsibilities as Vice President, notwithstanding his constitutional role in the certification process.

Here, Trump plainly took the alleged actions as a candidate running for president who, having lost the election, was trying to prevent the democratic process

13

mandated by the Constitution from playing out. *Id.* at 34. There may be, as the district court recognized, situations in which "the line between President and candidate will not . . . be clear." *Id.* at 235; *cf. Vance*, 140 S. Ct. at 2429 (rejecting the claim that subpoenas for a sitting president's "private papers" should be subject to the "heightened standard" applicable to "official documents," while recognizing that some "documents . . . while ostensibly private, [may] partake of the character of an official paper" (quotation marks omitted)). But this is plainly not an ambiguous situation. Trump is not eligible for absolute immunity for his actions as a failed candidate who, for his personal benefit, allegedly encouraged the use of force to prevent Congress from discharging its constitutional duty to certify the election results. *See* Daphna Renan, *The President's Two Bodies*, 120 Colum. L. Rev. 1119, 1212 (2020) (arguing that the need for "constitutional space" for presidential leadership must "not collapse into the use of power for purely personal gain").

This case is therefore very different from *Fitzgerald*, where the Court held that the president enjoyed absolute immunity from liability for civil damages for official acts. In *Fitzgerald*, the Court determined that the challenged decision-making was "clearly . . . within the President's constitutional and statutory authority" and was indeed "mandate[d]" by his office, *id.* at 757. Far from being "mandate[d]" by his office, however, Trump's alleged actions were wholly unauthorized by any legal authority. They were, instead, entirely unofficial,

14

reflecting only his personal interests and ambitions as a candidate. The former president therefore cannot invoke absolute presidential immunity for his acts, *see Jones*, 520 U.S. at 696, which fell well outside the outer perimeter of his official responsibility.

Thus, consistent with the proper application of binding Supreme Court precedent, this Court must deny Trump's attempt to invoke absolute presidential immunity. Moreover, as the next Section explains, the reasoning underlying that precedent—particularly the conclusion that presidential immunity is grounded in separation of powers concerns and the public policy interest in the effective functioning of the federal government—further demonstrates why Trump does not enjoy absolute immunity in this case. *See Fitzgerald*, 457 U.S. at 755 ("In defining the scope of an official's absolute privilege, this Court has recognized that the sphere of protected action must be related closely to the immunity's justifying purposes."); *accord Jones*, 520 U.S. at 694.

II.     **The Separation of Powers Concerns and Public Policy Considerations the Supreme Court Has Invoked to Justify its Immunity Precedent Further Compel the Denial of Trump's Claim for Absolute Immunity.**

Although "[t]he Constitution makes no mention of special presidential immunities," *Nixon v Sirica*, 487 F.2d 700, 711 (D.C. Cir. 1973) (en banc), the Supreme Court has held that a president enjoys absolute immunity when performing his official functions because such immunity protects the separation of powers and

the public interest.  The Court has explained that "[b]ecause the Presidency did not

exist through most of the development of common law, any historical analysis must

draw its evidence primarily from our constitutional heritage and structure,"

including the nature of the federal "government under a constitutionally mandated

separation of powers" and "concerns of public policy."  *Fitzgerald*, 457 U.S. at 747-

48.  In developing the presidential immunity doctrine, the Court "drew a careful

analogy to the common law absolute immunity of judges and prosecutors,

concluding that a President, like those officials, must 'deal fearlessly and impartially

with the duties of his office'—not be made 'unduly cautious in the discharge of

[those] duties' by the prospect of civil liability for official acts."  *Vance*, 140 S. Ct.

at 2426 (alteration in original) (quoting *Fitzgerald*, 457 U.S. at 751-52 & n.32).

Thus, as Trump acknowledges, the Court has indicated that presidential

immunity stems from separation of powers principles and public policy concerns.

*See* Appellant Br. 2; *id.* at 9 (noting that immunity protects "the effective functioning

of government" (quotation marks omitted)).  Indeed, Chief Justice Burger wrote a

separate concurrence in *Fitzgerald* "to underscore that the Presidential immunity

derives from and is mandated by the constitutional doctrine of separation of powers."

457 U.S. at 758 (Burger, C.J., concurring); *see id.* at 760 ("Absolute immunity for a

President for acts within the official duties of the Chief Executive is either to be

16

found in the constitutional separation of powers or it does not exist. The Court today holds that the Constitution mandates such immunity and I agree.").

As noted above, the separation of powers rationale behind absolute presidential immunity lies in ensuring that a president, as the nation's "Chief Executive," *id.* at 760, can make the decisions specifically entrusted to him, without needing to worry about private suits for damages challenging his official conduct. The public interest rationale for presidential immunity is similarly grounded in an understanding that immunity is "not for the protection or benefit of a malicious or corrupt [official], but for the benefit of the public, whose interest it is that the [officials] should be at liberty to exercise their functions with independence and without fear of consequences." *Id.* at 745-46. Thus, the Court has acknowledged that "an executive official's claim to absolute immunity must be justified by reference to the public interest in the special functions of his office, not the mere fact of high station." *Harlow v. Fitzgerald*, 457 U.S. 800, 812 (1982).

Neither of the two rationales underlying the doctrine of absolute presidential immunity supports Trump's argument for the application of that doctrine in this case. In fact, they counsel strongly against it. As Chief Justice Burger explained, "[t]he essential purpose of the separation of powers" is to enable the functioning "of each coequal branch of government within its assigned sphere of responsibility." *Fitzgerald*, 457 U.S. at 760-61 (Burger, C.J., concurring). But Trump's alleged

17

actions challenged in this case—inciting a riot at the U.S. Capitol to forcibly disrupt a constitutionally mandated session of Congress—were designed specifically to prevent a co-equal branch of government from discharging its constitutional duties. *See* J.A. 62, 64, 67. Given this flagrant attempt to *disrupt* the separation of powers, it would be particularly inappropriate to allow Trump to hide behind the shield of an immunity intended to *preserve* the separation of powers. Indeed, separation of powers principles require rejection of the absolute immunity defense here. As Justice Robert Jackson put it in his concurrence in *Youngstown*, "men have discovered no technique for long preserving free government except that *the Executive be under the law*" while Congress makes the laws, and that although "[s]uch institutions may be destined to pass away . . . it is the duty of the Court to be last, not first, to give them up." *Youngstown*, 343 U.S. at 655 (1952) (Jackson, J., concurring) (emphasis added).

In short, the presidential immunity doctrine is designed to prevent the judicial branch from undermining the president's capacity to discharge fully and fearlessly his constitutionally assigned roles. But Trump fails to point to any official responsibility that his alleged efforts to incite violence against a co-equal branch of government could have been advancing. It would be entirely improper to apply that doctrine to allow a current or former president to encourage the use of violence in order to incapacitate *Congress* in the discharge of *its* constitutional obligations.

18

Such an application would be a perversion of the separation of powers and a threat to the rule of law.

Relatedly, the public interest in maintaining a well-balanced and functioning government also compels the denial of absolute presidential immunity here.  As explained above, Plaintiffs are not challenging Trump's official conduct, so the public policy considerations that might justify insulating the president from damages liability for his official functions, including ensuring that the president can fulfill his official responsibilities without fear of personal liability, are inapposite in this case. And Trump's alleged conduct—his effort to prevent, "by force, intimidation, or threat," J.A. 64, the certification of the presidential election results in the manner mandated by the Constitution and to prevent the orderly transition of power—is plainly at odds with the public interest in a functioning government that operates in a manner consistent with the Constitution and federal law.  *See* Evan Caminker, *Democracy, Distrust, and Presidential Immunities*, 36 Const. Comment. 255, 289-90 (2021) ("If immunity is designed to let the president serve her national constituency rather than be deflected by narrower interests, . . . [t]he representation-reinforcing justification for an immunity shield . . . dissipates for presidential misconduct motivated by self-dealing that injures the public interest.").  For this reason too, absolute immunity is particularly inappropriate in the context of this case.

19

Thus, not only is Trump's attempt to invoke absolute presidential immunity inconsistent with Supreme Court precedent, but the separation of powers principles and public policy considerations underlying that precedent further demonstrate why this Court should deny his immunity claim.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

/s/ Brianne J. Gorod
Elizabeth B. Wydra
Brianne J. Gorod
Charlotte Schwartz
CONSTITUTIONAL
  ACCOUNTABILITY CENTER
1200 18th St. NW, Suite 501
Washington, DC 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae*

# APPENDIX
## List of *Amici*[†]

**Evan H. Caminker,** Dean Emeritus and Branch Rickey Collegiate Professor of Law, University of Michigan Law School

**Vicki C. Jackson,** Laurence H. Tribe Professor of Constitutional Law, Harvard Law School

**Andrew Kent,** Professor of Law and John D. Feerick Research Chair, Fordham University School of Law

**Sheldon Nahmod,** University Distinguished Professor of Law Emeritus, IIT Chicago-Kent College of Law

**Daphna Renan,** Peter B. Munroe and Mary J. Munroe Professor of Law, Harvard Law School

**Peter M. Shane,** Jacob E. Davis and Jacob E. Davis II Chair in Law Emeritus, The Ohio State University Moritz College of Law

† Institution names are provided for purposes of identification only.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 4,703 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that the attached brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 30th day of September, 2022.

/s/ Brianne J. Gorod
Brianne J. Gorod

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of September, 2022, I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: September 30, 2022

/s/ Brianne J. Gorod
Brianne J. Gorod