**ORAL ARGUMENT NOT YET SCHEDULED**

IN THE

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**22-5069, 22-7030, 22-7031**

———◆◆———

JAMES BLASSINGAME; SIDNEY HEMBY,

*Plaintiffs-Appellees,*

—v.—

DONALD J. TRUMP,

*Defendant-Appellant,*

——————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

**BRIEF OF FORMER WHITE HOUSE AND
DEPARTMENT OF JUSTICE OFFICIALS AS *AMICI CURIAE*
IN SUPPORT OF PLAINTIFFS-APPELLEES**

---

JOSHUA MATZ
    *Counsel of Record*
RAYMOND P. TOLENTINO
CARMEN IGUINA GONZÁLEZ
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(202) 742-2661
jmatz@kaplanhecker.com

ALYSHA M. NAIK
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883

*Attorneys for Amici Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

### A. Parties and *Amici Curiae*

All parties and *amici* appearing before the district court and in this Court are listed in the Brief for Plaintiffs-Appellees.

### B. Rulings under Review

References to the rulings under review appear in the Brief for Plaintiffs-Appellees.

### C. Related Cases

References to the consolidated cases and other related cases appear in the Brief for Plaintiffs-Appellees.

Dated: September 30, 2022

*/s/ Joshua Matz*

Joshua Matz
*Counsel for Amici Curiae*

## D.C. CIRCUIT RULE 29(d) STATEMENT

The *amici* who join this brief are filing a separate brief because, as former White House and Department of Justice officials, they have a unique perspective on the legal issues presented on appeal. Specifically, *amici* draw on their professional experience defending and advising the Executive Branch to argue that denying absolute immunity to former President Trump in this case is consistent with governing precedent and does not infringe upon important prerogatives or duties of the President of the United States.

Dated: September 30, 2022

*/s/ Joshua Matz*

Joshua Matz
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................v

IDENTITY AND INTEREST OF *AMICI CURIAE* ....................................................1

INTRODUCTION & SUMMARY OF ARGUMENT.............................................4

ARGUMENT .........................................................................................................6

   I.  ABSOLUTE PRESIDENTIAL IMMUNITY SERVES IMPORTANT
      PURPOSES AND IS SUBJECT TO EQUALLY IMPORTANT
      LIMITS ..........................................................................................................6

      A. The Important Purposes of Absolute Presidential Immunity....................7

      B. The Limits of Absolute Presidential Immunity........................................8

   II.  FORMER PRESIDENT TRUMP'S ALLEGED CONDUCT IS NOT
      COVERED BY ABSOLUTE PRESIDENTIAL IMMUNITY ...................12

      A. Absolute Presidential Immunity Does Not Apply Just Because Former
         President Trump's Conduct Included Public Statements........................14

         1.  Context matters in assessing whether a public statement by the
            President has been made in performance of an Article II function.... 15

         2.  The conduct alleged in this case involved more than just public
            statements by the President and should be viewed as a whole .......... 18

      B. Absolute Presidential Immunity Does Not Apply Based on the Take Care
         Clause of the Constitution ......................................................................21

   III.  HOLDING THAT ABSOLUTE PRESIDENTIAL IMMUNITY
       DOES NOT APPLY HERE WOULD NOT OPEN ANY
       FLOODGATES............................................................................................25

CONCLUSION ....................................................................................................27

iv

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aptheker v. Sec'y of State*,
   378 U.S. 500 (1964)....................................................................................25

*Banneker Ventures LLC v. Graham*,
   798 F.3d 1119 (D.C. Cir. 2015)..............................................................11

*Burns v. Reed*,
   500 U.S. 478 (1991)....................................................................................20

*Christ v. Trump*,
   No. 22 Civ. 2402, 2022 WL 1443078 (N.D. Cal. May 6, 2022).........................8

*Clinton v. Jones*,
   520 U.S. 681 (1997).................................................... 9, 10, 11, 15, 16

*Hildreth v. Obama*,
   950 F. Supp. 2d 63 (D.D.C. 2013)........................................................8

*Kendall v. U.S. ex rel. Stokes*,
   37 U.S. 524 (1838).......................................................................................22

*Klayman v. Obama*,
   125 F. Supp. 3d 67 (D.D.C. 2015)........................................................8

*Maryland v. King*,
   569 U.S. 435.................................................................................................25

*Medellín v. Texas*,
   552 U.S. 491 (2008).................................................................................22

*Myers v. United States*,
   272 U.S. 52 (1926)....................................................................................22

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982)................................................... 6, 7, 8, 9, 11, 16

*Richman v. Bush*,
  No. 16 Civ. 2089, 2016 WL 3136871 (W.D. Tenn. June 3, 2016) ......................8

*Sullivan v. Trump*,
  No. 19 Civ. 11824, 2020 WL 353553 (S.D.N.Y. Jan. 17, 2020) .........................8

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2017) ........................................................................................15

*Trump v. Vance*,
  140 S. Ct. 2412 (2020) ..........................................................................................7

*United States v. Burr*,
  25 F. Cas. 30 (C.C.D. Va. 1807) .........................................................................10

*Weimer v. Cnty. of Fayette*,
  972 F.3d 177 (3d Cir. 2020) ................................................................................20

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) .............................................................................................22

**Statutes**

3 U.S.C. §§ 1-15 ......................................................................................................24

52 U.S.C. § 20511(2)(B) .........................................................................................23

U.S. Const. art. II § 1, cl. 3 .....................................................................................24

**Rules**

D.C. Circuit Rule 28(a)(1) ........................................................................................ ii

D.C. Circuit Rule 29(d) ........................................................................................... iii

Fed. R. App. P. 29(a)(5) ............................................................................................3

**Other Authorities**

2 *The Debates in the Several State Conventions on the Adoption of the Federal
  Constitution* (Jonathan Elliot ed., Washington, 2d ed. 1836) ..............................9

3 Joseph Story, *Commentaries on the Constitution of the United States* (Boston,
  Hilliard, Gray & Co. 1st ed. 1833) ........................................................................7

vi

Farrand, *The Records of the Federal Convention of 1787* (1911).............................24

Laurence H. Tribe*, American Constitutional Law* (3d ed. 2000) ............................10

U.S. Dep't of Just., *Federal Prosecution of Election Offenses* (Richard C. Pilger, ed., 8th ed. 2017)..................................................................................................23

## IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amici curiae* are former White House and Department of Justice officials from both Democratic and Republican administrations:

**Donald B. Ayer**, who served as Deputy Attorney General at the U.S. Department of Justice from 1989-1990, Principal Deputy Solicitor General of the United States from 1986-1989, and the U.S. Attorney for the Eastern District of California from 1981-1986.

**John B. Bellinger III**, who served as Senior Associate Counsel to the President and Legal Adviser to the National Security Council in the White House from 2001-2005, Legal Adviser for the Department of State from 2005-2009, and Counsel for National Security Matters in the Criminal Division of the Department of Justice from 1997-2001.

**Matthew Collette**, who served as Deputy Director of the Appellate Staff of the Civil Division at the U.S. Department of Justice from 2012-2018, Senior Counsel to the Associate Attorney General from 2011-2012, and an Attorney in the Appellate Staff at the Civil Division of the U.S. Department of Justice from 1988-2011.

**Charles Fried**, who served as Solicitor General of the United States from 1985-1989, Special Assistant to the Attorney General from 1984-1985, and as an Advisor to the President in 1982.

**Stuart M. Gerson**, who served as Acting Attorney General of the United States in 1993, Assistant Attorney General for the Civil Division of the U.S. Department of Justice from 1989-1993, and Assistant U.S. Attorney for the District of Columbia from 1972-1975.

**Mary B. McCord**, who served as Acting Assistant Attorney General for National Security at the U.S. Department of Justice from 2016-2017, Principal Deputy Assistant Attorney General for National Security from 2014-2017, and Assistant U.S. Attorney for the District of Columbia from 1994-2001 and 2002-2014.

**David O'Neil**, who served in the Department of Justice as Acting Assistant Attorney General and Deputy Assistant Attorney General for the Criminal Division in 2014, Chief of Staff to the Deputy Attorney General from 2011-2014, Associate Deputy Attorney General from 2010-2011, Assistant to the Solicitor General from 2009-2010, and Assistant U.S. Attorney for the Southern District of New York from 2006-2009.

**Alan Charles Raul**, who served as Vice Chairman of the White House (and later independent) Privacy and Civil Liberties Oversight Board from 2006-2008, Associate Counsel to the President from 1986-1988, and General Counsel of the Office of Management and Budget from 1988-1989 and the U.S. Department of Agriculture from 1989-1993.

2

**Matthew D. Roberts**, who served as Assistant to the Solicitor General from 1997-2004 and 2006-2011, and as Senior Counsel in the Office of Legal Counsel from 2011-2017.

**Robert B. Shanks**, who served as Deputy Assistant Attorney General, Office of Legal Counsel, in the U.S. Department of Justice from 1981-1984.

**Kate Shaw**, who served as Special Assistant to the President and Associate Counsel to the President in the Office of White House Counsel from 2009-2011.

**Olivia Troye**, who served as Special Advisor to the Vice President for Homeland Security and Counterterrorism from 2018-2020, and Chief of Strategy, Plans and Policy at the Office of Intelligence and Analysis at the U.S. Department of Homeland Security from 2016-2018.

Collectively, *amici curiae* have decades of experience advising and litigating on behalf of former Presidents of the United States and other Executive Branch officials on the legality of executive action, including on issues related to the scope of absolute immunity and the Take Care Clause. Given *amici*'s prior experience, they have an ongoing interest in the correct resolution of the important questions raised in this appeal and submit this brief to offer their informed perspective on the scope of presidential immunity under the unique circumstances of this case.[1]

_____

[1] Under Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that no party's counsel authored this brief in whole or in part, no party or a party's counsel

3

## INTRODUCTION & SUMMARY OF ARGUMENT

The doctrine of absolute presidential immunity serves important purposes in our legal system. It ensures that the President can perform his official functions free of diversion or distraction from the risk of damages lawsuits. But these important purposes are matched by important limits. Most fundamentally, the President does not enjoy absolute immunity for unofficial conduct—or for acts not undertaken in performance of official functions. This limit raises questions about the boundaries between official and private conduct, and about the scope of official functions, that in some cases are easily resolved by precedent and that in some cases (like this one) require a careful study of the context and nature of the challenged conduct.

Here, Appellees allege that former President Trump engaged in a course of conduct whose nature, consequences, and coherence preclude absolute immunity. As the district court concluded, former President Trump did not perform Article II functions in undertaking the series of acts alleged, which include threatening state officials, interfering with state election processes based on frivolous legal theories, participating in planning a campaign rally, inciting the armed crowd at the rally to riot, directing that riot at the Capitol, interfering with the Joint Session of Congress

---

contributed money that was intended to fund the preparation or submission of this brief, and no person, other than *amici*'s counsel, contributed money that was intended to fund the preparation or submission of this brief. All parties consent to the filing of this brief.

4

held to certify presidential election results, further inciting rioters inside the Capitol to target the Vice President, and disrupting the peaceful transfer of power.

Former President Trump principally claims that he is entitled to absolute immunity because he performed an official function by speaking to the public on matters of public concern—and that his conduct is therefore immunized without any further analysis. This argument is mistaken. First, it presumes that whenever the President speaks to the public on matters of public concern, he is automatically performing an Article II function. Second, it treats the factual allegations here as little more than atomized claims targeting specific public statements. Both premises crumble when tested against precedent, common sense, and Appellees' allegations.

Alternatively, former President Trump claims that his conduct is immunized because he acted in performance of his Take Care Clause function. This argument fares no better: it misinterprets and misapplies the Take Care Clause, misdescribes Appellees' factual allegations, and misses the crucial point that the Constitution and the Electoral Count Act deliberately *preclude* the incumbent President from playing any role in administering, tabulating, and certifying presidential elections. Even more fundamentally, former President Trump did not act in furtherance of his duty to faithfully execute the laws when he incited violence against the government.

For these reasons and others described herein, the decision below should be affirmed. Former President Trump claims that doing so will open the floodgates to

5

litigation and chill future officeholders from performing their official functions. That claim is baseless. The facts alleged here represent that rare but clear circumstance in which a President broke the law while acting well beyond any official capacity or Article II function. Sustaining the decision below would send a proper message that even our highest public official is accountable to the law—and would not deter any remotely legitimate exercise of Article II power by future Presidents.

## ARGUMENT

### I.    ABSOLUTE PRESIDENTIAL IMMUNITY SERVES IMPORTANT PURPOSES AND IS SUBJECT TO EQUALLY IMPORTANT LIMITS

Our legal system rests on the principle that no person is above the law. But in some circumstances, the law itself recognizes good reason to confer immunity from civil liability. Drawing on that precept, the Supreme Court has held that the President enjoys absolute immunity from "damages liability for acts within the 'outer perimeter' of his official responsibility." *Nixon v. Fitzgerald*, 457 U.S. 731, 756 (1982). This rule ensures that the President is neither diverted nor distracted while performing Article II functions. As applied to official presidential acts, the doctrine of absolute immunity vindicates important constitutional principles, including the separation of powers. If applied beyond the realm of official conduct, however, this doctrine poses a risk of lawlessness and abuse, since it would free the President from liability for even egregious personal wrongs. The Supreme Court has therefore made clear that absolute immunity is subject to important constitutional limits.

6

### A.    The Important Purposes of Absolute Presidential Immunity

As the "chief constitutional officer of the Executive Branch," the President "occupies a unique position in the constitutional scheme." *Nixon*, 457 U.S. at 749-50. "His duties, which range from faithfully executing the laws to commanding the Armed Forces, are of unrivaled gravity and breadth." *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020); *see also Nixon*, 457 U.S. at 750. Simply put, the President wields enormous power under Article II, and "[n]o one doubts that Article II guarantees the independence of the Executive Branch." *Vance*, 140 S. Ct. at 2425.

"Because of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government." *Nixon*, 457 U.S. at 751; *accord* 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1563, at 418-19 (Boston, Hilliard, Gray & Co. 1st ed. 1833). Private lawsuits targeting a President's official conduct would also risk distracting the President from carrying out his official responsibilities, "to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Nixon*, 457 U.S. at 753. To avoid these risks—and to ensure that the President may "'deal fearlessly and impartially with the duties of his office'"—the Supreme Court has derived from constitutional structure the rule that Presidents enjoy absolute immunity for official acts. *Nixon*, 457 U.S. at 752 (citation omitted); *accord Vance*, 140 S. Ct. at 2425

7

(explaining that the "dominant concern" is this field is "distortion of the Executive's decisionmaking process with respect to official acts that would stem from worry as to the possibility of damages" (citations omitted)).

These principles have significant real-world implications. If Presidents were to conduct their official duties in omnipresent fear of private civil damages lawsuits—which could be filed either during or after their tenure—they might well account for that risk in their official decisions. That would burden the Presidency and distort the separation of powers by giving judicial process undue primacy in the conduct of Article II functions. The doctrine of absolute immunity guards against such risk. And over the years, it has been properly and straightforwardly applied in a wide range of settings to preclude civil damages suits aimed at official presidential acts. *See, e.g.*, *Christ v. Trump*, No. 22 Civ. 2402, 2022 WL 1443078, at *1 (N.D. Cal. May 6, 2022); *Sullivan v. Trump*, No. 19 Civ. 11824, 2020 WL 353553, at *2 (S.D.N.Y. Jan. 17, 2020); *Klayman v. Obama*, 125 F. Supp. 3d 67, 87 (D.D.C. 2015); *Hildreth v. Obama*, 950 F. Supp. 2d 63, 66 n.3 (D.D.C. 2013); *Richman v. Bush*, No. 16 Civ. 2089, 2016 WL 3136871, at *2 (W.D. Tenn. June 3, 2016).

## B. The Limits of Absolute Presidential Immunity

The purposes of absolute presidential immunity also define its limits. *See Nixon*, 457 U.S. at 755 ("[T]he sphere of protected action must be related closely to the immunity's justifying purposes."). Because those purposes concern only the

8

President's official acts, there is "no support for an immunity for *unofficial* conduct." *Clinton v. Jones*, 520 U.S. 681, 694 (1997). In other words, the President does not receive immunity for acts beyond the "'outer perimeter' of his official responsibility." *Nixon*, 457 U.S. at 756. "With respect to acts taken in his 'public character'—that is, official acts—the President may be disciplined principally by impeachment . . . [b]ut he is otherwise subject to the laws for his purely private acts." *Clinton*, 520 U.S. at 696.

This limit is itself based on constitutional structure. Although the President "is placed [on] high . . . far from being above the laws, he is amenable to them in his private character as a citizen." James Wilson, Debates in the Convention of the State of Pennsylvania (Dec. 4, 1787), *in* 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 480 (Jonathan Elliot ed., Washington, 2d ed. 1836). That principle rests at the bedrock of the constitutional system and marked our rejection of royal rule: an officer charged with faithfully executing the laws has no warrant to violate them in his private affairs. Applying immunity in such circumstances would aggrandize the person of the President above all others, thus undermining core separation of powers precepts and offending the rule of law.

In practice, this limitation on absolute presidential immunity raises questions about the scope of official conduct. The Presidency is a time-consuming, relentlessly difficult job. But as Chief Justice Marshall anticipated long ago, the demands of a

President's "duties as chief magistrate" are not so "unremitting" as to consume "his whole time." *United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (No. 14692D); *see also* Laurence H. Tribe, *American Constitutional Law* 631 (3d ed. 2000) (emphasizing that the President "is a person as well as an institution"). The Supreme Court has thus recognized that the President may indeed engage in "purely private acts" while holding office. *Clinton* 520 U.S. at 696; *see also, e.g.*, *id.* 705 n. 40 (observing that Presidents "face a variety of demands on their time, . . . some private, some political, and some as a result of official duty"). Former President Trump himself frequently relied on that understanding, insisting in numerous federal lawsuits that his conduct was exempt from constitutional limitation by virtue of its private nature. *See, e.g.*, Petition for Writ of Certiorari at 15, *Trump v. Knight First Amendment Institute*, No. 20-197 (U.S. Aug. 20, 2020) ("[B]locking third-party accounts from interacting with the @realDonaldTrump account is a purely personal action."); Mem. in Support of Defendant's Motion to Dismiss at 31, *District of Columbia v. Trump*, No. 17 Civ. 1596, ECF 21-1 (D. Md. Sept. 29, 2017) (arguing in Emoluments Clause litigation that former President Trump was free to profit from private commercial transactions with foreign powers while in office, so long as he did not receive "compensation for services rendered . . . in an official capacity or in an employment (or equivalent) relationship with a foreign government").

10

Because Presidents engage in a shifting mix of personal and official acts, only some of which can truly be said to reflect presidential functions, the Supreme Court has provided additional guidance in analyzing claims of absolute immunity. *First*, plaintiffs cannot defeat immunity merely by alleging that the President's conduct was unlawful or motivated by an improper purpose. *See Nixon*, 457 U.S. at 756. *Second*, the President cannot invoke immunity merely by claiming that his conduct was "clearly taken *within* an official capacity," since the "scope of immunity" even for official acts depends on "'performance of particular functions of his office.'" *Clinton*, 520 U.S. at 694. *Third*, a conception of absolute immunity that would encompass virtually all presidential conduct is inconsistent with the teaching that "immunities are grounded in 'the nature of the function performed, not the identity of the actor who performed it.'" *Id.* at 695 (citation omitted). *Finally*, as this Court has previously recognized, the official seeking immunity (here, the President) bears the burden of proof in establishing his entitlement to it for any particular act. *See, e.g.*, *Banneker Ventures LLC v. Graham*, 798 F.3d 1119, 1140 (D.C. Cir. 2015).

Taken together, these teachings structure the analysis of any claim of absolute presidential immunity. Under this framework, the President enjoys robust protection for conduct undertaken as part of an Article II function, but lacks immunity for any personal or unofficial conduct outside the scope of his presidential responsibilities.

11

## II.    FORMER PRESIDENT TRUMP'S ALLEGED CONDUCT IS NOT COVERED BY ABSOLUTE PRESIDENTIAL IMMUNITY

Here, Appellees allege that former President Trump participated in an illegal conspiracy to prevent Members of Congress from discharging their lawful duties in connection with the certification of the Electoral College vote on January 6, 2021.[2] This conspiracy sought to achieve its aims through force, intimidation, and threats, and its function (if successful) was to thwart President-elect Joseph R. Biden and Vice President-elect Kamala Harris from accepting or holding their federal offices. Appellees allege that former President Trump participated in this conspiracy through a sustained, overlapping course of conduct. That course of conduct included a series of false public statements asserting that the 2020 election was "rigged" and had been "stolen" from him; a series of direct attempts to induce and threaten state officials to reject adverse election results; personal involvement in preparations for the January 6, 2021 rally at the Ellipse; inciting the armed crowd at the January 6 rally to march to the Capitol and riot while Congress met to certify the results of the 2020 election; and issuing statements during the assault in which he criticized the Vice President and urged his supporters to "Remember this day forever!"

---

[2] Because this appeal arises from the denial of a motion to dismiss, we (like the district court) treat as true the facts alleged by Appellees in their complaints. *See* Dist. Ct. Op. at 6.

Former President Trump asserts that this conduct is categorically shielded from liability by absolute presidential immunity. As the district court concluded, he is mistaken. Looking to the nature, consequences, and coherence of the acts alleged, this course of conduct did not reflect the performance of any Article II function. No Article II function supports pressuring local officials to overturn certified election results based on legal theories precluded by precedent. No Article II function supports threatening a state election official unless he can "find" the exact number of votes needed to alter an election outcome. No Article II function supports planning a rally organized through a political campaign in which campaign funds were used to secure the permit, a campaign staffer was the "VIP lead," campaign fundraisers were in charge of logistics and budgeting, and campaign entities devoted over $3.5 million to organizing the event. No Article II function supports inciting an armed crowd to riot and directing them to the Capitol, where Congress sat in Joint Session to conduct business that the crowd had been urged to thwart. And no Article II function supports further inciting that same crowd to target the Vice President—who risked mortal peril—while the assault on the Capitol was actively underway.

Most fundamentally, no Article II function could conceivably support that full alleged course of conduct. Viewed as a whole, that course of conduct did not further any constitutional function. Instead, it reflected a decidedly personal undertaking. By design, the Constitution *precludes* the President from any role in administering,

tabulating, and certifying presidential elections. There is no basis for contending that conduct whose nature and function was to interfere with (and overturn) the lawful certification process was itself an official act. Nor can it be maintained that inciting violence against a coordinate branch of government is a presidential function.

Former President Trump resists this conclusion on two grounds. His lead argument is that he enjoys absolute immunity because his course of conduct included statements to the public on matters of public concern. Alternatively, he claims that his conduct was undertaken in furtherance of his obligations under the Take Care Clause. As the district court concluded, neither argument withstands scrutiny.

### A.    Absolute Presidential Immunity Does Not Apply Just Because Former President Trump's Conduct Included Public Statements

Former President Trump's principal argument for immunity rests on two key premises: *first*, that the President's official functions include making statements to the public about matters of public concern; and *second*, that the claims against him solely concern statements he made to the public on matters of public concern. *See* Opening Br. at 10-26. Relying on these premises, he contends that his whole course of conduct involved the performance of official functions and is therefore cloaked by immunity. Both premises, however, are flawed. We address each in turn.

14

*1.    Context matters in assessing whether a public statement by the President has been made in performance of an Article II function*

The first premise is that whenever the President makes a statement to the public on a matter of public concern, he is automatically engaged in the performance of an Article II function. On this view, context is irrelevant: anytime and anywhere the President addresses any group about any matter of potential public interest, he enjoys absolute immunity for his conduct. The district court correctly described that claim as "too simplistic." Dist. Ct. Op. at 28. Although the President has an "extraordinary power to speak to his fellow citizens[]," *Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2017), that does not mean every statement he makes to "his fellow citizens" is an exercise of Article II power. This follows from three considerations.

*First*, the Supreme Court has made clear that absolute immunity depends on "'the nature of the function performed, not the identity of the actor who performed it.'" *Clinton*, 520 U.S. at 682 (citation omitted). For that distinction to bear weight, the nature of the relevant functions must be understood in a manner that does not collapse into the identity of the actor who performs them. Yet that is exactly what former President Trump urges here. Every statement by a President may (by mere virtue of who uttered it) be seen as a matter of "public concern." As a result, former President Trump's position risks undermining the function/identity distinction required by *Clinton*: it would treat nearly every statement by a President as

15

automatically covered by absolute immunity, and would thus assign immunity to the Presidency itself rather than to particular presidential functions or actions.

*Second*, this position lacks the sensitivity to context required by precedent. As *Clinton* made clear, it is not enough for an act to occur generally within an official capacity. Instead, even "when defining the scope of an immunity for acts clearly taken *within* an official capacity, we have applied a functional approach." 520 U.S. at 694. This analysis rejects the categorical outlook modeled by former President Trump and focuses instead on examining whether a *particular act* fell within a recognized presidential function. Thus, while *Nixon* allowed that it may sometimes be "difficult to determine which of the President's innumerable 'functions' encompassed a particular action," it carefully examined the facts before it and held that President Nixon's conduct implicated Article II authority over the organization of the armed services. 457 U.S. at 756. Even more notable is *Clinton*'s handling of the defamation claim that Paula Jones had alleged against President Clinton and his associates (including his press secretary). *See* 520 U.S. at 685. Rather than hold that President Clinton automatically enjoyed immunity as to this claim—as would seem to follow from former President Trump's analysis—the Supreme Court proceeded much more cautiously, noting only that the defamation charge "arguably may involve conduct within the outer perimeter of the President's official responsibilities." *Id.* at 686. This modest observation reflects the Supreme Court's

16

context-sensitive approach to questions of absolute immunity—and it confirms that not every public statement reflects the performance of an official function.

*Third*, and finally, former President Trump's position cannot be squared with common sense. The district court offered numerous hypotheticals to illustrate that "the context in which [] words are spoken and what is said matter." Dist. Ct. Op. at 34. Additional examples are easily conjured; we will offer three. Imagine if a business-minded President appeared at one of his own privately-owned hotels and made false, unlawful statements about a competitor while urging listeners to stay at his hotel. Or consider a President who appeared at a campaign event and declared that he would publicly celebrate anybody who burned down his political opponent's private residence. Or take a President who blackmails his child's public school teacher to turn an "F" into an "A." In these scenarios, a refusal to consider context would defy common sense—and would lack any basis in the constitutional principles that animate the rule of absolute immunity, which exists to ensure that the President is not improperly diverted in the exercise of his Article II functions.

Now imagine a President who makes a series of public statements soliciting and threatening state officials to alter an election outcome in his favor, incites an armed mob to assault the United States Capitol and interrupt the peaceful transfer of power, and then further provokes that mob by issuing additional public statements while it targets his Vice President. In light of the legal principles and considerations

17

set forth above, it cannot be said that this President's public statements were automatically—and without accounting for context—exercises of any Article II functions. Such a claim offends precedent, departs from the foundations of absolute immunity, and blinks reality. For these reasons alone, it should be rejected. And in addition to those reasons, we would offer another: such conduct involves a grievous assault on a coordinate branch of government and the operation of our constitutional system. Absolute immunity exists to ensure the President can perform his own constitutional functions; it is no function of the Presidency to incite violence against the government or impede Congress from exercising its own Twelfth Amendment function. The doctrine of absolute presidential immunity should not be revised in the manner proposed by former President Trump, particularly in these circumstances.

2. *The conduct alleged in this case involved more than just public statements by the President and should be viewed as a whole*

The major premise of former President Trump's argument is that whenever the President makes public statements on matters of public concern, he is necessarily performing an Article II function. As we have shown, that premise is overstated in ways that render it inapplicable here. But even if that premise were sound, there is a second flaw in former President Trump's argument: its presumption that the claims against him solely concern statements he made to the public on matters of public concern. That presumption does not accurately describe the allegations at hand.

18

Former President Trump repeatedly describes the allegations here as though they concern one or two discrete public statements on matters of public concern. *See* Opening Br. at 10-26. There are two difficulties with this approach. The first is that it fails to account for allegations concerning non-public conversations in which he urged or threatened officials to alter election outcomes on his behalf—including a call with Georgia's Secretary of State in which he pressured the Secretary to "find 11,780 votes," which was the exact number necessary to flip the swing state's presidential election result. *See, e.g.*, Swalwell Compl. ¶¶ 37-54. Similarly, it fails to account for detailed allegations concerning his filing of multiple lawsuits aiming to secure incumbency (every one of which was rejected by courts), *see* Thompson Am. Compl. ¶ 36, his use of a personal Twitter account that he elsewhere argued was not used for any official purposes, *see* Swalwell Compl. ¶ 15, and his alleged agreement with other named defendants to prevent Congress on January 6, 2021 from exercising its constitutional function, *see, e.g.*, *id.* ¶¶ 166-84. In these respects, former President Trump ignores or elides substantial allegations, including allegations extending beyond statements to the public on matters of public concern.

The second difficulty with former President Trump's approach is that it seeks to fracture allegations that, by their very nature, concern a larger course of conduct. Appellees have alleged far more than discrete civil claims for incitement based on statements at the Ellipse on January 6, 2021. They have alleged an agreed-upon

19

course of conduct in which acts are related to (and built upon) each other. *See, e.g.*, *id.* ¶ 152 ("His words and actions in lying about massive, coordinated fraud, improperly pressuring state legislators to overturn specific state results, seeking to undo such results through largely frivolous lawsuits, and in inciting a crowd while knowing some of his supporters were willing to react to his claims with political violence, all were meant to serve his own partisan and individual aims."). Particularly at this early stage of the case—and given that former President Trump bears the burden in establishing his entitlement to absolute immunity—Appellees' allegations must be accepted as true and read in a favorable light. *See, e.g.*, *Burns v. Reed*, 500 U.S. 478, 486 (1991); *Weimer v. Cnty. of Fayette*, 972 F.3d 177, 187 (3d Cir. 2020). At bare minimum, that means reckoning with Appellees' claims on their own terms. And the heart of those claims is that the conduct for which they seek to impose liability was not just one or two public statements, but rather a full course of conduct (including unlawful agreements, private conversations, and other actions) whose nature and function was to prevent the Joint Session of Congress on January 6, 2021 from doing its job and certifying the electoral victory of President Biden.

Accounting for all of Appellees' particularized allegations, and recognizing how they fit together, requires rejection of former President Trump's argument that he enjoys absolute immunity here. That argument treats the allegations as merely targeting one or more discrete public statements. In so doing, it doubly errs. There

is no basis in precedent for adopting an approach that excludes material allegations and fractures those that remain. The district court properly evaluated the full course of conduct alleged by Appellees in finding that absolute immunity does not apply.

At bottom, former President Trump's main argument for absolute immunity rests on two deeply flawed premises. The first is flawed because precedent and commonsense do not support a categorical rule that all public statements by the President on matters of public concern are undertaken in performance of Article II functions. The second is flawed because it excludes crucial allegations and fails to afford the remainder a proper interpretation. Together and separately, these flaws require rejection of former President Trump's main argument on appeal.

### B.   Absolute Presidential Immunity Does Not Apply Based on the Take Care Clause of the Constitution

As a fallback, former President Trump also contends that the conduct at issue in this case occurred in furtherance of his presidential duty to "take Care that the Laws be faithfully executed" under Article II, Section 3 of the Constitution. *See* Opening Br. at 27-31. Until the final sentence of this argument, former President Trump does not identify any particular statute or constitutional provision that he sought to faithfully execute. Instead, citing President Washington's response to the Whiskey Rebellion and President Jefferson's non-enforcement of the Sedition Act, he claims that he was "addressing the faithful execution of the constitutional and statutory order." Opening Br. at 28-30. Only at the very end of his argument does

21

former President Trump cite a statute whose faithful execution he purportedly sought to ensure: namely, the Electoral Count Act ("ECA"). However, former President Trump mentions the Act only in passing and does not offer any reasoning or argument to show how he sought to ensure its faithful execution.

The district court rightly determined that this argument lacks merit. We will identify four points that collectively foreclose former President Trump's claim that his conduct was undertaken in performance of official Take Care Clause functions.

*First*, to the extent former President Trump invokes the Clause without citing any particular law whose execution he sought to ensure, he misreads it. The Clause is not an unlimited, roving grant of power to the President. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). In fact, the very opposite is true: "In the framework of our Constitution, the President's power to see that the laws are faithfully executed *refutes* the idea that he is to be a lawmaker." *Id.* (emphasis added). Thus, the Supreme Court has long recognized that the Take Care Clause "allows the President to execute the laws, not make them." *Medellín v. Texas*, 552 U.S. 491, 532 (2008); *accord Myers v. United States*, 272 U.S. 52, 295 (1926) (Holmes, J., dissenting); *Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 612-13 (1838). That precedent would lack force if the President could gesture vaguely at the "constitutional and statutory order"—and cite the Whiskey Rebellion—to claim that

22

any conduct somehow fulfilled a constitutional Take Care function. Therefore, this argument in support of absolute immunity cannot be sustained.

*Second*, former President Trump appears to suggest that at least some of his conduct performed a Take Care function to the extent he sought to persuade non-Executive Branch officials to carry out their own obligations. *See* Opening Br. at 28-29. The district court convincingly explained why this argument (which covers only a narrow slice of the allegations) is meritless as a matter of precedent and first principles—namely, that "[t]he President's Take Care Clause duty . . . does *not* extend to government officials over whom he has no power or control." Dist. Ct. Op. at 30-31. Moreover, it is difficult to see how former President Trump was engaged in the faithful execution of *any* federal law when he personally threatened Georgia's Secretary of State unless the Secretary could "find" the precise number of votes needed to alter the outcome of the presidential election in Trump's favor.[3]

_____

[3] Although various federal laws criminalize the knowing casting and tabulating of fraudulent ballots, *e.g.*, 52 U.S.C. § 20511(2)(B), at no point during his phone calls with Georgia officials did former President Trump claim to be acting in an enforcement role with respect to these or any other specified federal statutory provision. Nor could he have plausibly made that claim: the authority to enforce federal election laws does not include authority to threaten state officials with untoward consequences if they do not "find" additional ballots sufficient to sway the outcome of an election. *Cf.* U.S. Dep't of Just., *Federal Prosecution of Election Offenses* 84 (Richard C. Pilger, ed., 8th ed. 2017) (emphasizing that "[t]he Department does not have a role in determining which candidate won a particular election, or whether another election should be held because of the impact of the alleged fraud on the election").

23

*Third*, there is no merit to former President Trump's conclusory assertion—offered in the final sentence of his argument, without reasoning or elaboration—that he sought to faithfully execute the ECA. For starters, the ECA does not contemplate *any* role for the incumbent President. *See generally* 3 U.S.C. §§ 1-15. Nor does the Constitution, which expressly identifies the States and Congress—*not* the incumbent President—as the actors charged with carrying out presidential elections. *See* U.S. Const. art. II § 1, cl. 3; *id.* amend. XII. Those features of the Constitution and the ECA are not incidental. They reflect an obvious, prudent design choice to exclude the incumbent President (who might well be a candidate, or at least highly interested in the outcome) from any role in administering, tabulating, or certifying presidential election results. Indeed, the Framers of the Constitution repeatedly warned against a President who would corrupt an election to retain power. *See* 2 Farrand, *The Records of the Federal Convention of 1787* 64-69 (1911). Given these structural features of the Constitution and ECA, the President's only faithful role in their execution is to stand aside. And even if one could imagine some Take Care duty for the President in this field, it is inconceivable that such duty could encompass the conduct alleged here, whose nature, consequences, and function were fundamentally at odds with state officials and federal legislators carrying out their lawfully assigned functions.

*Finally*, the central obligation of the Take Care Clause is that the President "faithfully execute" the Nation's laws. The conduct alleged here includes corrupting

24

and attempting to corrupt state election officials, assailing the democratic system with legal theories and claims of fraud that were repeatedly rejected by the courts, inciting a riot at the Capitol, further inciting rioters to target the Vice President in the Capitol, and disrupting the peaceful transfer of power. The notion that *any* of this conduct (let alone all of it) was undertaken in performance of the Take Care Clause "taxes the credulity of the credulous." *Maryland v. King*, 569 U.S. 435, 466 (Scalia, J., dissenting). The Constitution of the United States is "'not a suicide pact.'" *Aptheker v. Sec'y of State*, 378 U.S. 500, 509 (1964). It does not confer absolute immunity on former President Trump for the conduct alleged here.

### III.    HOLDING THAT ABSOLUTE PRESIDENTIAL IMMUNITY DOES NOT APPLY HERE WOULD NOT OPEN ANY FLOODGATES

Former President Trump warns that denying his request for absolute immunity would "open the flood gates," would cause "the exception to swallow the rule," and would lead future courts "to look to the political context of the presidential act rather than being constrained to look no further than the nature of the act itself." Opening Br. at 2. Those warnings are misplaced, particularly given the narrow and well-reasoned opinion below, which hardly invites a cascade of future civil damages suits.

Denying absolute immunity to a President (or former President) is rightly a rare thing. But to describe the conduct alleged here as "unprecedented" would itself be a grave understatement. Holding that these acts were undertaken in performance of Article II functions would work a startling change in the law—and would declare

25

an understanding of the Presidency and its functions at odds with our constitutional system. Moreover, this Court would send a disturbing message if it declared that our Nation's most powerful official is unaccountable before the Judiciary for interfering with elections, menacing election officials, inciting violence against the government, impeding a core Article I function, and disrupting the peaceful transfer of power. Such a holding might itself invite future abuse by an occupant of the Oval Office. The Court should therefore apply the precedents and principles described above to conclude that former President Trump lacks absolute immunity in these cases.

*     *     *     *     *

As former government officials, *amici* are sensitive to and respectful of the unique role and lawful prerogatives of the President. We recognize the genuine importance of ensuring that the President can perform his official functions without diversion or distraction from civil damages lawsuits. But we also recognize that Presidents act in both official and personal capacities, and that Presidents have no claim to immunity when they break the law while performing a personal undertaking. That principle controls here. The decision of the district court should therefore be affirmed.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's order denying former President Trump's request for absolute immunity.

Dated: September 30, 2022

Respectfully Submitted,

*/s/ Joshua Matz*
Joshua Matz
  *Counsel of Record*
Raymond P. Tolentino
Carmen Iguina González
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@kaplanhecker.com

Alysha M. Naik
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,405 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because this brief has been prepared in a proportionally spaced type face using Microsoft Word 2010 in Times New Roman 14-point font.

Dated: September 30, 2022

*/s/ Joshua Matz*

Joshua Matz
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2022, I electronically filed the foregoing *amicus curiae* brief with the Clerk for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system.  A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.


Dated: September 30, 2022


/s/ Joshua Matz

Joshua Matz
*Counsel for Amici Curiae*